**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BANNER HEALTH<br>1441 North 12th Street<br>Phoenix, AZ 85006,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States Department<br>of Health and Human Services,<br>200 Independence Avenue, N.W.<br>Washington, DC 20201,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>) CASE No.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR SUMS DUE AND FOR DECLARATORY**
**AND INJUNCTIVE RELIEF CONCERNING MEDICARE PAYMENTS**
**TO DISPROPORTIONATE SHARE HOSPITALS**

**I.    INTRODUCTION**

1.    This is an action for review of a final decision of defendant, the Secretary of Health and Human Services (the "Secretary"), denying Medicare disproportionate share hospital ("DSH") payments to four non-profit Arizona hospitals with respect to services furnished to low-income Arizona Medicaid program patients some 8-15 years ago.  Good Samaritan Regional Medical Center/Banner Health v. Blue Cross/Blue Shield Association, Review of PRRB Dec. No. 2007-D35 (July 13, 2007).  This decision is the latest chapter in the book on the Secretary's now legendary "hostility" to the DSH payment enacted by Congress to "balance the inequities which exist for hospitals that treat a disproportionate share of low income patients." Jewish Hospital, Inc. v. Secretary of Health & Human Services, 19 F.3d 270, 274-76 (6th Cir. 1994).

1

2.      The Secretary does not dispute that the Medicare DSH payment
calculation (which serves as a proxy for low income patients) must include all patients
who are eligible for Medicaid.  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); 42 C.F.R.
§ 412.106(b)(4).  The Secretary also does not dispute that the Arizona Health Care Cost
Containment System ("AHCCCS") is Arizona's Medicaid program.  Stipulations ¶ 4.[1]
Nor does the Secretary dispute that the low-income patients in question were covered by
the AHCCCS program when they were treated by the hospitals during the 1992-1999
periods at issue.  Stipulations ¶ 6.  The Secretary denied DSH payments with respect to
the low-income Medicaid patients in question for a different reason – because the
Secretary provided Federal matching funds for some, but not all, of the State
expenditures made with respect to the inpatient hospital services furnished to these
patients.

3.      The Secretary's elevation of Federal/State funding over patients'
eligibility for Medicaid has previously been invalidated by every Federal Circuit Court
that has considered it.  See In Re: Medicare Reimbursement Litigation, Baystate Health
Systems v. Leavitt, 414 F.3d 7, 9 (D.C. Cir. 2005) (citing decisions of the Fourth, Sixth,
Eighth and Ninth Circuits).  As in prior cases, the Secretary's decision in this case must
be reversed because it is contrary to the plain meaning and manifest intent of the
controlling statute to provide Medicare DSH payments with respect to all patients who
are eligible for Medicaid, regardless of whether governmental payment is made for
services furnished to the patient by a hospital.  See, e.g., Jewish Hospital, 19 F.3d at 274-

---

[1]     References herein to the exhibits, transcript, and stipulations refer to the exhibits
filed by the parties, the stipulations of the parties, and the transcript in the
administrative proceedings below.

76. The overarching intent of Congress was to provide DSH payments based upon services furnished to low-income patients, and not to make the calculation of this crucial payment subject to the vagaries of budgetary constraints affecting Federal and State funding for services furnished to them. Id. at 274-75.

4.    Moreover, even if the Secretary's renewed focus on government funding in lieu of patients' eligibility for Medicaid was otherwise permissible (and it is not), the hospitals are entitled to the DSH payments at issue under the Secretary's own hold-harmless rule. The Secretary's rule provides for DSH payments to hospitals with respect to patients that otherwise would not be included in the DSH calculation if the hospitals had an expectation of receiving those payments because the hospitals received DSH payments with respect to those patients in prior years. Hospitals in Arizona received Medicare DSH payments for the patient populations at issue in years prior to the period in dispute. Accordingly, the plaintiff hospitals are entitled to the DSH payments at issue pursuant to that hold-harmless rule. This Court has previously ruled that there is a compelling public interest, founded in the rule of law, in judicial enforcement of the Secretary's compliance with his own rules. In Re: Medicare Reimbursement Litigation, Baystate Health System v. Thompson, 309 F. Supp.2d 89, 99 (D.D.C. 2004) ("Baystate"). See also St. Joseph's Hospital v. Leavitt, 425 F. Supp.2d 94, 99-100 (D.D.C. 2006) (reversing the Secretary's denial of Medicare DSH payments required to be made under the hold-harmless rule).

## II.    JURISDICTION AND VENUE

5.    This action arises under the Medicare Act, Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. § 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

6.    Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

7.    Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

## III.    PARTIES

8.    Plaintiff, Banner Health, is a non-profit health system that owned and operated, or is the successor in interest to the entity that owned and operated, each of the following four non-profit hospitals ("the Hospitals") in Arizona whose Medicare payments for the following cost reporting periods are at issue here:

a.    Banner Good Samaritan Medical Center (formerly known as Banner Good Samaritan Regional Medical Center and Good Samaritan Medical Center), Medicare provider number 03-0002, fiscal years 1991 and fiscal years 1993 through 1999;

b.    Banner Desert Medical Center (formerly known as Desert Samaritan Medical Center), Medicare provider number 03-0065, fiscal years 1995 through 1999;

c.    Banner Thunderbird Medical Center (formerly known as Thunderbird Samaritan Medical Center), Medicare provider number 03-0089, fiscal years 1994 through 1999;

     d.     Maryvale Hospital Medical Center (formerly known as Maryvale Samaritan Medical Center), Medicare provider number 03-0001, fiscal years 1995 through 1998.

     9.     Defendant Michael O. Leavitt (the "Secretary") is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program and DSH payment adjustment at issue. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

     10.     The Center for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program during the periods at issue here and at present.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.    <u>Medicare Payment and Appeals</u>

     11.     This case concerns Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-4, which provides payment for "inpatient hospital services" furnished by participating "providers of services" like the Hospitals. 42 U.S.C. § 1395d(a)(1).

     12.     Medicare payments to hospitals are determined by fiscal intermediaries (usually private insurance companies) that contract with CMS under 42 U.S.C. § 1395h.

     13.     After the close of a hospital fiscal year, the intermediary analyzes a cost report prepared by the hospital and issues a Notice of Program Reimbursement, or "NPR," that informs the hospital of the intermediary's final determination of the

hospital's Medicare reimbursement for the period.  See Baystate, 309 F. Supp.2d at 92.
See also 42 C.F.R. § 405.1803.

14.    The Provider Reimbursement Review Board ("PRRB" or "Board") is an
administrative tribunal appointed by the Secretary. 42 U.S.C. § 1395oo(h).

15.    The members of the Board are required by law to be knowledgeable in the
field of Medicare payment to providers.  Id.

16.    A hospital is entitled to an appeal to the PRRB if it is dissatisfied with an
intermediary's determination in an NPR as to the amount of Medicare payment due the
provider for a cost reporting period.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

17.    The final decision of the PRRB is subject to review by the Administrator
of CMS pursuant to delegation of authority by the Secretary to the Administrator.  See
42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875.

18.    The Secretary's final decision, as set forth either in the decision of the
Board or of the Administrator, may be reviewed in a civil action before this Court.  42
U.S.C. § 1395oo(f).

**B.    The Medicare DSH Adjustment**

19.    Since 1983, Medicare has paid most hospitals for the operating costs of
inpatient hospital services under a prospective payment system ("PPS").  42 U.S.C.
§ 1395ww; 42 C.F.R. Part 412.  See Baystate, 309 F. Supp.2d at 92.

20.    Under PPS, Medicare pays predetermined, standardized amounts per
discharge, subject to certain payment adjustments.  Id.

21.    One of those adjustments is the DSH payment.  See 42 U.S.C.
§ 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

22.    Because the standardized PPS rates are not based on the costs actually incurred by a hospital, they do not properly "account for the fact that poor and unhealthy patients often need more medical assistance than patients drawn from a more affluent and healthier population.  For example, if a patient were admitted for an appendectomy, but also required treatment for complications arising from malnutrition, the hospital would only be entitled to payment for the appendectomy."  Samaritan Health Ctr. v. Heckler, 636 F. Supp. 503, 508 (D.D.C. 1985).

23.    Congress enacted the DSH payment "balance the inequities which exist for hospitals that treat a disproportionate share of low income patients."  Jewish Hospital, 19 F.3d at 274.

### C.    Calculation of the Medicare DSH Adjustment

24.    A hospital that serves a disproportionate share of low-income patients - a DSH - is entitled to an upward percentage adjustment to the standard PPS rates.  See 42 U.S.C. § 1356ww(d)(5)(F).

25.    A hospital's qualification for a DSH adjustment, and the DSH payment made to a qualifying hospital, are based on the hospital's "disproportionate patient percentage."  42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106(b).

26.    The statute defines "disproportionate patient percentage" as the sum of two fractions, called the Medicare and Medicaid fractions.  42 U.S.C. § 1395ww(d)(5)(F)(vi).  See 42 C.F.R. § 412.106(b).

27.    The Medicare fraction is not at issue in this case.

28.     The Medicaid fraction represents the percentage of a hospital's total patient days attributable to individuals who are eligible for Medicaid.  The statute defines the numerator of the Medicaid fraction as:

> the number of the hospital's patient days for [a cost reporting] period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, but who were not entitled to benefits under Part A of this title [i.e., Medicare Part A].

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).   The denominator of the Medicaid fraction is defined in the statute as "the total number of the hospital's patient days for such period." Id.

29.     "[A]ll days for which an individual is capable of receiving Medicaid" should be included in the Medicaid fraction.  Jewish Hospital, 19 F.3d at 274.

30.     The DSH regulation requires the Intermediary to determine the numerator of a hospital's Medicaid fraction for each cost reporting period.  42 C.F.R. § 412.106(b)(4).

31.     During the cost reporting period, the Intermediary makes interim DSH payments to hospitals "based on the latest available data subject to a year-end settlement on a cost reporting period basis."  51 Fed. Reg. 16772, 16777 (May 6, 1986).

32.     In this case, the Hospitals are challenging the Intermediary's final determination of the numerator of Medicaid fraction for each of the fiscal years at issue.

**D.     The Medicaid Program**

33.     Medicaid is a joint federal and state program established under title XIX of the Social Security Act to provide "medical assistance" to low-income persons.  42 U.S.C. § 1396, et seq.

34.     Medical assistance is defined in the Medicaid statute to include payment for 25 medical services, including inpatient hospital services.  42 U.S.C. § 1396d(a)(1).

35.    The Secretary pays Federal funds for part of a State's Medicaid program expenditures, including State Medicaid program payments for hospitals that serve a disproportionate number of low-income patients ("Medicaid DSH" payments).

36.    CMS has previously taken the position that a State furnishes "medical assistance" to individuals when the cost of hospital services furnished to them is included in the calculation of the State's Medicaid DSH payment, even if those individuals are not otherwise eligible for Medicaid.  See Letter dated Aug. 16, 2002, from CMS to State Medicaid Directors.

**E.    Section 1115 Waiver Programs**

37.    Section 1115 of the Act, 42 U.S.C. § 1315, permits the Secretary to waive certain Title XIX requirements in connection with "experimental, pilot, or demonstration projects" that are "likely to assist in promoting the objectives" of Title XIX.  See Cookeville Regional Medical Center v. Thompson, 2005 WL 3276219, *2 (D.D.C. 2005).

38.    A Section 1115 waiver is part and parcel of a State Medicaid program, even if no Federal funds are provided to the State with respect to State expenditures to provide benefits under the waiver.  See Pharmaceutical Research and Manufacturers of America v. Thompson, 191 F. Supp. 2d 48, 66 (D.D.C. 2002), rev'd on other grounds, 313 F.3d 600 (D.C. Cir. 2003).

39.    States receive federal funding under Title XIX of the Social Security Act for expenditures incurred pursuant to a Section 1115 demonstration project because, under Section 1115, those expenditures must be regarded as expenditures under the State plan approved under title XIX.  See 42 U.S.C. § 1315(a)(2).  See Cookeville, 2005 WL

3276219 at *2 & *4; Portland Adventist v. Thompson, 399 F.3d 1091, 1099 (9th Cir. 2005).

40.    Patients who receive benefits under a waiver are eligible for Medicaid and "must be included in the DSH calculation." Cookeville, 2005 WL 3276219 at *4. See Portland Adventist, 399 F.3d at 1096-97.

**F.    Secretary's Prior Interpretation of the Medicare DSH Statute**

41.    From 1986 through 1997, the Secretary narrowly construed the Medicare DSH statute to exclude Medicaid patient days that were not paid by a State Medicaid program. See 51 Fed. Reg. 16772, 16777 (May 6, 1986); 51 Fed. Reg. 31454, 31460-61 (Sept. 3, 1986). See also Baystate, 309 F. Supp.2d at 93.

42.    After four consecutive Circuits invalidated the Secretary's original interpretation of the Medicare DSH Statute, see Baystate, 309 F.Supp.2d at 93, the Secretary rescinded his prior policy and amended the DSH regulation to provide that the Medicaid fraction must include all days for which a patient was eligible for Medicaid, regardless of whether a State Medicaid program actually paid the hospital for the days. See 63 Fed. Reg. 40954, 40985 (Jul. 31, 1998); 42 C.F.R. § 412.106(b)(4) (1998).

43.    While the new agency policy confirmed that "eligible" does not mean "paid," it did not fully resolve which patients are eligible for Medicaid.

44.    For example, fiscal intermediaries in many states historically had made, and continued to make, Medicare DSH payments with respect to individuals who received assistance from a State outside of the State Medicaid program. See Provider Exhibits 16, 18, 19.

45.     Beginning in 1998, however, some intermediaries began to amend their policies to deny Medicare DSH payments with respect to some patients who previously were included in the calculation.  See Provider Exhibits 17, 18.

46.     Faced with increasing political pressure for clarification of its policy, on December 1, 1999, CMS issued Program Memorandum A-99-62 ("PM 99-62").  Provider Exhibit 21.

47.     PM 99-62 addressed the agency's policy as to calculation of the DSH payment effective January 1, 2000.  Id. at 157-59.

48.     In addition, PM 99-62 established a hold-harmless payment provision for prior cost reporting periods beginning before January 1, 1998.  Id. at 159-61.

49.     Under the hold-harmless provision, a hospital is entitled to a Medicare DSH payment with respect to services furnished to a patient who otherwise could not be counted in the payment calculation pursuant to CMS' new policy clarification, if the hospital received Medicare DSH payment with respect to that same type of patient in earlier years.  Id. at 159-60.

## V.     FACTS SPECIFIC TO THIS CASE

### A.     Arizona's Medicaid Program

50.     Arizona's Medicaid program is the Arizona Health Care Cost Containment System ("AHCCCS").  Stipulations ¶4.

51.     The Arizona legislature established AHCCCS in 1981 to provide for the financing and delivery of covered health care services to the State's indigent population.  Stipulations ¶4; see also Ariz. Rev. Stat. § 36-2901 et seq.

52.     AHCCCS provides medical assistance through contractors that receive capitated payments from the State and make payments to health care providers that

furnish covered services to AHCCCS enrollees.  Stipulations ¶5; Provider Exhibit 2 at p. 4.

53.    All AHCCCS enrollees were entitled, among other things, to have payment made for covered inpatient hospital services.  Provider Exhibit 3 at p. 2.

54.    Under the program, all AHCCCS recipients were required to enroll in one of the contracted managed care plans.  Stipulations ¶ 5; Provider Exhibit 2 at p. 5.

55.    The managed care requirement, and other unique AHCCCS provisions, necessitated a waiver of certain Title XIX requirements pursuant to Section 1115 of the Social Security Act, 42 U.S.C. § 1315.  Stipulations ¶ 5.

### The Three Groups of AHCCCS Recipients At Issue

56.    AHCCCS provides medical assistance to individuals in several eligibility groups, including three low-income groups pertinent to this case:  the Medically Needy/Medically Indigent ("MN/MI"); Eligible Assistance Children ("EAC"); and Eligible Low Income Children ("ELIC").  Stipulations ¶ 6.

57.    All AHCCCS recipients in these three eligibility groups had incomes below the federal poverty level.  Id.

58.    The three eligibility groups at issue were established by the same State laws that established the other AHCCCS eligibility groups.  See Ariz. Rev. Stat. Ann. §§ 11-297, 36-2901.4, 36-2905, 2905.03 (Provider Exhibits 6-9).

59.    All AHCCCS recipients, including the individuals in the three eligibility groups at issue, received medical assistance through the single AHCCCS program.  Transcript at 87-90.  All were required to enroll in the same contracted managed care

plans, and all received the same benefits from the AHCCCS program. Transcript at 87-88.

60.    The AHCCCS managed care plans paid the hospitals the same rates for covered services furnished to all AHCCCS recipients, including the recipients in the three eligibility groups at issue. Transcript at 89-90.

### AHCCCS DSH Payment

61.    Arizona sought and obtained approval from the Secretary for a Medicaid DSH payment effective October 1, 1991. Provider Exhibit 12 at pp. 101, 108.

62.    The AHCCCS Medicaid DSH payment is a lump sum amount that is calculated, for each fiscal year, based on a hospital's utilization by all AHCCCS recipients, including the three groups of recipients at issue here. Stipulations ¶ 9; Transcript at 101-02.

63.    All of the Hospitals received a Medicaid DSH payment from AHCCCS for every cost reporting period at issue. Stipulations ¶ 9; Provider Exhibit 12 at p. 110.

### Federal Funding for AHCCCS Expenditures

64.    During the periods at issue, the State received Federal funding under Title XIX of the Social Security Act for Medicaid DSH payments made by AHCCCS. Stipulations ¶ 9.

65.    The State did not seek or receive Federal funding for capitated payments made to AHCCCS managed care plans for AHCCCS recipients in the MN/MI, EAC and ELIC eligible groups, because it chose to use local funds to cover the costs of capitated payments for those populations during the periods at issue. Stipulations ¶ 7.

66.     In 2001, with the Secretary's approval, the AHCCCS program was modified so that the State began to receive Federal funding for the capitated payments made for all AHCCCS recipients, including recipients in the MN/MI, ELIC and EAC eligibility groups.  Stipulations ¶ 7; Transcript at 270-71.

**B.     Intermediary Calculations of the Hospitals' Medicare DSH Payments**

67.     The Medicare fiscal intermediary in Arizona included the MN/MI, ELIC and EAC patients in the calculation of the Medicare DSH payments to Arizona hospitals for cost reporting periods through 1989.  Stipulations ¶ 10; Transcript at 104-05, 229-32.

68.     One of the plaintiff Hospitals, Good Samaritan, qualified for, and received, final Medicare DSH payments with respect to services furnished to patients in three eligibility groups at issue for all cost reporting periods that ended before 1990. Transcript at 104-08, 140-42.

69.     Good Samaritan also received interim Medicare DSH payments with respect to services furnished to patients in three eligibility groups at issue for subsequent cost reporting periods through and including the 1992 cost reporting period at issue in this case.  Transcript at 272-76.

70.     In 1992, the Medicare fiscal intermediary began to deny Medicare DSH payments retrospectively with respect to services furnished to patients in three eligibility groups at issue for cost reporting periods ending after 1989.  Stipulations ¶ 10; Provider Exhibit 28 at p. 198

71.     The Hospitals included patients in each of the three eligibility groups at issue in the cost reports they submitted for each fiscal year at issue, but the fiscal intermediary's final payment determination for each year denied Medicare DSH

payments with respect to services furnished to those patients. Stipulations ¶ 10; Transcript at 104-05, 229-32.

**C.     The Proceedings Below**

72.     On May 17, 2007, the Board issued its decision in this case overturning the fiscal intermediary's determination to exclude the MN/MI, ELIC or EAC patient days from the Hospitals' Medicare DSH payment calculations. Good Samaritan Regional Med. Ctr. (Ariz.) v. Blue Cross Blue Shield Assoc., PRRB Dec. No. 2007-D35 (May 17, 2007).

73.     As put by the Administrator, the Board ruled that "all patients eligible for medical assistance under a State Plan approved under Title XIX must be included in the [Medicare] DSH adjustment without regard to how they became eligible." Administrator's Decision at 2.

74.     In a decision signed on July 13, 2007, the Acting Deputy Administrator of CMS overturned the Board's decision. Administrator's Decision at 20. The decision was mailed to hospitals' counsel on July 16, 2007, and received by hospitals' counsel on July 19, 2007.

75.     The Deputy Administrator concluded "the days in question are associated with the general assistance days . . . [and] not related to patients eligible for Medicaid and hence, cannot be counted in the numerator of the Medicare DSH fraction." Administrator's Decision at 15.

76.     With respect to the hold-harmless provisions of PM 99-62, the Administrator concluded that relief was not appropriate because the Hospitals had "no expectation of being paid for the . . . population days at issue." Id. at 18.

77.    The decision of the Deputy Administrator is the final decision of the Secretary.  Id. at 20.

## VI.    ASSIGNMENT OF ERRORS

78.    The Secretary's July 16, 2007 final decision should be set aside because, as described below, it is contrary to law, arbitrary and capricious, and not based upon substantial evidence in the record.  See 42 U.S.C. § 1395oo(f); 5 U.S.C. § 706.

79.    The Secretary's final decision is inconsistent with the plain language and manifest intent of the applicable provisions of the Medicare DSH statute, it is inconsistent with prior agency policy, and it is unsupported by substantial evidence.

80.    The Secretary's determination that the Hospitals do not quality for hold-harmless protection under PM 99-62 is arbitrary and capricious because it is inconsistent with the clear dictates of that policy, and it is not based upon substantial evidence.

## VII.    CLAIM FOR RELIEF

81.    The Hospitals request an Order:

A.    declaring invalid the Secretary's denial of Medicare DSH payments with respect to services the Hospitals furnished to AHCCCS enrollees in the Medically Needy/Medically Indigent, Eligible Assistance Children, and Eligible Low Income Children eligibility groups;

B.    reversing the Secretary's decision dated July 16, 2007 and requiring the Secretary promptly to pay the Hospitals all sums due as a result of the reversal of that decision, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

C.    requiring the Secretary to pay legal fees and costs of suit incurred by the Hospitals; and

16

D.    providing such other relief as the Court may consider appropriate.

Respectfully Submitted,

*Stephanie A. Webster*

Stephanie A. Webster
 DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: September 11, 2007

DC 699147v.9

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Banner Health | Michael O. Leavitt, Secretary,<br>U.S. Department of Health & Human Services |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Maricopa<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____<br>(IN U.S. PLAINTIFF CASES)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Vinson & Elkins, LLP<br>1455 Pennsylvania Avenue, N.W.<br>Suite 600<br>Washington, DC 20004<br>202.639.6500 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○  **G.  *Habeas Corpus/ 2255*** | ○  **H.  *Employment Discrimination*** | ○  **I.  *FOIA/PRIVACY ACT*** | ○  **J.  *Student Loan*** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○  **K.  *Labor/ERISA (non-employment)*** | ○  **L.  *Other Civil Rights (non-employment)*** | ○  **M.  *Contract*** | ○  **N.  *Three-Judge Court*** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 1395oo(f); action for judicial review under the Medicare Act.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  September 11, 2007    SIGNATURE OF ATTORNEY OF RECORD  *Stephanie A. White*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.