# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BANNER HEALTH, )
)
      Plaintiff, )
)
v. )
)   No. 1:07-cv-1614 (RBW)
MICHAEL O. LEAVITT, )
Secretary, United States Department )
of Health and Human Services, )
)
      Defendant. )

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff respectfully moves for summary judgment in its favor on the grounds that there are no material facts in dispute and that plaintiff is entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment, and Plaintiff's Statement of Material Facts Not In Genuine Dispute. A proposed order setting the relief requested by this motion is also attached.

                        Respectfully submitted,

                        /s/ Stephanie A. Webster
                        Stephanie A. Webster
                         DC Bar No. 479524
                        Christopher L. Keough
                         DC Bar No. 436567
                        VINSON & ELKINS L.L.P.
                        1455 Pennsylvania Avenue, N.W.
                        Suite 600
                        Washington, D.C. 20004-1008
                        (202) 639-6500 (phone)
                        (202) 639-6604 (fax)

                        Counsel for Plaintiff

Dated: January 18, 2008

DC 734749v.1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION..................................................................................................... 1

II.   STATUTORY AND REGULATORY BACKGROUND .................................... 4

      A.    Medicare Payment and Appeals...................................................................4

      B.    The Medicare DSH Adjustment...................................................................5

      C.    Calculation of the Medicare DSH Adjustment ...........................................6

      D.    The Secretary's Construction of "Eligible for Medical Assistance Under a
            State Plan"....................................................................................................6

      E.    The Medicaid Program.................................................................................8

      F.    Medicaid DSH Payments .............................................................................9

      G.    Section 1115 Medicaid Waiver Programs...................................................9

III.  FACTS SPECIFIC TO THIS CASE ................................................................ 10

      A.    Nature of the Case......................................................................................10

      B.    The Factual Findings of the Secretary's Board ........................................10

            1.    Arizona's Medicaid Program ...................................................... 11

            2.    The Three Groups of Arizona Medicaid Recipients at Issue .................... 11

            3.    Federal Funding for Arizona Medicaid Expenditures............................... 11

            4.    Intermediary Calculations of the Hospitals' Medicare DSH
                  Payments .................................................................................... 12

      C.    The Decisions Below .................................................................................12

IV.   STANDARD OF REVIEW ............................................................................... 14

V.    SUMMARY OF ARGUMENT ......................................................................... 16

## TABLE OF CONTENTS
(continued)

Page

VI.     ARGUMENT ........................................................................................... 16

     A.     The Low-Income Patients at Issue Received Medical Assistance from the
             Arizona Medicaid Program ........................................................................ 16

          1.     Enrollment in the Medicaid Program ........................................ 17

          2.     Federal Payment Is Irrelevant .................................................. 18

          3.     The Secretary Cannot Inexplicably Change His Construction of
                "State Plan" to Exclude State Only Funded Benefits............................... 20

          4.     Arizona Received Federal Funding for Assistance Furnished to the
                Low-Income Patients in Question Via the Medicaid DSH Payment ........ 22

     B.     The Low-Income Patients at Issue Could Have Received Medical
             Assistance Through a Traditional Medicaid Program............................. 25

     C.     The Hospitals Are Otherwise Entitled to Relief Under the Secretary's Own
             Hold Harmless Rule ............................................................................... 27

VII.    CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Adena Reg'l Med. Ctr. v. Leavitt,*
No. 05-2422, 2007 WL 44389854 (D.D.C. June 11, 2007), *appeal docketed,*
No. 07-5273 (D.C. Cir. Aug. 8, 2007) ................................................................................ 3, 9

*AT&T Corp. v. FCC,*
86 F.3d 242 (D.C. Cir. 1996) ............................................................................................... 15

*Biloxi Reg'l Med. Ctr. v. Bowen,*
835 F.2d 345 (D.C. Cir. 1987) ............................................................................................. 15

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) .............................................................................................................. 15

*Cabell Huntington Hosp., Inc. v. Shalala,*
101 F.3d 984 (4th Cir. 1996) .................................................................................... 7, 8, 18, 19

*Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .............................................................................................................. 14

*Cookeville Reg'l Med. Ctr. v. Thompson,* No. 04-1053
2005 WL 3276219 (D.D.C. Oct. 28, 2005) ................................................................ 9, 10, 25

*Deaconess Health Services Corp. v. Shalala,*
83 F.3d 1041 (8th Cir. 1996) (per curiam) .......................................................................... 19

*Garrett v. FCC,*
533 F.2d 1056 (D.C. Cir. 1975) ........................................................................................... 15

*Hooper v. Nat'l Transp. Safety Bd.,*
841 F.2d 1150 (D.C. Cir. 1988) ........................................................................................... 15

*In re Medicare Reimbursement Litig. (Baystate),*
309 F. Supp. 2d 89 (D.D.C. 2004), *aff'd,*
414 F.3d 7 (D.C. Cir. 2005), *cert. denied,* 547 U.S. 1054 (2006)...................................*passim*

*In re Medicare Reimbursement Litig. (Baystate),*
414 F.3d 7 (D.C. Cir. 2005), *cert. denied,* 547 U.S. 1054 (2006)........................................ 2, 29

*\*Jewish Hosp., Inc., v. Sec'y of Health & Human Servs.,*
19 F.3d 270 (6th Cir. 1994)...............................................................................................*passim*

*Legacy Emanuel Hosp. & Health Ctr. v. Shalala,*
97 F.3d 1261 (9th Cir. 1996)............................................................................................... 8, 19

*Michigan Pub. Power Agency v. FERC,*
405 F.3d 8 (D.C. Cir. 2005) ................................................................................................. 15

*Morton v. Ruiz,*
415 U.S. 199 (1974)........................................................................................................... 14, 29

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................................................... 14

*\*Denotes cases or authorities principally relied upon.*

## TABLE OF AUTHORITIES
(continued)

*NLRB v. Columbian Enameling & Stamping Co.*,
  306 U.S. 292 (1939) ........................................................ 15

*\*Pharmaceutical Research & Mfrs. of Am. v. Thompson*,
  191 F. Supp. 2d 48 (D.D.C.), *rev'd on other grounds*,
  313 F.3d 600 (D.C. Cir. 2002) ........................................ *passim*

*Samaritan Health Ctr. v. Heckler*,
  636 F. Supp. 503 (D.D.C. 1985) .................................... 5

*\*St. Joseph's Hosp. v. Leavitt*,
  425 F. Supp. 2d 94 (D.D.C. 2006) ................................ 29-30

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) ...................................................... 14

*Transactive Corp. v. United States*,
  91 F.3d 232 (D.C. Cir. 1996) ........................................ 15, 22

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) ...................................................... 14, 29

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ...................................................... 14

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ...................................................... 15

*Wilkinson v. Legal Servs. Corp.*,
  27 F. Supp. 2d 32 (D.D.C. 1998) .................................. 14, 29

**Statutes**

5 U.S.C. § 706(2) .............................................................. 14

42 U.S.C. § 1315 .............................................................. 9

42 U.S.C. § 1315a ............................................................ 9

42 U.S.C. §§ 1395 *et seq.* ............................................... 4

42 U.S.C. §§ 1395c - 1395i-4 .......................................... 4

42 U.S.C. § 1395d(a)(1) ................................................... 4

42 U.S.C. § 1395h ............................................................ 4

42 U.S.C. § 1395oo(a) ...................................................... 4

42 U.S.C. § 1395oo(f) ....................................................... 4

42 U.S.C. § 1395oo(f)(1) .................................................. 14

42 U.S.C. § 1395oo(h) ...................................................... 4

42 U.S.C. § 1395ww .......................................................... 5, 27

iv

*\*Denotes cases or authorities principally relied upon*

# TABLE OF AUTHORITIES
(continued)

42 U.S.C. § 1395ww(d) ........................................................................ 5

42 U.S.C. § 1395ww(d)(5)(F) ........................................................ 1, 5, 6

42 U.S.C. § 1395ww(d)(5)(F)(vi) ...................................................... 6

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) ....................................... 6, 18, 27

42 U.S.C. § 1395x(v)(1)(E) ............................................................. 27

42 U.S.C. §§ 1396 *et seq.* ................................................................. 8

42 U.S.C. § 1396 ............................................................................... 8

42 U.S.C. § 1396a ............................................................................. 8

42 U.S.C. § 1396a(a)(10) ................................................................... 8

42 U.S.C. § 1396a(a)(10)(A)(i)(V) & (VI) ...................................... 26

42 U.S.C. § 1396a(a)(10)(C) ........................................................... 26

42 U.S.C. § 1396a(a)(13)(A)(iv) ...................................................... 9

42 U.S.C. § 1396a(a)(17) ................................................................. 26

42 U.S.C. § 1396a(*l*)(1)(B), (C) & (D) .......................................... 26

42 U.S.C. § 1396b(a)(1) ......................................................... 9, 19, 23

42 U.S.C. § 1396d(a) ................................................................. 8, 24

42 U.S.C. § 1396d(b) ......................................................................... 9

42 U.S.C. § 1396r-4 ................................................................ 9, 23, 24

42 U.S.C. § 1396r-4(f) ............................................................... 9, 23

42 U.S.C. § 1396r-4(g) ................................................................... 24

42 U.S.C. § 1396r-4(g)(1)(A) ......................................................... 24

42 U.S.C. § 1396r-8(b)(1)(A) ......................................................... 21

**Regulations**

42 C.F.R. § 405.1803 ......................................................................... 4

42 C.F.R. § 405.1835 ......................................................................... 4

42 C.F.R. § 405.1875 ......................................................................... 4

42 C.F.R. Part 412 ............................................................................. 5

42 C.F.R. § 412.106 ........................................................................... 5

42 C.F.R. § 412.106(b) ....................................................................... 6

*42 C.F.R. § 412.106(b)(4) (1998) ..................................... 1, 7, 18, 19

42 C.F.R. § 412.106(b)(4)(i) (1998) ............................................... 17

v

*Denotes cases or authorities principally relied upon

## **TABLE OF AUTHORITIES**
(continued)

42 C.F.R. Part 430 ................................................................................................. 8

42 C.F.R. § 430.0 ................................................................................................. 8

42 C.F.R. Part 433, Subpart A .......................................................................... 23

42 C.F.R. § 433.10 ............................................................................................... 9

42 C.F.R. § 440.1 ................................................................................................. 8

42 C.F.R. § 440.2 ................................................................................................. 8

42 C.F.R. § 440.10 ............................................................................................... 8

51 Fed. Reg. 16,772 (May 6, 1986) .............................................................. 6, 19

51 Fed. Reg. 31,454 (Sept. 3, 1986) ............................................................. 6, 19

63 Fed. Reg. 40,954 (July 31, 1998) ............................................................ 7, 19

65 Fed. Reg. 3,136 (Jan. 20, 2000) ....................................................... 10, 25, 27

**Other Authorities**

CMS Centers for Medicare & Medicaid Servs.,
   *Medicaid Program – General Information:*
   *Technical Summary* (2005) ........................................................................ 26

H.R. Rep. No. 99-241, pt. 1 (1986),
   *reprinted in* 1986 U.S.C.A.A.N. 579 ..................................................... 5, 20

Letter from Dennis G. Smith, Director,
   Center for Medicaid and State Operations,
   CMS, Dep't of Health & Human Servs.,
   to State Medicaid Director (Aug. 16, 2002) ................................. 3, 9, 24, 25

Dep't of Health & Human Servs.,
   Health Care Financing Admin., PMI A-99-62
   Clarification of Allowable Medicaid Days in the
   Medicare Disproportionate Share Hospital (DSH)
   Adjustment Calculation (Dec. 1, 1999) ............................................. *passim*

*Denotes cases or authorities principally relied upon*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BANNER HEALTH,                              )
                                            )
              Plaintiff,                    )        No. 1:07-cv-1614 (RBW)
                                            )
       v.                                   )
                                            )
MICHAEL O. LEAVITT,                         )
Secretary, United States Department         )
of Health and Human Services,               )
                                            )
              Defendant.                    )

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Begrudgingly, and only after repeated Congressional directives,[1] the Secretary of Health

and Human Services (the "Secretary") makes supplemental Medicare payments to hospitals that

furnish services to a disproportionate share of low-income patients.  These payments, central to

this claim brought by a group of four Arizona non-profit hospitals (the "Hospitals"), are called

Medicare "DSH" (shorthand for "Disproportionate Share Hospital") payments.  The amount of

these DSH payments depends on the extent to which DSH hospitals serve low-income patients

who are "eligible for medical assistance under a [Medicaid] State plan," 42 U.S.C.

§ 1395ww(d)(5)(F), a statutory phrase that the Secretary construes to mean "eligible for

Medicaid," 42 C.F.R. § 412.106(b)(4).  This calculation is quite simple:  if a patient is eligible

for Medicaid, then the number of inpatient days associated with his or her hospital stay may be

counted in the Medicare DSH payment calculation.  Medicaid payments – Federal or State – are

---

[1] *See Jewish Hosp., Inc., v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 275-276 (6th Cir.
1994).

irrelevant.  Perhaps reflecting the Secretary's almost legendary resistance to implementing the Medicare DSH payment as Congress intended, however, the Secretary here has failed at every pass to abide by his own rules on how to determine Medicaid eligibility for purposes of the Medicare DSH payment calculation.  As a result, the plaintiff Hospitals have been underpaid by $15 million.

Following consecutive adverse decisions from four Federal Courts of Appeals, and the Secretary's later acquiesanse, it is the law that the Medicare DSH calculation must include all Medicaid *eligible* patients, regardless of whether Medicaid actually paid the hospitals for services furnished to those patients.[2]  Except here, the Secretary has excluded some Medicaid-eligible patients because, he says, the Federal government did not provide matching funds for their assistance.  Incredibly, the Secretary has taken this stance after having previously argued to this Court that a patient is deemed to receive assistance under a Medicaid State plan even if the assistance is furnished under an experimental Medicaid program *for which there is no Federal funding.*[3]

What is more, according to the Secretary's prior Medicaid policy, and as recognized by this Court in a recent Medicare case, to the extent that patients receive any form of assistance from Medicaid, even if not the full range of traditional Medicaid benefits, they are also

---

[2]  *See, e.g., In re Medicare Reimbursement Litig. (Baystate)*, 414 F.3d 7, 18 (D.C. Cir. 2005), *cert. denied,* 547 U.S. 1054 (2006).

[3]  *See Pharmaceutical Research & Mfrs. of Am. v. Thompson*, 191 F. Supp. 2d 48, 64-65 (D.D.C.) (accepting the Secretary's view that "State-only" expenditures to provide pharmacy benefits under an approved waiver project are payments "under the State plan" even if there are no Federal matching funds for those expenditures), *rev'd on other grounds*, 313 F.3d 600 (D.C. Cir. 2002).

considered to be receiving medical assistance under a Medicaid State plan.[4] The Secretary has declined to follow this rule here, though.

In addition, as conceded by the Secretary here, if recipients of assistance under an experimental Medicaid project could have received assistance under a traditional Medicaid plan (as they could have here), then they are eligible for Medicaid for purposes of the Medicare DSH calculation. But, ignoring his own Medicaid eligibility standards, the Secretary refused to apply that proposition here, arguing that the Hospitals' extensive evidence of traditional Medicaid eligibility was insufficient.

And, lastly, the Secretary's own hold harmless rule provides that if a hospital had received DSH payments for "otherwise ineligible days" under vague DSH payment policies that were issued prior to 2000, the hospital is entitled to payment on the same terms for periods prior to the Secretary's December 1999 clarification of those policies. But, again, the Secretary refused to accept that result here and, instead, manufactured additional obstacles to relief under the plain terms of his hold harmless rule.

In the context of administering two of the largest government programs intended to fairly compensate hospitals that serve the most vulnerable among us, the Secretary's *ad hoc* application of law is most unfortunate. Here, this approach should be found unlawful, and the Hospitals' request for relief from it should be granted.

---

[4]  *See* Attachment to Defendant's Answer, Letter from Dennis G. Smith, Director, Center for Medicaid and State Operations, CMS, Dep't of Health & Human Servs., to State Medicaid Director (Aug. 16, 2002) ("2002 Medicaid DSH Letter"); *Adena Reg'l Med. Ctr. v. Leavitt*, No. 05-2422, 2007 WL 4438985, at *4 (D.D.C. June 11, 2007) (concluding that individuals who were not otherwise eligible for Medicaid but who received assistance through the Ohio Hospital Care Assurance Program, part of Ohio's State health plan, should be included in the numerator of the Medicaid fraction), *appeal docketed*, No. 07-5273 (D.C. Cir. Aug. 8, 2007).

II.     **STATUTORY AND REGULATORY BACKGROUND**

A.     <u>Medicare Payment and Appeals</u>

The Medicare program provides health insurance to the elderly and disabled. 42 U.S.C. §§ 1395 *et seq.* This case concerns Part A of the Medicare Act, 42 U.S.C. §§ 1395c - 1395i-4, which provides payment for "inpatient hospital services" furnished by participating "providers of services" like the plaintiff Hospitals. 42 U.S.C. § 1395d(a)(1). Fiscal intermediaries that contract with CMS under 42 U.S.C. § 1395h (usually private insurance companies) determine Medicare payments to hospitals.

After the close of a hospital fiscal year, the intermediary analyzes a cost report prepared by the hospital and issues a Notice of Program Reimbursement, or "NPR," that informs the hospital of the intermediary's final determination of the hospital's Medicare reimbursement for the period. *See In re Medicare Reimbursement Litig. (Baystate)*, 309 F. Supp. 2d 89, 92 (D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1054 (2006). *See also* 42 C.F.R. § 405.1803.

A hospital is entitled to an appeal to the Provider Reimbursement Review Board ("PRRB" or "Board") if it is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the provider for a cost reporting period. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. The PRRB is an administrative tribunal appointed by the Secretary. 42 U.S.C. § 1395oo(h).

The final decision of the PRRB is subject to review by the Administrator of CMS pursuant to delegation of authority by the Secretary to the Administrator. *See* 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875. The Secretary's final decision, as set forth either in the decision of the Board or of the Administrator, may be reviewed in a civil action before this Court. 42 U.S.C. § 1395oo(f).

4

B.    **The Medicare DSH Adjustment**

Since 1983, Medicare has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww; 42 C.F.R. Part 412. *See Baystate*, 309 F. Supp. 2d at 92. Under PPS, Medicare pays predetermined, standardized amounts per discharge, subject to certain payment adjustments. 42 U.S.C. § 1395ww(d); 42 C.F.R. Part 412. One of those adjustments is the DSH payment. *See* 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

Because the standardized PPS rates are not based on the costs actually incurred by a hospital, they do not properly

> account for the fact that poor and unhealthy patients often need more medical assistance than patients drawn from a more affluent and healthier population. For example, if a patient were admitted for an appendectomy, but also required treatment for complications arising from malnutrition, the hospital would only be entitled to payment for the appendectomy.

*Samaritan Health Ctr. v. Heckler*, 636 F. Supp. 503, 508 (D.D.C. 1985).

Congress found that, as a class, hospitals that serve a large proportion of low income patients have higher than average costs per discharge:

> [H]ospitals having a large share of low-income patients (Medicare and non-Medicare) have extra overhead costs and higher staffing ratios which reflect the special need for such personnel as medical social workers, translators, nutritional and health education workers. These hospitals are frequently located in central city areas and have higher security costs. They often serve as regional centers and have high standby costs for trauma units, burn units, psychiatric emergency services, neonatal intensive care units and poison control units. They are often recipients of economic transfers of high cost low-income patients from other hospitals.

H.R. Rep. No. 99-241, pt. 1, at 16 (1986), *reprinted in* 1986 U.S.C.A.A.N. 579, 594.

Accordingly, Congress established the Medicare DSH payment "to balance the inequities which exist for hospitals that treat a disproportionate number of low income patients." *Jewish Hosp.*,

19 F.3d at 274. The "overarching intent" of the statute is to provide additional Medicare payments to hospitals that serve "'low income' persons." *Id.* at 275.

### C.    Calculation of the Medicare DSH Adjustment

To accomplish this objective, a hospital that serves a disproportionate share of low-income patients - a DSH - is entitled to an upward percentage adjustment to the standard PPS rates. *See* 42 U.S.C. § 1395ww(d)(5)(F). A hospital's qualification for a DSH adjustment, and the amount of the DSH payment made to a qualifying hospital, are based on the hospital's "disproportionate patient percentage." *Id.*; 42 C.F.R. § 412.106(b).

The statute defines "disproportionate patient percentage" as the sum of two fractions, called the Medicare and Medicaid fractions. 42 U.S.C. § 1395ww(d)(5)(F)(vi). *See* 42 C.F.R. § 412.106(b). The Medicare fraction is not at issue in this case.

The Medicaid fraction, at issue here, represents the percentage of a hospital's total patient days attributable to individuals who are eligible for Medicaid, a joint Federal and State program established to provide "medical assistance" to low-income persons. The statute defines the numerator of the Medicaid fraction as:

> the number of the hospital's patient days for [a cost reporting] period which consist of patients who (for such days) were *eligible for medical assistance under a State plan approved under subchapter XIX of this chapter*, but who were not entitled to benefits under Part A of this subchapter.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

### D.    The Secretary's Construction of "Eligible for Medical Assistance Under a State Plan"

From 1986 through 1997, the Secretary narrowly construed the Medicare DSH statute to exclude Medicaid patient days that were not actually paid by a State Medicaid program from the number of "eligible" days used for determining the DSH payment. *See* 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (interim final rule); 51 Fed. Reg. 31,454, 31,460-61 (Sept. 3, 1986) (final

rule).  *See also Baystate*, 309 F. Supp. 2d at 93.[5]  After four consecutive circuits invalidated the

Secretary's original interpretation of the Medicare DSH statute, *see Baystate*, 309 F. Supp. 2d at

93, the Secretary rescinded his prior policy and amended the DSH regulation to provide that the

calculation must include all days for which a patient was "eligible for Medicaid . . . regardless of

whether particular items or services were covered or paid under the State Medicaid plan."  63

Fed. Reg. 40,954, 40,985 (July 31, 1998).  *See* 42 C.F.R. § 412.106(b)(4) (1998).

While the Secretary's new rule confirmed that "eligible for Medicaid" does not mean

"paid by Medicaid," it triggered new controversy over the meaning of Medicaid eligibility.  AR

33-34.  *See* Plaintiff's Statement of Material Facts Not In Genuine Dispute ("Pl. Stmt.") ¶ 25.

Faced with increasing political pressure for clarification of its policy, on October 15, 1999, the

agency wrote a letter to the Chairman of the Senate Finance Committee, admitting that the

agency's guidance on the calculation of Medicare DSH "was neither sufficiently clear nor well

understood."  AR 396.  *See* Pl. Stmt. ¶ 25.  The letter promised that the agency would "hold

harmless" hospitals that had received DSH payments with respect to patient days that otherwise

should not be counted in the DSH calculation.  AR 396.  Thereafter, on December 1, 1999, the

Secretary issued Program Memorandum A-99-62 ("PM A-99-62").  Dep't of Health & Human

Servs., Health Care Financing Admin., PMI A-99-62 Clarification of Allowable Medicaid Days

in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation (Dec. 1, 1999).

AR 401.  *See* Pl. Stmt. ¶ 26.

This December 1999 program memorandum addressed the agency's policy as to the

meaning of Medicaid "eligibility" effective January 1, 2000.  AR 34.  *See* Pl. Stmt. ¶ 26.

---

[5]  The Secretary unlawfully conflated the concepts of "eligibility" and "entitlement" to payment. *See Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996) ("[T]he terms 'eligible' and 'entitled' are not interchangeable. . . .  In a football game, wide receivers are *eligible* to receive the ball from the quarterback, but none of them is *entitled* to receive it.").

Consistent with the agency's October 15, 1999 letter to Congress, to address the ambiguity in the Secretary's prior policy, PM A-99-62 also established a hold harmless rule for hospitals in two groups. AR 34. *See* Pl. Stmt. ¶ 26.

The first group, consisting of hospitals that had received DSH payments based on otherwise "ineligible days" for cost reporting periods settled before October 15, 1999, could continue to receive DSH payments based on those days for cost reporting periods beginning prior to January 1, 2000. AR 34. *See* Pl. Stmt. ¶ 27. The second group, consisting of hospitals that had not received DSH payments based on "ineligible days" but had appealed the exclusion of the otherwise "ineligible days" prior to October 15, 1999, could also receive payment for those days for the cost years under appeal. AR 34-35. *See* Pl. Stmt. ¶ 28.

### E.    The Medicaid Program

Again, Medicaid is a joint Federal and State program established under title XIX of the Social Security Act ("the Act") to provide "medical assistance" to low-income persons. 42 U.S.C. §§ 1396 *et seq*. To participate in the Medicaid program, a State must have a "State plan[] for medical assistance" that meets Federal requirements for approval by the Secretary. 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. Part 430. The term "medical assistance" includes payment for inpatient hospital services. 42 U.S.C. § 1396d(a); *see* 42 C.F.R. §§ 430.0, 440.1, 440.2, and 440.10.

Under the Medicaid program, States are *required* to furnish medical assistance to individuals in mandatory eligibility groups, and may also *elect* to furnish medical assistance in certain optional eligibility groups. 42 U.S.C. § 1396a(a)(10). *See Cabell*, 101 F.3d at 987; *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1262 (9th Cir. 1996).

The Federal Medicaid statute authorizes the Secretary to pay a State Federal matching funds according to a "Federal medical assistance percentage," or "FMAP," for State expenditures

on "medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1); 42 C.F.R. § 433.10; *see* 42 U.S.C. § 1396d(b) (defining the FMAP). These Federal matching funds are also called "Federal Financial Participation" or "FFP."

### F.    Medicaid DSH Payments

A State plan must provide for payments to hospitals that "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients," 42 U.S.C. § 1396a(a)(13)(A)(iv), in a manner consistent with the specific requirements set forth in 42 U.S.C. § 1396r-4. These payments are called "Medicaid DSH" payments.

Medicaid DSH payments under 42 U.S.C. § 1396r-4 are considered to be "medical assistance under the State plan" for which a State receives Federal matching funds. 42 U.S.C. §§ 1396b(a)(1), 1396r-4(f). Accordingly, a State furnishes "medical assistance" to individuals when the cost of hospital services furnished to them is included in the calculation of the State's Medicaid DSH payment, even if those individuals are not otherwise eligible for Medicaid. *See* Attachment to Defendant's Answer, 2002 Medicaid DSH Letter; *Adena,* 2007 WL 4438985, at *4.

### G.    Section 1115 Medicaid Waiver Programs

Section 1115 of the Act, 42 U.S.C. § 1315, permits the Secretary to waive certain statutory Medicaid requirements to permit "'experimental, pilot, or demonstration projects'" that are "'likely to assist in promoting the objectives'" of Title XIX. *Cookeville Reg'l Med. Ctr. v. Thompson*, No. 04-1053, 2005 WL 3276219, at *2 (D.D.C. Oct. 28, 2005) (quoting 42 U.S.C. §§ 1315, 1315a). A Section 1115 waiver is considered part and parcel of a State Medicaid program, even if no Federal funds are provided to the State with respect to State expenditures to provide benefits under the waiver. *See Pharmaceutical Research*, 191 F. Supp. 2d at 64-65 (accepting the Secretary's view that State expenditures to provide pharmacy benefits under an

approved waiver project are payments "under the State plan" even if there are no Federal matching funds for those expenditures).

The Secretary divides patients who receive medical assistance under a demonstration project into two categories: "'hypothetical eligibles,' who would be eligible for Medicaid assistance with or without a § 1115 waiver; and 'expanded eligibility groups,' who become eligible for assistance solely because of the waiver." [6] *Cookeville,* 2005 WL 3276219, at *2; 65 Fed. Reg. at 3,136. The Secretary's established policy is to include days for "hypothetical eligibles" in the Medicare DSH calculation. *See Cookeville,* 2005 WL 3276219, at *2.

## III.    FACTS SPECIFIC TO THIS CASE

### A.    Nature of the Case

This is an action for review of a final decision of the Secretary denying $15 million in Medicare DSH payments (AR 224) to four non-profit Arizona hospitals with respect to services furnished to low-income patients in Arizona's Medicaid program beginning well over a decade ago.  Plaintiff, Banner Health, is a non-profit health system that owned and operated, or is the successor in interest to the entity that owned and operated each of the Hospitals for the 1991 and 1993-1999 cost reporting periods at issue. *See* Pl. Stmt. ¶ 1.

### B.    The Factual Findings of the Secretary's Board

In the proceedings below, the Board found the following facts that are not disputed in the final decision of the Secretary.

---

[6]    The Secretary claims that prior to January 20, 2000, the Secretary's policy was to exclude waiver "expansion days" from the Medicare DSH calculation. *See* 65 Fed. Reg. 3,136 (Jan. 20, 2000) (interim final rule); *Cookeville,* 2005 WL 3276219, at *2. While the patients at issue here received medical assistance pursuant to a Section 1115 waiver program, they were not Section 1115 "expansion populations" at issue in *Cookeville.*  Rather, they were the types of individuals who typically receive medical assistance in States across the country because they fall into Federally defined, Title XIX eligibility groups.

### 1.     Arizona's Medicaid Program

In 1982, Arizona established an experimental Medicaid managed care program called the Arizona Health Care Cost Containment System ("AHCCCS"). AR 35. *See* Pl. Stmt. ¶¶ 4, 5. "AHCCCS is a state plan approved by the Secretary," including all of the AHCCCS programs and sub-programs and irrespective of how the programs were funded. AR 35. *See* Pl. Stmt. ¶ 4. Arizona "operates its entire Medicaid program as a Section 1115 waiver project." AR 40. *See* Pl. Stmt. ¶ 4.

### 2.     The Three Groups of Arizona Medicaid Recipients at Issue

The AHCCCS program covers three low-income groups pertinent to this case:

1.  "Eligible Low Income Children" who were under 14 years of age and were recipients of Federal food stamps (AR 35) (*See* Pl. Stmt. ¶ 10);

2.  "Eligible Assistance to Children" who were under 14 years of age with incomes at or below 100 percent of the Federal poverty level (AR 35) (*See* Pl. Stmt. ¶ 10); and

3.  "Medically Needy/Medically Indigent" individuals with incomes below 40 percent of the Federal poverty level or with sufficient medical expenses to reduce their income to this qualifying income level (AR 35) (*See* Pl. Stmt. ¶ 10).

### 3.     Federal Funding for Arizona Medicaid Expenditures

The State did not seek or receive Federal funding specifically for the capitated payments made to AHCCCS managed care plans for AHCCCS recipients in the disputed eligibility groups. AR 35-36, 40. *See* Pl. Stmt ¶ 18. However, the AHCCCS program in Arizona funds the capitation payments it makes to the Medicaid managed care plans and the Medicaid DSH payments it makes directly to hospitals with all of the funds it receives from the Federal, State, and local governments. AR 40. Without this funding, Arizona would not be able to finance and maintain coverage for all of the low-income individuals eligible under its State plan. *Id.* Among other sources of funding for the program, Arizona received Federal matching funds for Medicaid

DSH payments made by the State directly to hospitals for services furnished to all AHCCCS enrollees, including the low-income patients in the three categories at issue. AR 37. *See* Pl. Stmt. ¶ 17.

### 4. Intermediary Calculations of the Hospitals' Medicare DSH Payments

For cost reporting periods from 1986 to 1989, the Medicare fiscal intermediary in Arizona included the low-income children and medically needy/medically indigent patients at issue here in the calculation of Arizona hospitals' Medicare DSH payments. AR 36. *See* Pl. Stmt. ¶ 20.

The Hospitals also included these days in the cost reports they submitted for each fiscal year at issue, but the fiscal intermediary excluded them. AR 36. *See* Pl. Stmt. ¶ 24.

### C.   **The Decisions Below**

After a hearing, the PRRB determined that the Arizona low-income children and medically needy/medically indigent patient days at issue here should be included in the Hospitals' Medicare DSH payment calculations. AR 41. The Board concluded that the DSH calculation should include all individuals "who became eligible for Medicaid as a result of the § 1115 waiver provisions." AR 39. "[A]ll patients eligible for medical assistance under a State plan approved under Title XIX must be included in the DSH adjustment without regard to whether the state receives direct FFP for this low-income population." *Id.*

The Board found further support for its decision in the fact that the State "could have included [the 3 groups at issue] as optional groups under a traditional Medicaid state plan (even without a waiver) and could have received direct FFP." AR 40. In addition, the Board found that although AHCCCS did not receive direct FFP for these three groups, the State of Arizona funds capitation payments to all of the AHCCCS managed care plans and DSH payments to

hospitals with all of the funds it receives from Federal, State and local governments, thereby resulting in a *de facto* sharing of the costs of the program. AR 40. Moreover, the Board concluded that "AHCCCS' state-funded eligibility group[s] did not stop being low-income merely because the [s]tate chose to bear the entire cost." AR 41.

The CMS Administrator reversed the Board. AR 1. The Administrator concluded that "the days in question are associated with the general assistance days . . . for which the State receives no matching FFP [that are] not related to patients eligible for Medicaid and hence, cannot be counted in the numerator of the Medicare DSH fraction." AR 16.

The Administrator acknowledged that the DSH calculation may include the patients who "could have been made eligible under a State Plan," AR 12, but he concluded that the record of this case does not show that the patients in the three low-income categories in question could have been included as "optional" Medicaid eligibility groups. AR 16-17

Regarding the Federal funds that were paid to the State to match the State's Medicaid DSH payments to hospitals for services furnished to the low-income patients at issue, the Administrator concluded, but does not explain why, "the issue of whether <u>costs</u> are regarded as expenditures under a State Plan approved under Title XIX for purposes of calculating Federal matching payments to the State is different from the issue of whether <u>patients</u> are considered eligible for medical assistance under a State Plan approved under Title XIX for purposes calculating Medicare DSH payments to a hospital." AR 17 (emphasis in original).

With respect to the hold harmless rule established in PM A-99-62, the Administrator concluded that relief was not appropriate here because the Hospitals had "no expectation of being paid for the . . . population days at issue." AR 19.

The decision of the Administrator is the final decision of the Secretary. AR 21.

## IV.    STANDARD OF REVIEW

Jurisdiction over this action lies under 42 U.S.C. § 1395oo(f)(1), which provides that the case "shall be tried pursuant to the applicable provisions under" the Administrative Procedure Act ("APA"). The applicable provisions of the APA require the Administrator's decision to be set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

An agency's interpretation of a statute or regulation must be set aside and is not entitled to deference when it is inconsistent with the plain language or manifest intent of the statute or regulation. *United States v. Mead Corp.,* 533 U.S. 218, 227-31 (2001); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994); *Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843-44 (1984).

The scope of review under arbitrary and capricious standard entails a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

An administrative agency is bound to follow its own rules and policies, even where those rules "are possibly more rigorous than otherwise would be required." *See Morton v. Ruiz,* 415 U.S. 199, 235 (1974); *see also United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266-68 (1954); *Baystate,* 309 F. Supp. 2d at 99; *Wilkinson v. Legal Servs. Corp.,* 27 F. Supp. 2d 32, 57-58 (D.D.C. 1998).

Indeed, an agency's unexplained departure from its established precedent is arbitrary and capricious. *See, e.g., Michigan Pub. Power Agency v. FERC*, 405 F.3d 8, 13-14 (D.C. Cir. 2005). In addition, an agency decision is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (an administrative agency's action is arbitrary and capricious when the agency "treats seemingly similar situations dissimilarly without explaining any relevant factual differences between the situations") (citing *Garrett v. FCC,* 533 F.2d 1056, 1060 (D.C. Cir. 1975)). The agency must either "conform its . . . policies to. . . apposite existing regulations or offer 'reasoned analysis' for why actual differences. . . justify any conflict." *Id. See Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1151 (D.C. Cir. 1988) (administrative rules must be applied uniformly).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" taking into account "'whatever in the record fairly detracts from its weight.'" *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Thus, the reviewing court must subject the agency's decision to searching, careful, and close judicial scrutiny. *See Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 350-53 (D.C. Cir. 1987).

Finally, a reviewing court may uphold agency action *only* on the basis articulated by the agency in its decision, not on *post-hoc* rationalizations offered by the agency or its counsel in litigation. *See, e.g., Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *Biloxi*, 835 F.2d at 348 n.12, 351 n.18.

## V.    SUMMARY OF ARGUMENT

The Secretary's interpretation of Medicaid eligibility for purposes of computing the Hospitals' Medicare DSH payments should be overturned as arbitrary and capricious and inconsistent with law for three fundamental reasons.

First, the record is clear that the low-income children and medically needy/medically indigent individuals at issue were included in Arizona's Medicaid program. The Secretary's determination to exclude these days violates the Medicare DSH statute and regulation.

Second, even if these patients were not included in the Arizona Medicaid program, their patient days should be included in the Hospitals' Medicare DSH calculations, because the patients were eligible for -- capable of receiving -- medical assistance under a State plan by virtue of their low-income status. The Secretary's refusal to grant relief on this concededly appropriate basis is not supported by the record evidence regarding the eligibility standards for the "hypothetical eligibles," as the Secretary calls them.

Third, under the Secretary's hold harmless rule, the Hospitals are entitled to the DSH payments they seek even if the patients at issue are otherwise ineligible, because the Hospitals received DSH payments reflecting these categories of patients for prior periods.

## VI.    ARGUMENT

### A.    The Low-Income Patients at Issue Received Medical Assistance from the Arizona Medicaid Program

There is no genuine dispute in this case that the Secretary's calculation of the Hospitals' Medicare DSH payments for the periods at issue excluded patient days attributable to low-income individuals who were included in Arizona's approved Medicaid Program. The Secretary excluded these days, he says, because Federal matching funds were not paid to the State for expenditures made by the State to provide medical assistance to *these particular AHCCCS*

*enrollees*.  But as shown below, the Secretary's decision is inconsistent with his own interpretation of the Medicare DSH statute to include days for individuals who are "eligible for Medicaid . . . regardless of whether particular items or services were covered or paid under the State plan." *See* 42 C.F.R. § 412.106(b)(4)(i) (1998).  Like the Secretary's original, unlawful preoccupation with the extent of State payments actually made for hospital services furnished to Medicaid recipients, the Secretary's focus here on the extent of Federal payment made specifically for the services furnished to the low-income Arizona Medicaid recipients at issue is contrary to the plain meaning and manifest intent of the Medicare DSH statute.  The Secretary's decision is also inconsistent with the Secretary's interpretation of similar language listed in a section of the Medicaid statute that was at issue in *Pharmaceutical Research*.  The Secretary's decision also conflicts with his prior interpretation of the *Medicaid* DSH statute, and finally, it is inconsistent with the undisputed record evidence that Arizona received Federal payments for the Medicaid DSH payments it made for hospital services furnished to all the low-income individuals included in Arizona's Medicaid program, including the low-income individuals at issue.

### 1.    Enrollment in the Medicaid Program

First and foremost, the patient days attributable to the low-income children and medically needy/medically indigent patients in question should be included in the Hospitals' Medicare DSH payments because these patients were not only eligible for, but were actually enrolled in and received medical assistance from, the Arizona Medicaid program.

To reiterate, the Board found, and the Secretary did not dispute, that AHCCCS is Arizona's Medicaid program.  Complaint ¶ 50; Answer ¶ 50; *see* Pl. Stmt. ¶ 4.  AHCCCS is a Medicaid State plan approved by the Secretary, including all of the AHCCCS programs and sub-programs and irrespective of how the programs were funded.  AR 35.  *See* Pl. Stmt.¶ 4.

Moreover, it is undisputed that the low-income children and medically needy/medically indigent patients at issue received the same Medicaid benefits, through the same contracted managed care plans, as individuals in other AHCCCS eligible categories. Pl. Stmt. ¶ 12.

In light of these uncontested facts in this case, and the Secretary's clear rule on what days should be included in the Medicare DSH payment calculation, the Secretary cannot plausibly conclude that these days should be excluded. The Secretary agrees that the plain language of the DSH statute includes patient days attributable to individuals who are "eligible for Medicaid." 42 C.F.R § 412.106(b)(4).

### 2.    Federal Payment Is Irrelevant

Nonetheless, the Secretary posits that these low-income patient days should be excluded from the Hospitals' DSH calculations because the State did not receive Federal matching for expenditures made by AHCCCS to provide medical assistance to these individuals. Even assuming that no Federal matching was paid for the services furnished to these patients (and it was), this position cannot be squared with the plain language or manifest intent of the DSH statute, or the Secretary's regulation interpreting the DSH statute, and therefore must be overturned.

As noted above, the DSH statute requires the Secretary to include all patient days attributable to patients who were "eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Nothing in this provision speaks to a requirement that Federal or State payments be made for these patient days in order for them to count in the DSH calculation. The plain language of the statute looks to the individual's eligibility for assistance, not to the payment of Federal or State funds for the services furnished to the individual. If the individual is eligible for Medicaid, that is the end of the inquiry. *Cf. Cabell*, 101 F.3d at 988 ("Congress having chosen the word 'eligible,' rather than 'paid,' the

Secretary is not at liberty to give the statutory language an entirely different and more restrictive meaning.").

From 1986 through 1997, the Secretary construed the Medicare DSH statute to exclude from the Medicare DSH calculation Medicaid patient days that were not paid by a State Medicaid program. *See* 51 Fed. Reg. at 16,777; 51 Fed. Reg. at 31,460-61. *See also Baystate*, 309 F. Supp. 2d at 93. Every Federal circuit court that considered the Secretary's interpretation found it inconsistent with the plain language of the Medicare statute. *See Jewish Hosp.*, 19 F.3d at 274-75; *Cabell*, 101 F.3d at 988; *Legacy Emanuel Hosp.*, 97 F.3d at 1265; *Deaconess Health Services Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996) (per curium).

After this litigation defeat, the Secretary rescinded his prior policy and amended the DSH regulation to provide that the calculation must include all days for which a patient was "eligible for Medicaid . . . regardless of whether particular items or services were covered or paid under the State Medicaid plan." 63 Fed. Reg. at 40,985. *See* 42 C.F.R. § 412.106(b)(4)(1998). Through this change, the Secretary acquiesced in the courts' unanimous rejection of the Secretary's former policy of excluding Medicaid patient days from the Medicare DSH payment if the hospital was not paid for those days by the State. Of course, the State cannot receive Federal matching funds unless there are State expenditures, *see* 42 U.S.C. § 1396b(a)(1), so to the extent that a patient day is not paid by the State, then there can be no Federal matching for that day. Here, by focusing on Federal funding, the Secretary is just attempting to breathe new life into a legal debate that has been settled for a decade. The Secretary's renewed elevation of Federal and State Medicaid *payments* over patients' Medicaid *eligibility* therefore cannot be countenanced.

Moreover, the intent of the Medicare DSH statute is to provide additional payments to hospitals that serve "'low income' persons." *Jewish Hosp.*, 19 F.3d at 275. Congress found that these hospitals, as a class, incur higher than normal costs per discharge stemming from "extra overhead costs," increased staffing, "higher security costs," and "high standby costs" for special care units. H.R. Rep. No. 99-241, pt. 1, at 16, *reprinted in* 1986 U.S.C.A.A.N. at 594. These higher than average costs, in other words, are correlated with the proportion of low-income persons treated by a hospital, but that correlation has nothing to do with the vagaries of Federal and State financing arrangements or the payment of Federal or State funds for the hospital services furnished to low-income patients who are eligible for Medicaid. And, in this case, there can be no dispute that the patients at issue were low-income. These children and medically indigent patients all had income and resources below the Federal poverty income level. Pl. Stmt. ¶ 11. The extent of Federal matching funds paid to the State for the services the Hospitals furnished to these patients had no impact whatsoever on their low-income status. It also had no impact on the higher than average costs per discharge incurred by the plaintiff Hospitals for their care. Likewise, it should have no impact on the Medicare DSH payments made to the Hospitals.

### 3.    The Secretary Cannot Inexplicably Change His Construction of "State Plan" to Exclude State Only Funded Benefits

Moreover, even if the Secretary's decision were not flatly inconsistent with the wording and purpose of the Medicare DSH statute (and it is), the Secretary's denial of DSH payments for the AHCCCS patient days at issue is arbitrary and capricious, and must be overturned, because it is inconsistent with the Secretary's own prior definition of what constitutes a payment under the Medicaid State plan. *See Pharmaceutical Research*, 191 F. Supp. 2d 48.

In this case, the Board found that the AHCCCS program is the State plan approved by the Secretary, and that the patients at issue were eligible for medical assistance under the State plan.

AR 39.   In reversing the Board, the Secretary concluded that the low-income AHCCCS recipients at issue are not eligible for medical assistance under the State plan, and thus cannot be included in the Hospitals' DSH calculations, because the State did not receive Federal funding for the assistance it furnished to these patients through the AHCCCS program.   AR 16.   This decision is irreconcilable, however, with the Secretary's prior interpretation of the similar statutory language at issue in *Pharmaceutical Research*.

In *Pharmaceutical Research*, the Secretary expressed his interpretation of "State plan" in the context of the Medicaid drug rebate program.   The Medicaid statute requires drug manufacturers to pay rebates to a State on all "covered outpatient drugs of the manufacturer . . . for which payment was made under the State plan."   42 U.S.C. § 1396r-8(b)(1)(A). *Pharmaceutical Research* concerned a waiver project, approved by the Secretary, under which some State expenditures on drugs were made without Federal financial participation. 191 F. Supp. 2d at 53-54.

In *Pharmaceutical Research*, the Secretary explained that when he has approved a Medicaid demonstration waiver project, both "expenditures that generate Federal financial participation and 'State only' expenditures that do not generate Federal financial participation are . . . 'regarded' as being made 'under the State plan,' for purposes of determining whether a rebate obligation attaches under 42 U.S.C. § 1396r-8(b)(1)(A)."   *Id*. at 54.   In other words, once approved, the waiver project is part of "the State plan," and expenditures by the State under the waiver are regarded as payments "under the State plan," even if there is no Federal funding provided to the State for those expenditures.[7]

---

[7]   The district court's decision in *Pharmaceutical Research* was reversed for a different reason, which is not relevant here.   The Court of Appeals reversed because a State cannot impose a rebate obligation with respect to drugs for which no Federal or State payment is made and the

In this case, the Secretary provided no explanation at all, let alone a rational one, for the inconsistency between his decision in this case and the Secretary's interpretation of the similar statutory language at issue in *Pharmaceutical Research*. In the earlier case, the Secretary asserted that "State-only" expenditures made under an approved demonstration waiver program are considered to be payments "under the State plan" even if there is no Federal financial participation in those expenditures. 191 F. Supp. 2d at 54-55. In this case, though, the Secretary's decision centers on the assertion that the patient days at issue in this case cannot be counted as days for patients who were "eligible for medical assistance under a State plan" because, according the Secretary's decision, "no FFP is paid" for those services. AR 15. The Secretary's decision provides no explanation for this inconsistency. This is the hallmark of arbitrary and capricious decision making. The Secretary cannot treat similar situations differently, applying one interpretation of the law in some cases and a different interpretation in other cases, without a rational explanation for the inconsistency. *See Transactive Corp.*, 91 F.3d at 237. The Secretary's decision, therefore, should be reversed.

### 4. Arizona Received Federal Funding for Assistance Furnished to the Low-Income Patients in Question Via the Medicaid DSH Payment

In any event, the Secretary erred in finding that "no FFP" was paid to the State for medical assistance furnished to the low-income children and medically needy/medically indigent patients at issue here. AR 15. The Secretary's suggestion (AR 17) that the Arizona Medicaid DSH payments, for which FFP was paid, were not payments for medical assistance furnished to

---

Maine project that was actually approved by the Secretary required no State payment for the drugs at issue in that case. *Pharmaceutical Research*, 313 F.3d at 603-04. There is no question in this case that Arizona incurred expenditures for the assistance furnished to all AHCCCS recipients, including the low-income children and medically needy/medically indigent. Pl. Stmt. ¶¶ 12, 13.

the low-income recipients at issue in this case is an arbitrary and capricious departure from the Secretary's prior view on Medicaid DSH payments and is otherwise not supported by the record in this case.

As found by the Board, during the cost reporting periods at issue, the patients in question were "eligible for medical assistance under a State plan" because Arizona received Federal matching funds for the Medicaid DSH payments that were made to the Hospitals for services furnished to the low-income patients at issue here. AR 37. With respect to the FFP for Medicaid DSH, however, the Administrator rejects the Board's rationale, concluding (but not explaining why), "the issue of whether <u>costs</u> are regarded as expenditures under a State Plan approved under Title XIX for purposes of calculating Federal matching payments to the State is different from the issue of whether <u>patients</u> are considered eligible for medical assistance under a State Plan approved under Title XIX for purposes calculating Medicare DSH payments to a hospital." AR 17 (emphasis in original).

This distinction defies not only logic, but the Medicaid statute. The Secretary's position seems to be that even if payments made by the Medicaid program for the costs of assistance furnished to particular patients count as expenditures for which a State can receive Federal matching payments under the Medicaid State plan, the recipients of the assistance are not eligible for assistance. The problem with this theory is that, with the exception of certain program administration costs not relevant here, there is *no* authority for the payment of Federal matching funds for any State expenditure that is not "medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1); 42 C.F.R. Part 433, Subpart A. That is why Medicaid DSH payments under 42 U.S.C. § 1396r-4 are considered to be "medical assistance under the State plan" for which a State receives Federal matching funds. 42 U.S.C. §§ 1396b(a)(1), 1396r-4(f).

Indeed, in the Medicaid DSH context, the Secretary has previously construed the Medicaid statute to mean that Medicaid DSH payments are a form of medical assistance under the State plan to the individuals whose service costs factor into the Medicaid DSH payment. More specifically, the Secretary has interpreted the Medicaid DSH provision of the Federal statute, 42 U.S.C. § 1396r-4, to mean that a State is in fact providing medical assistance under the State plan to individuals when the cost of hospital services furnished to them is included in the calculation of the State's Medicaid DSH payment. *See* Attachment to Defendant's Answer, 2002 Medicaid DSH Letter.

The Secretary took this position in a 2002 letter to State Medicaid Directors regarding: (1) the statutory provision establishing hospital-specific limits on FFP for Medicaid DSH payments, 42 U.S.C. § 1396r-4(g); and (2) a separate statutory provision prohibiting the payment of Federal matching funds for assistance furnished by a State to prison inmates, 42 U.S.C. § 1396d(a). *Id.* The former section of the statute limits FFP for Medicaid DSH payments to the costs incurred by a hospital in furnishing services to individuals who are either eligible for medical assistance under the State plan or who are uninsured (and have no other source of third party coverage for those services). 42 U.S.C. § 1396r-4(g)(1)(A).

The 2002 Medicaid DSH Letter addresses whether the uncompensated cost of services furnished by a hospital to prison inmates can be included in the computation of this hospital-specific Medicaid DSH limit. The Secretary concluded that such services cannot be included in the calculation. The Secretary reasoned that by virtue of furnishing FFP to a State for Medicaid DSH payments made by a State "for the costs of prisoner care," the Secretary would be providing Federal matching funds "for services" furnished to the prisoners, and the statute prohibits FFP for <u>medical assistance</u> furnished to prison inmates. Attachment to Defendant's

Answer, 2002 Medicaid DSH Letter at 2. In other words, the Secretary's 2002 letter recognizes that a State may provide medical assistance to individuals under a State plan by virtue of including the cost of such services in the calculation of the State's Medicaid DSH payments to hospitals, even if those individuals would not otherwise be considered eligible for Medicaid. The same rationale applies here, the Secretary's decision in this case provides no explanation for his inconsistent position in this case, and his decision in this case should therefore be reversed.

### B.   The Low-Income Patients at Issue Could Have Received Medical Assistance Through a Traditional Medicaid Program

Even if the low-income and medically needy/medically indigent patients did not receive medical assistance under the Arizona State plan, they nonetheless could have received medical assistance under a State plan, and their days should thus be included in the Hospital's DSH calculations. As the Board found, Arizona could have included the disputed AHCCCS groups as optional eligibility groups under a traditional Medicaid State plan. AR 35-36, 40. The Administrator concedes that the Secretary's policy was to include the Medicare DSH calculation days for populations who "could have been made eligible under a State plan."[8] AR 12. The Administrator simply disputes whether the record supports the conclusion that the days (which he summarily and incorrectly labels as "general assistance" days) could have been included under the Medicaid optional category of patients in a traditional Medicaid plan. AR 16-17.

The Administrator's position is arbitrary and capricious and is not supported by the undisputed record evidence. The record reflects very specific details about the AHCCCS

---

[8] The Secretary's concession on this point is consistent with the Secretary's policy of including in the Medicare DSH calculation days for what he calls "hypothetical eligibles"—individuals who could be eligible for Medicaid (through a mandatory or optional group) even without a Section 1115 waiver. *See Cookeville,* 2005 WL 3276219, at *2; 65 Fed. Reg. at 3,136. *See also* PM A-99-62 (distinguishing "ineligible" waiver days from waiver days that may be included in the Medicare DSH calculation), AR 401-07.

eligibility categories at issue, showing that the low-income children and medically indigent individuals who were included in those AHCCCS eligibility groups could have been included in a traditional Medicaid State plan. The categories at issue are:

1.  Eligible Low Income Children—children who were under 14 years of age and were recipients of Federal food stamps;

2.  Eligible Assistance to Children—children who were under 14 years of age with incomes at or below 100 percent of the Federal poverty level; and

3.  Medically Needy/Medically Indigent–individuals with low incomes at approximately 40 percent of the FPL or with sufficient medical expenses to reduce their income to this qualifying income level.

*See* Pl. Stmt ¶ 10.

During the periods at issue, all States were required (absent a Section 1115 waiver) to provide medical assistance to children under age 6 whose family income is at or below 133 percent of the Federal poverty level, and to children born after September 30, 1983 (or, at the option of the State, after any earlier date) who are under age 19 whose family income is at or below the Federal poverty level. 42 U.S.C. §§ 1396a(a)(10)(A)(i)(V) & (VI), 1396a(*l*)(1)(B), (C) & (D). These categories would cover the children in the disputed low-income children categories, all of whom were children under the age of 14 with family incomes below 100 percent of the Federal poverty level.

States also have the option of furnishing medical assistance to medically needy and medically indigent individuals. 42 U.S.C. §§ 1396a(a)(10)(C), 1396a(a)(17). Individuals covered under the medically needy option would be eligible for Medicaid under one of the Federally defined mandatory or optional groups, except that their incomes or resources are above the eligibility level set by the State for the other mandatory and optional groups. Centers for Medicare & Medicaid Servs., *Medicaid Program – General Information: Technical Summary* (2005), *available at* http://www.cms.hhs.gov/MedicaidGenInfo/ 03_Technical Summary.asp.

All of the MN/MI recipients at issue here had incomes below 40 percent of the poverty level. AR 35, 354, 314-17, 341, 354. *See* Pl. Stmt. ¶ 10.

Unlike other provisions of the Act,[9] the statutory provision governing the Medicare DSH calculation is not geared to the particular State plan adopted by the State in which a hospital is located. 42 U.S.C. § 1395ww. Rather, the DSH statute requires only that the individual be eligible for Medicaid under "<u>a</u> State plan." *Id.* Consistent with Congress' overarching purpose in employing the Medicaid fraction of the Medicare DSH calculation as a proxy measure of utilization by low-income patients, the keystone of the Medicare DSH calculation is an individual's <u>eligibility</u> to receive medical assistance under a Medicaid State plan. In other words, the statute's critical focus is on the individual's capacity to receive assistance, not on the vagaries of the various elections that a particular State may or may not make under title XIX of the Act. *Cf. Jewish Hosp.*, 19 F.3d at 274 (concluding that the DSH statute uses the term "eligible" to mean "capable of receiving federal medical assistance or Medicaid"). These "hypothetical eligibles," as the Secretary calls them, *see* 65 Fed. Reg. at 3,136, are capable of receiving Medicaid under <u>a</u> State plan that could be approved under title XIX of the Act even if they did not receive medical assistance under the Arizona State plan during the cost reporting periods at issue. Accordingly, their days should be included in the DSH calculation.

C.    <u>The Hospitals Are Otherwise Entitled to Relief Under the Secretary's Own Hold Harmless Rule</u>

Even if these patients were not eligible for medical assistance under a State plan (and they were), the days at issue should be included in the Medicare DSH payment under the

---

[9]    *Compare* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (referring to eligibility under "a State plan") *with* 42 U.S.C. § 1395x(v)(1)(E) (authorizing the Secretary to adopt regulations that "may, in the case of skilled nursing facilities in any State, provide for the use of rates, <u>developed by the State in which such facilities are located,</u> for the payment of the cost of skilled nursing facility services furnished under the State's plan approved under subchapter XIX").

Secretary's hold harmless rule. The plain language of the Secretary's hold harmless rule permits hospitals to include "otherwise ineligible" days in the DSH calculation if they received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999." AR 404.

Faced with increasing political pressure for clarification of its policy on Medicaid eligibility for purposes of the Medicare DSH calculation, on October 15, 1999, the Secretary wrote a letter to the Senate Finance Committee, admitting that the agency's prior "guidance on the calculation of Medicare. . . DSH was neither sufficiently clear nor well understood." AR 396. *See* Pl. Stmt. ¶ 25. The letter also promised that the Secretary would "hold harmless" hospitals that had received DSH payments reflecting certain kinds of Medicaid eligible days for prior periods. *Id.*

On December 1, 1999, CMS issued PM A-99-62 to announce its policy on which types of days count as Medicaid "eligible" for periods beginning after January 1, 2000. AR 401. *See* Pl. Stmt. ¶ 26. As promised, the Secretary also established a hold harmless rule permitting hospitals to include "otherwise ineligible" days in their DSH payment calculation for periods beginning before January 1, 2000 if the hospitals fell into either of two groups. The first group of hospitals includes hospitals that received Medicare DSH payments that included "otherwise ineligible days. . . in previous cost reporting periods settled before October 15, 1999." AR 34, 404. *See* Pl. Stmt. ¶ 27. The second group is comprised of hospitals that did not receive any DSH payments reflecting the "otherwise ineligible days" for prior cost reporting periods but that filed an appeal relating to the exclusion of those days before October 15, 1999. *Id.*

It is undisputed that, from 1986 to 1989, the types of days at issue were included in the Medicare DSH payment calculations for all Arizona hospitals that qualified for DSH payments at

that time, including one of the Banner Hospitals in this case (Good Samaritan). AR 36. The days at issue in this case had been included in the final Medicare DSH payments to Arizona disproportionate share hospitals for all years prior to 1990, and in the interim DSH payments made to them for periods after that. *See* Pl. Stmt ¶¶ 20, 22. In this case, the Secretary has adopted a rule interpreting the law to require the agency to include "otherwise ineligible" days in the Medicare DSH payment calculation when a hospital received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999." PM A-99-62. AR 404. Pl. Stmt. ¶ 27. Once again, a simple application of the Secretary's own rule dictates the relief sought by the Hospitals here. It is well-established that an administrative agency is bound to follow its own rules and policies, even where those rules "are possibly more rigorous than otherwise would be required." *See Morton*, 415 U.S. at 235; *see also Accardi*, 347 U.S. at 266-68; *Baystate*, 309 F. Supp. 2d at 99; *Wilkinson*, 27 F. Supp. 2d at 57-58. The Secretary, therefore, is required to include the days at issue in the DSH payment calculations, even if these days would be "otherwise ineligible" for inclusion of the Medicare DSH calculation. *Cf. Baystate,* 414 F.3d at 13 (affirming the district court's order compelling the Secretary to perform his obligation under agency rules to reopen and revise prior erroneous DSH payment determinations and concluding that the Secretary's "[h]aving to pay a sum [he] owes can hardly amount to an equitable reason for not requiring payment.")

But, in the final decision below, the Secretary ruled that the days at issue could not be included in the Medicare DSH calculation for any of the plaintiff Hospitals for a different reason – because, the Secretary says, the hospitals "had abandoned their expectation of receiving payment." AR 20. As in another case decided by this Court, the Secretary is impermissibly adding further conditions to, and limitations on, the hold harmless rule. *See St. Joseph's Hosp. v.*

29

*Leavitt*, 425 F. Supp. 2d 94, 99-100 (D.D.C. 2006) (concluding that it was arbitrary and capricious for the Secretary to deny the hospital's hold harmless claim because the hospital "failed to use the magic words 'general assistance days'" before October 15, 1999). Accordingly, that portion of the Secretary's decision denying the hold harmless claim is invalid, and should be set aside, because it conflicts with the plain language of the hold harmless rule.

## VII.    CONCLUSION

For the foregoing reasons, the Hospitals request that their motion for summary judgment be granted, and that this matter be remanded to the Secretary for correction of the Hospitals' Medicare DSH payments.

Respectfully submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: January 18, 2008

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BANNER HEALTH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )    No. 1:07-cv-1614 (RBW)
MICHAEL O. LEAVITT,                     )
Secretary, United States Department     )
of Health and Human Services,           )
                                        )
            Defendant.                  )

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## NOT IN GENUINE DISPUTE

**I.    PARTIES**

1.    Plaintiff, Banner Health, is a non-profit health system that owned and operated, or is the successor in interest to the entity that owned and operated, each of the following four non-profit hospitals ("the Hospitals") in Arizona during the following cost reporting periods are at issue:

a.    Banner Good Samaritan Medical Center (formerly known as Banner Good Samaritan Regional Medical Center and Good Samaritan Medical Center), Medicare provider number 03-0002, fiscal year 1991 and fiscal years 1993 through 1999;

b.    Banner Desert Medical Center (formerly known as Desert Samaritan Medical Center), Medicare provider number 03-0065, fiscal years 1995 through 1999;

c.     Banner Thunderbird Medical Center (formerly known as Thunderbird Samaritan Medical Center), Medicare provider number 03-0089, fiscal years 1994 through 1999; and

d.     Maryvale Hospital Medical Center (formerly known as Maryvale Samaritan Medical Center), Medicare provider number 03-0001, fiscal years 1995 through 1998.

Stipulations ¶¶ 1, 3, Administrative Record ("AR") 192; Complaint ¶ 8; Answer ¶ 8.

2.     Defendant Michael O. Leavitt (the "Secretary") is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program and DSH payment adjustment at issue. Complaint ¶ 9; Answer ¶ 9.

3.     The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program during the periods at issue here and at present. Complaint ¶ 10; Answer ¶ 10.

## II.     BACKGROUND

### A.     Arizona's Medicaid Program

4.     Arizona's Medicaid program is the Arizona Health Care Cost Containment System ("AHCCCS"). Stipulations ¶ 4, AR 192; PRRB Dec., AR 40; Complaint ¶¶ 2, 50; Answer ¶¶ 2, 50. As the Board found below, instead of having a traditional Medicaid program, the State of Arizona operates its entire Medicaid program pursuant to a waiver approved by the Secretary in 1982. AR 40. The AHCCCS program is the State Medicaid Plan. PRRB Dec., AR 40. The Secretary's approval of the plan "includes all the AHCCCS programs and sub-programs, irrespective of how the programs

2

and sub-programs were funded, because the waiver statute requires that all costs of the demonstration project be regarded as expenditures under the State plan." Id.

5.      The Arizona legislature established AHCCCS in 1981 to provide for the financing and delivery of covered health care services to the State's indigent population. Stipulations ¶ 4, AR 192; AR 301-29; Complaint ¶ 51; Answer ¶ 51.

6.      AHCCCS contracts with managed care organizations that receive capitated payments from the State and, in turn, make payments to health care providers that furnish services to AHCCCS enrollees.  Stipulations ¶ 5, AR 192; AR 228.

7.      All AHCCCS enrollees were entitled, among other things, to have payment made for covered inpatient hospital services.  AR 242.

8.      Under the program, all AHCCCS recipients were required to enroll in one of the contracted managed care plans.  Stipulations ¶ 5, AR 192; AR 229.

9.      The managed care requirement, and other unique AHCCCS provisions, necessitated a waiver of certain Title XIX requirements pursuant to Section 1115 of the Social Security Act, 42 U.S.C. § 1315.  Stipulations ¶ 5, AR 192; PRRB Dec., AR 40.

**B.      The Three Groups of AHCCCS Recipients At Issue**

10.      AHCCCS provides medical assistance to individuals in several eligibility groups, including three low-income groups pertinent to this case:

- "Eligible Low Income Children" who were under 14 years of age and were recipients of federal food stamps, AR 35, 193, 324-27, 354;

- "Eligible Assistance to Children" who were under 14 years of age with incomes at or below the Federal poverty level, AR 35, 193, 324-27, 354; and

- "Medically Needy/Medically Indigent" individuals with incomes below 40 percent of the Federal poverty income level or with

sufficient medical expenses to reduce their income to this
qualifying income level, AR 35, 193, 314-17, 341, 354.

11.    All AHCCCS recipients in these three eligibility groups had incomes
below the federal poverty level. Stipulations ¶ 6, AR 193; PRRB Dec., AR 35; AR 314-
17, 341, 354. The three eligibility groups at issue were established by the same State
laws that established the other AHCCCS eligibility groups. AR 281-329.

12.    All AHCCCS recipients, including the individuals in the three eligibility
groups at issue, received medical assistance through the single AHCCCS program.
PRRB Dec., AR 35; AR 130-31; Complaint ¶ 59; Answer ¶ 59. All AHCCCS recipients
were required to enroll in the same contracted managed care plans, and all received the
same benefits from the AHCCCS program. Stipulations ¶¶ 5, 6, AR 192-93; PRRB Dec.,
AR 36; AR 130; Complaint ¶ 59; Answer ¶ 59.

13.    The AHCCCS managed care plans paid the hospitals the same rates for
covered services furnished to all AHCCCS recipients, including the individuals in the
three AHCCCS eligibility groups at issue. AR 131; Complaint ¶ 60; Answer ¶ 60.

**C.    Arizona Medicaid DSH Payment**

14.    Arizona sought and obtained approval from the Secretary for a Medicaid
DSH payment effective October 1, 1991. AR 335, 342; Complaint ¶ 61; Answer ¶ 61.

15.    The Arizona Medicaid DSH payment is a lump sum amount that is
calculated, for each fiscal year, based on a hospital's utilization by all AHCCCS
recipients, including the three groups of recipients at issue here. Stipulations ¶ 9, AR
193; AR 134.

4

16.    All of the Hospitals received a Medicaid DSH payment from AHCCCS for every cost reporting period at issue.  AR 344, 351, 352, 364; Complaint ¶ 63; Answer ¶ 63.

**D.    Federal Funding for AHCCCS Expenditures**

17.    During the periods at issue, the State received Federal funding under Title XIX of the Social Security Act for Medicaid DSH payments made by AHCCCS. Stipulations ¶ 9, AR 193; PRRB Dec., AR 35-37; Complaint ¶ 64; Answer ¶ 64.

18.    The State did not seek or receive Federal funding specifically for the capitated payments made to AHCCCS managed care plans for AHCCCS recipients in the disputed eligibility groups.  Stipulations ¶ 7, AR 193; PRRB Dec., AR 35-36, 40; Complaint ¶ 65; Answer ¶ 65.  However, AHCCCS funds the capitation payments made to the Medicaid managed care plans and other Medicaid DSH payments made directly to hospitals with all of the funding the program receives from Federal, State and local government sources, and this results in a *de facto* sharing of all the costs of the program. PRRB Dec., 40.  Further, as the Board found, the three AHCCCS eligibility groups at issue could be included as optional Medicaid eligibility categories under a traditional Medicaid State plan.  Id.

19.    In 2001, with the Secretary's approval, the AHCCCS program was modified so that the State began to receive Federal funding for the capitated payments made for all AHCCCS recipients, including recipients in the eligibility groups at issue. Stipulations ¶ 7, AR 193; Complaint ¶ 66, Answer ¶ 66; AR 36, 176.

**E.    Intermediary Calculations of the Hospitals' Medicare DSH Payments**

20.    The Medicare fiscal intermediary in Arizona included the categories of AHCCCS patient days at issue here in the calculation of the Medicare DSH payments

5

made to Arizona hospitals for cost reporting periods ending prior to 1990.  Stipulations ¶
10, AR 193; AR 134-35, 166, 449-50, 825-26, 828-29; Complaint ¶ 67; Answer ¶ 67.

21.     One of the plaintiff Hospitals, Banner Good Samaritan Medical Center
("Good Samaritan"), qualified for, and received, final Medicare DSH payments with
respect to services furnished to patients in three eligibility groups at issue for cost
reporting periods that ended before 1990.  Stipulations ¶ 10, AR 193; AR 134-35, 143-
44, 158, 177; Complaint ¶ 68; Answer ¶ 68.

22.     Good Samaritan also received interim Medicare DSH payments with
respect to services furnished to patients in three eligibility groups at issue for subsequent
cost reporting periods through and including the 1992 cost reporting period at issue in
this case.  AR 176-77.

23.     In 1992, the Medicare fiscal intermediary in Arizona began to deny
Medicare DSH payments retrospectively with respect to services furnished to patients in
the three eligibility groups at issue for cost reporting periods ending after 1989.
Stipulations ¶ 10, AR 193; AR 449.

24.     The Hospitals included patient days attributable to patients in each of the
three AHCCCS eligibility groups at issue in the cost reports they submitted for each
fiscal year at issue, but the fiscal intermediary's final payment determination for each
year denied Medicare DSH payments with respect to services furnished to those patients.
PRRB Dec., AR 36.

F.      **Medicare DSH Hold-Harmless Rule**

25.     Faced with mounting political pressure (AR 380-84, 389-94), on October
15, 1999, the Deputy Administrator of CMS (then HCFA) wrote Senator William Roth,
Chairman of the Senate Finance Committee, admitting that the agency's "guidance on the

calculation of Medicare DSH. . . was neither sufficiently clear nor well understood." AR 396. The letter also promised that the agency would "hold harmless" hospitals that had already received DSH payments reflecting the inclusion of certain days or had such payments disallowed. AR 396.

26.     In December 1999, the Secretary issued Program Memorandum A-99-62, which interpreted the law to permit some hospitals to include "otherwise ineligible" days in their Medicare DSH payment calculations for cost reporting periods beginning before January 1, 2000. AR 401, 403-05. The Program Memorandum created a two-pronged hold-harmless rule for these cost-reporting periods, permitting hospitals to include "otherwise ineligible" days in its DSH calculation if the hospital met either of two alternative criteria. AR 403-05.

27.     Under the first alternative criterion, "otherwise ineligible" days may be included in the DSH calculation if the hospital received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999." AR 403-04.

28.     Under the second alternative criterion, hospitals that did not previously receive Medicare DSH payments including "otherwise ineligible" days could include such days in their DSH calculation for a period beginning before January 1, 2000 if the hospital "filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999." AR 404-05 (emphasis in original).

## III.    THE PROCEEDINGS BELOW

29.    On May 17, 2007, the Board ruled that the days at issue should be included in the Hospitals' Medicare DSH payment calculations for the periods at issue. AR 31-42.

30.    In a decision mailed to the Hospitals' counsel under cover of letter dated July 16, 2007, the Deputy Administrator of CMS overturned the Board's decision. AR 1-21.    The Hospitals' counsel received that letter and the accompanying decision on July 19, 2007.  Complaint ¶ 74.

31.    The decision of the Deputy Administrator constitutes the final decision of the Secretary.  AR 21.

Respectfully Submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: January 18, 2008


DC 734751v.6


8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


BANNER HEALTH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )          No. 1:07-cv-1614 (RBW)
                                        )
MICHAEL O. LEAVITT,                     )
Secretary, United States Department     )
of Health and Human Services,           )
                                        )
            Defendant.                  )


**<u>PROPOSED ORDER</u>**

Upon consideration of the parties' cross-motions for summary judgment, the memoranda in support of the motions, the decisions below, and evidence in the record, it is hereby:

ORDERED that plaintiff's motion be, and hereby is, GRANTED; and it is

FURTHER ORDERED that defendant Leavitt's motion be, and hereby is, DENIED; and it is

FURTHER ORDERED that the decision of the Administrator of the Centers for Medicare and Medicaid Services ("CMS") dated July 16, 2007 is hereby reversed; and it is

FURTHER ORDERED that this matter is remanded to defendant Leavitt, who shall, within 180 days of the date of this Order, pay the Plaintiff Hospitals the additional DSH payments due as a result of including in the Medicaid fraction of the DSH

calculation the days of low-income children and medically needy/medically indigent patients at issue, plus interest calculated in accordance with 42 U.S.C. §1395oo(f)(s).

_____

United States District Judge

DC 734752v.1