## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-1614-RBW |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| in his official capacity as Secretary, U.S. | ) | |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S COMBINED MOTION FOR SUMMARY JUDGMENT
### AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c) and LCvR 7.1 and 56.1, defendant, Michael O. Leavitt, in his official capacity as Secretary, U.S. Department of Health and Human Services, moves for summary judgment.

Pursuant to the Court's December 10, 2007 Order, as amended, defendant submits the following Combined Memorandum in Support of Defendant's Motion to Dismiss and Opposition to plaintiff's Motion for Summary Judgment. In addition, in support of defendant's Motion for Summary Judgment, defendant submit the attached Statement of Material Facts pursuant to LCvR 7(h) and 56.1. A proposed order is attached.

Dated:  February 20, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

KENNETH L. WAINSTEIN
U.S. Attorney for the District of Columbia

SHEILA LIEBER
Deputy Director, Federal Programs Branch

/s/ James D. Todd, Jr.
JAMES D. TODD, JR., Senior Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20530
(202) 514-3378
(202) 616-8470 (fax)
*james.todd@usdoj.gov*
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-1614-RBW |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| in his official capacity as Secretary, U.S. | ) | |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS**
**COMBINED MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.    Statutory and Regulatory Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            1.    Medicare and the Disproportionate Share Hospital Adjustment. . . . . . . . . . 4
            2.    Medicaid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            3.    Demonstration Projects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            4.    Medicare DSH Adjustment Payment Policy. . . . . . . . . . . . . . . . . . . . . . . . 8
                 a.    Pre-2000 DSH Adjustment Policy. . . . . . . . . . . . . . . . . . . . . . . . . . 8
                 b.    Program Memorandum A-99-62. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                 c.    Current DSH Adjustment Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            5.    Medicare DSH Adjustment Policy Ratification. . . . . . . . . . . . . . . . . . . . . . 11
            6.    Administrative Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      B.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.     STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.   THE MEDICARE DSH PROVISION DOES NOT INCLUDE DAYS OF STATE-ONLY
      POPULATIONS IN THE DSH ADJUSTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      A.    The Plain Meaning of the Medicare DSH Provision Does Not Include Days of
          State-Only Populations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            1.    None of the State-only Patients Were Eligible for Medicaid Under State
                Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a.  AHCCCS Operates a State Health Program and a Medicaid Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

b.  The Secretary's Decision To Include Only Medicaid-Eligible Patients in the Medicaid Proxy Is Not Based Solely on the State's Receipt of Federal Matching Payments. . . . . . . . . . . . . . . . . . . . . 23

c.  Plaintiff's Reliance on *Pharmaceutical Research & Mfrs. of Am. v. Thompson* is inapposite. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

d.  The Hospitals' Receipts of Medicaid DSH Payments is Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

e.  The State-Only Patients Were Not Eligible for Medical Assistance Under a State Plan Approved Under Title XIX. . . . . . . . . . . . . . . 28

B.  The Secretary's Interpretation of the DSH Provision is Reasonable. . . . . . . . . . . 32

II.  SECTION 5002 OF THE DEFICIT REDUCTION ACT OF 2005 CLARIFIES THE SECRETARY'S AUTHORITY TO EXCLUDE INPATIENT DAYS OF BOTH STATE-ONLY PATIENTS AND PATIENTS ELIGIBLE FOR BENEFITS UNDER A SOCIAL SECURITY ACT SECTION 1115(a)(2) WAIVER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.  Congress's Clarification of the Medicare DSH Provision Is Entitled To Controlling Weight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.  Section 5002 Ratified the Secretary's Policy of Excluding Care Received Under a Demonstration Project from the Medicare DSH Adjustment. . . . . . . . . . . . . . . . . 38

C.  Section 5002 Bars Plaintiff's Claim Even If That Provision Changed, Rather Than Clarified, the Secretary's Medicare DSH Adjustment Policy. . . . . . . . . . . . . . . . . 39

III.  THE SECRETARY REASONABLY DETERMINED THAT THE HOSPITALS DO NOT MEET THE SECRETARY'S CRITERIA FOR HOLD HARMLESS PAYMENTS. . . . . 40

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adena Regional Medical Center v. Leavitt*, 524 F. Supp. 2d 1 (D.D.C. 2007),
  *appeal pending*, No. 07-5273 (D.C. Cir.). .................................................. 2, 3, 20

*Alabama Home Health Care, Inc. v. Schweiker*, 527 F. Supp. 849 (D. Ala. 1981)........................ 30

*Almendarez-Torres v. U.S.*, 523 U.S. 224 (1998). ........................................................ 36

*Barnes v. Cohen*, 749 F.2d 1009 (3d Cir. 1984). ........................................................ 37

*Barnhart v. Walton*, 535 U.S. 212 (2002)................................................................. 17

*Beverly Community Hospital Association v. Belshe*, 132 F.3d 1259 (9th Cir. 1997). .............. 36, 37

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). ........................................... 17

*Bradley v. School Board of Richmond*, 416 U.S. 696 (1974) 39

*Brown v. Thompson*, 374 F.3d 253 (4th Cir. 2004). ..................................................... 37

*Cabell Huntington Hospital Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996)............................ 20, 24

*Chemical Manufacturers Association v. National Resources Defense Council, Inc.*,
  470 U.S. 116 (1985).......................................................................................... 33

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). ........ 18, 32

*Consumer Prod. Safety Commission v. GTE Sylvania*, 447 U.S. 102 (1980)................................ 37

*Cookeville Regional Medical Center v. Thompson*, No. 04-1053, 2005 WL 3276219
  (D.D.C. Oct. 28, 2005), *reversal in response to § 5002 indicated*, 2006 WL
  2787831 (Sept. 26, 2006), *appeal pending*, No. 07-5252 (D.C. Cir.). ........................ *passim*

*County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999)...................................... 32

*Deaconess Health Services Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996)............................. 20

*Department of Toxic Substances Control v. Interstate Non-Ferrous Corp.*,
  99 F. Supp. 2d 1123 (E.D. Cal. 2000)..................................................................... 40

*Episcopal Hospital v. Shalala*, 994 F.2d 879 (D.C. Cir. 1993). ....................................... 16

*Federal Trade Comission v. Mandel Brothers, Inc.*, 359 U.S. 385 (1959).................................. 36

*Fairfax Hospital Association, Inc. v. Califano*, 585 F.2d 602 (4th Cir. 1978). ....................... 30

*Friedman v. Secretary of Department of Health and Humans Services,*
     819 F.2d 42 (2d Cir. 1987)..................................................................... 30

*Holly Sugar Corp. v. Johanns,* 437 F.3d 1210 (D.C. Cir. 2006). ..................................... 32

*INS v. St. Cyr,* 533 U.S. 289 (2001). ............................................................... 39

*Jewish Hospital Inc. v. Secretary of Health and Human Services,*
     19 F.3d 270 (6th Cir. 1994). .......................................................... 20, 24

*Johnson v. Quander,* 440 F.3d 489 (D.C. Cir. 2006)...................................................... 39

*Kidney Center of Hollywood v. Shalala,* 133 F.3d 78 (D.C. Cir. 1998). ....................................... 16

*Landgraf v. USI Film Products,* 511 U.S. 244 (1994)...................................................... 39

*Legacy Emanuel Hospital & Health Center v. Shalala,* 97 F.3d 1261 (9th Cir. 1996). .......... 20, 22

*Liquilux Gas Corp. v. Martin Gas Sales, Inc.,* 979 F.2d 887 (1st Cir. 1992). ............................. 37

*Loving v. United States,* 517 U.S. 748 (1996). ............................................................... 36

*Mattingly v. District of Columbia,* 97 U.S. 687 (1878). ................................................. 38

*Means v. North Cheyene Tribal Court,* 154 F.3d 941 (9th Cir. 1998)............................................ 36

*Monmouth Medical Center v. Thompson,* 257 F.3d 807 (D.C. Cir. 2001). ................................... 20

*Motor Vehicle Manufacturers Association v. Farm Mutual Insurance Co.,* 463 U.S. 29 (1983)... 17

*National Medical Enterprises, Inc. v. Shalala,* 43 F.3d 691 (D.C. Cir. 1995). ............................. 17

*Perry v. Dowling,* 95 F.3d 231 (2d Cir. 1996). ............................................................... 33

*Pharmaceutical Research & Manufacturers of America v. Thompson,*
     191 F. Supp. 2d 48 (D.D.C), *rev'd,* 313 F.3d 600 (D.C. Cir. 2002). ........................... 25, 26

*Piama Cortes v. American Airlines, Inc.,* 177 F.3d 1272 (11th Cir. 1999). ................................. 37

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995).................................................... 39

*Porter v. Commissioner of Internal Revenue,* 856 F.2d 1205 (8th Cir. 1988)................................ 37

*Portland Adventist Medical Center v. Thompson,* 399 F.3d 1091 (9th Cir. 2005). ................. 21, 35

*Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367 (1969). ......................................................... 37

*Richards-Diaz v. Fasano*, 233 F.3d 1160 (9th Cir. 2000). ............................................................ 39

*Rodriguez v. United States*, 480 U.S. 522 (1987). ................................................................ 22, 27

*Rush University Medical Center v. Leavitt*,
    No. 06-1550, 2007 WL 2669021 (N.D. Ill. Sept. 04, 2007). ............................................. 41

*Schweiker v. Gray Panthers*, 453 U.S. 34 (1981). ........................................................................ 33

*Spry v. Thompson*, 487 F.3d 1272 (9th Cir. 2007). ............................................................ 22, 24, 27

*St. Joseph's Hospital v. Leavitt*, 425 F. Supp. 2d 94 (D.D.C. 2006). ......................................... 42

*Swayne & Hoyt v. United States.*, 300 U.S. 297 (1937). ............................................................. 38

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994). ......................................... 16, 17, 33

*Thomas v. Network Solutions, Inc.*, 176 F.3d 500 (D.C. Cir. 1999). .......................................... 38

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997). ...................................................... 37

*United States v. Winstar Corp.*, 518 U.S. 839 (1996). ................................................................ 37

*Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68 (1st Cir. 2006). ...... 30

*United Hospital v. Thompson, No. Civ. 02-3479*, 2003 WL 21356086 (D. Minn.
    June 9, 2003), *aff'd* 383 F.3d 728, 733 (8th Cir. 2004). ......................................... 40, 41, 43

*United States v. Beebe*,
    180 U.S. 343 (1901). .......................................................................................................... 38

## FEDERAL STATUTES

Pub. L. No. 93-66, Title II, § 231, 87 Stat. 159 (1973). ................................................................ 19

Pub. L. No. 99-272, § 9105, 100 Stat. 82 (1986). ........................................................................ 4

Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (Feb. 8, 2006). .................................................. *passim*

5 U.S.C. §§ 701 *et seq*. ................................................................................................................. 16

5 U.S.C. § 706(2). ......................................................................................................................... 16

8 U.S.C. § 1182(o)(6)(B)(iii). ....................................................................................................... 19

8 U.S.C. § 1611(b)(1)(A). ............................................................................................................. 19

8 U.S.C. § 1612(b)(2)(F). .............................................................................................................. 19

38 U.S.C. § 1722(a). ........................................................................................................ 19

42 U.S.C. § 254b(k)(3). .................................................................................................... 19

42 U.S.C. § 300z-5(a)(13). ............................................................................................... 19

42 U.S.C. § 602(a)(3). ...................................................................................................... 19

42 U.S.C. § 608(a)(11)(A) & (B). ................................................................................... 19

42 U.S.C. § 1315. ....................................................................................................... passim

42 U.S.C. § 1320a-7b(a)(6). ............................................................................................ 19

42 U.S.C. § 1382h(b)(3). .................................................................................................. 19

42 U.S.C. §§ 1395c *et seq.* ............................................................................................... 4

42 U.S.C. § 1395g. ........................................................................................................... 12

42 U.S.C. § 1395oo(a). ............................................................................................... 13, 43

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). ....................................................................... passim

42 U.S.C. § 1395ww(d)(5)(F)(vi). ................................................................................... 36

42 U.S.C. §§ 1396 *et seq.* ................................................................................................. 5

42 U.S.C. §§ 1396 - 1396v. .............................................................................................. 5

42 U.S.C. §§ 1396-1396v. ............................................................................................... 18

42 U.S.C. §§ 1396a *et seq.* ............................................................................... 2, 18, 19, 22

42 U.S.C. §§ 1396b(a)(1). ........................................................................................ 6, 19, 24

42 U.S.C. § 1396d(a). ......................................................................................... 6, 18, 19, 24

42 U.S.C. § 1396j(c). ....................................................................................................... 19

42 U.S.C. § 1396k(a)(1). .................................................................................................. 19

42 U.S.C. § 1396n(i)(1). ................................................................................................... 19

42 U.S.C. §1396p(c)(1)(D)(ii) & (c)(4) ......................................................................... 19

42 U.S.C. § 1396r(c)(5)(B)(iii). ....................................................................................... 19

42 U.S.C. § 1396r-1(c). .................................................................................................... 19

42 U.S.C. § 1396r-1a(c). ................................................................................................ 19

42 U.S.C. § 1396r-1b(c). ................................................................................................ 19

42 U.S.C. § 1396r-4. ................................................................................ 19, 21, 26, 27

42 U.S.C. § 1396r-6(b)(3)(B). ....................................................................................... 19

42 U.S.C. § 1396r-8(a)(5)(B). ....................................................................................... 19

42 U.S.C. § 1396u-2. ..................................................................................................... 19

42 U.S.C. § 1396u-4(a)(1). ............................................................................................ 19

42 U.S.C. § 1397ee(d)(1). ............................................................................................. 19

42 U.S.C. § 1886(d). .............................................................................................. 24, 25

42 U.S.C.A. § 1395g(a). ................................................................................................ 12

## FEDERAL REGULATIONS

42 C.F.R. § 412.106(b)(4). ............................................................................................. 8

42 C.F.R. §§ 405.1801(b)(1). ....................................................................................... 12

42 C.F.R § 405.1803. ..................................................................................................... 12

42 C.F.R. § 405.1841(a)(1). .......................................................................................... 13

42 C.F.R. § 412.106(b)(4)(ii). ................................................................................. 11, 33

42 C.F.R. § 413.24. ................................................................................................ 25, 26, 30

42 C.F.R. § 413.60. ........................................................................................................ 12

42 C.F.R. §§ 430.0 *et seq.* ............................................................................................. 5

42 C.F.R. § 435.403(a). ................................................................................................. 29

42 C.F.R. § 435.907. ...................................................................................................... 29

51 Fed. Reg. 16772 (1986). ............................................................................................ 8

59 Fed. Reg. 49249 (1994). ............................................................................................ 7

65 Fed. Reg. 3136 (2000). ................................................................................... 8, 11, 30

## LEGISLATIVE HISTORY

H.R. Rep. No. 99-241 at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594.......................... 4, 20

## STATE STATUTES

Ariz. Rev. Stat. §§ 36-2901 *et seq*. ................................................................................ 13

Ariz. Rev. Stat. § 11-297(1999)......................................................................... 14, 23, 34

Ariz. Rev. Stat. § 36-2905 (1999)....................................................................... 14, 23, 34

Ariz. Rev. Stat. § 36-2905.03 (1999)................................................................... 14, 23, 34

Ariz. Rev. Stat. § 26-2904(A) (1999). ................................................................... passim

Ariz. Rev. Stat. § 36-2903.01(B)(5) (1999). ................................................................ 34

## MISCELLANEOUS

2B Singer, Statutes and Statutory Construction, § 49.11 (6th ed. 2000). ....................................... 37

*Ashtabula County Medical Center v. Blue Cross/Blue Shield Association Inc.,*
      *AdminiStar Federal,* Admin. Dec. No. 2005-D49 (Oct. 12, 2005).................................... 25

## PRELIMINARY STATEMENT

This case concerns a dispute over whether the Secretary of Health and Human Services owes additional Medicare payments to plaintiff's four hospitals located in and around Phoenix because, in the relevant cost years, those hospitals treated a disproportionate share of low-income patients, defined as those patients who were eligible for Medicaid (but not Medicare) benefits or for Supplemental Security Income ("SSI") benefits.  Known as Medicare disproportionate share hospital ("DSH") payments, these additional payments are based, in part, on a calculation of the percentage of inpatient hospital days of patients eligible for Medicaid (but not Medicare) as compared to the total number of hospital inpatient days (referred to the "Medicaid fraction" or the "Medicaid proxy").[1]  Plaintiff seeks to include in the numerator of the Medicaid fraction not only the hospital days of Medicaid-eligible patients (which are not at issue) but also the days of patients who received health care benefits designed and funded by the State of Arizona ("State-only days").

The Arizona Health Care Cost Containment System (hereafter "AHCCCS") operates *both* the State's Medicaid program *and* its separate State-only health care programs whose participants are not Medicaid eligible.  Since 1982, in light of a demonstration project waiver granted by the Secretary, AHCCCS enrolled Medicaid-eligible beneficiaries in managed care plans.  At all relevant times, AHCCCS also enrolled beneficiaries in its State-funded, non-Medicaid programs in these same managed care health plans.  That, however, does not make the individuals enrolled in the latter programs "eligible for medical assistance under a State plan under subchapter XIX" of the Social Security Act, *i.e.*, Medicaid.

Contrary to plaintiff's lengthy recitation of historic, but irrelevant, litigation, *see* Pl. Mot. at 1-2, 6-7, the plain language of the Medicaid proxy of the Medicare DSH provision provides for a "DSH adjustment," (additional Medicare payments based on a hospital's DSH status) by including

---

[1]  This case does not concern the calculation of the SSI days, often referred to as the "Medicare proxy."

only those hospital inpatient days of Medicaid-eligible beneficiaries, *i.e.*, those "eligible for Medical assistance under a State plan under subchapter XIX of this chapter [the Medicaid program]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) . Congress has repeatedly employed the exact statutory term used in the Medicare DSH adjustment in other Medicare and Medicaid provisions, and courts have repeatedly found that this statutory term means "eligible for Medicaid" under Title XIX of the Social Security Act. *See, e.g.,* 42 U.S.C. §§ 1396a *et seq.*[2]

The administrative record in this case makes clear that AHCCCS operated two distinct programs throughout the times relevant to this litigation, and that only the days of patients eligible for the Federal State Medicaid program operated by AHCCCS were and should have been included in the hospitals' Medicare DSH adjustment. Because participants in the exclusively State-funded health care programs were *not* Medicaid-eligible, their days were not included, as is apparent from the plain language of the statute. But even if the terms of the Medicare DSH provision were found to be ambiguous, the Secretary's interpretation of that provision to include only the days of Medicaid-eligible patients would, regardless of how plaintiff characterizes the Secretary's interpretation, nevertheless be entitled to deference, and should be upheld.

Moreover, Congress has clarified that, in the cost years at issue in this case, even when hospitals treated patients who were not eligible for medical assistance under a State Medicaid plan approved under Title XIX, but whose costs, unlike here, were matched with Federal matching payments through a separate demonstration project waiver, the Secretary was not required to

---

[2] As discussed more fully, *infra*, the courts of appeals have uniformly interpreted the statutory term "eligible for medical assistance under a State plan under Title XIX (*i.e.,* Medicaid)" to mean "eligible for Medicaid." "Medical assistance" under Title XIX refers to Medicaid itself, not some other State program that included individuals who are not themselves Medicaid-eligible. One court in this district has disagreed, and that case is on appeal. *Adena Reg. Med. Ctr. v. Leavitt*, 524 F. Supp. 2d 1, 4 (D.D.C. 2007), *appeal pending*, No. 07-5273 (D.C. Cir.). Defendant submits that the D.C. Circuit's upcoming decision in *Adena* is likely to significantly influence, if not control, the outcome of this case.

include in the calculation of the Medicare DSH adjustment the inpatient days of those patients (known as "expansion populations," or "expansion waiver populations"), unless the Secretary had made the discretionary decision to the contrary.  Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (Feb. 8, 2006).  Congress spoke directly and clearly on this issue, and even expressly ratified the Secretary's policy at issue here of including only Medicaid-eligible patients in the Medicare DSH adjustment.  Indeed, even if Congress's clarification were deemed a change in the law, it would nonetheless be the law this Court must apply in reviewing this case.[3]  Congress's clarification that even inpatient days of days of those expansion populations for which the States received Federal matching payments were *not* required to be included in the calculation of the DSH payments, and would be included only at the Secretary's discretion, leaves no doubt that the Medicare DSH adjustment does not, contrary to plaintiff's argument here, include days of State-only populations, who are even further removed from the Medicaid program.  As important, even if the days of the State-only AHCCCS patients at issue here were considered to be days of expansion waiver populations rather than State-only days, the Medicare DSH adjustment would not include these days.

The administration of the Medicare DSH adjustment is complex, and, historically, certain hospitals have erroneously received Medicare DSH payments based in part on days of hospital inpatients who were not Medicaid-eligible.  Recognizing this fact, in 1999 the Secretary announced a "hold harmless" policy that eliminated those hospitals' liability for refunding those overpayments.  In this case, however, none of plaintiff's hospitals can satisfy the Secretary's criteria for hold harmless payments because none of them received Medicare DSH adjustments

_____

[3]  *See Cookeville Reg'l Med. Ctr. v. Leavitt,* No. 04-1053, 2006 WL 278831(D.D.C. Sept. 26, 2006) [Attached at Tab 1], *appeal pending,* No. 07-5252 (D.C. Cir.).  Like the D.C. Circuit's pending decision in *Adena, supra,* defendant submits that the D.C. Circuit's pending resolution of *Cookeville* is also likely to significantly affect, if not control, the outcome of this case.

that included days of State-only patients for any of the cost years at issue here, none had–before

the announcement of the hold harmless policy–specifically appealed the denial of the State-only

days, and none can demonstrate a reasonable reliance interest in receiving these erroneous DSH

payments.  Accordingly, the Secretary's determination here should be upheld.

## BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    Medicare and the Disproportionate Share Hospital Adjustment

This case arises under Part A of the Medicare program, which provides payments for

inpatient hospital services and related care.  42 U.S.C. §§ 1395c *et seq.*  Since 1983, the Secretary

has paid for inpatient hospital services for Medicare patients primarily through the Prospective

Payment System ("PPS").  *See* 42 U.S.C. § 1395ww(d).  Generally speaking, the Secretary bases

an individual hospital's PPS payment on prospectively determined national rates, rather than on

the actual operating costs incurred by the hospital.  42 U.S.C. §§ 1395ww(d)(1)-(4).  However, the

PPS contains a number of provisions that adjust payments on the basis of hospital-specific factors.

*See, e.g., id.* § 1395ww(d)(5).  This case involves one of those hospital-specific adjustments

known as the Medicare disproportionate share hospital ("DSH") adjustment.  *See* Consolidated

Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9105, 100 Stat. 82 (1986).

The DSH provision requires the Secretary of Health and Human Services to provide increased PPS

payments to hospitals that serve a "significantly disproportionate number of low-income patients."

42 U.S.C. § 1395ww(d)(5)(F)(i)(I).  Congress enacted this provision because it determined that

hospitals serving disproportionate numbers of low-income patients generally incur higher per-case

costs for treating Medicare patients.  *See, e.g.*, H.R. Rep. No. 99-241 at 16 (1986), *reprinted in*

1986 U.S.C.C.A.N. 579, 594.  Congress specifically defined how these additional DSH payments

were to be calculated and that calculation was to be made by counting inpatient days of two

specific population groups.

Whether a hospital qualifies for the Medicare DSH adjustment, and how large an adjustment it receives if it does qualify, depend primarily on the hospital's "disproportionate patient percentage." 42 U.S.C. § 1395ww(d)(5)(F)(v). Congress provided a statutory definition of "disproportionate patient percentage," which is codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi) and represents the combination of two fractions both of which serve *as a proxy* for low income. The first component, which is not at issue in this case, is known as the "Medicare fraction." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The second component, which is at the heart of this case, uses Medicaid eligibility *as the low-income proxy*. Known as the "Medicaid fraction" or "Medicaid proxy," it is defined as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of *patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter* [*i.e.*, the Medicaid program], but who were not entitled to benefits under part A of this subchapter [*i.e.*, the Medicare program], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). Generally under this equation, a hospital's Medicare DSH adjustment grows as the count of relevant patient days in the numerator of the Medicaid fraction increases. *See id.*; 42 U.S.C. § 1395ww(d)(5)(F)(vii)- (xiii).

### 2.    Medicaid

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, is commonly referred to as the Medicaid statute. Medicaid is a cooperative Federal-State program that provides health care to low-income persons. *See* 42 U.S.C. §§ 1396 - 1396v. *See also* 42 C.F.R. §§ 430.0 *et seq.* (implementing regulations). Medicaid benefits are provided pursuant to a State Medicaid plan, which specifies, among other things, the categories of individuals who are eligible to receive medical assistance under the State plan and the specific kinds of medical care and services that the

State plan will cover under the Medicaid program.  If the State plan is approved by the Secretary, the State is thereafter eligible to receive matching payments from the Federal government of the amounts "expended . . . as medical assistance under the State plan."  42 U.S.C. §§ 1396b(a)(1), 1396d(b).

The Medicaid statute establishes a number of requirements that must be met in order for the Secretary to approve a State plan for medical assistance.  *See generally id.* §§ 1396a(a)(1)-(65). In particular, the Medicaid statute sets forth a number of limiting requirements, including income and resource limitations, that apply to individuals who receive medical assistance under the State plan.  *See, e.g., id.* §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII).  *See also id.* § 1396b(f).  Individuals who do *not* meet the applicable Medicaid eligibility requirements, either by reason of their income levels or for other reasons, are *not* eligible for Medicaid.

The Medicaid statute requires that a State plan must make medical care available to certain groups of "categorically needy" persons, *id.* § 1396a(a)(10)(A)(i), and provides each participating State with the option to include in its State plan certain other specified groups of individuals.  *Id.* § 1396a(a)(10)(A)(ii).  At its option, a State may make medical assistance available to "medically needy" persons.  *Id.* § 1396a(a)(10)(C).  While these medically needy individuals do not need to be within the categorically needy groups specified in §§ 1396a(a)(10)(A)(i) or 1396a(a)(10)(A)(ii), they must fall within thirteen broader categories of individuals specified in the definition of medical assistance under § 1396d(a)(i)-(xiii).  The Medicaid statute limits the definition of "medical assistance" that can be made available under the State plan to payments that can be made on behalf of populations of Medicaid-eligible individuals.  42 U.S.C. § 1396d(a).  In other words, the Secretary's approval of a State plan that covers categorically needy individuals and certain medically needy individuals makes those *patients* eligible for Medicaid.  By contrast, individuals who are *not* categorically needy or *not* in a medically needy population that the State has elected to

-6-

cover under the Medicaid program are generally not eligible for Medicaid. Nevertheless, nothing in the Medicaid statute prevents the States from providing their own, State-funded medical services to populations not eligible for Medicaid, as indeed many states, including Arizona, do.

### 3.    Demonstration Projects

The Social Security Act provides the Secretary with two separate grants of authority to approve demonstration projects in order to allow States to explore innovative health-care initiatives, only the first of which is at issue in this case. *See* 42 U.S.C. § 1315 (Subchapter XI, section 1115 of the Social Security Act).

First, the Secretary may waive "compliance with any of the requirements of section . . . 1396a," including, for example, free access to mandatory medical services, *id.* § 1396a(a)(14), freedom to choose a provider, *id.* § 1396a(a)(23), and reimbursement arrangements with health care providers. *Id.* § 1396a(a)13. *See* 42 U.S.C. § 1315(a)(1). In other words, the Secretary has the authority to approve a demonstration project offering, for example, either different *benefits* not otherwise authorized by the Medicaid statute or benefits to *individuals* who do *not* otherwise qualify for benefits under the Medicaid statute.

Second, the Secretary, pursuant to his demonstration waiver authority, may treat the State's costs of providing benefits under the demonstration project as reimbursable Medicaid expenditures. 42 U.S.C. § 1315(a)(2).[4] Such individuals, who are *not* eligible for medical assistance under a State Medicaid plan approved under Title XIX, but who *are* eligible for healthcare coverage under a demonstration project approved under Title XI, section 1115, are referred to as "expansion waiver populations" or "expansion populations," and, when the Secretary

---

[4] Since 1994, federal policy has required that demonstration projects be budget-neutral with respect to the federal government, so that the federal government's costs over the life of the project do not exceed the contribution that the federal government would make to the State under the State Medicaid plan in the absence of the project. *See generally* 59 Fed. Reg. 49249, 49250 (Sept. 27, 1994).

has exercised his authority under section 1115(a)(2), a State can obtain federal matching funds for healthcare coverage provided to these populations.[5]  To be clear, expansion populations are distinct from State-funded, or "State-only" populations, discussed *infra*, that are at issue in this case.

### 4.        Medicare DSH Adjustment Payment Policy

#### a.        Pre-2000 DSH Adjustment Policy

Prior to January 2000, the Secretary's policy was to include only Medicaid-eligible populations, and not expansion waiver populations, in calculating the DSH adjustment.  Pursuant to his authority under the Social Security Act, the Secretary determined that patients who were members of expansion populations were not "patients entitled to Medicaid" under Title XIX, but instead received benefits pursuant to a demonstration project under Title XI.  42 C.F.R. § 412.106(b)(4) (1996); 51 Fed. Reg. 16772, 16777 (1986) (including only those patients "entitled to" Medicaid).  The Secretary therefore explained that the Medicaid fraction of the Medicare DSH statute would include only inpatient days of those individuals whose "benefits are payable under [T]itle XIX," *i.e.*, the Medicaid statute.  51 Fed. Reg. at 16777.  *See also* AR 398-99 (HCFA Ruling 97-2) (acknowledging that the statutory language "eligible for medical assistance" included "days on which the patient meets Medicaid eligibility criteria" regardless of whether a hospital received Medicaid payments for that patient; "Medicaid eligibility" thus includes, for example, a patient who had exceeded Medicaid coverage limitations on inpatient hospital days of service)).

#### b.        Program Memorandum A-99-62

In December 1999, the Secretary determined that it was "necessary to clarify the definition of eligible Medicaid days [for purposes of calculating the Medicare DSH adjustment]. . . and

---

[5]  It is important to note that when Congress first enacted the Medicare DSH adjustment provision there were no approved section 1115 expansion waiver demonstration projects.  65 Fed. Reg. 3136, 3137 (2000).

communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations." Program Memorandum No. A-99-62 ("PM A-99-62"), AR 401-07. The Program Memorandum explained that the term "Medicaid days," "does *not* refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical [care] under an approved Title XIX State plan." *Id.* at 402 (emphasis original).

In making this clarification, the Program Memorandum acknowledged that for cost years beginning prior to January 1, 2000, some fiscal intermediaries had made "Medicare DSH adjustment payments . . . attributable to the erroneous inclusion of State-only, . . . ineligible waiver or demonstration population days in the Medicaid [proxy]." *Id.* at 403  This error occurred because intermediaries and hospitals had relied upon "Medicaid days data obtained from State Medicaid agencies" that had "commingled [various] types of . . . ineligible days . . . with Medicaid Title XIX days." *Id.*[6]

In light of this clarification, the Secretary, in the further exercise of his discretion, determined that it was appropriate to hold harmless those hospitals that had already received payment for that erroneous inclusion or had filed *"a jurisdictionally proper appeal to the [Board] on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999."* *Id.* at 404 (emphasis in original). The Secretary explained that "[i]n practical terms this means that [fiscal intermediaries] are not to reopen any cost reports for . . . periods beginning before January 1, 2000 to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of . . . State-only,  . . . waiver or demonstration population days if the hospital received payments for those days." *Id.* at 403. The Secretary did not want intermediaries to

---

[6] The Program Memorandum addressed not only expansion waiver populations, but also numerous other populations that had from time to time been erroneously included in the DSH adjustment, such as patients who received benefits under purely state programs. *See* AR 401-05.

"reopen[] . . . settled cost report[s]" when hospitals had already received payment based on the erroneous calculation.  *Id.* at 404.  Likewise, the Secretary instructed intermediaries, for periods prior to January 1, 2000 that remained open, "to allow these types of [erroneously-included] days . . . only in accordance with the practice followed for the hospital at issue *before October 15, 1999*." *Id.* (emphasis added).  Accordingly, the hold-harmless determination accommodated the reliance interest of those hospitals that might have received payments reflecting the erroneous inclusion of State-only or expansion populations in calculating the Medicare DSH adjustment.

However, the Secretary's program memorandum also made it plain that hospitals which had no such reliance interests were not to receive payments reflecting the inclusion of State-only or expansion waiver populations in the DSH adjustment for years prior to January 1, 2000. Accordingly, where a hospital "did not [already] receive any payment based on the erroneous inclusion of . . . State-only, . . . waiver or demonstration population days for cost reports that were settled before October 15, 1999," *and* where the hospital did not "*appeal . . . on this issue*," the Secretary would not make DSH payments based on the hold harmless policy.  *Id.* (emphasis added).[7]

### c.    Current DSH Adjustment Policy

The Secretary published a rule revising his DSH adjustment policy on January 20, 2000. *Prospectively*, the Secretary decided to allow hospitals to include inpatient days of *expansion populations* in the Medicare DSH adjustment by allowing "hospitals to include the patient days of

---

[7]  The Program Memorandum contained the following direction to Fiscal Intermediaries:

Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on other Medicare DSH issues or other unrelated issues.

AR 405.

all populations eligible for Title XIX matching payments in a State's [approved] section 1115 waiver in calculating the hospital's Medicare DSH adjustment." 65 Fed. Reg. 3136 (Jan. 20, 2000).[8]  The Secretary stated that including "expanded waiver populations in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals of treating low income individuals covered under Medicaid." 65 Fed. Reg. at 3137.  The Secretary assessed the budgetary cost of changing the rule, estimating that the broader rule it was promulgating would result in an increase in Medicare payments of $370 million in the next fiscal year in the eight states in which there were expansion waiver demonstration projects.  *Id.* at 3138.

Although the Secretary changed the policy *prospectively*, the Secretary explained that "[u]nder current policy . . . expanded eligibility groups [under section 1115 demonstration projects] . . . [a]re *not* to be included in the Medicare DSH calculation." 65 Fed. Reg. at 3136. Nevertheless, the Secretary preserved the hold harmless policy announced in PM-A-99-62.

To be clear, the Secretary's decision prospectively to include expansion populations in the Medicaid fraction of the Medicare DSH adjustment had no effect on State-only populations, such as those at issue in this case.  The Secretary's policy has never been to include inpatient days of State-only populations in the Medicaid proxy of the Medicare DSH adjustment.

### 5.    Medicare DSH Adjustment Policy Ratification

Six years after the Secretary announced his current DSH adjustment policy, Congress passed the Deficit Reduction Act of 2005.  In pertinent part, § 5002 of the Act amended the

---

[8]  The relevant regulation provides:

Effective with discharges occurring *on or after January 20, 2000*, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals *may* include all days attributable to populations *eligible* for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4)(ii) (emphasis added).

-11-

Medicare DSH provision by adding the following:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [T]itleXIX, the Secretary *may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under [T]itleXI.*

Pub. L. No. 109-171, § 5002(a), 120 Stat. 4, 31 (Feb. 8, 2006) (emphasis added).  In addition, § 5002 expressly identified by Federal Register citation and expressly ratified the Secretary's Medicare DSH adjustment policy, as clarified on January 20, 2000,*"including the policy in such regulations regarding discharges occurring prior to January 20, 2000."  Id.* at § 5002(b).  Accordingly, § 5002 expressly ratified the Secretary's Medicare DSH adjustment policy of counting only inpatient days of individuals eligible for Medicaid for discharges occurring prior to January 20, 2000, and counting both inpatient days of individuals eligible for Medicaid and inpatient days of individuals included in approved expansion waiver projects for discharges occurring on or after January 20, 2000.

### 6.    Administrative Procedures

Generally, a hospital receives an interim Medicare payment after it discharges each Medicare patient and sends a bill to Medicare.  *See* 42 U.S.C.A. § 1395g(a); 42 C.F.R. § 413.60.[9] Acting as the agent of Medicare, a Fiscal Intermediary (typically a health care insurance company, such as Blue Cross Blue Shield, pursuant to a contract with the Secretary) reconciles those Medicare payments annually after reviewing the hospital's end-of-year cost reports.  42 U.S.C. § 1395g; 42 C.F.R. §§ 405.1801(b)(1), 413.24(f), 413.64(f).  The Fiscal Intermediary then issues a "Notice of Amount of Program Reimbursement" ("NPR"), which identifies the amount the hospital will be paid by Medicare for that year.  42 C.F.R § 405.1803.

---

[9] These interim payments may include a Medicare DSH adjustment.  AR 135 (Tr. 105:23 - 106:12).

A hospital that disagrees with a determination of the Fiscal Intermediary in an NPR may request an administrative hearing within 180 days of receiving the notice before the Provider Reimbursement Review Board ("PRRB" or "the Board").  42 U.S.C. § 1395oo(a).  The hospital's request for a hearing *must identify the issues that it is appealing,* 42 C.F.R. § 405.1841(a)(1), but, absent specific restrictions (such as those in the hold harmless policy), a hospital may add issues to the pending appeal up until the commencement of the hearing.  *Id.*

The Board is empowered to affirm, modify, or reverse a final determination of the Fiscal Intermediary.  42 U.S.C. § 1395oo(d).  The Board's decision with respect to reimbursement is the final agency action unless the Secretary exercises his authority to reverse, affirm, or modify that decision within 60 days after the provider is notified of that decision.  42 U.S.C. § 1395oo(f)(1).  A hospital has the right under the statute to seek judicial review of any such final determination in federal district court.  *Id.*

## B.    Factual Background

Prior to 1982, Arizona was the only State in the nation that had declined Federal Medicaid funds for low-income women, children, aged, blind, and the disabled.  AR 228.  Rather than accepting Federal funds for health care, the State relied on individual counties to fund and provide indigent care.  *Id.*

In 1981, the State legislature created the Arizona Health Care Cost Containment System (hereafter "AHCCCS" and pronounced "Access"), which became effective in 1982.  *See* Laws 1981, 4th S.S., Ch. 1, § 11, *codified at* Ariz. Rev. Stat. §§ 36-2901 *et seq.* (1999).  Rather than rely on a fee-for-service payment system, AHCCCS pays public and private managed care health plans an up-front monthly capitation payment on behalf of its enrollees.  AR 228.  The managed care plans are then responsible for managing all covered health care services provided to their AHCCCS enrollees.  *Id.  See also* Ariz. Rev. Stat. § 26-2904(A) (1999).  At all time relevant to

this litigation, AHCCCS provided health care benefits to individuals enrolled in healthcare

programs paid for exclusively by the State.  Those programs included individuals eligible for the

three State-funded groups at issue in this litigation:  the Medically Needy/Medically Indigent,

Eligible Low-Income Children, and Eligible Assistance to Children (EAC) (collectively "State-

only populations").  *See, e.g.*, AR 751-81 (reviewing State-only populations covered over the

history of the program).  *See also* Ariz. Rev. Stat. §§ 11-297, 36-2905, 36-2905.03 (expressly

defining "medically indigent," "medically needy," and "eligible child" as *not* eligible for

Medicaid) (1999).

Also in 1982, the Secretary approved the first demonstration project waiver pursuant to 42

U.S.C. § 1315(a)(1), which allowed Arizona to join and participate in the federal Medicaid

program solely through the demonstration project waiver.  AR 14-15; 228.  Under the waiver,

AHCCCS was permitted to require Medicaid enrollees to join managed care health plans and to be

subject to nominal cost sharing for mandatory medical services.  AR 229.  Thus, AHCCCS relies

on the same managed care health plans to deliver acute care services to both State-only and

Medicaid-eligible populations.  AR 233.  For each Medicaid enrollee, however, AHCCCS receives

Federal funds to reimburse a portion of each Medicaid dollar spent by AHCCCS.  AR 235.  *See*

*also* Ariz. Rev. Stat. § 36-2903.01(B)(5) (1999) (authorizing AHCCCS to apply for and accept

federal funds available under Title XIX of the Social Security Act to "be used *only* for the support

of persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct") (emphasis

added).  By contrast, AHCCCS did not obtain a waiver for any of its State-funded populations.

AR 235.  As a result, AHCCCS is funded by a combination of Federal, State, and county funds.

*Id.*[10]  Nevertheless, AHCCCS maintains separate eligibility criteria for its Medically

---

[10]  In 2001, the Secretary approved an AHCCCS proposal to expand Medicaid coverage to,
among others, many individuals in the three, previously State-only populations at issue in this

Needy/Medically Indigent and Eligible Children programs, and for its Medicaid programs. Ariz. Rev. Stat. § 36-2901(4)(a-c, h) (1999).

As part of its demonstration project waiver, AHCCCS makes Medicaid (rather than Medicare) DSH payments to participating hospitals. *See, e.g.*, AR 345. AHCCCS calculates Medicaid DSH payments in one of two ways: (i) it calculates a hospital's Medicaid DSH payment based on the hospital's Medicaid-eligible patient days; or (ii) it calculates a hospital's Medicaid DSH payment based on the care provided to the hospital's low-income patients who receive care because they are eligible for Medicaid, State-, or County-funded programs), plus the cost of charity care the hospital provides. *Id.* Hospitals are paid the larger of the two calculations. *See, e.g.,* AR 338. Like the rest of AHCCCS's Medicaid expenditures, the agency receives Federal matching payments for its Medicaid DSH adjustment payments. AR 64, 65, 355.

Plaintiff Banner Health System operates four short-term acute care hospitals in or near Phoenix, Arizona: Good Samaritan, Desert Samaritan, Thunderbird Samaritan, and Maryvale Samaritan. AR 36, 42, 61. Good Samaritan qualified as a disproportionate share hospital and received Medicare DSH payments from 1986 through 1989 that erroneously included State-only patients days. AR 82.[11] That hospital also received interim, but not final, Medicare DSH payments in 1990 through 1992 that also erroneously included State-only patient days. AR 82, 135-36 (Tr.105:15 - 109:6). Desert Samaritan, Thunderbird Samaritan, and Maryvale Samaritan qualified for Medicare DSH payments beginning in 1991. AR 82.

The present dispute centers around the decision of Blue Cross Blue Shield of Arizona, acting as the Medicare Fiscal Intermediary to include only Medicaid-eligible patient days in the

litigation. AR 247; 354. This change had no retroactive effect.

[11] In 1992, the Secretary informed Good Samaritan that for cost reports after 1989, Medicare DSH adjustments would be based only on Medicaid days, not State-only days. *See, e.g.*, AR 456. *See also* AR 135-36 (Tr. 108:14-109:6)

hospitals' Medicare DSH adjustments for cost years 1991 and 1993 through 1999.  AR 15.  On February 24, 1992, the Secretary informed the hospitals that, for cost reporting periods beginning in 1990, their Medicare DSH payments under the Medicaid proxy would include those days for which the hospitals' patients were eligible for Medicaid, and that interim Medicare DSH payments would "be revised to reflect the inclusion of Title XIX days only."  AR 456.  Accordingly, in calculating the hospitals' Medicare DSH adjustment for each year at issue, the Intermediary included only those days in which the hospitals' patients were eligible for Medicaid, but did not include days in which the hospitals' patients were eligible for health care coverage under State-only programs.  AR 69.  Although the hospitals appealed their NPRs for each cost year at issue, they did not seek inclusion of these State-only days until they amended their appeals in 2000–after the Secretary announced the hold harmless policy in Program Memorandum A-99-62–to include the issue of the Intermediary's use of only Medicaid-eligible patient days in the hospitals' Medicare DSH adjustments.  AR 70.

## ARGUMENT

## I.    STANDARD OF REVIEW

Judicial review of a final determination rendered by the Secretary is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.  Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994).   Under the APA, a court may set aside an agency action if the court finds that action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  *See Episcopal Hosp. v. Shalala*, 994 F.2d 879, 884 (D.C. Cir. 1993).  Similarly, a court may set aside any agency decision issued on the basis of an evidentiary hearing record only if the agency decision is "unsupported by substantial evidence" in the record.  5 U.S.C. § 706(2)(E).  *See Kidney Ctr. of Hollywood v. Shalala,* 133 F.3d 78, 85 (D.C. Cir. 1998).

-16-

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983). Similarly, the substantial evidence standard of review is "highly deferential." *Nat'l Med. Enterps., Inc. v. Shalala,* 43 F.3d 691, 693-94 (D.C. Cir. 1995). In addition, a court must give substantial deference to an agency's interpretation of its own regulations, *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945), and that interpretation "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" itself, *Thomas Jefferson,* 512 U.S. at 512 (quoting *Bowles,* 325 U.S. at 414). Under this test, a court must defer to an agency's interpretation of a regulation unless an alternative reading is "compelled by the regulation's plain language" or, if the language is ambiguous, by "other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* Accordingly, if the language of a regulation does not "speak[ ] clearly 'to the precise question at issue'" in a case, "say[ing] nothing explicitly about" the specific matter in dispute, a court must give substantial deference to the agency's resolution of the resulting ambiguity. *Barnhart v. Walton,* 535 U.S. 212, 217-19 (2002). A court's task, then, is "not to decide which among several competing interpretations best serves the regulatory purpose;" rather, the Court's limited role is to set aside only those agency interpretations that affirmatively are plainly "inconsistent" with the regulation itself. *Thomas Jefferson,* 512 U.S. at 512. The Supreme Court has recognized that this heightened deference is particularly warranted in the Medicare context because of the complex and highly technical nature of the program, where "the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson,* 512 U.S. at 512 (citations omitted).

-17-

II.    **THE MEDICARE DSH PROVISION DOES NOT INCLUDE DAYS OF STATE-ONLY POPULATIONS IN THE DSH ADJUSTMENT**

A.    **The Plain Meaning of the Medicare DSH Provision Does Not Include Days of State-Only Populations**

In *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984), the Supreme Court "recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  The first question under Chevron is "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  If the statute "is silent or ambiguous with respect to the specific issue," the court must proceed to the second prong of *Chevron*, under which "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

The statutory text of the Medicare DSH provision is straightforward with regard to counting the inpatient days of the State-only populations at issue in this case:  those days are not included in the calculation because the State-only program beneficiaries are not eligible for Medicaid.  The statute specifies that the numerator of the Medicaid fraction includes patient days for those "patients who (for such days) were eligible for medical assistance under a State plan approved *under subchapter XIX* of this chapter."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  "[S]ubchapter XIX" comprises the Medicaid provisions codified at 42 U.S.C. §§ 1396-1396v.  The referenced "State plan" is a State's Medicaid plan approved under those Medicaid provisions.  42 U.S.C. § 1396a ("State plans for medical assistance").  The statute defines the term "medical assistance," moreover, as the "payment of part or all of the cost" of certain medical services for certain broad categories of individuals.  42 U.S.C. § 1396d(a).  Further, a person is "eligible for" that "medical assistance" only if he or she fits into one of the groups of categorically needy or medically needy individuals within those broad categories, who

-18-

are specified as eligible for medical assistance under the State Medicaid plan. *See* 42 U.S.C.

§§ 1396a(a)(10)(A)(i)-(IV), (VI), (VII); *see also id.* § 1396b(f).

Indeed, Congress used the exact construction "eligible for medical assistance under a [or the] State plan" at least thirty-five times in the Social Security Act and elsewhere.[12]  Congress used nearly identical variations on this formulation at least an additional fourteen times.[13]  In each of these instances, Congress is identifying individuals who are eligible for Medicaid.

Contrary to plaintiff's suggestion, Pl. Mot. at 2, 6-7, the courts of appeals have uniformly

---

[12]  *See* 8 U.S.C. § 1182(o)(6)(B)(iii); 8 U.S.C. § 1612(b)(2)(F) (referring to certain aliens eligible for Medicaid); 42 U.S.C. § 602(a)(3) (requiring states to take such actions as are necessary to ensure that children in foster care program are "are eligible for medical assistance under the State plan under subchapter XIX"); 42 U.S.C. § 1320a-7b(a)(6) (used to prohibit making false statements in order to become eligible for Medicaid); 42 U.S.C. § 1382b(b)(3) (used twice); 42 U.S.C. § 1396a(a)(10)(A)(ii)(VII)(cc) (referring to a child who is "eligible for medical assistance under the State plan"); 42 U.S.C. § 1396a(a)(10)(E); 42 U.S.C. § 1396a-(a)(70); 42 U.S.C. § 1396a(e)(3); 42 U.S.C. § 1396a(q)(1)(B); 42 U.S.C. § 1396a(r)(1)(B)(i)(II); 42 U.S.C. § 1396b-(m)(1)(A)(i); 42 U.S.C. § 1396d(q)(1)(B); 42 U.S.C. § 1396j(c); 42 U.S.C. § 1396n(i)(1); 42 U.S.C. §1396p(c)(1)(D)(ii) & (c)(4); 42 U.S.C. § 1396r(c)(5)(B)(iii); 42 U.S.C. § 1396r-1(c)(2) & (3) (used twice to describe pregnant women who are eligible for Medicaid); 42 U.S.C. § 1396r-1a(c)(2) & (3) (used twice to describe children who are eligible for Medicaid); 42 U.S.C. § 1396r-1b(c)(2) & (3) (used twice to describe certain breast and cervical cancer patients who are eligible for Medicaid); 42 U.S.C. § 1396r-4 (used three times in Medicaid DSH provision); 42 U.S.C. § 1396r-8(a)(5)(B); 42 U.S.C. § 1396u-2 (used seven times); 42 U.S.C. § 1396u-4(a)(1); Pub. L. No. 93-66, Title II, § 231, 87 Stat. 159 (1973).

[13]  *See* 8 U.S.C. § 1611(b)(1)(A) ("eligibility requirements for medical assistance under the State plan"); 38 U.S.C. § 1722(a)(1) & (g) ("eligible to receive medical assistance under a State plan"); 42 U.S.C. § 254b(k)(3) ("eligible for medical assistance under such a State plan"); 42 U.S.C. § 300z-5(a)(13) ("eligible for medical assistance under such a State plan"); 42 U.S.C. § 608(a)(11)(A) & (B) ("eligible for medical assistance under the State's plan"); 42 U.S.C. § 1396a(a)(10)(G) ("eligibility for medical assistance under the State plan"); 42 U.S.C. § 1396a(a) ("eligible for medical assistance under such State plan"); 42 U.S.C. § 1396a(v) ("eligibility for medical assistance under the State plan"); 42 U.S.C. § 1396b(v)(2)(B) ("eligibility requirements for medical assistance under the State plan"); 42 U.S.C. § 1396k(a)(1) ("a condition of eligibility for medical assistance under the State plan"); 42 U.S.C. § 1396n(a)(1)(A) ("contract with an organization which has agreed to provide care and services in addition to those offered under the State plan to individuals eligible for medical assistance"); 42 U.S.C. § 1396n(g)(3) (referring to individuals "not eligible for medical assistance under the State plan"); 42 U.S.C. § 1396r-6(b)(3)(B) ("family may reestablish eligibility for medical assistance under the State plan"); 42 U.S.C. § 1397ee(d)(1) ("eligibility for medical assistance under the State plan").

concluded that *eligibility for Medicaid* is the touchstone of the Medicaid proxy of the Medicare DSH provision. *See Cabell Huntington Hosp. Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996); *Deaconess Health Serv. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp. Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 276 (6th Cir. 1994). *See also Cookeville Reg'l Med. Ctr.*, 2006 WL 278831, at *7-8 (expressly holding that expansion waiver populations cannot be included in the Medicaid proxy of the Medicare DSH adjustment because Congress has found that they are not eligible for Medicaid). As the Fourth Circuit explained, "[i]t is apparent that 'eligible for medical assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a *particular state's* Medicaid plan." *Cabell Huntington*, 101 F.3d at 989 (emphasis added).[14] Likewise, the House Report accompanying the provision explained that the "proxy measure for low-income would be the percentage of a hospital's total patient days *attributable to medicaid patients*." H.R. Rep. No. 99-241 at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 579, 594 (emphasis added); *id*. (referring to those patients as "medicaid-eligible"); *id*. at 17, *reprinted in* 1986 U.S.C.C.A.N. at 595 (if a "patient is *eligible for medicaid* at any point during his inpatient stay, all days of care attributable to that patient would be counted under the provision, whether or not actually paid for by the medicaid program") (emphasis added). Since none of the State-only patients at issue here were eligible for Medicaid at any time during

---

[14] The D.C. Circuit has explained that the "natural reading of the" provision leads to the conclusion that it includes "patients who were 'eligible' for Medicaid benefits." *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 810 (D.C. Cir. 2001); *see id*. at 809 (DSH "numerator . . . calls for the number of inpatient days of patients who 'were *eligible* for medical assistance under a State plan [*i.e.*, Medicaid].'") (emphasis and alteration in original). *But see Adena Reg. Med. Ctr. v. Leavitt*, 524 F. Supp. 2d 1, 4 (D.D.C. 2007) (holding that phrase "eligible for medical assistance under a [S]tate plan approved under Title XIX " is not "long-hand" for "eligible for Medicaid."), *appeal pending*, No. 07-5273 (D.C. Cir.). Defendant submits that the district court's decision in *Adena* is wrong because the Secretary did not approve the state charity-care plan at issue in that case and because the beneficiaries of that State-only program were not Medicaid-eligible.

this dispute, plaintiff can find recourse neither in the decisions of the courts of appeals nor the legislative history of the Medicare DSH provision.

In later enactments, moreover, Congress has further emphasized that it meant to key the Medicaid proxy of the DSH provision to Medicaid eligibility. In the Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006), Congress reversed the conclusion of the Ninth Circuit that the Medicare DSH provision unambiguously included individuals who received care under a Social Security Act section 1115(a)(2) demonstration project. *See Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091 (9th Cir. 2005). Congress characterized patients receiving benefits under a demonstration project as being "not [] eligible" for medical assistance under a State plan "but who are regarded as such because they receive benefits under a demonstration project." § 5002(a). Accordingly, Congress made plain that it considered patients who were part of section 1115(a)(2) demonstration projects to be "not . . . eligible" for Medicaid; it could not conceivably have intended that the AHCCCS State-only patients – who likewise are not eligible for Medicaid – *must* be counted under the Medicare DSH provision.

Further, while Congress used the same phrase in the provisions of the *Medicaid* DSH statute, 42 U.S.C. § 1396r-4(c)(3)(B) ("eligible for medical assistance under a State plan"), it also expressly authorized States to consider *other "low-income patients"* in determining the Medicaid DSH adjustment. *Id.*[15] Likewise, the Medicare statute itself provides for a special DSH adjustment (known as the "Pickle DSH") for certain hospitals "serv[ing] a significantly disproportionate number of *low-income patients*" without regard to Medicaid eligibility. 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Because Congress "include[d] particular language in one section

---

[15] The complete text of this provision creates "an adjustment for each type of hospital that is reasonably related to the costs, volume, or proportion of services provided to patients eligible for medical assistance under a State plan approved under this subchapter *or to low-income patients*." *Id.* (emphasis added).

of a statute but omit[ted] it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate . . . exclusion." *Rodriguez v. U.S.*, 480 U.S. 522, 525 (1987).  Under the hospitals' theory, Pl. Mot. at 17, these other DSH provisions of the Social Security Act designed to sweep more broadly than Medicaid-eligibility alone would be rendered largely superfluous.  Congress directly spoke to the issue here in making plain that individuals who are not eligible for Medicaid–like Arizona's State-only population patients–are not counted in calculating the Medicare DSH provision.  Congress simply meant "the word 'eligible' [to mean] . . . whether a patient is capable of receiving . . . Medicaid." *Legacy Emanuel*, 97 F.3d at 1264.

### 1.   None of the State-only Patients Were Eligible for Medicaid Under State Law

#### a.   *AHCCCS Operates a State Health Program and a Medicaid Program*

Plaintiff simply argues that because the State-only populations were enrolled in the AHCCCS, they were enrolled in what plaintiff characterizes as the "Arizona Medicaid program" and therefore should be included in the Medicare DSH adjustment.  Pl. Mot. at 17.  Plaintiff's argument ignores both the plain language of the Medicaid statute itself, the provisions of Arizona State law, and the nature of AHCCCS.  Under the Medicare DSH statute, a person is "eligible for" that "medical assistance" only if he or she fits into one of the groups of categorically needy or medically needy individuals within those broad categories who are specified as eligible for medical assistance under the State Medicaid plan.  *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); *see also id.* § 1396b(f).  *See also Spry v. Thompson*, 487 F.3d 1272, 1277 (9th Cir. 2007) (expressly rejecting argument that even an individual receiving health care coverage as a member of an approved expansion waiver population may be deemed "eligible" for Medicaid); *Cookeville Reg. Med. Ctr.*, 2006 WL 278831, at *7-8 (expressly holding that an patient days of individuals

receiving health care coverage as members of an approved expansion waiver population cannot be included in the Medicaid proxy of the Medicare DSH adjustment).  Under Arizona law, AHCCCS provides certain healthcare benefits to individuals who are eligible for its Medicaid program *and* those eligible for State-only programs.  *E.g.,* AR 751.  However, simply because Arizona administers both programs under a single state agency does not magically transform AHCCCS's State-only populations into patients that are eligible for Medicaid.  Rather, Arizona law makes clear that AHCCCS operates separate Medicaid and State-only programs.  *See* Ariz. Rev. Stat. § 36-2903.01(B)(5) (1999) (authorizing AHCCCS to apply for and accept federal funds available under Title XIX of the Social Security Act "may be used *only* for the support of persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct") (emphasis added).  *See also* Ariz. Rev. Stat. §§ 11-297, 36-2905, 36-2905.03 (expressly defining "medically indigent," "medically needy," and "eligible child" as *not* eligible for Medicaid) (1999).  Thus, AHCCCS's State-only populations are not eligible for Medicaid.

> **b.    *The Secretary's Decision To Include Only Medicaid-Eligible Patients in the Medicaid Proxy Is Not Based Solely on the State's Receipt of Federal Matching Payments***

Plaintiff incorrectly contends that the basis of the Secretary's decision not to count Arizona's State-only population in the Medicare DSH adjustment was based solely on the fact that AHCCCS did not receive direct Federal matching payments for the State-only populations.  Pl. Mot. at 19.  Plaintiff further contends that this alleged focus on receipt of Federal matching payments somehow indicates that the Secretary is "attempting to breathe new life into a legal debate that has been settled for a decade."  Pl. Mot. at 19 (citing decisions rejecting the Secretary's prior policy of excluding from the Medicare DSH adjustment patient days of individuals who were Medicaid-eligible but whose hospital care was not paid by a State Medicaid program because the individual had exhausted his Medicaid inpatient hospital days under the State Medicaid plan).

These contentions misapprehend the Medicare DSH provisions and mischaracterize the Secretary's decision at issue here.

In determining a hospital's disproportionate patient percentage, 42 U.S.C. § 1886(d)(5)-(F)(vi)(ii) requires the Secretary to count the days of patients who were eligible for medical assistance under a State Plan approved under Title XIX. Plaintiffs ignore the fact that the term "medical assistance" is a defined term of art under Title XIX. *See* 42 U.S.C. § 1396d(a). The "term 'medical assistance' means payment of part or all of the cost of the following care and services . . . ." *Id.* Section 1396d(a) sets forth 13 categories of individuals that a State may choose to make eligible for "medical assistance" under its State plan. *See Cabell Huntington*, 101 F.3d at 990 ("Section 1396d defines 'medical assistance' to include twenty-five medical services. If Congress had wanted 'medical assistance' to take on a completely different meaning in the context of this Medicaid proxy provision of the [Medicare] DSH calculation, Congress could easily have so indicated."). Thus, the Secretary's decision here tracks, rather than contradicts, the decisions cited by plaintiff. *See, e.g., Jewish Hosp.,* 19 F.3d at 274-75 (finding that the Medicaid proxy includes days of patients eligible for Medicaid).

Indeed, one purpose of the phrase "medical assistance" is to specify when States will receive matching payments for care provided to the eligible patients. *See* 42 U.S.C. § 1396b(a)(1), 1396d(b) (providing matching payments for amounts "expended . . . as medical assistance under the State plan"). Contrary to the hospitals' argument, if an individual does not fall within one of these categories (and AHCCCS's State-only beneficiary in the 1990s did not), the care provided to that individual is not "medical assistance" under the State Medicaid plan. *Id. See also Spry*, 487 F.3d at 1277. As the Secretary has explained, "the term 'medical assistance' is not a general term used to describe people in need for whom a State decides to offer some relief. Rather, the term 'medical assistance' has a precise meaning including the identification of individuals who may be

covered." *Ashtabula Cty. Med. Ctr. v. Blue Cross/Blue Shield Ass'n AdminiStar Fed., Inc.*, Admin. Dec. No. 2005-D49 (Oct. 12, 2005) [Attached at Tab 2].

The days involved in this case are related to individuals not eligible for "medical assistance" as that term is used under Title XIX. Quite simply, these days are related to patients not eligible for Medicaid. As the record makes clear, this distinction formed the basis of the Secretary's decision. *See* AR 16 ("[T]he days involved in this case are related to individuals who are not eligible for 'medical assistance' as that term is used under Title XIX and thus, are not properly included in the Medicaid patient percentage of [the] Medicare DSH calculation under § 1886(d)(5)(F)(vi)(II).").

### c. *Plaintiff's Reliance on* Pharmaceutical Research & Mfrs. of Am. v. Thompson *is inapposite*

Plaintiff contends that the Secretary's decision below is impermissibly inconsistent with a litigation position he took in defending a case involving the Medicaid drug rebate program. *See* Pl. Mot. at 21 (citing *Pharmaceutical Research & Mfrs. of Am. ("PhRMA") v. Thompson,* 191 F. Supp. 2d 48 (D.D.C.), *rev'd,* 313 F.3d 600 (D.C. Cir. 2002)). *PhRMA* concerned the Secretary's authority to approve a demonstration project under 42 U.S.C. § 1315(a)(2) when, "in the judgment of the Secretary," the project "is likely to assist in promoting the objectives" of, among other things, the Medicaid program. Accordingly, the dispute in *PhRMA* concerned the extent of the Secretary's statutory authority to direct that the costs of the project "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan," 42 U.S.C. § 1315(a)(2)(A), in order to extend the reach of Maine's Medicaid drug rebate program. *PhRMA,* 191 F. Supp. 2d at 53-54. What this has to do with Medicaid eligibility or Medicare DSH payments plaintiff does not say. The Secretary never took the position that the State-only programs at issue in that case were for Medicaid-eligible individuals, *see PhRMA passim*, nor did

the Secretary provide Federal matching payments for those programs. *Id.* at 51-52. If the individuals enrolled in those State programs had been Medicaid-eligible, there would have been no case to begin with. Indeed, the conceded *lack* of Medicaid-eligibility of individuals enrolled in the State program was the sole reason for plaintiff's bringing of the lawsuit. *Id.* at 51.

Moreover, plaintiffs have not, and could not, make any showing that any aspect of the Secretary's authority under § 1315(a)(2)(A) to regard State demonstration project expenditures as expenditures under the approved State Medicaid plan is at issue in this case. *See* Compl. *passim*; Pl Mot. *passim*. Rather, Arizona law makes clear that no Federal matching funds are used for its State-only programs. *See* Ariz. Rev. Stat. § 36-2903.01(B)(5) (1999) (authorizing AHCCCS to apply for and accept federal funds available under Title XIX of the Social Security Act "may be used *only* for the support of persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct") (emphasis added). Thus, plaintiff's reliance on the Secretary's litigation position in *PhRMA* does not advance its case.

### d.    The Hospitals' Receipts of Medicaid *DSH Payments is Irrelevant*

Contrary to plaintiff's assertion, Pl. Mot. at 22-25, the fact that Arizona's Medicaid DSH payment to plaintiff's hospitals included State-only populations is irrelevant: the Medicaid DSH is an entirely different provision with an entirely different set of requirements than the Medicare DSH provision that is at issue here.

Unlike the Medicare DSH provision, the Medicaid DSH adjustment provision expressly provides States with broad flexibility in determining which hospitals in the state will be eligible for Medicaid DSH payments and on what basis. 42 U.S.C. § 1396r-4(b)(4) ("[t]he Secretary may not restrict a State's authority to designate hospitals as disproportionate share hospitals under this section"). Moreover, unlike the *Medicare* DSH provision, which keys its Medicaid fraction to eligibility for federal Medicaid, the *Medicaid* DSH provision expressly authorizes the

consideration, at the discretion of the State, of hospitals that treat a significant portion of individuals who are *not eligible* for Medicaid.  The Medicaid DSH statute authorizes an adjustment to be made "under a methodology that . . . results in an adjustment . . . that is reasonably related to the costs, volume, or proportion of services provided to patients eligible for medical assistance under a State [Medicaid] plan *or to low-income patients*."  *Id.* § 1396r-4(c)(3)(B) (emphasis added); *see also id.* § 1396r-4(a)(2)(D) (state must describe methodology used "to identify and make payments to disproportionate share hospitals . . . on the basis of the proportion of *low-income* and medicaid patients"); *see* 42 U.S.C. § 1396r-4(b)(4) ("[t]he Secretary may not restrict a State's authority to designate hospitals as disproportionate share hospitals under this section").[16]  As the Secretary has explained, "[s]ometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days;" this payment, "however, is not 'payment' for those days and does not mean that the *patient* is eligible for Medicaid benefits or can be counted in the Medicare [DSH] formula."  AR 407 (emphasis added).  *See also Spry*, 487 F.3d at 1277 (distinguishing calculations of hospital reimbursement from determinations of eligibility for Medicaid).  Because Congress "include[d] particular language in one section of a statute but omit[ted] it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate . . . exclusion."  Rodriguez, 480 U.S. at 525.  Under the hospitals' theory, Pl. Mot. at 17, these other DSH provisions in the Social Security Act designed to sweep more broadly than Medicaid-eligibility would be rendered impermissibly superfluous.  Rather, Congress directly spoke to the

---

[16]  The Medicare statute also creates a special DSH adjustment for certain hospitals "serv[ing] a significantly disproportionate number of low-income patients" without regard to Medicaid eligibility.  42 U.S.C. § 1395ww(d)(5)(F)(i)(I) (known as the "Pickle DSH").  That provision is not at issue here, but further underscores the fact that Congress knows how to reach more broadly than Medicaid eligibility when that is its intent in prescribing a formula for caculating a DSH adjustment.

issue here in making plain that individuals who are not eligible for Medicaid–like Arizona's State-only patients–are not counted in calculating the Medicare DSH provision.

> ### e.   The State-Only Patients Were Not Eligible for Medical Assistance Under a State Plan Approved Under Title XIX

Plaintiff makes the novel contention that, even if the State-only populations were not eligible for Medicaid in Arizona, they should be included in the Medicare DSH calculation because they "could have" been eligible for Medicaid "under *a* State plan that *could* be approved under Title XIX." Pl. Mot. at 25, 27 (first emphasis in original, second emphasis added). This argument lacks merit as a matter of statutory construction; moreover, the Secretary's decision to exclude the State-only populations at issue is supported by substantial evidence in the record.

1. Plaintiff's statutory argument could be read in either of two ways: (i) even if the patients its hospitals treated were not eligible for Medicaid under any State plan, so long as there remained the possibility that the Secretary could, under the Medicaid statute, *theoretically* approve a State plan under which they would be eligible, they should be included in the hospitals' Medicare DSH adjustment; or (ii) even if the patients its hospitals treated were not eligible under Arizona's system, so long as they might have been eligible under another State's plan (assuming they lived in that State, which they obviously do not), they should be included in the hospitals' Medicare DSH adjustment.

With respect to the first possible reading of plaintiff's argument, plaintiff argues, Pl. Mot. at 27, that "the statutory provision governing the Medicare DSH calculation is not geared to the particular State plan adopted by the State in which a hospital is located" because, according to plaintiff, the statute requires only that an individual be eligible for Medicaid under "*a* State plan," which plaintiff apparently interprets as meaning *any* State plan, including a theoretical one. Plaintiff's reference to "a State plan" is disingenuous–plaintiff includes only part of the relevant

language, which is "a State plan *approved under [T]itleXIX*."  Thus, contrary to plaintiff's assertion, the statute is in fact  "geared to the particular State plan adopted by the State" and approved by the Secretary.  Nothing in the statutory language compels the conclusion that Congress intended the inclusion of individuals who "could have been" eligible for Medicaid under a theoretical State plan.

Following plaintiff's argument to its logical conclusion would require the Secretary to count individuals who might not be receiving *any* benefits under *any* program–Medicaid or State-only–but in theory could receive such benefits; under plaintiff's argument, the Secretary would be violating the statute by not counting individuals who had not applied for benefits but might qualify if they did apply.  This result is anomalous at best, as it is unclear how the Secretary or the State would even be able to identify these individuals.

The second possible reading–that Arizona's State-only populations should be included in the hospital's DSH adjustment because they might have been eligible for Medicaid in another State's approved Medicaid plan–is truly specious; plaintiff's argument ignores the fact that, in light of the Federal-State cooperative nature of the Medicaid program, Medicaid eligibility under a State plan is tied to State residency.  *See* 42 C.F.R. § 435.403(a).  *See also id.* § 435.203(i)(1)(i) (defining a State resident as one "Living with the intention to remain there . . . for an indefinite period." ).  *See also* 42 C.F.R. § 435.907 (requiring a written application for Medicaid benefits before a State agency may seek Federal reimbursement);  Ariz. Rev. Stat. § 36-2903.01(D) (requiring proof of Arizona residency to be provided benefits under AHCCCS).  Accordingly, the hospitals cannot obtain a Medicare DSH adjustment that includes State-only patients on this basis.

Moreover, regardless of which way plaintiff's argument is read, both ignore the well-settled proposition that it is a hospital, and not the Secretary, that has the burden of proving its entitlement to reimbursement of the costs at issue.  *See Fairfax Hosp. Ass'n, Inc. v. Califano,* 585

F.2d 602, 611 (4th Cir. 1978).  *See also Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 77 (1st Cir. 2006); *Friedman v. Sec'y of Dept. of HHS*, 819 F.2d 42, 45 (2d Cir. 1987); *Alabama Home Health Care, Inc. v. Schweiker,* 527 F. Supp. 849, 853 (D. Ala. 1981), *vacated on other grounds,* 711 F.2d 988 (11th Cir. 1983).  *See generally* 42 C.F.R. § 413.24.[17]

To be sure, the Secretary's policy prior to January 20, 2000 was to include certain "hypothetical eligibles" in the Medicaid proxy of the Medicare DSH adjustment.  65 Fed. Reg. at 3136.  In certain section 1115 demonstration project waivers, the State has chosen to make members of a given population group, which otherwise *could* have been "eligible for Medicaid under section 1902(r)(2) or 1931(b) in a State plan amendment" (had the State so chosen), instead eligible under the *waiver*.  *Id.*  These populations are referred to as "hypothetical eligibles," and are specific, finite populations identifiable in the budget neutrality agreements found in the Special Terms and Conditions for the demonstrations.  *Id.*

But this does not help plaintiff.  As discussed above, contrary to plaintiff's assertions, the Medicare DSH statute does not require the Secretary to include individuals who are not eligible for Medicaid but, under some far-fetched notion, "could have been" eligible for Medicaid.  The Secretary, although not required to do so, exercised his discretion in including the inpatient hospital days of certain carefully-defined "hypothetical eligibles" in the Medicare DSH adjustment for discharges prior to January 20, 2000, and Congress ratified the Secretary's policy.  *See* § 5002(b).  Accordingly, this Court should reject plaintiff's effort to have the Court substitute a more expansive policy for the Secretary's policy.

---

[17]  *See also* AR 403 ("[T]he hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay.  The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed.  Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.").

2.  The Secretary's decision applying his policies to the facts in this case is supported by substantial evidence.  As explained above, plaintiff bears the burden of demonstrating that the patient days for which it seeks an additional DSH payment should be included, and plaintiff failed to meet its burden in this case.  The Secretary found that "[t]he record does not show an analysis of the criteria for the State[-only] population under the Medicaid optional eligibility criteria."  AR 16.  The Secretary also found that there was no "demonstration in the record that the criteria for these [State-only] populations are identical to the Medicaid optional eligibility criteria.  Therefore, as the Secretary concluded, the Board finding that the [State-only] population at issue would have been included under the Medicaid optional category of patients in a traditional State Plan is not supported by the record."  AR 16-17.  This Court should decline plaintiff's request to have the court substitute its judgment for that of the Secretary with respect to the application of a highly technical policy that has been ratified by Congress.

Further, a review of the record in this case belies plaintiff's assertion that the hospitals' Medicare DSH adjustment failed to include patients that were actually eligible for Medicaid.  In testimony before the Board, the Fiscal Intermediary's representative explained that, in the process of auditing the hospitals' cost reports, Arizona provided the hospitals' data concerning *all* AHCCCS patient days, not only including patients already enrolled in Medicaid, but also including "[Medicaid-]eligible days."  AR 168 (Testimony of Derrick Edmonson, Tr. 240:1-13).  As a result, the hospitals "would have an opportunity to go through their internal listing to find these days that would represent eligible Title 19 days that weren't paid by AHCCCS."  AR 168 (Tr. 240:14-18).[18]

---

[18]  *See also* AR 169 (Tr. 243:1-15) ("Q: But the process, whether it be in the initial settlement or through reopenings was to specifically identify to the [hospitals] including the [Banner Health hospitals] exactly what days on a patient[-]by[-]patient basis the Intermediary thought should be used in the Medicaid proxy [of the Medicare DSH adjustment]?  A: Yes.  Q: And then you would consider whatever the Provider came back with saying you need to add these days in too, audit them, and include them?  A: Exactly.").

Thus, plaintiff's hospitals had every opportunity to include all patients that were eligible for Medicaid in their Medicare cost reports. Moreover, the hospitals had the burden before the Board to establish on a patient-day-by-patient-day basis that each patient was eligible for Medicaid for the days of the patient's hospitalization for which DSH payments were sought. They cannot now simply claim that they are generally entitled to payment for days attributable to State-only populations just because some individuals in those groups may have theoretically been eligible for Medicaid at the time.

### B.    The Secretary's Interpretation of the DSH Provision is Reasonable

Even if the Court were to find that the language of the DSH provision is not clear in excluding the hospitals' State-only patient days, it in no event unambiguously *requires* the inclusion of the days of those patients. Accordingly, the statute is at most ambiguous, and the Secretary's interpretation of it is reasonable and entitled to deference.

Under *Chevron*, if the statute "is silent or ambiguous with respect to the specific issue," the court must proceed to the second prong of *Chevron*, under which "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see Holly Sugar Corp. v. Johanns*, 437 F.3d 1210, 1213 (D.C. Cir. 2006); *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1012-1013 (D.C. Cir. 1999). The second step in *Chevron* provides that the court should give "considerable weight . . . to an executive department's construction of a statutory scheme it is entrusted to administer." 467 U.S. at 844.

The "view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, [the Court] need not find that it is the only permissible construction that [the agency] might have adopted." *Chemical Mfrs. Ass'n v. Nat'l Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985). "This broad deference is all the more warranted when . . . the regulation concerns 'a complex and highly technical regulatory program.'" *Thomas Jefferson Univ.*, 512 U.S.

at 512) (citation omitted).  *See also Perry v. Dowling*, 95 F.3d 231, 236 (2d Cir. 1996) ("Such

deference is particularly warranted with respect to interpretations of the Social Security Act,

because of the Act's intricate nature").  Because the Medicare statute "is among the most intricate

ever drafted by Congress," Congress accordingly has "conferred on the Secretary exceptionally

broad authority to prescribe standards" for applying sections of the Act.  *Schweiker v. Gray*

*Panthers*, 453 U.S. 34, 43 (1981).  *See also N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 92

(D.C. Cir. 1999) (applying deference to the Secretary's interpretation of the "Pickle DSH"

adjustment).

Even assuming, *arguendo*, that this Court did not agree with the Secretary that the

Medicare DSH provision unambiguously excludes from the Medicaid proxy the days of State-only

patients because they were *ineligible* for Medicaid, it should find, at the very least, that Congress

left it to the Secretary to resolve how to treat individuals who were not eligible for Medicaid but

who were beneficiaries of State-only programs.  And there is "little difficulty [in] concluding that

the Secretary's interpretation is a permissible construction" because at most the "ambiguity of the

provision . . . arises largely because the provision is reasonably amenable to both the Secretary's

and [the hospitals'] readings."  *N. Broward Hosp. Dist.*, 172 F.3d at 99.

Indeed, it is eminently reasonable for the Secretary to interpret the statutory phrase

"eligible for medical assistance under a State plan approved under [T]itleXIX [of the Social

Security Act]" to mean "eligible for Medicaid."  42 C.F.R. § 412.106(b)(4) (1999).  In interpreting

the Medicare DSH provision, the Secretary reasonably looked to the terms as used in Title XIX of

the Social Security Act because Title XIX is specifically referenced in the DSH provision.  In

addition, the Secretary reasonably determined that an individual is "eligible for medical

assistance" under a State Medicaid plan only if he or she meets the income, resource, and status

criteria set forth in the Medicaid statute and the State plan approved under Title XIX, as opposed

to eligibility criteria for State-only programs.  Moreover, the DSH formula is a *proxy* for estimating the number of very poor patients served by a hospital; it is not designed to count *every* low-income person served by the hospital but instead to *estimate* the percent of low-income people served *based solely on* the number of days in which Medicaid patients served (the Medicaid proxy, at issue here), and the number of inpatient days of individuals entitled to SSI benefits.  Congress specifically rejected any requirement that the Secretary attempt to calculate the entire population of low-income patients or to identify any low-income patients except by reference to Medicaid and SSI eligibility.

At the very least, Congress would have given the Secretary the discretion to determine when the days of populations not eligible for Medicaid will be counted in the Medicare DSH.  *N. Broward Hosp. Dist.*, 172 F.3d at 93 ("[w]hether such an increase in the [DSH] provision's applicability would be appropriate or desirable is a matter of policy, not of statutory construction, and within the bounds of congressional directive, it is primarily a question for [the Secretary], not the courts").  In this case, the Arizona legislature authorized AHCCCS to apply for and obtain Federal funding available under Title XIX to "be used *only* for the support of persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct."  Ariz. Rev. Stat. § 36-2903.01(B)(5) (1999).  Moreover, the legislature expressly limited eligibility for its State-only programs at issue to those not eligible for Medicaid, Ariz. Rev. Stat. §§ 11-297, 36-2905, 36-2905.03 (1999).  In light of this clear distinction between the Medicaid and exclusively State-funded programs, it was entirely reasonable for the Secretary to include only inpatient days of individuals eligible for Medicaid benefits in the hospital's Medicare DSH calculation.

II.     **SECTION 5002 OF THE DEFICIT REDUCTION ACT OF 2005 CLARIFIES THE SECRETARY'S AUTHORITY TO EXCLUDE INPATIENT DAYS OF BOTH STATE-ONLY PATIENTS AND PATIENTS ELIGIBLE FOR BENEFITS UNDER A SOCIAL SECURITY ACT SECTION 1115(a)(2) WAIVER**

Even if the Arizona State-only populations at issue in this case were considered expansion populations under a Social Security Act § 1115(a)(2) waiver, which they are not, they would still not be included in the Medicare DSH adjustment. Section 5002 of the Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006), expressly ratified the Secretary's policy in force during the cost years here in dispute of excluding from the DSH adjustment patients who were not eligible for Medicaid but received care under a section 1115(a)(2) demonstration project.

Congress passed section 5002 to reverse the conclusion of a panel in the Ninth Circuit that the Medicaid proxy of the Medicare DSH provision unambiguously included inpatient days of individuals who were not eligible for Medicaid but received health care coverage pursuant to a demonstration project approved pursuant to 42 U.S.C. § 1315(a)(2). *See Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091 (9th Cir. 2005). *See also Cookeville Regional Med. Ctr.*, 2005 WL 3276219 (D.D.C. Oct. 28, 2005) [Attached at Tab 3], *reversal in response to § 5002 indicated*, 2006 WL 2787831 (Sept. 26, 2006), *appeal pending*, No. 07-5252 (D.C. Cir.).[19] Congress expressly characterized section 1115 expansion populations as being "*not [] eligible*" for medical assistance under a State plan under Title XIX "but who are regarded as such because they receive benefits under a demonstration project." DRA § 5002(a) (emphasis added). Accordingly, Congress made plain that it considered non-Medicaid patients who received medical coverage

---

[19]   The district court's October 25, 2005 decision in *Cookeville*, on which plaintiff relies, was already on appeal when, in response to the court of appeals' instruction, the district court reconsidered its earlier opinion. 2006 WL 2787831, *2. Accordingly, the district court indicated it would reverse its earlier decision if the D.C. Circuit remanded the case, *see id.* at *8, and finally reversed it on April 27, 2007, after remand from the appeals court, *see Cookeville Reg'l Med. Ctr. v. Leavitt*, 04-1053 (Apr. 27, 2007) [Attached at Tab 4]. The *Cookeville* plaintiffs appealed that order, which plaintiff here neglects to mention.

under a demonstration project approved under § 1115(a)(2) to be "not . . . eligible" for Medicaid.

## A.    Congress's Clarification of the Medicare DSH Provision Is Entitled To Controlling Weight

Congress passed § 5002 to "clarify" that, under the Medicare DSH provision, "the Secretary *may*, to the extent and for the period the Secretary determines appropriate, include patient days of patients *not* so eligible [*i.e.*, not eligible for medical assistance under a State Medicaid plan] but *who are regarded as such* because they receive benefits under a demonstration project approved under [§ 1115(a)(2)]." 42 U.S.C. § 1395ww(d)(5)(F)(vi), *as amended* Feb. 8, 2006 (emphasis added).

A clarification is a statement "of what [Congress] believed the law already was, and thus to be applicable to all cases, past, present, and future." *Means v. N. Cheyene Tribal Ct.,* 154 F.3d 941, 951 (9th Cir. 1998) (Reinhart, J., concurring). *See also Beverly Community Hosp. Ass'n v. Belshe,* 132 F.3d 1259, 1264 (9th Cir. 1997) ("Congress['s] characterization [of a new act as a clarification] plainly reflects its intention to resolve every still-live dispute in the manner specified by the new legislation."). *See also Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998) (title of a statute is a useful interpretive tool); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959) (title of statute is "useful" in determining congressional intent). Thus, Congress has clarified that section 1115 expansion populations are *not* eligible for medical assistance under a State Medicaid plan, although they may be "regarded as such" *at the Secretary's discretion*. The Secretary's interpretation and exercise of his authority are therefore valid.

The Supreme Court has repeatedly held that "'[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.'" *Loving v. U.S.*, 517 U.S. 748, 770 (1996) (*quoting Consumer Prod. Safety Com'n v. GTE Sylvania*, 447 U.S. 102, 118 n.13 (1980)). *See also U.S. v. Winstar Corp.*, 518 U.S. 839, 891 (1996) (plurality) ("Subsequent

legislation declaring the intent of an earlier statute is entitled to significant weight."); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969).

As the Ninth Circuit has explained, "[b]ecause Congress . . . has [the] authority to change the law as to pending cases, its power to clarify the law – to confirm what the law has always meant – follows *a fortiori*." *Beverly,* 132 F.3d at 1265. Here, as in *Beverly*, "Congress expressly (and formally) stated as its intention that the new provision in [§ 5002] was a 'clarification' of the [DSH adjustment] rules contained in" the DSH statute. *Id.*; *see also Brown v. Thompson,* 374 F.3d 253, 259 (4th Cir. 2004) ("In determining whether an amendment clarifies or changes an existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment."); *Piama Cortes v. Amer. Airlines, Inc.*, 177 F.3d 1272, 1284 (11th Cir. 1999) ("[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment."); *U.S. v. Sepulveda,* 115 F.3d 882, 885 n.5 (11th Cir. 1997); *Liquilux Gas Corp. v. Martin Gas Sales, Inc.,* 979 F.2d 887, 890 (1st Cir. 1992) (using "legislature's expression of what it understood itself to be doing" to determine whether new legislation is a clarification.). And "[i]t has been established law since nearly the beginning of the republic . . . that congressional legislation that thus expresses the intent of an earlier statute must be accorded great weight." *Beverly,* 132 F.3d at 1265 (citing, *inter alia, Red Lion Broadcasting Co.*, 395 U.S. at 381-82 & n.8, and earlier cases cited there).[20]

In light of Congress's clarification that care received under a demonstration project waiver approved under § 1115(a)(2) is, absent the Secretary's decision to the contrary, "not so eligible" to be included in the Medicare DSH adjustment, any position that days of expansion populations, let

---

[20]   This principle, moreover, applies with added force where, as here, Congress has intervened in order to correct a misinterpretation of the prior statute in the case law. *See Barnes v. Cohen,* 749 F.2d 1009, 1015-16 (3d Cir. 1984); *Porter v. Com'r of Internal Rev.,* 856 F.2d 1205, 1209-10 (8th Cir. 1988); 2B Singer, STATUTES AND STATUTORY CONSTRUCTION, § 49.11 (6th ed. 2000).

alone days of State-only populations, must always be included in the Medicare DSH adjustment, would be plainly untenable.

**B.    Section 5002 Ratified the Secretary's Policy of Excluding Care Received Under a Demonstration Project from the Medicare DSH Adjustment**

In addition to clarifying that the Medicare DSH adjustment statute did not require the Secretary to include in the DSH adjustment days of individuals in expansion populations, Congress also expressly ratified the Secretary's DSH adjustment policy for discharges prior to January 20, 2000, which necessarily includes those involved here.  It has long been "well settled that Congress may, by enactment not otherwise inappropriate, 'ratify . . . acts which it might have authorized'[.]"  *Swayne & Hoyt v. U.S.,* 300 U.S. 297, 301-02 (1937) (quoting *Mattingly v. District of Columbia,* 97 U.S. 687, 690 (1878)).  *See also Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 506-07 (D.C. Cir. 1999) (same).  In Section 5002(b) of the DRA, Congress expressly ratified the Secretary's DSH policy of excluding from the DSH adjustment calculation patient days attributable to members of State-only and expansion waiver populations, specifically "including the policy . . . regarding discharges occurring *prior* to January 20, 2000."  § 5002(b)(3)(A) (emphasis added).

In determining whether Congress has ratified the Secretary's policy, the critical "element" is simply that Congress knows what it is ratifying.  *Cf. U.S. v. Beebe,* 180 U.S. 343, 345 (1901) ("without that knowledge [of the agency action] there can be no ratification").  That element is easily satisfied here because Congress could not have more clearly identified the agency action that it was ratifying.  *See* § 5002(b)(3) (expressly identifying the particular policy element it was ratifying and citing the policy by Federal Register volume and page).  Thus, in ratifying the Secretary's pre-2000 Medicare DSH policy, plaintiff cannot maintain any viable argument that the hospitals' Medicare DSH payments must include days of patients enrolled in AHCCCS's State-

only programs.

### C.    Section 5002 Bars Plaintiff's Claim Even If That Provision Changed, Rather Than Clarified, the Secretary's Medicare DSH Adjustment Policy

Even if one were to assume for the sake of argument that Section 5002 changed the DSH payment rules, it would nonetheless bar plaintiff's claim here.  "[I]t is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect."  *INS v. St. Cyr,* 533 U.S. 289, 316 (2001).  *See also Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 233 n.7 & 225-26 (1995) ("Congress may require (insofar as separation-of-powers limitations are concerned) that new statutes be applied in cases not yet final . . . ." ); *Landgraf v. USI Film Products,* 511 U.S. 244, 267 (1994) ("Absent a violation of one of [the Constitution's] specific provisions [restricting retroactive legislation], the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope.").  *See also Bradley v. Sch. Bd. of Richmond,* 416 U.S. 696, 711-21 (1974) (courts must apply the law in effect at the time it renders its decision).

Where, as here, both the structure and the words of a statute provide such an indication, the statute must be applied retroactively.  *See, e.g., Richards-Diaz v. Fasano,* 233 F.3d 1160, 1163 (9th Cir. 2000) (following *St. Cyr*); *accord Johnson v. Quander*, 440 F.3d 489, 501 (D.C. Cir. 2006) ("with all questions of statutory interpretation, we consider the statute's text and its structure to determine the legislative objective") (internal quotations, citation omitted).

In this case, Congress clearly indicated that Section 5002 should be applied retrospectively with both its use of language–titling it a "clarification," as well as its structure, by explicitly ratifying the Secretary's "policy . . . regarding discharges occurring *prior to* January 20, 2000." DRA § 5002(b) (emphasis added).  As another judge in this Court has already found, "Congress's titling of Section 5002 as a 'clarification' is strong evidence of its retroactive effect." *Cookeville*

-39-

*Regional Med. Ctr.*, 2006 WL 2787831, at *7. Quite simply, Congress's "use of the word 'clarification' in the headings . . . is clear, unambiguous, and commanding evidence in favor of retrospectivity." *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp. 2d 1123, 1133 (E.D. Cal. 2000).

Thus, regardless of whether § 5002 may be viewed as clarifying the existing law and ratifying the Secretary's pre-2000 policy, or changing existing law, it would nevertheless validate the Secretary's policy of not including in the Medicaid proxy of the DSH adjustment provision inpatient days of both State-only and expansion populations. Thus, even if Arizona's State-only populations could be considered expansion waiver populations under § 1115(a)(2), rather than merely State-only populations, they still would not be included in the hospitals' Medicare DSH payment.

### III. THE SECRETARY REASONABLY DETERMINED THAT THE HOSPITALS DO NOT MEET THE SECRETARY'S CRITERIA FOR HOLD HARMLESS PAYMENTS

Contrary to the plaintiff's contention, Pl. Mot. at 27-30, plaintiff's hospitals do not meet the Secretary's criteria for hold harmless treatment, and the Secretary's application of the criteria in PM A-99-62 to the plaintiff's hospitals should be upheld.

Because the plaintiff's hospitals could not demonstrate a reasonable reliance interest in retaining or receiving Medicare DSH payments that included State-only days for any of the years at issue, *and* because they did not raise the issue of the exclusion of those days prior to October 15, 1999–the date the Secretary first announced the hold harmless policy–they are not entitled to hold harmless treatment for those days. *See United Hosp. v. Thompson,* No. Civ. 02-3479, 2003 WL 21356086, *4 (D. Minn. June 9, 2003) [Attached at Tab 5], *aff'd* 383 F.3d 728, 733 (8th Cir. 2004). The Secretary has consistently maintained that the hold harmless policy was intended only to protect those providers that held "an independent and genuine belief that they were entitled to

-40-

general assistance [or State-only] days." *Id.* at *6 ("[T]o the extent that the Secretary sought to provide relief to hospitals that had an independent and genuine belief that they were entitled to general assistance [or State-only] days while simultaneously exercising fiscal responsibility, the October 15, 1999, deadline separates hospitals that genuinely believed they were entitled to general assistance [or State-only] days from hospitals that did not believe they were entitled to such days until the issuance of the Program Memo."). *See also Rush Univ. Med. Ctr. v. Leavitt,* No. 06-1550, 2007 WL 2669021, *8 (N.D. Ill. Sept. 04, 2007) (same) [Attached at Tab 6].

In *United Hospital,* a hospital filed a jurisdictionally appropriate appeal with the Board, without reference to any DSH day-counting, yet later sought to take advantage of PM A-99-62 by amending its appeal (as was otherwise allowed by HHS regulations) after October 15, 1999, to include the issue. 383 F.3d at 730. The court found that the plaintiff sought to use an existing regulation to do something the memorandum explicitly said it could not do–obtain hold harmless payments by raising the issue after October 15, 1999. *Id.* at 731. To the contrary, the court held, the plain language of the Program Memo expressly excludes hospitals in United's position from gaining its protections, declaring a hospital's eligibility for reimbursement only if the hospital filed "a jurisdictionally proper appeal to the [Board] *on the issue* of the exclusion of these types of days from the Medicare DSH formula *before October 15, 1999." Id.* at 732 & n.4 (emphasis added) ("The Program Memo goes on to instruct: 'Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before [the Board].'"). The court found that the Secretary had set a date beyond which the erroneous overpayments would cease. *Id.* at 733. Accordingly, the court held that the date of October 15, 1999 satisfied common sense (and the rational basis test) because any claims raised for the first time after that date would come from

-41-

hospitals that knew full well that the Secretary's previous payments were undeserved. *Id.* This is consistent with the rationale of the hold harmless policy, which was intended to protect providers who were operating under the erroneous belief that they were entitled to include general assistance days for purposes of Medicare reimbursement, and who had budgeted in reliance on intermediaries who allowed them to include those days in their cost reports.[21]

In this case, plaintiff argues that its hospitals are entitled to take advantage of the Secretary's hold harmless policy because one of its four hospitals received final Medicare DSH adjustments that included Arizona expansion population patient days from 1986 until 1989 and received interim, but presumably non-final, DSH adjustments that included Arizona expansion population patients days until 1992. Pl. Mot. at 29. There are several flaws with plaintiff's contention. First, plaintiff fails to explain how one hospital's receipt of the erroneous payments from 1986 until 1989 entitles the other three hospitals to such payments in the cost years at issue in the 1990s. Second, plaintiff fails to explain how that same hospital's receipt of interim erroneous payments for cost years 1990 through 1992 entitles any hospital to erroneous final payments. *See* 42 U.S.C. § 1395oo(d). Third, and perhaps most significantly, plaintiff fails to demonstrate that any of its hospitals maintained this reliance interest throughout all of the cost years at issue in this litigation, *compare* AR 82, 135-36 (Tr.105:15 - 109:6) *with* Pl. Statement of Material Facts ¶ 1(a-d) – plaintiff's hospitals did not receive payments reflecting the erroneous inclusion of State-only days for approximately ten years prior to October 15, 1999, and plaintiff's hospitals filed no appeals on this issue until after issuance of the Secretary's Program Memorandum. Yet the plaintiffs had explicit notice of the Secretary's clear intention to exclude these days for cost years

---

[21] By contrast, in *St. Joseph's Hosp. v. Leavitt*, 425 F. Supp. 2d 94, 98, 100 (D.D.C. 2006), the court held that the provider had, in fact, appealed the precise issue of general assistance days, and thus was entitled to the protection of the hold harmless policy. *Id.* As plaintiff does not argue that it had properly filed appeals on the precise issue in question before October 15, 1999, *St. Joseph's* is inapposite.

beginning after 1990. AR 456. In other words, plaintiff has failed to demonstrate that it "genuinely believed [it was] entitled to [State-only] days [as opposed to those] hospitals that did not believe they were entitled to such days until the issuance of the Program Memo." *United Hosp.*, 2003 WL 21356086, at \*6; *Rush Univ. Med. Ctr.*, 2007 WL 2669021, \*8. Plaintiff does not even allege in its Complaint, and does not even attempt to demonstrate in its summary judgment motion, that it appealed the Fiscal Intermediary's denial of Arizona State-only population patient days before October 15, 1999, for any of the cost years for any of the hospitals at issue in this litigation. *See* Compl. ¶¶ 68-71; Pl. Mot. at 27-30. Rather, the record demonstrates that the plaintiff's hospitals failed to bring any appeal concerning State-only patient days before October 15, 1999. AR 141 (Testimony of Rudolph Angulo, Tr. 129:7-12 "Q: Prior to 2000 for any of the years[,] did the hospital appeal that determination which excluded the State-funded days? A: No, not that particular issue."). *See also id.* at 153 (Tr. 179:20 - 180:15) (same). Thus, plaintiff cannot demonstrate that any of its hospitals had a reliance interest, reasonable or otherwise, in receiving these erroneous payments.

Plaintiff raises the spurious argument that the Secretary "is impermissibly adding further conditions to, and limitations on, the hold harmless rule." Pl. Mot. at 29. Contrary to plaintiff's position, the Secretary's decision reflects an *application* and *interpretation* of the hold harmless policy, not a *change* of the policy. The Secretary reasonably concluded that the hospitals had no reasonable expectation of or reliance interest in receiving payments based on State-only days for the fiscal years at issue in this case. The hold harmless program memorandum directs intermediaries to make hold harmless payments based on "the practice followed for the hospital at issue before October 15, 1999." AR 404. In light of the Secretary's 1992 memorandum, AR 456, the "practice followed" by the Fiscal Intermediary for the plaintiff hospitals for approximately ten years (or longer) "before October 15, 1999" was to exclude the days at issue in this case. The

Secretary also reasonably determined that, even if one of the plaintiff hospitals received erroneous payments based on State-only days during the period 1986-89, this was insufficient to establish a reliance interest under the Secretary's criteria because the hospitals failed to appeal this issue before October 15, 1999, and because they "had abandoned their expectation of receiving payment." AR 20. Despite plaintiff's attempt to characterize the Secretary's reason as an impermissible reason not provided for in the hold harmless program memorandum, a review of the decision below demonstrates that it is simply an application of the Secretary's hold harmless criteria. *See* AR 20 ("[W]hile for some cost years some of the Providers had appeals pending prior to October 15, 1999, the appeals did not raise the specific issue of the inclusion of the State-only days. The record shows that the Providers did not add the issue regarding the inclusion of State-only days in the DSH calculation prior to the October 15, 1999 date set forth in the Program Memorandum and, therefore, they cannot find relief under its terms."). Thus, the present case is far more analogous to *United Hospital* than to *St. Joseph's Hospital*: the hospitals' raising the issue of State-only days only *after* October 15, 1999 reflects an attempt to take advantage of the hold harmless policy in unintended ways, rather than out of genuine confusion over the Medicare DSH policy. *See United Hosp.,* 383 F.3d at 733. Accordingly, the Secretary's decision should be upheld.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Motion for Summary Judgment, grant the Secretary's Cross-Motion, and enter judgment for defendant.

Dated:  February 20, 2008

                                        Respectfully submitted,

                                        JEFFREY S. BUCHOLTZ
                                        Acting Assistant Attorney General

                                        KENNETH L. WAINSTEIN
                                        U.S. Attorney for the District of Columbia

                                        SHEILA LIEBER
                                        Deputy Director, Federal Programs Branch

                                        /s/ James D. Todd, Jr.
                                        JAMES D. TODD, JR., Senior Counsel
                                        U.S. DEPARTMENT OF JUSTICE
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue N.W.
                                        Washington, DC 20530
                                        (202) 514-3378
                                        (202) 616-8470 (fax)
                                        *james.todd@usdoj.gov*
                                        Attorneys for Defendant

-45-

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2008, a copy of the foregoing pleading, together with proposed order, was filed electronically via the Court's ECF system, through which a notice of the filing will be sent to:

CHRISTOPHER L. KEOUGH, Esq.
Vinson & Elkins, L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, DC 20004
(202) 639-6745
(202) 879-8945 fax
*ckeough@velaw.com*

STEPHANIE A. WEBSTER, Esq.
Vinson & Elkins, L.L.P.
1455 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 639-6634
(202) 879-8832 fax
*swebster@velaw.com*
Attorneys for Plaintiff

/s/ James D. Todd, Jr.
JAMES D. TODD, JR.



**H** Cookeville Regional Medical Center v. Leavitt
D.D.C.,2006.

United States District Court,District of Columbia.
COOKEVILLE REGIONAL MEDICAL CENTER, et
al., Plaintiffs,
v.
Michael O. LEAVITT, Secretary, Department of Health
and Human Services, Defendant.
**Civil Action No. 04-1053 (JR).**

Sept. 26, 2006.

Jacqueline Elizabeth Bennett, Reed Smith LLP,
Washington, DC, for Plaintiffs.

***MEMORANDUM***
JAMES ROBERTSON, District Judge.
*1 Pending before the court is Defendants' Motion to Alter
the Judgment [28]. For the reasons set forth below, that
motion would be granted if the case were remanded to this
court.

***Background***

Plaintiffs, fifteen Tennessee hospitals, brought an action
against the Secretary of Health and Human Services ("the
Secretary") seeking a declaration that the Secretary's
method of calculating reimbursements under the Medicare
statute's disproportionate share hospital (DSH) formula,
42 U.S.C. § 1395ww(d)(5)(f)(vi), was unlawful. They also
sought reimbursement they would be entitled to receive
under their interpretation of the DSH formula, for services
they provided to low-income patients prior to January 20,
2000 (the date the Secretary began applying the

interpretation they seek). Both sides moved for summary
judgment.

On September 30, 2005, I granted plaintiffs' motion for
summary judgment, denied defendants' motion for
summary judgment, and stated that the reasons for the
ruling, along with a remedial order, would follow. On
October 28, 2005, I issued a memorandum explaining my
conclusion that "the Secretary's exclusionary method of
calculating the DSH adjustment that was in effect before
January 20, 2005 contravenes clear and unambiguous
statutes."Mem. Order at 20 [dkt. # 22]. I ordered the
Secretary to instruct his fiscal intermediaries to correct
plaintiffs' cost reports for the fiscal years at issue within 90
days of their receipt of the relevant documentation from
the plaintiffs. Defendants appealed that ruling on
December 27, 2005.

Notwithstanding that he had already appealed, the
Secretary moved for the entry of final judgment on
January 18, 2006, citing Rule 58 of the Federal Rules of
Civil Procedure, which states that "Every judgment ...
must be set forth on a separate document."Fed.R.Civ.P.
58(a)(1). On January 28, 2006, I granted the motion,
stating:
The order of September 30, 2005, granting the motion for
summary judgment, would ordinarily have sufficed as and
for a final, appealable order, but in this case the
memorandum explaining that order was not issued for
another 28 days, and the later memorandum was
accompanied by a remedial order. The sequencing of the
court's orders was not calculated to "avoid dispute and
promote certainty," and the government's confusion is
understandable. The Clerk is accordingly directed to enter
final judgment in favor of the plaintiff and against the
government.

Order of Jan. 24, 2006 (Dk.25). Pursuant to that order, the
Clerk entered final judgment for the plaintiffs on February

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2, 2006.

The February 2, 2006 judgment, which at the time seemed to be a simple matter of bookkeeping, had the convenient effect (for the government) of reopening the 10-day window for motions to alter or amend under Rule 59(e). The Secretary took advantage of this, and, on February 13, 2006, filed his motion to alter or amend the judgment based on a new statutory provision enacted five days earlier as part of the Deficit Reduction Omnibus Act of 2005 ("DRA"). Pub.L. 109-171. Section 5002 of that act, entitled "Clarification of Determination of Medicaid Patient Days for DSH Computation," amended the Medicaid provision at issue in this litigation to reflect the Secretary's position, and purported to ratify his regulations of January 20, 2000, including "the policy in such regulations regarding discharges occurring prior to January 20, 2000."

**\*2** After the Secretary's Rule 59(e) motion was filed, the Court of Appeals stayed the Secretary's appeal pending resolution of the motion that is now before me. Ordinarily I would be hesitant to rule on a motion to alter a judgment while an appeal is pending. The Court of Appeals has made it clear that I am to do something with the motion, however, and accordingly, under *Smith v. Pollin,* 194 F.2d 349, 350 (D.C.Cir.1952), I will consider the Rule 59(e) motion and indicate whether I would grant it, so that the Secretary may then ask the Court of Appeals for a remand for entry of the order.

### *Analysis*

An extended discussion of the statutory framework governing the DSH formula appears in the October 2005 memorandum and will not be repeated here. Stated simply, the issue is whether "expansion populations" [FN1] are necessarily "eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(f)(vi)(II). The recently enacted Section 5002

of the DRA amends the DSH formula to state explicitly that such populations are *not* so eligible:

> FN1. *I.e.,* patients who would not otherwise be eligible for Medicaid but who become eligible solely because of the Secretary's waiver of certain Medicaid program requirements as part of a demonstration project under 42 U.S.C. § 1315a.

In determining ... the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI. DRA, Section 5002(a), Pub.L. 109-171 (emphasis added). The Secretary argues that this amendment is a "clarification" of the DSH formula, rather than a substantive change, and thus, that I should revisit my conclusion about the meaning of the DSH formula in light of this Congressional input. Alternatively, according to the Secretary, even if this amendment does reflect a substantive change of the DSH formula, in Section 5002(b) Congress has now approved and ratified the Secretary's pre-2000 exclusionary policy toward expansion populations. That section, entitled "Ratification and Prospective Application of Previous Regulations," states:

(1) IN GENERAL-[R]egulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

...

(3) REGULATIONS DESCRIBED-For purposes of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

paragraph (1), the regulations described in this paragraph are as follows:

1. 2000 REGULATION-Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., *including the policy in such regulations regarding discharges occurring prior to January 20, 2000 .*

DRA, Section 5002(a), Pub.L. 109-171 (emphasis added).

**\*3** Plaintiffs raise a number of challenges to this motion. First, they argue that the Secretary's motion was untimely. Second, they argue that the DRA was unconstitutionally approved without passing both houses of Congress, and thus is not law. Third, they argue that the DRA changes rather than "clarifies" the Medicare statute, and that the change either does not apply retroactively to the cost reports at issue or violates their due process rights if it does. Finally, they argue that the Secretary's decision, even if lawful, was nevertheless arbitrary and capricious. Each of those challenges is discussed below. None is successful.

### Timeliness of the Secretary's motion

The hospitals argue that the ten-day period of limitations on Rule 59(e) motions began to run, at the very latest, with the entry of the memorandum order of October 28, 2005, setting forth the reasons for the September 30 order and remanding the matter to the Secretary, because that order fixed the rights and obligations of the parties with regard to the current dispute, "end[ing] the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment."*Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 275 (1988). The Secretary, in his memorandum to the Court of Appeals supporting the appeal of that order, stated that "the October 28 order constituted a judgment pursuant to Rule 54(a) because it is a final 'order from which an appeal lies.' " Secretary's Opposition to Plaintiff's Motion to Dismiss Appeal, at 7 (quoting Fed.R.Civ.P. 54(a)). Plaintiffs make much of this apparent admission by the Secretary of the finality of the October 28 order.

Entertaining the instant motion, filed 97 days after the "final" order of October 28, 2005, does offend the spirit of Rule 59(e)'s ten-day limit, but it does not violate the letter of that rule. Judgment must be entered on a separate document under Rule 58 before time for an appeal can run out, but the separate document rule is not such a categorical imperative that it cannot be waived, *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 384 (1978), as, perhaps, by an appellee's acquiescence in an appeal taken *before* a judgment becomes final. It seems intuitively correct that taking an appeal would cut off an appellant's right to seek amendment of the judgment appealed from, but plaintiffs have not supported that intuitive argument with case law. My conclusion, accordingly, is that the Secretary's appeal of the October 28 order did not preclude his insisting that judgment on a separate document was required before time began to run on his other post-judgment options, including his option to move under Rule 59(e). Moreover, of course, if the October 28 order is deemed not to have been a final order after all, because it was supplanted by the later judgment issued on February 2, 2006, then the status of the appeal may be in question, but the Rule 59(e) motion is certainly timely.

### The constitutionality of the DRA

**\*4** Plaintiffs next challenge the constitutionality of the DRA based on Congress's failure to pass identical versions of the bill in both houses. The predecessor to the DRA, S.1932, was passed by the Senate in a slightly different form than the version passed by the House of Representatives. Despite this discrepancy, the leaders of both houses attested that their respective chambers had passed the Senate version of S.1932, which the president signed into law as the DRA. Because the version of S.1932 signed by the president was not in fact the version passed by the House, plaintiffs argue, enforcement of the DRA violates the bicameral requirement of Art. I § 7 of the Constitution.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4
Slip Copy, 2006 WL 2787831 (D.D.C.), Med & Med GD (CCH) P 301,910
(Cite as: Slip Copy)

This argument fails in light of *Marshall Field & Co. v. Clark,* 143 U.S. 649 (1892). In that case, the Supreme Court established the rule that courts may not second-guess Congress's attestation as to what bills it has passed:

The signing by the speaker of the house of representatives, and by the president of the senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed congress.... And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed congress should be deemed *complete* and *unimpeachable*....The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed congress, all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act so authenticated, is in conformity with the constitution.

*Id.* at 672 (emphasis added).

Plaintiffs and amicus curiae point to *U.S. v. Muñoz-Flores,* 495 U.S. 385 (1990), in which the Supreme Court struck down a law that had originated in the Senate in violation of the origination clause requiring bills for raising revenue to originate in the House. In that case, the Court looked beyond Congress's designation of the relevant bill as "H.J. Res. 648," indicating the bill's origin in the House,[FN2] and made its own determination that the bill actually originated in the Senate. However, the Court explicitly stated that its analysis was different from the analysis in *Marshall Field,* which concerned the "nature of the evidence" a court should consider in deciding whether a bill had actually passed Congress. 495 U.S. at 391 n. 4. In *Muñoz-Flores,* unlike *Marshall Field,* a "constitutional requirement binding Congress" was at stake. *Id.*

        FN2. The designation "H.J. Res." is a standard

abbreviation for "House Joint Resolution." *See Muñoz-Flores,* 495 U.S. at 409 (Scalia, J. dissenting).

Plaintiffs urge that the bicameral clause is just such a "constitutional requirement binding on Congress," and that a statute passed in violation of this requirement may be struck down under the *Muñoz-Flores* framework. The argument is a sound one, as far as it can go-a bill that does not pass both houses in the same form is not good law, no matter what the president does-but, under *Marshall Field,* it comes to an abrupt stop with the attestation of the leadership of both houses of Congress that they did pass the bill in question.

**The effect of the DRA**

**\*5** In the memorandum explaining my original judgment, I stated that "the DSH formula unambiguously includes all patients eligible for medical assistance under Title XIX, regardless of the mechanism by which they become eligible."Mem. of October 28, 2005 at 20. Moreover, I found that the statutory scheme clearly and expressly included expansion populations among those made eligible for medical assistance under Title XIX. The 109th Congress, disagreeing, issued what it called a "clarification" now explicitly stating that expansion populations are "not so eligible." DRA, Section 5002(a). The Secretary argues that this was the true meaning of the DSH formula all along, and that my understanding of the statutory language was incorrect. Alternatively, the Secretary argues that the DRA must be applied retroactively to overrule my ruling.

Before reaching the question of whether the DRA was a "clarification" of or a substantive change to the DSH formula, I should note plaintiffs' argument that the law of the case doctrine prevents this court, at this stage, from accepting the DRA as a clarification. The law of the case doctrine is the prudent observation that "the *same issue*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presented a second time in the *same* case in the *same* court should lead to the *same* result."*Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C.Cir.1999). Plaintiffs cite *McCreary v. Offner*, 1 F.Supp.2d 32, 36 (D.D. C.1998), for the proposition that the first step in analyzing whether a statutory amendment is a "clarification" is whether the existing law is ambiguous. Pl.'s Opp. at 14. Because that question was answered by my first opinion, which described the DSH formula as unambiguously including expansion populations, plaintiffs argue that I am now constrained to find the DRA to be a substantive change in the law.

The Secretary's multiple filings never offered a cogent response to this argument or, indeed, even appeared to grasp it, as evidenced by his statement that the law of the case doctrine "would not only preclude this Court from considering the new statute, but would also preclude the Court of Appeals from passing on the question."Def.'s Reply Mem. at 5. The doctrine applies to the same *court*, and the Court of Appeals is, of course, not bound by my conclusion that the original DSH formula was unambiguous.

Nevertheless, it is not clear to me that the question of whether pre-amendment law is "settled," *McCreary*, 1 F.Supp.2d at 36, is identical to the question of whether it is "unambiguous[ ]" under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984). In *Beverly Community Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1266 (9th Cir.1997), for example, the court noted that although four different circuits had pronounced the Medicare provision at issue to be unambiguous under *Chevron*, none of them expressed the same construction of the statute. With so many interpretations endorsed by different courts, the Ninth Circuit did not feel the need even to look to the statute before accepting Congress's statement that its subsequent amendment was a clarification. *Id.* This suggests some play in the joints between *Chevron's* ambiguity analysis and *McCreary's* and *Beverly's* approach to pre-amendment law.

**\*6** Accordingly, I will decline plaintiffs' invitation to rely upon law of the case. It matters little, however, because I remain of the view that the DSH formula, as it existed at the time of the cost reports at issue, expressly included expansion populations. That formula referred to all patients eligible for Title XIX medical assistance, and expansion populations' medical expenses are reimbursed from funds allocated under Title XIX. The DRA's insertion of the phrase "not so eligible" into the formula did not "clarify" this simple equation-it simply changed it. *See U.S. v. Montgomery County, Md.*, 761 F.2d 998, 1003 (4th Cir.1985) ("[A] statute which has all along unambiguously proclaimed WHITE cannot retrospectively be made to assert BLACK just because the legislature, at the later date, says so.")

The Secretary's arguments to the contrary rely not on exegesis of the original language of the DSH formula as now illuminated by the DRA, but solely on deference to Congress's later statement on the matter. The Secretary points to Supreme Court and other appellate decisions teaching that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."*Loving v. United States*, 517 U.S. 748, 769-70 (1996).*See also Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir.2004) ("In determining whether an amendment clarifies or changes existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment."); *Piama Cortes v. American Airlines, Inc.*, 177 F.3d 1272, 1284 (11th Cir.1999) ("[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment."); *United States v. Sepulveda*, 115 F.3d 882, 885 n. 5 (11th Cir.1997); *Liquilux Gas Corp. v. Martin Gas Sales, Inc.*, 979 F.2d 887, 890 (1st Cir.1992) (using "legislature's expression of what it understood itself to be doing" to determine whether new legislation is a clarification.).

There is considerable irony in the Secretary's reliance on the *Loving* line of cases and his exhortation that I assign "significant" and "great weight" to the DRA. His reply to

plaintiffs' opposition to his original motion for summary judgment included an entire section entitled "The Language ... of Subsequent Statutes Cited by Plaintiffs is Irrelevant."Defs.' Reply at 11. That section was a response to plaintiffs' citation of two subsequent enactments in which Congress, contrary to the Secretary's current view, interpreted the DSH formula to *include* expansion populations. *See* Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 13581 (defining "Medicaid beneficiary" as "an individual entitled to benefits under a State plan for medical assistance under title XIX (*including* a State plan operating under a Statewide waiver under section 1115.).") (emphasis added); Balanced Budget Act of 1997, Pub.L. No. 105-33 § 4403(b)(3) (defining the DSH calculation as "including ... individuals who receive medical assistance under such title pursuant to a waiver by the Secretary under section 1115."). The Secretary dismissed these statues as the "irrelevant understanding of the 103d [and, presumably, 105th] Congress," Defs.' Reply at 13 n. 8, and cited the "canons of statutory construction," *id.* at 11, that "[L]ater-enacted laws ... do not declare the meaning of earlier law," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998), and "the view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996). Why the view of the 103rd and 105th Congresses should be irrelevant for purposes of statutory construction, while that of the 109th should be of "great weight," is a mystery the Secretary has failed to explain. Whatever significance should be given to later legislation declaring the meaning of an earlier statute, at the very least, *conflicting* Congressional enactments purporting to interpret the same statute ought to cancel each other out, particularly when the statute at issue is as clear and unambiguous as the original DSH formula.

**\*7** Although it is clear to me that the DRA makes a substantive change to the DSH formula and is not a "clarification," it is equally clear that Congress did intend this change to apply retroactively. In reaching this conclusion, I am mindful of the heavy presumption in the law against the retroactive application of statutes and the

rule that courts will only apply a law retroactively if there is a clear statement in the statute requiring that result. *See Rivers v. Roadway Express*, 511 U.S. 298, 307-310 (1994). I find such clarity for two reasons. First, Congress's titling of Section 5002 as a "clarification" is strong evidence of its retroactive effect. A clarification is a statement "of what [Congress] believed the law already was, and thus to be applicable to all cases, past, present and future."*Means v. Northern Cheyenne Tribal Court*, 154 F.3d 941, 951 (9th Cir.1998) (J. Reinhardt, concurring); *see also Beverly*, 132 F.3d at 1264 ("Congress' characterization [of a new act as a clarification] plainly reflects its intention to resolve every still-live dispute in the manner specified by the new legislation."); *Department of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F.Supp.2d 1123, 1133 (E.D.Cal.2000) ("Repeated use of the word 'clarification' ... is clear, unambiguous, and commanding evidence in favor of retrospectivity."). Second, Congress included an express ratification of the Secretary's conduct in § 5002(b) of the DRA. That section ratifies "[r]egulations promulgated on January 20, 2000 ... including the policy in such regulations regarding discharges occurring prior to January 20, 2000."

Regarding the ratification provision, plaintiffs argue that there is no mention of any policy regarding pre-January 20, 2000 discharges in the text of the regulations. But it is evident that Congress was referring to the pre-2000 exclusionary policy described in the Secretary's commentary to the January 20, 2000 regulations. The plaintiffs also assert, relying on *Thomas v. Network Solutions, Inc.*, 1998 WL 1738180, \*3 (D.D.C.1998), aff'd, 176 F.3d 500 (D.C.Cir.1999), that in order for a ratification to be effective, Congress must "express its clear recognition of the illegal nature of the [agency action], and its explicit intent to ratify that [action]." That may be true in the tax context of the *Thomas* case, but it makes little sense here to require Congress to recognize agency action as illegal if Congress does not agree that it was. Insisting on such a requirement would hamstring a Congress that genuinely disagreed with a court's view of an earlier statute: Congress would be unable to "clarify"

what the statute meant, because the court would call that a substantive change; and it would be unable to ratify the actions at issue, because it would have to deem them illegal, something it does not believe. The DRA's double-barreled approach to this conundrum-"clarifying" the DSH formula while "ratifying" agency action that, if Congress were right, would not need to be ratified-resolves this problem by giving the court two paths to the same result. Whether as a clarification or a ratification, the DRA's expression of the DSH formula must be retroactively applied to still-pending cases.

**8** The path to that result chosen by this court-retroactive ratification-raises what plaintiffs, in a footnote, perceive as a constitutional question. It is not the case, however, that "retroactivity would violate the due process clause of the Fifth Amendment to the United States Constitution."Pls.' Opp. at 20 n. 16. *See Association of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1255 (D.C.Cir.1998) (economic legislation is accorded a " 'presumption of constitutionality' that can be overcome only if the challenges establishes that the legislature acted in an arbitrary and irrational way."); *Adams v. Hinchman,* 154 F.3d 420, 424 (D.C.Cir.1998) (even assuming statute had given federal employees a property interest in earning overtime for services already rendered, "any such property interest could be extinguished so long as the retroactive economic legislation met the guarantees of due process"). Those who operate in regulated fields like Medicare and Medicaid " 'cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.' " *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 227 (1986)(quoting *FHA v. The Darlington, Inc.,* 358 U.S. 84, 91 (1958)).

**The Administrative Procedures Act (APA)**

Plaintiffs argue, finally, that even if the DRA retroactively endorses the Secretary's policy excluding expansion populations from the DSH formula, his decision to exclude them was arbitrary, capricious, and unreasonable, and therefore unlawful. 5 U.S.C. § 706(2)(A). The plaintiffs rest their argument on the reasons given by the Secretary for changing from an exclusionary to an inclusionary policy toward expansion populations in his January 20, 2000, promulgation. Rehashing these reasons, plaintiffs state "there is no rational connection between the findings of the Secretary, all of which support the inclusion of those populations, and the decision by the Secretary to exclude those populations with respect to the hospitals in Tennessee."Pls.' Opp. at 30.

It is not surprising, of course, that there is little connection between the Secretary's pre-2000 policy and the findings he announced in the regulation *changing* that policy. That does not mean that there were no reasons for the prior policy, however. The Secretary has cited the most obvious reason for his prior exclusionary policy, namely, that expansion populations may have higher incomes than traditional Medicaid beneficiaries, and thus may be a poor proxy for the needy patients the DSH formula is intended to represent. That is reason enough to uphold the prior policy under the APA.

*Conclusion*

Because the DRA changed the law regarding the calculation of Medicare reimbursements under the DSH formula, and because that change applies retroactively, the court would **grant** the Secretary's Motion to Alter the Judgment [28] should this case be remanded from the United States Court of Appeals for the District of Columbia Circuit.

D.D.C.,2006.
Cookeville Regional Medical Center v. Leavitt
Slip Copy, 2006 WL 2787831 (D.D.C.), Med & Med GD (CCH) P 301,910

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 8
Slip Copy, 2006 WL 2787831 (D.D.C.), Med & Med GD (CCH) P 301,910
(Cite as: Slip Copy)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PRRB-DEC, MED-GUIDE, ¶81,442, **Ashtabula County Medical Center (Ashtabula County, Ohio) v. Blue Cross/Blue Shield Association AdminiStar Federal, Inc.,** *CMS Administrator Decision*, (Oct. 12, 2005)

**Ashtabula County Medical Center (Ashtabula County, Ohio) v. Blue Cross/Blue Shield Association AdminiStar Federal, Inc.**

*CMS Administrator Decision*, Oct. 12, 2005.

**Medicare and Medicaid: State Programs and DSH Adjustment**

**Prospective payment system —Disproportionate share hospitals —Patient days defined. —** Patient days covered by the state's Hospital Care Assurance Program (HCAP) must be excluded in the count of Medicaid-related days in calculating the providers' disproportionate share hospital (DSH) percentages to the extent that these HCAP days were associated with individuals who were not eligible for medical assistance under a state Medicaid plan. Soc. Sec. Act §1886(d)(5)(F)(vi) defines the numerator of the Medicaid-related fraction as the number of days for patients who were eligible for "medical assistance under (a state plan approved under) Title XIX" but not eligible for Part A Medicare benefits. Although the state Medicaid DSH program involves some expenditures of federal financial participation based on the uncompensated care provided to individuals by these hospitals, this care is specifically for those individuals not eligible for Medicaid. The decision of the Provider Reimbursement Review board including the HCAP-covered days in the Medicaid proxy was reversed.

See ¶4275.15.

**The decision of the PRRB (see ¶81,376) was reversed.**

**[Text of Decision]**

**CENTERS FOR MEDICARE AND MEDICAID SERVICES**

*Decision of the Administrator*

**In the case of:**

**Ashtabula County Medical Center; The Community Hospital; Akron General Medical Center; Lima Memorial Hospital and The Toledo Hospital Provider vs. Blue Cross /Blue Shield Association AdminiStar Federal, Inc. Intermediary**

**Claim for:**

**Provider Cost Reimbursement Determination for Cost Reporting Periods Ending: Various**

**Review of:**

**PRRB Dec. No. 2005-D49**

**Dated: August 10, 2005**

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

Section 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The Center for Medicare Management (CMM) submitted comments, requesting reversal of the Board's decision. Accordingly, the parties were notified of the Administrator's intention to review the Board's decision. Comments were also received from the Intermediary requesting reversal of the Board's decision. Finally, comments were received from the Providers' requesting that the Administrator affirm the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final agency review.

### ISSUE AND BOARD'S DECISION

The issue is whether the Intermediary's adjustment excluding patient days related to Ohio's Hospital Care Assurance Program (HCAP) from the Providers' disproportionate share (DSH) calculation was proper.

The Board held that the Intermediary's adjustment improperly excluded HCAP patient days from the Providers' DSH calculations. In reaching this determination, the Board concluded that the DSH statute was not limited to only Medicaid patients, but included patients who qualify for "medical assistance" under the Ohio HCAP State Plan that was approved under Title XIX.[1]  Therefore, since the Ohio HCAP State Plan was approved under Title XIX, the HCAP days should be included in the Medicaid proxy to determine the Providers' DSH adjustment.

### SUMMARY OF COMMENTS

CMM commented requesting that the Administrator reverse the Board's decision. Specifically, CMM requested reversal of the Board's decision on grounds that the inpatient days associated with Ohio HCAP program were not provided to Medicaid eligible patients. CMM stated that under Section 1886(d)(5)(F)(vi) of the Act a portion of a hospital's DSH percentage is based on a calculation referred to as the Medicaid fraction. Clause (II) of that paragraph indicates that the Medicaid fraction is computed by dividing the number of patient days furnished to patients who, for those days, were eligible for Medicaid but who where not entitled to benefits under Medicare Part A by the number of total hospital patient days in the same period. Thus, to be included in the Medicaid fraction, the inpatient days associated with the HCAP program must be furnished to Medicaid eligible patients. CMM pointed out that the State explains that the HCAP is Ohio's version of the federally required [Medicaid] DSH program. HCAP compensates hospitals that provide a disproportionate share of care to indigent patients (Medicaid consumers, people below the poverty line and people without health insurance. The Medicaid DSH program is separate and distinct from the Medicare DSH adjustment. People below the poverty line are not necessarily eligible for medical assistance under a Title XIX approved State plan. Similarly, people without health insurance are by definition not eligible for medical assistance under the State plan.

CMM pointed out that Chapter 5112 of the Ohio Revised Code confirms that not all individuals whose income is below the Federal poverty guidelines are eligible for Medicaid, which is a further indication that not all inpatient days associated with the HCAP program are provided to Medicaid eligible patients. In particular, Section 5112.17(B) of the Ohio Revised Code states that:

> Each hospital that receives funds distributed under sections 5112.01 to 5112.21 of the revised code shall provide, without charge to the individual, basic, medically necessary hospital-level services to individuals who are residents of this state, *are not recipients of the medical assistance program*, and whose income is at or below the federal poverty guidelines.

Section 5112.01(G) of the Ohio Revised Code explains that "medical assistance program" means the program of medical assistance established under Section 5111.01 of the Revised Code and Title XIX of the Social Security Act. These provisions make clear that while the inpatient days associated with the HCAP program are used in determining the Medicaid DSH adjustment by the State of Ohio, not all of the inpatient days that are used in the HCAP calculation are provided to Medicaid eligible patients. CMM stated that by law, the HCAP inpatient days provided to patient that are not eligible for Medicaid should be excluded

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

from the numerator of Medicaid fraction to determine a hospital's Medicare DSH payments.

CMM stated that the Program Memorandum (PM) A-99-62 outlines which days are to be included in the Medicaid fraction of the Medicare DSH calculation. Program Memorandum A-99-62 identifies Medicaid DSH days as days that are ineligible for inclusion in the Medicare DSH calculation. These excluded days include days described as days for patients who are not eligible for Medicare benefits, but are considered in the calculation of Medicaid DSH payments by the State. Regarding these days, the PM A-99-62 explained that:

> These patients are not Medicaid-eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula.

Therefore, given the fact that the State of Ohio regulations specify that not all of inpatient days associated with the HCAP program are provided to Medicaid eligible patients, the Intermediary correctly excluded HCAP inpatients days from the Medicare DSH calculation that were not provided to Medicaid eligible patients.

The Intermediary submitted comments requesting that the Administrator reverse the Board's decision. The Intermediary concurred with CMM's comments. The Intermediary also argued that the use of the word "medical assistance" in the statute and the use of the word "Medicaid" in the regulation are interchangeable, both meaning that Medicaid eligibility is required to be included in the Medicaid proxy. Accordingly, since the Ohio State HCAP provides help to individuals who are not eligible for Medicaid, they cannot be included in the numerator for purposes of determining the Providers' DSH percentage.

The Intermediary also reviewed the statutory Medicaid DSH provisions which are based on either a hospital's Medicaid inpatient utilization rate or a hospital's low-income utilization rate. The Intermediary pointed out that these terms are not interchangeable. The HCAP revenues are included in the calculation of the low-income utilization rate for purposes of the Medicaid DSH. This was a means by which Ohio raised cash to subsidize hospital care for Ohio residents who did not qualify for Medicaid and to take advantage of the Federal matching funds for Medicaid DSH.

The Intermediary stated that similar to the calculation of the Medicaid DSH payment, the HCAP days are categorically excluded from being classified as patients eligible for medical assistance under a State plan approved under Title XIX. Title XIX sets forth the appropriations for "medical assistance" at section 1901 of the Act, while section 1902(a)(10) sets forth those individuals for whom "medical assistance" may be eligible. Both underline the fact that the term "medical assistance" is not a general term used to describe people in need for whom a State decides to offer some relief. Rather, the term "medical assistance" has a precise meaning including the identification of individuals who maybe covered. State funded programs like HCAP which by operation of State law help out individuals who are not recipients of Medicaid are not included in the Medicaid proxy definitions.

The Intermediary pointed out that this case was similar to the facts presented in *Jersey Shore Medical Center*, PRRB Dec. No. 99-D4. The Administrator in that case noted that the payment of Federal Financial Participation funds (FFP) under the Medicaid DSH provisions was not necessarily evidence that related days were for individuals "eligible for medical assistance under a State plan approved under title XIX.." As in that case, here any Federal matching funds are limited to the payment for the Medicaid DSH to the extent it incorporates HCAP patients into the Section 1923 "low-income utilization" Medicaid DSH payments.

The Providers commented requesting that the Administrator affirm the Board's decision. The Providers argued that a plain reading of the Act requires that HCAP days be included in the Providers' DSH calculation because HCAP is part of Ohio's State plan approved under title XIX. Furthermore, the Providers

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

argued that the Intermediary is incorrect that the statute and the implementing regulation read collectively mean that Medicaid eligibility is required to be included in the Medicaid proxy. The DSH statute does not require that a patient day be "eligible for Medicaid." It only requires that the patient day "be eligible for medical assistance under a State plan approved under title XIX.

### *DISCUSSION*

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

Relevant to the issue involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations. The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children.[2]  The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines. Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy. Participating States are required to provide Medicaid coverage to the categorically needy.[3]  The "categorically needy" are persons eligible for cash assistance under two Federal programs: Aid to Families with Dependent Children (AFDC) [42 USC 601 et. seq.] and Supplemental Security Income or SSI [42 USC 1381, et. seq.]. Participating States may elect to provide for payments of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes or resources, while exceeding the financial eligibility requirements for the categorically needy (such as an SSI recipient) are insufficient to pay for necessary medical care.[4]

In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval. The State plan must specify, *inter alia*, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered.[5]  If the State plan is approved by CMS, the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State plan.

Within broad Federal rules, States enjoy a measure of flexibility to determine "eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.[6]  In particular, the Medicaid statute sets forth a number of requirements, including income and resource limitations that apply to individuals who wish to receive medical assistance under the State plan. Individuals who do not meet the applicable requirements are not eligible for medical assistance under the State plan.

Section 1901 of the Social Security Act sets forth that appropriations under that title are "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish medical assistance on behalf of families with dependent children and of aged, blind or disabled individuals whose incomes and resources are insufficient to meet the costs of necessary medical services...." Section 1902 sets forth the criteria for State plan approval. As part of a State plan, Section 1902(a)(13)(A)(iv) requires that a State plan provide for a public process for determination of payment under the plan for, *inter alia*, hospital services which in the case of hospitals, take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs. Section 1905 defines the term "medical assistance" within the context of the payment of part or all of the costs of certain specified care and medical services and the identification of certain individuals for whom payment maybe made.

Section 1923 of the Act implements the requirements that a State plan under Title XIX provide for an adjustment in payment for inpatient hospital services furnished by a disproportionate share hospital. A hospital maybe deemed to be a Medicaid disproportionate share hospital pursuant to Section 1923(b)(1)(A), which addresses a hospital's Medicaid inpatient utilization rate,[7] or under paragraph (B), which addresses a

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

hospital's low-income utilization rate.[8]  The latter criteria relies, inter alia, on the total amount of the hospital's charges for inpatient services which are attributable to charity care.

While Title XIX implemented medical assistance pursuant to a cooperative program with the States for certain low-income individuals, the Social Security Amendments of 1965[9] established title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[10] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[11]  At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[12]  However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[13]  This provision added §1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[14]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimburse their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis related groups (DRG) subject to certain payment adjustments.

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to Section 1886(d)(5)(F)(i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[15]

There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[16]  To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage. Relevant to this case, with respect to the proxy method, Section 1886 (d)(5)(F)(vi) of the Act states that the terms "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" and the "Medicaid low-income proxy", respectively, and are defined as follows:

> (I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of *patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX*, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patient days for such period. (Emphasis added.)

CMS implemented the statutory provisions at 42 CFR 412.106. The first computation, the "Medicare proxy" or "Clause I" is set forth at 42 CFR 412.106(b)(2). Relevant to this case, the second computation, the "Medicaid-low income proxy", or "Clause II", is set forth at 42 CFR 412.106(b) (4) (1995) and

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

provides that:

> *Second computation.* The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to patients entitled to Medicaid but not to Medicare Part A, and divides that number by the total number of patient days in the same period.

Although not at issue in this case, CMS revised 42 C.F.R. 412.106(b)(4) to conform to HCFA Ruling 97-2, which was issued in light of Federal Circuit Court decisions disagreeing with CMS' interpretation of a certain portion of §1886(d)(5)(vi)(II) of the Act. In conjunction with this revision, CMS issued a Memorandum dated June 12, 1997, which explained the counting of patient days under the Medicaid fraction, stating that:

> [I]n calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX beneficiary on that day of service?' If the answer is "yes," the day counts in the Medicare disproportionate share adjustment calculation. This does not mean that title XIX had to be responsible for payment for any particular services. It means that the person had to have been determined by a State agency to be eligible for Federally-funded medical assistance for any one of the services covered under the State Medicaid Title XIX plan (even if no Medicaid payment is made for inpatient hospital services or any other covered service)....

In order to clarify the definition of eligible Medicaid days and to communicate a hold harmless position for cost reporting periods beginning before January 1, 2000, for certain providers, CMS issued Program Memorandum (PM) A-99-62, dated December 1999.[17] With respect to the days to be included in the Medicaid proxy, the PM A-99-62 stated that the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. The PM explained that:

> In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for Medicaid days reflects several key concepts. First, the focus is on the patients eligibility for Medicaid benefits as determined by the State, not the hospital's eligibility for some form of Medicaid payment. Second, the focus is on the patient's eligibility for medical assistance under an approved Title XIX state plan, not the patient's eligibility for general assistance under a State-only program, Third, the focus is on eligibility for medical assistance under an approved Title XIX State plan, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid (under an approved Title XIX State plan).

Consistent with this explanation of days to be included in the Medicare DSH calculation, the PM stated regarding the exclusion of days, that:

> Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program.... These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

> In addition, if a given patient day affects the level of *Medicaid* DSH payments to the hospital but the patient is not eligible for Medicaid under a State plan approved under title XIX on that day, the day is not included in the *Medicare* DSH calculation.

*Copyright © 2008,* **CCH** *INCORPORATED.  All rights reserved.*

...

> Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate document to substantiate the number of Medicaid days claimed.[18]  (Emphasis added.)

The Secretary reasserted, in the August 1, 2000 *Federal Register*, his policy regarding general assistance days, State-only health program days and charity care days.

> General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program. Charity care days are those days that are utilized by patients who cannot afford to pay and whose care is not covered or paid by any health insurance program. While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid eligible under the State plan and are not considered Titled XIX beneficiaries.[19]

In this case, involves sixteen different appeals brought by five Ohio Providers. The Providers' receive funding under the Ohio Hospital Care Assurance Program (HCAP). The Providers argue that the patient days relating to HCAP should be included in the numerator of the "Medicaid proxy" disproportionate share hospital (DSH) payment calculation. The Providers contend that a plain reading of the Section 1886(d)(5)(F) of the Social Security Act requires that HCAP days be included in the Providers' DSH calculation because HCAP is part of Ohio State plan approved under Title XIX. The Board held that the Intermediary's adjustment improperly excluded HCAP patient days from the Providers' DSH calculations.

Chapter 5112 of the Ohio Revised Code implements the Ohio State Hospital Care Assurance Program. The Ohio State Hospital Care Assurance Program is described as "Ohio's version of the federally required Disproportionate Share Hospital program. HCAP compensates hospitals that provide a disproportionate share of care to indigent patients (Medicaid consumers, people below the poverty line and people without health insurance)."[20]  Section 5112.17(B) of the Ohio Revised Code states that:

> Each hospital that receives funds distributed under section 5112.01 to 5112.21 of the Revised Code shall provide, without charge to the individual, basic, medically necessary hospital-level services to individuals who are residents of this state, *are not recipients of the medical assistance program*, and whose income is at or below the federal poverty guidelines.[21] (Emphasis added.)

Thus, hospitals that receive funds paid under the Hospital Care Assurance Program (an indigent care pool)[22]  are to provide without charge medically necessary hospital-level services to individuals that are not recipients of the medical assistance program.

A review of the case shows that the days at issue are related to individuals that are specifically identified as not eligible for medical assistance under an approved Title XIX State plan. However in order to receive the Ohio version of the Medicaid DSH payment, a hospital is required to provide medical services without charge to these individuals.[23]  The Administrator finds that the language set forth in section 1886(d)(5)(F)(vi)(II) requires that the day be related to an individual eligible for "medical assistance under Title XIX" also known as the Federal program Medicaid. The use of the term "medical assistance" at Sections 1901 and 1905 of the Social Security Act and the use of the term "medical assistance" at Section 1886(d)(5)(F)(vi)(II) of the Social Security Act is reasonably concluded to have the same meaning. As noted by the courts, "the interrelationship and close proximity of these provisions of the statute presents a classic case for the application of the normal rule of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning."[24]  Therefore, the Administrator

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

reads the language at section 1886(d)(5)(F)(vi)(II) that states that the numerator "is the number of the hospital's patients days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX," to require that for a day to be counted, the individual must be eligible for medical assistance under Title XIX, that is, the individual must be eligible for the Federal government program also referred to as Medicaid. Notably, the days involved in this case are related to individuals that are not eligible for medical assistance as that term is used under Title XIX and, thus, are not properly included in the Medicaid proxy of the Medicare DSH calculation under Section 1886(d)(5)(F)(vi)(II) of the Act.

The Administrator finds that the Intermediary properly excluded the Ohio HCAP days at issue from the numerator of the Medicaid fraction to the extent that these HCAP days were associated with individuals who are *not* eligible for medical assistance under a State plan approved under Title XIX, i.e., the Federal program called Medicaid. The Ohio State Medicaid DSH program may involve some expenditure of Federal financial participation (FFP) based on the uncompensated care provided to individuals by these hospitals;[25] however, the uncompensated care is by definition for individuals not eligible for Medicaid. The approval of the Ohio State Medicaid DSH provision under the State plan and the expenditure of Medicaid DSH FPP does not constitute "medical assistance" for the individuals at issue in this case as that term is used under Title XIX and Title XVIII.

### DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.**

Date: *10/11/05*

[1] The record contains the Ohio State plan that was approved effective January 1, 2001. Providers' Exhibit P-8. Reference is made to prior year approval of the Ohio HCAP program as part of the Ohio State Plan under title XIX at Provider's Amended Final Position Paper at 6, fn.2. However, the State plan approved for the cost reporting periods at issue in this case are not in the record.

[2] Section 1901 of the Social Security Act (Act) (Pub. Law 89-97.)

[3] Section 1902(a) (10) of the Act.

[4] Section 1902(a) (1) (C) (i) of the Act.

[5] *Id*. §1902 et. seq. of the Act.

[6] *Id.*

[7] Section 1923(b)(2) explains that for purposes of paragraph (1)(A), "the term `medicaid inpatient utilization rate' means, for a hospital, a fraction ... the numerator of which is the hospital's number of inpatient days attributable to *patients who (for such days) were eligible for medical assistance under a State plan approved under this title* in a period ..., and the denominator of which is the total number of the hospital's inpatient days in that period...." (Emphasis added.)

[8] Section 1923(b)(3) explains that "for purposes of paragraph (1)(B), the term `low-income utilization rate' means, for a hospital, the sum of —(A) the fraction.... —(i) the numerator of which is the sum (for a period) of (I) the total revenues paid the hospital for patient services under a State plan under this title ... and (II) the amount of the cash subsidies for patient services received directly from State and local

*Copyright © 2008, **CCH** INCORPORATED.  All rights reserved.*

governments, and (ii) the denominator of which is the total amount of revenues of the hospital for patient services (including the amount of such cash subsidies) in the period; and (B) a fraction (expressed as a percentage) —(i) the numerator of which is the total amount of the hospital's charges for inpatient hospital services which are attributable to charity care in a period, less the portion of any cash subsidies described in clause (i)(II) of subparagraph (A) in the period reasonably attributable to inpatient hospital services, and (ii) the denominator of which is the total amount of the hospital's charges for inpatient hospital services in the hospital in the period. The numerator under subparagraph (B)(i) shall not include contractual allowances and discounts (other than for indigent patients not eligible for medical assistance under a State plan approved under this title)."

[9] Pub. Law No. 89-97.

[10] Section 1811-1821 of the Act.

[11] Section 1831-1848(j) of the Act.

[12] Under Medicare, Part A services are furnished by providers of services.

[13] Pub. Law No. 98.21.

[14] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

[15] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). *See also* 51 Fed. Reg. 16772, 16773-16776 (1986).

[16] The Pickle method is set forth at section 1886(d)(F)(i)(II) of the Act.

[17] The PM provided a hold harmless provision which was not raised as being applicable to the appeals at issue in this case.

[18] An attachment to the PM describes the type of day, description of the day and whether the day is a Title XIX day for purposes of the Medicare DSH calculation. In particular, the attachment describes "general assistance patient days" as "days for patients covered under a State-only (or county only) general assistance program (whether or not any payment is viable for health care services under the program). These patients are not Medicaid-eligible under the State plan." The general assistance patient day is not considered an "eligible Title XIX day." "Other State-only health program patient days" are described as "days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State program." Likewise, State-only health program days are not eligible Title XIX days. Finally, charity care patient days are described as "days for patients not eligible for Medicaid or any other third-party payer and claimed as uncompensated care by a hospital. These patients are not Medicaid eligible under the State plan." Charity care patient days are not eligible Title XIX days.

[19] 65 Fed. Reg. 47054 at 47087 (Aug. 1, 2000).

[20] *See* http://jfs.ohio.gov/ohp/bhpp/hcap/.

[21] Ohio Revised Code Section 5112.17(B).

[22] Chapter 5111.01 of the Ohio Revised Code sets out the eligibility for medical programs and explains that as used in this chapter `medical assistance program' or `medicaid' means the program that is authorized by this chapter and provide by the department of job and family services under this chapter, Title XIX of the Social Security Act ... as amended and the waivers of Title XIX requirements granted to the department by [CMS]

*Copyright © 2008, **CCH** INCORPORATED. All rights reserved.*

[23] The Ohio State Medicaid DSH formula and how the days, costs, or charges, related to the individuals at issue are used in the formula is not discuss in detail.

[24] *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *Commissioner v. Lundy*, 516 U.S. 235, 250 (1996).

[25] For purposes of distributing funds to hospitals under, *inter alia*, the medical programs pursuant to sections 5112.01 to 5112.21 of the Ohio Revised Code, Section 5112.06 sets forth annual assessments on hospitals based on the hospital's total facility costs. In addition, Section 5112.08 of the Ohio Revised Code sets forth the methods of distributing to hospitals all money in the indigent care pool. See *http://jfs.ohio.gov/ohp/bhpp/hcap* (A portion of the pool is collected in the form of assessments to providers with the balance of the funds provide by the Federal government under the Section 1923 of the Act (the Medicaid DSH provision). *See Id.* showing each provider's assessment and DSH payment amount.

*Copyright © 2008,* **CCH** *INCORPORATED.  All rights reserved.*



▶  Cookeville Regional Medical Center v. Thompson
D.D.C.,2005.

United States District Court, District of Columbia.
COOKEVILLE REGIONAL MEDICAL CENTER, et
al., Plaintiffs,
v.
Tommy G. THOMPSON, Secretary, Department of
Health and Human Services, Defendant.
**No. Civ.A. 04-1053 JR.**

Oct. 28, 2005.

Jacqueline Elizabeth Bennett, Reed Smith LLP,
Washington, DC, for Plaintiffs.
Steven Y. Bressler, U.S. Department of Justice,
Washington, DC, for Defendant.

*MEMORANDUM ORDER*
ROBERTSON, J.
**\*1** Plaintiff hospitals brought this action against the
Secretary for Health and Human Services, alleging the
wrongful denial of Medicare reimbursements for services
they provided to low-income patients in years prior to
2000. They sought a declaration that the Secretary's
interpretation of the Medicare statute's disproportionate
share hospital (DSH) formula is contrary to law, and they
sought reimbursement for the difference between the
payments they received and the amounts they would be
due under their interpretation of the DSH formula. Both
parties moved for summary judgment. On September 30,
2005 I granted plaintiff's motion for summary judgment
and denied defendant's cross-motion. The reasons for this
order are set forth below.

*Background*

This case is significantly more difficult to describe than to
decide. It involves a dispute between fifteen Tennessee
hospitals and the Secretary for Health and Human Services
over the meaning of discrete provisions for payments
made under the Medicare program, which reimburses
hospitals for inpatient services to Medicare-eligible
patients. 42 U.S.C. §§ 1395*etseq.* Medicare uses a
"prospective payment" system (PPS) for reimbursement.
42 U.S.C. § 1395ww(d). Hospitals are credited with fixed
amounts for defined "diagnosis-related groups," and these
amounts are then subject to a variety of hospital-specific
adjustments. This dispute is about the correct calculation
of one such adjustment.

In 1986, Congress authorized a PPS adjustment for
hospitals that serve "a significantly disproportionate
number of low income patients ..."42 U.S.C. §
1395ww(d)(5)(F)(i)(I). It did so after determining that
low-income patients tend to consume a disproportionately
large share of hospitals' resources, resulting in higher
per-case Medicare costs. H.R.Rep. No. 99-241 at 16
(1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594. The
amount a hospital receives under this provision is
calculated using a "disproportionate share hospital" (DSH)
percentage, which in turn is derived from a statutory
formula that compares the number of patient days a
hospital devotes to low-income patients with its total
number of patient days. *See* 42 U.S.C. §
1395ww(d)(5)(f)(vi).

Rather than specify a particular income threshold for its
definition of "low income," the DSH formula uses
eligibility for Medicaid as a proxy for low-income status.
Using this proxy, the statute defines "disproportionate
share percentage" as the sum of two fractions: the
Medicare low-income fraction, which is not at issue in this
case, and the Medicaid fraction, which is. The Medicaid
fraction is defined as:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
(Cite as: Not Reported in F.Supp.2d)

the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [the Medicaid program], but who were not entitled to benefits under [Medicare Part A], and the denominator of which is the total number of the hospital's patient days for such period.

**\*2**42 U.S.C. § 1395ww(d)(5)(f)(vi)(II). The most significant aspect of this definition, for purposes of this case, is the requirement that Medicaid patients be "eligible for medical assistance under a State plan approved under [Title] XIX" in order to be included in the DSH calculation. 42 U.S.C. § 1395ww (d)(5)(f)(vi).

Title XIX of the Social Security Act (Medicaid) authorizes the use of federal funds to help states offset the cost of providing medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396 *etseq.* To receive these funds, a state must submit a "state plan" for approval by the Secretary, and it must administer the plan according to Medicaid requirements. 42 U.S.C. § 1396d(a). These requirements regulate the manner in which the plan is implemented (*e.g.,* requiring the plan to be state-wide rather than limited to urban areas), as well as which individuals may be covered. See 42 U.S.C. § 1396a. Only expenditures made under an approved Medicaid state plan become eligible for matching federal payments. 42 U.S.C. § 1396d (a)-(b).

State plans must ordinarily meet the requirements of the Medicaid statute (Title XIX) to receive funding. However, Congress has authorized the Secretary, through Section 1115 of subchapter XI of the Social Security Act, to approve "experimental, pilot, or demonstration projects" that go beyond these requirements in order to promote innovative approaches to meeting the health care needs of low-income individuals. 42 U.S.C. § 1315. These projects must, in the judgment of the Secretary, be "likely to assist in promoting the objectives of ... [Title] XIX."42 U.S.C.

§ 1315a. The Secretary may waive the Medicaid requirements set forth in 42 U.S.C. § 1396a for these demonstration projects, and the costs of such projects "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under [Title XIX]."42 U.S.C. § 1315a(1)-(2).

As a result of these § 1115 waivers, states sometimes receive matching Medicaid payments for patients who otherwise would not have been eligible for medical assistance under Medicaid. These patients, referred to by the government as "expansion populations," are at the center of the dispute between the hospitals and the government in this case.

Before January 2000, the Secretary interpreted the DSH formula as excluding patients made eligible for Title XIX matching payments solely through a § 1115 waiver. Because of regional inconsistencies among its fiscal intermediaries in the treatment of expansion populations,<sup>FN1</sup> however, the Secretary issued an interim rule in January 2000 clarifying the Department's position. *See* Interim Final Rule, 65 Fed.Reg. 3136, 3137, 3139 (Jan. 20, 2000). The Secretary explained that patients who receive medical assistance under a demonstration project fall into two categories: "hypothetical eligibles," who would be eligible for Medicaid assistance with or without a § 1115 waiver; and "expanded eligibility groups," who became eligible solely because of the waiver. *Id.* The Secretary made it clear that agency policy *before* the issuance of the interim rule had been to include "hypothetical eligibles" in the DSH calculation, but to exclude "expanded eligibility groups." *Id.*

> FN1. Fiscal intermediaries act as the Secretary's agents in his dealings with Medicare service providers. The intermediaries review annual cost reports submitted by hospitals and issue a "Notice of Program Reimbursement" explaining the amount of reimbursement a hospital may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
(Cite as: Not Reported in F.Supp.2d)

receive. Before 2000, some intermediaries used expansion populations to calculate a hospital's DSH percentage, while others followed the Secretary's policy of excluding them.

**\*3** Having clarified the agency's past interpretation of the DSH formula, the Secretary then used the same interim rule to reverse his policy and to announce that, in future calculations, *all* patients receiving medical assistance under § 1115 waiver programs would be included in the DSH formula, including expansion populations. *Id.* at 3136-37.The Secretary acknowledged that "[o]ne of the purposes of a section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for Medicaid."*Id.* The Secretary stated that the inclusion of persons made "eligible for Title XIX matching payments under a section 1115 waiver" was "fully consistent" with the goals of the DSH adjustment. *Id.* While not applying this rule retroactively, the Secretary stated that hospitals that had erroneously been allowed by fiscal intermediaries to include expansion populations in their DSH calculations would be held harmless. *Id.* The interim rule-excluding expansion populations from DSH calculations before January 2000, and including them thereafter-was subsequently made final, 65 Fed.Reg. 47,054 (Aug. 1, 2000).

*Procedural History*

Plaintiffs are fifteen not-for-profit Tennessee hospitals that participate in Medicare and Medicaid through the "TennCare" program. TennCare is a state plan operating under a § 1115 waiver that provides medical assistance to uninsured and underinsured patients, many of whom do not fit Medicaid's traditional eligibility requirements. Prior to 2000, each hospital submitted its DSH adjustment request to the Secretary's fiscal intermediary, and each hospital's DSH adjustment was reduced by the exclusion of expansion populations. Plaintiffs filed timely appeals to the Provider Reimbursement Review Board (PRRB), but

also requested expedited judicial review because their appeal involved "a question of law," which the PRRB lacks authority to decide. 42 U.S.C. § 1395oo(a). The PRRB granted that request, giving plaintiffs 60 days to file a civil action, and plaintiffs then timely filed this action. They sought (1) a declaration that the Secretary's former interpretation of the Medicare PPS statute, by excluding expansion populations from the DSH adjustment formula, contravenes the clear language of the statute; and (2) an order requiring the Secretary to recalculate plaintiffs' DSH percentage using the correct formula and directing the Secretary to pay plaintiffs the amounts unlawfully withheld from their DSH adjustment, with interest.

*Discussion*

Judicial review of an agency's interpretation of a statutory scheme it administers has two steps. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).* First, the reviewing court looks to the statutory language and legislative history to determine if Congress has directly spoken to the precise question at issue.*Id.* Clear Congressional intent must be given effect, and an agency's inconsistent interpretation is not entitled to deference. *Id.* If the statute is silent or ambiguous, the reviewing court proceeds to the second *Chevron* step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute."*Id.* A court cannot substitute its judgment for an agency's reasonable interpretation of a statute in the absence of unambiguous Congressional intent. *Id.*

**\*4** This case lies at the intersection of two statutes: the DSH formula, 42 U.S.C. § 1395ww(d)(5)(F)(vi), and the § 1115 waiver provision, 42 U.S.C. § 1315. The Secretary contends that these statutes are ambiguous or at least silent on the question of whether the DSH provision includes Medicaid patients eligible for medical assistance only because of a § 1115 waiver. I find, however, that "the statutory scheme is coherent and consistent,"*Barnhart v.*

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
(Cite as: Not Reported in F.Supp.2d)

*Sigmon Coal Co., Inc.* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)) and that "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."*Id.*

In defining its proxy for low-income patients, the DSH formula directs the Secretary to include all "patients who ... were eligible for medical assistance under a State plan approved under [Title] XIX."§ 1395ww(d)(5)(F)(vi). And, in defining the relationship between demonstration projects and the Medicaid program as a whole, § 1115 dictates that the "costs of [demonstration] projects ...*shall,* to the extent and for such period prescribed by the Secretary, be regarded as expenditures under the State plan approved under [Title] XIX."42 U.S.C. § 1315 (emphasis added). If the costs of a § 1115 demonstration project must be regarded as part of "a State plan approved under [Title XIX]," as § 1115 mandates, then patients whose treatment is funded by such expenditures must be "eligible for medical assistance under a State plan approved under [Title] XIX," as the DSH formula specifies. See*Portland Adventist Med. Ctr. v. Thompson,* 399 F.3d 1091, 1098 (2005) ("Use of the term 'shall' creates a mandatory equivalence between expenditures under a § 1115 project and Title XIX expenditures.") It follows that expansion populations, no less than "hypothetical eligibles," must be included in the DSH calculation, and that the Secretary's exclusion of expansion populations from plaintiffs' DSH adjustments for fiscal years prior to 2000 contravenes the clear language of the statute.

Although there is nothing ambiguous about the language of the statutes, it is helpful that Congress spoke quite directly to the precise issue of the relationship between § 1115 waivers and the DSH formula in a later statute. Under longstanding DSH rules, urban and rural hospitals of varying sizes face different DSH percentage thresholds before they become eligible for DSH adjustments. 42 U.S.C. § 1395ww(d)(5)(F)(v). In 1997, Congress directed

the Secretary to submit a report on the viability of changing these varying thresholds into a single standard for all DSH-eligible hospitals. Pub.L. No. 105-33 § 4403(b). In its directive, Congress made it clear that the DSH formula includes the cost of providing "medical assistance under the State plan under title XIX ... (*including*... individuals who receive medical assistance under such title pursuant to a waiver by the Secretary under section 1115 ...)."Pub.L. No. 105-33 § 4403(b)(3) (emphasis added). While "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,"*Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 484-85, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (quoting *U.S. v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)), Congress, through this parenthetical, simply confirmed what was already clear from the language and structure of the § 1115 and the DSH formula.[FN2]

>    FN2. The Secretary appeared to interpret this Congressional directive in just this way. The agency's rule explains that Congress required the Secretary to submit a formula that considers "the costs incurred for furnishing services to individuals receiving Medicaid ...*including*... individuals who receive medical assistance in a State with an § 1115 waiver under Medicaid."Final Rule, 62 Fed.Reg. 45,966, 46,002 (Aug. 29, 1997) (emphasis added).

**\*5** The Secretary offered two interesting, but ultimately flawed, theories for his contention that he had the authority to exclude expansion populations from the DSH formula for years prior to 2000. First, he maintained that § 1115(a)(2) provided him with "separate expenditure authority" over medical assistance to expansion populations. Def.'s Reply Memo. at 7. Second, the Secretary asserted that § 1115(a)(2) gives him the authority to regard medical assistance to expansion populations as part of a Title XIX state plan for purposes of reimbursement, but not for purposes of the DSH adjustment. Neither contention was persuasive.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*A. Section 1115 and Medicaid Expenditure Authority*

The Secretary argued at length in his briefs that § 1115 gives him "expenditure authority" under Title *XI* with which he funds demonstration projects, and that this "expenditure authority" is "separate" from Title XIX.*Id.* As he correctly pointed out, expansion populations cannot be made eligible for Medicaid by a § 1115(a)(1) waiver of Medicaid's requirements alone. Rather, "it is with [§ 1115(a)(2) ] authority, and this authority only, that the Secretary may authorize federal dollars be used to reimburse states for providing medical assistance to 'expansion populations' ..."*Id.* at 8. Because § 1115 is part of subchapter XI of the Social Security Act, and not subchapter XIX, the Secretary went on to argue that a demonstration project is "indisputably a creature of Title XI, approved by the Secretary pursuant to § 1115 ..., and *not* approved under 42 U.S.C. § 1396a, § 1396b, *or any other provision of Title XIX."*Id. at 10 (emphasis in original).

The Secretary's contention that § 1115(a)(2) gives him "separate expenditure authority" is refuted, however, by the language and structure of Title XIX and XI. The DSH formula requires the inclusion of all patients who are "eligible for medical assistance under a State plan approved under [Title XIX]."42 U.S.C. § 1395ww (d)(5)(F)(vi). "Medical assistance" is defined in Title XIX as "payment of part or all of the cost of ... care and services ... for individuals ... whose income and resources are insufficient to meet all of such cost...."42 U.S.C. § 1396a. The Secretary is only authorized to provide medical assistance "under a state plan," and only expenditures made under a state plan are eligible for Title XIX payments. *See*42 U.S.C. §§ 1396, 1396d(a)-(b); *Portland Adventist,* 399 F.3d at 1097-98. Section 1396a spells out certain requirements for state plans, including populations they *must* serve, and § 1396b provides for the reimbursement of states for a portion of the costs of providing medical assistance under the state plan. Section

§ 1396b also prevents federal reimbursement for patients who fall outside of the eligibility rules of the state plan.

These provisions defining medical assistance and laying out the conditions for federal matching payments make it clear that Title XIX is the source and vehicle of federal authority for providing medical assistance under Medicaid. Nothing in § 1115 creates a similar scheme of medical assistance or authorizes appropriation of any sums for funding demonstration projects. As the Ninth Circuit wrote in *Portland Adventist,*"When Congress has established separate funding sources, it has done so with specific language."399 F.3d at 1097-98, citing 42 U.S.C. § 301 (authorizing appropriations for state "old-age assistance" plans) and § 1396 (authorizing appropriations for Medicaid payments to states). This is no less true for demonstration projects funded under independent appropriations. *Id.,* citing 42 U.S.C. § 300z-9 (authorizing appropriations for adolescent family life demonstration projects). There is no independent authorizing language in § 1115, demonstrating that Congress did not consider § 1115 to be a funding source. Rather, the purpose of § 1115 is to empower the Secretary to waive certain restrictions on state plans so that they may become eligible for *Title XIX* funds. Indeed, even this authority is conditioned on the Secretary's determination that such a waiver "assist[s] in promoting the objectives of [Title] XIX."42 U.S.C. § 1315(a).

**\*6** The Secretary took pains to avoid the text of § 1115(a)(2) when he defined his "separate expenditure authority" as the authority to specify that state expenditures for demonstration projects " 'shall be regarded as' matchable for the purpose of providing federal funding."*Id.* at 8 (quoting 42 U.S.C. § 1315). But what follows the half-quoted clause, "shall be regarded as," is, "expenditures under the State plan approved under [Title] XIX."42 U.S.C. § 1315. Rather than establishing an independent authority to direct federal spending, this and the other operative parts of § 1115 explicitly define the Secretary's authority by reference to *Title XIX*.It is clear that expansion populations become eligible for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

medical assistance only under a state plan approved under Title XIX, not a separate § 1115 funding mechanism. See Portland v. Adventist, 399 F.3d at 1097 ("Neither this provision nor any other authorizes appropriation of any sums for purposes of funding projects approved under § 1115.")

There is a further problem with the Secretary's contention, of course, namely, that it contradicts his current practice, in force since January 2000, of *including* expansion waiver populations in the DSH calculation. When he announced the current policy, the Secretary stated that "[o]ne of the purposes of a section 1115 expansion waiver is to extend Title XIX matching payments to services furnished to populations that otherwise could not have been made eligible for Medicaid." See Interim Final Rule, 65 Fed.Reg. 3136, 3137, 3139 (Jan. 20, 2000). He also stated that including persons made "eligible for Title *XIX* matching payments under a section 1115 waiver" was "fully consistent" with the goals of the DSH adjustment. *Id.* (emphasis added). But in his argument justifying his previous exclusion of expansion populations, the Secretary called demonstration projects (and the medical assistance they provide) "indisputably [ ] creature[s] of Title XI, approved by the Secretary pursuant to § 1115 ..., and *not* approved under 42 U.S.C. § 1396a, § 1396b, *or any other provision of Title XIX."* Def.'s Reply Memo. at 10 (emphasis in original).

The Secretary cannot have it both ways. Medical assistance provided to expansion populations is either part of a state plan approved under Title XIX, or it is not. If the medical assistance provided through demonstration projects indeed flows from a "separate [Title XI] expenditure authority," as the Secretary maintained, it would contravene the statute to include expansion populations in the DSH formula no less than it would to exclude them if such assistance flows from Title XIX, as plaintiffs claim. Thus, the only way the Secretary's pre-2000 exclusionary policy could have been lawful is if his current policy of inclusion were unlawful. Even the ambiguity the Secretary purported to find in the statutes

could not embrace two contradictory policies.

*B. The Secretary's "Extent and Period" Discretion*

**\*7** The Secretary's second justification for his prior exclusion of expansion populations from the DSH statute rested on the language of § 1115(a)(2), which provides that the cost of demonstration projects "shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan ... approved under [Title XIX]." 42 U.S.C. § 1315(a)(2)(A). The Secretary claimed that this provision gives him "broad discretion to treat [demonstration project] expenditures as Medicaid expenditures only to the extent of determining Medicaid reimbursement to a state, but not for the further purpose of calculating the DSH adjustment." Def.'s Reply Memo. at 13.

Such a reading rips the "extent" and "period" language from its context, and unjustifiably turns it into an expansive grant of authority unmoored to any statutory scheme. As the Ninth Circuit explained, the " 'extent' and 'period' language, following and modifying the mandatory term 'shall,' plainly ... refers to the lifespan of a the project-the period during which the equivalence between § 1115 and Title XIX expenditures is required." Portland Adventist, 399 F.3d at 1098. In other words, the Secretary may determine the period of time for which demonstration project expenditures will be reimbursed under Title XIX, and also to what extent those expenditures will be reimbursed under Title XIX. But, once he makes those determinations, he has no choice but to treat the costs as expenditures under a Title XIX state plan. See Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ("Shall" is "language of an unmistakably mandatory character"). No other reading does justice to the structure and plain language of § 1115.

It is noteworthy that the very same language appears in § 1115(a)(1), which grants the Secretary the authority to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
(Cite as: Not Reported in F.Supp.2d)

waive certain state plan restrictions "to the extent and for such period as [the Secretary] finds necessary to enable such State or States to carry out [a demonstration] project." 42 U.S.C. § 1315(a)(1). The Secretary did not maintain that this language means anything other than that he may carve out certain exceptions to Title XIX's state plan requirements for the duration of the demonstration project. That is, he did not claim that this authority gives him the ability to prevent an approved demonstration project from being included in the DSH calculation.

Instead, the Secretary attempted to distinguish § 1115(a)(1)'s "extent" and "period" clause from that in § 1115(a)(2) by pointing to the first clause's addition of the language, "he finds necessary to enable such State or States to carry out such project." 42 U.S.C. § 1315(a)(1). Because this language is absent from § 1115(a)(2), which deals with program costs, the Secretary argued that the clauses cannot mean the same thing. He pointed to *Hohn v. United States*, 524 U.S. 236, 250, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998), which states, "[W]here Congress includes particular language in one section of a statue, but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." The Secretary then claimed that a permissible reading of § 1115(a)(2)'s use of "extent" and "period" is one that grants him the authority to regard demonstration project expenditures as part of Title XIX state plans for purposes of providing matching federal payments, but "to decline to further regard them as Medicaid expenditures for purposes of the Medicare DSH provision." Def.'s Reply Memo. at 13-14.

**\*8** This conclusory leap is unsupported by the statute. The Secretary's insistence that the deletion of the "carry out" language in § 1115(a)(2) must be regarded as purposeful is well taken, but an obvious purpose presents itself: such language is useful when dealing with § 1115(a)(1)'s waiver of programmatic regulations (such as whether a program must operate state-wide, or which patients it must serve), but unnecessary when dealing with the reimbursement of

state payments for the program once it is up and running (as § 1115(a)(2) does). A particular Medicaid requirement may doom a potential demonstration project unless it is waived, but whether a State receives Title XIX matching payments *after* it has carried out a project cannot affect its ability to carry the project out in the first place. For this reason, additional language is unnecessary to spell out § 1115(a)(2)'s grant of authority to the Secretary to determine which costs, over which periods, are expenditures that will be eligible for matching Title XIX funds.

There is simply no statutory support for the proposition that the Secretary can pick and choose how to characterize the costs of demonstration projects, regarding them as expenditures under a Title XIX state plan for purposes of reimbursement, but not for the DSH calculation (or, for that matter, any other statute that references Title XIX state plans). Under § 1115(a)(2), the Secretary may decide, consistent with "the objectives of [Title] XIX," the extent to which the costs of a demonstration project should be regarded as reimbursable expenditures under a Title XIX state plan. Once he makes this decision, however, the DSH formula requires that patients served by such a project be counted as part of a hospital's DSH adjustment. *Cf.Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1533 (D.C.Cir.1990) ("The words 'whenever' the Administrator 'has reason to believe' imply a degree of discretion.... Once [a] finding is made, however, the ... action that follows is both specific and mandatory-the Administrator 'shall' notify the Governor of the specific State ...").

## Conclusion

The plain language of the DSH and § 1115 waiver provisions, the statutory scheme of medical assistance under Medicare, and Congress's subsequent statements on the matter lead me to the conclusion that the DSH formula unambiguously includes all patients eligible for medical assistance under Title XIX, regardless of the mechanism

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760
(Cite as: Not Reported in F.Supp.2d)

by which they become eligible. This includes those patients who would not otherwise have been eligible for Medicaid but for the § 1115 waiver provision. I therefore find that the Secretary's exclusionary method of calculating the DSH adjustment that was in effect before January 20, 2000 contravenes clear and unambiguous statutes. Because I find that Congress has spoken clearly through these statutes, I do not need to address whether the Secretary's policy was a "permissible" interpretation of the statute. *Chevron U.S.A., Inc.,* 467 U.S. at 843.

**\*9** The Secretary must instruct his fiscal intermediaries in Tennessee to correct each of plaintiffs' cost reports for the fiscal years at issue, reflecting the inclusion of all Medicaid-eligible patients excluded under the prior invalid policy. Any increased DSH adjustment payments to which plaintiffs are due under this calculation must be delivered to plaintiffs within 90 days of the receipt by the Secretary's intermediary of all relevant documents by each plaintiff. These payments shall include an award of interest pursuant to 42 U.S.C. § 1395oo(f)(2). This case is remanded to the Secretary for a resolution consistent with this order.

It is SO ORDERED.

D.D.C.,2005.
Cookeville Regional Medical Center v. Thompson
Not Reported in F.Supp.2d, 2005 WL 3276219 (D.D.C.), Med & Med GD (CCH) P 301,760

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
COOKEVILLE REGIONAL MEDICAL        :
CENTER, et al.,                    :
                                   :
        Plaintiffs,                :
                                   :
     v.                            :  Civil Action No. 04-1053 (JR)
                                   :
MICHAEL O. LEAVITT, Secretary,     :
Department of Health and Human     :
Services,                          :
                                   :
        Defendant.                 :
```

**<u>ORDER</u>**

Upon remand from the Court of Appeals (mandate dated 4/11/07, received in chambers 4/24/07), and for the reasons set forth in my memorandum of September 26, 2006 [49], it is **ORDERED** that defendant's motion to alter judgment [28], construed as a motion for relief under Rule 60(b), is **granted**.  It is **FURTHER ORDERED** that the judgment entered on 2/2/06 [27] is **vacated**.  And it is **FURTHER ORDERED** that the Clerk enter judgment in favor of the defendant.

JAMES ROBERTSON
United States District Judge



Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

**C**   United Hosp. v. Thompson
D.Minn.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
UNITED HOSPITAL, Plaintiff,
v.
Tommy G. THOMPSON, in his official capacity as
Secretary of the Department of Health and Human
Services, Defendant.
**No. Civ.02-3479(DWF/SRN).**


June 9, 2003.


Richard A. Duncan, and Elizabeth Hendricks Schmiesing,
Faegre & Benson, Minneapolis, MN, and J.D. Epstein,
and Gregory N. Etzel, Vinson & Elkin, Houston, TX, for
Plaintiff.
Karen Y. Stewart, United States Department of Justice,
Washington, DC, for Defendant.


MEMORANDUM OPINION AND ORDER
FRANK, J.


Introduction


**\*1** The above-entitled matter came on for hearing before
the undersigned United States District Judge on May 23,
2003, pursuant to cross motions for summary judgment.
This case involves a dispute over the Secretary of Health
and Human Services's administration of the Medicare
program. For the reasons set forth below, Plaintiff's
motion is denied, and Defendant's motion is granted.


Background


This case involves the formula for reimbursing hospitals
under the Medicare program, a federal health insurance
program that covers the elderly and disabled. Medicare
provides prospective reimbursement to hospitals on a
per-patient basis, with the amount based upon the patient's
"diagnosis-related group" or "DRG." *See*42 U.S.C. §
1395ww. In addition, Medicare provides certain payment
adjustments based upon hospital-specific factors. One
such hospital-specific adjustment is the "disproportionate
share hospital" or "DSH" adjustment.


Congress originally mandated the DSH adjustment in the
Consolidated Omnibus Budget Reconciliation Act of
1985, Pub.L. No. 99-272, § 9105, 100 Stat. 158 (1986)
("COBRA"). DSH adjustments are designed to offset costs
incurred by hospitals that "serve[ ] a significantly
disproportionate number of low-income patients...."42
U.S.C. § 1395ww(d)(5)(F)(i)(I). In determining whether
and to what extent a hospital is entitled to a DSH
adjustment, the Secretary of Health and Human Services
("the Secretary") must employ a formula prescribed by
Congress at 42 U.S.C. § 1395ww(d)(5)(F)(vi). The
formula is the sum of two fractions, the "Medicare
fraction"-which is not at issue here-and the "Medicaid
fraction."


The "Medicaid fraction" is
the fraction (expressed as a percentage) the numerator of
which is the number of hospital's patient days for such
period which consist of patients who (for such days) were
eligible for medical assistance under a State plan approved
under subchapter XIX of [the Social Security Act], but
who were not entitled to benefits under [Medicare] Part A,
and the denominator of which is the total number of the
hospital's patient days for such period.


42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). In other words, the
numerator of this fraction is the number of patient days
which consist of patients eligible for Medicaid but not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

Medicare.

Hospitals file detailed cost reports with a private "fiscal intermediary," and the fiscal intermediary determines how much the hospital is entitled to for reimbursement and additional adjustments. If a hospital is dissatisfied with the Notice of Program Reimbursement ("NPR") issued by the fiscal intermediary, the hospital may, within 180 days, appeal the NPR to the Provider Reimbursement Review Board ("PRRB").

The controversy giving rise to this litigation began as a result of inconsistencies in the way various fiscal intermediaries interpreted 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) and the related regulations promulgated by the Centers for Medicare and Medicaid Services ("CMS"),[FN1] the division of the Department of Health and Human Services charged with overseeing the Medicare program. Specifically, some fiscal intermediaries informed the hospitals under their purview that patient days for patients eligible for state general assistance programs (as distinct from state programs approved under the Medicaid program) should not be included in the numerator of the Medicaid fraction, while other fiscal intermediaries interpreted the statute and regulation to apply to all low-income health assistance, whether approved by the Medicaid program or not.[FN2]

> FN1. CMS was formerly known as the Health Care Financing Administration ("HCFA").

> FN2. The record suggests that general assistance days were improperly included in the Medicaid fraction in as many as 22 states. It is unclear whether the fiscal intermediaries in these states affirmatively believed that general assistance days *should* be included or whether the fiscal intermediaries were simply unaware that the figures provided by the hospitals-as provided to them by the relevant state agencies-contained

both true Medicaid days and general assistance days.

*2 In 1998 and 1999, CMS and the fiscal intermediaries for Pennsylvania and New York realized that the fiscal intermediaries for those states had been improperly allowing hospitals to include general assistance days in their calculation of the Medicaid fraction. The fiscal intermediaries began sending overpayment notices to the hospitals involved. In New York alone, fiscal intermediaries sought to recover roughly $1 billion in overpayments. Federal politicians from both Pennsylvania and New York intervened.

The record suggests that Congress was considering passing legislation that would not only prevent CMS from recovering overpayments, but would also amend the legislation to allow for inclusion of general assistance days in the DSH calculation. In light of that possibility, which would have resulted in CMS incurring significantly higher obligations to hospitals, CMS adopted a compromise position.

On October 15, 1999, CMS issued a letter that conceded the ambiguity of the statute and the implementing regulations.[FN3] The letter further conveyed CMS's intent to hold harmless those hospitals that had been overpaid as a result of the confusion.

> FN3. Frankly, the Court finds this concession to be remarkably generous. The statute clearly states that the numerator of the Medicaid fraction applies to patient days for patients eligible for a state plan approved under subchapter XIX (the Medicaid provisions) of the Social Security Act. How someone could, in good faith, read this to mean both state plans approved as Medicaid programs and state plans that are *not* approved as Medicaid programs remains a bit of a mystery.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

On December 1, 1999, CMS issued Program Memorandum A-99-62 ("the Program Memo"). The Program Memo stated clearly and unequivocally that general assistance days would be excluded from DSH calculations for cost reporting periods beginning after January 1, 2000; hospitals that received DSH overpayments for cost reports settled before October 15, 1999, could keep the funds; and for cost reporting periods beginning before January 1, 2000, hospitals that did not receive payments based on general assistance days, but that had filed an appeal with the PRRB on that issue prior to October 15, 1999, would receive the funds without the necessity of further appeal.

Plaintiff United Hospital ("United") is a private hospital located in St. Paul, Minnesota. United filed timely appeals with the PRRB for its cost reporting years 1992 and 1993; neither of these appeals, however, requested credit for general assistance days with respect to the DSH adjustment calculations. In 2000, prior to any PRRB hearing, United amended the appeals to request credit for general assistance days in the calculation of its DSH adjustment. United and its fiscal intermediary settled all issues of both appeals, with the exception of the inclusion of general assistance days in the DSH adjustment calculation, before any hearing before the PRRB.

The PRRB denied United's claim for relief with respect to the inclusion of general assistance days. Specifically, the PRRB determined that United did not fall within the categories of hospitals entitled to payment for general assistance days by virtue of the Program Memo because United did not have a pending appeal on the specific issue of the general assistance days as of October 15, 1999.

United brings the instant appeal of the PRRB decision asserting that: (1) United does meet the requirements for relief outlined in the Program Memo; (2) if United does not meet the requirements of the Program Memo then the Program Memo illegally limits United's statutory right to appeal; (3) the Secretary's application of the "new" DSH interpretation to some hospitals, but not others, is arbitrary and capricious; and (4) the Secretary's application of the "new" DSH interpretation to some hospitals, but not others, violates United's right to equal protection pursuant to the United States Constitution.

Discussion

1. Standard of Review

**\*3** Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.' ' Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.*Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Krenik,* 47 F.3d at 957.

The case at bar is an appeal of an administrative decision

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

by the PRRB. Judicial review of that decision is governed by the Administrative Procedure Act, 5 U.S.C. § 706. See 42 U.S.C. § 1395oo(f). Although the Court reviews an agency's legal determinations *de novo*, the Court must afford substantial deference to an agency's interpretation of its own rules and the laws it is charged to implement. *See Chevron U.S.A., Inc. v Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-44 (1984); *Vue v. INS,* 92 F.3d 696, 699 (8th Cir.1996). An agency's implementation of a statute entrusted to it or interpretation of its own regulation will be rejected by the Court only if it is clearly contrary to express legislative intent or if it is arbitrary and capricious. *Id.*

### 2. Scope of the Program Memo

United argues that it falls within the scope of the Program Memo because it had a jurisdictionally proper appeal of the 1992 and 1993 cost reporting years as of October 15, 1999, and that appeal, by definition, could extend to any and all issues relevant to the 1992 and 1993 cost reporting years. Specifically, United notes that "once [PRRB] jurisdiction pursuant to subsection (a) obtains, anything in the original cost report is fair game for a challenge by virtue of subsection (d)." *HCA Health Services of Oklahoma, Inc. v. Shalala,* 27 F.3d 614, 617 (D.C.Cir.1994) (citing *Bethesda Hosp. Ass'n v. Bowen,* 485 U.S. 399, 406 (1988)). In other words, filing a timely appeal on any issue pertaining to a cost report preserves the right to challenge any other issue pertaining to the same cost report, no matter how untimely, so long as the challenge is made before the PRRB hearing. United argues that, as a result, the date of raising a new issue in a PRRB appeal should relate back to the date of the original appeal. As creative as the argument is, it simply does not hold water.

**\*4** The legislative and case law cited by United stands for the proposition that a timely-and hence jurisdictionally proper-appeal on one issue will serve to toll the limitations period for raising additional issues. It does not necessarily

follow that the Court should engage in the judicial fiction that later-raised issues shall be construed to have been raised from the outset.

The Program Memo does not extend to all hospitals that had filed a jurisdictionally proper appeal before October 15, 1999, and that raised the issue of the exclusion of general assistance days. Rather, on its face, the Program Memo extends only to hospitals that had filed a jurisdictionally proper appeal on the issue of the exclusion of general assistance days before October 15, 1999. In other words, on its face, the Program Memo requires that, in order to be eligible for relief, a hospital must have raised the precise issue of exclusion of general assistance days before October 15, 1999.

### 3. Does the Program Memo Affect Appeal Rights?

United further argues that, to the extent that the Program Memo seeks to preclude United from amending its jurisdictionally proper appeal to add certain issues, the Program Memo alters United's statutory appeal rights. As noted above, 42 U.S.C. § 1395oo(d) allows the PRRB to consider any and all issues arising out of a cost report for which there is a timely appeal filed, regardless of whether the appeal raises the issue or whether the fiscal intermediary considered the issue in its initial determination. United argues that the Program Memo, by limiting relief to hospitals that raised a particular issue by a particular date, runs afoul of the liberal appeal rights granted by 42 U.S.C. § 1395oo(d). The Court disagrees.

The cases cited by United in conjunction with this argument relate to the PRRB's jurisdiction to consider certain issues, *see, e.g., HCA Health Services of Oklahoma v. Shalala, supra,* not to the appellant's right to relief. Nothing in the Program Memo seeks to remove jurisdiction over the DSH payment calculation from the PRRB; rather, the Program Memo defines who is entitled to relief on the merits of the issue. In other words, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Program Memo does not preclude United from appealing the issue, it only precludes United from obtaining relief.

### 4. Is the Program Memo Arbitrary and Capricious?

United further argues that the Program Memo is arbitrary and capricious in that it results in similarly situated hospitals being treated differently because the October 15, 1999, deadline for relief bears no relation to the Medicare schedule and because the October 15, 1999, deadline actually precedes the December, 1999, notice of the deadline. The Court does not agree.

United concedes that the scope of the Court's review is narrow.
The court is not empowered to substitute its judgment for that of the agency. The agency must articulate a "rational connection between the facts found and the choice made." While we may not supply a reasoned basis for the agency's action that the agency itself has not given ... we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

**\*5** *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285-286 (1974) (citations omitted). Here, the "agency's path" is clear: the agency intended to hold harmless hospitals that had reasonably relied up on a false belief that they were entitled to compensation for general assistance days. Those hospitals include both hospitals that received payments for those days and hospitals that believed they were entitled to payments for those days. A hospital that did not file an appeal on this issue prior to October 15, 1999-the date on which CMS announced the resolution to the confusion over inclusion of general assistance days-did not manifest a belief, independent of the Program Memo, that it was entitled to such payments and, presumably, would not have made budget decisions based on a belief in such entitlement.

United seeks to characterize the Program Memo as a change or a reversal of CMS's policy of which hospitals should have been given notice. Yet the Program Memo is, on its face, a clarification of existing policy. The record indicates that CMS's policy has consistently been that general assistance days are not relevant to the Medicaid fraction, and the Program Memo simply reiterates that position. The fact that hospitals other than United misunderstood the policy and acted in reliance upon that misunderstanding and the fact that CMS decided to provide those hospitals with relief from their own mistake do not lead to the conclusion that CMS had some obligation to extend additional benefits to other hospitals.

### 5. Equal Protection

United alleges that the Program Memo violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

The parties disagree about the equal protection standard to be applied in this case. The Secretary argues that an equal protection challenge to the Program Memo, which suspends enforcement of the long-standing (albeit, allegedly unclear) policy regarding general assistance days as to certain hospitals, is tantamount to a selective enforcement claim; as a result, United must establish that the Secretary's action was motivated by invidious discrimination or bad faith. *See United States v. Deering,* 179 F.3d 592, 594 (8th Cir.1999) (setting forth the elements of a prima facie case for selective prosecution). United, on the other hand, argues that it must only show that the Secretary's disparate treatment of certain hospitals bears no rational relation to any legitimate government interest. *See Arkansas Pharmacists Ass'n v. Harris,* 627 F.2d 867, 871 (8th Cir.1980) ("in reviewing economic and social welfare regulations, a court must uphold the regulations if they bear a rational relation to a legitimate congressional purpose").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

Whether the Program Memo should be construed as an "economic [or] social welfare regulation" or as a suspension of prosecution of such a regulation poses an interesting question. However, it is one that the Court need not address. Under either standard of review, the Court finds that the Program Memo does not violate United's equal protection rights.

**\*6** First, there is absolutely no evidence that the division drawn by the Program Memo-the October 15, 1999, deadline-was motivated by discrimination based on race, religion, exercise of constitutional rights, etc. Moreover, as discussed above, the October 15, 1999, deadline does bear a rational relationship to a legitimate government interest. Specifically, to the extent that the Secretary sought to provide relief to hospitals that had an independent and genuine belief that they were entitled to general assistance days while simultaneously exercising fiscal responsibility, the October 15, 1999, deadline separates hospitals that genuinely believed they were entitled to general assistance days from hospitals that did not believe they were entitled to such days until the issuance of the Program Memo. In other words, the deadline separates those hospitals who were legitimately confused from those hospitals who sought to benefit from the confusion of others.

Accordingly, the Court finds that United has failed to establish that the Secretary's action violates United's right to equal protection under the laws.

For the reasons stated, IT IS HEREBY ORDERED:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 4) is DENIED;

2. Defendant's Motion for Summary Judgment (Doc. No. 23) is GRANTED; and

3. The COMPLAINT is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2003.
United Hosp. v. Thompson
Not Reported in F.Supp.2d, 2003 WL 21356086 (D.Minn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Rush University Medical Center v. Leavitt
N.D.Ill.,2007.

United States District Court,N.D. Illinois,Eastern
Division.
RUSH UNIVERSITY MEDICAL CENTER, Plaintiff,
v.
Michael O. LEAVITT, Secretary, Department of Health
and Human Services, Defendant.
**No. 06 C 1550.**

Sept. 4, 2007.

James F. Flynn, Bricker & Eckler, Columbus, OH,
Jennifer A. Waters, Kenneth Emanuel Kraus, Schopf &
Weiss LLP, Chicago, IL, for Plaintiff.
Samuel S. Miller, United States Attorney's Office,
Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

JOAN B. GOTTSCHALL, United States District Judge.
    *1 Plaintiff Rush University Medical Center, f/k/a
Rush-Presbyterian-St. Luke's Medical Center ("Rush"),
filed a three-count complaint against Michael O. Leavitt,
the Secretary of Health and Human Services (the
"Secretary"), seeking review of the Secretary's final
decision reversing in part and affirming in part a decision
of the Provider Reimbursement Review Board ("PRRB")
regarding reimbursement under various Medicare
programs. Rush and the Secretary have filed cross-motions
for summary judgment. For the reasons set forth below,
Rush's motion is denied in part and granted in part and the
Secretary's motion is denied in part and granted in part.

### I. BACKGROUND

    This is a civil action arising under Title XVIII of the
Social Security Act, 42 U.S.C. §§ 1395et seq. (2006) (the
"Medicare Act") and the Administrative Procedures Act,
5 U.S.C. §§ 551-59 and701-06 (2006) (the "APA").

    Rush is a large, not-for-profit, certified
Medicare-participating provider ("provider") in Chicago,
Illinois. Rush is also a teaching hospital where many
residents train in a number of specialties and
sub-specialties. Pursuant to the Medicare statute and
regulations, the federal government reimburses providers
for the reasonable cost of medical services provided to
eligible beneficiaries, including the costs of graduate
medical education ("GME") and interest expenses on
current and capital indebtedness.

    The Centers for Medicare and Medicaid Services
("CMS") is the agency designated by the Secretary to
administer the Medicare program. CMS engages
contractors to act as fiscal intermediaries who, among
other things, determine the amount of payments to be
made to a provider by the federal government each year.
Each provider is required to file a cost report with an
intermediary at the close of every fiscal year. The
intermediary audits the cost report and issues a Notice of
Program Reimbursement which identifies and briefly
explains any adjustments to the provider's cost report.

    The PRRB is an independent panel authorized to hear
appeals by providers dissatisfied with an intermediary's
final determination. The Secretary, through authority
delegated to the Administrator of the Health Care
Financing Administration ("HCFA") may reverse, affirm,
or modify the decision of the PRRB either on his own
motion or upon request by the parties. The final decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 2
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

of the Secretary is subject to judicial review pursuant to 42 U.S.C. § 1395*oo* (f)(1).

At issue is the Medicare cost report filed by Rush for fiscal year ending June 30, 1991 ("FY 1991").FN1 The Intermediary FN2 issued its audit findings and adjustments in a Notice of Program Reimbursement dated September 28, 1993. Rush appealed these adjustments to the PRRB by notice dated March 24, 1994. On June 12, 2002, a live evidentiary hearing was conducted before five members of the PRRB, and documentary evidence and witness testimony were presented. The PRRB considered the following issues:

> FN1. Rush's cost reporting period begins on July 1 and ends on June 30.

> FN2. Health Care Services Corp. audited Rush's FY 1991 cost report in 1993 but the contractor has subsequently changed to AdminaStar.

**\*2** (1) Whether the Intermediary's adjustment to and calculation of Rush's disproportionate share hospital payment was proper, specifically relating to the inclusion of general assistance days and the applicability of the Medicare Program Memorandum A-99-62 ("Issue 1");
(2) Whether the Intermediary's calculation of the number of interns and residents and the amount of allowable costs for FY 1991 for purposes of Rush's graduate medical education programs was proper ("Issue 2"); and
(3) Whether the Intermediary should have reclassified expenses relating to the Inn at University Village as investment losses and offset such losses against investment income rather than disallowing them entirely ("Issue 3").

Certified Administrative Record ("AR") 67.

After deliberating for over three years and requesting additional information, the PRRB issued its decision on November 18, 2005. The PRRB ruled in favor of Rush on the first and third issues. Regarding the second issue, the PRRB found that only one of Rush's thirteen fellowship programs constituted an "approved" program for purposes of GME reimbursement.

On January 20, 2006, the Secretary (through the Administrator) reversed in part and affirmed in part the decision of the PRRB. Rush now appeals the Secretary's final decision to this court.FN3

> FN3. Rush seeks review only of those decisions by the Secretary that were adverse to it. Additional facts relevant to each issue are provided below.

**II. STANDARD OF REVIEW**

Under the APA, a court must affirm the Secretary's decision unless it is found to be arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. 42 U.S.C. § 1395*oo* (f); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). An agency's interpretation of its own regulations must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *See id.;Hinsdale Hosp. Corp. v. Shalala,* 50 F.3d 1395, 1399 (7th Cir.1995). The court "must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.,* 512 U.S. at 512. The court acknowledges that "[t]his broad deference is all the more warranted when ... the regulation concerns a complex and highly technical regulatory program,' [such as Medicare] in which the identification and classification

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                              Page 3
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."*Id.* (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991); *Adventist Living Centers, Inc. v. Bowen,* 881 F.2d 1417, 1421 (7th Cir.1989) ("The Secretary's interpretation of regulations issued pursuant to the complex and reticulated Medicare Act is entitled to considerable deference.") However, the court also notes that "this does not shield the Secretary's decision from a thorough, probing, in-depth review."*Loyola University of Chicago v. Bowen,* 905 F.2d 1061, 1067 (7th Cir.1990) (internal quotation marks omitted).

*3 Moreover, the court does not reweigh the evidence or substitute its own judgment for that of the Secretary. *Cass v. Shalala,* 8 F.3d 552, 555 (7th Cir.1993). The court's inquiry is limited to whether there is substantial evidence to support the decision-it need not rule on the correctness of that decision. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."*Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Anderson v. Bowen,* 868 F.2d 921, 923 (7th Cir.1989).

Rush challenges the Secretary's decision regarding Issues 1, 2, and 3 as being arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and not in accordance with the law. Rush often relies on the decision by the PRRB to support its argument against the Secretary, noting that "[the Secretary's] action was the result of an administrator's 60-day decision to arbitrarily reverse the findings of a 5-person board which took more than 3 years to consider the evidence."Pl.'s Mem. 3.[FN4] However, the court cannot give greater weight to the findings of the PRRB in its review of the Secretary's decision because it took longer and may have worked harder. "Upon judicial review of an agency decision, the Secretary is considered the fact-finder and deference is given to the Secretary's factual findings."*Saint Mary of Nazareth Hosp. Center v. Shalala,* 96 F.Supp.2d 773, 776

(N.D.Ill.2000) (quoting *Adventist Living Centers, Inc.,* 881 F.2d at 1420.*"*The fact that the PRRB and the Secretary may have reached different conclusions in this case does not diminish the deference due to the Secretary's final decision."*Adventist Living Centers, Inc.,* 881 F.2d at 1421.

FN4. Though the parties have filed cross-motions for summary judgment, the court will refer to Rush's motion as "Pl.'s Mem.," the Secretary's response and motion for summary judgment as "Def.'s Opp.," Rush's reply and opposition as "Pl.'s Reply," and the Secretary's reply as "Def.'s Reply."

**III. ANALYSIS**

**A. Disproportionate Share Hospital Calculation (Issue 1)**

Rush contends that the Secretary erred in refusing to apply the plain language of Program Memorandum A-99-62 ("PM A-99-62") to Rush's FY 1991 appeal of its disproportionate share payment.

*1. Summary of the Hold Harmless Rule*

Pursuant to 42 U.S.C. § 1395ww(d)(5)(F)(i)(I) (2006), hospitals that serve a "significantly disproportionate number of lower income patients" may receive additional Medicare payments. This is called the "disproportionate share hospital" ("DSH") adjustment. A hospital qualifies for the DSH adjustment for a given cost reporting period if its "disproportionate patient percentage" for that period equals or exceeds thresholds specified by statute. 42 U.S.C. § 1395ww(d)(5)(F)(v). The Secretary determines the DSH adjustment for a particular

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hospital based on the number of days that Medicaid patients spent in the hospital ("Medicaid days").

During the nineties, there was enormous confusion [FN5] about how Medicaid days were to be calculated. The short of it is that some fiscal intermediaries allowed hospitals to count any low-income-patient day, regardless of whether the patient was covered by state general assistance programs for low-income individuals-which are called "general assistance days"-or by the federally funded Medicaid program. The problem with this was that some states' provision of benefits under their own programs was counting towards those hospitals' reimbursement rate under Medicaid.

> FN5. Initially, the Secretary maintained that the numerator of the Medicaid fraction could only include those days for which the hospital received Medicaid payment (and not Medicare payment) for inpatient hospital services. However, after much confusion and litigation regarding the interpretation of the statute, the Secretary issued Ruling 97-2, in February of 1997, which provided that the Medicaid fraction should also include those days for which a patient was "eligible" for Medicaid benefits, even if the hospital received no Medicaid payment for its services. AR 13, 68. *See also St. Joseph's Hosp. v. Leavitt, 425 F.Supp.2d 94, 96-97 (D.D.C., 2006)* (describing the history of the DSH adjustment).

**\*4** In December of 1999, the Secretary issued PM A-99-62, which clarified what days should and should not be included in the Medicaid fraction for cost reporting periods beginning on or after January 1, 2000. General assistance days were not to be included. However, noting the confusion over the issue of general assistance days, the Secretary created what is known as the "Hold Harmless Rule" for DSH payments that had been calculated using

general assistance program days for cost periods beginning prior to January 1, 2000.

The Hold Harmless Rule had two provisions intended to protect "providers that were genuinely confused or held a genuine belief" that the ineligible days were to be included in the DSH calculation. AR 15. First, hospitals that had received DSH payments based on the inclusion of general assistance days in cost reports settled before October 15, 1999, could keep the funds and continue to be reimbursed for the same types of program days for fiscal years beginning before January 1, 2000. *See St. Joseph's Hosp. v. Leavitt, 425 F.Supp.2d 94, 96-97 (D.D.C., 2006).* Second, hospitals that did not receive payment calculated with general assistance days, but appealed claiming their entitlement to such payment prior to October 15, 1999, could receive DSH reimbursement reflecting the inclusion of otherwise "ineligible" general assistance program days [FN6] for fiscal years beginning prior to January 1, 2000. *See* AR 15 ("If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of Medicaid days.").

> FN6. "Otherwise ineligible days" included "general assistance or other State-only health program, charity care, Medicaid DSH, and/or other ineligible waiver or demonstration population days for cost reports that were settled before October 15, 1999."*St. Joseph's Hosp., 425 F.Supp.2d at 96-97.*

The Rule also contained the following direction to fiscal intermediaries:
Where, for cost reporting periods beginning before

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods.... Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues. You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

**\*5** AR 195 (emphasis in original).[FN7]

> FN7. The full text of PM A-99-62 can be found in the Administrative Record at pages 191-97.

Essentially, any hospital that did not raise the "precise issue" of the exclusion of general assistance days prior to October 15, 1999-the date the Hold Harmless Rule was first announced-could not be eligible for reimbursement based on those days. *See United Hosp. v. Thompson,* No. Civ. 02-3479(DWF/SRN), 2003 WL 21356086, at \*4 (D.Minn. June 9, 2003), aff'd *United Hosp. v. Thompson,* 383 F.3d 728, 733 (8th Cir.2004). The Secretary's position is that any hospital that raised the issue only after the Hold Harmless Rule was announced was presumed to be doing

so to take advantage of the loophole, rather than out of genuine confusion over the rule. *See United Hosp.,* 383 F.3d at 733 ("The date of October 15, 1999 satisfies common sense (and the rational basis test) because any claims raised for the first time after that date would come from hospitals that knew full well that the Secretary's previous payments were undeserved.")

However, as the court in *St. Joseph's Hospital* noted, a provider is not required to use any "magic words" in its notice of appeal to qualify for the Hold Harmless Rule, so long as the provider can point to evidence demonstrating that it was challenging the exclusion of general assistance days from the relevant cost report. *See St. Joseph's Hospital,* 425 F.Supp.2d at 100.

#### 2. Rush's Appeals

Rush raised the issue of general assistance days when it appealed its FY 1989 and FY 1990 cost reports, both of which were filed prior to October 15, 1999.[FN8] However, Rush did not include general assistance days in its DSH calculation in its FY 1991 cost report, and the Intermediary did not make an adjustment to eliminate general assistance days from Rush's DSH calculation. AR 3, 152; *see also* Rush's Resp. to Def.'s Statement of Facts ¶¶ 1-2. Therefore, when Rush appealed its FY 1991 cost report to the PRRB in March of 1994, it did not appeal the exclusion of general assistance days from its DSH calculation at that time, nor did Rush raise the issue in its "Identification of Additional Issues" filed in March of 1998. AR 2221, 1969. It was not until May of 2002 that Rush added the general assistance days issue to its pending FY 1991 appeal, through the submission of a revised final brief filed with the PRRB. AR 748.

> FN8. Rush identified the following issue: "To exclude General Assistance patient days from the calculation of Title XIX eligible days used in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Medicare disproportionate share payment amount."AR 884, 889.

Both the Secretary and the PRRB found that Rush did not raise the issue of general assistance days regarding its FY 1991 appeal until after October of 1999. *See* AR 16-17 (finding that Rush made no reference to appealing general assistance days in its notice of appeal to the PRRB and noting that the PRRB itself found that Rush did not add the issue of general assistance days until after October 1999). However, the PRRB found that because Rush had raised the issue of general assistance days in its FY 1989 and FY 1990 appeals, it was entitled to Hold Harmless protection even though it added the issue to its FY 1991 appeal only after the Hold Harmless Rule was announced. The Secretary disagreed and reversed the PRRB's holding on the grounds that the PRRB's reading of the Hold Harmless rule was not supported by the provision's language.

a. Appeal Filed Prior to October 15, 1999

**\*6** The court first addresses whether Rush filed a "jurisdictionally proper appeal" before October 15, 1999 regarding the exclusion of general assistance days from its FY 1991 cost report. *See* PM A-99-62 (directing intermediaries to revise cost reports to include general assistance days if the hospital "filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days ... before October 15, 1999"). Although Rush had filed a jurisdictionally proper appeal of its FY 1991 cost report prior to October 15, 1999, Rush did not explicitly challenge the exclusion of general assistance days in its notice of appeal. AR 2221; 73.

However, on April 1, 1998, Rush filed a position paper with the PRRB that raised the following issue: "The Intermediary's calculation [of Rush's disproportionate share payment] did not include all inpatient hospital days

as directed by HCFA Ruling No. 97-2 dated February 27, 1997."AR 1743. Rush argues that the language it used in this position paper is broad enough to include the general assistance days.[FN9]Pl.'s Mem. 10. This proposition was rejected by the court in *United Hospital,* which held that "on its face, [PM A-99-62] requires that, in order to be eligible for relief, a hospital must have raised the precise issue of exclusion of general assistance days before October 15, 1999."2003 WL 21356086, at \*4.

FN9. Neither the Secretary nor the PRRB found this to be a statement by Rush that it was appealing the exclusion of general assistance days.

Rush argues that the language could include the issue of general assistance days, citing *St. Joseph's Hospital* for the proposition that it is not required "to include the magic words 'general assistance days' " in its notice of appeal to qualify for the Hold Harmless Rule. *See St. Joseph's Hospital,* 425 F.Supp.2d at 100. In *St. Joseph's Hospital,* the provider's appeal stated, "We believe the DSH reimbursement is significantly understated. The intermediary did not properly recognize all appropriate DSH related days of service."*Id.* at 99.However, examination of the underlying audit report and the intermediary's audit workpapers, which contained "the more detailed analysis of the intermediary's basis for the adjustment," revealed that this *specifically* referred to the exclusion of general assistance days. *See id.* at 100 (noting that the workpapers stated that DSH will be disallowed because of the inclusion of "general assistance patients" and "claims paid by General Assistance"). Based on these underlying documents, the court held that the provider had appealed the precise issue of general assistance days, even if it did not use the "magic words" in its notice of appeal. *Id.*

That is not the case here, where Rush has pointed to no evidence or documentary supplements that would

Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

indicate that the broad language used in its FY 1991 appeal referred to the exclusion of general assistance days. Nor can it, in light of the undisputed fact that the Intermediary did not eliminate general assistance days from Rush's DSH calculation in its FY 1991 cost report. AR 3, 152. Rush must do more than argue that the language it used *could have* included the issue of general assistance days; it must demonstrate that general assistance days were excluded from its DSH calculation and that Rush appealed that exclusion. Furthermore the record demonstrates Rush knew perfectly well how to appeal the precise issue of general assistance days prior to the time it appealed its FY 1991 cost report. *See* AR 884, 889 (when appealing its FY 1989 and 1990 cost reports, Rush identified the following issue: "To exclude General Assistance patient days from the calculation of Title XIX eligible days used in the Medicare disproportionate share payment amount."). Therefore, the Secretary's finding that Rush did not appeal the exclusion of general assistance days from its FY 1991 cost report prior to October 15, 1999, *see* AR 16-17, is neither arbitrary nor capricious.

b. The Effect of Prior Appeals of General Assistance Days

**\*7** The court next addresses whether Rush's history of appealing the exclusion of general assistance days in prior cost reports [FN10] entitles Rush to apply the Hold Harmless Rule to its DSH payment calculation for FY 1991.

FN10. Rush's FY 1989 and 1990 cost reports are not at issue here.

It was not until May of 2002 that Rush added the general assistance days issue to its pending FY 1991 appeal, through the submission of a revised final brief filed with the PRRB. AR 74. However, the PRRB found that "adding the general assistance days issue to the pending appeal in this instance [was] equivalent to filing

a jurisdictionally proper appeal" because of Rush's prior history of appealing the exclusion of general assistance days. [FN11] AR 73-74. The Secretary disagreed, noting that this would render meaningless the provision of the Rule specifically directing intermediaries *not* to "reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues."AR 17 (emphasis in original). In other words, the Secretary held that the Hold Harmless Rule did not apply to any provider that *added* the issue of general assistance days to a pending appeal after October 15, 1999, notwithstanding a prior history of appealing the issue.

FN11. Presumably the PRRB relied on the provision of PM A-99-62 that states, "Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods."AR 195. There is no dispute that Rush appealed the denial of general assistance days in FY 1989 and 1990.

Rush argues (relying on the PRRB decision) that this creates an arbitrary distinction between two similarly situated providers. That is, a provider that filed an appeal for the first time after October 15, 1999, would have hold harmless protection if it had a history of challenging the exclusion of general assistance days, whereas a provider that had an appeal pending but added the issue of general

assistance days would not be entitled to hold harmless protection even though it had the same history of claiming the exclusion. This distinction, however, is rationally related to the Secretary's goal of separating those "providers that were genuinely confused or held a genuine belief" that the ineligible days were to be included in the DSH calculation, *see* AR 15, from those who sought to take advantage of the Rule by raising the issue only after the Rule was announced. *See United Hosp.*, 383 F.3d at 730 ("The basic structure of the Program Memo distinguished between hospitals that wrongly believed themselves eligible for reimbursement for state-only days, and hospitals that correctly realized they were not eligible but then pursued benefits once it became clear that the mistaken hospitals would not have to pay for their error.")

The Secretary's position is that the provision relied upon by Rush applies only to hospitals that had not had the opportunity to appeal any issue-either because the hospital had not yet received the intermediary's Notice of Program Reimbursement, or because the time period to appeal the Notice of Program Reimbursement had not expired. Def.'s Opp. 17. Rush had the opportunity to appeal the issue of general assistance days when it initially filed its appeal in 1994, but chose to-a decision that might indicate, given its prior history of appealing the issue, that Rush was no longer "genuinely confused" about the eligibility of such days.[FN12] Its addition of the issue only after the Hold Harmless Rule was announced does not entitle it to the Rule's protection despite its prior history of appeals.

FN12. This is further substantiated by the undisputed fact that Rush did not attempt to include general assistance days in its FY 1991 cost report.

**8** Rush also argues that its prior appeals qualify it for hold harmless protection because of the provision which states that an intermediary should "continue paying the

Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports."*See* AR 195 (emphasis in original).

The Secretary held that because Rush's prior appeals had not been successful, the intermediary could not *"continue* to pay the Medicare DSH adjustment reflecting the inclusion of [general assistance] days," reasoning that because Rush had never received payment in the past reflecting the inclusion of general assistance days, it would not have made a budgeting decision based on the erroneous belief that it would be entitled to continued payments. AR 17 (emphasis in original). This is consistent with the rationale of the Hold Harmless Rule, which was intended to protect providers who were operating under the erroneous belief that they were entitled to include general assistance days for purposes of Medicare reimbursement, and who had budgeted in reliance on intermediaries who allowed them to include those days in their cost reports. Rush's proposed interpretation would render meaningless the words "continue to pay." "Courts are to avoid interpretations of agency regulations which render words superfluous."*Gillespie v. Trans Union, LLC,* 433 F.Supp.2d 908, 914 (N.D.Ill.2006)

The Secretary's interpretation of PM A-99-62 to exclude Rush is neither "plainly erroneous [n]or inconsistent with the regulation."*See Thomas Jefferson Univ.*, 512 U.S. at 512. The Secretary has consistently maintained that the Hold Harmless policy was intended only to protect those providers that held "an independent and genuine belief that they were entitled to general assistance days."*See United Hosp.*, 2003 WL 21356086, at *6* ("[T]o the extent that the Secretary sought to provide relief to hospitals that had an independent and genuine

belief that they were entitled to general assistance days while simultaneously exercising fiscal responsibility, the October 15, 1999, deadline separates hospitals that genuinely believed they were entitled to general assistance days from hospitals that did not believe they were entitled to such days until the issuance of the Program Memo.") Rush has not demonstrated that it is such a provider. Accordingly, the court grants the Secretary's motion for summary judgment and denies Rush's motion for summary judgment on this issue.

### B. Graduate Medical Education Reimbursement (Issue 2)

#### 1. Rush's Fellowship Programs

Rush argues that the Secretary erred in finding that certain of its fellowship programs did not meet the statutory and regulatory definitions of an "approved medical residency program." Pursuant to the Social Security Act of 1965, hospitals are reimbursed by the Medicare program for costs relating to medical education.[FN13] This includes both Direct Graduate Medical Education ("DME") costs and Indirect Graduate Medical Education ("IME") costs. The hospital's reimbursement is based on the number of its full-time equivalent residents ("FTE") participating in approved medical residency programs.

FN13. The payment policy for these costs is found in Section 1886(h) of the Act, which provides, *inter alia*, "The Secretary shall determine, for each hospital with an approved medical residency training program, an approved [full-time-equivalent] resident amount for each cost reporting period beginning on or after July 1, 1985," and directs the Secretary to "establish rules consistent with this paragraph for the c o m p u t a t i o n   o f   t h e   n u m b e r   o f

full-time-equivalent residents in an approved medical residency training program."42 U .S.C. § 1395ww(h)(2) (2006); 42 U.S.C. § 1395ww(h)(4)(A) (2006).

**\*9** An "approved medical residency program" is one that meets one of the following criteria:

(1) Is approved by one of the national organizations listed in § 405.22(a) of this chapter.

(2) May count towards certification of the participant in a specialty or subspecialty listed in the Directory of Residency Training Programs published by the American Medical Association.

(3) Is approved by the Accreditation Council for Graduate Medical Education (ACGME) as a fellowship program in geriatric medicine ....

42 C.F.R. § 413.86(b) (1990).[FN14]

FN14. Rush argues that this regulation was not promulgated until September of 1989, nine months prior to the beginning of Rush's FY 1991. As a result, Rush "had little or no opportunity to make adjustments in conformity with the regulation."Pl.'s Mem. 24. Even if this were true, Rush has pointed to no authority that would allow the court to waive the application of the regulation to Rush for its FY 1991 cost report.

In FY 1991, Rush claimed reimbursement for the costs associated with twenty-eight residents participating in thirteen fellowship programs. The PBBR concluded that twelve of the thirteen programs were not "approved programs." The PBBR exempted Rush's neuroradiology program because, though the program was not approved by the ACGME until October 22, 1991, after the cost reporting period had ended, "the ACGME approval would be based upon the program's conduct in the subject cost

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

reporting period."AR 75. The Secretary held that none of Rush's programs-including the neuroradiology program-was an approved program. The Secretary's position is that the program must be approved by the appropriate authority during the cost reporting period in order to qualify as an "approved program" for purposes of this reimbursement. Def.'s Opp. 26. Rush now appeals the finding and argues that its neuroradiology, spine and forensic psychiatry fellowship programs should be counted as approved programs.

Rush concedes that none of these programs received its ACGME approval until after the cost reporting period for FY 1991 had ended. Pl.'s Mem. 25. Rush's spine fellowship program was approved by the ACGME in 1993, its forensic psychiatry fellowship program was approved in 1998, and its neuroradiology program was accredited on October 22, 1991. *Id.* Though Rush contends that these programs were approved by other organizations, it does not argue or demonstrate that those organizations are "approved by one of the national organizations listed in § 405.22(a)."*See*42 C.F.R. § 413.86(b) (1990).

Rush also states-without pointing to anything in the record-that the programs constituted a postgraduate medical training program that may be counted towards certification in its respective sub-specialty. Pl.'s Opp. 25. However, the regulation requires that the program count towards certification in a specialty or sub-specialty listed in the AMA's Directory of Residency Training Programs. Rush has not pointed to anything that demonstrates that these programs met this requirement. The Secretary's decision must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Thomas Jefferson Univ.*, 512 U .S. at 512. Given the plain language of the regulation, the Secretary's decision to disallow the three fellowship programs at issue was not unsupported by the law or substantial evidence.

**\*10** Nor was the Secretary's disallowance of Rush's neuroradiology program improper given the undisputed fact that the program was not accredited until after the cost reporting period had ended. Rush has pointed to no rule or regulation that would justify retroactively applying an accreditation to a program for reimbursement purposes. The Secretary's position that the fellowship program must be approved by a recognized approving organization "at the time of the subject cost reporting period" is reasonable. AR 21. *See Little Co. of Mary Hosp. and Health Care Centers v. Shalala,* 994 F.Supp. 950, 956 (N.D.Ill.1998) ("the dispositive question is whether Secretary's reading is a reasonable construction of the controlling regulatory language").

Rush next argues that it can still be reimbursed for the disallowed fellowship participants pursuant to 42 C.F.R. § 405.523 (1990), which provides, *inter alia,* that "[t]he services of a hospital resident or intern who is not under an approved teaching program in the hospital are reimbursable to the hospital on a cost basis under the supplementary medical insurance program."42 C.F.R. § 405.523 (1990). The Intermediary did not dispute that Rush would be entitled to reimbursement under this provision, but the PRRB noted that Rush had not provided the necessary documentation (Worksheet D-2) because Rush "believed each resident would be included in its FTE counts."AR 75. Therefore, the PBBR ordered Rush to "revise its cost report and furnish all documentation required by the Intermediary to support its claim."AR 75.

The Secretary reversed, holding that remand was not appropriate to determine whether Rush was entitled to compensation under 42 C.F.R. § 405.523 because "the Intermediary stated that it understood [Rush] did not have the voluminous data necessary to complete Worksheet D-2, nor has [Rush] offered the proof that such documentation exists."AR 22-23. The Secretary's determination that Rush does not have the data necessary to complete Worksheet D-2 is contradicted by the testimony of Karen Williams, the Director of Cost

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

Accounting at Rush. Williams testified that Rush could provide "payroll records, salaries, and fringes," and other data that would be provided from the Provider Statistical and Reimbursement report. AR 135.

The Secretary argues that despite Williams' testimony, Rush "never actually produced the required data to the Intermediary or before the PRRB." Def.'s Opp. 30. However, this does not prove that Rush does not have the data. The Secretary's opinion is unhelpful, simply providing, "the Intermediary stated that it understood that [Rush] did not have the voluminous data necessary to complete Worksheet D-2, nor has [Rush] offered proof that such documentation still exists."AR 22-23.

The Secretary's ruling on this issue, when combined with the above ruling, effectively foreclosed all possibility of reimbursement to Rush for its fellowship programs. The court sees no reason in the Secretary's decision that justifies preventing Rush from at least attempting to meet its burden of completing Worksheet D-2 in order to be reimbursed for its fellowship programs in some way. Accordingly, the court remands this issue so that Rush can be allowed to complete Worksheet D-2.

*2. Rush's Residency Programs (Drs. Muhsin, Wong and Miles)*

**\*11** Rush's next argument is that the Secretary improperly disallowed 3.0 FTEs (representing Dr. Muhsin, Dr. Wong and Dr. Miles) from Rush's IME count.

In order to be included in Rush's FTE count for purposes of IME, the hospital must submit an annual report to the Intermediary listing all the residents and interns assigned to the hospital and providing services to the hospital on the "count date," which is September 1 unless that date falls on a weekend or federal holiday.[FN15] *See* 42 C.F.R. § 412.118(f) (1990). However, the regulation provides that:

> FN15. For FY 1991, because September 1 fell on a holiday weekend, the applicable "count date" was September 4, 1990.

Interns and residents who are assigned to a setting other than the inpatient or outpatient department of the hospital (such as a freestanding family practice center or an excluded distinct part hospital unit) on the day that the count of interns and residents ... is made are not counted as full-time equivalents. Only the percentage of time that these residents spend in the portion of the hospital subject to the prospective payment system or in the outpatient department of the hospital on the day the count is made is used to determine the indirect medical education adjustment.
42 C.F.R. § 412.118(f)(5) (1990). The Secretary disallowed the three FTEs for the above mentioned residents because, although they were participating in approved teaching programs, there was not sufficient documentation to demonstrate that they were present in the appropriate location within Rush's facility.

*a. Dr. Muhsin*

Rush's rotation schedule places Dr. Muhsin at the Johnston R. Bowman Center ("JRB Clinic") on the IME count date. The JRB Clinic is a psychiatry and rehabilitation clinic that Rush asserts was also an acute care facility during the relevant time period. Though a resident assigned to an acute care facility would qualify Rush for the 1.0 FTE it is claiming, a resident assigned to the psychiatry and/or rehabilitation clinic-or the "subprovider units"-would not. *See* 42 C.F.R. 412.105(f)(1)(ii) (1990).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Secretary examined Dr. Muhsin's rotation schedule, which does not specify the area of the JRB clinic to which Dr. Muhsin was assigned on September 4, and noted that "The record shows that the Provider could not provide documentation specific enough that the resident did not rotate through the Provider's subprovider unit on the IME count date."AR 22. Based on this, the Secretary disallowed the 1.0 FTE associated with Dr. Muhsin for IME.

Rush contends that the rotation schedule of Dr. Muhsin demonstrates he was at Rush on the IME count day, and therefore Rush is entitled to the 1.0 FTE related to his residency. However, the Secretary disallowed the FTE on the ground that Dr. Muhsin may have been in an excluded area; that is, an area of the hospital not covered by 42 C.F.R. § 412.118(f) (1990). Rush argues that the Secretary's decision was "arbitrary and capricious" because there is no evidentiary support for the proposition that Dr. Muhsin's rotation may have been through an excluded distinct part of Rush's hospital; and points to testimony from the hearing where a Rush representative testified as follows:

**12** Q: And then finally, with respect to Dr. Mushin on page 14, there is a statement here that Dr. Muhsin's rotation appears to have lasted from 7-24-90 to 9-14-90, and it was located in the JRB?

A: Yes, that is what it states here.

Q: What is the JRB?

A: The JRB is a Johnston R. Bowman Center for, typically, psych and rehab, but at that year, it also was an acute care facility.

Q: Okay. So that is a Rush facility?

A: It is a Rush facility.

Q: And it has acute care components?

A: It did at that time have acute care components.

Q: But it also has distinct part unit components?

A: Yes, it does.

Q: Okay. And do you believe the Intermediary's contention here to be that it is not clear whether they are in an allowable non-allowable [sic] portion of the JRB?

A: That is how I read her ...

AR 138. This testimony, however, does not prove that Dr. Muhsin was rotating through a proper unit of the hospital; it proves that Dr. Muhsin was rotating through the JRB, a facility that contained both allowable and non-allowable portions for purposes of 42 C.F.R. § 412.118(f) (1990). Rush contends that the Secretary's decision is based on speculation that Dr. Muhsin was in the non-allowable portion of the JRB but Rush does not point to evidence that proves he was rotating through the acute care facility. "It is the provider, not the intermediary, that bears the burden of providing evidence to establish its claim." *Saint Mary of Nazareth Hosp. Center,* 96 F.Supp.2d at 779 (citing *Johnson County Mem. Hosp. v. Heckler,* 761 F.2d 354, 358 n. 8 (7th Cir.1985)). Rush offers nothing to demonstrate that the Secretary's decision was not based on substantial evidence. Its only argument is that it is entitled to the benefit of the doubt when presenting ambiguous evidence in support of its claims. The court does not agree. Therefore, the court finds that the Secretary's decision regarding Dr. Muhsin was neither arbitrary nor capricious and is due deference by this court.

b. Dr. Miles and Dr. Wong

Rush's argument regarding Dr. Miles and Dr. Wong also fails. Dr. Miles and Dr. Wong both participated in Rush's maternal/fetal fellowship program but Rush did not submit their rotation schedules to establish the doctors' location in the hospital on September 4, 1990. The Secretary disallowed the FTEs for both doctors, noting that Rush "did not furnish reasonable documentation to the Intermediary identifying the location of the residents' training in the hospital on the date of the IME count."AR 22. Rush does not deny that it failed to submit the rotation schedules of these doctors but contends that due to the nature of the maternal/fetal fellowships-which focus on high-risk mother and baby care-the doctors could not have been rotating through the non-allowable portions of the hospital, which are the psychiatry and rehabilitation units,

Slip Copy                                                                                    Page 13
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

and various outpatient clinics. *See* Pl.'s Mem. 33.

It was within the proper discretion of the Secretary to require documentation of the doctors' whereabouts rather than relying on the inference that because a maternal/fetal fellow would not work in one of the excluded areas of the hospital, the doctors had to have been working in one of the included areas of the hospital. The Secretary uniformly relied on rotation schedules to establish the locations of the individual residents for purposes of the IME count. *See* AR 22. Given that Rush did not submit rotation schedules for either Dr. Miles or Dr. Wong, and in light of Rush's burden to prove its claims, the court finds that the Secretary's decision was neither arbitrary nor capricious. Accordingly, the court grants the Secretary's motion for summary judgment and denies Rush's motion for summary judgment on this issue.

**C. The Inn at University Village (Issue 3)**

**\*13** Rush's next challenge pertains to whether the Secretary properly disallowed Rush's operating losses resulting from The Inn at University Village (the "Inn"), which is a hotel owned and operated by Rush.

Pursuant to 42 U.S.C. § 1395x(v)(1)(A) (2006), Medicare will reimburse health care providers for reasonable and necessary costs related to the efficient delivery of health services. *See also* 42 C.F.R. § 413.9. This includes capital-related costs such as interest on current and capital indebtedness, which means a provider can be reimbursed for interest paid on loans taken for purposes reasonably related to patient care. *See* Provider Reimbursement Manual ("PRM") § 202.2; § 200.[FN16] However, if a provider borrows money to invest in a *nonpatient care activity*, the interest incurred by the provider is not allowable. *See* PRM § 202.2 ("Where funds are borrowed for purposes of investing in other than the provider's own patient care related activities, interest

expense is not allowable. Such a loan is not considered necessary.").

FN16. The PRM provides interpretive rules promulgated to implement Medicare regulations for determining the reasonable cost of provider services. "Black-letter law directs that such interpretive rules are entitled to deference as long as they do not alter the substantive obligations created by the Medicare statute and its regulations." *Little Co. of Mary Hosp. and Health Care Centers v. Shalala,* 994 F.Supp. 950, 956 (N.D.Ill.1998)

The Medicare system discourages unnecessary borrowing by hospitals. Loans "that result in excess funds or investments" are not considered "necessary." *See* PRM § 202.2. Therefore, the interest on those loans is not an allowable cost. Before resorting to loans, hospitals are required to withdraw available funds from their funded depreciation account for the acquisition of depreciable assets or other capital purposes. PRM § 226.4(c). This reduces the interest expense that Medicare is required to reimburse; if the hospital has the funds readily available, additional loans are not "necessary."

To avoid reimbursing interest on loans which result in excess funds or investments, a provider's allowable interest expense is offset by the "net investment income," which is the aggregate amount realized from all investments of patient care funds in nonpatient care related activities, including interest, operating profits and losses, and investment gains and losses. *See* PRM § 202.2(C). This prevents hospitals from unnecessarily borrowing money at Medicare's expense to invest in nonpatient care activities when those hospitals could be using their existing funds. *See Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Serv., Inc.,* 689 F.2d 1112, 1119 (1st Cir.1982) (the "offset rule's sole purpose is to deter excess borrowing and thereby prevent providers

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                         Page 14
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

from obtaining financial advantage from trading on the Medicare system").

If a hospital loses money from an investment made with patient care funds, theoretically that loss could increase a hospital's reimbursement; the loss would reduce the hospital's net investment income, increasing its allowable interest expense subject to Medicare reimbursement. However, a hospital must have used patient care funds, rather than borrowed funds, to fund the losing investment. *See* PRM § 202.2(C) ("if the funds invested in nonpatient care activities are borrowed, the interest expense is not allowable and the investment income is not subject to offset").

**\*14** Here, the key issue is whether the Secretary's finding-that Rush used proceeds from an Illinois Educational Facilities Authority ("IEFA") loan to finance the construction of the Inn, which is a nonpatient care investment-was arbitrary, capricious, an abuse of discretion, or not in accordance with the law.

### 1. Factual Background

The Inn is a 114-room full-service hotel that provides accommodations, meeting rooms and a restaurant. Pl.'s Statement of Facts 58. It is 100% owned by Rush.*Id.* Construction for the Inn began in the Spring of 1987 and was completed in the Fall of 1988. AR 94. The Inn cost $9.8 million to build. AR 347. Rush paid for the Inn's construction out of its general operating fund. AR 110, 112.

In July of 1987, Rush took a $10 million IEFA loan. The loan was taken to reimburse the hospital for various expenditures that had already been made between six and twenty-three months prior to the loan. The loan proceeds were deposited into the hospital's general operating account.

In FY 1991, the Inn suffered a net operating loss. Rush originally sought to have the Inn classified as a patient care related activity, thereby allowing it to claim related interest and amortization expenses as a "necessary" capital cost. It is undisputed that the Intermediary disallowed $751,151 for interest and amortization expenses related to the Inn from the $10 million IEFA bond issue for the reason that the Inn was not related to patient care. Pl.'s Resp. Def.'s Statement of Facts ¶ 34.

Rush then altered its course, claiming that the Inn is a nonpatient care investment funded by patient care funds and it could use the Inn's operating loss and expenses to reduce Rush's net investment income, thereby increasing its allowable interest expense subject to Medicare reimbursement.[FN17]Rush also sought to have the interest expense relating to the $10 million IEFA loan allowed as a reimbursable interest expense.

> [FN17.] Rush concedes that the costs incurred by the Inn were not related to patient care. Pl.'s Mem. 37. However, in Rush's first notice of appeal, it attempted to categorize the Inn as patient care related. One of the issues it identified was: "To offset interest and amortization relating to the Inn (from $10 M IEFA loan) as non-patient care related."AR 2221.

The Secretary found that Rush used the proceeds of the IEFA loan to construct the Inn. AR 25. Because interest is not allowable on borrowed funds invested in nonpatient care activities, the interest from the IEFA loan was disallowed.*Id.* For the same reason, the Secretary did not allow Rush to use the loss from the Inn to offset its investment income. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 15
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

*2. Analysis*

Rush argues that the Secretary's finding was arbitrary, capricious, an abuse of discretion, and not in accordance with the law because the evidence does not support a finding that the funds invested in the Inn came from the IEFA loan rather than proceeds from patient care related activities. The court reiterates that in reviewing an agency decision, the court does not reweigh the evidence or substitute its own judgment for that of the Secretary. *Cass, 8 F.3d at 555.* The court's sole inquiry is whether there is substantial evidence to support the Secretary's decision. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Loyola University of Chicago,* 905 F.2d at 1067 (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842(1971)).

**\*15** The Secretary found that Rush used the borrowed funds from the IEFA loan to finance the construction of the Inn. The Secretary relied on the following evidence to support this finding. First, Rush took the IEFA loan "in and around that time [sic] of the construction of the Inn."AR 25. The IEFA Loan Agreement was dated July 1, 1987, and construction on the Inn began in the spring of 1987 and was completed in the fall of 1988. AR 94. Second, the Secretary found that the interest on the IEFA loan was booked in Rush's books as associated with the Inn. *Id.* (citing Rush's Exhibit 45). Third, the Secretary interpreted a notation by Rush's accountant, Arthur Anderson, in the Intermediary's FY 1989 workpapers to mean that the IEFA loan proceeds were used to build the Inn.[FN18]*Id.*

FN18. The notation states, "AA & CO noted that the interest expense relating to the $10MM debt used for construction of the Inn at University Village was not being properly capitalized.... The 10MM debt is considered to be a tax-exempt borrowing. However, the hotel built with these

proceeds is not considered a qualifying asset...." AR 25. Ms. Pardieck, the Intermediary's accountant, testified that this statement meant Arthur Anderson had concluded that the $10 million proceeds from the IEFA bond were used to build the Inn. Rush contends that the Arthur Anderson comment could have a different interpretation. However, it is not the job of the court to question the judgment of the Secretary in choosing between two conflicting interpretations of a document. The Secretary's judgment to believe the interpretation of Ms. Pardieck over Rush's witness is entitled deference.

The Secretary also found that the IEFA loan was "unnecessary borrowing" because Rush had sufficient funds available in its funded depreciation account around the time it took the IEFA loan.[FN19]

FN19. Rush does not dispute this finding, arguing instead that it is irrelevant.

The Secretary's position is that Rush "effectively" used the loan proceeds to finance construction of the Inn. Def.'s Opp. 41. Though the Secretary's finding is not supported by direct evidence, taken together, the timing of the loan coinciding with the construction; the amount of the loan compared with the cost of construction; and the fact that Rush was booking interest on its books as associated with the Inn, all support a finding that Rush used the borrowed funds to finance the construction of the Inn.

Rush makes two arguments in support of its position. First, it argues that because the construction of the Inn was financed with money from the General Operating Fund, the IEFA loan proceeds were not "actually" used to construct the Inn. Essentially, Rush is arguing that the IEFA loan proceeds lost their character as "loan proceeds"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 16
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197
(Cite as: Slip Copy)

once they were deposited into the hospital's General Operating Fund. Even if this were to be a compelling argument, the Secretary's finding-based on Rush's own documents-that Rush was booking all interest and amortization on the IEFA loan to the Inn's cost center demonstrated that there was a link between the IEFA loan and the Inn, even if the IEFA check was not specifically earmarked for the Inn.

Second, Rush protests that it could not have used the IEFA loan proceeds on the Inn because it was bound by covenants within the loan, which required the proceeds to be used "to finance, refinance, and/or be reimbursed for all or a portion of the costs of completing the projects described in Exhibit B" (which does not include the Inn). AR 1272. Although the Secretary acknowledged that the purpose of the loan, based on the loan documents, was to reimburse Rush for previously made capital expenditures, it noted that there was no method by which Rush was obligated to account for the funds' actual use. AR 25. The fact that Rush had sufficient funds available at the time it took the IEFA loan, rendering the loan "unnecessary," made the loan look suspicious. Furthermore, the Secretary argues, the stated purpose of the loan was to reimburse Rush for equipment that had been purchased "long before the funds were obtained," which, when combined with the timing of the loan, demonstrates that Rush's intent in obtaining the loan was really to develop the hotel. Therefore, the Secretary looked beyond the stated use of the loan. When Rush received the IEFA loan proceeds, they were deposited in Rush's general operating account, from which the funds for the Inn came. AR 110. The stated purpose of the loan is not conclusive in light of the other evidence the Secretary considered. Though this is not a clear cut case,[20] the evidence that the Secretary relied on is adequate to support the conclusion reached.

FN20. Indeed, Rush admits as much, conceding that "there may have been some level of confusion about a link between the IEFA loan and the Inn."Pl.'s Reply 24.

## IV. CONCLUSION

*16 For the foregoing reasons, defendant's motion for summary judgment is granted in part and plaintiff's motion for summary judgment is denied in part.[21] The court remands the issue of whether Rush is entitled to reimbursement under 42 C.F.R. § 405.523 (1990) so that Rush can complete Worksheet D-2. If Rush is entitled to additional reimbursement for its "unapproved" fellowship programs, the Secretary does not dispute that Rush will also be entitled to interest on the reimbursement, pursuant to 42 U.S.C. § 1395oo(F)(2).

FN21. Rush has filed a motion to strike the Secretary's response because he did not comply with Local Rule 56.1. However, the court has relied almost exclusively on the Certified Administrative Record for the relevant "material facts." Given that there are no material facts in dispute, and in light of the fact that the Secretary filed a corrected response, the Secretary's failure to comply with the local rule is excusable. See Saint Mary of Nazareth Hosp. Center v. Shalala, 96 F.Supp.2d 773, 780, n. 6 (N.D.Ill.2000) (Secretary's failure to comply with Rule 56.1 excusable given that the material facts required for decision were contained in the administrative record.)

N.D.Ill.,2007.
Rush University Medical Center v. Leavitt
Slip Copy, 2007 WL 2669021 (N.D.Ill.), Med & Med GD (CCH) P 302,197

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-1614-RBW |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| in his official capacity as Secretary, U.S. | ) | |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER GRANTING DEFENDANT'S MOTION FOR
### SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR
### SUMMARY JUDGMENT AND ENTERING JUDGMENT FOR DEFENDANT

Before this Court are the parties' Cross-Motions for Summary Judgment. For the reasons set forth in Defendant's Memorandum in Support of His Combined Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, and in consideration of the Administrative Record, it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED. It further ORDERED that Plaintiff's Motion for Summary Judgment is DENIED. Accordingly, the Clerk of this Court is directed to enter JUDGMENT for Defendant.

Dated: _____

/s/ Reggie B. Walton
REGGIE B. WALTON
United States District Court Judge