**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BANNER HEALTH,              )
                                )
          Plaintiff,        )
                                )
       v.                )      No. 1:07-cv-1614 (RBW)
                                )
MICHAEL O. LEAVITT,      )
Secretary, United States Department   )
of Health and Human Services,    )
                                )
         Defendant.     )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   ARGUMENT ........................................................................................................... 5

      A.    The Secretary's Attempt To Relitigate The Factual Findings In The
            Proceedings Below Should Be Disregarded In This Action For Judicial
            Review ....................................................................................................... 5

      B.    The Funding Rationale For The Secretary's Decision Is Unlawful And The
            Post-Hoc Rationalizations Of The Secretary's Litigation Counsel Are
            Entitled To No Weight ........................................................................... 10

      C.    The Secretary's Failure To Provide An Explanation For His Inconsistent
            Interpretations Of The Statutory Term "Eligible For Medical Assistance
            Under A State Plan" Is Arbitrary And Capricious ............................... 13

      D.    The Secretary Has Not Challenged The Proposition That The Low-Income
            Populations At Issue Are Eligible For Assistance Under A Traditional
            Medicaid State Plan ............................................................................... 17

      E.    The Secretary's Rewording Of His 1999 Hold Harmless Rule Is Invalid
            And Should Be Set Aside ...................................................................... 25

III.  CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Adena Reg'l Med. Ctr. v. Leavitt,*
  524 F. Supp. 2d 1 (D.D.C. 2007),
  *appeal docketed*, No. 07-5273 (D.C. Cir. Aug. 8, 2007) .......................................... 15, 16, 23

*Andreiu v. Ashcroft,*
  253 F.3d 477 (9th Cir. 2001) ..................................................................................................22

*Biloxi Reg'l Med. Ctr. v. Bowen,*
  835 F.2d 345 (D.C. Cir. 1987)................................................................................................12

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988)..................................................................................................................8

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962)................................................................................................................11

*Cabell Huntington Hosp., Inc. v. Shalala,*
  101 F.3d 984 (4th Cir. 1996) .................................................................................... 12, 22, 23

*Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Serv., Inc.,*
  689 F.2d 1112 (1st Cir. 1982) ...............................................................................................16

*City of Brookings Mun. Tel. Co. v. FCC,*
  822 F.2d 1153 (D.C. Cir. 1987)...............................................................................................8

*Cookeville Reg'l Med. Ctr. v. Thompson,*
  No. 04-1053, 2005 WL 3276219 (D.D.C. Oct. 28, 2005),
  *appeal docketed*, No. 07-5252 (D.C. Cir. July 20, 2007) ............................................... 18, 19

*Deaconess Health Servs. Corp. v. Shalala,*
  83 F.3d 1041 (8th Cir. 1996) (per curium)...................................................................... 22, 23

*East Tennessee Natural Gas Co. v. FERC,*
  953 F.2d 675 (D.C. Cir. 1992)..................................................................................................8

*Florida Pub. Telecomm. Ass'n, Inc. v. FCC,*
  54 F.3d 857 (D.C. Cir. 1995)..................................................................................................22

*Harper v. United States Seafoods L.P.,*
  278 F.3d 971 (9th Cir. 2002) ..................................................................................................22

*In re Medicare Reimbursement Litig. (Baystate),*
  309 F. Supp. 2d 89 (D.D.C. 2004), *aff'd,* 414 F.3d 7 (D.C. Cir. 2005),
  *cert. denied,* 547 U.S. 1054 (2006) .......................................................................................26

*Jewish Hosp., Inc., v. Sec'y of Health & Human Servs.,*
  19 F.3d 270 (6th Cir. 1994)............................................................................... 3, 17, 22, 23

*Legacy Emanuel Hosp. & Health Ctr. v. Shalala,*
  97 F.3d 1261 (9th Cir. 1996).......................................................................................... 22, 23

*Michigan Pub. Power Agency v. FERC*,
   405 F.3d 8 (D.C. Cir. 2005) ....................................................................................... 3, 16

*Morall v. DEA*,
   412 F.3d 165 (D.C. Cir. 2005)................................................................................... 8, 18

*Morton v. Ruiz*,
   415 U.S. 199 (1974)........................................................................................................ 26

*Nat'l Treasury Employees Union v. Federal Labor Relations Auth.*,
   399 F.3d 334 (D.C. Cir. 2005) ....................................................................................... 16

*Pharmaceutical Research & Mfrs. of Am. v. Thompson*,
   191 F. Supp. 2d 48 (D.D.C.),
   *rev'd on other grounds,* 313 F.3d 600 (D.C. Cir. 2002)............................................... 11

*Portland Adventist Med. Ctr. v. Thompson*,
   399 F.3d 1091 (9th Cir. 2005) ....................................................................................... 19

*PPG Indus., Inc. v. United States*,
   52 F.3d 363 (D.C. Cir. 1995)..................................................................................... 2, 8

*Russello v. United States*,
   464 U.S. 16 (1983)......................................................................................................... 22

*Spry v. Thompson*,
   487 F.3d 1272 (9th Cir. 2007) ....................................................................................... 18

*St. Joseph's Hosp. v. Leavitt*,
   425 F. Supp. 2d 94 (D.D.C. 2006) .......................................................................... 4, 26, 28

*Transactive Corp. v. United States*,
   91 F.3d 232 (D.C. Cir. 1996)......................................................................................... 16

*United Hosp. v. Thompson*,
   No. 02-3479, 2003 WL 21356086, *1 (D. Minn. June 9, 2003),
   *aff'd* 383 F.3d 728 (8th Cir. 2004)......................................................................... 27, 28

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954)....................................................................................................... 26

*United States v. Menasche*,
   348 U.S. 528 (1955)....................................................................................................... 22

*Wilkinson v. Legal Servs. Corp.*,
   27 F. Supp. 2d 32 (D.D.C. 1998).................................................................................. 26

**Federal Statutes**

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)........................................................................... 12, 21

42 U.S.C. § 1396a(a)(4).................................................................................................... 21

42 U.S.C. § 1396a(a)(7).................................................................................................... 21

42 U.S.C. § 1396a(a)(9)(A)............................................................................................... 21

42 U.S.C. § 1396a(a)(10)(A) .................................................................................................9

42 U.S.C. § 1396a(a)(17) ......................................................................................................21

42 U.S.C. § 1396a(a)(19) ......................................................................................................21

42 U.S.C. § 1396a(a)(20)(C) .................................................................................................21

42 U.S.C. § 1396a(a)(22) ......................................................................................................21

42 U.S.C. § 1396a(a)(33)(A) .................................................................................................21

42 U.S.C. § 1396a(a)(37) ......................................................................................................21

42 U.S.C. § 1396a(a)(45) ......................................................................................................21

42 U.S.C. § 1396a(n)(2) ........................................................................................................21

42 U.S.C. § 1396b(a)(1) ........................................................................................................13

42 U.S.C. § 1396b(g) .............................................................................................................21

42 U.S.C. § 1396d(a) .............................................................................................................21

42 U.S.C. § 1396k ..................................................................................................................21

42 U.S.C. § 1396n(b)(3) ........................................................................................................21

42 U.S.C. § 1396n(c)(2)(E) ...................................................................................................21

42 U.S.C. § 1396n(d)(2) ........................................................................................................21

42 U.S.C. § 1396n(e)(2)(C) ...................................................................................................21

42 U.S.C. § 1396o(f)(3) .........................................................................................................21

42 U.S.C. § 1396o(f)(4) .........................................................................................................21

42 U.S.C. § 1396o(f)(5) .........................................................................................................21

42 U.S.C. § 1396r-4(f) ...........................................................................................................13

42 U.S.C. § 1396u(d)(5) ........................................................................................................21

42 U.S.C. § 1397bb(b)(3)(B) .................................................................................................22

**Regulations**

42 C.F.R. § 400.203 ...............................................................................................................21

42 C.F.R. § 405.1841(a) .........................................................................................................29

42 C.F.R. § 405.1875(c)(2) ......................................................................................................8

42 C.F.R. § 412.106(b)(4)(1998) ..........................................................................................12

42 C.F.R. Part 433, Subpart A ...............................................................................................13

42 C.F.R. § 1000.30 ...............................................................................................................21

63 Fed. Reg. 40,954 (July 31, 1998) .....................................................................................12

65 Fed. Reg. 3,136 (Jan. 20, 2000) ........................................................................... 3, 18, 19

68 Fed. Reg. 45,345 (Aug. 1, 2003) ..........................................................................19

**State Statutes**

Ariz. Rev. Stat. Ann. § 11-297 (1997)......................................................................10

Ariz. Rev. Stat. Ann. § 36-2901(4)(a-c, h) (1997) ...............................................9, 10

Ariz. Rev. Stat. Ann. § 36-2905 (1997) ................................................................9, 10

Ariz. Rev. Stat. Ann. § 36-2905.03 (1997) ...........................................................9, 10

**Other Authorities**

*Castle Medical Center v. Blue Cross/Blue Shield Association*, CMS Adm'r Dec.,
    *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 81,085 (Sept. 12, 2003) .........................28

Deficit Reduction Act of 2005,
    Pub. L. No. 109-171, § 5002, 120 Stat. 4 (Feb. 8, 2006) ..................................................18, 19

Dep't of Health & Human Servs., Health Care Financing Admin.,
    PMI A-99-62 Clarification of Allowable Medicaid Days in the Medicare
    Disproportionate Share Hospital (DSH) Adjustment Calculation (Dec. 1, 1999).............*passim*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Recognizing the weaknesses of the final agency decision from which the Hospitals seek relief, the Secretary's brief all but disavows it.[1]  The Secretary would have this Court relitigate established facts, and accept newly conjured legal theories based on those freshly spun facts. This approach, of course, is unavailing in this action for judicial review of the Secretary's final decision below.

The parties stipulated in the proceedings before the Provider Reimbursement Review Board ("PRRB" or "Board"), the Board found in its decision, and the Secretary does not dispute, that the Arizona Health Care Cost Containment System ("AHCCCS") is the Arizona Medicaid program, and that the low-income children and other medically needy/medically indigent

---

[1] *See, e.g.,* Defendant's Memorandum in Support of His Combined Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def. Mem.") at 22-23.

patients at issue here received assistance from that program.[2]  The Hospitals have shown that, given these undisputed facts regarding the Hospitals' patients' enrollment in the Arizona Medicaid program, and applying the Secretary's own "Medicaid eligible" standard, the days at issue should be included in the Hospitals' Medicare DSH calculations.[3]  Plain and simple.  So in his brief, the Secretary argues, with no support from either the factual findings below or the administrative record, that the AHCCCS patients at issue were in a "separate" program from the rest of the AHCCCS patients treated by the Hospitals.  The Secretary's attempts to undo the facts established below should be disregarded.  *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995).

The Hospitals also have shown that the rationale for the Secretary's decision below, based solely on payment of Federal matching funds rather than patients' eligibility for medical assistance, was unlawful.[4]  Tellingly, the Secretary's brief now says (incorrectly) that funding was not the only reason for the Secretary's decision.[5]  The Secretary's actual decision plainly belies the Secretary's argument, however, and as shown in our opening brief, the actual basis for the Secretary's decision below is inconsistent with four consecutive Circuit Court decisions that invalidated the Secretary's prior Medicare DSH rule of excluding Medicaid "eligible" days when a State did not make payment for those days.

In addition, the Hospitals have shown that the Secretary's construction of the statutory term "medical assistance under a State plan approved under Title XIX" *here* is patently

---

[2] *See* Complaint ¶ 50; Answer ¶ 50; Def. Mem. at 13-14; *see also* Administrative Record ("AR") 192-93 (Stipulations); AR 40 (Board decision).

[3] *See* Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Pl. Mem.") at 16-18.

[4] *See* Pl. Mem. at 18-22.

[5] *See, e.g.,* Def. Mem. at 23-25.

inconsistent with the Secretary's *prior* interpretation of the same term.[6]  Previously, the Secretary construed the Medicaid statute to mean that a State provides "medical assistance" to individuals who (like the AHCCCS patients at issue) are included in the Medicaid DSH payment calculation.  And what does the Secretary say about this inconsistency in his brief?  He ignores it.[7]  The Secretary's unexplained departure from his prior interpretation is arbitrary and capricious and must be reversed.  *See, e.g., Michigan Pub. Power Agency v. FERC*, 405 F.3d 8, 12-13, 16 (D.C. Cir. 2005).

The Hospitals have further demonstrated (*See* Pl. Mem. at 25-27) that even if the patients at issue did not receive medical assistance under the Arizona Medicaid program (and they did), the AHCCCS patients at issue were "*eligible* for medical assistance," and thus should be included in the Medicare DSH calculation, because they were capable of being included in a traditional Medicaid State plan.  *See Jewish Hosp., Inc., v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 274 (6th Cir. 1994) (concluding that the DSH statute uses the term "eligible" to mean "capable of receiving federal medical assistance or Medicaid").  Rather than address this head on, the Secretary responds (*see* Def. Mem. at 10-12, 35-40) with a nine page dissertation on legal authorities regarding so-called "expansion waiver days" that are not at issue here.  Under the Secretary's own policy of including days for what he calls "hypothetical" Medicaid eligibles in the Medicare DSH calculation,[8] and consistent with *Jewish Hospital*, these days should be included.

---

[6] *See* Pl. Mem. at 22-25.

[7] *See, e.g.,* Def. Mem. at 26-28.

[8] *See* 65 Fed. Reg. 3,136 (Jan. 20, 2000).

Finally, the Hospitals have established that even if the AHCCCS patient days at issue are not considered "eligible for medical assistance," they should be included in the Medicare DSH calculation under the plain terms of the Secretary's two-prong hold harmless rule.[9] Under one prong of the rule, a hospital is entitled to payment for "otherwise ineligible days" if the hospital received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999."[10] The Secretary does not dispute that at least one of plaintiff Hospitals previously received Medicare DSH payments for the AHCCCS patient groups at issue. So, the Secretary has attempted to collapse the first prong of the rule with the second alternative prong, and otherwise substitute for the plain words of the rule a policy rationale not found anywhere within the rule's four corners.[11] This, too, is unlawful because the Secretary's argument denies the payments granted to the plaintiff Hospitals by the plain language of the Secretary's rule. *Cf. St. Joseph's Hosp. v. Leavitt*, 425 F. Supp. 2d 94, 99-100 (D.D.C. 2006).

For these reasons, the Secretary's final decision should be reversed, and the Hospital's motion for summary judgment should be granted.

---

[9] *See* Pl. Mem. at 27-30.

[10] Dep't of Health & Human Servs., Health Care Financing Admin., PMI A-99-62 Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation (Dec. 1, 1999) ("Program Memorandum A-99-62" or "Program Memorandum") (AR 404). *See* Plaintiff's Statement of Material Facts Not in Genuine Dispute ("Pl. Stmt.") ¶ 27.

[11] *See, e.g.*, Def. Mem. at 40-44.

## II.    ARGUMENT

### A.    The Secretary's Attempt To Relitigate The Factual Findings In The Proceedings Below Should Be Disregarded In This Action For Judicial Review

The Secretary has attempted to rewrite the factual underpinnings of the Secretary's decision below to bolster his *post-hoc* legal arguments in this case. Ultimately, the arguments in the Secretary's brief stand and must fall on the false premise that the low-income children and the medically needy/medically indigent AHCCCS enrollees at the center of this controversy received assistance not through the Medicaid program, but through a *separate* program funded *only* by the State of Arizona. *See, e.g.,* Def. Mem. at 1. This supposition is entirely inconsistent with the factual findings below and is a *post-hoc* rationalization of counsel. *See* Pl. Stmt. ¶ 4. The parties stipulated in the proceeding below that AHCCCS is Arizona's Medicaid program. AR 192-93. The Secretary's Board also found that the AHCCCS program is the State Medicaid Plan, and the Secretary's approval of the plan "includes all the AHCCCS programs and sub-programs, irrespective of how the programs and sub-programs were funded" AR 40. The Administrator did not dispute these findings by the Board (*see* AR 14-18). Accordingly, in responding to the plaintiff Hospitals' Complaint, the Secretary admitted unequivocally that AHCCCS is Arizona's Medicaid program. *See* Complaint ¶ 50; Answer ¶ 50. Indeed, in the Secretary's brief itself, he admits that AHCCCS furnishes assistance to the populations at issue here. *See* Def. Mem. at 13-14 (AHCCCS provided health care benefits to the three groups at issue in this litigation). Even under the Secretary's standard of including only those days for which the patients were "eligible for Medicaid," all AHCCCS enrollees should be reflected in the plaintiff Hospitals' Medicare DSH calculations. It is that simple.

During the periods at issue, AHCCCS did not apply for or receive Federal matching funds for the per-member capitation payments it made to the managed care plans that were

contracted to provide services to AHCCCS recipients in the three eligibility groups at issue. *See* Pl. Stmt. ¶ 18; Defendant's Response to Plaintiffs' Statement of Material Facts ("Def. Resp.") ¶ 18. For this reason, the Board's decision sometimes referred to these three groups as "state-only categories of assistance" or "State funded" groups for short. *See* AR 36, 40. But in using these short-hand references, the Board in no way expressed or implied that there was no Federal funding provided to the State for the medical assistance that AHCCCS furnished to the three groups at issue. The Board itself found, and the Secretary does not dispute, that the State received Federal matching funds for "Medicaid expenditures" made to provide Medicaid DSH payments directly to the plaintiff Hospitals, and other Arizona hospitals, for the care they provided to the AHCCCS recipients in the three eligibility groups at issue. *See* Pl. Stmt. ¶¶ 15-17; Def. Resp. ¶¶ 15-17; Plaintiff's Response to Defendant's Statement of Material Facts ("Pl. Resp.") ¶ 3. Further, as the Board found, all Federal, State and local government funding for the AHCCCS program were commingled to finance all of the assistance that AHCCCS furnished to all recipients, including the three groups at issue. *See* Pl. Stmt. ¶ 18; Def. Resp. ¶ 18; Pl. Resp. ¶ 4.

The Secretary's argument that the AHCCCS patients at issue were in a "separate" program is largely a matter of semantics. For starters, the Secretary's brief makes liberal use of the Board's short-hand way of referring to the three groups at issue as "State-only" groups, Def. Mem. at 1, 3, 4, 8, 9, 11, 18, 22, 23, 24, and "State-funded" groups. *Id.* at 1, 7, 8, 14. But, notwithstanding the undisputed facts of this case and the clear weight of undisputed record evidence discussed above, the Secretary's brief carries these short-hand references much further – to the point of suggesting, wrongly, that the three AHCCCS recipient groups at issue comprised "exclusively State-funded health care programs," *id.* at 2, that were "paid for

exclusively by the State," *id.* at 14. These latter characterizations of the AHCCCS groups at issue are clearly unsupported by the record evidence and the undisputed facts found in the proceedings before the agency.

But, the Secretary's brief does not stop at those already-over-the line mischaracterizations of the AHCCCS groups at issue in this case. Building on his characterization of the AHCCCS patients as "exclusively State-funded," the Secretary argues that those patients were in "separate" programs, Def. Mem. at 1, 23, that were part of an AHCCCS program that encompassed not just one but "two distinct programs", *id.* at 2, including one program, which, his brief suggests, consisted of the three AHCCCS patient groups at issue that together comprised a "State-funded, non-Medicaid" program, *id.* at 1, including the "individuals who are not themselves Medicaid-eligible," *id* at 2 n.2. None of these characterizations of the AHCCCS patients at issue as part of a "separate", "non-Medicaid" program, are supported by citation in the Secretary's brief to any factual finding in the decisions of the Board and the Secretary below nor to any record evidence. *See* Def. Mem. at 1, 2, 23. These characterizations of these AHCCCS patients stand solely on an argument on page 23 of the Secretary's brief about the meaning that the Secretary's litigation counsel ascribes in this Court, for the first time, to select excerpts from certain Arizona State statutes, as amended in late 1999, nearly at the very end of the multiple-year period at issue in this case. Tellingly, though, none of those statutes was even cited, let alone considered, in the Secretary's final decision below. *See* AR 2-21. The Secretary's 20-page final decision (*see id.*) in this case does not cite any of the Arizona statutes now relied upon in Defendant's Statement, in his response to Plaintiff's Statement, and in his Brief.

The Secretary may not relitigate these facts now to avoid the inevitable legal conclusion they require. In his capacity as the Secretary's delegate, the CMS Administrator reviews and

may reverse Board findings that the Administrator believes to be unsupported by substantial evidence in the record. 42 C.F.R. § 405.1875(c)(2). The Administrator has a significant burden in doing so.[12] It follows that, in this action for judicial review of his own final decision, the Secretary cannot relitigate the factual findings that the Board reached if the Administrator failed to reverse them. *See PPG Indus.,* 52 F.3d at 365 (the reviewing court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the [agency's decision] was factually flawed") (alteration in the original) (quoting *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1225 (D.C. Cir. 1993)); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate"); *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C. Cir. 1987); ("*Post hoc* rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless.")

Even assuming the Secretary is entitled to a second bite of the apple, though, his case fails. The Secretary offers no record support at all for his assertion (inconsistent with other statements in the brief, as noted above) that AHCCCS "operated two distinct programs." Def. Mem. at 2. The scant portions of the record cited in the Secretary's brief do not contradict, but support, the Board's finding that the low-income children and medically needy/medically indigent are eligibility groups within the single AHCCCS program. For example, in one paragraph (¶ 8) of the Defendant's Statement of Material Facts in Support of His Motion for

---

[12] *See East Tennessee Natural Gas Co. v. FERC*, 953 F.2d 675, 681 (D.C. Cir. 1992) ("Because the ALJ relied on substantial evidence in the record, coupled with a well-reasoned and highly sensible analysis . . . , we can find no basis upon which to accept the Commission's unsupported and ill-reasoned conclusion to the contrary."); *Morall v. DEA*, 412 F.3d 165, 167, 180 (D.C. Cir. 2005) (an agency's findings of fact cannot be upheld if the final decision departs from the fact findings by the administrative tribunal that heard the evidence directly without considering contradictory evidence and the credibility findings of the tribunal that heard the evidence).

Summary Judgment ("Def. Stmt."), and in one sentence of his brief (Def. Mem. at 14), the Secretary cites one page of the administrative record in this case for the proposition that what the Secretary calls the "State-funded" populations are not part of the AHCCCS waiver program. That page of the record (AR 235) contains the "Program Funding" section of a document called "2002 AHCCCS Overview" (AR 226) and says nothing about any AHCCCS eligible populations being part of a separate State program. Indeed, the page actually says that the single program, AHCCCS, "is funded by a combination of federal, state and county funds." AR 235.

The Arizona state statutes now cited in the Secretary's brief, which the Secretary seems to consider his saving grace, lend no more support to the Secretary's case. The Secretary claims in his brief that the Arizona state statutes (not discussed in his decision below) "expressly" define the populations at issue as "*not* eligible for Medicaid." (Def. Mem. at 14, 23). But, in truth, the Arizona statutes cited in the Secretary's brief do not even use the term "Medicaid." *See* Pl. Resp. ¶ 9. Like the Federal Medicaid statute in Title XIX of the Social Security Act, *see, e.g.,* 42 U.S.C. § 1396a(a)(10)(A), Arizona State statutes establish different eligibility criteria for different eligibility categories (some overlapping) covered by AHCCCS, which is the Medicaid program in Arizona. *See, e.g.,* Ariz. Rev. Stat. Ann. § 36-2901(4)(a-c, h) (1997) (AR 301-02). Arizona state law also requires that individuals be screened for eligibility in certain mandatory Title XIX groups before becoming enrolled in other AHCCCS eligibility groups. *See, e.g.* Ariz. Rev. Stat. Ann. §§ 36-2901(4)(a-c, h), 36-2905, 36-2905.03 (1997). But none of the State statutes invoked in the Secretary's brief (at 14, 23) or his other pleadings (*see* Def. Resp. ¶¶ 18-19; Def. Stmt ¶ 9) anywhere states or implies that the optional groups are "*not* eligible for

Medicaid." *See* Ariz. Rev. Stat. Ann. §§ 11-297, 36-2901(4)(a-c, h), 36-2905, 36-2905.03 (1997) (AR 281-84, 301-02, 314-17, 324-27).[13]

The low-income children and medically needy/medically indigent populations were eligible for and enrolled in Medicaid. Given these facts, even assuming the Secretary's narrow construction of "medical assistance" to mean "Medicaid eligible" is appropriate, these patients' days should be included in the Medicare DSH calculation and the Secretary's decision cannot be upheld.

### B.    The Funding Rationale For The Secretary's Decision Is Unlawful And The Post-Hoc Rationalizations Of The Secretary's Litigation Counsel Are Entitled To No Weight

Counting on his ability to rewrite the facts, but recognizing the legal consequences of not being permitted to do so, the Secretary also attempts to spin a new legal basis for the Secretary's decision below. The Secretary determined in his decision below that "the days in question are associated with the general assistance days. . . . for which the State receives no matching FFP. . . [that are] not related to patients eligible for Medicaid and hence, cannot be counted in the numerator of the Medicare DSH fraction." AR 16. As shown in our opening brief, this focus on Federal/State payments as opposed to patients' eligibility for medical assistance is clearly invalid. *See* Pl. Mem. at 19-20. The Secretary now argues in his brief, however, that the Hospitals "incorrectly contend[] that the basis of the Secretary's decision not to count Arizona's State-only population in the Medicare DSH adjustment was based solely on the fact that AHCCCS did not receive direct Federal matching payments for the State-only populations." Def. Mem. at 23. That argument is plainly wrong.

---

[13] The 1999 version of these statutes cited by the Secretary were only in effect for the last several months of the nine year period at issue here.

The Secretary cites one sentence from the Administrator's final decision to support this theory:

> The days involved in this case are related to individuals not eligible for "medical assistance" as that term is used under Title XIX. Quite simply, these days are related to patients not eligible for Medicaid. As the record makes clear, this distinction formed the basis of the Secretary's decision. *See* AR 16 *("[T]he days involved in this case are related to individuals who are not eligible for 'medical assistance' as that term is used under Title XIX and thus, are not properly included in the Medicaid patient percentage of [the] Medicare DSH calculation under [§ 1395ww(d)(5)(F)(vi)(II)].")*

Def. Mem. at 25 (citing AR 16) (emphasis added). The very next sentence after the sentence italicized above explains the basis for the Administrator's conclusion that the patients at issue were not eligible for medical assistance. It reads: "Rather, the days in question are associated with general assistance days." AR 16. And, we are reminded further down in the same paragraph of that decision that the Secretary defines "general assistance eligibles" as "eligibles for which the State receives no matching FFP." AR 16. So, despite the Secretary's *post-hoc* contentions to the contrary, the Secretary simply has not pointed to any portion of the final decision below that offers any reason other than Federal/State funding for the decision the Hospitals challenge here.[14] And, of course, this Court may only review the legality of the Secretary's rationale for the decision below. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (a reviewing court may uphold agency action *only* on the basis

---

[14] For this reason, the Secretary cannot justifiably dispute the relevance of *Pharmaceutical Research & Mfrs. of Am. v. Thompson*, 191 F. Supp. 2d 48 (D.D.C.), *rev'd on other grounds,* 313 F.3d 600 (D.C. Cir. 2002). *See* Pl. Mem. at 20-22. In that case, the Secretary took the position that under a Medicaid demonstration waiver project, both "expenditures that generate [F]ederal financial participation and 'State only' expenditures that do not generate [F]ederal financial participation are . . . 'regarded' as being made 'under the State plan,' for purposes of determining whether a rebate obligation attaches under 42 U.S.C. § 1396r-8(b)(1)(A)." *Pharmaceutical Research,* 191 F. Supp. 2d at 54. In other words, once approved, the waiver project is part of "the State plan," and expenditures by the State under the waiver are regarded as payments "under the State plan," even if there is no Federal funding provided to the State for those expenditures.

articulated by the agency in its decision, not on *post-hoc* rationalizations offered by the agency or its counsel in litigation); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 348 n.12, 351 n.18 (D.C. Cir. 1987) (same).

Moreover, as set forth in detail in Plaintiff's first brief (Pl. Mem. at 19-20), the Secretary's focus on Federal and State *payments* rather than patients' program *eligibility* is unlawful. The DSH statute requires the Secretary to include all patient days attributable to patients who were "eligible for medical assistance under a State plan approved under [title] XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). There is no requirement that State or Federal payments be made for these patient days in order for them to count in the DSH calculation. The plain language of the statute looks to the individual's eligibility for assistance, not to Federal/State payments for the services furnished to the individual. If the individual is eligible, that is the end of the inquiry. *See* 63 Fed. Reg. 40,954, 40,985 (July 31, 1998).[15] (the DSH calculation must include all days for which a patient was "eligible for Medicaid . . . regardless of whether particular items or services were covered or paid under the State Medicaid plan"); 42 C.F.R. § 412.106(b)(4)(1998) (same). *Cf. Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996) ("Congress having chosen the word 'eligible,' rather than 'paid,' the Secretary is not at liberty to give the statutory language an entirely different and more restrictive meaning."). For this reason also, the Secretary's decision cannot stand.

---

[15] After acquiescing in four courts of appeals decisions striking down the Secretary's prior policy of excluding unpaid Medicaid days from the Medicare DSH calculation, the Secretary amended the DSH regulation to make this clear.

**C.    The Secretary's Failure To Provide An Explanation For His Inconsistent Interpretations Of The Statutory Term "Eligible For Medical Assistance Under A State Plan" Is Arbitrary And Capricious**

The Secretary's decision also must be overturned because it is inconsistent with the Secretary's prior construction of the same language in the Medicaid statute.    Under the Secretary's prior interpretation, a State provides medical assistance to those individuals who are included in the calculation of the *Medicaid* DSH payment.    The Secretary's unexplained departure in this case from the established agency precedent is arbitrary and capricious and, therefore, should be set aside.

By way of background, the Board found that the patients in question were eligible for medical assistance under a State plan under the DSH statute in part because Arizona received Federal matching funds for the Medicaid DSH payments that were made to the Hospitals for services furnished to the low-income patients at issue here.    AR 40.    As set forth in Plaintiff's first brief (Pl. Mem. at 23), with the exception of certain costs not relevant here, there is *no* authority for the payment of Federal matching funds for any State expenditure that is not "medical assistance under the State plan."    *See* 42 U.S.C. § 1396b(a)(1); 42 C.F.R. Part 433, Subpart A.    For this reason, Medicaid DSH payments under 42 U.S.C. § 1396r-4 are considered to be "medical assistance under the State plan" for which a State receives Federal matching funds.    42 U.S.C. §§ 1396b(a)(1), 1396r-4(f).

Nonetheless, citing the Secretary's 1999 Program Memorandum, the Secretary's brief theorizes that even if Medicaid DSH payments are "based upon" days of service to what he calls "charity care" or "general assistance" patients, those Medicaid DSH payments are *not* payment for those days, and those patients are not "eligible for Medicaid."    Def. Mem. at 27 (citing Program Memorandum A-99-62).    This is true, according to the Secretary, even though the Medicaid DSH statute allows States to consider hospital services to these "low-income patients"

who are not *otherwise* eligible for "medical assistance under a State plan" in determining Medicaid DSH payments.  Def. Mem. at 27 (citing 42 U.S.C. § 1396r-4(a)(2)(D)).  This theory cannot be reconciled with the undisputed facts in this case.

Defendant concedes that Medicaid DSH payments are "Medicaid expenditures" that are "based on the care provided to [a] hospital's low-income patients who receive care because they are eligible" for benefits under the AHCCCS program, including individuals in the three-income low-income AHCCCS eligibility groups at issue here.  *See* Def. Mem. at 15;  Def. Stmt. ¶¶ 10-11; *see also* Pl. Stmt. ¶¶ 15-17; Def. Resp. ¶¶ 15-17.  There is no dispute that each of the plaintiff Hospitals received these Medicaid DSH payments, and those "Medicaid expenditures" were funded with Federal matching funds.  *See* Pl. Stmt. ¶¶ 16-17; Def. Resp. ¶¶ 16-17; Def. Mem. at 15.  Moreover, there can be no genuine dispute that these Medicaid expenditures were for the care provided to the low-income patients in the three AHCCCS eligibility groups at issue.  *See* Def. Mem. at 15;  Def. Stmt. ¶¶ 10-11; *see also* Pl. Stmt. ¶¶ 15-17; Def. Resp. ¶¶ 15-17.  Indeed, a hospital could receive that Medicaid payment from AHCCCS even if the hospital treated no AHCCCS patients other than those individuals who were in the three AHCCCS eligibility groups at issue (AR 132-34, 175).  These facts clearly disprove the Secretary's hypothesis that the AHCCCS patients at issue do not receive "medical assistance under a State plan" *via* the Medicaid DSH payment.

Moreover, as discussed in our opening brief (Pl. Mem. at 24-25), the Secretary has previously taken the position that individuals whose service costs are included in the Medicaid DSH payment do in fact receive "medical assistance" under Title XIX.  In a formal policy letter interpreting the Medicaid DSH statute in 2002, the Secretary determined that a State provides medical assistance to individuals under a Title XIX State plan by virtue of including the cost of

- 14 -

services to those individuals in the calculation of the State's Medicaid DSH payments to hospitals, even if those individuals would not otherwise be considered eligible for "Medicaid." *See* Pl. Mem. at 22-25. Tellingly, the Secretary fails to even *mention* this 2002 pronouncement—even after filing it as the only attachment to his Answer to the Complaint in this case and even after the Hospitals' opening brief showed that the Secretary cannot reasonably construe the phrase "medical assistance under a State plan" to mean something different in the Medicaid DSH context than it means in the Medicare DSH context.

Moreover, the Secretary's brief itself takes the position that "[i]n interpreting the Medicare DSH provision, the Secretary reasonably looked to the terms as used in Title XIX of the Social Security Act because Title XIX is specifically referenced in the [Medicare] DSH provision."[16] Def. Mem. at 33. *See also id.* at 19 & nn.12-13. And, in a Medicare DSH case now before our Court of Appeals, the Secretary has acknowledged that he must construe the same language in the Medicaid DSH statute and Medicare DSH statute consistently. *See Leavitt (Appellant) v. Adena Reg'l Med. Ctr. (Appellee)*, No. 07-5273, Appellant's Reply Brief at 5-21 (D.C. Cir. filed Feb. 29, 2008) (attached hereto as Exhibit A) (the Secretary arguing that the

---

[16] Given this inconsistency between the Secretary's current construction of "medical assistance" for purposes of the Medicare DSH statute and his prior construction of "medical assistance" for purposes of the Medicaid DSH statute, and given the Secretary's apparent view that eligibility for "Medicaid" is something different from eligibility for "medical assistance," it is not "eminently reasonable for the Secretary to interpret the statutory phrase 'eligible for medical assistance under a State plan approved under [T]itle XIX [of the Social Security Act]' to mean 'eligible for Medicaid.'" Def. Mem. at 33.

Medicare DSH statute incorporates the Title XIX meaning of "medical assistance").[17]   Having previously interpreted the Medicaid statute to mean that individuals whose service costs factor into Medicaid DSH payments are individuals who receive "medical assistance," the Secretary is bound by that same interpretation here, and his unexplained departure from it is arbitrary and capricious.  *See Michigan Pub. Power Agency*, 405 F.3d at 12-13, 16 (no deference to agency "expertise" where agency inexplicably departed from past practice); *Nat'l Treasury Employees Union v. Federal Labor Relations Auth.*, 399 F.3d 334, 340-41 (D.C. Cir. 2005) ("It is well-established in this circuit that where an agency departs from its prior cases, it must offer a reasoned explanation for its change in view.") (citation omitted); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (an administrative agency's action is arbitrary and capricious when the agency "treats seemingly similar situations dissimilarly without explaining any relevant factual differences between the situations") (citing *Garrett v. FCC*, 513 F.2d 1056, 1060 (D.C. Cir. 1975)); *Cheshire Hosp. v. New Hampshire-Vermont Hospitalization Serv.*, *Inc.*, 689 F.2d 1112, 1126 (1st Cir. 1982) (an agency cannot treat similarly-situated hospitals differently by applying one interpretation of its rules in some cases and a different interpretation in other cases).

---

[17] In *Adena*, the plaintiff hospitals argue that patients who admittedly are not eligible for Medicaid should, nonetheless, be included in the Medicare DSH calculation.  This Court found for the hospitals in *Adena*, holding that the Medicare DSH phrase "'eligible for *medical assistance under a [S]tate plan approved under Title XIX*' is not 'long hand' for 'eligible for Medicaid.'"  *Adena Reg'l Med. Ctr. v. Leavitt*, 524 F. Supp. 2d 1, 4 (D.D.C. 2007), *appeal docketed*, No. 07-5273 (D.C. Cir. Aug. 8, 2007).  If the *Adena* hospitals prevail in the D.C. Circuit, then plaintiff Hospitals should prevail in this case.  The converse is not true, however, because the patients at issue here *are* eligible for medical assistance under Title XIX and, for that reason, should be included in the Medicare DSH calculation.  *See* Def. Mem. at 2 n.2 (the Secretary "submits that the D.C. Circuit's upcoming decision in *Adena* is likely to significantly influence, if not control, the outcome of this case.").

### D.    The Secretary Has Not Challenged The Proposition That The Low-Income Populations At Issue Are Eligible For Assistance Under A Traditional Medicaid State Plan

Even assuming *arguendo* that the low-income patients at issue were not receiving medical assistance from AHCCCS (and they were), the plaintiff Hospitals are still entitled to count their days in the Medicare DSH calculation because they were "eligible" to receive such assistance under a traditional State plan. The Secretary's brief only underscores the force of the plaintiff Hospitals' argument (Pl. Mem. 25-27) that the low-income and medically needy/medically indigent populations were capable of receiving medical assistance under a State plan.[18] The Secretary's Board found that Arizona could have included the disputed AHCCCS groups as optional eligibility groups under a traditional Medicaid State plan. AR 35-36, 40. The Secretary also concedes in his final decision that his policy was to include the Medicare DSH calculation days for populations who "could have been made eligible under a State plan." AR 12.

In the decision below, the Secretary ruled against the Hospitals for a different reason. He summarily found, without discussing or analyzing the evidence, that the record did not support the conclusion that the disputed patients could have been included under the Medicaid optional category of patients in a traditional Medicaid plan. AR 16-17. In Plaintiff's first brief, however, the Hospitals showed that the record contained extensive details, not addressed by the Secretary below, as to how these individuals could have been eligible for medical assistance under a

---

[18] *See Jewish Hosp.*, 19 F.3d at 274 (concluding that the DSH statute uses the term "eligible" to mean "capable of receiving federal medical assistance or Medicaid"). It is undisputed that in 2001, with the Secretary's approval, the AHCCCS program was modified so that the State began to receive Federal funding for the per-patient capitated payments made by the State to AHCCCS managed care organizations for services furnished to the individuals in the eligibility groups at issue here. *See* Pl. Stmt. ¶ 19; Def. Resp. ¶ 19. Thus, there is no question that these categories of patients were capable of receiving medical assistance under a traditional Medicaid program.

traditional State plan that included all Title XIX optional eligibility groups. *See* Pl. Mem. at 25-27; *see also Morall*, 412 F.3d at 167, 180.

Importantly, while the Secretary has offered up many *post-hoc* rationalizations for the Secretary's decision below, the Secretary's brief does not challenge the Hospitals' contention (Pl. Mem. at 25-27) that, under Federal law, applying the Title XIX eligibility standards to the facts here, the patients whose days were excluded in this case could have been eligible under a traditional Medicaid State plan. The Secretary's silence on this is deafening.

The Secretary instead employs several other strategies to attempt to overcome this failure, none of which furthers his cause. First, even though the plaintiff Hospitals have stated their position that the days at issue are *not* Section 1115 "expansion" group waiver days like the days in *Cookeville*[19] (Pl. Mem. at 10 n.6), and even though the Secretary appears at times to understand this point (*see, e.g.,* Def. Mem. at 8, 26), the Secretary spends nine pages of his brief arguing that "expansion" waiver days should not be included in the Medicare DSH calculation under section 5002 of the Deficit Reduction Act.[20] *See* Def. Mem. 10-12, 35-40.

For years, however, it is has been the Secretary's established policy to include what he calls "hypothetical eligibles" in the Medicare DSH calculation. *See* 65 Fed. Reg. at 3,136; AR

---

[19] *Cookeville Reg'l Med. Ctr. v. Thompson*, No. 04-1053, 2005 WL 3276219 (D.D.C. Oct. 28, 2005), *appeal docketed*, No. 07-5252 (D.C. Cir. July 20, 2007). At issue in *Cookeville* was whether Section 1115 waiver "expansion populations" should be included in the Medicare DSH calculation. Likewise, *Spry v. Thompson*, 487 F.3d 1272 (9th Cir. 2007), involved "expansion populations." More specifically, the question in *Spry* was whether the restrictions on the imposition of deductibles and coinsurance that applied to Medicaid eligible patients also applied to "expansion populations" who received assistance under a Section 1115 waiver. *Spry*, 487 F.3d at 1276. Neither *Cookeville* nor *Spry* bears on this case because this case does not involve "expansion waiver days." It involves patients who were the types of individuals who typically receive medical assistance in States across the country because they fall into Federally defined, Title XIX eligibility groups. *See* Pl. Mem. at 25-27.

[20] Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (Feb. 8, 2006) ("DRA § 5002").

12 & n.29.  The Secretary divides patients who receive medical assistance under a Medicaid demonstration project into two categories:  "'hypothetical eligibles,' who would be eligible for Medicaid assistance with or without a § 1115 waiver; and 'expanded eligibility groups,' who become eligible for assistance solely because of the waiver."  *Cookeville,* 2005 WL 3276219, at *2; 65 Fed. Reg. at 3,136.  As reflected in the Secretary's brief in this case, the Secretary considers the so-called "hypothetical eligibles" (which were historically included in the Medicare DSH calculation) to be "Medicaid-eligible" days.  *See* Def. Mem. at 8; *see also id.* at 12.  There is absolutely no need for this Court to accept the Secretary's invitation to delve into a morass of irrelevant legal authority on "expansion waiver days" or the DRA legislation regarding such days.

As Secretary explains (Def. Mem. at 3, 21, 35), Congress passed DRA § 5002 to reverse the Ninth Circuit's conclusion in *Portland Adventist* that the Medicare DSH calculation included inpatient days of individuals who were not eligible for traditional Medicaid but received assistance as "expansion populations" pursuant to a Section 1115 waiver.  *See Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091 (9th Cir. 2005).[21]  The days at issue here are not "expansion days," and DRA § 5002 is not relevant to this Court's analysis.  According to the Secretary, however, "Congress's clarification that even inpatient days . . . of those expansion

---

[21] Notwithstanding the Secretary's assertion to the contrary (Def. Mem. at 38), DRA § 5002 did not "ratify" the Secretary's DSH policy of excluding what he calls "State-only" days.  DRA § 5002(b)(3) "ratifies" Medicare DSH rules that addressed only "waiver" days and did not address so-called "State-only" days.  *See* DRA § 5002(b) (ratifying regulations at 65 Fed. Reg. 3,136 (Jan. 20, 2000) and 68 Fed. Reg. 45,345 (Aug. 1, 2003)); *see also* 65 Fed. Reg. at 3,136-37 (changing the Secretary's Medicare DSH policy to begin including "expansion" waiver days, but not changing the Secretary's then existing policy of including "hypothetical eligibles" who could have been eligible for medical assistance absent the waiver); 68 Fed. Reg. at 45,420-21 (changing the Secretary's Medicare DSH policy to exclude days of patients in waiver programs who do not receive inpatient hospital benefits).

- 19 -

populations for which the States received Federal matching payments were *not* required to be included in the calculation of the DSH payments, and would be included only at the Secretary's discretion, leaves no doubt that the Medicare DSH adjustment does not, contrary to plaintiff's argument here, include days of State-only populations, who are even further removed from the Medicaid program." (Def. Mem. at 3). This argument depends on the false factual assumptions that the AHCCCS recipients at issue are part of a separate "State-only" program, and that there is no Federal funding for services furnished to these recipients. Neither premise is true for the reasons shown above.

The Secretary's second strategy to deflect from his failure to address Federal Title XIX eligibility standards is to claim that the Hospitals' "novel" contention that individuals who are capable of being eligible for Medicaid should be included in the Medicare DSH calculation "lacks merit as a matter of statutory construction" (Def. Mem. at 28). The most obvious problem with this theory is that, as the Secretary elsewhere acknowledges in his brief (Def. Mem. at 30), this contention is not "novel" at all. The Secretary's policy has been to include in the Medicare DSH calculation the days of individuals who "could have been made eligible under a State plan." AR 12. Because the Secretary has (*see* Def. Mem. at 30) included these so-called hypothetical eligibles in the Medicare DSH calculation he cannot very well claim that the Hospital's position on these individuals violates the statute governing that calculation.

Further, although the Secretary concedes that terms used in the Medicare DSH statute in Title XVIII of the Social Security Act should be construed consistently with the Medicaid statute in Title XIX of the same Act (*see, e.g.*, Def. Mem. at 19 & nn.12–13), the Secretary's brief argues for an interpretation of the Medicare DSH statute that is clearly at odds with Congress' view of "medical assistance" in Title XIX. The key language in the Medicare DSH statute

requires the Secretary to count patient days attributable to individuals who were "eligible for medical assistance under a State plan approved under [title] XIX."   42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  In his brief (at 18-19, 22, 24, 25), the Secretary says that Congress used those 12 words in the Medicare DSH statute to describe an individual who is in an eligibility category that is both:   (i) eligible for Medicaid under Title XIX of the Act as categorically needy or medically needy; <u>and</u> (ii) specified in a particular State's Medicaid plan as a category of individuals for which the State will receive federal matching funds.  There is a single word, however, that describes such an individual who is enrolled in a Medicaid State plan; it is a word that Congress has used at least 33 times in 22 separate provisions of Title XIX of the Act; and, that word is "recipient."[22]   In the Medicaid context, this is a familiar and well-established term, which is defined in at least two regulations of the Secretary to mean "an individual who has been determined eligible for Medicaid."[23]   *See* 42 C.F.R. §§ 400.203, 1000.30.

        Accordingly, the DSH statute's use of the 12-word phrase describing individuals who are "eligible for medical assistance . . . " should not be construed to include only individuals who are "recipients" after having been "determined to be eligible" and thus enrolled in a particular

---

[22]   *See* 42 U.S.C. §§ 1396a(a)(4), 1396a(a)(7), 1396a(a)(9)(A), 1396a(a)(17), 1396a(a)(19), 1396a(a)(20)(C), 1396a(a)(22), 1396a(a)(33)(A), 1396a(a)(37), 1396a(a)(45), 1396a(n)(2), 1396b(g), 1396d(a), 1396k, 1396n(b)(3), 1396n(c)(2)(E), 1396n(d)(2), 1396n(e)(2)(C), 1396o(f)(3), 1396o(f)(4), 1396o(f)(5), 1396u(d)(5).

[23] The Secretary is undoubtedly correct that the Social Security Act quite often uses the phrase "eligible for medical assistance under a State plan," or something similar.  See Def. Mem. at 19. However, that is beside the point. The Secretary's brief, with no citations to the record or to any authorities, states only in conclusory fashion (again) that "[i]n each of these instances, Congress is identifying individuals who are eligible for Medicaid."  *See id.*  In any event, the Secretary has not explained how such a construction would exclude the patients at issue here.  To the extent that the Secretary reads the phrase "eligible for Medicaid" to mean something different than "eligible for medical assistance under a State plan," his reading conflicts with the plain language of the Medicare DSH statute and is invalid.

Medicaid State plan under Title XIX.  As a matter of statutory construction, each word used in the Medicare DSH statute should be given effect and none should be presumed to be superfluous.[24]  So, when Congress uses different language in different sections of the statute, or mentions one thing in part of a statute and omits it from another part of the same statue, it is presumed that Congress acted intentionally.  *See Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Florida Pub. Telecomm. Ass'n, Inc. v. FCC*, 54 F.3d 857, 860 (D.C. Cir. 1995) (if Congress had intended for a telecommunications statute to apply only to the particular defined term "access-code calls," Congress would have used the particular defined term instead of using the broader language it enacted); *Andreiu v. Ashcroft,* 253 F.3d 477, 480 (9th Cir. 2001) (where Congress includes particular language in one section of a statute but omits it from another section, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion).

In short, the Medicare DSH statute's use of the term "eligible for medical assistance . . ." does not connote enrollment in a particular Medicaid State plan any more than it does "entitled" or "paid", which is a construction of the statute that the Secretary originally adopted and the federal Circuit courts uniformly invalidated.  *See Jewish Hosp.*, 19 F.3d at 274-75; *Cabell,* 101 F.3d at 988; *Legacy Emanuel Hosp. & Health Ctr. v. Shalala,* 97 F.3d 1261, 1265 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala,* 83 F.3d 1041, 1041 (8th Cir. 1996) (per curium).  Moreover, the construct of the Social Security Act as a whole shows that an individual may be "eligible for medical assistance" under a State plan even if he or she is not enrolled in, or a recipient of, assistance under such plan.  *See, e.g.,* 42 U.S.C. § 1397bb(b)(3)(B) (reflecting

---

[24]     *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *see also Harper v. United States Seafoods L.P.*, 278 F.3d 971, 975 (9th Cir. 2002).

Congress' understanding that an individual may be "eligible" for benefits under a State plan under title XXI of the Social Security Act even if she is not "enrolled" in that plan by requiring a State plan to include procedures to ensure that "children found . . . to be eligible for medical assistance under the State [M]edicaid plan under [title] XIX [] are enrolled for such assistance under such plan.").

As the Sixth Circuit put it, the Medicare DSH statute's use of the term "eligibility" refers to "capability of receiving" medical assistance. *Jewish Hosp.*, 19 F.3d at 274-75. And, inasmuch as the "operative qualification for [the DSH payment] is the servicing of 'low income' persons," *id.* at 275, an individual's capability of receiving medical assistance under a State Medicaid plan by reason of his or her low-income status likewise is the operative qualification for inclusion in the numerator of the Medicaid low-income proxy. Under the Medicare DSH provision, patient days of individuals who are *eligible* to receive medical assistance must be included in the Medicare DSH calculation; and, this is so even if the State has elected its option *not* to offer *payment* for particular Title XIX covered services furnished to those individuals. *See Jewish Hosp.*, 19 F.3d at 274-75; *Cabell,* 101 F.3d at 988; *Legacy Emanuel Hosp.*, 97 F.3d at 1265; *Deaconess*, 83 F.3d at 1041.[25] Likewise, if the State has elected its option *not* to seek

---

[25] Notwithstanding the Secretary's discourse on them, (Def. Mem. at 19-21), the Secretary can find no support for his view of "medical assistance" in the four circuit court cases that undid his prior construction of the Medicare DSH statute to exclude days for which Medicaid has not made payment. Those cases involved whether the Secretary could narrowly construe days "eligible for medical assistance under a State plan under Title XIX" to mean only days for which Medicaid made *payment*. *See Jewish Hosp.*, 19 F.3d at 274-75; *Cabell*, 101 F.3d at 988; *Legacy Emanuel Hosp.*, 97 F.3d at 1265; *Deaconess*, 83 F.3d at 1041. Those courts simply did not decide the question of whether "medical assistance under a State plan" and "Medicaid" are concepts that have different meanings under the Social Security Act. This Court has previously considered the passages from these cases cited by the Secretary to be "slips of language [that] are not even dicta." *Adena*, 524 F. Supp. 2d at 5. Likewise, the legislative history of the Medicare DSH statute cited by the Secretary (Def. Mem. at 20) begs the question of what type of assistance counts as "Medicaid" or "medical assistance."

Federal funding for all or a portion of the assistance it furnished to certain categories of persons that could be covered under Title XIX, then the days associated with that assistance should still be included in the Medicare DSH calculation. Otherwise, Congress's use of the word "eligible" is effectively written out of the Medicare DSH statute.

As a third strategy on this point, the Secretary raises theoretical concerns (Def. Mem. at 28-29) that are not concerns at all. The Hospitals are not asking to include individuals in undefined eligibility groups; the eligibility standards for the groups at issue here are clearly defined. *See* Pl. Stmt. ¶¶ 10-11. In addition, the patients have been found eligible for assistance under those clear standards. *Id.* The Hospitals are not asking to include unidentified patients who, as individuals, "had not applied for benefits but might qualify if they did apply." Def. Mem. at 29. Rather, the Hospitals are asking to include patients who received assistance through AHCCCS and, categorically, could be covered as optional categories under an Arizona State Medicaid plan if Arizona had decided to administer its program differently.[26]

The Secretary's final strategy is to attempt to supplement the nonexistent analysis of the factual record in the Secretary's final decision below. Even assuming *arguendo* that the Secretary could now recast the Secretary's assessment of the facts, his efforts to do so would prove fruitless. For example, the transcript testimony cited in the Secretary's brief (Def. Mem. at 31-32) only shows that the Hospitals developed data on AHCCCS patients to determine paid and unpaid days for those patients. The testimony does not reflect any determination by the Hospitals in this case that the AHCCCS enrollees here should not be included in the Medicare DSH calculation because they are not eligible for "Medicaid." The Secretary's brief also

---

[26]  As a result, there would be consistency across States as to which categories of individuals could be included in Medicare DSH calculations of hospitals in different states.

invokes general Medicare rules regarding hospitals' burden of proving entitlement to Medicare reimbursement (not mentioned in the Secretary's final decision), and then asks this Court not to substitute its judgment for the Secretary's on this "technical" issue. (Def. Mem. at 29-30, 31). The Hospitals agree that hospitals must prove their reimbursement cases. But the Hospitals submitted substantial documentation regarding the eligibility standards of the low-income children and medically needy/medically indigent individuals at issue, and the Secretary did not even assess it (never mind demonstrate his "technical" prowess). His decision, therefore, is arbitrary and capricious, and should be overturned.

E.      **The Secretary's Rewording Of His 1999 Hold Harmless Rule Is Invalid And Should Be Set Aside**

The Secretary is also recasting the Secretary's hold harmless rule to withhold DSH payments from the Hospitals. *See* Program Memorandum A-99-62. The Program Memorandum created a two-pronged hold-harmless rule, permitting hospitals to include "otherwise ineligible" days in the DSH calculation for periods beginning before January 1, 2000 if either of two alternative criteria are met. AR 403-05; *see* Pl. Mem. at 27-28. Under the first alternative criterion, "otherwise ineligible" days may be included in the DSH calculation if the hospital received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999."[27] Under that criterion, even if AHCCCS patients at issue were not eligible for medical assistance under a State plan (and they were), they should be included in the Medicare DSH payments at least for Good Samaritan Medical Center, one of the

---

[27]   AR 403-04. *See* AR 34; Pl. Stmt. ¶ 27. Under the second criterion, "otherwise ineligible" days may be included in the Medicare DSH calculation if a hospital did not receive any DSH payments reflecting the "otherwise ineligible days" for prior cost reporting periods but filed an appeal relating to the exclusion of those days before October 15, 1999. AR 404. *See* Pl. Stmt. ¶ 28.

hospitals in this case, because its Medicare DSH payments for prior cost reporting periods included the same type of day.[28]  *See* Pl. Mem. at 27-30.

The Secretary's brief does not deny that prior payments included the AHCCCS patient groups at issue, but instead argues that plaintiff Hospitals are not entitled to hold-harmless payments for a different reason.  He argues that, "[b]ecause the plaintiff's hospitals could not demonstrate a reasonable reliance interest in retaining or receiving Medicare DSH payments that included State-only days for any of the years at issue, *and* because they did not raise the issue of the exclusion of those days prior to October 15, 1999–the date the Secretary first announced the hold harmless policy—they are not entitled to hold harmless treatment for those days."  Def. Mem. at 40.  *See also* Def. Resp. ¶¶ 26-27.  The Secretary's argument is untenable, however, because the Secretary impermissibly writes new restrictions into the rule, and collapses a two-prong test into one.  *See St. Joseph's Hosp.*, 425 F. Supp. 2d at 99-100.

An administrative agency is bound to follow its own rules and policies, even where those rules "are possibly more rigorous than otherwise would be required."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-68 (1954); *In re Medicare Reimbursement Litig. (*"*Baystate*"*)*, 309 F. Supp. 2d 89, 99 (D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005), *cert. denied,* 547 U.S. 1054 (2006); *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 57-58 (D.D.C. 1998).  The Secretary, therefore, is required to include the days at issue in the DSH payment calculations, even if these days would be "otherwise ineligible" for inclusion in the Medicare DSH calculation.  *Cf. Baystate*, 414 F.3d at 13 (affirming the district court's order compelling the Secretary to perform his obligation under

---

[28]  And, Good Samaritan received interim DSH payments with respect to services furnished to the three populations at issue for periods immediately prior to the cost reporting periods at issue and including the 1992 cost reporting period at issue here.  *See* Pl. Stmt. ¶ 22; Def. Resp. ¶ 22.

agency rules to reopen and revise prior erroneous DSH payment determinations and concluding

that the Secretary's "[h]aving to pay a sum [he] owes can hardly amount to an equitable reason

for not requiring payment.")

The Secretary's treatment of the hold harmless issue in his Response to Plaintiff's

Statement of Material Facts is instructive.  First, the Secretary's response reflects that there are

two alternate paths for hold harmless qualification:   "[t]he Secretary determined that it was

appropriate to hold harmless those hospitals that had already received payment for that erroneous

conclusion *or that had already raised a challenge seeking to include waiver populations in the

DSH adjustment*."   Def. Resp. ¶ 26 (bold emphasis added; italics in original).  In addition, it

reflects that the requirement of a "reliance interest" is not found anywhere in the text of the

Program Memorandum itself.  The Secretary only generally cites ("*See id.*") the first page of the

Program Memorandum for the notion that "[t]he hold harmless determination accommodated the

reliance interest of those hospitals that might have received payments reflecting the erroneous

inclusion of State-only or expansion populations in calculating the Medicare DSH adjustment."

Def. Resp. ¶ 26; *see also id.* ¶ 27.  The Secretary did not and cannot cite any specific language in

the Program Memorandum establishing any requirement of (or even referring to) a "reliance

interest" or any such concept.  *See* AR 401-07.

In his brief, the Secretary looks to *United Hospital*[29] to support this notion.  He cites the

case for the proposition that "[t]he Secretary has consistently maintained that the hold harmless

---

[29]   *United Hosp. v. Thompson*, No. 02-3479, 2003 WL 21356086, *1 (D. Minn. June 9, 2003),
*aff'd* 383 F.3d 728 (8th Cir. 2004).  *United Hospital* involved whether days of "patients eligible
for state general assistance programs (as distinct from state programs approved under the
Medicaid program)" should be included in the Medicare DSH calculation.  *United Hosp.*, 2003
WL 21356086 at *1.  The hospital did not argue that it had received Medicare DSH payments
based on such "general assistance" days for prior cost reporting periods.

policy was intended only to protect those providers that held 'an independent and genuine belief that they were entitled to general assistance [or State-only] days." Def. Mem. at 40-41 (citing *United Hosp.* at *6). The *United Hospital* court's ability to identify a potential rationale for the hold harmless rule in analyzing an equal protection claim of that hospital, however, does not magically make that rationale part of the rule itself (or make that rationale the Secretary's consistent interpretation). Nor does it permit the Secretary to apply the rule's rationale to effect the denial of that which the rule itself grants. *See St. Joseph's Hosp.*, 425 F. Supp. 2d at 99-100.

Like almost all rules, the hold-harmless rule arguably does not set out a perfect test for identifying the hospitals that the Secretary says the rule was intended to cover.[30] Still, the rule is the Secretary's rule and the Secretary is bound by it. He cannot rewrite the rule now – nine years

---

[30] For example, in *Castle Medical Center v. Blue Cross/Blue Shield Association*, CMS Adm'r Dec., *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 81,085 (Sept. 12, 2003) (attached hereto as Exhibit B), the Secretary applied the hold-harmless rule to a hospital that amended a PRRB appeal on October 6, 1999 by adding a claim for a Medicare DSH payment for otherwise ineligible "Quest days" in a 1994 fiscal year. Without assessing any evidence of whether the hospital had any "reliance interest" in receiving a Medicare DSH payment for Quest days in its 1994 fiscal year, the Administrator concluded that the Quest days should be included the Medicare DSH payment for that year because the hospital had added the issue to its appeal before the October 15, 1999 appeal deadline under the second prong of the hold-harmless rule. Conversely, we can imagine that if the hospital had waited just 10 more days to add the Quest days to its appeal on October 16, 1999, it would not have qualified for the hold-harmless payment and no amount of arguing about its "reliance interest" would have changed that. In both scenarios, the hospital's qualification for the hold-harmless payment turns not any subjective evaluation of its expectation or "reliance interest" in the DSH payment but rather on the hospital's satisfaction of the bright-line, objective criteria the Secretary adopted in the hold-harmless rule itself to identify those hospitals that the Secretary says the rule was intended to protect. Having adopted such objective criteria in the rule, the Secretary is bound by those standards in *all cases*, not just those cases in which the rule's objective criteria can be applied to deny the hold-harmless payment to a hospital that does not meet them.

after it was announced – in order to deny what the plain language of the rule grants.[31]

In any event, the Hospitals did genuinely believe they were entitled to include the days at issue in the Medicare DSH calculation, so to the extent that the "reasonable reliance" test is appropriate to apply, the Secretary's decision is not based on substantial evidence. *See* Pl. Stmt. ¶¶ 20-24. The particular types of days at issue had been included in the Medicare DSH payment calculations for Good Samaritan and all of the other hospitals in Arizona that received DSH payments before 1990. *See* Stipulations ¶ 10, AR 193; AR 134-35, 143-44, 152-58, 166, 176-77, 449-54, 825-26, 828-29. Arizona hospitals did not agree with the Intermediary's later determination to exclude these days from the DSH calculation. AR 136, 139-40, 335-52. The Hospitals included patient days attributable to patients in each of the three AHCCCS eligibility groups at issue in the cost reports they submitted for each fiscal year at issue, but the fiscal intermediary's final payment determination for each year denied Medicare DSH payments with respect to services furnished to those patients. AR 36. After the issuance of Program Memorandum A-99-62 (once they learned that the date October 15, 1999 had significance), and consistent with the regulations at 42 C.F.R. § 405.1841(a), which permits providers to add issues to PRRB appeals anytime "[p]rior to the commencement of the hearing," the Hospitals formally amended their appeals to challenge the exclusion of the medically needy/medically indigent and low-income children from their Medicare DSH calculations. AR 71. There is no reasonable basis for concluding that the Hospitals' accepted or agreed with the Secretary's view that their Medicare DSH calculations should not include all AHCCCS patients.

---

[31] As the Secretary has conceded, the Program Memorandum was not issued as a matter of administrative largesse. *See* Pl. Stmt. ¶ 25; Def. Resp. ¶ 25. The Secretary faced mounting political pressure to issue the hold harmless rule because his "guidance on the calculation of Medicare DSH. . . was neither sufficiently clear nor well understood." AR 396. *See* Pl. Stmt. ¶ 25; Def. Resp. ¶ 25.

### III.    CONCLUSION

For the foregoing reasons, the Hospitals request that their motion for summary judgment be granted, that the Secretary's motion for summary judgment be denied, and that this matter be remanded to the Secretary with instructions to pay the plaintiff Hospitals the additional DSH payments due from including in their payment calculations the three AHCCCS recipient groups at issue here.

Respectfully submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: March 18, 2008

**Exhibit A**

[ORAL ARGUMENT SCHEDULED FOR MARCH 18, 2008]

No. 07-5273

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ADENA REGIONAL MEDICAL CENTER, et al.,
Plaintiffs-Appellees,

v.

MICHAEL O. LEAVITT, Secretary,
Department of Health & Human Services,
Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

APPELLANT'S REPLY BRIEF

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney General*

JEFFREY A. TAYLOR
*United States Attorney*

ANTHONY J. STEINMEYER
 (202) 514-3388
AUGUST E. FLENTJE
 (202) 514-1278
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530-0001*

# TABLE OF CONTENTS

**Page**

GLOSSARY

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.  The Plain Language of the Medicare DSH Provision
    Excludes HCAP Patients From Its Calculation
    Because they Are Not Eligible for Medicaid . . . . . . . . . . . . . . . . . . . . . . . . 3

B.  In Enacting the Medicare DSH, Congress Intended
    to Incorporate the Meaning of "Medical Assistance"
    Used in the Medicaid Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C.  The Ohio HCAP is Not a 'State Plan Approved
    Under Subchapter XIX" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
    OF THE FEDERAL RULES OF APPELLATE PROCEDURE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Cases:

*Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427 (1932) . . . . . . . . . . 12

*Cabell Huntington Hosp. Inc. v. Shalala*, 101 F.3d 984  . . . . . . . . . . 8, 9, 17-19

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 451-52 (2002)  . . . . . . . . . . 14

*Deaconess Health Services Corp. v. Shalala*, 912 F. Supp. 438
   (E.D. Mo. 1995), *aff'd, Deaconess Health Serv. Corp. v.*
   *Shalala*, 83 F.3d 1041 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-101 (2003) . . . . . . . . . . . . . . . 14

*Edmonds v. Compagnie Generale Transatlantique*,
   443 U.S. 256, 268 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Energy Research Foundation v. Defense Nuclear Facilities*
   *Safety Bd.*, 917 F.2d 581 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) . . . . . . . . 15

*Finney v. Roddy*, 617 F. Supp. 997 (E.D. Va. 1985) . . . . . . . . . . . . . . . . . . . . . 16

*Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84 (1934) . . . . . . . . . . . . . . 12

*Jewish Hospital v. Sec'y of Health & Human Servs.*, 19 F.3d 270
   (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*K mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) . . . . . . . . . . . . . . . . . . . . . . 13

*Legacy Emanuel Hosp. & Health Ctr. V. Shalala*, 97 F.3d 1261
   (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Linberg v. Brenner*, 399 F.2d 990 (D.C. Cir. 1968) . . . . . . . . . . . . . . . . . . . . . 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Monmouth Medical Center v. Thompson*, 257 F.3d 807 . . . . . . . . . . . . . . . . . . . 5

*Moore v. District of Columbia*, 907 F.2d 165 (D.C. Cir. 1990) . . . . . . . . . . . . . 15

*Oklahoma v. New Mexico*, 501 U.S. 221 (1991) . . . . . . . . . . . . . . . . . . . . . . . . 15

*PDK Laboratories Inc. v. U.S. D.E.A.*, 362 F.3d 786 (D.C. Cir. 2004) . . . . . . . . 8

*Portland Adventist Med. Ctr. v. Thompson*, 399 F.3d 1091 . . . . . . . . . . . . . 20, 21

*In re Professional Air Traffic Controllers Organization*,
    18 B.R. 894 (Bankr. D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sorenson v. Secretary of Treasury*, 475 U.S. 851 (1986) . . . . . . . . . . . . . . 11, 13

*Spry v. Thompson*, 487 F.3d 1272 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 24

*\*Sullivan v. Stroop*, 496 U.S. 478 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11-13

*United Hospital v. Thompson*, 383 F.3d 728, 733 . . . . . . . . . . . . . . . . . . . . . . 18

*Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir. 1990) . . . . . . 15-16

\* Cases primarily relied upon are marked with an asterisk.

## Statutes:

5 U.S.C. § 552(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
28 U.S.C. § 1963 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
29 U.S.C. § 1168(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Social Security Act:
    42 U.S.C. § 1315(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    42 U.S.C. § 1315(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    42 U.S.C. § 1395d(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    42 U.S.C. § 1395w-4(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) . . . . . . . . . . . . . . . . . . 2, 3, 17, 22, 26
    42 U.S.C. § 1396(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10
    42 U.S.C. § 1396a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    42 U.S.C. § 1396a(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    42 U.S.C. § 1396a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII) . . . . . . . . . . . . . . . . . . . 6
    42 U.S.C. § 1396a(a)(13)(A)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 1396a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
42 U.S.C. § 1396b(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. § 1396d (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
42 U.S.C. § 1396d (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. § 1396r-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
42 U.S.C. § 1396r-4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
42 U.S.C. § 1396r-4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24
42 U.S.C. § 1396r-4(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
42 U.S.C. § 1396r(c)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
42 U.S.C. § 1396s(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
42 U.S.C. § 1397ee(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
42 U.S.C. § 2000a, et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
42 U.S.C. § 2286(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Consolidated Omnibus Budget Reconciliation Act of 1985
    ("COBRA"), Pub. L. No. 99-272, § 9105(a), 100 Stat. 82 (1986) . . . . . . . 8

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4 (2006)
    § 5002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-22, 27

Social Security Amendments of 1965, Pub. L. No. 89-97,
    Title I, § 121(a), 79 Stat. 286 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# GLOSSARY

Centers for Medicare & Medicaid Services ........................... CMS

Medicare disproportionate share hospital adjustment .. Medicare DSH adjustment

Medicaid disproportionate share hospital adjustment .. Medicaid DSH adjustment

Ohio Hospital Care Assurance Program ............................ HCAP

Prospective Payment System ..................................... PPS

U.S. Department of Health and Human Services ....................... HHS

[ORAL ARGUMENT SCHEDULED FOR MARCH 18, 2008]

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 07-5273

---

**ADENA REGIONAL MEDICAL CENTER, et al.,**
**Plaintiffs-Appellees,**

v.

**MICHAEL O. LEAVITT, Secretary,**
**Department of Health & Human Services,**
**Defendant-Appellant.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

APPELLANT'S REPLY BRIEF

---

### SUMMARY OF ARGUMENT

Although this case involves technical, sometimes complex, statutory provisions,

at bottom, the result is clear in view of the hospitals' admission that the exact

phraseology used in the Medicare DSH provision *excludes* Ohio HCAP patients when

that statutory language is used in the *Medicaid* provisions of the Social Security Act.

Appellees' Br. at 53. But they contend that this same statutory phrase – "eligible for

medical assistance under a State plan approved under subchapter XIX of this chapter"

– means something entirely different – and *includes* the HCAP patients – when used in the *Medicare* provisions of the Social Security Act. Accordingly, to prevail, the hospitals would have this Court hold that Congress meant two different things when using the identical language in the two interrelated portions of the Social Security Act. Indeed, they would have this Court ignore the meaning of the phrase in the Medicaid provisions even though the phrase constitutes a *direct reference* to people covered by the Medicaid provisions. Such a reading does violence to the plain language of the statute and should be rejected.

The Medicare DSH provision provides increased payments to hospitals based in part on a "Medicaid fraction," which counts hospital patient days for "patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The purpose is to use this calculation of the portion of Medicaid patients served by a hospital as a proxy for the portion of low-income patients served by the hospital. The hospitals argue that this "Medicaid proxy" includes patients who both parties agree are *not* eligible for Medicaid. This interpretation of the proxy unmoors it from its purpose – to count Medicaid-eligible patients– and should not be adopted.

More specifically, the hospitals' arguments fail because the HCAP patients do not receive "medical assistance," as that term is used in the Medicare DSH statute and

-2-

defined in the Medicaid statute. Moreover, the HCAP program is *not* "a State plan approved under subchapter XIX" because it does not purport to be such a plan and it does not comply with numerous requirements for such a plan. Instead, the Ohio HCAP is a state initiative, parts of which constitute the method by which the state calculates the *Medicaid* DSH adjustment – an adjustment that is not at issue in this case.

## ARGUMENT

### A.  The Plain Language of the Medicare DSH Provision Excludes HCAP Patients From Its Calculation Because They Are Not Eligible for Medicaid.

As we explained in our opening brief (pp. 14-25), the plain language of the Medicaid fraction of the Medicare DSH excludes patients who are not eligible for Medicaid, such as the patients who receive care under the Ohio HCAP program.[1] This is because HCAP patients are not "eligible" for the "medical assistance" authorized by the Title XIX (the Medicaid provisions) and provided for in "a State plan approved under Title XIX," *i.e.*, Medicaid. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). In short, they are not eligible for Medicaid. Instead, HCAP patients receive care pursuant to a state program, and their only connection to the Medicaid program is that they are counted

---

[1]  The hospitals state that the Secretary gave "only the most abbreviated lip service" to *Chevron* step one. Appellees' Br. at 31. In fact, the majority of the Secretary's opening brief – the first 23 pages of the argument – addressed *Chevron* step one, in urging that the unambiguous language of the provision precludes the inclusion of HCAP patients. *See* Appellant's Br. at 14-37.

in calculating the *Medicaid* DSH adjustment (and for that reason, the HCAP provisions were submitted along with Ohio's Medicaid plan). But the Medicaid DSH adjustment is not at issue here, and it is defined differently and more broadly than the Medicare DSH so as to expressly allow consideration of low-income patients who are *not* eligible for Medicaid, such as the HCAP beneficiaries. *See* 42 U.S.C. § 1396r-4(b). Thus, their inclusion in the Medicaid DSH calculation does not mean that they are eligible for Medicaid – instead, everyone agrees that they are not. *See* App. 31 & 36 (hospitals concede "beneficiaries of [HCAP] are not eligible for Medicaid").

As we explained on our opening brief (pp. 17-19), the appellate courts are unanimous in concluding that *eligibility for Medicaid* is the touchstone in applying the Medicaid fraction of the Medicare DSH provision. The hospitals' only response to this uniformity of case law is to urge that those courts did not address the precise question presented here and our reliance on those decisions is therefore "wildly off the mark." Br. at 50. We agree that those cases did not address the precise question here, but their reasoning all but compels the conclusion that the district court erred here. The hospitals have conceded that the patients they seek to include in the Medicare DSH calculation are *not* eligible for Medicaid, and each of those cases focused primarily on Medicaid eligibility in interpreting the provision. As this Court explained, the most "natural reading" of the Medicaid fraction of the Medicare DSH

-4-

provision is that it includes those "patients who were 'eligible' for Medicaid benefits."
*Monmouth Medical Center v. Thompson*, 257 F.3d 807, 810 (D.C. Cir. 2001).

In fact, as we explained in our opening brief (pp. 21-22), Congress has used the
formulation used in the Medicare DSH nearly fifty times in the U.S. Code to convey
a simple concept – eligibility for Medicaid.  Moreover, as we explained (pp. 22-23)
Congress has several times explicitly equated that formulation with its own shorthand:
"eligible for Medicaid," "medicaid-eligible," or "medicaid eligibility."[2]  In sum, the
plain language of the Medicare DSH unambiguously excludes patients from its
"Medicaid proxy" if they are not eligible for Medicaid.

## B.    In Enacting the Medicare DSH, Congress Intended to Incorporate the Meaning of "Medical Assistance" Used in the Medicaid Act.

The hospitals concede that they cannot prevail if the Medicare DSH provision
incorporates the definition of "medical assistance" from the Medicaid provisions of
the Social Security Act, 42 U.S.C. § 1396(a).  *See* Appellees' Br. at 53 ("the Hospitals
do not dispute that the term 'medical assistance' is defined by the Medicaid statute
* * * and that the definition *does not include* HCAP") (emphasis added).  Accordingly,
the hospitals spend the bulk of their brief urging that "medical assistance," as used in

---

[2]    29 U.S.C. § 1168(b); 42 U.S.C. § 1395w-4(g)(3); 42 U.S.C. §
1396s(b)(2)(B); 42 U.S.C. § 1396r(c)(7)(B); 42 U.S.C. § 1397ee(d)(1). Similarly, the
Medicaid DSH provision describes that same formulation as the "Medicaid * * *
utilization rate," 42 U.S.C. § 1396r-4(b)(2), in contrast with a separate subsection that
provides for a "low-income utilization rate." *Id.* § 1396r-4(b)(3).

-5-

the Medicaid proxy of the Medicare DSH, means something different than "medical assistance" when it is used in the Medicaid provisions of the Social Security Act. But they are mistaken. Instead, the most obvious place to look for the meaning of the phrase – the Medicaid provisions – is the correct place to look. Indeed, the entire point of this statutory proxy is to count Medicaid patients and the provision directly and expressly refers to Medicaid requirements. Congress has therefore provided a roadmap to interpreting the provision, and the road leads directly to the Medicaid statute's repeated use of the identical phrase. Thus, the hospitals' notion that the statutory language of the Medicare DSH provision, such as the term "medical assistance," must be read 'ivorced from its meaning and usage in the Medicaid statute, is entirely unpersuasive.

1. As we explained in our opening brief (p. 25), the term "medical assistance" is defined as the "payment of part or all of the cost" of certain medical services for certain broad categories of individuals. 42 U.S.C. § 1396d(a). And a person is "eligible for" that "medical assistance" if he or she fits into one of the groups of categorically needy or medically needy individuals within those broad categories, who are specified as eligible for medical assistance under the state Medicaid plan. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); *see also id.* § 1396b(f). Accordingly, the Medicare DSH provision includes only those patients who are eligible for the

"medical assistance" provided by the Medicaid program. HCAP patients are not so eligible, as the hospitals concede. *See* Appellees' Br. at 53 ("th[e] [Medicaid] definition [of medical assistance] does not include HCAP").

The hospitals' argument rests on a countertextual interpretation of the phrase "medical assistance" that is patently incorrect – under this argument the term "medical assistance" as used in the Medicare DSH provision must be divorced from the meaning specifically given to the phrase in the Medicaid statute. They suggest that relying on the Medicaid statute is somehow inappropriate or constitutes "extrinsic evidence" of the meaning of the statutory language. These arguments are meritless and contrary to the plain language of the statute.

First, referencing the Medicaid statute to interpret the terms in the Medicare DSH provision is entirely appropriate because that is what Congress directed. The statute instructs the Secretary to include those people eligible for "medical assistance *under a State plan approved under subchapter* XIX", *i.e.*, the *Medicaid* statute. The notion that in interpreting the term "medical assistance," this Court must disregard this express reference to the Medicaid statute and the definition of the term "medical assistance" in the Medicaid statute ignores, rather than applies, standard norms of statutory interpretation. *Energy Research Foundation v. Defense Nuclear Facilities Safety Bd.*, 917 F.2d 581, 582-83 (D.C. Cir. 1990) ("It would be a tall piece of

-7-

statutory construction for a court to say that an 'establishment in the executive branch' as used in [42 U.S.C.] § 2286(a) is not an 'establishment in the executive branch' within the meaning of [5 U.S.C.] § 552(f)"); *see also Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("identical words used in different parts of the same act are intended to have the same meaning"); *PDK Laboratories Inc. v. U.S. D.E.A.*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("When Congress uses the same word in different parts of a statute, it usually means the same thing").

It is for this reason that the cases interpreting the Medicare DSH address and rely upon the Medicaid definition of "medical assistance" in interpreting the phrase. *See, e.g., Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 989 (4th Cir. 1996) ("Congress * * * wrote 'eligible for medical assistance,' [] prescribed a specific definition for 'medical assistance,'" and "[w]e must respect that choice"); *see also id.* at 987 (relying on "Medicaid statute defin[ition of] 'medical assistance'" to set forth those "eligible patients 'whose income and resources are insufficient to meet all of such cost [of listed medical services].'"); *id.* at 988 (the term "'Medical assistance" [as used in the Medicare DSH] is defined in the Medicaid statute").

Second, the term "medical assistance" was a carefully defined and critical element of the Medicaid statute at the time of the enactment of the Medicare DSH provision in 1986. *See* 42 U.S.C. § 1396d (1986) (definition of "medical assistance");

Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 9105(a), 100 Stat. 82 (1986) (enacting Medicare DSH).    In fact the definition of "medical assistance" was an element of the original law creating the Medicaid program. *See* Social Security Amendments of 1965, Pub. L. No. 89-97, Title I, § 121(a), 79 Stat. 286, 351 (1965). In using this term of art in 1986 in the Medicaid fraction of the Medicare DSH as a means of identifying Medicaid-eligible patients (both, of course, parts of the Social Security Act), Congress plainly intended to invoke the Medicaid statutory definition. *See Energy Research Foundation*, 917 F.2d at 583 (when Congress used the language "establishment in the executive branch" in 1974, the "language was not innovative. Before 1974, Congress had been using 'establishment in the executive branch' to describe what it meant by 'agency'" in numerous enactments and Congress meant the same thing in the 1974 enactment); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006). As the Fourth Circuit explained in addressing the Medicare DSH, "[i]f Congress had wanted 'medical assistance' to take on a completely different meaning [from its definition in the Medicaid statute] in the context of this Medicaid proxy provision of the DSH calculation, Congress could easily have so indicated." *Cabell Huntington*, 101 F.3d at 990.

2. As we explained in our opening brief, Congress has frequently used the

-9-

precise language used in the Medicare DSH – including the reference to "medical assistance" – to identify Medicaid-eligible individuals. *See* Opening Br. at 21-22 (citing 49 statutory provisions). The hospitals point out that many of these iterations appear within the Medicaid statute itself and argue that those iterations are not helpful interpretive guides because the phrase "medical assistance" was defined by Congress within the Medicaid statute. Appellees' Br. at 52-53. This response, however, does not undermine the government's argument; it all but compels the conclusion that our argument is correct.

The hospitals forthrightly concede that the eligibility phrase when used in the *Medicaid* statute, incorporates the Medicaid definition of "medical assistance"; it therefore refers only to Medicaid-eligible individuals and *excludes* the HCAP patients. *See* Appellees' Br. at 53 ("the Hospitals do not dispute that the term 'medical assistance' is defined by the Medicaid statute * * * and that the definition *does not include* HCAP") (emphasis added). But they argue that the opposite is true when Congress used the *exact same phrase* in the Medicare statute. *Id.* at 53-54. We submit that the inference to be drawn is not the one suggested by the hospitals – rather, when Congress used the same language in the Medicare DSH as it had used on numerous occasions in the Medicaid statute and elsewhere in the U.S. Code, it plainly intended the various iterations to mean the same thing barring some compelling contextual

factor. *See Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860 (1986) ("[t]he normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning'" and the fact that the act "includes an explicit definition of [the term] in the same subchapter strengthens the presumption").

Moreover, the Medicare DSH provision specifically cross-references the Medicaid statute (by referring to eligibility for medical assistance *"under a State plan approved under subchapter XIX"*); the entire purpose of the provision is to incorporate individuals who are Medicaid beneficiaries. In those circumstances, incorporating the Medicaid definitions of the relevant terms is all but compelled in interpreting the provision. As the Supreme Court explained in interpreting other interrelated parts of the Social Security Act in *Stroop*, "cross-references illustrate Congress' intent that" the programs "operate together" and "leads to the further conclusion that Congress used the term 'child support' in * * * Part A * * * in the limited sense given the term by its repeated use in Part D." 496 U.S. at 484. The Court went on to explain that "[t]he substantial relation between the two programs presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Ibid.* (internal quotation marks omitted).

-11-

This same reasoning applies here – the "cross-reference" in the Medicare DSH and its "substantial relation" to the Medicaid program show that Congress "used the term [medical assistance] in [the Medicare DSH provision] * * * in the limited sense given the term by its repeated use in" the Medicaid act. *Ibid.* As in *Stroop*, because there is a "substantial relation" between the Medicaid fraction of the Medicare DSH and the Medicaid program itself, the "identical words used" must have been "intended to have the same meaning." *Ibid.*; *see Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934) (looking to whether the same words, "though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent"); *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) (asking whether "the subject-matter to which the [identical] words refer is not the same in the several places where they are used"). Here, the identical words are used to address the same "subject-matter" (*Atlantic Cleaners*, 286 U.S. at 433) – beneficiaries of the Medicaid program – rather than subjects with "dissimilar connections" (*Stockholms Enskilda*, 293 U.S. at 87); the words "medical assistance" in the Medicare DSH provision should therefore be given the same meaning as when used in the Medicaid statute.

3. The hospitals are incorrect in suggesting that this reference violates rules of statutory construction or constitutes a reference to "extrinsic materials" to ascertain

-12-

the meaning of the Medicare DSH provision. Appellees' Br. at 54. As we have explained, the interpretation we submit to be correct simply employs the "normal rule of statutory construction" that Congress means the same thing when using the same phrase in different parts of a statute, *Sorenson*, 475 U.S. at 860; this maxim is not a novel theory of statutory interpretation but instead one of the most basic canons. *See* Singer, Statutes and Statutory Construction, § 46:01, at p. 127 (6th ed. 2000) (looking to whether the statute's "language is plain" and whether it is "[]controlled by other parts of the act or other acts upon the same subject"); *id.* § 46.05, at p. 154 ("each part or section [of a statute] should be construed in connection with every other part or section  o as to produce a harmonious whole"). Nor is it a technique that is employed only if a statute is first deemed ambiguous. Rather, in *Stroop*, as we have explained, the Supreme Court looked to how a phrase was used in various related enactments when interpreting that phrase. *Stroop*, 496 U.S. at 484. The result of this analysis was the Court's conclusion that the statute was "'clear and unambiguous'" and "'the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* at 482 (quoting *K mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291-292 (1988)).

Indeed, the two Supreme Court cases cited by the hospitals in support of their argument (Appellees' Br. at 32) both expressly relied on the use of terms in other parts

-13-

of the statute in reaching their conclusion that the language was plain. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 451-52 (2002) (in concluding that the "statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" specifically analyzing use of terms in "another section of the same Act"); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-101 (2003) (concluding that "the words of the statute are unambiguous, [and] the 'judicial inquiry is complete'" after assessing "the use of the term [] in other provisions of [the Act]" and "declin[ing] to give the same term in the same Act a different meaning"). Accordingly, contrary to the hospitals' misstatement of the law, courts employ the interpretive techniques we urge at the *Chevron* step one stage of determining whether the statute was in fact ambiguous.

In fact, the hospitals entirely misapply the concept of "extrinsic materials." Appellees' Br. at 31-34. Rather, extrinsic materials are not the sort of interpretive aids relied on in the foregoing discussion. Instead, extrinsic materials are legislative history and other materials *besides enacted statutory language* that are utilized to interpret an enactment. *Compare* Singer, Statutes and Statutory Construction § 47:02, at p. 212 (describing as one key "*intrinsic* aid[]" to construction "[t]he whole act interpretation" whereby "the entire act must be read together" because "any attempt to segregate any portion or exclude any other portion from consideration is almost

-14-

certain to distort the legislative intent") (emphasis added) *with id.* § 48:01, at p. 407 ("[s]ources *outside the text* are known as extrinsic aids" such as "background information about circumstances which led to the enactment of a statute, events surrounding enactment, and developments pertinent to subsequent operation") (emphasis added).[3] Here, the reason that the government is correct in its interpretation of "eligible for *medical assistance*" is that Congress used this phrase many times throughout the Social Security Act in the *statutory text* to mean the same thing – eligibility for the "medical assistance" provided under and defined in the Medicaid statute. No reference to extrinsic materials is needed to reach this conclusion.

The cases the hospitals cite relating to the use of extrinsic materials lend no support to their argument that a court may not survey how Congress has used the language it enacted in other parts of the same statute to determine its meaning. The only appellate case they cite (Appellees' Br. at 31), *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 240 (6th Cir. 1990), addressed whether Title II of the Civil Rights Act, 42 U.S.C. § 2000a, et seq. (governing discrimination in public

---

[3] *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005) (referring to "legislative history or any other extrinsic material"); *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991) (extrinsic material includes "the negotiation history" of an interstate compact enacted into law); *Moore v. District of Columbia*, 907 F.2d 165, 168 (D.C. Cir. 1990) (contemporary court decisions interpreting language constitute an "extrinsic aid to construction"); *Linberg v. Brenner*, 399 F.2d 990, 993 (D.C. Cir. 1968) ("administrative interpretation, practice and usage" are "extrinsic aid[s] in * * * interpretation").

-15-

accommodations) repealed 42 U.S.C. § 1981 by implication. The case law on repeals

by implication, of which *Watson* is an example, is not relevant here. The two lower

court cases they cite (Appellees' Br. at 31, 33) also do not support their argument. *In*

*re Professional Air Traffic Controllers Organization*, 18 B.R. 894, 902 (Bankr. D.D.C.

1982) (addressing whether FRCP 62 applies to limit when a bankruptcy judgment may

be registered under 28 U.S.C. § 1963); *Finney v. Roddy*, 617 F. Supp. 997, 1001 (E.D.

Va. 1985) (ultimately finding it appropriate to rely upon interpretation of identical

language in a different, later-enacted statute in interpreting earlier-enacted provision).

None of these cases address Congress's use of language that is *identical* to language

used in an earlier-enacted, closely related provision of the same Act and yet *ignore* the

meaning of that earlier enactment, as the hospitals contend must happen here.

    4.    The hospitals' other arguments against giving the phrase "medical

assistance" the meaning Congress defined for it also fail. First, the hospitals contend

that courts have previously declined to employ the Medicaid definition of "medical

assistance" when applying the Medicare DSH because the Secretary has included

patient days where treatment to the patient was not paid for by Medicaid. *See*

Appellees' Br. at 44-46.[4]   The hospitals reason that this care was not "medical

---

[4]   The hospitals cite *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984
(4th Cir. 1996), *Jewish Hospital v. Sec'y of Health & Human Servs.*, 19 F.3d 270 (6th
Cir. 1994), *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir.
1996), and *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir.1996).

assistance" because the State did not receive matching payments for it under the Medicaid program. *Id.* at 44. It is true that the DSH provision does not turn on whether a state receives a matching payment, but that point is irrelevant given the terms of the Medicare DSH provision. As an initial matter, contrary to the hospitals' suggestion, the case addressing this issue in the most detail, *Cabell Huntington*, relied extensively on the definition of "medical assistance" in the Medicaid statute in reaching its conclusion. As we detailed above, the court held that "Congress * * * wrote 'eligible for medical assistance,' [] prescribed a specific definition for 'medical assistance'" in the Medicaid provisions, and "[w]e must respect that choice." *Cabell Huntington*, 101 F.3d at 990; *see id.* at 987-990; *supra*, p. 8.

Additionally, the hospitals' argument is faulty because the DSH provision does not rest on whether the specific care provided to a patient on any particular day received matching payments as "medical assistance." Instead, it rests on whether on that day the "patient (for such day[]) w[as] *eligible* for medical assistance." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). Eligibility, in turn, is a broader concept that sweeps in any patient who is eligible for the "medical assistance" provided under the Medicaid program irrespective of whether the particular care being provided on a particular day qualifies for a matching payment.

-17-

As the Fourth Circuit explained, the definition of "medical assistance" in the Medicaid statute "refers to potentially eligible patients as those 'whose income and resources are insufficient to meet all of such cost [of listed medical services]' and "distinguishes between 'individuals with respect to whom there is being paid, or who are eligible' for Medicaid." *Cabell Huntington*, 101 F.3d at 987 (quoting 42 U.S.C. § 1396d(a) (definition of "medical assistance")); *see Jewish Hosp., Inc. v. Secretary of Health and Human Services*, 19 F.3d 270, 274 (6th Cir. 1994) ("Looking to the plain language of the statute, the word 'eligible' refers to whether a patient is capable of receiving federal medical assistance or Medicaid"); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1 61, 1266  (9th Cir. 1996); *Deaconess Health Services Corp. v. Shalala*, 912 F. Supp. 438, 440 (E.D. Mo. 1995), *aff'd, Deaconess Health Serv. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *see also United Hospital v. Thompson*, 383 F.3d 728, 733 (8th Cir. 2004) ("the statute makes clear that only Medicaid days can be included in the [Medicare] DSH calculations"). Accordingly, the Fourth Circuit continued, "patients can be 'eligible' for Medicaid in a particular state by reason of income and status, while not 'being paid' for a particular medical expense because of further state restrictions for that service." *Cabell Huntington*, 101 F.3d at 987. Importantly, those courts directly relied upon the Medicaid definition of "medical assistance." *See Cabell Huntington*, 101 F.3d at 987-90; *see also Deaconess*

-18-

*Health Services*, 912 F. Supp. at 448. Those courts did not ignore that definition as the plaintiff hospitals contend is appropriate and as this Court must do in order for the hospitals to prevail.

5. The hospitals also contend that the government's argument is defeated by the inclusion of certain patients who receive benefits under a demonstration project authorized by the Social Security Act, 42 U.S.C. § 1315(a). Appellees' Br. at 36-43. They argue that the beneficiaries of a Medicaid demonstration project, like the beneficiaries of the Ohio HCAP program, are not eligible for the "medical assistance" as that term is defined in the Medicaid statute. It is true that demonstration project beneficiaries do not meet the eligibility criteria set forth in the definition of "me ical assistance." However, as we explained in our opening brief, the inclusion of demonstration project beneficiaries is specifically authorized by the Deficit Reduction Act and Congress explicitly ratified the Secretary's policies regarding those beneficiaries in that law. Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (2006) (codified at  42 U.S.C. § 1395ww(d)(5)(F)(vi)). Nothing in the DRA or any other law indicates that Congress required or even authorized the Secretary to include other non-eligible individuals, such as the HCAP patents, in calculating the Medicare DSH.

-19-

Moreover, even prior to the DRA, the demonstration project statute presented a unique ambiguity not present here because the demonstration project statute confers upon the Secretary the authority to provide that the costs of those projects may be "*regarded as* expenditures under the State plan or plans approved under such subchapter." 42 U.S.C. § 1315(a) (emphasis added). Accordingly, those demonstration project costs can be "regarded as" medical assistance under the Medicaid statute and, as so "regarded," the demonstration project beneficiaries would then be "eligible for medical assistance under" the state Medicaid plan. This reasoning led the Ninth Circuit to conclude that demonstration project beneficiaries were *regarded as* receiving medical assistance and therefore included in the Medicare DSH:

> In the demonstration project statute, Congress expressly tied § 1115 waivers to approved state Medicaid plans by providing that the costs of such demonstration projects "shall ... be regarded as expenditures under the State plan." 42 U.S.C. § 1315(a)(2)(A). Thus, the statute defines low-income individuals receiving medical assistance under a § 1115 plan as receiving medical assistance under a Title XIX plan. *Id.* As a result, because expansion population patients are capable of receiving Title XIX assistance, they must be regarded as "eligible" for it.

*Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091, 1096 (9th Cir. 2005).

In effect, the demonstration project statute can be read as a supplement to the Medicaid definition of "medical assistance" so as to allow demonstration project beneficiaries to be regarded as eligible for it. *See* DRA § 5002 (reversing mandatory

nature of *Portland Adventist* decision and giving Secretary authority and discretion to "include [in Medicare DSH] patient days of patients not * * * eligible [for medical assistance] but who are regarded as such because they receive benefits under a demonstration project"). There is no similar statutory provision that would give the Secretary the discretion to regard HCAP patients as eligible for medical assistance under the Medicaid definition. Instead, we know that the HCAP patients are *not* eligible for Medicaid and the hospitals concede that "th[e] definition [of medical assistance] does not include HCAP." Appellees' Br. at 53.

As we explained in our opening brief (p. 20), the DRA makes it crystal clear that Congress intended the Medicare DSH to count those patients who are eligible for medical assistance, as that term is defined in the Medicaid statute. Congress characterized patients receiving benefits under a demonstration project as being "not [] eligible" for medical assistance under a state plan "but who are regarded as such because they receive benefits under a demonstration project." DRA § 5002(a). Implicit in this statement is Congress's recognition that eligibility for Medicaid is the touchstone of the Medicare DSH provision. Moreover, Congress's acknowledgment that a patient who is part of a section 1115 demonstration project is "not * * * eligible" for Medicaid carries with it the implication that other types of patients who are not

-21-

eligible – such as the HCAP patients – are not to be counted in the Medicare DSH absent a special congressional authorization to include them.

The hospitals do not dispute these contentions, but argue that the DRA itself is "in violation of the pristine rule proffered by the Secretary" (Appellees' Br. at 41) whereby ineligible individuals are excluded from the DSH. *See also id.* at 43. ("the Secretary's central argument * * * cannot be reconciled with the fact that expansion waiver days, according to the Secretary's own regulations, must still be included"). It is true that Congress has carved out a special exception for demonstration project beneficiaries, as we have explained. But this fact only shows Congress may make exceptions when it sees fit, as it did in the DRA by expressly providing for the optional inclusion of the demonstration project beneficiaries. Congress has not, however, enacted a special rule providing for the ineligible HCAP patients to be included in the Medicare DSH or "regarded as" receiving medical assistance. DRA § 5002(a).

## C.    The Ohio HCAP is Not a "State Plan Approved Under Subchapter XIX."

As we explained in our opening brief, the Ohio HCAP is not "a state plan approved under [Title] XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Instead, it was submitted in conjunction with the state Medicaid plan to define which hospitals would

be entitled to an increased Medicaid payment pursuant to the *Medicaid* DSH provision, 42 U.S.C. § 1396r-4.

1. We explained in our opening brief (pp. 27-29) that the Ohio HCAP does not purport to meet the detailed requirements for a "state plan for medical assistance" approved under Title XIX. *See* 42 U.S.C. § 1396a. And the HCAP could not be approved as a state Medicaid plan because it covers only individuals who are not eligible for Medicaid, its costs are not submitted for reimbursement under the Medicaid cost-sharing provisions, and it fails to meet many Medicaid requirements, such as coverage requirements. The HCAP therefore was not, and could not have been, approved as an element of Ohio's state plan for medical assistance.

The hospitals would have the Court ignore these statutory requirements and hold that HCAP is "a state plan approved under [Title] XIX" because it was "inserted into the Ohio State plan by means of black ink and a formal submission." Appellees' Br. at 42. But as we explained in our opening brief (pp. 30-33), the HCAP was submitted not to constitute a component of Ohio's state plan for medical assistance under Title XIX, but to set forth the manner and method by which the Medicaid DSH adjustment would be calculated and distributed. *See* 42 U.S.C. § 1396a(a)(13)(A)(iv); 42 U.S.C. § 1396r-4(a). *Cf. Spry v. Thompson*, 487 F.3d 1272, 1277 (9th Cir. 2007)

-23-

(distinguishing calculations of hospital reimbursement from determinations of eligibility of individuals for Medicaid).

As the hospitals admitted, the HCAP is simply part of the "procedure for which hospitals will be reimbursed for serving a disproportionately high number of low-income individuals" (App. 35) – it is not itself a component of the medical assistance provided by the state Medicaid plan. And, as we explained, when the Secretary approved the HCAP submission, he was not approving it under the standards for "approv[al]" of a "State plan for medical assistance," 42 U.S.C. § 1396a(a), (b), but was approving the method of calculating the Medicaid DSH adjustment "for compliance with [the statutory Medicaid DSH] requirement[s]." 42 U.S.C. § 1396r-4(a)(3). In sum, the Ohio HCAP is not a "a State plan approved under subchapter XIX"; rather, it is referenced in Ohio's method of calculating the Medicaid DSH adjustment, and it was approved pursuant to the specific provision governing approval of the Medicaid DSH adjustment. *Ibid.* Moreover, as we explained, including patients who are counted solely for purposes of the Medicaid DSH adjustment as themselves being Medicaid beneficiaries would improperly bootstrap them into the program – for example, under that logic, the Medicaid beneficiaries counted in calculating the Medicare DSH would be treated as *Medicare* beneficiaries because they were counted in calculating payments under the Medicare statute's DSH provision. But that is not

-24-

correct because, by definition, those Medicaid patients are not eligible for Medicare just as the HCAP charity patients are not eligible for Medicaid.

The hospitals appear to concede that the HCAP was submitted for the sole purpose of setting forth the Medicaid DSH methodology. Appellees' Br. at 69; *see* App. 35 (HCAP is part of the "procedure for which hospitals will be reimbursed for serving a disproportionately high number of low-income individuals"). Their only substantive response is that this fact is "irrelevant" and "an interesting side bar, but why should the court care?" *Id.* at 66, 69. The Court should care because, as we have explained, this fact shows that HCAP was *not* submitted to constitute part of the Ohio stat  plan for medical assistance, and that, accordingly, the HCAP patients are not "eligib'  " for the "medical assistance" provided by the Ohio "state plan approved under [Title] XIX."[5]

---

[5] The hospitals also urge that the Ohio HCAP provision requiring treatment of indigents (which they contend renders those patients "eligible for medical assistance under a state plan") is *sui generis* to any legal requirement governing the Medicaid program or the Medicaid DSH adjustment. *See* Appellees' Br. at 70, 71 (HCAP provisions that require certain Ohio hospitals to treat the HCAP beneficiaries "are not required by any federal * * * law * * * to be included in the [Medicaid] State plan" and the state "can comply with the Medicaid DSH * * * without having any HCAP-like program" requiring hospitals to treat "indigent patients who are ineligible for traditional Medicaid"). But if these provisions are in fact *sui generis* to the Medicaid program, it only further establishes that the patients who benefit from them are not "eligible for medical assistance under a State plan approved under [Title] XIX." We submit, however, that the hospitals are partially mistaken – while HCAP is *sui generis* to the requirements for the state Medicaid plan to which Congress was referring in the Medicare DSH, the HCAP provision is part of the methodology by which the

2. Finally, the hospitals state that including the HCAP patients "will not affect the accuracy of the Medicare DSH adjustment." Appellees' Br. at 72. In the hospitals' view, there will always be inter-state inequities in the Medicare DSH given that the Medicaid program accords states wide latitude in determining which medically-needy patients will be covered. But the presence of some variability in the Medicare DSH does not call for an interpretation that will impose *even more* variation. *Cf. Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 268 (1979) (accepting that "[s]ome inequity appears inevitable in the present statutory scheme" yet refusing to adopt an interpretation that "creates other[]" inequities). Additionally, the potential for inequities is much higher und   the hospitals' interpretation: The Medicaid statute sets categorical limits on which categorically and medically needy patients may be covered by a state plan (*see* 42 U.S.C. § 1396a(a)(10)). Those limits create a ceiling on the level of interstate variability in the Medicare DSH adjustment. Adopting the hospitals' interpretation would forego these limits and have the potential to create even larger variations given that, as we have explained, there are very few limits on who a state may consider pursuant to the Medicaid DSH adjustment. *See* 42 U.S.C. § 1396r-4(b)(4) ("[t]he Secretary may not restrict a state's authority to designate hospitals as disproportionate share hospitals under [the Medicaid DSH]"). And, as we

Medicaid DSH adjustment is calculated, in that a hospital only receives a DSH adjustment if it serves the indigent patients who qualify for HCAP.

-26-

have explained, under the hospitals' theory, once those patients are considered in calculating the Medicaid DSH adjustment (as memorialized in documents submitted to the Secretary to implement the Medicaid DSH) they are then receiving "medical assistance" under the state's Medicaid plan and must be included in calculating the Medicare DSH adjustment.

The hospitals note that one state (Tennessee) has implemented a Medicaid demonstration project pursuant to which patients similar to the HCAP patients are covered. Appellees' Br. at 73. They point out that in Tennessee, those patients will be counted in calculating the Medicare DSH. This point is correct, but it speaks only to the fact that Congress has given the Secretary the discretion to count those demonstration project beneficiaries if he finds it appropriate, whereas Congress did not give the Secretary discretion to include the ineligible HCAP patients. DRA § 5002(a) (codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).[6] Further, demonstration projects are subject to far more federal review and oversight than the HCAP program here – which as the hospitals concede (Appellees' Br. at 70-71), is largely implemented without substantive oversight by the Secretary. And, of course, it

---

[6] Under the hospitals' interpretation, while the Secretary would have discretion to determine how to handle the demonstration project beneficiaries, he would *lack any discretion* to evaluate whether patients who are further removed from the Medicaid program – *i.e.*, the ineligible HCAP patients – should be included in the Medicare DSH.

-27-

remains open to the State of Ohio to address concerns raised by the hospitals by developing a demonstration project similar to the Tennessee program. Accordingly, the interstate variations that are present in the Medicare DSH system do not, contrary to the hospitals' argument, call for imposing more variability by unhinging the Medicare DSH definition from the concept that gives it substance and meaning: eligibility for Medicaid.

As every court to face the issue has held, the Medicaid fraction of the Medicare DSH turns on whether a patient is eligible for Medicaid. The HCAP patients at issue in this case are not eligible: they do not receive "medical assistance" as that term is used in the Medicare DSH and defined in the Medicaid statute. And the Ohio HCAP is not "a State plan approved under [Title] XIX." In any event, as we explained in our opening brief (pp. 37-45), at best the Medicare DSH provision is ambiguous as to how to treat the HCAP patients. Accordingly, the district court erred in holding that the text of the Medicare DSH unambiguously requires the consideration of the HCAP patients.

## CONCLUSION

For the foregoing reasons and the reasons explained in our opening brief, the district court order should be reversed, and the case should be remanded with direction to enter summary judgment for the Secretary.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ANTHONY J. STEINMEYER
(202) 514-3388
AUGUST E. FLENTJE
(202) 514-1278
Attorneys, Appellate Staff
Civil Division, Room 7242
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530-0001

February 29, 2008

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief is proportionally spaced, has a typeface of 14 point and contains 6863 words (which does not exceed the applicable 7,000 word limit).

August E. Flentje

## CERTIFICATE OF SERVICE

I hereby certify that on this February 29, 2008, I caused copies of the foregoing

brief to be served upon counsel of record by causing copies to be sent by overnight

delivery:

        Murray Klein
        Reed Smith LLP
        Princeton Forrestal Village
        136 Main Street
        Suite 250
        Princeton, NJ 08543

August E. Flentje

**Exhibit B**

**CMS-DEC, MED-GUIDE, ¶81,085, Castle Medical Center., *CMS Administrator Decision*, (Sept. 12, 2003)**

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Castle Medical Center.**

***CMS Administrator Decision***, (Review of PRRB Case No. 2003-D6), Sept. 12, 2003.

### Medicare: Medicaid Days for DSH Calculation

**Prospective payment systems --Disproportionate share hospitals --Disproportionate patient percentage. --** The Provider Reimbursement Review Board (PRRB) correctly determined that the intermediary improperly refused to include patient days from a state Medicaid program in the formula used to calculate the provider's disproportionate share hospital's (DSH) adjustment. The state Medicaid Quest Program, a Medicaid managed care, operated under a federal waiver that allowed the state program to expand coverage to general assistance (GA) and State Health Insurance Program (SHIP) patients. Because the Quest program obtained a Medicaid waiver, patient days under that program were appropriately included in the hospital's DSH calculation. However, the PRRB's decision to include "waitlist" days in the DSH calculation was improper because it is the status of the patient, as opposed to the payment of the day, which determines whether a patient day is included in the formula.

See ¶4275.15.

**The decision of the PRRB (see ¶81,022) was affirmed in part and reversed in part.**

### [Text of Decision]

### CENTERS FOR MEDICARE AND MEDICAID SERVICES

*Decision of the Administrator*

**In the case of: Castle Medical Center Provider vs. Blue Cross /Blue Shield Association United Government Services, LLC-CA Intermediary**

**Claim for:**

**Provider Cost Reimbursement Determination for Cost Reporting Period Ending: 12/31/94**

**Review of:**

**PRRB Dec. No. 2003-D36**

**Dated: July 16, 2003**

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in §1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The Intermediary submitted comments, requesting reversal of the Board's decision. Accordingly, the parties were notified of the Administrator's intention to review the Board's decision. Comments were also received from the Center for Medicare Management (CMM) requesting reversal or modification of the Board's decision. No comments were received from the Provider. Accordingly, this case is now before the Administrator for final agency review.

### *ISSUE AND BOARD'S DECISION*

The issue is whether the Intermediary adjustment to the disproportionate share hospital (DSH) payment was proper.

The Board first held that the Intermediary's refusal to include all Quest Days, including general assistance (GA) and State Health Insurance Program for children (SHIP) days in the calculation of the Provider's DSH payment beginning on and after August 1, 1994 was not proper. The Board determined that the Social Security Act and the implementing regulations require the inclusion of all Medicaid eligible patient days in the DSH payment calculation.

With the implementation of the Title XIX waiver, effective August 1, 1994, the Board concluded that all Quest days including GA and SHIP days should be included in the calculation of the Provider's DSH payment because they represent days of services furnished to patients who were eligible for medical assistance under a State plan approved under Title XIX. The fact that the regulation was amended effective January 20, 2000, to specify that Title XIX waiver days representing expanded Medicaid population should be included in the Medicaid percentage only confirmed the Board position that the regulation as it existed in 1994 required the same treatment. Finally, with regard to Quest days, the Board held that, under Program Memorandum (PM) A-99-62, issued December 1999, all Quest days, including GA days and SHIP days should be included in the calculation of the Provider's DSH payment because the Provider filed a jurisdictionally proper appeal requesting the inclusion of all GA days and all Title XIX waiver days in the calculation of the DSH payment prior to October 15, 1999. The Board determined that the Provider's reference to "GA Days" and all "Title XIX waiver days," specific enough to satisfy the hold harmless provision of PM A-99-62.

With respect to waitlist days, the Board held that the Intermediary's refusal to include these days in the Provider's Medicaid fraction was improper. The Board determined that since the waitlisted patients were not entitled to Medicare benefits during the time they were waitlisted and the fact that the days were not included in the SSI statistics there would be no duplication if the days were included in the Medicaid fraction. In addition, the Board held that it would be a violation of the Medicare statute if these were not included in the Medicaid proxy, since the Act requires Medicaid eligible days to be included in the Medicaid proxy.

With respect to no-pay days, the Board held that the Intermediary's refusal to include these days in the Provider's Medicaid fraction was improper. The Board determined the No-Pay Days represented Medicaid eligible days, and by law should be included in the calculation of the Provider's DSH payment for the fiscal year in question. In addition, the Board held that they should be included in the Medicaid fraction, because there was no evidence in the record that the days in question were for days in which the patient was also entitled to Medicare Part A benefits.

Finally, the Board found that the Provider should use the admission date in calculating days as the Intermediary instructed the Provider to use the admission date rather than the discharge date. The Board instructed the intermediary to use the days identified in the Provider's exhibits as a basis for the Intermediary to revise its adjustments determining the appropriate number of days to be included in the Provider's DSH payment for the 1994 fiscal year.

## SUMMARY OF COMMENTS

The Intermediary commented requesting that the Administrator reverse the Board's decision because it reflected an incorrect interpretation of the regulations and program instructions. Specifically, the Intermediary argued that, the Provider did not meet the hold-harmless provision of Program Memorandum (PM) A-99-62.

CMM commented requesting that the Administrator review the Board's decision with respect to the inclusion of all three categories of days in the Medicaid fraction of the Provider's DSH calculation. Specifically, CMS disagreed with the Board's determination that all Quest days, including GA and SHIP days should be included in the Medicaid fraction. CMS wrote that, under Medicare policy at the time, hospitals were to include in the Medicare DSH calculation only those days for population under the section 1115 waiver who were or could have been made eligible under a State plan. Patient days of the expanded eligibility groups, however, were not to be included in the Medicare DSH calculation.

In addition, CMM disagreed with the Board's determination that all Quest days, including GA days and SHIP days should be included in the Medicaid fraction because the Provider filed a jurisdictionally proper appeal with the Board requesting the inclusion of all Quest days. CMM noted that the Provider's request was not specific enough to include all Quest days. CMS stated that, under the PM A-99-62, the Provider's appeal documents only contain

a reference to GA days. Accordingly, in 2002, the CMS San Francisco Regional Office advised the Intermediary that the Provider should be held harmless for the GA days, but not for all categories of Quest days. The PM A-99-62 is very specific in stating that hold harmless is not to be applied to all questionable days on a blanket basis but is to be applied to specific categories of days that have been properly appealed, which did not occurred in this case.

Regarding the waitlist days, CMM disagreed with the Board's determination that these days should be included in the Provider's DSH payment calculation. CMM noted that the Act specifically excludes days in which a patient is entitled to benefits under Part A from the Medicaid fraction. CMM stated that this position appears to be based on the incorrect assumption that Medicare does not provide benefits for waitlist patients. The Administrator's Decision in *Edgewater Medical Center*, PRRB Dec. No.2000-D44 (June 19, 2000) clarified this point. CMM stated that the statutory phrase "but who were not entitled to benefits under Part A" cannot be read to mean that days for which Medicare is not paid should be included in the numerator of the Medicaid proxy for dually eligible patients. Furthermore, under Medicare, waitlisted days, or administrative days, are considered acute care days and payment for these days are included in the hospital inpatient prospective payment amount under Medicare.

Regarding the no-pay days, CMM stated that the issue was one of documentation. CMM stated that the no-pay Quest days should be included in the Provider's DSH calculation so long as the patient was eligible for Title XIX, effective for cost reporting periods not settled as of the date of Ruling 97-2, February 27, 1997. However, with regard to no-pay Quest days associated with §1115 waivers, (i.e., GA days and SHIP days), these days are not eligible for Title XIX under the State plan, as noted above, and, thus, should not be included in the Provider's DSH calculation.

### DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

Relevant to the issues involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations. The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children.[1] The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines. Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy. Participating States are required to provide Medicaid coverage to the categorically needy.[2] The "categorically needy" are persons eligible for cash assistance under two Federal programs: Aid to Families with Dependent Children (AFDC) [42 USC 601 et. seq.] and Supplemental Security Income or SSI [42 USC 1381, et seq.].[3] Participating States may elect to provide for payment of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes or resources, while exceeding the financial eligibility requirements for the categorically needy (such as an SSI recipient) are insufficient to pay for necessary medical care.[4]

In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval. The State plan must specify, *inter alia*, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered.[5] If the State plan is approved by CMS, the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State plan.

Within broad Federal rules, States enjoy a measure of flexibility to determine "eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.[6] In particular, the Medicaid statute sets forth a number of requirements, including income and resource limitations that apply to individuals who wish to receive medical assistance under the State plan. Individuals who do not meet the applicable requirements are not eligible for medical assistance under the State plan.

However, Congress recognized that the requirements of Title XIX under which a State may participate in the Medicaid program created certain obstacles to experimental State health-care initiatives. Congress amended Title XI of the Act to provide flexibility for States to pursue such experimental programs.[7] Under §1115 of the Act, a State that wants to conduct such an experimental program must submit an application to the Secretary for

approval. The Secretary may approve the application, if, it is determined that the demonstration project is likely to assist in promoting the objectives of certain programs established under the Social Security Act, including Medicaid.[8] To facilitate the operation of an approved demonstration project, the Secretary may waive compliance with specified requirements of Title XIX, to the extent necessary and for the period necessary to enable the State to carry out the demonstration project.[9] In addition, the Secretary may direct that costs of the demonstration project that otherwise would not qualify as Medicaid expenditures, "be regarded as expenditures under the State Title XIX plan (i.e., receive Federal Financial Participation (FFP)). Thus, individuals who are not eligible for medical assistance under the State plan approved under Title XIX of the Act might be eligible for medical assistance under a §1115 demonstration project.

In addition to the medical assistance provided under Title XIX and Title XI, the Social Security Amendments of 1965[10] established Title XVIII of the Social Security Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[11] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[12] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[13] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[14] This provision added Section 1886(d) to the Act and established the prospective payment system (PPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of PPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[15]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under PPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis-related groups (DRG) subject to certain payment adjustments.

Concerned with possible payment inequities for PPS hospitals that treat a disproportionate share of low-income patients, pursuant to Section 1886(d)(5)(F)(i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for an additional payment amount for each subsection (d) [PPS] hospital" serving "a significantly disproportionate number of low-income patients...."[16]

There are two methods to determine eligibility for a DSH adjustment: the "proxy method" and the "Pickle method."[17] To be eligible for the DSH payment under the proxy method, a PPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage. Relevant to this case, with respect to the proxy method, Section 1886(d)(5)(F)(vi) of the Act states that the term "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" and the "Medicaid low-income proxy", respectively, and are defined as follows:

    (I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of *patients who (for such days) were entitled to benefits under Part A of this title* and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

    (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patients days for such period which consists *of patients* who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, *but who were not entitled to benefits under Part A of this title*, and the denominator of which is the total number of the hospital patients days for such period. (Emphasis added.)

CMS implemented the provisions of the Act at 42 CFR 412.106. The regulation explains the proxy method at 42 CFR 412.106. Relevant to these cases, the first computation, the "Medicare proxy" or "Clause I" set forth

at 42 CFR 412.106(b)(2)(1994) states:

(2) *First computation* : *Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS

(i) Determines the number of covered patient days that --

(A) Are associated with *discharges* occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period; and

(ii) Divides the number determined under paragraph (b)(2)(ii) of is this section by the total number of patient days that -

(A) Are associated with *discharges* that occur during that period; and

(B) Are furnished to patients entitled to Medicare Part A. (Emphasis added.)

In addition, the second computation, the "Medicaid-low income proxy", or "Clause II", is set forth at 42 CFR 412.106(b)(4)(1994) and provides that:

*Second computation.* The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished *to patients entitled* to Medicaid *but not to Medicare Part A*, and divides that number by the total number of patient days in the same period. (Emphasis added.)

Although not at issue in this case, CMS revised 42 CFR 412.106(b)(4) to conform to HCFA Ruling No. 97-2, which was issued in light of Federal Circuit Court decisions disagreeing with CMS' interpretation of a certain portion of Section 1886(d)(5)(vi)(II) of the Act. In conjunction with this revision, CMS issued a Memorandum dated June 12, 1997, which explained the counting of patient days under the Medicaid fraction, stating that:

[I]n calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX) beneficiary on that day of service?" If the answer is "yes," the day counts in the Medicare disproportionate share adjustment calculation. This does not mean that Title XIX had to be responsible for payment for any particular services. It means that the person had to have been determined by a State agency to be eligible for Federally-funded medical assistance for any one of the services covered under the State Medicaid Title XIX plan (even if no Medicaid payment is made for inpatient hospital services or any other covered service).....

We note that individuals who are eligible for payments under a demonstration project, but would not be eligible under the provisions of the underlying State plan, are not included in this definition. Demonstration projects often involve waivers of State plan provisions; individuals eligible only by virtue of those waivers are not eligible under the State plan itself. Thus, they would not meet the statutory definition of Medicaid days....

In particular, concerning individuals eligible for payment under a demonstration project, CMS explained that:

[S]ome States have a demonstration project which includes expanded eligibility populations who would not be eligible under a State plan under title XIX, or a State waiver which includes people who are not and would not have been Medicaid Title XIX beneficiaries. Inpatient hospital days for these non-Medicaid individuals would not be properly included in the calculation of Medicaid days.... State records should distinguish between individuals eligible under the State plan and individuals who are only eligible under a demonstration project or waiver.

However, while CMS assumed that State records would distinguish between individuals eligible under the State plan and those individuals who were eligible under a demonstration project or waiver, problems arose.

In 1999, CMS observed certain practices and policies regarding Medicare DSH payment reflecting confusion regarding the counting of those State-only and waiver days for purposes of the DSH calculation. CMS determined that certain hospitals and intermediaries relied on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and that some of those agencies commingled the types of otherwise ineligible days listed above with Medicaid Title XIX days in the data transmitted to hospitals and/or intermediaries.

In order to again state the definition of eligible Medicaid days and to communicate a hold harmless position for cost reporting periods beginning before January 1, 2000, for certain providers, CMS issued Program Memorandum (PM) A-99-62, dated December 1999. This program memorandum again explained that State-only and waiver days were not to be counted in the Medicaid proxy. With respect to included days, the PM A-99-62 stated that the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid (under an approved Title XIX State plan) and does *not* include all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical assistance benefits under an approved Title XIX State plan.

Consistent with this definition of days to be included, the PM-A-99-62 stated regarding the exclusion of days, that:

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program.... These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

.....

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed....

In addition, for those providers that were genuinely confused or held a genuine belief that, for example, certain "State-only" days and/or "waiver days were to be included in the DSH calculation, CMS announced a hold harmless policy for cost reporting periods beginning before January 1, 2000. Pertinent to this case, CMS instructed intermediaries, pursuant to the PM A-99-62, to apply the hold harmless policy under certain limited circumstances. Regarding hospitals that did not receive payments reflecting the erroneous inclusion of days at issue, CMS stated that:

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days.... The actual number of these types of days that you use in this revision must be properly supported by adequate documentation provided by the hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on other Medicare DSH issues or other unrelated issues. (Emphasis added.)

In this case, relevant to the foregoing provisions of the law, Hawaii operated a fee-for-service Medicaid system for which it received Federal Financial Participation (FFP). Prior to the August 1, 1994, Hawaii also provided health insurance benefits to certain non-Medicaid beneficiaries, including general assistance (GA), and State Health Insurance Program (SHIP) patients, through separate State-only funded programs.

In April of 1993, Hawaii submitted a demonstration waiver application under §1115 of the Social Security

Act, for review and approval to CMS. The Project was known as the Hawaii Health managed care project (hereafter referred to as the Quest program). CMS approved Hawaii's Quest program, for a period of five years, with an effective date of August 1, 1994. The Quest program included all current Medicaid eligible in the AFDC-related Program, and expanded eligibility for, what had been, the State-only funded general assistance (GA) and State hospital insurance program (SHIP).[18] Consequently, effective August 1, 1994, those patients previously eligible for medical assistance under the State-only GA and SHIP programs were eligible for medical assistance under the Hawaii Quest program, a section 1115 waiver project.

This case involved a dispute over the inclusion in the Medicaid fraction of the following types of patient days:

    1. Quest program days. The Quest program was implemented effective August 1, 1994. The Quest days at issue are described as State assistance program days approved under a Section 1115 demonstration waiver. These State assistance program days were, prior to August 1, 1994, State-only general assistance (GA) days and SHIP days.

    2. SNF/ICF waitlist days. These days are described as days in which dually eligible patients received skilled nursing facility services or intermediate care services while the Provider was waiting to transfer the patients to another facility.

    3. No-pay-Medicaid-as-secondary-payor-days. These days are described as days for which patients were eligible for Medicaid but which were not paid by Medicaid. Certain of these days involve Quest no pay days.

The Provider contends that all Quest days (including all State assistance program days approved for Medicaid under a §1115 demonstration waiver, effective August 1994), no-pay days and waitlist days should be included in the Medicaid fraction for purposes of determining the Provider's DSH patient day percentage.

## *QUEST DAYS*

These days at issue in this case, as presented before the Board, is limited to Quest waiver days, that is, those days for individuals eligible for medical assistance under the Quest waiver program implemented August 1, 1994 and not otherwise eligible for Medicaid. The Board found that all Quest days, including those Quest days that represent patients in expanded waiver programs (which were previously the State-only GA and SHIP programs) must be counted in the Medicaid fraction because all days represent patients eligible for Medicaid under a State Plan approved by the Federal government, effective date August 1, 1994. The Board also found that these days must be counted in the Medicaid fraction because the Provider met the hold-harmless provisions of the Program Memorandum A-99-62.

The Administrator finds that Section 1886(d)(5)(F)(vi)(II) of the Act requires for purposes of determining a Provider's "disproportionate patient percentage" counting patient days attributable to patient who were *eligible for medical assistance under a State plan approved under Title XIX of the Act*, but who were not also entitled to Medicare Part A. (Emphasis added). In this case, certain of the Quest days (i.e., the former GA Days and SHIP days) are attributable to patients who were eligible for medical assistance under Title XI of the Act, not Title XIX.

From the initial implementation of the Medicare DSH provision through the fiscal period at issue in this case, CMS has consistently taken the position that the numerator of the Medicaid fraction includes patient days of patients who were eligible for medical assistance under a Medicaid State plan approved under Title XIX of the Act. While §1115 demonstration waiver days are treated, as expenditures for payment purposes under Title XIX, the medical assistance provided on that day is not approved under Title XIX. The Administrator finds that the §1115 demonstration waiver project days for patients formerly eligible for medical assistance under the GA and SHIP are *not* days for patients eligible for medical assistance under a State plan approved under Title XIX. Thus, the Administrator finds that under the existing policy in effect these days are properly excluded from the calculation of the Provider's DSH payment.

However, while these days are not to be included under the policy in effect for these cost reporting period, CMS did provide a hold harmless provision under certain circumstances pursuant to PM-A-99. The record in this case shows that the Provider, by letter dated October 6, 1999, added the issue of the exclusion of "waiver" days from the DSH calculation prior to the October 15, 1999 deadline. That is, the record indicates that the Provider believed that it was entitled to the inclusion of waiver days (that is, those days formerly referred to as GA days and SHIP days) prior to the issuance of the October 15, 1999 CMS memorandum.

Consequently, the Provider meets the criteria for inclusion of the "waiver" days (i.e., those GA and SHIP days that were subsumed effective August 1, 1994 in the Quest waiver program) for purposes of its DSH payment for the subject cost year.[19] In accordance with the PM, the actual number of these types of days that the Intermediary uses in this revision must be properly supported by adequate documentation provided by the hospital.[20]

### NO PAY DAYS

As the Provider meets the criteria of the hold harmless provision for the waiver days, the Administrator finds that the Medicaid proxy should include no pay days for the expanded waiver population under Quest to the extent they do not include dually eligible days.

### WAITLIST DAYS

Waitlist days are "dual eligible Medicare Part A and Medicaid days." In this case, the Intermediary maintained at the hearing that "waitlist days" should be excluded from the Medicaid proxy of the DSH calculation.[21] In contrast, the Provider argued that the waitlist days should be included in the DSH numerator as the waitlist days were for patients not entitled to Medicare benefits for those services furnished during the time they were waitlisted, because Medicare does not provide benefits for such a level of care in a hospital. The Board agreed with the Provider, finding that: "the waitlist patients were not entitled to Medicare benefits for those services furnished during the time they were waitlisted. Since none of the waitlist days were actually paid by Medicare, these days are not included in the total number of Medicare days in the Medicare proxy and therefore they will not be duplicated if they are included in the total number of Medicaid days in the Medicaid proxy. If they are not included in the Medicaid proxy, they will be omitted altogether."

CMM commented that the Board's position appears to be based on the incorrect assumption that Medicare does not provide benefits for waitlist patients. However, CMM stated that, under Medicare, waitlist days, or administrative days, are considered acute care days and payment for these days are included in the hospital inpatient PPS amount. Moreover, CMM stated that, regardless of whether the day is paid under Medicare, the day is for a patient entitled to Medicare Part A.

The Administrator finds that the statutory phrase in the Medicaid proxy requiring the exclusion of days for patients "who were not entitled to benefits under Medicare Part A of this title" forecloses the inclusion of these days at issue in the numerator of the Medicaid proxy. A review of the plain language of the statute reflects that the Medicare low-income proxy and the Medicaid low-income proxy are intended to capture distinct patient populations. The Medicare low-income proxy, because it uses SSI as the income indicator, includes Medicare/Medicaid dual eligible patients. Thus, because such patients are counted in the Medicare proxy, the Medicaid low-income proxy specifically excludes from its calculations patients entitled to Medicare Part A and limits its proxy to Medicaid-only eligible patients.

The relevant language of the Medicaid proxy indicates that it is the status of the patients, as opposed to the payment of the day, which determines whether a patient day is included in the numerator of the Medicaid proxy. The phrase "but who were not entitled to benefits under Part A" cannot be read to mean that days for which Medicare is not paid should be included in the numerator of the Medicaid proxy.

In addition, a review of the legislative history of the Medicare proxy and the Medicaid proxy supports the agency's interpretation. The Administrator finds instructive the legislative history related to the Medicare proxy in determining the scope of the Medicaid proxy.

The legislative history related to the Senate enactment reflects that, in introducing the bill,[22] and describing the Medicare proxy, Senator Dole stated that:

First, hospitals larger than 100 beds serving a large portion of low-income individuals or those participating in Medicare, will be eligible to receive an adjustment on the basis of *the proportion of low-income elderly and the proportion of Medicaid patients they serve*. In order to qualify for a adjustment, a hospital must have a specified proportion of its days accounted for by *either* dually eligible Medicare and Medicaid patients [Medicare proxy] *or* nonage Medicaid patients [Medicaid proxy].[23] [Emphasis added.]

As reflected in this statement, generally, the Medicare proxy was intended to capture the Medicare/Medicaid dual eligible, i.e. the aged low-income patient, as the low-income proxy. The Medicaid proxy was intended to

capture the "non-aged", i.e. non-Medicare, Medicaid patient as the low-income proxy. Thus, the Medicare proxy and Medicaid proxy, together, include Medicaid/Medicare "dual eligible" patients and Medicaid patients in the DSH patient percentage.[24]

The courts have similarly recognized that the two "proxies" serve different purposes:

Within the Medicare proxy, the language "entitled to benefits under [Medicare]" does not serve to define Medicare patients that are low income. Instead the language only limits the Medicare proxy to Medicare patients. This language does not determine the low-income status of Medicare patients --that status is determined by their entitlement to SSI.

Within the Medicaid proxy, in contrast, the language "eligible for medical assistance under [Medicaid]" defines the low-income status of Medicaid patients. The Medicaid proxy covers patients "not entitled to benefits under [Medicare]" *(thereby preventing Medicaid-eligible patients from being counted twice)*. The Medicaid proxy thus uses eligibility for Medicaid as the indicator.

In short, the clauses [proxies] serve different purposes within each proxy.[25] [Emphasis added.]

Accordingly, based on the plain language of the statute and the intent of Congress, the Administrator finds that waitlist days are properly not included in the Medicaid days of the DSH Medicaid proxy.[26]

### DISCHARGES VERSUS ADMISSIONS

In addition to the foregoing differences between the Provider and Intermediary in calculating the DSH patient percentage, the Administrator also notes that the respective parties positions differed because the Provider used admissions to calculate the subject patient days, while the Intermediary used discharges to calculate the DSH adjustment. The Administrator finds that the regulation at 42 CFR 412.106, with respect to the Medicare proxy, generally refers to patient days relating to "discharges" occurring during the applicable period. While the Medicaid computation does not similarly explicitly refer to "discharges", it is reasonable to conclude that both computations would calculate patient percentage using the same statistic methodology of discharges.[27]

This conclusion is further supported by Section 2805 of the Provider Reimbursement Manual (HIM-15) which explains that, prior to PPS, providers were required to use cost apportionment data (charges and days) for the actual services rendered during the cost reporting period. That is, days and charges for patients remaining in the provider at the end of the cost reporting period were accrued through the last day of the period. However, in hospitals subject to PPS, payment for Medicare inpatients is based on discharges. Therefore, hospitals under PPS use utilization statistics for services (i.e., days and charges) related to discharges occurring during the cost reporting period as the Medicare apportionment statistic. Accordingly, the Administrator concludes that the patient days are to be calculated using discharges, not admissions.

### DECISION

The decision of the Board is modified in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF THE HEALTH AND HUMAN SERVICES

Date: 9/12/03

[1] Section 1901 of the Act (Pub. Law 89-97.)

[2] Section 1902(a)(10)(A) of the Act.

[3] Relevant to this case, eligibility for SSI generally confers automatic eligibility for Medicaid. However, Congress allows States to retain more restrictive pre-1972 eligibility standards for determining whether new SSI recipients qualified for Medicaid under the State plan.

[4] Section 1902(a)(10)(C)(i) of the Act.

[5] *Id.* §1902 et seq. of the Act.

[6] *Id.*

[7] Section 1115 of the Act.

[8] *Id.*

[9] *Id.*

[10] Pub. Law No.89-97.

[11] Section 1811-1821 of the Act.

[12] Section 1831-1848(j) of the Act.

[13] Under Medicare, Part A services are furnished by providers of services.

[14] Pub. Law No. 98-21.

[15] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

[16] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). *See also* 51 Fed. Reg. 16772, 16773-16776 (1986).

[17] The Pickle method is set forth at Section 1886(d)(5)(F)(i)(II).

[18] When Medicare usually refers to GA days, it is referring to "State-only" days. That is, days for patients eligible for medical assistance under a State-only program. In this case, the parties continue to refer to certain days as GA days and SHIP days, although no longer State-only funded after August 1, 1994. These "GA" and "SHIP" Quest days, after August 1, 1994, could also more properly be referred to as waiver days as they were included in the expanded wavier program.

[19] Regarding the pre-August 1, 1994 State-only GA and SHIP days, at the hearing, the Intermediary agreed that the DSH calculation should be modified to include "GA days" based on the hold harmless provision. Transcript of Oral Hearing (Tr.) at 20, 89. *See also* CMM comments regarding the Regional Office ruling on inclusion of "GA days." Intermediary worksheet I-12 ("days prior to 8/1/94 should not be subject to GA reduction per miller/DHS ruling.") The record is not clear as to the treatment of State-only SHIP days, prior to August 1, 1994, (Tr. 99-100, 157-159) by either the Provider or the Intermediary, but it was not raised at the hearing and the Provider's Exhibit-13 does not list any pre-August 1, 1994 SHIP State-only days at issue.

[20] This documentation has not yet been reviewed by the Intermediary in this case, as the Intermediary rejected the application of the hold harmless rule to these days for this period.

[21] Tr. 74-75, 146-147.

[22] (See S. 1606, 99th Cong., 1st Sess. (Aug 1, 1985).(text reproduced in 131 Cong. Rec. S10928, S10930 (daily ed. Aug. 1, 1985).

[23] 131 Cong. Rec. at S10930 (Statement of Senator Dole).

[24] The prohibition of counting Medicare patients in the Medicaid proxy could be considered a prophylactic rule to prevent double counting of patients (and, thus, days) in both the Medicare and Medicaid proxy.

[25] *Legacy Emanuel Hospital and Health Center v. Shalala*, 97 F.3d 1261, 1265-1266 (9th Cir. 1996).

[26] CMS requested comments in the proposed inpatient hospital PPS FY 2004 rule on modifying the policy where Part A benefits have been exhausted. 68 Fed. Reg. 27208 (May 19, 2003). CMS noted that "we recognize that it is often difficult for fiscal intermediaries to differentiate the days for dual eligible patient whose Part A coverage has been exhausted ... Some States identify all dual-eligible beneficiaries in their lists of Medicaid patient days ..., while in other States, the fiscal intermediary must identify patient days attributable to dual eligible[s] ... by matching Medicare Part A bills with lists of Medicaid patients provided by the State. The latter case is problematic ... because no Medicare Part A bill may be submitted for these patients." Due to the volume and nature of the comments received on the proposed policy, CMS decided to address them in a separate document. 68 Fed. Reg. 45421 (August 1, 2003).

[27] That the Medicaid computation requires the calculation of patient days based on discharges (like the Medicare computation) is also evident from 42 CFR 412.106(a)(4)(ii) (2002) which incorporates the prospective change to the waiver day policy based on *"discharges"*, not admissions, "occurring on or after January 20, 2000" in calculating the Medicaid fraction.

© 2008, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BANNER HEALTH,                              )
                                           )
              Plaintiff,                    )
                                           )
      v.                                    )          No. 1:07-cv-1614 (RBW)
                                           )
MICHAEL O. LEAVITT,                         )
Secretary, United States Department         )
of Health and Human Services,               )
                                           )
              Defendant.                    )

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATEMENT OF MATERIAL FACTS**

The plaintiff Hospitals respond as follows to the Defendant's Statement of

Material Facts in Support of His Motion for Summary Judgment ("Def. Stmt."):

1.      Undisputed.

2.      This statement is incomplete, and Plaintiff disputes it, insofar as it omits

that the State statutes that created and govern the Arizona Health Care Cost Containment

System ("AHCCCS") include the three low-income eligibility groups at issue in the

AHCCCS program and specify the eligibility criteria for each of those three groups as

well the other eligibility groups covered by AHCCCS.   *See* Ariz. Rev. Stat. Ann. § 36-

2901 *et seq.*

3.      This statement is incomplete, and Plaintiff disputes it, insofar as it omits

that AHCCCS also provided direct Medicaid payments to hospitals that serve a

disproportionate share of low-income patients for services to those low-income patients.

Defendant concedes that these "Medicaid expenditures," called ('Medicaid DSH')

payments, are "based on the care provided to [a] hospital's low-income patients who receive care because they are eligible" for benefits under the AHCCCS program, including individuals in the three low-income AHCCCS eligibility groups at issue here. *See* Defendant's Memorandum in Support of His Combined Motion For Summary Judgment and Opposition To Plaintiff's Motion For Summary Judgment ("Def. Mem.") at 15 ("Medicaid DSH payments" are "Medicaid expenditures" that are "based on the care provided to the hospital's low-income patients who receive care because they are eligible for Medicaid, State-, or County-funding programs."); Def. Stmt. ¶¶ 10, 11 (same); Plaintiff's Statement of Material Facts Not in Genuine Dispute ("Pl. Stmt.") ¶ 15 (Arizona's Medicaid DSH payments are "based on a hospital's utilization by all AHCCCS recipients, including the three groups of recipients at issue here."), ¶¶ 16, 17; Defendant's Response to Plaintiff's Statement of Material Facts ("Def. Resp.") ¶¶ 15, 16, 17.  There is no dispute that each of the Plaintiff hospitals received these Medicaid DSH payments, and those "Medicaid expenditures" were funded with Federal matching funds. *See* Pl. Stmt. ¶¶ 16, 17; Def. Resp. ¶¶ 16, 17; Def. Mem. at 15.  Moreover, there can be no genuine dispute that these Medicaid expenditures were for the care provided to the low-income patients in the three AHCCCS eligibility groups at issue because: (i) the calculation of these Medicaid DSH payments was "based on the care provided" to individuals in the three AHCCCS groups at issue (Def. Mem. at 15; Def. Stmt. ¶ 10); and; (ii) a hospital could receive that Medicaid payment from AHCCCS even if the hospital treated no AHCCCS patients other than those individuals who were in the three AHCCCS eligibility groups at issue (Administrative Record ("AR") 132-34, 175).

4.    Plaintiff disputes the allegation in the first sentence of this paragraph of Defendant's Statement that AHCCCS provided health care benefits to individuals enrolled in health care programs paid for exclusively by the State.   Defendant cites no record evidence in support of that sentence, and it is contradicted by the undisputed facts and record evidence discussed above (*see supra* ¶ 3).   Plaintiff admits that, during the periods at issue in this case, AHCCCS provided health care benefits to individuals in the AHCCCS eligibility categories called "Medically Needy/Medically Indigent," "Eligible Low-Income Children," and "Eligible Assistance to Children," and admits that the State was one source of funding for benefits to those individuals.   Plaintiff disputes Defendant's unsubstantiated allegations that those benefits were "paid for exclusively by the State" and that the individuals were in "State-only populations."   Those disputed allegations are contradicted by the undisputed facts and record evidence discussed above (*supra* ¶ 3) and are not supported by the record evidence cited in Defendant's Statement (AR 751-81).  The "Enrollment" tables on the portion of the record cited in Defendant's Statement (AR 751-81) for the period at issue here (1/1/91 to 12/31/99) show that these three AHCCCS eligibility populations (shown as MN/MI, EAC, and ELIC) received assistance from and were enrolled in AHCCCS.  *See* AR 762 (bottom; 10/1/90 – 9/30/91), 764 (bottom; 10/1/91 – 9/30/92), 766 (middle; 10/1/92 – 9/30/93), [10/1/93 – 9/30/94 missing from Intermediary Exhibit in the AR], 769 (bottom; 10/1/94 – 9/30/95), 771 (bottom; 10/1/95 – 9/30/96), 773 (middle; 10/1/96 – 9/30/97), 775 (top; 10/1/97 – 9/30/98), 776 (bottom; 10/1/98 – 9/30/99), 778 (middle; 10/1/99 – 9/30/00).   The Secretary's Provider Reimbursement Review Board ("PRRB" or "Board") found, and the Secretary's final decision did not refute the Board's finding, that all AHCCCS recipients,

including the individuals in the three eligibility populations at issue, received medical assistance through the single AHCCCS program. *See* AR 35; AR 130-31; Complaint ¶ 59; Answer ¶ 59; *see also supra* ¶¶ 2, 3. The Secretary's Board found, and the Secretary's final decision did not refute the Board's finding, that AHCCCS funded the capitation payments made to the managed care plans and Medicaid DSH payments made directly to hospitals with all of the funding the program receives from Federal, State and local government sources, and this results in a *de facto* sharing by all of these government sources of all the costs of the program. AR 40.

5.    Plaintiff admits that the Secretary first approved Arizona's Medicaid demonstration project waiver pursuant to 42 U.S.C. § 1315 in 1982, and that the waiver permits AHCCCS to require enrollees to join managed care health plans and pay nominal cost sharing for mandatory medical services, but otherwise denies the allegations in this paragraph, which are unsupported by the record evidence cited in Defendant's Statement.

6.    Plaintiff admits that AHCCCS delivers acute care services through the same managed care plans for all AHCCCS enrollees, but denies Defendant's unsubstantiated allegation that AHCCCS covers or relies on managed care health plans to deliver services to "State-only populations." The portion of the record cited in Defendant's Statement (AR 233) does not support Defendant's allegation that AHCCCS provides services to "State-only" populations. Moreover, this allegation is contradicted by the undisputed facts and record evidence discussed above (*see supra* ¶¶ 3, 4).

7.    Plaintiff admits that AHCCCS expenditures are Medicaid expenditures, and admits that AHCCCS received Federal matching funds for some expenditures on AHCCCS enrollees, but disputes that AHCCCS receives Federal matching for "each

Medicaid dollar spent." This evidence is unsupported by the record evidence Defendant cites (AR 235), which states that "CMS pays a federal match to the state based on an annual matching percentage established in federal regulation." It is undisputed that "[t]he State did not seek or receive Federal funding specifically for the capitated payments made to AHCCCS managed care plans for AHCCCS recipients in the disputed eligibility groups." Pl. Stmt. ¶ 18; Def. Resp. ¶ 18. It is also undisputed that, as the Secretary's Board found, "AHCCCS funds the capitation payments made to the Medicaid managed care plans and other Medicaid DSH payments made directly to hospitals with all of the funding the program receives from Federal, State and local government sources, and this results in a *de facto* sharing of all the costs of the program." *See id.*; PRRB Dec., AR 40. Moreover, as discussed above (*supra* ¶ 3), there is no dispute that each of the Plaintiff hospitals received Medicaid DSH payments for the care provided to the individuals in the three AHCCCS eligibility groups at issue and those "Medicaid expenditures" were funded with Federal matching funds.

8.     Plaintiff disputes the unsubstantiated allegations set forth in the first sentence of this paragraph of Defendant's Statement. The portion of the record cited in Defendant's Statement (AR 235) does not support these allegations. The parties stipulated below, the Secretary's Board found, and the Secretary's final decision below did not refute the Board's finding, that AHCCCS is Arizona's Medicaid program. Stipulations ¶ 4, AR 192; AR 40; Complaint ¶¶ 2, 50; Answer ¶¶ 2, 50. As the Board found below, instead of having a traditional Medicaid program, the State of Arizona operates its entire Medicaid program pursuant to a waiver approved by the Secretary, and the AHCCCS program is the State Medicaid Plan. AR 40. Further, the portion of the

record cited in Defendant's Statement (AR 235) contains the "Program Funding" section of a document called "2002 AHCCCS Overview" (AR 226), and the page cited by Defendant says  nothing about any AHCCCS eligibility groups being part of a separate or "State-funded" program.  Indeed, that page says that the single program, AHCCCS, "is funded by a combination of federal, state and county funds."  AR 235.  Accordingly, Plaintiff agrees with Defendant's statement, in the second sentence of this paragraph of his Statement, that AHCCCS is funded by a combination of Federal, State, and county funds.

9.    Plaintiff admits that AHCCCS maintains eligibility criteria for the three AHCCCS eligibility groups at issue, but Plaintiff denies Defendant's unsubstantiated allegations that AHCCCS had multiple "Medicaid programs" and that the eligibility criteria for the three groups at issue were "separate" from the single AHCCCS program that is Arizona's Medicaid program.  *See supra* ¶¶ 2, 3, 4.  Like the Federal Medicaid statute in Title XIX of the Social Security Act, *see, e.g.,* 42 U.S.C. § 1396a(a)(10)(A), Arizona State statutes establish different eligibility criteria for different eligibility categories (some overlapping) covered by AHCCCS, which is the Medicaid program in Arizona.  *See, e.g.,* Ariz. Rev. Stat. Ann. § 36-2901(4)(a-c, h) (1997) (AR 301-02).  The State statutes that were in effect during the 1991-1999 periods at issue required that individuals be screened for eligibility under mandatory and certain optional eligibility categories established under Title XIX of the Social Security Act before being enrolled in other AHCCCS eligibility groups, including other optional eligibility categories under Title XIX.   *See, e.g.* Ariz. Rev. Stat. Ann. §§ 36-2901(4)(a-c, h), 36-2905, 36-2905.03 (1997) (the 1999 versions of the statutes cited by Defendant were only in effect for the

last several months at issue) (AR 301-02, 314-17, 324-27).  The Arizona State statutes cited in this paragraph of Defendant's Statement, in Defendant's Response to Plaintiff's Statement (Def. Resp. ¶¶ 18, 19), and in Defendant's Memorandum (at 14, 23) do not state or provide, however, that the three optional AHCCCS eligibility groups at issue were "not eligible for Medicaid."  *See* Ariz. Rev. Stat. Ann. §§ 11-297, 36-2901(4)(a-c, h), 36-2905, 36-2905.03 (1997) (AR 281-84, 301-02, 314-17, 324-27). These allegations also are unsupported by any finding of fact by the Secretary's Board or by the Secretary's delegate, the Administrator of the Centers for Medicare and Medicaid Services, in their decisions in this case.  Indeed, the Administrator's 20-page decision in this case does not cite any of the Arizona statutes now relied upon in Defendant's Statement, in his response to Plaintiff's Statement, and in his Brief.  AR 2-21.

10.   Plaintiff disputes Defendant's characterization in the second and third sentences of this paragraph of his Statement regarding the calculation of the Medicaid DSH payment made by AHCCCS and of the AHCCCS groups that are included in that calculation.  Defendant's characterizations of the calculation and of the groups included in the calculation are unsupported by the portions of the record cited in Defendant's Statement.  *See* AR 345, 338.  Further, the parties stipulated below, the Secretary's Board found, the Secretary's final decision did not refute the Board's finding, and Defendant's Response does not dispute that AHCCCS calculates Medicaid DSH payments "based on a hospital's utilization by all AHCCCS recipients, including the three groups of recipients at issue here."  Pl. Stmt. ¶ 15; Def. Resp. ¶ 15.  *See* Stipulations ¶ 9, AR 193; AR 40; AR 2-21.

11.    Plaintiff admits that AHCCCS' Medicaid DSH payments are Medicaid expenditures and that AHCCCS received Federal matching funds for those Medicaid payments. Plaintiff denies Defendant's allegation that AHCCCS' Medicaid DSH payments are "[l]ike the rest of AHCCCS's Medicaid expenditures" in this way, which is unsubstantiated by the record evidence cited in Defendant's Statement (AR 64, 65, 355). Plaintiff also disputes this allegation for the reasons noted above (*supra* ¶ 7).

12.    It is undisputed that Plaintiff, Banner Health, is a non-profit health system that owned and operated, or is the successor in interest to the entity that owned and operated, each of the four hospitals mentioned in this paragraph.   *See* Pl. Stmt. ¶ 1; Def. Resp. ¶ 1.

13.    It is undisputed that the Medicare Fiscal Intermediary in Arizona included the categories of AHCCCS patient days at issue in the calculation of the Medicare DSH payments made to Arizona hospitals, including Good Samaritan, one of the Plaintiff hospitals in this case, for cost reporting periods ending prior to 1990  Pl. Stmt. ¶¶ 20, 21; Def. Resp. ¶¶ 20, 21.   For the reasons noted above, Plaintiff denies Defendant's legal conclusion that those days were "erroneously included" in the Medicare DSH payments for the reasons set forth in Plaintiff's briefs and denies Defendant's allegation that those days were for "State-only patients" for the reasons noted above (*see supra* ¶3).

14.    It is undisputed that Good Samaritan also received interim Medicare DSH payments with respect to services furnished to patients in the three eligibility groups at issue from 1990 through 1992, including interim DSH payments during the 1991 cost reporting period at issue in this case.  Pl. Stmt. ¶ 22; Def. Resp. ¶ 22.  Plaintiff denies Defendant's legal conclusion that those days were "erroneously included" in the

Medicare DSH payments for the reasons set forth in Plaintiff's briefs and denies Defendant's allegation that those days were for "State-only patients" for the reasons noted above *(see supra* ¶ 3).

15.    Undisputed.

16.    Plaintiff disputes the implication in Defendant's Statement that the three AHCCCS eligibility groups at issue, which the Fiscal Intermediary ultimately decided to exclude from the hospitals' Medicare DSH payments for 1991 and 1993 through 1999, were not "Medicaid-eligible patient days." Plaintiff contends that the excluded AHCCCS recipients were Medicaid-eligible for the reasons set forth in Plaintiff's briefs. Plaintiff further disputes Defendant's characterization of the present dispute. The question presented is whether the Secretary, in his final decision below, properly determined that the three groups of AHCCCS recipients at issue should be excluded from the Medicare DSH payment calculation because they were not "eligible for medical assistance under a State plan approved under [Title XIX]." *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

17.    Plaintiff denies the allegations in this paragraph, which are unsubstantiated by the record evidence cited in Defendant's Statement. The evidence shows that the Medicare Fiscal Intermediary informed Arizona hospitals in early 1992 that, for prior and future cost reporting periods ending during and after 1990, their Medicare DSH payments would include only "Title XIX" days attributable to patients for whom the State received federal funding (AR 449), and that interim Medicare DSH payments would be revised to reflect these days only (AR 456). In 1992, the Medicare Fiscal Intermediary in Arizona began to deny Medicare DSH payments retrospectively with respect to services furnished

to patients in the three AHCCCS eligibility groups at issue for cost reporting periods back to 1990.  Stipulations ¶ 10, AR 193; AR 449, 456.

18.     Plaintiff disputes that the Fiscal Intermediary "included only those days in which the hospitals' patients were eligible for Medicaid, but did not include days in which the hospitals' patients were eligible for health care coverage under State-only programs."  The Fiscal Intermediary excluded days for patients in the three AHCCCS groups at issue, who received medical assistance under AHCCCS, which is Arizona's Medicaid program.  *See supra* ¶¶ 1-4.   In addition, even if these patients had not received medical assistance under AHCCCS (which they did), they were "eligible for assistance under a State plan approved under Title XIX", because, as the Secretary's Board found (AR 40), the individuals in these three AHCCCS groups could be included in a traditional Medicaid State plan as optional Medicaid eligibility groups.

19.     Plaintiff disputes Defendant's allegation that the hospitals "did not seek inclusion" of patient days for the three AHCCCS groups at issue until 2000.  The Secretary's Board found, and the Secretary's final decision did not dispute the Board's finding, that the Plaintiff hospitals included days attributable to patients in each of the three AHCCCS eligibility groups at issue in the cost reports they submitted to the Medicare program for each fiscal year at issue.  AR 36.  The Fiscal Intermediary denied Medicare DSH payments with respect to services furnished to those patients for each of the periods at issue.  AR 36.  Pursuant to the Secretary's regulations governing appeals to the PRRB, 42 C.F.R. § 405.1841(a), which permit hospitals to add issues to an appeal anytime "[p]rior to the commencement of the hearing," the Plaintiff hospitals formally amended their appeals in 2000 to challenge the Fiscal Intermediary's determinations to

- 10 -

exclude the AHCCCS groups at issue from the calculation of the Medicare DSH payments made to the hospitals for the periods at issue.  AR 70.  For the reasons stated above, Plaintiff denies the Secretary's characterization of the three AHCCCS groups at issue as "State-only days."  *See supra* ¶ 3.

Respectfully Submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
 DC Bar No. 479524
Christopher L. Keough
 DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: March 18, 2008