**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-1614-RBW |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| in his official capacity as Secretary, U.S. | ) | |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Secretary's Final Determination Excluding Inpatient Days of Individuals Receiving Care Under Arizona's State-Only Programs Was Based on the Statute, Agency Policy, and the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Secretary's Decision Comports with the *Cabell Huntington Hospital v. Shalala* Line of Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.    The Secretary's Decision *Is* Consistent with His Prior Interpretations. . . . . . . . . 10

    D.    The Secretary Determined That Plaintiff Failed to Establish That the Individuals Receiving Care Under AHCCCS State-Only Programs Were Eligible for Medicaid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    E.    The Secretary's Application of His Hold Harmless Policy to the Facts of This Case is Reasonable and Consistent with the Terms of the Policy. . . . . . . . . . . . . . 18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Action on Smoking and Health v. Civil Aeronautics Board*, 713 F.2d 795 (D.C. Cir. 1983). ......... 7

*American Colloid Co. v. Babbitt*, 145 F.3d 1152 (10th Cir. 1998). ............................... 10

*America's Community Bankers v. Federal Deposit Insurance Corp.*,
    200 F.3d 822 (D.C. Cir. 2000). ........................................................... 7

*Appalachian Regional Healthcare, Inc. v. Shalala*, 131 F.3d 1050 (D.C. Cir. 1997). ............... 1, 6

*Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246 (D.C. Cir. 1998). ............. 10

*Cabell Huntington Hospital Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996). ...................... 3, 8, 9, 16

*Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197 (1938). ..................... 7

*Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). .................................... 7

*Deaconess Health Services Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996). .................................. 8

*Drake v. Federal Aviation Administration*, 291 F.3d 59 (D.C. Cir. 2002). .................................. 19

*East Tennessee National Gas Co. v. Federal Energy Regulatory Commission*,
    953 F.3d 675 (D.C. Cir. 1992). ........................................................... 6

*Environmental Defense Fund, Inc. v. United States Environmental Protection Agency*,
    489 F.2d 1247 (D.C. Cir. 1973). ......................................................... 7

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984). ................ 6

*Howard Young Medical Center, Inc. v. Shalala*, 207 F.3d 437 (7th Cir. 2000). ............................. 6

*J. Andrew Lange, Inc. v. Federal Aviation Administration*, 208 F.3d 389 (2d Cir. 2000). .............. 6

*Jewish Hospital Inc. v. Secretary of Health and Human Services*, 19 F.3d 270 (6th Cir. 1994). ..... 8

*Legacy Emanuel Hospital and Health Center v. Shalala*, 97 F.3d 1261 (9th Cir. 1996). ................ 8

*Milton Hospital Transitional Care Unit v. Thompson*, 377 F. Supp. 2d 17 (D.D.C. 2005). ............ 4

*Morall v. United States Drug Enforcement Administration*, 412 F.2d 165 (D.C. Cir. 2005). ........... 6

*National Medical Enterprises v. Shalala*, 43 F.3d 691 (D.C. Cir. 1995). ....................... 6

*Pharmaceutical Research and Manufacturers of America v. Thompson*,
 191 F. Supp. 2d 48 (D.D.C.), *reversed*, 313 F.3d 600 (D.C. Cir. 2002). ........................... 10

*Spry v. Thompson*, 487 F.3d 1272 (9th Cir. 2007). ......................................................... 12

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994). ....................................... 18

*United States v. Chemical Foundation Inc.*, 272 U.S. 1 (1926). ....................................... 6

*United Hospital v. Thompson*, 383 F.3d 728 (8th Cir. 2004) . ......................................... 18

*University Health Services, Inc. v. United State Department of Health and Human Services*,
 120 F.3d 1145 (11th Cir. 1997) . ..................................................................... 18

## ADMINISTRATIVE CASES

*Arizona 96-99 DSH Group Provider v. Blue Cross /Blue Shield Association*,
 No. 2007-D29, 2007 WL 2238625 (Decision of Admin., July 6, 2007), *on review*,
 *Phoenix Memorial Hospital v. Leavitt*, No. 2:07-cv-1720 (D. Ariz.). ................................. 5

*Ashtabula County Medical Center v. Blue Cross/Blue Shield Association AdminiStar Federal,
 Inc.*, No. 2005-D49 (Decision of Admin., Oct. 12, 2005). ....................................... 9-10, 13

*Rush-Presbyterian-St. Lukes Medical Center v. Blue Cross*,
 No. 2006-D5, 2006 WL 752456 (Decision of Admin., Jan. 17, 2006)............................... 19

## DOCKETED CASES

*Adena Regional Medical Center v. Leavitt*, No. 07-5273 (D.C. Cir.)............................................. 13

## FEDERAL STATUTES

Pub. L. No. 106-554, 114 Stat. 2763 (2000). ................................................................. 11

Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (Feb. 8, 2006). ................................................ 15, 17

42 U.S.C. § 1395oo(f)(1). ........................................................................................ 4

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). ........................................................................ 1, 7

42 U.S.C. § 1396a. ................................................................................................ 14

42 U.S.C. § 1396r-4(b). ......................................................................................... 1, 12

42 U.S.C. § 1396r-4(c)(3)(B)................................................................................... 12

## FEDERAL REGULATIONS

51 Fed. Reg. 16772 (1986) ........................................................................................ 15

59 Fed. Reg. 49249 (1994) ................................................................................... 14, 17

65 Fed. Reg. 3136 (2000) ..................................................................................... 15, 17

42 C.F.R. § 400.203 .................................................................................................. 16

42 C.F.R. § 405.1875(g) ............................................................................................. 6

42 C.F.R. § 435.203(i)(1)(I) ..................................................................................... 16

42 C.F.R. § 435.403(a) ............................................................................................. 16

42 C.F.R. § 435.907 .................................................................................................. 16

## STATE STATUTES

Ariz. Rev. Stat. § 36-2903.01(B)(5) (1997) ............................................................. 6

Ariz. Rev. Stat. § 36-2903.01(D) ............................................................................ 16

Ariz. Rev. Stat. § 36-2901(a)(I), (iv) (2008) .......................................................... 17

Ariz. Rev. Stat. § 36-2901.01 (2008) ..................................................................... 17

**PRELIMINARY STATEMENT**

As explained in the Secretary's opening brief (Doc. No. 20), the plain language of the Medicaid proxy of the Medicare disproportionate share hospital (DSH) adjustment excludes inpatient hospital days of individuals who are not eligible for Medicaid, such as the individuals who receive care under the Medically Needy/Medically Indigent, Eligible Low-Income Children, and Eligible Assistance to Children programs (collectively "State-only programs") of the Arizona Health Care Cost Containment System ("AHCCCS"). This is because individuals receiving care under AHCCCS's State-only programs are not "eligible" for the "medical assistance" authorized by Title XIX of the Social Security Act (the Medicaid provisions) and provided for in "a State plan approved under Title XIX," *i.e.,* Medicaid. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). In short, they are not eligible for Medicaid. Instead, individuals enrolled in the AHCCCS groups at issue receive care pursuant to programs created and funded exclusively by the State of Arizona, and their only connection to the Medicaid program is that AHCCCS includes the costs of providing care to them in calculating the *Medicaid* DSH adjustment. But the *Medicaid* DSH adjustment is not at issue here, and it is defined differently and more broadly than the Medicare DSH adjustment so as to expressly allow consideration of low-income patients who are *not* eligible for Medicaid, such as the individuals enrolled in AHCCCS's State-only programs. *See* 42 U.S.C. § 1396r-4(b). Thus, their inclusion in the *Medicaid* DSH calculation does not mean that they are eligible for Medicaid. Rather, as explained in the Secretary's opening brief, the appellate courts are unanimous in concluding that eligibility for Medicaid is the touchstone in applying the Medicaid fraction of the Medicare DSH provision.

In fact, as the Secretary explained in his opening brief, Congress has used the formulation used in the Medicare DSH ("eligible for medical assistance under a State plan approved under subchapter XIX") nearly fifty times in the U.S. Code to convey a simple concept–eligibility for

Medicaid.  Moreover, as the Secretary explained, Congress has several times explicitly equated

that formulation with its own shorthand: "eligible for Medicaid," "medicaid-eligible," or

"medicaid eligibility."  In addition, Congress clarified that even individuals receiving medical

assistance under an expansion waiver population are not, absent the Secretary's discretionary

decision to the contrary, "so eligible."  The plain language of the Medicare DSH unambiguously

excludes from its "Medicaid proxy" the inpatient days of individuals who are not eligible for

Medicaid.  Moreover, as the Secretary demonstrated in his opening brief, his final determination

that the Secretary's 1999 hold harmless policy did not apply to plaintiff's hospitals was reasonable.

While repeatedly asserting that the Secretary's opening brief fails to defend his final

determination and is an improper *post-hoc* rationalization of counsel, plaintiff's opposition fails to

demonstrate what aspects of the Secretary's final determination he has allegedly abandoned or

what arguments in his opening brief might even be considered *post-hoc* rationalizations.

However, as a review of the Secretary's final determination makes clear, the plain meaning of the

Medicare DSH provision and the record in this case entirely support the Secretary's final

determination that the inpatient days at issue in this case should not be included in Medicaid proxy

of the Medicare DSH provision.  By contrast, neither the case law cited by plaintiffs nor the record

(apart from findings of the Provider Reimbursement Review Board ("PRRB" or the "Board") that

the Secretary *reversed*) provides any support for the plaintiff's arguments.

First, plaintiff's reliance on findings of the Board that the Secretary reversed or on self-

serving, oversimplified characterizations of AHCCCS plans are insufficient to overcome the

highly deferential substantial evidence standard of review that this Court must employ to review

the Secretary's finding of fact that individuals receiving health care benefits under the three

AHCCCS programs at issue in this case were not eligible for Medicaid under the Arizona State

plan.

Second, plaintiff's claim that the Secretary's final determination was contrary to the *Cabell Huntington Hospital v. Shalala* line of cases is meritless because plaintiff can point to no evidence in the record that the Secretary's decision was based on including in the Medicaid proxy of the Medicare DSH provision only inpatient days of individuals for which hospitals received Medicaid payment, rather than inpatient days of all individuals "eligible for medical assistance under a State plan approved under subchapter XIX." Indeed, the record contradicts plaintiff's claim.

Third, plaintiff's claim that the Secretary's final determination is impermissibly inconsistent with his prior interpretations of other Medicaid provisions is erroneous and in fact is rebutted by plaintiff's own admission that the Secretary's position *is consistent* with his prior policy pronouncements on the subject of which individuals should be included the Medicaid proxy of the Medicare DSH provision. Moreover, the letter on which plaintiff relies for its position makes none of the statements plaintiff asserts it does.

Fourth, plaintiff's claim that the inpatient days of the individuals enrolled in Arizona's State-only program are "eligible for medical assistance" fails to understand the difference between the "hypothetical eligibles" that the Secretary has included in the Medicaid proxy of the Medicare DSH adjustment and the individuals enrolled in Arizona's State-only programs, as well as the significance of the section 5002 Deficit Reduction Act of 2005, and fails to acknowledge either the residency requirement of any State Medicaid plan or that plaintiff's hospitals failed to meet their burden of establishing that State-only individuals were eligible for Medicaid in Arizona or anywhere else at the time of their hospitalization.

Finally, contrary to plaintiff's assertion, the Secretary's application of his 1999 Hold Harmless policy to plaintiff's hospitals is entirely reasonable and consistent with the policy itself. Indeed, the Secretary's consistent application of that policy over time demonstrates the reasonableness of its application to plaintiff's hospitals.

Accordingly, this Court should grant the Secretary's motion for summary judgment and deny the plaintiff's motion for summary judgment.

## ARGUMENT

**A.    The Secretary's Final Determination Excluding Inpatient Days of Individuals Receiving Care Under Arizona's State-Only Programs Was Based on the Statute, Agency Policy, and the Record**

Without foundation, plaintiff alleges that the Secretary's position in his opening brief that the inpatient hospital days of the individuals at issue in this case received health care benefits from a non-Medicaid program "is inconsistent with the findings below" and is a "*post-hoc* rationalization" of counsel.  Pl. Opp'n at 5.

Contrary to plaintiff's assertion, however, the Secretary is not bound by the finding of the Board that the Secretary's approval of the Arizona's State plan allegedly "'include[d] all the AHCCCS programs and sub-programs,'" Pl. Opp'n at 5 (quoting AR 40), *because the Secretary reversed the Board's finding*.  As this Court has previously made clear, the Secretary has clear authority to reverse, affirm, or modify any decision of the Board.  42 U.S.C. § 1395oo(f)(1).  *See Milton Hosp. Transitional Care Unit v. Thompson,* 377 F. Supp. 2d 17, 24 n.9 (D.D.C. 2005).  In this case, the Secretary reversed the Board's finding that the populations at issue were eligible for Medicaid.  In describing the issue before him, the Secretary found that "[t]he State has *also* decided to provide services to three other groups, . . . each with different *State* eligibility requirements."  AR 15 (emphasis added).  The Secretary further found that "[t]hese three . . . categories . . . are [for] persons who do *not* qualify as categorically eligible for Medicaid.  These categories are funded entirely with State and County funds."  *Id.* n.38 (emphasis added).  Accordingly, contrary to plaintiff's contention, the Secretary clearly reversed the finding of the Board, and, *based on the Secretary's finding,* reversed the Board's conclusion that the inpatient days of individual receiving care under Arizona's State-only programs must be included in the

- 4 -

Medicaid proxy of the Medicare DSH adjustment.  *See* AR 16 ("the days involved in this case are related to individuals that are *not* eligible for medical assistance as that term is used under Title XIX, and thus are *not* properly included in the Medicaid patient percentage of the Medicare DSH calculation") (emphasis added).

Nor, contrary to plaintiff's assertion, Pl. Opp'n at 5, was the Secretary's final determination reversing the Board unsupported by substantial evidence.  As AHCCCS documents in the record themselves clearly explain, AHCCCS is, in fact, both "Arizona's Medicaid program, *and the State's health care program for persons who do not qualify for Medicaid.*"  AR 745 (emphasis added).  *See also* AR 233 ("AHCCCS was the first statewide Medicaid program in the nation to rely on Health Plans to deliver acute care services to both Medicaid *and state-funded populations*.") (emphasis added); AR 745 (stating that AHCCCS's members include "575,620 Title XIX individuals," and "28,185 individuals in *State-only funded programs*."  *Id.* (emphasis added).[1]

---

[1]  Plaintiff's claim, Pl. Opp'n at 8, that the Secretary had no basis for reversing the Board is puzzling.  In addition to the record evidence discussed above, in a contemporaneous final determination concerning a different set of Arizona hospitals raising nearly identical claims about the same State-only populations, *see Ariz. 96-99 DSH Group Provider v. Blue Cross /Blue Shield Ass'n*, No. 2007-D29, 2007 WL 2238625 (Decision of Admin., July 6, 2007), *on review, Phoenix Mem'l Hosp. v. Leavitt,* No. 2:07-cv-1720 (D. Ariz.), the Secretary had before him a copy of a 1997 AHCCCS request to the Secretary to add individuals currently in the State-only populations to the Arizona demonstration project waiver.  *See* AHCCCS Waiver Proposal for 100% FPL (1997) [Attached hereto].  The request explained that AHCCCS provides coverage for "all persons eligible for the [F]ederal mandatory groups" and that "AHCCCS also operates a 100% [S]tate-financed [MN/MI] program and two smaller [S]tate-financed programs for children known as the [EAC] and [ELIC] programs."  *Id.* at II-2.  *See also* Ltr. from Lynn Dunton, Ass't Dir., AHCCCS to Joan Peterson, Project Officer, HCFA (Oct. 16, 2000) (Q&As 1-2) (same) [Attached hereto].  This proposed change to Arizona's demonstration project waiver, which did not go into effect until after the time period at issue in this litigation, *see* Ltr. from Robert Berenson, Acting Dpty. Admin., HCFA to Phyllis Biedess, Dir., AHCCCS (Jan. 18, 2001) [Attached hereto] provides further support for the Secretary's determination that individuals enrolled in the State-only program were *not* "eligible medical assistance under a State plan approved under subchapter XIX" during the time period at issue here.
By contrast, there is no support in the record for the Board's determination that "AHCCCS

Moreover, as defendant demonstrated in his opening brief, Def. Mem. at 23, the Arizona

legislature authorized AHCCCS to apply for federal funds to "be used *only* for the support of

persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct," Ariz. Rev.

Stat. § 36-2903.01(B)(5) (1997) (emphasis added),[2] and, as plaintiff itself admits, the "State did

not apply for . . . Federal matching funds . . . [for] the three groups at issue." Pl. Opp'n at 5-6. *See*

*also* AR 193 (Stipulations) ¶ 7.[3]  If these groups were truly Medicaid eligible, there is no reason

that Arizona would not have sought federal matching funds for the benefits that it had provided to

them.

    But even if plaintiff could point to some evidence in the record to support its proffered

conclusion, "the possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence," as the

---

is the State Plan approved by the Secretary," or that the Secretary's approval included "all the
AHCCCS programs and sub-programs, irrespective of how they were funded." AR 40.  The
Secretary has no authority to approve or disapprove State-only programs. Accordingly, contrary to
plaintiff's suggestion, Pl. Opp'n at 8, n.12, neither *E. Tenn. Nat. Gas Co. v. FERC*, 953 F.3d 675
(D.C. Cir. 1992), nor *Morall v. DEA*, 412 F.2d 165 (D.C. Cir. 2005), have any applicability here.

    [2]  Contrary to plaintiffs' contention, Pl. Opp'n at 7, 10 n. 13, the Arizona statutes which the
Secretary discussed in his opening brief were in effect throughout the time of this dispute and were
before the Secretary when he issued his final determination below, both as a matter of law, 42
C.F.R. § 405.1875(g); *Nat'l Med. Enterps. v. Shalala*, 43 F.3d 691, 693-94 (D.C. Cir. 1995)
(Secretary may rely on other applicable law whether or not it was cited by the parties), and because
they were in the Administrative Record. AR 281-329. *See U.S. v. Chem. Foundation Inc.*, 272
U.S. 1, 14-15 (1926) (presumed that the Secretary considered all evidence in the record when
making his determination); *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 394 n.7 (2d Cir. 2000)
(same).

    [3]  Because, unlike plaintiff, the Secretary is not a party to the hearing, he is not bound by
stipulations entered into by the fiscal intermediary nor by misrepresentations made by the fiscal
intermediary.  *Howard Young Med. Ctr., Inc. v. Shalala*, 207 F.3d 437, 443 (7th Cir. 2000) ("[W]e
do not consider the Secretary to be bound by the stipulation entered into at the PRRB hearing by
counsel for the hospital and counsel for the intermediary").  *See also Heckler v. Cmty. Health
Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984) (government not bound by
misrepresentations made by fiscal intermediary); *Appalachian Reg'l Healthcare, Inc. v. Shalala*,
131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997) ("the intermediary's position is not the Secretary's")
(citations omitted).

standard "frees the reviewing courts . . . of weighing the evidence," and instead "gives proper respect to the expertise" of the Secretary. *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). *See also Envtl. Def. Fund, Inc. v. EPA*, 489 F.2d 1247, 1251-52 (D.C. Cir. 1973) (same). As Chief Justice Hughes long ago explained, "even as to matters not requiring expertise" a court may not "displace the [Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938). Thus, the fact that AHCCCS sometimes characterizes itself as Arizona's Medicaid program, *see, e.g.,* AR 228, or that defendant admitted that AHCCCS may be so characterized, Answer ¶ 50, does not mean that the Secretary's finding that individuals receiving health care benefits under AHCCCS's State-funded programs are not "eligible for medical assistance under a State plan approved under subchapter XIX of this chapter," 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), is unsupported by substantial evidence. Thus, contrary to plaintiff's assertion, Pl. Opp'n at 5-10, these were findings that the Secretary made in his final determination, and not counsel's *post-hoc* rationalization.[4]

In sum, the findings of the Board that the Secretary reversed provide an insufficient basis to hold that the Secretary's final determination is unsupported by substantial evidence. Nor can the Secretary's arguments in his opening brief reasonably be considered *post-hoc* rationalization of counsel. Rather, the plain meaning of the statute and the record supports the Secretary's decision to exclude from the Medicaid proxy of the Medicare DSH provision inpatient days of individuals

---

[4] To the extent that plaintiff maintains that legal arguments concerning the Medicare DSH provisions in the Secretary's opening brief are *post-hoc* rationalizations of counsel, this Circuit has made clear that "[t]here is no difficulty in [a court] reviewing the statutory language *de novo*. That is, after all, what courts do." *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 835-36 (D.C. Cir. 2000). *See also Action on Smoking & Health v. CAB*, 713 F.2d 795, 799 n.2 (D.C. Cir. 1983) (finding that an agency's submission . . . to explicate a "curt" decision is not a "*post hoc* rationalization of its earlier action, but merely elaborates, fills in interstices, or takes account of isolated neglected issues").

receiving health care benefits under AHCCCS's State-only programs.

**B.    The Secretary's Decision Comports with the *Cabell Huntington Hospital v. Shalala* Line of Cases**

Contrary to plaintiff's contention, Pl. Opp'n at 10-12, a comparison of the dispute at issue in the *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984 (4th Cir. 1996), line of cases[5] with the Secretary's final determination in this case entirely undermines plaintiff's claims.  In the *Cabell Huntington* line of cases, the issue before the courts was whether "hospitals serving large numbers of Medicaid recipients who outstay their state-imposed day limit" (and therefore received no Medicaid reimbursement for hospital inpatient days) should receive "Medicare DSH payments for these additional hospital days."  101 F.3d at 987.  That issue arose "because of . . . state [imposed] restrictions," under which "an otherwise Medicaid-eligible patient" could "exhaust[] his coverage for inpatient hospital care"  *Id.* at 987, 989.  The court in *Cabell Huntington* held that, because "a Medicaid patient who has exceeded his day limit in a West Virginia hospital, for example, is still eligible for payment of a number of the other twenty-four categories of medical services like outpatient hospital services, rural health clinic services, and X-rays," the inpatient days of that Medicaid patient must be included in the Medicaid proxy of the Medicare DSH provision, even if the hospital did not receive payment for that individual's inpatient hospital stay. *Id.* at 989.  *See also Jewish Hosp.*, 19 F.3d at 275 ("A Medicaid eligible individual is no less 'eligible for medical assistance' on some days simply because his or her state Medicaid program only pays for a fixed number of days.").

By contrast, as defendant demonstrated in his opening brief and above, the inpatient days of the individuals at issue here are those of individuals who were not eligible *at any time* during

---

[5]  *See also Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp. Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 276 (6th Cir. 1994).

the period at issue for any of the categories of medical assistance available under the Arizona State

Plan approved under the Medicaid statute.[6]  They were not "Medicaid patients."  *Cabell*

*Huntinginton*, 101 F.3d at 987, 989.  Thus, the *Cabell Huntington* line of cases provide no support

for plaintiff's characterization of the Secretary's final determination as impermissibly relying on

"Federal/State payments as opposed to patient's eligibility for medical assistance"  Pl. Opp'n at 10.

Rather, as defendant explained in its opening brief, Def. Mem. at 23-25, and as a complete

reading of the Secretary's final determination makes clear, AR 5-20, the Secretary's reference to

Federal matching payments is merely an explanation of his determination that "the days involved

in this case are related to individuals who [were] not eligible for Medicaid" at all.  AR 16.

Moreover, plaintiff has failed to respond to the Secretary's explanation in his opening brief that the

health care benefits provided to individuals enrolled in AHCCCS State-only programs were not

"medical assistance" under Arizona's State Medicaid plan as that term is used in both the

Medicaid statute and the Medicare DSH provision.  Def. Mem. at 22.  And contrary to plaintiff's

repeated assertions, Pl. Opp'n at 11, this is not a *post-hoc* rationalization of counsel.  Rather, as the

Secretary has explained in a *prior* administrative decision, "the term 'medical assistance' is not a

general term used to describe people in need for whom a State decides to offer some relief," but

"has a precise meaning including the identification of individuals who may be covered."

*Ashtabula Cty. Med. Ctr. v. Blue Cross/Blue Shield Ass'n AdminiStar Fed., Inc.,* Admin. Dec. No.

2005-D49 (Oct. 12, 2005) [Attached at Tab 2 to Def. Mem.].[7]  Because "a reviewing court should

---

[6]  Indeed, the record makes clear that AHCCCS provided the hospitals with data concerning "[Medicaid-]eligible days."  AR 168 (Testimony of Derrick Edmonson, Tr. 240:1-13). As a result, the hospitals "would have an opportunity to go through their internal listing to find these days that would represent eligible Title 19 days that weren't paid [days] by AHCCCS."  AR 168 (Tr. 240:14-18).

[7]  Even plaintiff could not reasonably argue that individuals receiving charity care are eligible for "medical assistance."  Indeed, their non-eligibility for Medicaid is one reason that they need "charity care."

give weight to an agency decision which is consistent with *earlier* pronouncements on the subject

under review," *Am. Colloid Co. v. Babbitt*, 145 F.3d 1152, 1157 (10th Cir. 1998) (emphasis

added), this Court should uphold the Secretary's final determination.  *See Ass'n of Bituminous*

*Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1252 (D.C. Cir. 1998) (distinguishing between

explanations of a rationale implicitly adopted by the agency in its *prior* actions and explanations

that offer new explanations for conduct previously defended *on other grounds*).[8]

## C.    The Secretary's Decision *Is* Consistent with His Prior Interpretations

Contrary to plaintiff's assertion, Pl. Opp'n at 13-15, the Secretary's final determination in

this case is entirely consistent with his prior interpretations of the Medicare DSH provision.

Indeed, plaintiff itself *admits* that the Secretary's determination is *consistent* with his interpretation

set forth in Program Memorandum A-99-62.  *See* Pl. Opp'n at 13 ("citing the Secretary's 1999

Program Memorandum . . .").  *See also Ashtabula Cty. Med. Ctr.*, *supra*.  Nevertheless, plaintiff

insists that a 2002 letter from the Secretary to State agencies demonstrates this alleged

impermissible inconsistency.  Pl. Opp'n at 14-15.  However, the letter makes none of the

statements plaintiff asserts it does.[9]  In light of the Benefits Improvement and Protection Act

---

[8]  Plaintiff's continued reliance, Pl. Opp'n at 11 n.14, on *Pharm. Research & Mfrs. of Am.
("PhRMA") v. Thompson,* 191 F. Supp. 2d 48 (D.D.C.), *rev'd,* 313 F.3d 600 (D.C. Cir. 2002), is
without merit.  As defendant explained in his opening brief, Def. Mem. at 25-26, the Secretary
never took the position that the State-only programs at issue in that case were for Medicaid-
eligible individuals, *see PhRMA passim*, nor did the Secretary provide Federal matching payments
for those programs.  *Id.* at 51-52.  If the individuals enrolled in those State programs had been
Medicaid-eligible, there would have been no case.  Rather, PhRMA brought suit because the
individuals enrolled in the State program were *not* eligible for Medicaid, and the drug companies
objected to that State's efforts to require them to provide to individuals in State-only programs the
same discounts and rebates on drugs that they were required to provide to individuals eligible for
Medicaid.  *Id.* at 51.  Plaintiff here acknowledges none of this.  *See* Pl. Opp'n at 11 n. 14.

[9]  Plaintiff makes much of the fact that the Secretary attached this letter to his Answer but
failed to discuss the letter in his opening brief.  Pl. Opp'n at 15.  However, the Secretary only
attached the letter in response to inaccurate allegations plaintiff made in the letter in plaintiff's
Complaint.  *See* Compl. ¶ 36.  The Secretary advanced no arguments about the letter, because, as
shown below, its statements have nothing to do with the issues in this case.

("BIPA") of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000), the letter simply "clarifie[d]
questions states and providers have regarding the *Medicaid* DSH program, supplemental upper
payment limit (UPL) payments, and payment for prisoner inmate care."  Ltr. fr. Dennis Smith,
Dir., Medicaid & State Operations, Ctr. for Medicare & Medicaid Servs. to State Medicaid Dirs.
("Smith Ltr.") (Aug. 16, 2002) (emphasis added) [Attached to Answer (Doc. No. 15)].  Plaintiff
asserts that in the letter, "the Secretary *determined* that a State provides medical assistance to
individuals under a Title XIX State plan by virtue of including the cost of services to those
individuals in the calculation of the state's Medicaid DSH payments to hospitals, even if those
hospitals would not otherwise by considered eligible for Medicaid."  Pl. Opp'n at 14-15 (emphasis
added).[10]

---

[10]  The relevant portion of the letter states:

Section 1902(a)(13) of the Social Security Act (the Act) provides that *Medicaid*
inpatient hospital payment *rates* take into account the situation of hospitals that
serve a disproportionate number of low-income patients with special needs.
Section 1923 of the Act requires that state [*Medicaid*] DSH programs recognize
those hospitals that serve a disproportionate number of Medicaid *and low-income
patients* by providing additional Medicaid payments to those hospitals that qualify.

*        *        *

Section 1923(b) of the Act spells out two formulas states must use to determine
which hospitals, at a minimum, receive payments under the DSH program.  The
first formula, the Medicaid inpatient utilization rate formula, accounts for inpatient
hospital days attributable to patients who for such days were eligible for medical
assistance under a state plan approved under title XIX of the Act.  The second
formula, the low-income utilization rate formula, accounts for inpatient payments
paid for patient services under a Medicaid state plan *and charges for charity care*.

Section 701(b) of BIPA amended the low-income utilization rate formula and the
Medicaid inpatient utilization rate formula.  Effective with DSH payments made *on
or after January 1, 2001*, states must count Medicaid days of patients enrolled in
managed care in the calculation of the Medicaid inpatient utilization rate, and count
Medicaid payments paid by a managed care entity on behalf of the state in the
calculation of the low-income utilization rate.  Please ensure that all DSH eligibility
determinations made *after January 1, 2001* comply with this requirement.

Smith Ltr. (emphasis added).

Without citation to any authority, Pl. Opp'n at 13, 15, plaintiff asserts that the term "Medicaid payment" that appears in the letter must be equated with the term, "medical assistance under a State plan" in the *Medicaid* DSH provision, 42 U.S.C. § 1396r-4, such that Federal matching payment made to the State for its *Medicaid* DSH payments somehow means that all individuals accounted for in the determination of the *Medicaid* DSH calculation are eligible for Medicaid. In essence, plaintiff appears to argue that, simply because the *Medicaid* DSH provision allows states to include low-income individuals who are *not eligible* for Medicaid into its Medicaid DSH adjustment, 42 U.S.C. § 1396r-4(c)(3)(B), that such *payment* makes those low-income individuals eligible for Medicaid. But the *Medicaid* DSH provision no more makes low-income patients eligible for Medicaid than does the *Medicare* DSH provision make individuals *eligible* for Medicaid into *Medicare* patients because it includes the inpatient days of individuals eligible for Medicaid in the Medicaid proxy of the Medicare DSH adjustment. Indeed, as defendant demonstrated in its opening brief, Def. Mem. at 27, but plaintiff failed to acknowledge, *see* Pl. Opp'n at 13-16, the Ninth Circuit has considered and *rejected* an argument very similar to that of plaintiff. *Spry v. Thompson*, 487 F.3d 1272, 1277 (9th Cir. 2007) (expressly distinguishing calculations of hospital reimbursement under the *Medicaid* DSH from determinations of eligibility for Medicaid). But even if plaintiff's assertion were true, nowhere in the letter has the Secretary made any determination that "a State provides medical assistance to individuals under a Title XIX State plan by virtue of including the cost of services to those individuals in the calculation of the state's Medicaid DSH payments to hospitals." Pl. Opp'n at 14-15. The Secretary's alleged determination simply does not exist. Moreover, the letter itself expressly states that the requirements of BIPA apply to Medicaid DSH "eligibility determinations made *after January 1, 2001*." Smith Ltr. (emphasis added). Thus, even if the Secretary had made such a determination, it would not even be applicable to the time period at issue in this litigation. Accordingly, there is

no inconsistency between the Secretary's final determination challenged here and this letter.[11]

Rather, as demonstrated above, the Secretary's final determination is consistent with the Medicare

DSH provision, Program Memorandum A-99-62 and *Ashtabula County, supra,* and that is reason

enough to uphold it.

> **D.    The Secretary Determined That Plaintiff Failed to Establish That the Individuals Receiving Care Under AHCCCS State-Only Programs Were Eligible for Medicaid**

In his opening brief, the Secretary demonstrated that "[t]he State-only patients were not

eligible for medical assistance under a State plan approved under Title XIX." Def. Mem. at 17-21,

26-30.  Nevertheless, plaintiff argues in its opposition that the Secretary "does not challenge the

Hospitals' contention that, under Federal law, applying the Title XIX eligibility standards to the

facts here, the patients whose days were excluded in this case would have been eligible under a

traditional Medicaid plan." Pl. Opp'n at 18 (citing Pl. Mem. at 25-27).  Plaintiff claims that,

because the Secretary has included in the Medicaid proxy of the Medicare DSH adjustment

"hypothetical eligibles," that is, individuals receiving medical assistance under a § 1115

demonstration waiver approved by the Secretary but who could have received medical assistance

under a State plan approved by the Secretary under Title XIX, the Secretary must also include

individuals receiving health care benefits under AHCCCS's State-only programs. *Id.*  Plaintiff's

argument is premised on a fundamental error:  as demonstrated in the Secretary's opening brief

---

[11]   Nor is the Secretary's position in his opening brief inconsistent with his position in his appellate brief in *Adena Reg'l Med. Ctr. v. Leavitt,* No. 07-5273 (D.C. Cir.).  The Secretary argues both in his opening brief here and in *Adena* that the term "eligible for medical assistance under a State plan approved *under subchapter XIX*" in the Medicare DSH provision of the Social Security Act should be construed to have the same meaning as it does in the Medicaid provisions of the Act, *compare, e.g.,* Def. Mem. at 17-21 *with Adena* Reply at 5-21 ("B.  In Enacting the Medicare DSH, Congress Intended to Incorporate the Meaning of 'Medical Assistance' Used in the Medicaid Act"), although not, as plaintiff claims, Pl. Opp'n at 15, with *only* the Medicaid *DSH* provision.  Accordingly, contrary to plaintiff's assertion, the Secretary has made no "unexplained departure." Pl. Opp'n at 16.

and above, in granting Arizona's § 1115 demonstration waiver, the Secretary did *not* approve

AHCCCS's State-only programs as part of Arizona's demonstration waiver or its State plan. Def.

Mem at 22-23, 30-31. Instead, the waiver approved by the Secretary allowed Arizona to limit

Medicaid-eligible individuals' statutory right to freedom of choice of health care providers by

allowing Arizona to require that all Medicaid patients receive their health care services from

managed care organizations. Moreover, when the Secretary has elsewhere approved

demonstration projects that include hypothetical eligibles, the Secretary has determined that the

health care benefits offered to such individuals complies with sufficient requirements of 42 U.S.C.

§ 1396a (apart from those for which he is granting a waiver under § 1115(a)(1)), but the Secretary

made no such determination here. Moreover, as the Secretary noted in his final determination, AR

12 n.29, hypothetical eligible individuals are identifiable in the budget neutrality agreements found

in the Special Terms and Conditions for the demonstration project, AR 12 n.29 (citing 65 Fed.

Reg. 3136 (Jan. 20, 2000)), in accord with the federal policy that requires that demonstration

projects be budget-neutral with respect to the federal government, *i.e.*, that the federal

government's costs over the life of the project do not exceed the contribution that the federal

government would make to the State under the State Medicaid plan in the absence of the project.

*See generally* 59 Fed. Reg. 49249, 49250 (Sept. 27, 1994). And that determination and that

identification is the basis of the Secretary's determination that such individuals may be considered

eligible for Medicaid for purposes of calculating the Medicare DSH adjustment. In this case,

however, the Secretary has made no such determination or identification about AHCCCS's State-

only programs and, indeed, has no authority to do so under the Social Security Act.

Plaintiff's refusal to acknowledge the applicability of the Deficit Reduction Act of 2005

("DRA"), Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (Feb. 8, 2006), is also without merit. First,

plaintiff ignores the fact that by clarifying that an individual receiving health care benefits

provided under a demonstration project waiver approved under § 1115(a)(2) is, absent the

Secretary's decision to the contrary, "not so eligible" to be included in the Medicare DSH

adjustment, Congress also made clear that days of State-only populations need not be included in

the Medicaid proxy of the Medicare DSH adjustment.  Plaintiff's insistence that there is no such

thing as State-only populations, either in Arizona or elsewhere, and that the Secretary made up this

term in this litigation, Pl. Opp'n at 6-7, 20, is without foundation.  AR 745, 233.[12]  Second,

plaintiff fails to acknowledge that the DRA expressly ratified the Secretary's policy, for discharges

occurring prior to January 20, 2000, of "includ[ing] in the Medicare DSH calculation *only* those

days for populations under the section 1115 waiver who were or could have been made eligible

[for Medicaid] under a State plan."  65 Fed. Reg. 3136 (Jan. 20, 2000) (emphasis added) (cited by

DRA § 5002(b)).  Indeed, apart from the inclusion of hypothetical eligibles, as defined by the

Secretary–a policy that was addressed in the January 20, 2000 Federal Register and ratified by

Congress–it has long been the Secretary's policy that inpatient days of individuals receiving care

under any general assistance or State-only program cannot be included in the Medicaid proxy "if a

patient is *not* eligible for medical [care] under an approved Title XIX State plan," AR 402

("Program Memorandum A-99-62) (emphasis in original), *see also* 51 Fed. Reg. 16772, 16777

---

[12]  *See, e.g.,* AR 405 (PM A-99-62:  Attachment):

| Type of Day | Description | Eligible Title XIX Day |
| --- | --- | --- |
| General Assistance Patient Days | Days for patients covered under a *State-only* (or county-only) general assistance program (whether or not any payment is available for health care services under that program).  These patients are not eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a *State-only* health program.  These patients are not Medicaid eligible under the State plan. | No. |

(emphasis added).

(1986), and plaintiff cites no judicial authority that has ever required inclusion of State-only

individuals in the Medicaid proxy of the Medicare DSH provision.

Finally, plaintiff's continued insistence that, because, an individual in the State-only

populations might somehow be "eligible for medical assistance . . ." even if they are not eligible

for Medicaid in Arizona, the inpatient days of that individual must be included in the Medicaid

proxy of the Medicare DSH provision, Pl. Opp'n at 22-24 (ellipsis in original), fails to even

acknowledge that there is a federal and state-residency requirement for all State Medicaid plans.

*See* 42 C.F.R. §§ 435.403(a), 435.203(i)(1)(i), 435.907.  *See also, e.g.,* Ariz. Rev. Stat.

§ 36-2903.01(D) (requiring proof of Arizona residency to be provided benefits under AHCCCS).

Plaintiff's argument that, but for the residency requirement, individuals enrolled in AHCCCS

State-only programs could be "eligible for medical assistance under a State plan approved under

subchapter XIX" in another State is obviously meritless, since residency is part of eligibility.[13]

Nor, for the reasons stated above, can plaintiff rely, Pl. Opp'n at 17-18, on the fact that the

Secretary later approved Arizona's inclusion of many of the same individuals receiving care under

AHCCCS's State-only programs as a waiver population under Social Security Act § 1115(a) as

evidence that they were "eligible for medical assistance under a State plan approved under

subchapter XIX" during the relevant periods at issue here.[14]  Further, the Secretary need not count

---

[13]  Plaintiff's suggestion that, had Congress meant to require Medicaid eligibility, it should have used the term "Medicaid recipient," Pl. Opp'n at 21, is meritless, since, as plaintiff itself admits, the term "Medicaid recipient" is legally equivalent to the term "eligible for Medicaid,"  42 C.F.R. § 400.203, just as the courts have determined that the term "eligible for medical assistance under a State plan approved under subchapter XIX" is legally equivalent to the term "eligible for Medicaid."  *See Cabell Huntington*, 101 F.3d at 988.

[14]  Indeed, Arizona still maintains separate eligibility requirements for individuals receiving medical assistance under Title XIX and individuals in the expansion waiver population who used to receiving health care benefits under AHCCCS's MN/MI program.  *See* Ariz. Rev. Stat. § 36-2901(a)(i), (iv) ("Eligible person" means *either* "mandatorily or optionally eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct as authorized by the [S]tate plan" *or* eligible under § 36-2901.01) (2008).  *See also id.* § 36-2901.01 ("'eligible person' includes any person who has

the State-only populations under the policy with respect to hypothetical eligibles, since at no time

has Arizona identified the State-only populations in the budget neutrality agreements found in the

Special Terms and Conditions for the demonstration project in accord with the federal policy that

requires that demonstration projects be budget-neutral with respect to the federal government, *i.e.*,

that the federal government's costs over the life of the project do not exceed the contribution that

the federal government would make to the State under the State Medicaid plan in the absence of

the project. 65 Fed. Reg. at 3136; *see generally* 59 Fed. Reg. 49249, 49250 (Sept. 27, 1994).

Finally, despite plaintiff's attempt to dismiss the significance of their burden to establish an

entitlement to payment, Pl. Opp'n at 25, the bottom line is that plaintiff's hospitals had a sufficient

opportunity to demonstrate that some or all of the individuals enrolled in AHCCCS State-only

programs were also eligible for Medicaid during the time of their hospitalizations and were unable

to do so.[15]

> E.    **The Secretary's Application of His Hold Harmless Policy to the Facts of This Case is Reasonable and Consistent with the Terms of the Policy**

Plaintiff's claim, that by discussing in his opening brief the Eighth Circuit's opinion

upholding the Secretary's Hold Harmless policy in *United Hosp. v. Thompson*, 383 F.3d 728, 730

---

an income level that, at a minimum, is between zero and one hundred per cent of the federal
poverty guidelines . . . and also based on other eligibility requirements of federal law or the
[Health [C]are [F]inancing [A]dministration pursuant to *§ 1115* of the [S]ocial [S]ecurity [A]ct.")
(2008) (emphasis added). Moreover, Congress's ratification in DRA § 5002(b) of the Secretary's
policy of excluding from the Medicaid proxy of the Medicare DSH calculation the inpatient days
of expansion waiver populations for discharges prior to January, 20, 2000, provides further support
for the Secretary's final determination, since these individuals are not, and never have been
"eligible for medical assistance under a State plan approved under subchapter XIX."

[15] Similarly, to the extent that plaintiff maintains that its hospitals are entitled to Medicare
DSH payments that reflect the inclusion of the inpatient days of the State-only patients in the
Medicaid proxy because those patients were somehow eligible for medical assistance under a State
plan approved under subchapter XIX from another State, the record is devoid of any showing that
the State-only patients were so eligible in any other State, if *arguendo*, eligibility for Medicaid
outside Arizona mattered.

(8th Cir. 2004), Def. Mem. at 41-42, the Secretary has imposed on plaintiff's hospitals

requirements which are not found in policy, is without merit.  To clarify the Secretary's Hold

Harmless policy, the Secretary issued a series of Questions and Answers to Intermediaries.  In

determining whether Hold Harmless treatment was appropriate, the Secretary quoted Question and

Answer 16 in the final determination at issue here:

> Q16.  How are the open cost reports for fiscal years beginning prior to 1-1-00 to be
> handled in a situation where the intermediary disallowed the ineligible days during
> the audit of the latest settled cost report (*e.g.*, FYE 12-31-97) but allowed them in
> the preceding cost reports(s) (*e.g.*, FYE 12-31-96 or FYE 12-31-96 and several
> prior fiscal years)?
>
> A. . . . *If the hospital abandoned its expectation of receiving payment in those open
> cost reports (FYE 12-31-98 and FYE 12-31-99) and did not even include this issue
> on the "protected amount" line, the intermediary should not continue paying the
> Medicare DSH adjustment reflecting the inclusion of these types of days for those
> years.*

AR 19 (emphasis in original).  Applying that policy to this case, the Secretary found that "the

Providers had abandoned their expectation of receiving payment before the Program Memorandum

had been issued."  AR 20.  In addition, the Secretary found that the hospitals' appeals "did not

raise the issue of the inclusion of State-only days."  *Id.*  Plaintiff cannot reasonably deny that

Question and Answer 16 is part of the Secretary's Hold Harmless policy, and his findings are

consistent with it.  *Accord Univ. Health Servs., Inc. v. HHS,* 120 F.3d 1145, 1149-50 (11th Cir.

1997) (rejecting claim that "the Secretary's decision is based on an unreasonable interpretation of

the governing interpretive rules.") (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512

(1994)).

    Moreover, where the Secretary's position is consistent with his past statements and actions,

"there is good reason for the court to defer, for then the position seems simply to articulate an

explanation of longstanding agency practice."  *Drake v. F.A.A.*, 291 F.3d 59, 69 (D.C. Cir. 2002).

As the Secretary has explained both in his final determination here and in prior litigation "the

intent of continuing payments for the incorrect inclusion of general assistance [or State-only] days was to prevent hardship on hospitals that were relying on payment based on prior treatment *and receipt* of these funds." AR 19 (emphasis added). *See also, e.g., Rush-Presbyterian-St. Lukes Med. Ctr. v. Blue Cross*, No. 2006-D5, 2006 WL 752456, *13 (Decision of Admin., Jan. 17, 2006) ("The Intermediary cannot continue to pay the Medicare DSH adjustment reflecting the inclusion of [general assistance or State-only] days to the Provider, one of the conditions for application of the "hold harmless" provision, as the Intermediary had not made such incorrect payments in the past. As the Provider had not received payment in the past reflecting the inclusion of [general assistance or State-only] days, it would not have made budgeting decisions based on a belief that it would continue to be entitled to such payments. Thus, the Provider does not qualify for the "hold harmless" provisions of PM A-99-62."). Thus, because the Secretary's position here is consistent with his past statements and actions, this Court should uphold the Secretary's final determination.[16]

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's Motion for Summary Judgment, grant the Secretary's Motion for Summary Judgment, and enter judgment for defendant.

---

[16] It should be noted that plaintiff appears to concede that, even under its proposed interpretation of the Hold Harmless policy, only one of its hospitals, Good Samaritan, would qualify for Hold Harmless treatment, because it was the only one of plaintiffs' hospitals that had *ever* received erroneously included State-only days in its Medicare DSH payments. Pl. Opp'n at 25-26. But even this hospital had not received such payments for more than ten years. Indeed, the Secretary informed Good Samaritan, and all Arizona hospitals receiving Medicare DSH adjustments at the time, that for cost reports after 1989, Medicare DSH adjustments would be based only on Medicaid days, not State-only days. AR 456. Even though Good Samaritan was on notice, neither Good Samaritan nor any of plaintiff's other hospitals brought an appeal on this specific issue until after the "October 15, 1999 date set forth in the Program Memorandum [announcing the Hold Harmless policy] and, therefore, they cannot find relief under its terms." AR 20.

Dated:  April 16, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

KENNETH L. WAINSTEIN
U.S. Attorney for the District of Columbia

SHEILA LIEBER
Deputy Director, Federal Programs Branch

/s/ James D. Todd, Jr.
JAMES D. TODD, JR., Senior Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20530
(202) 514-3378
(202) 616-8470 (fax)
*james.todd@usdoj.gov*
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2008, a copy of the foregoing pleading, together with proposed order, was filed electronically via the Court's ECF system, through which a notice of the filing will be sent to:

CHRISTOPHER L. KEOUGH, Esq.
Vinson & Elkins, L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, DC 20004
(202) 639-6745
(202) 879-8945 fax
*ckeough@velaw.com*

STEPHANIE A. WEBSTER, Esq.
Vinson & Elkins, L.L.P.
1455 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 639-6634
(202) 879-8832 fax
*swebster@velaw.com*
Attorneys for Plaintiff

/s/ James D. Todd, Jr.
JAMES D. TODD, JR.

# State of Arizona
## Fife Symington, Governor



# ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

# WAIVER PROPOSAL FOR 100% FEDERAL POVERTY LEVEL

Prepared for:
HEALTH CARE FINANCING ADMINISTRATION
U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES
MAY 1997

H.E./P-0069
1387

# TABLE OF CONTENTS

TRANSMITTAL LETTER

EXECUTIVE SUMMARY


CHAPTER 1        WAIVER AMENDMENT RATIONALE


CHAPTER 2        DESIGN FOR THE PROPOSAL


CHAPTER 3        EVALUATION QUESTIONS


CHAPTER 4        COST AND CASELOAD ESTIMATES


CHAPTER 5        REQUESTED WAIVERS


APPENDICES

Appendix I       Quality Initiative Material

Appendix II      Acute Care Covered Services

Appendix III     Caseload Estimate Documentation
                 Table 3.1      AHCCCS Categorical Growth Rates
                 Table 3.2      Arizona Population Growth 1997 - 2002
                 Table 3.3A     Comparison of Estimates of Arizona's Low Income Insured
                                Population
                 Table 3.3B     An Historic Perspective of Poverty and the Uninsured in Arizona

Appendix IV      Cost Estimate Documentation
                 Table 4.1      Base AHCCCS Budget for Federal Fiscal Year 1998
                 Table 4.2      Construction of Acute Capitation Rate for New Low Income
                                Population
                 Table 4.3      Capitation Worksheet by Federal Fiscal Year

Appendix V       Letters of Support

1398 H.E./P-0070



STATE OF ARIZONA

## EXECUTIVE OFFICE

FIFE SYMINGTON
Governor

June 29, 1997

Mr. Bruce C. Vladeck
Administrator
Health Care Financing Administration
Hubert Humphrey Building, Room 314-G
200 Independence Avenue, S.W.
Washington, D.C.  20201

Dear Mr. Vladeck:

I am pleased to submit this amendment to the current Arizona Health Care Cost Containment System (AHCCCS) 1115 Research and Demonstration Waiver. This proposal, offering Medicaid eligibility to adults and children with incomes up to 100% of the federal poverty level (FPL), is a product of three years of discussions between my office, the Arizona legislature, the AHCCCS Administration and many other interested parties.  The proposal has become a critical element of Arizona health policy based on the will of Arizona voters who overwhelmingly approved a November ballot measure requiring AHCCCS to expand eligibility up to the 100% FPL standard, subject to HCFA approval.

The proposal will simplify eligibility, expand health care coverage through the successful AHCCCS program and complement other state-funded programs that Arizona has initiated to provide health care coverage for low income and chronically ill persons.  Without question, AHCCCS is a mature managed care program that is imminently capable of successfully implementing this proposal.  I fully support the waiver request and will work with HCFA to address any issues or questions you may have.  One issue that I know we will discuss is budget neutrality. I trust that we will resolve any differences in an equitable manner since we have a mutual goal of increasing -- within the contraints of our respective budgets -- the number of individuals who have access to health care.

1369

Mr. Bruce C. Vladeck
June 29, 1997
Page Two


I look forward to your response on this proposal. If you have any questions, please call Jack Kelly, AHCCCS Director at (602) 417-4111.

Sincerely,

Fife Symington
GOVERNOR

FS/smh

cc:    Ms. Donna E. Shalala, Secretary of Health and Human Services
       Arizona Congressional Delegation
       Members of the Arizona Legislature
       Members of the Governor's Task Force

# EXECUTIVE SUMMARY

Arizona requests approval from the Health Care Financing Administration (HCFA) to amend the current Arizona Health Care Cost Containment System (AHCCCS) 1115 Research and Demonstration waiver and to extend the demonstration through September 30, 2002. With HCFA approval, AHCCCS will implement a new initiative that will allow the state to extend acute care Medicaid eligibility to low income adults and children with income up to 100% of the federal poverty level and a Medical Expense Deduction program for persons with unpaid medical bills. AHCCCS intends to use its successful managed care model to implement expanded health care coverage to low income populations beginning January 1, 1998, with full implementation by April 1, 1998. This proposal will enable the state to serve as a managed care model and realize the goal of increasing health care coverage for low income adults and children, which is supported by the Clinton Administration and many members of Congress.

Unlike many states who have requested population expansions while transitioning into a managed care environment from a fee-for-service program, AHCCCS is not in the embryonic stage of managed care. AHCCCS is a stable, mature, managed care program with a proven infrastructure and is prepared to enroll the new populations with AHCCCS' health plans with no disruption to the existing Medicaid population. With almost 15 years of experience in operating a managed care program, AHCCCS believes that this proposal is a logical progression for the state and an effective means to achieve health care reform by providing Medicaid coverage to low income individuals, families and children. As part of the proposal, AHCCCS will simplify eligibility for the acute care portion of the AHCCCS program and reduce the time it takes to make a final eligibility determination. Eligibility for the Arizona Long Term Care System will not be changed by this proposal.

Public support for this proposal in this state is significant; over 72% of Arizona voters approved a ballot Initiative to extend eligibility for the acute care medical AHCCCS program to individuals with income up to 100% of FPL. A Governor's Task Force, consisting of a broad cross-section of different constituencies, has met formally to discuss the shape of the proposal and overwhelmingly endorse the expanded coverage.

2.3     Service Delivery Structure

2.4     Public Notice

2.5     Health Care for Native Americans

## 2.1 ELIGIBILITY BASED ON 100% OF FPL

In Arizona, individuals can be eligible for either Medicaid or for one of the 100% state-funded programs. Therefore, in a single family unit, some individuals are eligible for Medicaid services while others receive a more restrictive service package through one of the state-funded programs. This proposal will allow AHCCCS to integrate family coverage by basing it on a gross income test and not categorical linkages. Two other major benefits for members will be a uniform service package, including behavioral health services, and the right to choose a health plan.

**Eligibility Hierarchy Under the Proposal**

To meet the objective of simplifying the eligibility categories and streamlining eligibility determinations, AHCCCS will establish an eligibility hierarchy for the application process.

AHCCCS provides coverage for all persons eligible for the federal mandatory groups, including recipients of SSI cash assistance, TANF cash assistance, SSI and (formerly AFDC) Section 1931 MAO groups, and SOBRA pregnant women, infants and children. AHCCCS also covers many of the optional federal eligibility categories. The SOBRA income standards are based on the federal poverty level and currently are established at 140% of FPL for pregnant women and infants; 133% of FPL for children up to age 6; and, 100% of FPL for children 6 years or older, born on or after October 1, 1983. Through the authority of Section 1902(r)(2) of the Social Security Act, AHCCCS also covers children up to age 14, if the child's net income is at or below 100% of FPL.

AHCCCS also operates a 100% state-funded Medically Needy/Medically Indigent program (MN/MI) and two smaller state-financed programs for children known as the Eligible Assistance Children (EAC) and Eligible Low Income Children (ELIC) programs. Many of the individuals in the state-funded programs could be eligible for Medicaid if they applied for the current AHCCCS Medicaid program or could be eligible to receive Medicaid services through a federal medically needy option, if Arizona elected this option. In fact, a 1996 AHCCCS study of the state-funded programs in Arizona revealed that 29 percent of the population had categorical linkages and could be eligible for Medicaid. Under this proposal, 86.9% of the individuals in the state-funded groups will be eligible for Medicaid based on the 100% of FPL criteria and will be converted from the state-funded program to Medicaid. The remainder of the state-funded

1392     H.E./P-0074

population will be converted into the MED program discussed below in Section 2.2. As explained earlier, integrating this population into Medicaid will expand services for this population and provide all members with a choice of health plans, rather than automatic assignment into a health plan which is the current procedure for the MN/MI populations.

AHCCCS will also streamline the eligibility process by using one of the seven groups below, rather than determining eligibility under one of the 25 different Medicaid categories in use today. If the individual qualifies based on 100% of FPL, they will be eligible for AHCCCS on the first day of the month of application. If an individual does not qualify based on one of the eight groups, AHCCCS will screen applicants for potential eligibility under one of the other Medicaid categories authorized under the State Plan. By using this streamlined process, the time it will take to process eligibility determinations should be significantly reduced and individuals will be enrolled into a managed care health plan more quickly. The seven groupings that AHCCCS will use are:

- Adults and children eligible for Section 1931 TANF-Medical Assistance Only, with gross income up to 100% of FPL as allowed under more liberal income and resource disregards. This group will be subject to the enrollment cap discussed in the budget neutrality section of this Chapter. Families with children who qualify under the TANF definition of deprivation which will allow the state to disregard the difference between the AFDC standard of payment and 100% of FPL. This group will be subject to the enrollment cap discussed in the budget neutrality section of this Chapter.

- Recipients of TANF cash, Title IV-E Foster Care, Adoption Subsidies, deemed TANF groups and persons eligible for Transitional Medical Assistance (TMA).

- SSI cash recipients and related SSI-MAO groups.

- SOBRA pregnant women, infants and children with income above 100% of FPL.

- Single adults and couples without children in assistance units with gross countable income up to 100% of FPL. This group will be subject to the enrollment cap discussed in the budget neutrality section of this Chapter.

- Individuals eligible for the medical expense deduction (MED) program based on the income and resource criteria discussed in Section 2.3 of this Chapter. This group will be subject to the enrollment cap discussed in the budget neutrality section of this Chapter.

- Illegal immigrants and non-qualified immigrants who apply for the federal emergency services program.

II-3

H.E./P-0075
1383

during the readiness reviews, AHCCCS will accommodate the request.  If at any time during the demonstration, AHCCCS determines that additional health plan capacity is required, health plans will be added to the program.

As with the existing AHCCCS program, all new enrollees will have an initial six month period of guaranteed enrollment, a choice of health plans and primary care practitioners and all other rights and privileges afforded to the AHCCCS Medicaid population.

AHCCCS imposes nominal copayments on services provided to Medicaid eligible persons enrolled in the acute care program.  These copayments are not imposed on prenatal care visits, including all obstetrical care; EPSDT care; services provided to members residing in a nursing facility; prescription drugs and medications; and visits scheduled by a primary care physician/practitioners which are not requested by the member.  The copayments are $1 for each physician visit; and diagnostic and rehabilitative, x-ray and laboratory services; $5 for all non-emergency surgery; and, $5 for the non-emergency use of the emergency room.  AHCCCS proposes to make one change to the schedule by increasing the charge for the non-emergency use of the emergency room to $25 for all members enrolled with AHCCCS.  The current AHCCCS policy which requires providers to waive the copayment requirements if a person cannot afford to pay will continue.

Adding these new populations will improve access to health care and will be positive for AHCCCS health plans since membership will be much more stable if based on a specific income level, rather than more transitory Medicaid linkages.  The six month guaranteed enrollment period will also allow the health plans to manage the health care needs of the new population, promote preventive care and minimize their risk.  AHCCCS will also ensure that the health plans comply with the following requirements to ensure that the current system can absorb the new population without any disruption to the existing members:

- *Network*.  By contract, AHCCCS has set stringent standards for the provider network which require that each health plan network is sufficient to provide all covered services within designated times and distances, including emergency medical care on a 24-hour day, 7 days a week basis.  In fact, this variable is one of the most important items scored in the evaluation of health plan bids.  Although all health plans will be advised that they must expand provider networks to meet the demands of the new expanded population, AHCCCS will ensure compliance through readiness reviews.

- *Financial Solvency*.  The established financial solvency requirements for health plans will be the same for the new populations; however the amount of financial reserves may change to reflect any increased enrollment within a health plan.  The requirements include minimum capitalization requirements and a performance bond or an approved substitute.  AHCCCS will use established financial viability criteria to assess each health plan on the following factors: the ratio of current assets divided by current liabilities; the equity per member

II-8

H.E./P-0080

(failure to meet this standard could result in a cap on new enrollment into the health plan by AHCCCS); medical expenses divided by capitation payments; the total administrative costs; and, the number of days unpaid bills are outstanding.

- *Reporting*.  Accurate and timely encounter reporting will continue to be required of all health plans for all enrollees, including the new population.

- *Quality Management*.  All AHCCCS health plans must comply with Quality Management standards specified in contract and develop a Quality Management Plan.  As part of that Plan, each health plan must conduct two clinical studies per year and incorporate ways to improve performance rates for quality indicators with established baselines.  Please see Appendix I for more detailed information.

As part of this demonstration, AHCCCS will implement age and sex adjusted rate codes for all AHCCCS members, except the SSI, SSI-related MAO groups and individuals eligible for the MED program.  AHCCCS will report expenditure information on the HCFA-64 report for the new age and sex rate codes.

## 2.4  PUBLIC NOTICE PROCESS

AHCCCS will meet or exceed public notice requirements published in the *Federal Register* in September 1994.  In 1995, the legislature held extensive public hearings on an almost identical proposal, later submitted to HCFA as a waiver request in March 1995.  Public support for the 1995 proposal was significant. When the legislature failed to pass the enabling legislation for the 1995 proposal, an Initiative measure to extend eligibility to 100% of FPL was circulated and sponsors gained enough signatures to place it on the 1996 ballot.  In the 1996 election, over 72% of Arizona voters overwhelmingly supported an expansion of AHCCCS eligibility for individuals with income that did not exceed 100% of FPL.

In support of the voter mandate, Governor Symington convened a special Task Force on the FPL proposal.   Task Force members included the Governor and key staff, and members of:  the legislature and staff, representatives from AHCCCS, the Department of Economic Security and the Department of Health Services, representatives from the Healthy Arizona Initiative (the group that sponsored the successful Initiative measure), the County Supervisor's Association and county officials from Maricopa and Pima Counties, the Arizona Hospital and Healthcare Association and individual hospital representatives, University Medical Center, the Arizona Medical Association, Association of Community Health Centers, Governor's Commission on Indian Affairs and consumers.   Task Force members have met three times to discuss concepts contained in this proposal and were provided a copy of the proposal.  Task Force meetings are open to the press which provides an avenue for the public to remain informed about the proposal.

1399    H.E./P-0081

The Governor's Office also convened tribal members representing many of the Arizona Tribes as well as representatives from the Advisory Council on Indian Health Care, the Inter-Tribal Council, the Governor's Commission on Indian Affairs and the Indian Health Service. The purpose of the meeting was to discuss the waiver proposal and the Native American On-Reservation Demonstration Program pending at HCFA and solicit comments and other areas of interest to the Tribes. A copy of this proposal has been provided to each tribal leader.

The letters of support which are provided in Appendix V show significant support for this proposal. AHCCCS will also share this proposal and solicit additional comments in the next few months from any other consumer groups who express an interest in the proposal. The agency has discussed this proposal with the Arizona Hospital and Healthcare Association, Association of Rural Health Centers and the State Medicaid Advisory Committee. The legislature will also encourage public comment on the proposal in public hearings before the legislature later this year.

## 2.5 HEALTH CARE FOR NATIVE AMERICANS

This waiver proposal will expand health care opportunities for all citizens who have income at or below 100% of FPL. It provides increased access to health care services and will expand the availability of services that are available to Native Americans. This waiver is not intended to diminish the availability of health care for tribal members who choose to receive services through IHS. It would undermine the intent of this proposal if the federal government retreated from their health care responsibilities to Native Americans or if they reduced their financial commitment to fund IHS services in Arizona.

H.E./P-0082
1400

October 16, 2000

Joan Peterson, Ph.D., Project Officer
HCFA, CMSO/FCHPG/DIHS
7500 Security Blvd., Mail Stop S2-01-16
Baltimore, Maryland 21244-1850

Dear Joan:

The following are the responses to your e-mail dated September 12 requesting additional information about the eligibility waiver expansion submitted by AHCCCS. I am also enclosing a revised Chapter Two to replace the original Chapter submitted to HCFA in May 1997.

1.    *What criteria and process will the State use to determine eligibility for the second group listed on page 1 of your letter, namely "individuals who are not categorically linked to Medicaid (e.g., single adults and couples with no children or women who are not pregnant)?" Please provide a more complete description of this eligibility category.*

      These are individuals who do not currently qualify for Medicaid because they do not have a categorical linkage. They are men and women without children or couples without children. AHCCCS will screen an applicant for Medicaid eligibility, and if ineligible, the person will be screened for eligibility based on 100% of the FPL with the same deductions that are allowed for the 1931(b) group. Please see the revised Chapter Two for a more detailed description.

2.    *Who is Arizona currently covering under its State-only programs? Would these populations be entirely subsumed under the proposed eligibility expansion? Does AHCCCS still intend to cover all the State-only groups included in the May 1997 proposal through this expansion (including children in the Eligible Assistance Children and the Eligible Low Income Children programs), even though they are not mentioned in your August 15 letter?*

      Currently, Arizona provides health care coverage with 100% state funds to the following five groups:

      •    **Medically Indigent.** Men and women without children or childless couples who have income at or below 40% of the FPL.

Joan Peterson
October 16, 2000
Page 2

- **Medically Needy.** Persons with higher income but sufficient unpaid medical bills to spend down to 40% of the FPL.
- **Eligible Assistance Children.** Persons under the age of 14 years who are not eligible for Medicaid. In October 2000, there were 345 children residing in a food stamp household with household income up to 100% of FPL. Because the food stamp household has different budgeting requirements, there are children who are eligible as a food stamp household who do not qualify for Medicaid.
- **Eligible Low Income Children.** Persons under the age of 14 who are not eligible for MN/MI or Medicaid because of too much income. In October 2000, there were 94 children residing in a household with income up to 100% of FPL.
  - **State Emergency Services.** Low income undocumented persons or non-qualified legal immigrants with income up to 40% of FPL. These individuals can also spend down unpaid medical bills to 40% of FPL. This group only receives emergency services.

The above groups will be "subsumed" by this eligibility expansion. Arizona will not be operating a parallel state-funded program for these same populations and will convert all existing state-funded populations into the proposed eligibility expansion.

3. *On page 1 of the letter, you state that the third group to be covered by the expansion is "individuals who meet the Medical Expense Program criteria." However, the two groups described on page 2 appear to include the Federal Emergency Services program as well as the State-only Medical Expense Program. Please clarify who is included in the two groups listed on page 2 and whether or not these go beyond "individuals who meet the Medical Expense Program criteria."*

Please see the revised Chapter Two for more detail. To give you a complete picture of who will be covered by AHCCCS, it may be helpful to describe the groups. The following will be eligible for Medicaid once the waiver is approved:

**Families.** The first screen will be based on 1931(b) with income up to 100% of FPL with deductions allowed for income exclusions allowable under federal law, a deduction for dependent care up to $200 per month and a deduction of $90 for employment-related expenses.

**Ribicoff and AF-related (210) groups**. These individuals will be subsumed under the expansion and reduce the number of groups that DES must screen for Medicaid eligibility without affecting their eligibility for Medicaid services. AHCCCS will also accelerate the phase-in of children born on or after September 30, 1983 to age nineteen.

**Women and children.** If ineligible under 1931(b) requirements, the next screen will be based on S.O.B.R.A income levels which are 140% of FPL for pregnant women and infants, 133% of FPL for chilren one to five years and 100% of FPL for children over the

Joan Peterson
October 16, 2000
Page 3

age of five years.

**Aged, Blind and Disabled (SSI-Related).** Eligibility for SSI-related for the acute care program will be raised to 100% of the FPL except for the mandatory SSI-MAO categories.

**Foster Care and Adoption Subsidy.** These groups will remain.

**Men and women without children and couples without children.** Also referred to as the "non-categoricals", this group will be screened for eligibility based on 100% of the FPL with the same income exclusions allowed for the 1931(b) group. The date of eligibility will be the first day of the month of application or the first day of the month in which the person is eligible.

**Undocumented Persons and Non-qualified Legal Immigrants.** This group will be eligible for only emergency services based on one of three critera: (1) categorical linkage to existing Medicaid categories; (2) non-categorical individuals with income at or below 40% of the FPL frozen at 2000 levels; or (3) eligibility for the Medical Expense Deduction (MED) program described below. For categorically linked persons and those with income at or below 40% of the FPL, the date of eligibility will be the first day of the month of application or the first day of the month in which they are found eligible.

**Medical Expense Deduction (MED).** The MED program will provide health care coverage for individuals and households who have a catastrophic illness or medical event. Under this proposal, individuals and their family members will be determined Medicaid eligible based on incurred medical bills, which will enable individuals to spend down to the established income level of 40% of the FPL frozen at 2000 levels.

AHCCCS will use income levels that approximate the current state-funded Medically Needy (MN) program that is $3200 per year for an individual, $4,260 for two persons and an additional amount for each additional person. The following criteria will be used to determine eligibility:

1.      The household income that will be considered will be the current month's income at the time of application taking into consideration any projected changes multiplied by three months.

2.  U.S. citizenship or legal alienage requirements for U.S. citizens. Undocumented persons or non-qualified legal immigrants will only receive emergency services.

3.  Medical bills, not subject to third party recovery, incurred during the three income counting months and the month following the month of application will be sequentially deducted from the income to determine when spend down is met.

4.  A resource test will be imposed. The total of all resources, including equity in a home, cannot exceed $50,000; liquid resources cannot exceed $5000. One car will be excluded.

Joan Peterson
October 16, 2000
Page 4

5.  The date of eligibility will be the first day of the month of application or the day that spend
    down is met, whichever is later.  Eligibility will be granted for up to six months from the
    month of eligibility.

        For U.S. citizens or persons who meet the alienage requirements, all AHCCCS services
        will be provided through AHCCCS health plans based on capitation rates set by
        AHCCCS.  Undocumented persons or non-qualified legal immigrants will only receive
        emergency services.  Full service members will be given a choice of available health
        plans at the time of application.  Prior quarter coverage would not be provided to the
        MED population.

4.    *Are you planning to retain a Medical Expense Program per se under the expansion?*
      *If so, please provide information on how the program would work, including any*
      *changes from the current State-only program.*

      Please see the revised Chapter Two for more detail and the response to Question Three.
      Arizona will not retain a 100% state-funded MED program after this waiver is approved.
      Under this proposal, individuals and their family members will be determined Medicaid
      eligible based on unpaid medical bills that will enable an individual to spend down
      household income to 40% of the FPL frozen at 2000 levels.   This income test
      approximates the current state-funded Medically Needy income levels of $3200 per year
      for an individual, $4,260 for two persons and $544 for each additional person.

5.    *Would non-categorically eligible people, as well as people who meet the categorical*
      *requirements, be eligible under the spend down program?  Also, is a spend down*
      *required, or could those who are under 40 percent FPL qualify, regardless of medical*
      *expenses?  Please confirm that spend down can be met by documenting liabilities (i.e.,*
      *bills) that would reduce the individual/family to below 40 percent FPL, rather than by*
      *presenting receipts for bills paid.   Finally, what does "individuals and family*
      *members" mean in the spend down group?  What is the eligibility unit, individuals or*
      *families?*

      Spend down is not required in order to establish eligibility for the eligibility expansion.
      The MED program is a means by which U.S. citizens and persons who meet the alienage
      requirements, who are not eligible for Medicaid or 100% of FPL may use unpaid medical
      bills to spend down to at least 40% of the FPL frozen at 2000 levels.  If eligible, the entire
      household is eligible for full services.  Undocumented persons or non-qualified legal
      immigrants may also qualify for the MED program but will only receive emergency
      services and only the individual is eligible, not the entire household.

6.    *Would non-qualified legal immigrants and undocumented persons enrolled on a spend*
      *down basis be covered only for emergency services?  Please elaborate on your proposal*
      *with regard to coverage of non-qualified legal immigrants and undocumented persons.*

Joan Peterson
October 16, 2000
Page 5

Only emergency services will be covered for this group. Please see the response to questions four and five for more detail on this group.

Joan Peterson
October 16, 2000
Page 6

7.  *Does AHCCCS intend to not apply a resource test only for the expansion population, or will this be eliminated for all title XIX populations?*

A resource test will be eliminated for all acute care groups except those who qualify for the MED program.

8.  *Does AHCCCS want to eliminate prior quarter coverage (3 months' retroactive eligibility under section 1902(2)(34)) only for the acute care program, or also for the long term care program (as stated on page II-5 of your May 1997 waiver request)?*

AHCCCS is requesting a waiver of prior quarter coverage for all eligible populations in both the acute care and long term care program.

9.  *You indicate that persons enrolled at income levels up to 100 percent FPL would not be disadvantaged by any rollback in eligibility levels, but would remain in the program at the 100 percent FPL income level, if otherwise eligible. Does this mean that any reduced income level would not be applied to this "grandfathered" group at the time of redetermination, but would apply only to new applicants and to those whose eligibility had ceased and who were now reapplying?*

If the state reduces eligibility levels at a later date, persons who are currently eligible at 100% or below of FPL would be re-determined based on 100% of FPL. Reduced income levels will not be applied to the "grandfathered" group. Only new applicants would have income measured at a lower eligibility level.

10.  *In your proposed term and condition, you say that "the State shall provide previously agreed-upon data to support the request for a reduction based on the fact that continued enrollment will exceed the amount budgeted for the program." Please describe the type of data that you anticipate submitting.*

AHCCCS will continually monitor enrollment and costs for the expansion to determine if federal or state budget neutrality will be exceeded at the current eligibility levels. The type of data that AHCCCS will use is the cost for the non-categorical population that is subject to budget neutrality. The data will be supplied to HCFA within 60 days of the intended action as justification to lower the eligibility level.

Please call me at (602) 417-4447 if you have any further questions or need clarification.

Sincerely,


Lynn Dunton
Assistant Director



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Health Care Financing Administration

Deputy Administrator
Washington, D.C. 20201

JAN 1 8 2001

Ms. Phyllis Biedess
Director
Arizona Health Care Cost
 Containment System
801 East Jefferson
Phoenix, Arizona 85034

Dear Ms. Biedess:

We are pleased to inform you that we have approved your requests to: (1) expand eligibility to
100 percent of the Federal poverty level (FPL) for the acute care program; and (2) waive the
requirement to provide prior quarter coverage to new enrollees in both the acute and long term
care programs of the Arizona Health Care Cost Containment System (AHCCCS). As part of the
eligibility expansion, we are approving a budget neutrality agreement limited to the acute care
program that covers the period April 1, 2001, through September 30, 2006. However,
continuation of the budget neutrality agreement beyond September 30, 2002, the current
expiration date for the overall AHCCCS demonstration, is contingent on the extension of the
demonstration beyond September 30, 2002. Approval is under the authority of section 1115 of
the Social Security Act (the Act).

The following expenditure authority is granted for the eligibility expansion:

Under the authority of section 1115(a)(2) of the Act, expenditures made by the State for the items
identified below (which would not otherwise be included as matchable expenditures under
section 1903) shall, for the period of this project, be regarded as matchable expenditures under
the State's Medicaid State plan:

> Expenditures to provide Medicaid coverage to individuals with adjusted net countable
> income at or below 100 percent of the FPL who are not otherwise eligible for Medicaid.

> Expenditures to provide Medicaid coverage to individuals who have medical bills
> incurred by the family unit sufficient to reduce their adjusted net countable family income
> to 40 percent or less of the FPL and who are not otherwise eligible for Medicaid.

In addition, the following waiver is granted under the authority of section 1115(a)(1) of the Act:

> To enable the State to waive the requirement to provide medical assistance for up
> to 3 months prior to the date that an application for assistance is made.

Section 1902(a)(34)

Page 2 - Ms. Phyllis Biedess

The demonstration authority approved in this letter is subject to compliance with the enclosed special terms and conditions. These have been revised to include the budget neutrality agreement. The cumulative list of waivers and expenditure authorities for the overall AHCCCS demonstration is also enclosed. Notification to our office of your acceptance of this award must be received within 30 days after you receive this letter.

Your project officer continues to be Ms. Joan Peterson, who may be reached at (410) 786-0621. Communications regarding program matters should be sent to the project officer at the following address: Health Care Financing Administration, Center for Medicaid and State Operations, Family and Children's Health Programs Group, Division of Integrated Health Systems, Mail Stop S2-01-16, 7500 Security Boulevard, Baltimore, Maryland, 21244-1850. Administrative correspondence concerning the project should also be submitted to Ms. Peterson.

We look forward to working with you on the continued success of the AHCCCS program.

Sincerely,

Robert A. Berenson, M.D.
Acting Deputy Administrator

Enclosures