**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF FILING OF PLAINTIFF'S APPENDIX**

Pursuant to Local Rule 7(n), Plaintiff submits the attached Appendix containing all pages of the Administrative Record cited by the Plaintiff and the Defendant in their pleadings filed with the Court in this case.

Plaintiff's counsel has conferred with Defendant's counsel in an unsuccessful attempt to reach an agreement as to the contents of a joint submission.  Plaintiff's counsel received no response from Defendant's counsel to email communications regarding the Appendix that were sent to Defendant's counsel on Friday, April 25, 2008, and again on Tuesday, April 29, 2008.

Defendant's last communication regarding the Appendix proposed to include documents from the Administrative Record that were not cited in any pleadings filed in this case, as well as new evidence that is not in the Administrative Record and is the subject of Plaintiff's April 22, 2008 Motion to Strike.

Consistent with Local Rule 7(n), Plaintiff's Appendix includes all pages of the Administrative Record cited by the Plaintiff and the Defendant in their pleadings filed in this

case.  Plaintiff has not included the non-record evidence that Defendant requested to include in the Appendix.

Respectfully submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of April, 2008, I electronically filed the foregoing

Notice of Filing of Appendix using the CM/ECF system, which will automatically send email

notification of such filing to the following attorneys of record for the Defendant:

James D. Todd
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Linda L. Keyser
U.S. Department of Health and Human Services
330 Independence Ave., S.W.
Cohen Building
Room 5344
Washington, D.C. 20201

/s/ Stephanie A. Webster
Stephanie A. Webster
 DC Bar No. 479524
Christopher L. Keough
 DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PLAINTIFF'S APPENDIX PURSUANT TO LOCAL RULE 7(n)**</u>

**Volume I of V**
[AR 1 – AR 83]

Respectfully submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
 DC Bar No. 479524
Christopher L. Keough
 DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Notice of Administrator's Decision, dated July 16, 2007 | 1 |
| Administrator's Decision, dated July 13, 2007 | 2-21 |
| PRRB Decision No. 2007-D35, dated May 17, 2007 | 31-42 |
| Excerpts from Provider's Post Hearing Brief, dated May 17, 2004 | 61-71, 81-83 |
| Excerpts from Transcripts of Oral Hearing, held March 18, 2004 | 128-180 |
| Stipulations of the Parties | 192-93 |
| Provider's Exhibit P-1 | 223-24 |
| Excerpts from Provider's Exhibit P-2 | 225-29, 233-35 |
| Excerpts from Provider's Exhibit P-3 | 240-42 |
| Excerpts from Provider's Exhibit P-4 | 246-47 |
| Provider's Exhibit P-6 | 280-99 |
| Provider's Exhibit P-7 | 300-12 |
| Provider's Exhibit P-8 | 313-22 |
| Provider's Exhibit P-9 | 323-29 |
| Provider's Exhibit P-12 | 334-52 |
| Excerpts from Provider's Exhibit P-13 | 354-55, 364 |

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Provider's Exhibit P-14 | 379-81 |
| Provider's Exhibit P-15 | 382-84 |
| Provider's Exhibit P-17 | 388-91 |
| Provider's Exhibit P-18 | 392-94 |
| Provider's Exhibit P-19 | 395-96 |
| Provider's Exhibit P-20 | 397-99 |
| Provider's Exhibit P-21 | 400-07 |
| Provider's Exhibit P-28 | 448-54 |
| Provider's Exhibit P-29 | 455-56 |
| Excerpts from Intermediary's Exhibit I-12 | 732-33 |
| Excerpts from Intermediary's Exhibit I-14 | 745, 751-81* |
| Intermediary's Exhibit I-20 | 824-26 |
| Intermediary's Exhibit I-21 | 827-29 |

*The Administrative Record filed by the Secretary in this case did not include page 768.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



CENTERS for MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**

JUL 1 6 2007

**VIA CERTIFIED MAIL**

Christopher L. Keough, Esquire
Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20004

Re: <u>Good Samaritan Regional Medical Center/Banner Health 94, 96, 97, 98, 99 DSH
Calculation Groups/Samaritan 95 DSH Calculation Group</u>, PRRB Decision No. 2007-D35

Dear Mr. Keough:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

CENTERS FOR MEDICARE AND MEDICAID SERVICES
*Decision of the Administrator*

| In the case of: | Claim for: |
|---|---|
| **Good Samaritan Regional Medical Center/Banner Health 94, 96, 97, 98, 99 DSH Calculation Groups/Samaritan 95 DSH Calculation Group** | **Provider Cost Reimbursement Determination for Cost Reporting Periods Ending: Various** |
| **Providers** | |
| **vs.** | |
| **Blue Cross /Blue Shield Association Blue Cross & Blue Shield of Arizona** | **Review of: PRRB Dec. No. 2007-D35 Dated: May 17, 2007** |
| **Intermediary** | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The parties were notified of the Administrator's intention to review the Board's decision. The Center for Medicare Management (CMM) submitted comments, requesting reversal of the Board's decision. Comments were received from the Providers'[1] requesting that the Administrator affirm the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final agency review.

---

[1] The Providers in this appeal involve four non-profit hospitals: Good Samaritan, Desert Samaritan, Thunderbird Samaritan and Maryvale Samaritan. Each of the Providers was operated by Samaritan Health System until a 1999 merger. Stipulations ¶ 2. Since 1999, each of the Providers has been operated by Banner Health System. Id.

{ ,   2

2

## ISSUE AND BOARD'S DECISION

The issue is whether Arizona's State-funded general assistance days (hereafter referred to as MN/MI population days)[2] qualify as Medicaid days for purposes of determining the Providers' Medicare disproportionate share hospital (DSH) adjustments for the fiscal years in dispute.

The Board held that the Intermediary improperly excluded Arizona State funded MN/MI population inpatient days associated with the Arizona Health Care Cost Containment System (AHCCCS) program from the numerator of the Medicaid fraction of the Medicare DSH calculation.[3]  Relying on Portland Adventist Medical Center v. Thomas, 399 F.3d 1091 (9th Cir. 2005)(Portland), the Board held that all patients eligible for medical assistance under a State Plan approved under Title XIX must be included in the DSH adjustment without regard to how they became eligible.  The Board held that this included patients who became eligible for Medicaid as a result of the §1115 waiver provisions. The Board also held that all patients eligible for medical assistance under a State Plan approved under Title XIX must be included in the DSH adjustment without regard to whether the State received direct Federal Financial Participation (FFP) for this low-income population.

The Board noted that Title XIX of the Act authorized the use of Federal funds to help States offset the costs of providing medical assistance to eligible low-income individuals.[4]  The Board also noted that to receive these funds, a State must have a "State Plan" approved by the Secretary (i.e., CMS) and administered according to the Medicaid requirements.[5] However, the Secretary may waive the Medicaid requirements through §1115 (demonstration project waiver) of the Act, to approve "experimental, pilot, or demonstration projects" that go beyond the Medicaid requirements in order to promote innovative

---

[2]  See Providers' Post Hearing Brief at 17 §3.2.1.  The Providers refer to the State-only general assistance groups as: Medically Indigent (MI); Medically Needy (MN); Eligible Low Income Children (ELIC); and Eligible Assistance to Children (EAC).  The Board's decision and the parties have referred to all these categories as MI/MN days.

[3] The Administrator finds that the record indicates that, technically, the Intermediary did not "exclude" these days, but rather that the State followed CMS policy and forwarded data that did not include these days. See Providers' Post Hearing Brief at 23-24 § 3.3 ("[t]he Intermediary has always determined the numerator of the Medicaid fraction based upon data the Intermediary receives from AHCCCS....")

[4] 42 U.S.C. § 1396 et. seq

[5] Id.

3

3

approaches to meeting the health care needs of low-income individuals.[6]  The Board noted that the State of Arizona did not have a traditional Medicaid program.  Instead, the State of Arizona operated its Medicaid program as a §1115 waiver project that was approved by the Secretary on July 13, 1982.  Therefore, the Board concluded that the AHCCCS program was the "State Plan" approved by the Secretary.  This approval included all the AHCCCS programs and sub-programs, irrespective of how they were funded, because §1115 of the Act requires that all costs of the demonstration project be regarded as expenditures under the State Plan.  Therefore, since Arizona's §1115 waiver project is a State Plan approved by the Secretary, the Board concluded that the MN/MI population days should be included in the Providers' Medicare DSH calculation.

The Board was also persuaded by two additional factors that supported the inclusion of the MN/MI population in the DSH calculation.  First, even though AHCCCS did not receive direct FFP for its MN/MI population, the State funded its capitation and DSH payments to providers with all of the funds it received from the Federal, State and local governments. The Board held that this indirect funding, or the lack of direct FFP, did not prohibit a population from being considered part of the "State Plan approved under Title XIX." Secondly, the fact that AHCCCS could have included the MN/MI population as an optional groups under a traditional Medicaid State Plan (even without a waiver) and received direct FFP persuaded the Board that the MN/MI population should be included in the Providers' Medicare DSH calculation.

## SUMMARY OF COMMENTS

CMM submitted comments requesting that the Administrator overturn the Board's decision.

The Providers commented requesting that the Administrator affirm the Board's decision. The Providers argued that the MN/MI population days should be included in the Medicaid fraction because these patients were eligible for medical assistance under the AHCCCS plan that was approved by the Secretary.  The Providers stated that these MN/MI patients received the same benefits under the AHCCCS program as any other AHCCCS recipient and that the State received FFP for AHCCCS DSH payments made for hospital services furnished to the MN/MI patients.  For these reasons alone, the Providers maintained that the MN/MI population days should be included in the numerator of the Medicaid fraction, irrespective of whether the State received FFP for these particular patients, because these patients were eligible for medical assistance under the State Plan.

---

[6] 42 U.S.C. § 1395.

4

4

The Providers also asserted that, even if these MN/MI patients did not receive medical assistance under Arizona's AHCCCS plan, these patients were "eligible" for medical assistance under a State Plan that could be approved under Title XIX of the Act by virtue of their low-income status.   In addition, the Providers asserted that they are entitled to relief under the hold harmless provisions of Program Memorandum (PM) A-99-62, dated December 1999, because the Intermediary included MN/MI population days in the DSH calculation of the Medicaid fraction for prior cost reporting periods 1986 through 1989.[7]

Finally, the Providers argued that the deadline imposed by PM A-99-62 to qualify for the hold harmless under the second prong should be equitably tolled or waived because the Providers did not learn of the imposed deadline of October 15, 1999 until after it had passed.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

Relevant to the issue involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations. The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children.[8]   The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines.   Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy.   Participating States are required to provide Medicaid coverage to the categorically needy.[9]   The "categorically needy" are persons eligible for cash assistance under two Federal programs:   Aid to Families with Dependent Children (AFDC) [42 USC 601 et seq.] and Supplemental Security Income or SSI [42 USC 1381, et seq.]   Participating States may elect to provide for payments of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes

---

[7] Supra n. 2 at 27 § IV. The Providers also argued with respect to Good Samaritan for fiscal years 1990 through 1992 that this provider's interim Medicare DSH payments included MN/MI population days in the numerator of the Medicaid fraction. Thus, at a minimum, for each cost reporting period at issue (1991 & 1993 through 1999) the MN/MI population days should be included in the numerator of Good Samaritan's Medicaid fraction.

[8]   Section 1901 of the Social Security Act (Pub. Law 89-97).

[9]   Section 1902(a) (10) of the Act.

or resources, while exceeding the financial eligibility requirements for the categorically needy (such as an SSI recipient) are insufficient to pay for necessary medical care.[10]

In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval. The State Plan must specify, inter alia, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered.[11] If the State Plan is approved by CMS, under §1903 of the Act, the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State Plan.

Within broad Federal rules, States enjoy a measure of flexibility to determine "eligible groups, types and range of services, payment levels for services, and administrative and operating procedures."[12] However, the Medicaid statute sets forth a number of requirements, including income and resource limitations that apply to individuals who wish to receive medical assistance under the State Plan. Individuals who do not meet the applicable requirements are not eligible for "medical assistance" under the State Plan.

In particular, §1901 of the Social Security Act sets forth that appropriations under that title are "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish medical assistance on behalf of families with dependent children and of aged, blind or disabled individuals whose incomes and resources are insufficient to meet the costs of necessary medical services...." Section 1902 sets forth the criteria for State Plan approval.[13] As part of a State Plan, § 1902(a) (13) (A) (iv) requires that a State Plan provide for a public process for determination of payment under the plan for, inter alia, hospital services which in the case of hospitals, take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs. Notably, § 1905(a) states that for purposes of this title "the term 'medical assistance' means the payment of part or all of the costs" of the certain specified "care and medical services" and the identification of the individuals for whom such payment maybe made.

---

[10]  Section 1902(a) (1) (C) (i) of the Act.

[11]  Id. §1902 et. seq. of the Act.

[12]  Id.

[13]  42 C.F.R. 200.203 defining a State Plan as "a comprehensive written commitment by a Medicaid agency submitted under section 1902(a) of the Act to administer or supervise the administration of a Medicaid plan in accordance with Federal requirement."

6

Section 1923 of the Act implements the requirements that a State Plan under Title XIX provide for an adjustment in payment for inpatient hospital services furnished by a disproportionate share hospital. A hospital maybe deemed to be a Medicaid disproportionate share hospital pursuant to §1923(b) (1) (A), which addresses a hospital's Medicaid inpatient utilization rate, or under paragraph (B), which addresses a hospital's low-income utilization rate. The latter criterion relies, inter alia, on the total amount of the hospital's charges for inpatient services which are attributable to charity care.[14]

Congress recognized that the various conditions and requirements of Title XIX of the Act, under which a State may participate in the Medicaid program created certain obstacles to potentially innovative and productive State health-care initiatives. Consequently, Title XI of the Act was amended to allow States to pursue such innovative programs.[15] Under §1115 of subchapter XI of the Act, a State that wishes to conduct such an innovative program must submit an application to CMS for approval. CMS may approve the application, if, in their judgment, the demonstration project is likely to assist in promoting the objectives of certain programs established under the Act, including Medicaid.[16] To facilitate the operation of an approved demonstration project, CMS may waive compliance with specified requirements of Title XIX, to the extent necessary and for the period necessary to enable the State to carry out the demonstration project.[17] In addition, CMS may direct that costs of the demonstration project that otherwise would not "otherwise" qualify as section 1903 Medicaid expenditures, "be regarded as expenditures under the State plan approved under [Title XIX]."[18]

While Title XIX implemented medical assistance pursuant to a cooperative program with the States for certain low-income individuals, the Social Security Amendments of 1965[19] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part

---

[14] Congress has revisited the Medicaid DSH provision several times since its establishment. In 1993, Congress enacted further limits on DSH payments pursuant to section 13621 of Pub. Law 103-66 that took into consideration costs incurred for furnishing hospital services by the hospital to individuals who are either eligible for Medicare assistance under the state Plan or have no health insurance (or other source of third part coverage for services provide during the year). The Medicaid DSH payments may not exceed the hospital's Medicaid shortfall; that is; the amount by which the costs of treating Medicaid patients exceeds hospital Medicaid payments plus the cost of treating the uninsured.

[15] Section 1115 of the Act.

[16] Id.

[17] Id.

[18] Id.

[19] Pub. Law No. 89-97.

of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[20] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[21] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[22] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[23] This provision added §1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost-effective hospital practices.[24]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis related groups (DRGs) subject to certain payment adjustments.

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to §1886(d) (5) (F) (i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[25] There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[26] To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage. Relevant to this case, with respect to the proxy method, §1886 (d)(5)(F)(vi) of the Act states that the terms

---

[20]  Section 1811-1821 of the Act.

[21]  Section 1831-1848(j) of the Act.

[22]  Under Medicare, Part A services are furnished by providers of services.

[23]  Pub. Law No. 98.21.

[24]  H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

[25]  Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). See also 51 Fed. Reg. 16772, 16773-16776 (1986).

[26]  The Pickle method is set forth at section 1886(d) (F) (i) (II) of the Act.

8

"disproportionate patient percentage" means the sum of two fractions, which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" and the Medicaid low-income proxy", respectively, and are defined as follows:

> (I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of <u>patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX</u>, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patient days for such period. (Emphasis added.)

CMS implemented the statutory provisions at 42 C.F.R. § 412.106. The first computation, the "Medicare proxy" or "Clause I" is set forth at 42 C.F.R. § 412.106(b) (2). Relevant to this case, the second computation, the "Medicaid-low income proxy", or "Clause II", is set forth at 42 C.F.R. § 412.106(b) (4) (1995) and provides that:

> *Second computation.* The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to <u>patients entitled to Medicaid</u> but not to Medicare Part A, and divides that number by the total number of patient days in the same period. (Emphasis added.)

Although not at issue in this case, CMS revised 42 C.F.R. § 412.106(b)(4) to conform to HCFA Ruling 97-2, which was issued in light of Federal Circuit Court decisions disagreeing with CMS' interpretation of a certain portion of § 1886(d)(5)(vi)(II) of the Act. In conjunction with this revision, CMS issued a Memorandum dated June 12, 1997, which explained the counting of patient days under the Medicaid fraction, stating that:

> [I]n calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX beneficiary on that day

> of service?"  If the answer is "yes," the day counts in the Medicare
> disproportionate share adjustment calculation.  This does not mean that title
> XIX had to be responsible for payment for any particular services.  It means
> that the person had to have been determined by a State agency to be eligible
> for Federally-funded medical assistance for any one of the services covered
> under the State Medicaid Title XIX plan (even if no Medicaid payment is
> made for inpatient hospital services or any other covered service)....

In order to clarify the definition of eligible Medicaid days and to communicate a hold
harmless position for cost reporting periods beginning before January 1, 2000, for certain
providers, CMS issued Program Memorandum (PM) A-99-62, dated December 1999. The
PM was in response to problems that occurred as a result of hospitals and intermediaries
relying on Medicaid State days data obtained from State Medicaid agencies to compute the
DSH payment that commingled the types of otherwise ineligible days listed with the
Medicaid days.

In clarifying the type of days that were proper to include in the Medicaid proxy, the PM A-
99-62 stated that the hospital must determine whether the patient was eligible for Medicaid
under a State Plan approved under Title XIX on the day of service.  The PM explained that:

> In calculating the number of Medicaid days, the hospital must determine
> whether the patient was eligible for Medicaid under a State plan approved
> under Title XIX on the day of service. If the patient was so eligible, the day
> counts in the Medicare disproportionate share adjustment calculation.  The
> statutory formula for Medicaid days reflects several key concepts. First, the
> focus is on the patient's eligibility for Medicaid benefits as determined by the
> State, not the hospital's eligibility for some form of Medicaid payment.
> Second, the focus is on the patient's eligibility for medical assistance under an
> approved Title XIX State plan, not the patient's eligibility for general
> assistance under a State-only program; Third, the focus is on eligibility for
> medical assistance under an approved Title XIX State plan, not medical
> assistance under a State-only program or other program. Thus, for a day to be
> counted, the patient must be eligible on that day for medical assistance
> benefits under the Federal–State cooperative program known as Medicaid
> (under an approved Title XIX State plan).

Consistent with this explanation of days to be included in the Medicare DSH calculation, the
PM stated regarding the exclusion of days, that:

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program.... These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation.   If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

In addition, if a given patient day affects the level of *Medicaid* DSH payments to the hospital but the patient is not eligible for Medicaid under a State plan approved under title XIX on that day, the day is not included in the *Medicare* DSH calculation.

\*\*\*\*

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed. [27] (Emphasis added.)

Regarding hospitals that did not receive payments in the cost year reflecting the erroneous inclusion of days at issue, CMS stated that:

---

[27] An attachment to the PM describes the type of day, description of the day and whether the day is a Title XIX day for purposes of the Medicare DSH calculation. In particular, the attachment describes "general assistance patient days" as "days for patients covered under a State–only (or county only) general assistance program (whether or not any payment is viable for health care services under the program). These patients are not Medicaid–eligible under the State plan." The general assistance patient day is not considered an "eligible Title XIX day." "Other State-only health program patient days" are described as "days for patients covered under a State-only health program.   These patients are not Medicaid-eligible under the State program." Likewise, State-only health program days are not eligible Title XIX days.  Finally, charity care patient days are described as "days for patients not eligible for Medicaid or any other third-party payer and claimed as uncompensated care by a hospital.  These patients are not Medicaid eligible under the State plan." Charity care patient days are not eligible Title XIX days.

> If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days.... Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on other Medicare DSH issues or other unrelated issues.

In the August 1, 2000 Federal Register, the Secretary reasserted his policy regarding general assistance days, State-only health program days and charity care days.

> General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program. Charity care days are those days that are utilized by patients who cannot afford to pay and whose care is not covered or paid by any health insurance program. While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid eligible under the State plan and are not considered Titled XIX beneficiaries.[28]

In addition, for the relevant fiscal periods in dispute, the Secretary's policy was to include in the Medicare DSH calculation only those days for populations under the Title XI § 1115 waiver who were or could have been made eligible under a State Plan. The patient days of the "expanded" eligibility groups, however, were not to be included in the Medicare DSH calculation.[29] This policy did not affect the longstanding policy of not counting general

---

[28] 65 Fed. Reg. 47054 at 47087 (Aug. 1, 2000).

[29] 65 Fed. Reg. 3136 (Jan. 20, 2000). ("In some section 1115 waivers, a given population that otherwise could have been made eligible for Medicaid under section 1902(r)(2) or 1931(b) in a State Plan amendment was made eligible under the section 1115 waiver. This population was referred to as hypothetical eligible, and is a specific, finite population identifiable in the budget neutrality agreements found in the Special Terms and Conditions for the demonstrations. The patient days utilized by that population are to be recognized for purposes of calculating the Medicare DSH adjustment. In addition, the section 1115 waiver

12

assistance or State–only days in the Medicare DSH calculation. The policy of excluding §1115 waiver expansion populations from the DSH calculation was revisited by CMS and, effective with discharges occurring on, or after, January 20, 2000, certain §1115 waiver expansion days were to be included in the Medicare DSH calculation in accordance with the specific instructions as specified in more detail in the January 20, 2000 <u>Federal Register</u>.[30]

In 2001, CMS issued a Program Memorandum (PM) Transmittal A-01-13[31] which again stated, regarding Medicaid DSH days, that:

> Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid eligible. Sometimes, Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care of general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicaid formula.

> ****

> Days for patients covered under a State-only (or count-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan.

Finally, in a recently enacted legislation, Congress clarified the meaning of the phrase "eligible for medical assistance under a State Plan approved under title XIX" with respect to patients not Medicaid eligible, but who are regarded as such, because they receive benefits

---

may provide for medical assistance to expanded eligibility populations that could not otherwise be made eligible for Medicaid. Under current policy, hospitals were to include in the Medicare DSH calculation only those days for populations under the §1115 waiver who were or could have been made eligible under a state plan. Patient days of the expected eligibility groups however, were not to be included in the Medicare DSH calculation.")

[30] <u>Id</u>.

[31] The PM, while restating certain longstanding interpretations in the background material, clarified certain other points for cost reporting periods beginning on or after January 1, 2000, with respect to the hold harmless policy. <u>See</u> Transmittal A-01-13; Change Request 1052 (January 25, 2001)

under a demonstration project approved under title XI. Congress added language to §1886(d) (5) (F) (vi) (II) of the Act which stated:

> In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.[32]

This amendment to §1886(d)(5)(F)(vi) of the Act specifically addressed the scope of the Secretary's authority to include (or exclude), in determining the numerator of the Medicaid fraction of the Medicare DSH calculation, patient days of patients not eligible for medical assistance under a State Plan but who receive benefits under a demonstration project approved under Title XI of the Act. This  enactment clearly distinguishes those patients eligible to receive benefits under Medicaid from those patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.

In sum, for the cost years at issue, the Secretary has consistently required the exclusion of days relating to general assistance or State-only days.  The policy distinguishes those days for individuals that receive medical assistance under a Title XIX State Plan that are to be counted and "other" days that are not to be counted.  Examples of some of these other days include days for individuals that are not in fact eligible for medical assistance but may receive State assistance; days that may be a basis for Medicaid DSH payment under the State Plan only; or days related to individuals that may receive benefits  under a Title XI plan.  These other days are not counted for purposes of the Medicare DSH payment.

This particular case centers on whether Arizona's general assistance State-only funded days at issue qualify as Medicaid days for purposes of determining the Providers' Medicare DSH adjustments for the fiscal years in dispute. Prior to 1982, the State of Arizona did not have a Medicaid program under Title XIX.[33]  In May of 1982, the State of Arizona submitted a §1115 demonstration project waiver proposal to CMS.[34]  CMS approved the §1115

---

[32] Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (February 8, 2006) (codified in part at 42 U.S.C. § 1395ww (d) (5) (F) (vi) (II).
[33] Stipulation ¶ 4, Providers' Exhibit P-2.
[34] Providers' Exhibit P-3.

14

demonstration project waiver on July 13, 1982, and the §1115 demonstration project waiver was implemented on October 1, 1982.[35] The system under which Arizona operates is called the Arizona Health Care Cost Containment System (AHCCCS). The AHCCCS program is a Statewide managed care system which delivers acute care services based on a prepaid, capitated approach.[36] Under Arizona's §1115 demonstration project waiver as approved by CMS, only the categorically needy receive direct Federal Financial Participation (FFP).[37] These patients are called the Mandatory Eligible under Title XIX (Categorically Needy). The State has also decided to provide services to three other groups, for which no FFP is paid, each with different State eligibility requirements. The Providers refer to the groups as:

1.    Medically Needy/Medically Indigent (MN/MI);
2.    Eligible Low Income Children (ELIC); and
3.    Eligible Assistance to Children (EAC).[38]

For the fiscal periods in dispute, the Intermediary computation only included those AHCCCS days in which the patient was eligible to receive Federal Title XIX funds (Mandatory Eligible under Title XIX-Categorically Needy) in determining the Medicaid days to be included in the Medicaid fraction. The Providers dispute this treatment. The Providers contend that all days covered under the AHCCCS program including the MN/MI population days should be included in the DSH computation.

The Administrator finds that §1886(d)(5)(F)(vi)(II) of the Act requires, for purposes of determining a Provider's "disproportionate patient percentage," that the Secretary count patient days attributable to patients who were eligible for medical assistance under a State Plan approved under Title XIX of the Act, but who were not also entitled to Medicare Part A. The Administrator finds that, as reflected at 42 C.F.R. § 412.106, the Secretary has interpreted this statutory phrase "patients who (for such days) were eligible for medical assistance under a State Plan approved under Title XIX," to mean "eligible for Medicaid."[39]

---

[35] Id.

[36] Providers' Exhibit P-2.

[37] Stipulation ¶ 7, Tr. 270-71, 283-84; Declaration of Branch McNeal ¶ 5, Providers' Exhibit 13 & 28, Providers' Post Hearing Brief at 19.

[38] Id. These three categories MN/MI, ELIC, and EAC populations are persons who do not qualify as categorically eligible for Medicaid. These categories are funded entirely with State and county funds.

[39] See e.g. Cabell Huntington Hosp. Inc.. v. Shalala, 101 F.3d 984, 989 (4th Cir. 1996) ("It is apparent that 'eligible for medical assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a particular state's Medicaid

15

The Administrator further finds that the term "Medicaid" refers to the joint State/Federal program of medical assistance authorized under title XIX of the Act. If a patient is not eligible for Medicaid, then the patient is not "eligible for medical assistance under a State plan approved under Title XIX."

The Administrator finds that the language set forth in §1886(d) (5) (F) (vi) (II) of the Act requires that the day be related to an individual eligible for "medical assistance under a State plan approved under Title XIX" also known as the Federal Program Medicaid. The use of the term "medical assistance" at §§1901 and 1905 of the Act and the use of the term "medical assistance" at §1886(d) (5) (F) (vi) (II) of the Act is reasonably concluded to have the same meaning. As noted by the courts, "the interrelationship and close proximity of these provisions of the statute presents a classic case for the application of the normal rule of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning."[40]  Therefore, the Administrator finds the language at §1886(d) (5) (F) (vi) (II) of the Act requires that for a day to be counted, the <u>individual</u> must be eligible for "medical assistance" under Title XIX. That is, the <u>individual</u> must be eligible for the Federal government program also referred to as Medicaid.

In contrast, the days involved in this case are related to individuals that are not eligible for "medical assistance" as that term is used under Title XIX and, thus, are not properly included in the Medicaid patient percentage of Medicare DSH calculation under §1886(d)(5)(F)(vi)(II) of the Act. Rather, the days in question are associated with the general assistance days. Arizona's AHCCCS oversees the Medicaid mandatory eligibles under the § 1115 demonstration project waiver approved under Title XI (not under a State Plan as defined under § 1902 of the Act and 42 C.F.R. § 400.203 under Title XIX) for which the State receives matching FFP and the general assistance eligibles for which the State receives no matching FFP. These latter days are not related to patients eligible for Medicaid and hence, cannot be counted in the numerator of the Medicare DSH fraction.

The Board also found that, if the State had operated a traditional Medicaid program, the AHCCCS State funded MN/MI population days would be included in the traditional plan. The record does not show an analysis of the criteria for the State funded MN/MI population under the Medicaid optional eligibility criteria. Rather, the Providers allege that certain

---

plan...."); <u>Legacy Emanuel Hospital v. Secretary</u>, 97 F.3d 1261, 1265 (9th Cir. 1996)("[T]he Medicaid proxy includes all patient days for which a person was eligible for Medicaid benefits whether or not Medicaid actually paid for those days of service.")
[40] <u>Sullivan v. Stroop</u>, 496 U.S. 478, 484 (1990); <u>Commissioner v. Lundy</u>, 516 U.S. 235, 250 (1996).

parts of the MN/MI population would be eligible for Medicaid if they were to apply.[41] Moreover, by virtue of their low-income stature, the MN/MI population was capable of receiving Medicaid under a State Plan that could be approved under Title XIX of the Act. However, the Administrator finds that there is no demonstration in the record that the criteria for these general assistance populations are identical to the Medicaid optional eligibility criteria. Therefore, the Board finding that the MN/MI population at issue would have been included under the Medicaid optional category of patients in a traditional State Plan is not supported by the record.

Further, regarding the expenditure of FFP under a Medicaid DSH program, generally, the issue of whether <u>costs</u> are regarded as expenditures under a State Plan approved under Title XIX for purposes of calculating Federal matching payments to the State is different from the issue of whether <u>patients</u> are considered eligible for medical assistance under a State Plan approved under Title XIX for purposes of calculating Medicare DSH payments to a hospital. The statute clearly states that the patient's Title XIX eligibility for that day is a requirement. Therefore, regardless of any possible indirect Medicaid DSH payment (much less indirect FFP provided under Title XI), the general assistance population days operated and funded by the State of Arizona (not Title XIX) are not counted as Medicaid days.

The Board also found that its decision is supported by the Ninth Circuit's decision in <u>Portland</u>. The Administrator finds that the general assistance days at issue in this case are distinguished for several reasons from the days at issue in <u>Portland</u>. Among other things, no direct FFP was expended for individuals in this case under §1115(a) (2) (or Title XIX) and, similarly, the MN/MI population at issue is not referenced as an expanded eligibility group under the waiver. While Arizona may have operated under a §1115 waiver, these general assistance days were not approved by the Secretary and included for payment under the waiver.[42] Further, even if one were to assume, *arguendo*, that these days were like the

---

[41] Providers' Post Hearing Brief at 35.

[42] Despite the fact that no direct FFP was even paid for these individuals, the Board agreed with the Providers' argument that, under a <u>Portland</u> analysis, the §1115 waiver enabling statute does not deem "Federal costs" alone to be expenditures under a State plan. The Board agreed that the statute in no way limits which "costs" are deemed expenditures under a State Plan. Thus, the Board found that expenditures under the §1115 waiver (whether Federal, State or county) are equivalent to and deemed to be costs expended under the Title XIX. However, the Administrator finds that §1115(a)(2) states that "the costs of such projects *which would not otherwise be included as expenditures under section....1903* ... shall to the extent and for the period prescribed by the Secretary be regarded as expenditures under the state plan approved under such title." This phrase specifically refers

17

Portland days, the Administrator finds that Congress has intervened since Portland was issued. Section 5002 of DRA 2005 ratified CMS' policy of not counting patient days of the expanded eligibility groups in the Medicare DSH calculation prior to January 20, 2000.[43] Hence, the court's analysis of the statute under Portland has been since revisited by Congress.

However, because the Board found that these days could be included under its reading of the statute, the Board did not make any factual findings as to whether any of the Providers could otherwise be allowed to include these days in the DSH calculation under the "hold harmless" provisions of PM A-99-62. In this case, the Providers assert that they are entitled to relief under the hold harmless provisions of PM A-99-62 because the Intermediary included MN/MI population days in the DSH adjustment for each of the Providers from 1986 through 1989.[44] Therefore, the Providers maintain that for open cost reports, the Providers should continue to receive payments for MN/MI population days.

The basis for the Providers' claim is a letter to Bonnie Irwin, Audit Manager at the Intermediary from Eugene Chinn at CMS, dated January 30, 1992.[45] This letter discusses the commingling of types of days not eligible as Title XIX days in the State's AHCCCS report. The Administrator notes however, that the problem of commingling involved cost reports ending prior to 12/31/90 and that from 1990 forward, the State of Arizona (i.e., AHCCCS) excluded MN/MI population days from the data reported to the Intermediary.[46] The Providers argue that the October 15, 1999 appeal deadline for qualification under the second prong of the hold harmless provision in PM A-99-62 should be equitably tolled or

---

to section 1903 (FFP) expenditures, not State or local government expenditures as the Board and Providers contend. Therefore, even under a Portland analysis, the fact that a State with a section 1115 waiver, has decided to expend State funds for general assistance population, is not a basis for including the related days of such a population in the numerator of the Medicaid fraction of the Medicare DSH calculation.

[43] Cookeville Regional Medical Center v. Leavitt, 2006 Lexis 68961 (D.D.C. Sept. 26, 2006). "whether as a clarification or ratification, the DRA's expression of the DSH formula must be retroactively applied to still-pending cases."

[44] See, Stipulations 10.

[45] Provider's Exhibit P-11.

[46] Providers' Post Hearing Brief at 41. The Providers argued that this problem continued for Good Samaritan through the interim payments for FYs 1990, 1991 and 1992.

waived because the Providers were not aware that these days were excluded and that they only became aware that these days were excluded after the issuance of PM A-99-62.[47]

Based on the record, the Administrator finds that the Providers had no expectation of being paid for the MN/MI population days at issue. The Administrator finds that the intent of continuing the payments for the incorrect inclusion of general assistance days was to prevent hardship on hospitals that were relying on the payment based on prior treatment and receipt of these funds. This finding is supported by question 16 to "Questions and Answers Related to Program Memorandum A-99-62" that states:

> Q16. How are the open cost reports for fiscal years beginning prior to 1-1-00 to be handled in a situation where the intermediary disallowed the ineligible days during the audit of the latest settled cost report (e.g., FYE 12-31-97) but allowed them in the preceding cost reports(s) (e.g., FYE 12-31-96 or FYE 12-31-96 and several prior fiscal years)?

> A. If before October 15, 1999 the hospital filed a jurisdictionally proper appeal on the issue of exclusion of these types of days for FYE 12-31-97 cost report the intermediary should reopen that cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days. Since the hospital established an expectation that these types of days should be included in the computation of the Medicare DSH payments, the intermediary should also continue to include these type of ineligible days in the computation of the Medicare DSH payment in the open cost reports for FYE 12-31-98 and FYE 12-31-99 as long as the hospital included these days in the "as submitted" cost reports for those years thus continuing this expectation. If the hospital abandoned its expectation of receiving payment in those open cost reports (FYE 12-31-98 and FYE 12-31-99) and did not even include this issue on the "protected amount" line, the intermediary should not continue paying the Medicare DSH adjustment reflecting the inclusion of these types of days for those years. (Emphasis added).

---

[47] Id.("The Hospitals had no way of knowing before October 15, 1999 that a deadline for appealing this issue (or adding it to already pending appeals) was going to be established as of that date. There is no dispute that the Hospitals absolutely would have added this issue to their pending appeals, as they are entitled to do, prior to October 15, 1999 deadline if they had been given fair notice of the significance of date before it already passed.")

In this case, the record shows that the Providers had abandoned their expectation of receiving payment before the Program Memorandum had been issued.  Moreover, while for some cost years some of the Providers had appeals pending prior to October 15, 1999, the appeals did not raise the specific issue of the inclusion of State-only days. The record shows that the Providers did not add the issue regarding the inclusion of State-only funded days in the DSH calculation  prior to the October 15, 1999 date set forth in the Program Memorandum and, therefore,  they cannot find relief under its terms.

In sum, applying the relevant law and program policy to the foregoing facts, the Administrator finds that the Intermediary properly did not count the State funded general assistance days at issue in this case in the numerator of the Medicaid fraction of the Medicare DSH calculation.

20

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES**

Date: 7 | 13 | 07

Herb B. Kuhn
Acting Deputy Administrator
Centers for Medicare & Medicaid Services

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2007-D35

**PROVIDER** - Good Samaritan Regional Medical Center/Banner Health 94, 96, 97, 98, 99 DSH Calculation Groups/Samaritan 95 DSH Calculation Group

Provider Nos.: 03-0002, 03-0065, 03-0089, 03-0001
(See Attached Appendix)

vs.

**INTERMEDIARY -**
BlueCross BlueShield Association/
BlueCross & BlueShield of Arizona

**DATE OF HEARING -**
March 18, 2004

Cost Reporting Periods Ended -
December 31, 1991 and
December 31, 1993 through
December 31, 1999

**CASE NOs.:** 95-0795, 97-1098, 00-3556G, 01-2892G, 01-2936G, 01-2937G, 02-1810G and 03-1423G

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Disproportionate Share Hospital Adjustment Statutory and Regulatory Background | 2 |
| Background on the AHCCCS Program and Procedural History of this Case | 5 |
| Stipulation of Facts | 6 |
| Parties' Contentions | 7 |
| Findings of Fact, Conclusions of Law and Discussion | 9 |
| Decision and Order | 11 |
| Schedule of Providers | 12 |

Page 2                                    CNs:95-0795, 97-1098, 00-3556G, 01-2892G,
                                          01-2936G, 01-2937G, 02-1810G, 03-1423G

ISSUE:

Whether the Intermediary improperly omitted certain inpatient hospital days from the
numerator of the Medicaid low-income proxy used to calculate the Providers'
disproportionate share hospital (DSH) adjustment.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due providers of medical
services.

The Medicare program was established to provide health insurance to the aged and
disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services
(CMS), formerly the Health Care Financing Administration (HCFA), is the operating
component of the Department of Health and Human Services (DHHS) charged with
administering the Medicare program. CMS' payment and audit functions under the
Medicare program are contracted out to insurance companies known as fiscal
intermediaries. Fiscal intermediaries determine payment amounts due the providers
under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C.
§1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal
intermediary showing the costs it incurred during the fiscal year and the portion of those
costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews
the cost report, determines the total amount of Medicare reimbursement due the provider
and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R.
§405.1803. A provider dissatisfied with the intermediary's final determination of total
reimbursement may file an appeal with the Provider Reimbursement Review Board
(Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R.
§405.1835.

Disproportionate Share Hospital Adjustment Statutory And Regulatory Background:

Short-term hospitals are paid for services provided to Medicare patients under a
Prospective Payment System (PPS). Under PPS, inpatient operating costs are reimbursed
based on a prospectively determined formula taking into account national and regional
operating costs.

Section 1886(d)(5)(F)(i)(I) of the Social Security Act (SSA or the Act) specifies that the
Secretary of the Department of Health and Human Services (Secretary) shall provide for
an additional payment to hospitals that serve a significantly disproportionate number of
low-income patients. The formula used to calculate a provider's DSH adjustment is the
sum of two fractions, which are expressed as percentages. SSA §1886(d)(5)(F)(vi). The
first fraction's numerator is the number of hospital patient days for patients entitled to
both Medicare Part A and Supplemental Security Income, excluding patients receiving

state supplementation only, and the denominator is the number of patient days for patients entitled to Medicare Part A. Id. The second fraction's numerator is the number of hospital patient days for patients who were eligible for medical assistance under a State plan approved under Title XIX for such period but not eligible for benefits under Medicare Part A, and the denominator is the total number of the hospital's patient days for such period. Id.; see also 42 C.F.R. §412.106(b)(4). The first fraction is frequently referred to as the Medicare Proxy and the second fraction, as the Medicaid Proxy. Providers whose DSH percentages meet certain thresholds receive an adjustment which results in increased PPS payments for inpatient hospital services. SSA §1886(d)(5)(F)(ii).

In the mid-1990's a controversy arose over HCFA's interpretation of the DSH formula as set forth under the Act. Pursuant to the Act, the Medicaid component of the DSH formula:

> is the number of the hospital's patient days for such period which consists of patients who (for such days) were *eligible* for medical assistance under a State plan approved under Title XIX . . .

SSA §1886(d)(5)(F)(vi)(II) (emphasis added).

HCFA's regulation governing a provider's DSH percentage in effect at the time of the controversy referred to the "number of patient days furnished to patients *entitled* to Medicaid." 42 C.F.R. §412.106(b)(4) (1993) (emphasis added). In applying the statute and the regulation, HCFA's interpretation substituted the concept of payment and coverage by Medicaid for each day of care, for the statutory standard of "eligibility" for Medicaid coverage thereby limiting the DSH adjustment to inpatient hospital days of service that were actually paid by a Medicaid state agency. However, in HCFA Ruling No. 97-2[1] (February 27, 1997), HCFA changed its prior policy of including in the DSH calculation only inpatient days of service which were actually *paid* by a Medicaid state agency in recognition of the holdings on this issue of the United States Courts of Appeals in the Fourth, Sixth, Eighth, and Ninth Circuits, all of which rejected HCFA's prior interpretation of including only patient days *paid* by Medicaid. Thus, in HCFA Ruling 97-2, HCFA conceded that it should include in the Medicaid fraction all days attributable to inpatient hospital days of service for patients who were eligible on that day for medical assistance under a State Medicaid plan, whether or not the hospital received payment for those inpatient hospital services.

The language in HCFA Ruling 97-2 and the implementing instructions regarding which individuals qualify as "eligible for medical assistance under a State plan approved under Title XIX" created a new controversy, in that it clarified HCFA's policy that days attributed to individuals eligible for general assistance and other state-only funded programs (collectively, "State-Only Program Days") should be excluded from the DSH calculation. Intermediaries in certain states historically had allowed providers to include

---

[1]  See Provider Exhibit P-20.

State-Only Program Days funded with state-only dollars in their DSH calculations even though Section 1886(d)(5)(F)(vi)(II) of the Act states that only days attributable to individuals "eligible for medical assistance *under a State plan approved under Title XIX*" are to be included in the DSH calculation. (emphasis added). Based on HCFA 97-2, several of the intermediaries that previously had allowed inclusion of State-Only Program Days in the DSH calculations began amending their policies on this issue and notifying their providers that the erroneously paid funds would be recouped.

Congressional leaders in Pennsylvania and New York intervened on behalf of their constituent hospitals, citing under financial harm if HCFA recouped DSH payments that had been made to providers that had State-only days included in their DSH adjustments. Following pleas for reconsideration of the proposed repayment, HCFA agreed to abandon its effort to recoup these funds. HCFA's decision was communicated in a letter dated October 15, 1999. The letter stated that HCFA would "quickly clarify [its] Medicare DSH policy both to [its] fiscal intermediaries and to hospitals." Id.

HCFA then issued its guidance to fiscal intermediaries, Program Memorandum A-99-62, on December 1, 1999 (the Program Memo)[2] addressing treatment of the State-Only Program Days on both a prospective and retrospective basis. For cost reporting periods beginning on or after January 1, 2000, HCFA declared that no State-Only Program Days would be counted as Medicaid days for purposes to the DSH calculation for any provider. It further clarified that "the term 'Medicaid days' refers to days on which a patient is eligible for medical assistance benefits under an approved Title XIX State plan." Program Memo at 2. Several examples of days that HCFA interpreted as not being "Medicaid days" were set out in an attachment.

For cost reporting periods beginning January 1, 2000, HCFA declared that hospitals could retain or receive DSH payments that included State-Only Program Days provided the hospitals met certain criteria. Hospitals were split into two groups. The first group included hospitals that had already received payments reflecting the inclusion of State-Only Days. For cost reporting periods beginning prior to January 1, 2000, HCFA directed intermediaries not to disallow the portion of Medicare DSH payments previously made to hospitals attributable to the inclusion of the State-Only Program Days. In addition, the Program Memo explained that for open cost reports, intermediaries were to allow only those State-Only Program Days if the hospital had *received* such payment in previous cost reporting periods settled before October 15, 1999.

The second group of hospitals focused on those that did *not* receive a Medicare DSH payment based on the inclusion of the State-Only Program Days but that had claimed the days in an appeal. For cost reports that were settled before October 15, 1999, if a hospital had never received any DSH payment based on the erroneous inclusion of State-Only Program Days and the hospital had not filed a jurisdictionally proper appeal with the Board on this issue prior to October 15, 1999, then intermediaries were not to pay the hospital DSH funds based on the inclusion of these types of days for any open cost reports for periods beginning prior to January 1, 2000. Moreover, intermediaries

---

[2] See Provider Exhibit P-21.

were instructed not to accept reopening requests for previously settled cost reports or
amendments to previously submitted cost reports pertaining to the inclusion of
State-Only Program Days in the Medicare DSH formula. However, if a hospital had filed
a jurisdictionally proper appeal with the Board for a given fiscal year on this issue before
October 15, 1999, the intermediary was to reopen the cost report at issue and revise the
Medicare DSH payment to reflect the inclusion of these State-Only Program Days in the
DSH calculation.

BACKGROUND ON THE AHCCCS PROGRAM AND PROCEDURAL HISTORY OF
THIS CASE:

Prior to 1982, the State of Arizona did not have a Medicaid program. In 1982, the State
of Arizona proposed, and the Secretary of Health and Human Services approved, a plan
to establish an experimental Medicaid program called Arizona Health Care Cost
Containment System (AHCCCS). AHCCCS[3] was approved under the provisions of
§1115 of the Medicaid Act, 42 U.S.C. §1315, which allow the Secretary to waive
mandatory requirements of a traditional Medicaid program. Under 1115 waivers, a state
may expand eligibility, change the scope of services provided, restrict a beneficiary's
freedom of choice, limit providers that may participate in the program or modify methods
of reimbursement.

Pursuant to its 1115 waiver, AHCCCS is a state plan approved by the Secretary. The
Secretary approved AHCCCS, and all of its programs and sub-programs, as part of
Arizona's 1115 Waiver, irrespective of how the programs and sub-programs are funded.[4]

The AHCCCS program covers the following three groups of individuals pertinent to this
case:[5]

1.  Medically Indigent/Medically Needy (MI/MN). Eligibility for MI/MN assistance
    requires a person to have an annual income less than 40% of the federal poverty
    level and ineligible for other AHCCCS eligibility categories.

2.  Eligible Low Income Children (ELIC): Eligibility for ELIC requires a person to
    have an annual income below the federal poverty level and to be under 14 years
    of age.

3.  Eligible Assistance Children (EAC): Eligibility for EAC assistance requires a
    person to have an annual income below the federal poverty level, to be eligible to
    receive food stamps, and to be under 14 years of age.

The MI/MN, ELIC and EAC categories of assistance (collectively referred to as the
State-funded eligibility group) were approved under the AHCCCS waiver program, and

---

[3]  See Provider Exhibits P-2-5.
[4]  See, Provider Exhibits P-2, P-3 and P-13.
[5]  See, Stipulations of the Parties - #6.

Page 6                              CNs:95-0795, 97-1098, 00-3556G, 01-2892G,
                                    01-2936G, 01-2937G, 02-1810G, 03-1423G

were state-only categories of assistance even though the state could have included them
as optional Medicaid eligibility categories receiving direct FFP. The issue in this case is
whether these Arizona State funded days, MI/MN, ELIC and EAC, qualify as "Medicaid
days" for purposes of determining the Providers' Medicare DSH for fiscal years 1991 and
1993 through 1999.

This case involves four short-term acute care hospitals that were operated by Samaritan
Health System until a 1999 merger with Banner Health System (Providers). Each of the
individual facilities is located in the state of Arizona and is reimbursed under the
AHCCCS for medical services furnished to qualified low income patients.

During the cost reporting periods at issue the Providers included in their Medicaid proxy
inpatient days attributable to individuals in the aforementioned State-funded eligibility
group. Blue Cross Blue Shield of Arizona (Intermediary) reviewed the Providers' cost
reports and excluded these patient days from the Providers' DSH calculations, thereby
reducing the Providers' DSH adjustments.

The Providers appealed the Intermediary's exclusions to the Board pursuant to 42 C.F.R.
§§405.1835-405.1841 and met the jurisdictional requirements of those regulations. The
amount of Medicare funds in controversy is approximately $15,000,000.[6]

The Providers were represented by Christopher L. Keough, Esq. of Vinson & Elkins,
L.L.P. The Intermediary was represented by Bernard M. Talbert, Esq., Associate
Counsel, Blue Cross Blue Shield Association

STIPULATION OF FACTS:

On March 17, 2004, the parties submitted a joint stipulation of facts, which includes the
following:

> 1. All individuals covered under AHCCCS are enrolled in contracted managed
> care plans.
>
> 2. The AHCCCS program covers the State-funded eligibility groups at issue in
> this case. The individuals in each of these groups have an income below the
> federal poverty income level.
>
> 3. During the cost reporting periods at issue, the State did not receive Federal
> Financial Participation (FFP) for the costs attributed to the State-funded eligibility
> groups. However, CMS subsequently approved an expansion of the federally
> funded portion of the AHCCCS program to include these individuals.
>
> 4. The Intermediary included total AHCCCS inpatient days in the Providers' 1986
> through 1989 DSH calculations. These inpatient days included days attributable
> to the State-funded eligibility groups.

---

[6] Exhibit P-1.

5. During the subject cost reporting periods, the State did receive FFP for the DSH payments AHCCCS made to hospitals.  The AHCCCS DSH payment considers AHCCCS revenues, which includes revenues attributable to services furnished by a hospital to individuals in the State-funded eligibility groups.

## PARTIES' CONTENTIONS:

The Intermediary contends that patient days whose costs are not funded by Title XIX are not counted as Medicaid days.[7]  The Intermediary asserts its position is supported by 42 U.S.C. §1395ww(d)(5)(F)(vi) which states that the numerator of the Medicaid proxy is "the number of the hospital's patient days . . . which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX."

The Intermediary contends that its position is supported by Medicare's Hospital Audit Program and Audit Quality Review Program which state that days associated with "general medical assistance programs operated and funded exclusively by the State (not Title XIX) are not counted as Medicaid days."  Also, 61 Federal Register No. 170 at 46207 (Aug. 30, 1996) states "[i]f a State chooses to adopt some sort of a waiver program and elects to cover people who would not have otherwise been eligible for care, those persons will not be included as Medicaid days in the current formula. . . ."[8]

The Intermediary disagrees with the Providers' reliance upon the hold-harmless portion of Program Memorandum A-99-62 that directs intermediaries to allow, for open cost reports, "those types of otherwise ineligible days that the hospital received payment for in previous cost reporting periods settled before October 15, 1999."  The Providers' DSH reimbursement had not included State-funded eligibility group patient days since 1990, and the Providers had no expectation of being reimbursed for these days throughout the subject cost reporting periods.  The Providers did not claim these days in the subject as-submitted cost reports, nor did they include the issue under protested amounts.  Questions and Answers pertaining to Memorandum A-99-66, issued by CMS, address this issue as follows:

> [i]f the hospital abandoned its expectation of receiving payment in those open cost reports. . . and did not even include this issue in the "protested amount" line, the intermediary should not continue paying the Medicare DSH adjustment reflecting the inclusion of these types of days for those years.[9]

The Intermediary notes that the AHCCCS State-funded eligibility group programs at issue did not come under Title XIX of the Act until April 1, 2001, but were under Title XXI until that time.

---

[7] Intermediary's Position Paper at 2.
[8] Intermediary's Position Paper at 3.
[9] Exhibit I-12 at Q-16.

Page 8                                CNs:95-0795, 97-1098, 00-3556G, 01-2892G,
                                      01-2936G, 01-2937G, 02-1810G, 03-1423G

The Intermediary cites the CMS Administrator's decision reversing the Board in Castle
Medical Center v. Blue Cross Blue Shield Association/United Government Services
LLC, PRRB Dec. No. 2003-D36, July 16, 2003, aff'd. in part and rev'd. in part, CMS
Administrator, September 12, 2003 (Castle). In that case, the Administrator found that
certain State-funded general assistance days could not be included in the provider's DSH
calculation because they were attributable to patients eligible for medical assistance
under Title XI of the Act rather than Title XIX.

The Intermediary also disagrees with the Providers' argument that Program
Memorandum A-99-66 is arbitrary and results in inequitable treatment for hospitals that
complied with CMS policy regarding State-funded eligibility group days. The
Intermediary cites United Hospital v. Thompson, No 02-3479, 2003 U.S. Dist. LEXIS
9942 (D. Minn 2003), aff'd. 383 F.3d 728 (8th Cir. 2004), where the court found that
Program Memorandum A-99-66 does not violate the equal protection of hospitals.

Also, the Intermediary contends that the fact that the federal government shares in the
costs of AHCCCS' DSH payments to hospitals has no significance in the instant case.[10]
The Medicaid DSH comes primarily from sections 1923 and 1924 of the Act, and they
can not be used to broaden 42 U.S.C. § 1395ww(d)(5)(F)(vi) stating "patients who (for
such days) were eligible for medical assistance under. . . under Title XIX. . . ."

The Providers contend that the subject patient days should be included in the Medicaid
proxy pursuant to the DSH statute.[11] The patients at issue were eligible for medical
assistance under AHCCCS' plan approved by the Secretary, and the State received FFP
for AHCCCS DSH payments made to hospitals for these individuals. Moreover, the
patients whose days are at issue were "eligible" for assistance under a State plan that
could have been approved under Title XIX by virtue of their low-income status, and these
days were included in the fully federally funded portion of the AHCCCS plan since 2001.

The Providers also contend that even if the subject patient days are otherwise ineligible
for inclusion in the Medicaid proxy, they are entitled to be included (for at least some of
the subject cost reporting periods) pursuant to the hold-harmless provisions of Program
Memorandum A-99-66. It is undisputed that the Intermediary included these types of
days in the Medicaid proxy in prior cost reporting periods ended in 1986 through 1989.
Moreover, these days were included in the interim payments made to Good Samaritan
Hospital in its 1990 through 1992 cost reporting periods.

Finally, the Providers explain that there is a second prong to Program Memorandum A-
99-66 that allows hospitals to include otherwise ineligible days in their Medicaid proxy if
they appealed the exclusion of these days to the Board before October 15, 1999. The
Providers contend this deadline is arbitrary and capricious and should be waived because
it results in disparate treatment of similar hospitals. The Providers assert that CMS must

---

[10] Intermediary's Post-Hearing Brief at 5.
[11] Providers' Post-Hearing Brief at 28.

uniformly apply its policies. Therefore, if a type of patient day is eligible for inclusion in
the DSH calculation for some DSH hospitals, then it must be included in the calculation
for all DSH hospitals.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board, after consideration of Medicare law and guidelines, parties' contentions, and
evidence presented, finds and concludes as follows:

This case turns on the interpretation of two statutes: 42 U.S.C. §1395ww(d)(5)(F)(vi)
which establishes the DSH adjustment, and 42 U.S.C. §1315 which authorizes the
Secretary to approve "experimental, pilot, or demonstration projects" to promote
innovative approaches to meeting the health care needs of low-income individuals. In a
similar case, the 9th Circuit Court of Appeals addressed the interpretation of these two
statutes. In Portland Adventist Medical Center v. Thomas, 399 F.3d 1091 (9th Cir. 2005)
(Portland), the court found that the plain language of the DSH and 1115 waiver statutes
led it to conclude that DSH must include all patients eligible for medical assistance under
Title XIX without regard to how they became eligible. This includes patients who
became eligible for Medicaid as a result of the §1115 waiver provisions. The Board
agrees with the reasoning in Portland, and applying similar reasoning, finds for the
Providers in this case. The Board also finds that all patients eligible for medical
assistance under a State plan approved under Title XIX must be included in the DSH
adjustment without regard to whether the state receives direct FFP for this low-income
population.

Title XIX of the Act (Medicaid) authorizes the use of federal funds to help states offset
the costs of providing medical assistance to eligible low-income individuals. See 42
U.S.C. §1396 et seq. To receive these funds, a state must submit a "State plan" for
approval by the Secretary, and it must administer the plan according to Medicaid
requirements. 42 U.S.C. §1396d(a). These requirements regulate the manner in which
the plan is implemented as well as which individuals may be covered. See 42 U.S.C.
§1396(d)(a). Only expenditures made under an approved Medicaid State plan become
eligible for federal matching payments. 42 U.S.C. §1396d (a)-(b).

Ordinarily, State plans must meet the requirements of the Medicaid statute to receive
funding. However, Congress has authorized the Secretary, through Section 1115 of
subchapter XI of the Act, to approve "experimental, pilot, or demonstration projects" that
go beyond these requirements in order to promote innovative approaches to meeting the
health care needs of low-income individuals. 42 U.S.C. §1315. These projects must, in
the judgment of the Secretary, be "likely to assist in promoting the objectives of . . .
[Title] XIX." 42 U.S.C. §1315a. The Secretary may waive the Medicaid requirements
set forth in 42 U.S.C. §1396a for these demonstration projects, and the costs of such
projects "shall, to the extent and for the period prescribed by the Secretary, be regarded
as expenditures under the State plan or plans approved under [Title XIX]." 42 U.S.C.
§1315a(1) - (2) (emphasis added).

Page 10                                        CNs:95-0795, 97-1098, 00-3556G, 01-2892G,
                                                       01-2936G, 01-2937G, 02-1810G, 03-1423G

The State of Arizona does not have a traditional Medicaid program. Instead, it operates its entire Medicaid program as a Section 1115 waiver project. The State of Arizona submitted its waiver proposal in May 1982, and the Secretary approved the waiver on July 13, 1982. The Board finds that under the Section 1115 waiver, AHCCCS is the "State plan" approved by the Secretary. The approval includes all the AHCCCS programs and sub-programs, irrespective of how the programs and sub-programs were funded, because the waiver statute requires that all costs of the demonstration project be regarded as expenditures under the State plan.

The Board agrees with the Portland Court's conclusion that:

> [t]he plain language of the statute requires us to conclude that §1115 does not confer on the Secretary discretion to characterize expenditures as Title XIX (Medicaid) expenditures for some purposes and not for others. On the contrary, while the provision gives the Secretary discretion in *approving* projects, the provision *requires* the Secretary to regard expenditures under §1115 projects designed to assist low income patients as Title XIX expenditures for the duration of such projects, and therefore to regard §1115 expansion populations as receiving medical assistance under a state plan approved under Title XIX.

Id. at 1099 (emphasis in original).

The Board is also persuaded by two additional factors that support the inclusion of the State-funded eligibility group days in the DSH calculation. First, even though AHCCCS does not receive direct FFP for these beneficiaries, it funds its capitation and DSH payments to providers with all of the funds it receives from the federal, state and local governments. Without this indirect funding, AHCCCS would not be able to finance and maintain coverage for all of the low-income populations eligible under its State plan. These facts are similar to those in Castle, in which the Board found that "capitated Medicaid payments to Medicaid 'HMOs' for all Quest covered beneficiaries, including GA [General Assistance] . . ." resulted in a de facto sharing of the costs of the program as a whole between federal, state, and local governments. As in Castle, the Board finds that the lack of direct FFP does not prohibit a population from being considered part of the "State plan approved under Title XIX." 42 U.S.C. §1395ww(d)(5)(F)(vi); 42 C.F.R. §412.106(b)(4).

Second, AHCCCS could have included the State-funded eligibility group as optional groups under a traditional Medicaid state plan (even without a waiver) and could have received direct FFP.[12] Instead, Arizona chose to include this low-income population in its State plan, but for its own reasons, chose not to accept FFP funding for this group. The Board observes that in Legacy Emmanuel Hospital and Health Center v. Shalala, 97 F.3d 1261, 1265 (9th Cir. 1996), low-income populations do not stop being low-income merely because the state did not pay for their services, and in a similar vein, concludes

---

[12] The Board notes that in 2002, AHCCCS changed its State plan to include the State-funded eligibility group population as an optional group and has received direct FFP since that time. See e.g., Tr. at 47.

40

Page 11                            CNs:95-0795, 97-1098, 00-3556G, 01-2892G,
                                        01-2936G, 01-2937G, 02-1810G, 03-1423G

that AHCCCS' State-funded eligibility group did not stop being low-income merely
because the state chose to bear the entire cost.

The Board's finding for the Providers based upon the plain language of the 1115 waiver
and DSH statutes obviates the need to address the Providers' argument that they are also
entitled to include State-funded eligibility group days in their DSH calculations under the
hold harmless provision of Program Memorandum A-99-62.

DECISION AND ORDER:

The Board finds that the Intermediary's removal of the subject State-funded eligibility
group patient days from the Providers' DSH calculations was improper. The
Intermediary's adjustments are reversed.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, C.P.A.
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

MAY 1 7 2007

Suzanne Cochran, Esquire
Chairman

41

APPENDIX

Schedule of Providers

Banner Health System-DSH Calculation Group Appeals

|  | Good Samaritan (Provider No. 03-0002) | Desert Samaritan (Provider No. 03-0065) | Thunderbird Samaritan (Provider No. 03-0089) | Maryvale Samaritan (Provider No. 03-0001) |
|---|---|---|---|---|
| FY 91 (PRRB Case No. 95-0795) | $1,327,000 | N/A | N/A | N/A |
| FY 93 (PRRB Case No. 97-1098) | $1,512,000 | N/A | N/A | N/A |
| FY 94 (PRRB Case No. 01-2892G) | $1,587,000 | N/A | $136,380* | N/A |
| FY 95 (PRRB Case No. 00-3556G) | $1,351,000 | $214,087* | $419,000 | $439,000 |
| FY 96 (PRRB Case No. 01-2936G) | $1,235,000 | $283,000 | $17,535* | $503,000 |
| FY 97 (PRRB Case No. 01-2937G) | $1,295,000 | $315,773* | $300,000 | $547,000 |
| FY 98 (PRRB Case No. 02-1810G) | $988,000 | $218,000 | $424,000 | $232,000 |
| FY 99 (PRRB Case No. 03-1423G) | $1,062,000 | $293,000 | $353,000 | N/A |

1115 demonstration waiver are considered to be "covered by a state plan under the Medicaid Act," because "demonstrations are to be treated the same as state plans").

## III.    STATEMENT OF FACTS

The facts regarding these consolidated cases are largely undisputed.  The parties have stipulated to all, or virtually all, of the pertinent facts.  Following is the Providers' full statement of the facts.

### 3.1.    The Parties

The Providers in these appeals are four non-profit hospitals:  Good Samaritan, Desert Samaritan, Thunderbird Samaritan and Maryvale Samaritan.  Stipulations of the Parties ("Stipulations") ¶ 1.  The fiscal years at issue are:  fiscal year 1991 and fiscal years 1993-1999 for Good Samaritan; fiscal years 1994-1999 for Thunderbird Samaritan; fiscal years 1995-1999 for Desert Samaritan; and fiscal years 1995-1998 for Maryvale Samaritan.  Id.; Provider Exhibit 1.  Each of the Providers was operated by Samaritan Health System until a 1999 merger.  Stipulations ¶ 2.  Since 1999, each of the Hospitals has been operated by Banner Health System.  Id.  Each of the Hospitals is located in, or near, Phoenix, Arizona, and each of them participates in Medicare and Medicaid.  Id. ¶ 3.  The Medicare fiscal intermediary for the period at issue is Blue Cross Blue Shield of Arizona ("Intermediary").

### 3.2.    AHCCCS – Arizona's Medicaid Program

Arizona's Medicaid program is called the Arizona Health Care Cost Containment System ("AHCCCS").  Stipulations ¶ 4; Provider Exhibit 2 (at p.0004).  AHCCCS was established by State legislation in 1981 to provide for the financing and delivery of covered health care services to the State's indigent population.  Stipulations ¶ 4; see also

61

Ariz. Rev. Stat. § 36-2901 et seq. Since the inception of the AHCCCS program, one of its key operational attributes has been the mandatory enrollment of all AHCCCS recipients in contracted managed care plans that are paid capitated rates for the provision of covered services to AHCCCS recipients. Stipulations ¶ 5; AHCCCS Overview, Provider Exhibit 2 (at p. 0004). This requirement, and other unique AHCCCS provisions, necessitate a waiver of certain federal requirements under Title XIX of the Act; and since 1982, AHCCCS has operated as Medicaid managed care demonstration project pursuant to a series of section 1115 waivers. Stipulations ¶ 5; AHCCCS Overview, Provider Exhibit 2 (at p. 0005). In sum, the AHCCCS acute care program "is a statewide, managed care system which delivers acute care services through 10 prepaid, capitated" managed care plans. AHCCCS Overview, Provider Exhibit 2 (at p. 0006).

### 3.2.1. The Three Groups of AHCCCS Recipients At Issue

During the period at issue here, the AHCCCS acute care program covered three groups of recipients pertinent to this case: the Medically Needy / Medically Indigent ("MN/MI"); Eligible Assistance Children ("EAC"); and Eligible Low Income Children ("ELIC"). Stipulations ¶ 6; AHCCCS Overview & App. II, Provider Exhibit 2 (at pp. 0007, 0015); see also 2001 AHCCCS Overview, App. II, Intermediary Exhibit 14 (pp. 1 of 31, 6 of 31, and 7 of 31). All AHCCCS recipients in each of these three groups had income below the federal poverty income level. Stipulations ¶ 6.

The three AHCCCS eligibility groups at issue were part and parcel of the single, integrated, AHCCCS acute care program. AHCCCS Overview & App. II, Provider Exhibit 2 (at pp. 0007, 0015); see also 2001 AHCCCS Overview, App. II, Intermediary Exhibit 14 (pp. 1 of 31, 6 of 31, and 7 of 31); Transcript of Hearing ("Tr.") 258-63. These three eligibility groups were established by the same State laws that established the

62

other AHCCCS eligibility groups, see Ariz. Rev. Stat. Ann. §§ 11-297, 36-2901.4, 36-2905, 2905.03, Provider Exhibits 6-9, and the AHCCCS recipients in these three groups received medical assistance through the single AHCCCS acute care program. Tr. at 87-90. They were required to enroll in the same contracted managed care plans that enrolled the AHCCCS recipients in all other eligibility groups. Tr. 87-88; Stipulations ¶ 5. They received the same inpatient hospital benefits as the AHCCCS recipients in the other eligibility groups, and the AHCCCS managed care plans paid the hospitals the same rates for covered services furnished to all AHCCCS recipients. Tr. 88-89.

Thus, from the Hospitals' perspective, there was no meaningful distinction among the AHCCCS recipients in different eligibility groups. Tr. 90. Indeed, until 1992, AHCCCS itself included the MN/MI, ELIC, and ELAC patient days, and did not distinguish these patient days from any other AHCCCS patient days that were included, in the information that AHCCCS furnished to the Intermediary for purposes of calculating Medicare DSH payments. See HCFA Letter to Intermediary dated January 30, 1992, Provider Exhibit 11; Memorandum to Intermediary Audit & Reimbursement Staff dated January 10, 1992, Provider Exhibit 28; Tr. 104-05, 272; Stipulations ¶ 10.

The number of AHCCCS recipients in three eligibility groups at issue and in all other AHCCCS eligibility groups are listed in a table appearing in Appendix II to the 2002 AHCCCS Overview. Provider Exhibit 2 (at p. 0015). As reflected on that table, the numbers of MN/MI, EAC, and ELIC recipients declined, as a percentage of total AHCCCS enrollees, during the period from 1983 through 1999. See id. During the

63

1980s, this percentage ranged from a high 43% in 1984 to a low of 27% in 1985.[8]  See id.
For the period at issue in these consolidated cases, the combined population of the
MN/MI, EAC and ELIC enrollees as a percentage of total AHCCCS enrollees steadily
decreased from a high of 18% in 1991 to a low of 4.7% in 1999.  See id.  The average
percentage to total during this period was 9.4%.  See id.

### 3.2.2.  FFP Under Title XIX for AHCCCS Expenditures

During the period at issue in these consolidated cases, the State received FFP
under title XIX for the capitated payments made to AHCCCS managed care plans for all
of the groups covered under AHCCCS' acute care program, except for the AHCCCS
recipients in the three eligibility groups at issue here (i.e., the MN/MI, EAC and ELIC
groups).  Stipulations ¶ 7.  Subsequently, in 2001, the Secretary approved an expansion
of the fully federally-funded portion of the AHCCCS program to include all individuals
who were, or previously had been, included in the three groups at issue here.  Stipulations
¶ 7; Tr. 270-71, 283-84; Declaration of Branch McNeal ¶ 5, Provider Exhibit 13.  But
prior to the 2001 expansion, the State received no FFP for the capitated payments made
by AHCCCS for individuals included in these three groups.

The State did receive FFP, however, for inpatient hospitals services furnished to
the three AHCCCS groups during the period at issue.  It is undisputed that the State
received FFP under title XIX for Medicaid DSH payments by AHCCCS to the hospitals
and that the calculation of the AHCCCS DSH payments was based on utilization by
MN/MI, EAC and ELIC patients.  Stipulations ¶ 9; Tr. at 163-66, 265-67, 301-04;
Declaration of Branch McNeal ¶ 6, Provider Exhibit 13; HCFA Letter to AHCCCS dated

---

[8]    The Providers' calculation of these percentages is based on the combined total number enrollees in
the MN/MI, EAC and ELIC categories divided by the total number of all enrollees listed on the
AHCCCS table for each fiscal year.

May 14, 1992, Provider Exhibit 12 (at p. 0108); HCFA Letter to AHCCCS dated February 2, 1994, Provider Exhibit 12 (p. 0109).

A graphic illustration of the flow of federal and State funding for AHCCCS expenditures is attached in the Appendix (at App. 001). As depicted in that illustration, the State did not receive FFP for payments made to the contracted managed care plans on a per-capita basis for the MN/MI, EAC or ELIC recipients, but it did receive FFP for the Medicaid DSH payments that it made to the hospitals based, in part, on utilization by these three groups of AHCCCS recipients.

### 3.2.3. AHCCCS DSH Payments

In 1991, AHCCCS submitted a proposed State plan amendment to provide for a Medicaid DSH payment to Arizona hospitals. AHCCCS Letter to HCFA Region IX dated November 12, 1991, Provider Exhibit 12 (at p. 0101). In 1992, HCFA authorized AHCCCS DSH payments, effective October 1, 1991, as part of the section 1115 waiver, noting that a State plan amendment was not the appropriate manner in which to add this provision because the Arizona Medicaid program itself operates under section 1115 waiver. HCFA Letter to AHCCCS dated May 14, 1994, Provider Exhibit 12 (at p. 0108). From the inception, the approved AHCCCS DSH payment has been jointly funded by federal and State expenditures. Stipulations ¶ 9 ("during the periods at issue here, the State did receive FFP for disproportionate share hospital ("DSH") payments made to hospitals by AHCCCS beginning with fiscal year 1992"); see also HCFA Letter to AHCCCS dated May 14, 1994, Provider Exhibit 12 (at p. 0108); HCFA Letter to AHCCCS dated February 2, 1994, Provider Exhibit 12 (at p. 0109).

65

### 3.2.3.1. Lump Sum Payments

Unlike the Medicare DSH payment, which is a percentage adjustment to the PPS payments per discharge,[9] the AHCCCS DSH payment is not calculated or paid as an add-on to some other Medicaid payment. The AHCCCS DSH payment for a fiscal year is a lump sum amount that is calculated, for each fiscal year, based in part on the hospital's utilization by AHCCCS recipients in the three groups at issue here. Stipulations ¶ 9 ("The AHCCCS DSH payment considers AHCCCS revenues, which include revenues attributable to services furnished by a hospital to individuals in the MN/MI, EAC and ELIC groups. The AHCCCS DSH payment to a hospital is a lump sum and is not a percentage add-on to other payments."); see also Tr. at 92-104, 266-67; Provider Exhibit 12 (at pp. 0111-16); Provider Exhibit 13 (at pp. 0120, 0122-42).

### 3.2.3.2. Low-Income Utilization Rate

Under the AHCCCS DSH payment methodology, a hospital's low-income utilization rate ("LIUR") is taken into account both in determining a hospital's qualification as a DSH and in calculating the lump-sum payment made to each qualifying institution. Tr. at 92-104, 137, 266-67; Provider Exhibit 12 (at pp. 0111-14); Provider Exhibit 13 (at pp. 0122-25). The LIUR itself is the sum of two fractions based on patient revenues. Provider Exhibit 12 (at pp. 0111); Provider Exhibit 13 (at pp. 0122). The numerator of the first of those two fractions is total AHCCCS revenues, including revenues attributable to the three groups of AHCCCS recipients at issue here (i.e., MN/MI, EAC, and ELIC individuals), plus certain county and State subsidy payments to the hospital. Tr. at 92-104, 137, 266-67; Provider Exhibit 12 (at pp. 0111, 0114); Provider Exhibit 13 (at pp. 0122, 0125). The denominator of that fraction is net inpatient

---

[9]    See 42 C.F.R. § 412.106(d).

revenue. Provider Exhibit 12 (at pp. 0111, 0114); Provider Exhibit 13 (at pp. 0122, 0125).[10]

As noted above, a hospital may qualify for the AHCCCS DSH payment based upon its LIUR or based on a Medicaid utilization rate that considers patient days. Tr. at 92-104, 137, 266-67; Provider Exhibit 12 (at pp. 0111, 0114); Provider Exhibit 13 (at pp. 0122, 0125). If a hospital qualifies as a DSH for AHCCCS purposes, then payment is made out of one of four AHCCCS DSH payment pools, or "groups." Tr. at 102, Provider Exhibit 12 (at p.0112-15); Provider Exhibit 13 (at p.0123-25).

One of the four AHCCCS DSH payment groups (i.e., Group 4) includes only public hospitals. Tr. at 102, Provider Exhibit 12 (at p.0112-15); Provider Exhibit 13 (at p.0123-25). The calculations of the AHCCCS DSH payments to qualifying hospitals in two of the three non-public hospital groups (i.e., Group 2 and Group 3) consider each hospital's LIUR in proportion to the LIURs for all other hospitals receiving DSH payments from that pool. Tr. at 102, Provider Exhibit 12 (at p.0112-15); Provider Exhibit 13 (at p.0123-34). Throughout the period at issue here, the great majority of the non-public disproportionate share hospitals were in AHCCCS Groups 2 or 3, which take into account each hospital's LIUR.[11] See AHCCCS Summary of Disproportionate Share Payments By Hospital Group, Provider Exhibit 13 (at p. 0129).

---

[10] The numerator of the second fraction used compute the LIUR is a hospital's gross charity revenue for a year, and the denominator of that fraction is the hospital's gross patient revenues. Provider Exhibit 12 (at pp. 0111, 0114); Provider Exhibit 13 (at pp. 0122, 0125).

[11] The only non-public AHCCCS DSH group that does not consider a hospital's LIUR is Group 1. Provider Exhibit 12 (at p.0112); Provider Exhibit 13 (at p.0123). From 1992 through 1999, the number of non-public hospitals in Group 1 ranged two to six hospitals per year, while the total number of non-public hospitals in Groups 2 and 3 ranged from 21 to 25 hospitals per year. Provider Exhibit 13 (at p. 0129).

All of the Hospitals in these consolidated cases received an AHCCCS DSH payment for every year at issue here.[12]  See AHCCCS Summaries of Disproportionate Share Payments By Hospital, Provider Exhibit 12 (at pp. 0110, 0117, 0118) & Provider Exhibit 13 (at p. 0128).  The AHCCCS DSH payments are made twice a year, by check, directly from AHCCCS to each hospital.  Tr. at 132.  In response to the Board's request (Tr. at 328-29), a graphic illustration of the amount and flow of federal funding for the AHCCCS DSH payments made to the Hospitals (for fiscal year 1999) is attached in the Appendix to this post-hearing brief (at App. 002).  The Appendix also cites the sources for federal and State expenditures shown therein.

    3.3.    <u>Intermediary Calculations of the Medicare DSH Payments Due the Hospitals</u>

All four of the Hospitals in this case included the MN/MI, EAC and ELIC days in the number of Medicaid days reported on worksheet S-3 of their as-filed cost reports for all years at issue.  Tr. 84-85, 121.  The number of days recorded on the as-filed cost reports was generated from internal hospital reports that capture patient days by payer class (e.g., AHCCCS, Aetna, workers' compensation, etc.).  Tr. 85, 119.

The Intermediary, however, does not use the number of days recorded on the as-filed cost reports to determine the Medicaid fraction that is used to compute the hospitals' DSH payments.[13]  Tr. 85-86, 239-40, 245-46.  Indeed, the Intermediary does not even ask for the Hospitals' source documents for the numbers reported on worksheet S-3.  Tr. 239.  Instead, the Intermediary has always determined the numerator of the Medicaid fraction

---

[12]    Good Samaritan received an AHCCCS DSH payment of $489,012 for federal fiscal year 1992 (i.e., the year beginning October 1, 1991 and ending September 30, 1992), which included the last quarter of the Hospital's cost reporting period ending December 31, 1991.  Provider Exhibit 12 (at p. 0110).

[13]    As noted above, "a hospital's eligibility for, and amount of, any disproportionate share adjustment [is] made by the fiscal intermediary at the time of the year-end settlement of [a] cost report."  51 Fed. Reg. at 31458.

based upon data the Intermediary receives from AHCCCS about 2-3 years after the end of each cost reporting period.[14] Tr. 85-86, 122-24, 239-40, 245-46, 308-12.

For cost reporting periods prior to 1990, the patient days associated with the AHCCCS recipients in the MN/MI, ELIC, and EAC groups were included in data that was furnished to the Intermediary by AHCCCS, and therefore were also included in the Intermediary's calculation of the Medicaid fraction for purposes of the Medicare DSH adjustment.[15] In 1992, the Intermediary concluded that these days should not be included in the numerator of the Medicaid fraction, based upon a false factual assumption that these days (MN/MI, ELIC and EAC) were not "eligible to receive Title XIX funds."[16] As the Intermediary's witness acknowledged at the hearing, that assumption was erroneous because the State did receive FFP under title XIX for the AHCCCS DSH payments that are based, in part, on the LIUR, which includes utilization by the AHCCCS recipients in the three groups at issue here. Tr. 301-02; see also Stipulations ¶ 9. Nevertheless, the Intermediary has excluded the MN/MI, EAC and ELIC days from the numerator of the Medicaid fraction for purposes of computing the final DSH payments due for all fiscal years after 1989. Stipulations ¶ 10, Tr. 232-33, 239-41, 245-46; HCFA Letter to Intermediary dated January 30, 1992, Provider Exhibit 11.

---

[14]  The AHCCCS reports were not available to the Hospitals when they filed their cost reports for the fiscal years at issue here. Tr. 86-87, 123-24, 126-27.

[15]  Stipulations ¶ 10; Tr. at 104-05, 229-32, 272; Memorandum from Bonnie Irwin to Debbie Donovan dated January 9, 1992, Intermediary Exhibit 20; Memorandum from Debbie Donovan to Audit & Reimbursement Staff dated January 10, 1992, Provider Exhibit 28; Intermediary Letter to HCFA Regional Office dated January 15, 1992, Intermediary Exhibit 21.

[16]  Memorandum from Debbie Donovan to Audit & Reimbursement Staff dated January 10, 1992, Provider Exhibit 28 (p. 0198, 1st line of 3d para.). See also Memorandum from Bonnie Irwin to Debbie Donovan dated January 9, 1992, Intermediary Exhibit 20 (1st page, 5th para.); Intermediary Letter to HCFA Regional Office dated January 15, 1992, Intermediary Exhibit 21 (1st page, 3d para.).

69

One of the Hospitals involved in this case, however, did receive interim Medicare DSH payments for MN/MI, ELIC and EAC days for fiscal years 1990 – 1992. For fiscal years 1986-1989, Good Samaritan qualified for and received final Medicare DSH payments that were calculated by including MN/MI, ELIC and EAC patient days in the numerator of the Medicaid fraction. Tr. 105-08, 140-42, 175-76, 197-98; Stipulations ¶ 10. In addition, because the calculations of its DSH payments for those earlier years included the MN/MI, ELIC and EAC days, Good Samaritan also received interim DSH payments for fiscal years 1990 through 1992 based on DSH adjustment percentages that reflected the MN/MI, ELIC and EAC days that were allowed in the earlier years. Tr. 105-08, 140-42, 175-76, 272-76; see also 51 Fed. Reg. 16772, 16777 (May 6, 1986) (noting that interim DSH payments will be made "based on the latest available data subject to a year-end settlement on a cost reporting period basis.") The final DSH determinations for these years (1990-1992), however, did not include the MN/MI, ELIC or EAC patient days. Tr. 277.

3.4.    Procedural History of This Appeal

As a general matter, the hospitals in Arizona were not pleased with the Intermediary's decision in 1992 to exclude the MN/MI, EAC and ELIC patient days from the Medicare DSH calculation. Tr. 109-12; Provider Exhibit 27. The Hospitals in these consolidated cases also did not agree with the Intermediary's determination. Tr. 112, 122, 128. The Providers ultimately began adding this issue to pending appeals in 2000.

The Hospitals did not immediately appeal this issue when the notices of program reimbursement were issued for the years in dispute because the hospital system (at that time, the Hospitals were operated by Samaritan Health System) was confronted with more pressing issues concerning other aspects of the Intermediary's DSH calculations

and the organization had very limited resources available to devote to these sorts of legal disputes.[17] Tr. 112-16. One of the major issues at the time was the improper exclusion from the DSH calculation of other AHCCCS patient days that had been omitted due to an early cut-off date on the data supplied to the Intermediary by AHCCCS. Tr. 113, 115-16. This was an "enormous" problem that took several years and a tremendous amount of time and resources to resolve. Tr. 113, 116, 183-84. In addition, the Hospitals understood that they could add this issue to pending appeals anytime prior the commencement of a hearing. Tr. 183-84. Nevertheless, the Providers "absolutely" would have appealed this particular issue before the October 15, 1999 if anyone had given them advance notice of the significance of that date before it had already passed. Tr. 116-17, 182-83.

## IV.    ARGUMENT

As noted above, the Medicare DSH statute defines the numerator of the Medicaid fraction as "the number of a hospital's patient days for [a cost reporting] period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX" of the Act. Section 1886(d)(5)(F)(vi)(II) of the Act, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). The Providers contend that the MN/MI, ELIC, and EAC patient days should be included in the Medicaid fraction for the cost reporting periods at issue for four independent reasons.

First, the patients were eligible for medical assistance under the AHCCCS plan that was approved by the Secretary. There is no dispute that these patients received the same benefits under the same integrated AHCCCS program as any other AHCCCS

---

[17]    Samaritan's financial problems ultimately led to the 1999 merger that created Banner Health System. Tr. 113-14.

Moreover, there is no dispute that the MN/MI, ELIC and EAC patients had incomes below the federal poverty income level.  Stipulations ¶ 6.  Accordingly, these individuals, by virtue of their low-income status, were capable of receiving Medicaid under a State plan that could be approved under title XIX of the Act even if they were not eligible for assistance under the AHCCCS program during the cost reporting periods at issue.  Indeed, it is undisputed that the fully federally-funded portion of AHCCCS' plan was expanded as of 2001, with the Secretary's approval, to include all individuals who previously would have been included in the MN/MI, ELIC or EAC eligibility groups. Stipulations ¶ 7; see also 2002 AHCCCS Overview, App. II (Provider Exhibit 2); CMS Summary of Arizona Statewide Health Reform Demonstration (Provider Exhibit 3); Declaration of Branch McNeal (Provider Exhibit 13).  And, importantly, all AHCCCS expenditures incurred since then for these individuals are, and must be, regarded as medical assistance under the State plan.  Section 1115(a)(2) of the Act, 42 U.S.C. § 1315(a)(2); see also Portland Adventist Medical Center v. Thompson, Slip Op. at 17 Civ. No. 02-289-JE (D. Ore. Feb. 11, 2003) (Report and Recommendation) (Provider Exhibit 22).  Thus, there is no doubt that all of the MN/MI, EAC and ELIC patients were capable of receiving medical assistance under a State plan and, therefore, all of their inpatient days at the Hospitals must be included in the Medicaid fraction for the cost reporting periods at issue.

4.3    Even If the MN/MI, ELIC and EAC Patient Days Are "Otherwise Ineligible" For Inclusion in the Numerator of the Medicaid Fraction, the Hospitals Are Entitled To Count These Patient Days For At Least Some of the Periods At Issue Pursuant To the Hold-Harmless Provision Established in PM 99-62.

Even if the MN/MI, ELIC and EAC patients did not receive, and were not eligible for, medical assistance under a State plan approved under title XIX, these days

36

81

nevertheless should be included the numerator of the Medicaid fraction for at least some (if not all) of the Hospital cost reporting periods at issue under the first prong of the hold-harmless provision established in PM 99-62. The first part of the Secretary's hold-harmless provision provides that the numerator of a hospital's Medicaid fraction, for cost reporting periods at issue here, may include "otherwise ineligible days" if the hospital received Medicare DSH payments that included the same type of day "in previous cost reporting periods settled before October 15, 1999." Provider Exhibit 21 (p. 0160, 1st full para.).

As discussed in section 3.3 above, there is no dispute that for cost reporting periods prior to 1990, the Intermediary included MN/MI, ELIC, and EAC patient days in the calculation of the Medicaid fraction for purposes of the Medicare DSH adjustment. Stipulations ¶ 10. For this reason alone, all of the Hospitals should receive the benefit of the hold-harmless protection established in PM 99-62. Even though three of the four Hospitals in this case did not qualify for a Medicare DSH payment until after 1990, the Intermediary's prior practice of counting these days in the Medicare DSH calculation was sufficient to establish a reasonable expectation that these types of days should be counted for later years as well. See Tr. 122, 128 (the Banner Hospitals always believed that the MN/MI, ELIC and EAC days should be counted).

In addition, there is no dispute that Good Samaritan qualified as a DSH, and received final Medicare DSH payments that included MN/MI, ELIC and EAC patient days for fiscal years 1986 through 1989, and that it also received interim Medicare DSH payments reflecting these days for fiscal years 1990 through 1992. Tr. at 105-108, 140-42, 175-76, 197-98, 273-76. Thus, at a minimum, Good Samaritan's MN/MI, ELIC and

82

EAC patient days should be included in the numerator of its Medicaid fraction for each cost reporting period at issue (1991 & 1993-1999). Good Samaritan received final Medicare DSH payments including these days in "previous cost reporting periods" (1986-1989), and as the Intermediary's witness acknowledged, the plain language of PM 99-62 therefore compels the conclusion that the MN/MI, ELIC and EAC patient days should be counted for Good Samaritan's later cost reporting periods at issue here. Tr. 271-72.

Even under the more restrictive reading of the hold-harmless provision, which is set forth in HCFA guidance that was published after PM 99-62 (HCFA Questions and Answers, Intermediary Exhibit 12), and which the Intermediary relies upon here, Good Samaritan's MN/MI, EAC and ELIC patient days should be counted for the cost reporting periods at issue. Having received interim DSH payments including these days through the earliest year under appeal (1991) and including the next year (1992) prior to the remainder of the cost reporting periods at issue (1993 – 1999), Good Samaritan had an established expectation that these days would be counted. Thus, there is no meaningful distinction between Good Samaritan's situation and that of a hospital that received a final Medicare DSH payment which included "otherwise ineligible days" and which was later reopened to disallow those days, as discussed in HCFA guidance issued after the promulgation of PM 99-62.[31] See Intermediary Exhibit 12 (Q&A 16).

---

[31] In any event, HCFA's later guidance is invalid and of no force or effect to the extent that it would deny a hospital the benefit of the hold-harmless protection to which it would be entitled under the plain language of PM 99-62. The Administrative Procedures Act requires the Secretary to invoke notice and comment rulemaking procedures when he amends an established interpretation of the Medicare statute or regulations. See Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1028 (D.C. Cir. 2000); Alaska Professional Hunters Ass'n. Inc. v. Federal Aviation Admin., 177 F.3d 1030, 1033-34 (D.C. Cir. 1999); Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94-95 (D.C. Cir. 1997); Paralyzed Veterans of America v. D.C. Arena, 117 F.3d 579, 586 (D.C. Cir. 1997); Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan, 979 F.2d 227, 240-41 (D.C. Cir. 1992).

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BANNER HEALTH,                              )
                                            )
              Plaintiff,                     )          No. 1:07-cv-1614 (RBW)
                                            )
        v.                                  )
                                            )
MICHAEL O. LEAVITT,                         )
Secretary, United States Department         )
of Health and Human Services,               )
                                            )
              Defendant.                     )

**PLAINTIFF'S APPENDIX PURSUANT TO LOCAL RULE 7(n)**

**Volume II of V**
[AR 128 – AR 247]

Respectfully submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Notice of Administrator's Decision, dated July 16, 2007 | 1 |
| Administrator's Decision, dated July 13, 2007 | 2-21 |
| PRRB Decision No. 2007-D35, dated May 17, 2007 | 31-42 |
| Excerpts from Provider's Post Hearing Brief, dated May 17, 2004 | 61-71, 81-83 |
| Excerpts from Transcripts of Oral Hearing, held March 18, 2004 | 128-180 |
| Stipulations of the Parties | 192-93 |
| Provider's Exhibit P-1 | 223-24 |
| Excerpts from Provider's Exhibit P-2 | 225-29, 233-35 |
| Excerpts from Provider's Exhibit P-3 | 240-42 |
| Excerpts from Provider's Exhibit P-4 | 246-47 |
| Provider's Exhibit P-6 | 280-99 |
| Provider's Exhibit P-7 | 300-12 |
| Provider's Exhibit P-8 | 313-22 |
| Provider's Exhibit P-9 | 323-29 |
| Provider's Exhibit P-12 | 334-52 |
| Excerpts from Provider's Exhibit P-13 | 354-55, 364 |

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Provider's Exhibit P-14 | 379-81 |
| Provider's Exhibit P-15 | 382-84 |
| Provider's Exhibit P-17 | 388-91 |
| Provider's Exhibit P-18 | 392-94 |
| Provider's Exhibit P-19 | 395-96 |
| Provider's Exhibit P-20 | 397-99 |
| Provider's Exhibit P-21 | 400-07 |
| Provider's Exhibit P-28 | 448-54 |
| Provider's Exhibit P-29 | 455-56 |
| Excerpts from Intermediary's Exhibit I-12 | 732-33 |
| Excerpts from Intermediary's Exhibit I-14 | 745, 751-81* |
| Intermediary's Exhibit I-20 | 824-26 |
| Intermediary's Exhibit I-21 | 827-29 |

*The Administrative Record filed by the Secretary in this case did not include page 768.

77

fight, which A99-D62 at least
was attempting to deal with so
there's no -- they're not
entitled, none of the
hospitals, for any of the
years are entitled to the
benefit of A99-62. Maybe the
other piece of bread on our
sandwich goes to what we'll
call the unfairness. And
again the hospitals here are
about as far away from the
equity argument as any group
of hospitals could be because
they as a group had clear
notice of the Medicare policy
on non-Title 19 days. The
problem days here did not
belong in the DSH calculation.
They took no action, offered
no real resistance. They're
complaining about the fact
that the appeal cut off was
October 15 that's referred to
as some magic day but if you

78

look at the date, look at the
program memorandum, which was
released some month and a half
to two months later, I think
it's clear just make the
release date and the appeal
date the same day that the
objective of the program
memorandum which we submit is
very much a legally legitimate
programmatic objective within
the discretion of the Medicare
program management to deal
with cases or claims that had
been protected or preserved
but not give to Providers who
had not done that the idea to
raise a new claim they hadn't
thought about before. That's
what happened here so as a
matter of equity this Provider
is in no position to complain
about the program memorandum.
Again, we see this case as
primarily containing a number

79

of sophisticated although
maybe overstated legal
arguments trying to define and
cope with what the Medicaid
program really was about. We
see, with all respect to the
Board, this problem going much
past this Board and even the
administrative system into the
judicial system. We want to
leave some clear markers as to
what we think the appropriate
analysis is. And again we
thank you for your attention
and we believe that eventually
the Intermediary's position
here will be supported. Thank
you.
THE CHAIRMAN:
     Thank you. We'll take a
     break. We'll come back at
     10:30.
               ***
[Off the record]
[On the record]

80

               ***
THE CHAIRMAN:
     Mr. Keough, you may call your
     first witness.
MR. KEOUGH:
     Thank you. The Provider will
     call Mr. Rudy Angulo.
               ***
[Witness sworn]
               ***
THE CHAIRMAN:
     Go ahead, Mr. Keough.
MR. KEOUGH:
     Thank you.
               ***
          RUDOLPH ANGULO,
having been first duly sworn, was
called as a witness herein and was
examined and testified as follows:
               ***
          DIRECT EXAMINATION
BY MR. KEOUGH:
     Q. Mr. Angulo, would you just
for the court reporter state your
full name and maybe spell it for him?

128

81

1    A. Rudolph Angulo,
2  R-U-D-O-L-P-H A-N-G-U-L-O.
3    Q. Mr. Angulo, who is your
4  current employer?
5    A. My current employer is
6  Banner Health located in Phoenix,
7  Arizona.
8    Q. And what is your job title?
9    A. My job title is senior
10 reimbursement specialist in the
11 reimbursement services department.
12    Q. How long have you been
13 employed by Banner?
14    A. I've been at Banner for a
15 little over ten years.
16    Q. And the parties have
17 entered a stipulation, Mr. Angulo,
18 that prior to the merger that
19 occurred in 1999 these hospitals were
20 a part of Samaritan. Were you with
21 the Samaritan side prior to that
22 merger?
23    A. Yes. I was with the
24 Samaritan health system.
25    Q. Samaritan up until the

82

1  merger and then -- in '99 and then
2  from there you've been with Banner?
3    A. Correct.
4    Q. And could you provide to
5  the Board just a brief general
6  description of your job
7  responsibilities with Samaritan and
8  then Banner?
9    A. My current job
10 responsibilities are the preparation
11 of the Medicare cost report for Good
12 Samaritan Medical Center and also the
13 home office cost reporting in
14 addition to other duties related to
15 Medicare issues.
16    Q. And, Mr. Angulo, prior to
17 the time about ten years ago when you
18 joined Samaritan, what did you do
19 before that professionally, I mean?
20    A. Prior to Samaritan, I was
21 with St. Joseph's Medical Center in
22 Phoenix for two years, and prior to
23 that I was with the Blue Cross and
24 Blue Shield of Arizona Intermediary
25 for three years as a senior auditor.

83

1    Q. And now, Mr. Angulo, the
2  four hospitals in this case, were
3  they from the Samaritan side prior to
4  the merger?
5    A. Yes, they were.
6    Q. Now, Mr. Angulo, Banner is
7  claiming here, if I understand this
8  correctly, that the Medicaid fraction
9  for your Medicare DSH calculation
10 omitted some days that should have
11 been included in the numerator.  Is
12 that essentially a fair statement of
13 the issue?
14    A. Yes, that's correct.
15    Q. And you referred to -- do
16 you have a copy of the parties'
17 stipulations that were filed with the
18 Board?
19    A. Yes, I do.
20    Q. Look at paragraph six of
21 the stipulations.
22    A. I don't think I have that
23 with me.
24        * * *
25 MR. KEOUGH:

84

1    If the Board has no objection,
2    I'll give him a copy of this.
3  THE CHAIRMAN:
4    Sure.  Go ahead.
5  MR. ANGULO:
6    Thank you.
7  MR. KEOUGH:
8    That's not -- that's not the
9    copy that's been filed.
10        * * *
11 BY MR. KEOUGH:
12    Q. Mr. Angulo, I give you a
13 correct copy of the stipulations that
14 have been filed.
15    A. Thank you.  Thanks.
16    Q. Referring to paragraph six,
17 it references the MN/MI, EAC, and
18 ELIC days, and those are the days at
19 issue here, is that correct?
20    A. Yes, that's correct.
21    Q. Now have the hospitals in
22 this case, four hospitals in this
23 case, Good Sam, Thunderbird,
24 Maryvale, and a fourth which I'm
25 blanking out on, Desert Samaritan,

85

1  included the inpatient days
2  associated with those categories of
3  patients on their submitted cost
4  reports, Medicare cost reports, for
5  the fiscal years at issue here?
6      A. Yes.
7      Q. Is that for all years or
8  just some years, all hospitals, some
9  hospitals, which?
10     A. For all the years for all
11 the hospitals.
12     Q. Do you know what data these
13 hospitals use to compile those
14 numbers of AHCCCS days which you
15 report on your Medicare cost report?
16     A. We use internal reports
17 that captures the patient days by a
18 financial class, a payer class, and
19 AHCCCS is one of the categories that
20 captures all the days.
21     Q. Now when -- that's what
22 goes on to your report when it's
23 filed?
24     A. Correct.
25     Q. When the Medicare fiscal

86

1  Intermediary, Blue Cross and Blue
2  Shield of Arizona, does a settlement
3  on a cost report, do they use that
4  as-filed number of AHCCCS days you
5  report based on your internal records
6  or do they use some other number?
7      A. They do not use the as-
8  filed data.  They use AHCCCS data.
9      Q. Now when you say they use
10 AHCCCS data, what do you mean?
11     A. AHCCCS produces reports
12 that is given to the Intermediary
13 approximately two to three years
14 after our fiscal year end, and that's
15 the data that's used to finalize the
16 cost reports.
17     Q. I think you said those
18 reports are produced maybe two or
19 three years, whatever, after.  I take
20 it you don't have those reports from
21 AHCCCS when at the time you're filing
22 the cost report, two, three, five
23 months after the end of the fiscal
24 year, is that correct?
25     A. Correct.  We don't have

87

1  that AHCCCS data available to us.
2      Q. Now, Mr. Angulo, if you
3  would refer back again to the
4  stipulation of the parties on the
5  second page in paragraph ten.  The
6  parties agree that the Intermediary
7  in this case included all AHCCCS
8  days, excuse me, including the MN/MI,
9  EAC, and ELIC days in the numerator
10 of the Medicaid fraction for the
11 Medicare disproportionate share
12 calculation for all years through
13 1989.  I'd like you to tell the Board
14 a little more about these patients in
15 those three categories I mentioned,
16 the MN/MI, the ELIC, and the EAC.
17 First, let me ask you this.  I had
18 mentioned at the outset and the
19 stipulations of the parties reflect
20 that in Arizona the AHCCCS program,
21 which is the Medicare program in
22 Arizona, is managed care.  Everybody
23 goes into a managed care plan.  Is
24 that right?
25     A. Correct.  That's correct.

88

1      Q. Now the individuals who are
2  covered under these three categories
3  that we're concerned with today, are
4  they also enrolled in managed care
5  plans?
6      A. Yes, they are.
7      Q. Are they all lumped into
8  one special managed care plan or are
9  they dispersed among all contracted
10 or all plans that contract with
11 AHCCCS?
12     A. Actually they're amongst
13 all the plans that contract with
14 AHCCCS.
15     Q. Now are these patients, by
16 these I mean the patients in the
17 three categories we're talking about,
18 are they -- do they get some
19 different coverage under AHCCCS for
20 inpatient hospital services or is it
21 the same benefit that other AHCCCS
22 patients receive?
23     A. They received the same
24 benefits as other AHCCCS patients
25 also.

89

Q. Are your hospitals, Banner hospitals, paid any different reimbursement rates by AHCCCS or more specifically by the managed care plans when you furnish services to patients in these three categories as opposed to other AHCCCS patients?

A. No, there are no payment differences.

***

THE CHAIRMAN:

Excuse me just a minute, Mr. Keough, before you go on. Could you turn off the light there, will you? We're getting a nice show of your hand gestures.

MR. KEOUGH:

Okay. I'll try to stop doing that but I'm afraid if I turn this projector off we're going to have a hard time getting us up again, and we'll have a couple of examples of things that in lieu of putting on the

90

easel we can put up here on a slide. I apologize for that. Okay.

***

BY MR. KEOUGH:

Q. Okay. No difference in the reimbursement rates you received from the managed care plan between these three groups and other AHCCCS patients, correct?

A. No.

Q. Now the Intermediary's position paper mentions something about different rate codes assigned to different categories of AHCCCS patients. Do these rate codes mean anything to the hospitals in terms of coverage for inpatient hospital services in terms of who you send your bills to, in terms of the amounts you get paid, or anything else that you care about as a hospital providing care?

A. No, because an AHCCCS patient to us is an AHCCCS patient.

91

Q. Now, Mr. Angulo, could you turn to Provider Exhibit 13? Can you identify that document?

A. Yes. This is a declaration from Branch McNeal [ph].

Q. Who is Branch McNeal, do you know?

A. He was a high level official with the AHCCCS program for about ten years during the 1990s.

Q. Now Mr. McNeal's declaration talks about -- in part talks about a DSH payment made by AHCCCS. Are you familiar with the AHCCCS DSH payment?

A. Yes, I am.

Q. Now the parties have stipulated in the stipulations we filed in a separate document that the state received, Arizona received federal financial participation, FFP, for DSH payments made to hospitals by AHCCCS beginning with or beginning in '92. I'd like you to tell the Board a little bit more about how this

92

AHCCCS DSH payment works. You said you're familiar with it. Can you tell us very briefly first are there criteria that the AHCCCS program applies in determining whether a particular hospital qualifies for any DSH payment under AHCCCS?

A. Yes. There's two methods of qualification. One is the Medicaid utilization, which is based on patient days, and the second is the low income utilization, which is based on AHCCCS revenues to total revenues.

Q. Now once a hospital meets the criteria and qualifies as a DSH hospital is that low income utilization rate you mentioned, does that also come into play in determining the amount of the payment made to a qualified hospital?

A. Yes, it does.

Q. Now there's some documents from the state reflecting the state DSH payment both behind tab A in 13

93

```
 1    and also tab 12.  Let me ask you to
 2    turn to tab 12.  It's a little easier
 3    to follow.  That's Provider Exhibit
 4    12.  Turn back to the page numbered -
 5    - pardon me for one moment.  The page
 6    numbered at the bottom BAN-0111.
 7    Could you just briefly identify what
 8    this document is?
 9         A.  Yes.  It explains the
10    AHCCCS payment methodology for DSH
11    and it includes the two criteria
12    factor that I mentioned previously.
13         Q.  Now you say it includes the
14    two criteria factors.  You're
15    referring, I take it, correct me if
16    I'm wrong, but you're referring to at
17    the top of the page under the first
18    paragraph the two bullet points?
19         A.  Yes.
20         Q.  And the first criteria
21    under the first bullet is the
22    Medicaid utilization rate, is that
23    right?
24         A.  Correct.
25         Q.  The second is the low
```

94

```
 1    income utilization rate to which you
 2    referred earlier?
 3         A.  Yes.
 4         Q.  Now I want to talk a little
 5    bit more about the low income
 6    utilization rate.  You've said just a
 7    moment ago that comes into play both
 8    in determining qualification for the
 9    Medicaid DSH payment as well as the
10    amount if you qualify?
11         A.  Correct.
12         Q.  Now further down on the
13    same page toward the bottom is a
14    definition of the low income
15    utilization rate, I take it, is that
16    right?
17         A.  Yes, there is.
18         Q.  And the sum of two
19    fractions, is that correct?
20         A.  Correct.
21         Q.  The numerator of the first
22    fraction refers to total AHCCCS
23    revenue, is that right?
24         A.  That's correct.
25         Q.  Looking at the first
```

95

```
 1    sentence of the paragraph just above
 2    that depiction of it explain to the
 3    Board what's included in total AHCCCS
 4    revenue looking at the paragraph just
 5    above the fraction.
 6         A.  Okay.  Total AHCCCS revenue
 7    includes Medicaid, Medicare
 8    crossovers, the MN/MI category, and
 9    the EAC and ELIC categories.
10         Q.  Now I'd like you to turn
11    back in the same exhibit about three
12    pages to the page numbered 0114.  The
13    page number is at the bottom.  And
14    I'd like you to look specifically at
15    the -- there are three charts on this
16    page.  I direct your attention
17    specifically to the second of the
18    three charts under the heading low
19    income utilization.
20         A.  Yes.
21         Q.  Now the column on the left,
22    those are -- are those components of
23    that calculation of the low income
24    utilization rate?
25         A.  Yes, they are.
```

96

```
 1         Q.  Okay.  And, for example,
 2    the first component, charity care
 3    revenue, do you see in the next
 4    column it says UAR?
 5         A.  Yes.
 6         Q.  Can you tell the Board what
 7    UAR stands for?
 8         A.  In the State of Arizona the
 9    UAR is the Uniform Accounting Report
10    that all hospitals submit to AHCCCS.
11         Q.  And directing your
12    attention up to the top of the page
13    in the text in the second line that
14    Uniform Accounting Report, and the
15    definition of the acronym UAR is
16    defined there, is that right?
17         A.  Yes, it is.
18         Q.  Are you familiar with that
19    Uniform Accounting Report?
20         A.  Yes, to some degree.
21         Q.  Now I'd like to run through
22    with you an example of how the low
23    income utilization rate computes.  If
24    you'd explain this to the Board, and
25    if I did this right it should come up
```

97

1    on the screen.
2                    ***
3    MR. TALBERT:
4         Excuse me.  Could I have about
5         30 seconds?  I think I want to
6         shift around to the other side
7         of the table so I can watch
8         the graphic.
9    MR. KEOUGH:
10        Oh.  Bernie, I have a hard
11        copy of this and I'd be happy
12        to give Mr. Talbert one and if
13        the Board members want one.
14        It doesn't matter to me.
15   MR. TALBERT:
16        Okay.  Then I'll stay...
17   THE CHAIRMAN:
18        I think that would be helpful
19        if you have extras for us.
20   MR. KEOUGH:
21        Yes.
22                    ***
23   BY MR. KEOUGH:
24        Q.  Okay, Mr. Angulo, let's
25   work through an example here.

98

1    Suppose that charity care revenue
2    from the UAR report for a given
3    hospital for a given year is zero.
4    Gross patient revenue, is that
5    another factor in the calculation of
6    the low income utilization rate?
7         A.  Yes, it is.
8         Q.  Assume for sake of this
9    discussion that that number is 100
10   million.  Net inpatient revenue, is
11   that another factor in the
12   calculation of the low income
13   utilization rate?
14        A.  Yes, it is.
15        Q.  Okay.  Let's assume that's
16   80 million.  Total AHCCCS revenue, I
17   believe you mentioned earlier, is
18   included, is that right?
19        A.  That's correct.
20        Q.  In this case let's assume
21   it's 40 million, and it's made up of
22   20 million attributable to MN/MI, and
23   that is included, is it not?
24        A.  Yes, it is.
25        Q.  10 million EAC revenue, and

99

1    that is also included, is it not?
2         A.  Yes, it is.
3         Q.  10 million of ELIC revenue,
4    which as I understand from earlier
5    testimony is also included, correct?
6         A.  Yes.
7         Q.  Other AHCCCS revenue in
8    this hypothetical let's assume is
9    zero, so the total is 40.  County
10   revenue could be included, is that
11   right?
12        A.  Yes, it can be.
13        Q.  And let's assume for the
14   sake of this discussion it's zero.
15   Other government revenue may be
16   included, is that correct?
17        A.  Yes.
18        Q.  And for the sake of this
19   discussion let's assume that's zero.
20   The next slide.  Using the numbers I
21   just gave you for purposes of our
22   hypothetical, I would compute a low
23   income utilization rate for this
24   hospital of 50 percent?
25        A.  Correct.

100

1         Q.  Do you agree with that
2    calculation?
3         A.  Yes.
4         Q.  It would be 40 million of
5    AHCCCS revenue, which is in this
6    instance entirely comprised of MN/MI,
7    ELIC and EAC revenue.  Do you agree?
8         A.  Yes.
9         Q.  Zero revenue for county and
10   state subsidies, is that correct?
11        A.  Right.
12        Q.  Net inpatient revenue of 80
13   million?
14        A.  Right.
15        Q.  You do that fraction and
16   you get 50 percent?
17        A.  Correct.
18        Q.  The second fraction is
19   gross charity care revenue, and it
20   left off the number on this
21   projection but in our example it was
22   zero, is that right?
23        A.  That's correct.
24        Q.  And gross inpatient
25   revenues of 100 million?

101

A. Right.

Q. Add those two together and the rate would be 50 percent?

A. That's correct.

Q. Now what does that mean, Mr. Angulo? I would take it from this example to mean that a hospital in Arizona could qualify for the AHCCCS DSH payment even if the only AHCCCS patients it treats are low income, is that true?

A. Yes, that's correct.

Q. In fact, in this case with a 50 percent rate they would meet the criteria to qualify, is that correct?

A. Yes, with the total 50 percent rate they would.

Q. And in the same situation where the only AHCCCS patients the hospital should treat are let's say MN/MI, and they qualify, they would also receive some lump sum AHCCCS DSH payment, is that true?

A. Yes, they would.

Q. Now calculating the lump

102

sum paid the qualifying hospitals, I think you mentioned before Arizona would take into account the low income utilization rate in some instances, is that right?

A. Yes.

Q. And briefly can -- just very briefly give the Board an overview of how the state would compute the amount paid to qualifying hospitals, the amount that the AHCCCS DSH paid.

A. In the State of Arizona there's four pools of money that are funded by the state. One of them is a public fund, which goes to the county hospitals. The other three funds, two of them are allocated based on the percentage of the low income utilization percentage to the hospitals in Arizona.

* * *

MS. POWELL:

What's the source of those funds?

103

MR. ANGULO:

The source of the funds, I believe the state legislature allocates those funds out of the state monies.

MS. POWELL:

General revenue?

MR. ANGULO:

I believe so.

* * *

BY MR. KEOUGH:

Q. And, Mr. Angulo, part of that funding is also through the federal FFP, is that right?

A. Yes, correct.

Q. And the parties have stipulated to that?

A. Yes.

Q. So, for example, I don't know if Arizona's federal matching assistance percentage is 50 percent or 60 percent or whatever it is but if it's 60 percent, for example, then 60 percent of that money is FFP, correct?

104

A. Yes, they do receive federal matching.

Q. Now, Mr. Angulo, I know you're not a lawyer but from your understanding would you consider a payment by AHCCCS to a hospital with respect to services to a patient, is that something that you would think of as medical assistance?

A. Yes.

* * *

MS. POWELL:

Excuse me. Could you get that light out of my eyes?

MR. KEOUGH:

We won't need that anymore for a while.

* * *

BY MR. KEOUGH:

Q. Now I need to shift gears again and go to a different topic. The parties have stipulated that the Intermediary's calculations, the Medicaid fraction for purposes of the Medicare DSH calculation for years up

134

105

through '89 included the numerator
for Medicaid fraction, inpatient days
attributable to patients in these
three groups, MN/MI, ELIC and EAC, is
that -- you're familiar with the
stipulations?

A. Yes.  They did include
those days up to those -- 1986
through 1989.

Q. Now did Good Samaritan, one
of the Providers in this case, Good
Samaritan, did Good Samaritan receive
Medicare DSH payments in those years?

A. Yes, they did.

Q. And when Good Samaritan DSH
hospital sends Medicare bill, I
guess, periodically -- the patient is
discharged and you send a Medicare
bill.  When Medicare makes payment on
that, that's through a remittance
advice, is that right?

A. Correct.

Q. Now a remittance advice
would include a DRG payment, I
presume, for the appropriate

106

discharge?

A. Yes.

Q. Does it also include an
amount for DSH?

A. Yes, it's an add on to the
DRG payment on the remit.

Q. You would get those
payments as you go, so to speak?  As
discharges are billed and paid you're
getting a DRG, and you're getting a
DSH amount, is that true?

A. Yes.

Q. Now of course those may be
reconciled year end and through
settlement of the cost report but you
do receive those payments as you go
over a year?

A. Yes, we do.

Q. Those DSH payments you
received on the as you go basis over
the course of a year, how does the
Intermediary compute how much of a
DSH add on it's going to make in
respect of your discharge say for
fiscal year 1990?  How does the

107

Intermediary calculate that?

A. It's normally based on the
prior year's audits.

Q. Of the DSH adjustment?

A. Of the cost report and the
DSH adjustment.

Q. So in 1990, for example,
Good Samaritan would have been
receiving DSH payments per discharge?

A. Yes.

Q. And the amount of those DSH
payments would have been derived from
Good Samaritan's DSH add on in
earlier years, is that right?

A. Yes.

Q. And of course Good
Samaritan's DSH payment for earlier
years in turn was calculated by
including a numerator of the Medicaid
fraction, these MN/MI, ELIC and EAC
days, is that right?

A. Yes.

Q. And also going up through
1991 the same situation, I presume.
You would have received DSH payments

108

on an as you go basis on the
remittance advices, is that right?

A. Yes.

Q. And they would have been
computed likewise based on your DSH
amounts from earlier years, your
settled amounts, is that right?

A. Yes, based on the audits.

Q. And continuing on up
through at least to the beginning of
'92 the same would have been true, is
that right?

A. Yes, that's correct.

Q. Now somewhere in 1992,
actually in early '92, the
Intermediary in consultation with the
CMS regional office came to a
determination that they shouldn't --
that those MN/MI, ELIC and EAC days
shouldn't continue to be counted in
the numerator of the Medicaid
fraction, correct?

A. Yes, that's a determination
the Intermediary made.

Q. So I presume at some point

109

1  thereafter, the settled cost reports
2  or whatever later they would have
3  computed Medicaid fractions taking
4  those days out, is that correct?
5      A. Correct, if the data was
6  available.
7      Q. Now would you turn to
8  Provider Exhibit 27, please?  Could
9  you identify that document?
10     A. Yes, I can.
11     Q. What is it?
12     A. It's an article from the
13 local newspaper called the Business
14 Journal, which is a local paper with
15 different issues related to what's
16 going on in the community.
17     Q. And what's the date of that
18 article?
19     A. It is dated February 3,
20 1992.
21     Q. I'd like to direct your
22 attention to the quotation in the
23 second paragraph in the middle column
24 of the article, and that paragraph
25 begins with a reference to a John

110

1  Rivers.  He is described in the
2  article as the then president and
3  chief executive officer of the
4  Arizona Hospital Association.  Do you
5  know who Mr. Rivers was?
6      A. Yes, at the time he was the
7  president and CEO of the Arizona
8  Hospital Association.
9      Q. And then the article
10 contains a quote from Mr. Rivers.
11 Could you just read out loud his
12 quotation?
13     A. Sure.  His quote is, "I
14 haven't ever seen the members of the
15 Association as upset about an issue
16 as they are about this.  If they wish
17 to change that policy, it should be
18 thoroughly discussed with the
19 affected providers beforehand.  We
20 simply want due process and an
21 opportunity to discuss alternatives."
22     Q. Now what issue is Mr.
23 Rivers referring to in that
24 quotation?
25     A. The issue he's referring to

111

1  is the Intermediary's disallowance of
2  the three categories at issue here.
3      Q. And you were around in the
4  community in 1992, were you not?
5      A. Yes, I was.
6      Q. At that time, I don't
7  recall, were you at Samaritan or at
8  St. Joseph's?
9      A. At this time I was at St.
10 Joseph's Medical Center.
11     Q. Just prior to this time you
12 had been with Blue Cross of Arizona?
13     A. Correct.
14     Q. And at that point in time
15 were you familiar with this issue
16 about when the days we're talking
17 about today count in the Medicaid
18 fraction?
19     A. Yes, I was familiar with
20 this issue.
21     Q. And I know this was several
22 years back but does the sentiment
23 expressed by Mr. Rivers in this
24 quotation jive with your recollection
25 of what the hospital's reaction was

112

1  at that time to the determination
2  that these days don't count?
3      A. The hospitals were
4  definitely in agreement that this was
5  not what they were -- they were not
6  in favor of this.
7      Q. Now was Samaritan -- you
8  came over to Samaritan shortly
9  after...
10     A. Yes, the following year.
11     Q. Banner was then Samaritan.
12 Did Samaritan concur with the
13 Intermediary's determination in '92
14 that these days should be excluded?
15 Did Samaritan think that was the
16 correct decision?
17     A. No.  We did not agree that
18 that was the proper treatment of
19 these days.
20     Q. Now I guess the
21 stipulations that the parties in fact
22 -- we've agreed that the hospitals
23 didn't add this particular issue to
24 the appeals at issue here today until
25 beginning in 2000, is that right?

136

113

A. That's correct, yes.

Q. Now why did your institution decide -- what was going on that you decided to contest the issue in 2000 and not beforehand? What was happening?

A. During this time period we were just starting to receive the NPRs for these years. One of the bigger issues at hand was receiving Title 19 days. That was the bigger issue that we were working on and using an enormous amount of resources and time to insure that we were properly capturing those days. We had to utilize consultants and a lot of time, money and resources, which took about a five -- it was about a five-year project to finally get this information. The AHCCCS information was very messy. The cutoff dates that they applied were not capturing all the proper days. Also, at that time Samaritan Health System was in some financial difficulties, which

114

ultimately led to the merger in 1999. So for those reasons we directed our resources and time to try to get the Title 19 days that we knew we were entitled to.

Q. Now, Mr. Angulo, you've referred and the other parties sort of colloquially referred to Title 19 days as the folks in the other portion of the AHCCCS program, not these three categories, is that right?

A. Correct.

Q. Now you mentioned that one of the issues you were devoting substantial time and attention to being this -- you mentioned the cut off in terms of data that AHCCCS provides to the Intermediary.

A. Correct.

Q. That they didn't use to calculate your DSH?

A. Exactly.

Q. Now turn to Provider -- I'm sorry, Intermediary Exhibit 18, the

115

tab I-18.

A. Okay.

Q. Mr. Angulo, this is a letter from 1995. It's addressed to Ms. Bonnie Irwin, Blue Cross of Arizona. And it's from, if you look at the third page, I think that's Gene -- I believe that's Gene Chin [ph], and maybe it's cut off at the end but chief financial operations division of Medicare. Just a little bit of background. Look back on the first page of the letter, the first numbered paragraph, and it says issue. The AHCCCS reports, which contain a hospital's Title 19 patient day information have a cut off date of July 1 of each year. Claims paid after July 1 are not included. Then it goes on beyond that. My question, is that the same issue that you were alluding to earlier with this early cut off?

A. Yes, it is.

Q. Was that a big problem in

116

the hospitals?

A. It was an enormous problem because the data could not be captured properly.

Q. And was that all resolved and wrapped up nice and tidy in '95 when this letter was sent?

A. No, it was not. It was a continuous process of trying to get the accurate data from AHCCCS.

Q. Now, Mr. Angulo, let me ask you this. I'm coming to the end here. If someone told you before October 15, 1999, that all these MN/MI, EAC and ELIC days be included in your Medicare DSH calculation for every hospital in this case and every year at issue in this case, if the hospitals just add this issue to your then pending appeals and do it before October 15, '99, if someone had told you that, would you have done it?

A. Oh, absolutely we would have.

Q. So why didn't you do it?

( 137

117

A. We didn't know that that
was the cut off date.
*   *   *
MR. KEOUGH:
Thank you. No further direct.
THE CHAIRMAN:
Mr. Talbert.
*   *   *
CROSS EXAMINATION
BY MR. TALBERT:
Q. I want to refer back to
paragraph six of the stipulation, and
I want to make sure I heard something
in the beginning of your testimony
correct. Would it be fair to say
possibly with the exception of
Samaritan in '91 the DSH claim and
appeals history for all the hospitals
in all the years we're dealing with
were generally the same?
A. Were all the issues
generally the same?
Q. Just as far as DSH. I mean
if we were to look at Samaritan '96
DSH claim or Thunderbird Samaritan's

118

'94 DSH claim, would we be seeing
basically the same type of
information included or not included?
A. In the cost reports?
Q. Yeah.
A. Yes, we would be using the
same type of internal data.
Q. Now and you said you were
actually doing Good Samaritan's cost
reports?
A. Yes, that's correct.
Q. I'm just going to pick this
one blind, and I'm looking at
Provider Exhibit 1, and we'll see
what details you have. Just focusing
on Good Samaritan's 1996 cost report.
A. Okay.
Q. Now did I understand -- and
I take if Good Samaritan actually
claims and calculates a DSH, Medicare
DSH, in the cost report it files, is
that correct?
A. Yes.
Q. And so it calculates the
SSI and the Medicaid proxy?

119

A. The SSI is a given.
Q. The SSI is a given but it
gets that, and then computes its own
Medicaid proxy when it files its cost
report. If someone were to look
through the work papers they would
see we had X number of Medicaid days
in the numerator and Y number of
total days in the denominator?
A. Correct. Yes.
Q. Was it your testimony that
when Good Samaritan filed its 1996
cost report it actually included in
the numerator the MN/MI days and the
EAC and the ELIC days, those were
actually included in the cost report?
A. When we filed the cost
reports, we use internal data. We do
not distinguish the various
categories of days because the AHCCCS
days in total are what we capture and
file on the cost report so those days
would be included in the total AHCCCS
days.
Q. And you don't -- did the

120

hospital have any internal records
which would indicate which payments
were Title 19 and which patients were
MN/MI?
A. At this time period, no.
Q. I'm talking about 1996.
Using that as an example, kind of
picking the middle of our cycle.
A. Would the hospital have --
I'm sorry. Can you restate the
question?
Q. Would the hospital have in
its records for all -- for any AHCCCS
patients, would there be a source
that would tell it which individual
patients were Title 19 patients
versus which were MN/MI patients?
A. Possibly, yes.
Q. But those numbers were not
used to compile the Medicaid DSH
component?
A. We do not report that level
of detail on the cost report.
Q. So you just plucked a
number kind of -- you're saying you

121

1     plucked the bottom line of the AHCCCS
2     days and just used that without
3     knowing what was included and what
4     was not included?
5        A. We know that the AHCCCS
6     days are inclusive of all categories
7     that relate to the AHCCCS program.
8        Q. Now by the time you filed
9     the 1996 cost report the Provider was
10     aware of the Intermediary's position
11     as backed by CMS that these MN/MI
12     days did not belong in the DSH
13     calculation?
14        A. Through the internal memo
15     from Blue Cross, yes.
16        Q. But the hospital was aware
17     and you were personally aware?
18        A. Yes.
19        Q. I understand the testimony
20     that those days were still included
21     in the initial cost report claim?
22        A. Correct.
23        Q. But they were not -- just
24     because you plucked the number -- you
25     just plucked some global number? You

122

1     just looked at the AHCCCS report and
2     whatever and said that's the number
3     that was used?
4        A. That is correct. But we
5     also have always believed that those
6     days should always be included.
7        Q. Well, kind of answer the
8     question that I'm asking you, and
9     then you'll have a chance to
10     volunteer stuff like that later.
11        A. Okay.
12        Q. To keep the record clear.
13        A. Okay.
14        Q. But the -- and then the
15     Intermediary -- you talked about how
16     the Intermediary actually settled the
17     cost report, and I believe used only
18     the title, the actual Title 19 days?
19        A. They used the data that was
20     supplied to them by AHCCCS.
21        Q. And eventually AHCCCS was
22     able to distinguish between its MN/MI
23     and its Title 19 patients?
24        A. Eventually, yes, but not in
25     those early years.

123

1        Q. And you're considering
2     1996, an earlier year?
3        A. I know by that point they
4     were -- I believe they were able to
5     distinguish that.
6        Q. Well, that's why I'm
7     getting confused. AHCCCS was able to
8     distinguish Title 19 from MN/MI for
9     the Intermediary's audit but it
10     wasn't able to distinguish MN/MI for
11     the -- the Provider was not able to
12     distinguish it for its own cost
13     report?
14        A. We have to consider the
15     time frames involved here.
16        Q. Well, I'm using 1996 as a
17     specific time frame.
18        A. Okay. 1996, yes. They
19     would have had, I believe, the
20     capability to distinguish that.
21        Q. The hospital would?
22        A. No. Are you referring -- I
23     thought you were referring to AHCCCS.
24        Q. Well, okay, I was referring
25     to -- AHCCCS could distinguish but

124

1     they wouldn't give the hospital a
2     report which would distinguish?
3        A. That data is not available
4     to the hospitals approximately two to
5     three years after the hospital's
6     fiscal year end, and it is not sent
7     to the hospitals. It is sent to the
8     Intermediary.
9        ***
10 MR. HOOVER:
11        Let me ask a question right
12        here.
13 MR. ANGULO:
14        Sure.
15 MR. HOOVER:
16        The AHCCCS plan in Arizona,
17        what is the source data that
18        they accumulate this
19        information from?
20 MR. ANGULO:
21        Paid claim data.
22 MR. HOOVER:
23        Well, if it's coming from the
24        paid claim then why wouldn't
25        the hospital have that data?

125

1       They submit the claim.
2  MR. ANGULO:
3       We have the data in total,
4       yes, we do.
   MR. HOOVER:
6       No, that wasn't my question.
7       How does AHCCCS distinguish
8       Title 19 and the other?
9  MR. ANGULO:
10      By various rate codes that are
11      established for the different
12      categories.
13 MR. HOOVER:
14      Do you have access to those
15      rate codes?
16 MR. ANGULO:
17      At this time period they're in
18      the system, yes.
19 MR. HOOVER:
20      I don't understand.  If the
21      source of the data by AHCCCS
22      is your claim form then I
23      don't understand why you don't
24      have the data.
25 MR. ANGULO:

126

1       We do have the data, yes, we
2       do.
3  MR. HOOVER:
4       Why didn't you -- that's all
5       the questions I have.
6                    ***
7  BY MR. TALBERT:
8       Q.  You're saying that the data
9  distinguishing Title 19 from MN/MI
10 was not used in the filing of the
11 cost report by the facility?
12      A.  We don't report that level
13 of detail.  We report all AHCCCS days
14 inclusive of all categories.
15      Q.  And then just figuring out
16 eventually the Intermediary would
17 sort it out by the time it got around
18 to the audit?
19      A.  Not the Intermediary.
20 AHCCCS and then provide the
21 information to the Intermediary.
22      Q.  So is it your testimony
23 that the Intermediary was working
24 with a more detailed report of
25 specific AHCCCS days than the

127

1  Provider had available to it when it
2  provided its cost report?
3       A.  Yes.
4       Q.  We'll come back to this but
5  could you turn to Provider's Exhibit
6  11, and I'm looking at the letter
7  from Mr. Chin to Ms. Irwin.
8       A.  Okay.
9       Q.  And I'm looking
10 specifically at the second paragraph
11 that starts yesterday.  It reiterates
12 a discussion with a Mr. Titlebaum
13 [ph], and the conclusion here is that
14 AHCCCS could not be able to
15 accurately segregate Title 19 days
16 from total AHCCCS days prior to 1990
17 but they could segregate -- make that
18 segregation from 1990 onward.  Is
19 that your -- are we reading the
20 letter the same?
21      A.  Yes, that's my
22 understanding.
23      Q.  Okay.  And to your
24 knowledge was that in fact a correct
25 statement by Mr. Chin as to what

128

1  AHCCCS could or couldn't do?
2       A.  Yes, that was my
3  understanding at the time.
4       Q.  But just so that I
5  understand your testimony, is it four
6  years later, five years later, when
7  the facility is doing the 1996 cost
8  report it could not distinguish Title
9  19 days from the other days when it
10 filed its cost report?
11      A.  We possibly could have,
12 yes.
13      Q.  But just didn't?
14      A.  No, because again to us
15 total AHCCCS days were what we were
16 entitled to.
17      Q.  Well, when you received the
18 Intermediary's calculation DSH, would
19 it then have been clear to the
20 hospital that the MN/MI days, for
21 example, were not included in the
22 ultimate Medicaid proxy?
23      A.  We knew that the days were
24 still inaccurate.
25      Q.  Try to answer my question.

140

129

A. Okay.

Q. Would the hospital have been aware that the Intermediary's calculation specifically excluded the MN/MI and the children's days?

A. Yes.

Q. Prior to 2000 for any of the years did the hospital appeal that determination which excluded the MN/MI and the children days?

A. No, not that particular issue.

Q. If we were to look at a year by year basis of the Intermediary's initial adjustment to the Provider's own DSH calculation, would we see a pattern of the Medicaid eligible of the -- of days being increased or decreased?  Let me make the question more direct.

A. Okay.

Q. For the hospitals that we're talking about here, did the Intermediary's settlement of the cost report systematically decrease the

130

Medicaid days that were in issue and claimed by the Provider?

A. Yes.

Q. Systematically if we looked at every year we would see the pattern of decrease?

A. Possibly not, depending on utilization for that year.

Q. Depending on utilization.

A. Yes, what the patient mix could have been.  Various factors could affect that.

Q. I mean it sounds like maybe that the provider included maybe not knowingly or purposefully the MN/MI days, and I'm just using that as a synonym for the other days in its DSH calculation, and the Intermediary adjusted it out?

A. Correct.

Q. Wouldn't that necessarily reflect adjustments reducing the total patient days used in the DSH calculation?

A. Yes, it would.

131

Q. And if we were to see a pattern of the adjustments more often than not increasing the number of Medicaid days might that suggest that in fact the MN/MI days were never in the cost report in the first place?

A. I don't think so, no.

Q. I want to ask you about the -- little bit more about the Medicaid DSH calculation.  You discussed Exhibit 13 and -- Provider 12 and Provider 13 with Mr. Keough.  Do the individual hospitals calculate their own what they believe is their Medicaid DSH payment?

A. On the Medicare cost report?

Q. On the Medicaid cost report.

A. On the Medicaid?

Q. Well, let me ask you how does an Arizona hospital get a Medicaid DSH payment from the state?

A. The AHCCCS DSH payment is what we're referring to?

132

Q. If that's what you want to call it, yeah.

A. Okay. It's based on when the two criteria...

Q. That isn't my question. This is more of a mechanical question.

A. Okay.

Q. What are the communications between the hospital and AHCCCS to get the money into the hospital? We'll talk about how it's done in a moment.

A. The communications, I'm confused there.

Q. Okay.  If you know in 1996 did Good Samaritan get a DSH payment, a Medicaid or an AHCCCS DSH payment?

A. Yes.

Q. Did a check just show up in the mail one day?

A. Actually they come twice a year in the mail.

Q. Does the hospital do anything to initiate the DSH payment,

141

133

1  do any calculations, help the state
2  develop the figure?
3      A.  They don't assist the state
4  in calculating the payment but by
5  submitting the claim data we're
6  submitting the information to
7  calculate -- help them calculate the
8  data and the payment.
9      Q.  Now I want to talk about
10  the two methods by which the AHCCCS
11  DSH payment is calculated, and I'm
12  going to be looking at page in
13  Exhibit 12, the page first marked 111
14  on the bottom, and then looking at --
15  and then going to page 114 so if you
16  could put your finger on those two
17  pages.  We see a Medicaid utilization
18  calculation and a low income
19  utilization calculation.
20      A.  Right.  Right.
21      Q.  And are those really the
22  two alternatives?
23      A.  To the best of my
24  understanding, yes.
25      Q.  There may be some other

134

1  ones listed here but they really
2  don't apply to the type of hospitals
3  we're looking at here?
4      A.  I don't believe so.
5      Q.  I just want to confirm one
6  thing.  When we look at the Medicaid
7  utilization and we see total Title 19
8  days over all payer days, and when I
9  turn to page 114 when we see up at
10  the top Title 19 days under Medicaid
11  utilization, and then when we see
12  total AHCCCS revenue is the sum of
13  payments for the Title 19 MN/MI, EAC
14  and ELIC, is it correct to conclude
15  that the Title 19 day calculation
16  excludes MN/MI, EAC, and ELIC?
17      A.  It appears under that
18  calculation that it does exclude it.
19      Q.  Okay.  So the first
20  calculation is a straight Title 19
21  over all payer days?
22      A.  Yes, based on...
23      Q.  Which is basically the same
24  as what the Medicare program is
25  saying the Medicare proxy is.  I mean

135

1  it's using Title 19 days and all
2  payer days the same way that the
3  Medicare program uses Title 19 and
4  all payer days for the purposes of
5  calculating part of the Medicare DSH?
6      A.  That's what it appears to
7  be doing.
8      Q.  I mean any doubt in your
9  mind?  You're hedging your answer.
10      A.  I'm not completely positive
11  but that's on the surface what
12  appears to be happening.
13      Q.  I mean it may include for
14  Medicaid purposes maybe some days in
15  excluded units.
16      A.  Correct.
17      Q.  Otherwise, it's talking
18  about the federally matched Title 19
19  days.
20              ***
21  MS. POWELL:
22      May I ask a question at this
23      point, Mr. Talbert?
24  MR. TALBERT:
25      Sure.

136

1  MS. POWELL:
2      Could you tell us what -- if
3      all of Arizona -- AHCCCS is
4      Arizona's Medicaid program
5      where are these Title 19 days
6      coming from, these straight
7      Title 19 days?
8  MR. ANGULO:
9      They are a component of other
10      eligibility categories.  There
11      are several eligibility
12      categories, so the days are
13      being generated by those
14      patients in those categories.
15  MS. POWELL:
16      So AHCCCS has straight Title
17      19 and then they have these
18      subcategories, these other
19      categories?
20  MR. ANGULO:
21      These additional eligibility
22      categories.
23  MS. POWELL:
24      Okay.  So this would be the
25      actual days that were paid or

142

137

1    eligible for Medicaid Title 19
2    that's encompassed in the
3    AHCCCS?
4    MR. ANGULO:
5        Yes.
6    MS. POWELL:
7        Okay.  Thank you.
8                *** 
9    BY MR. TALBERT:
10       Q.  And the low income
11   utilization, that takes total AHCCCS
12   revenue, which includes Title 19, the
13   revenue for the days in the Medicaid
14   utilization plus all of the revenue
15   for MN/MI and the children's days and
16   some other days?
17       A.  Correct.  Yes.
18       Q.  And then the hospital will
19   then get a payment calculated under
20   one formula or the other?
21       A.  Yes, under -- yes, they
22   will.
23       Q.  Do you happen to know under
24   which component the hospitals in the
25   appeal -- in the years in the appeal,

138

1    their DSH payment was calculated,
2    their state DSH payment?
3        A.  No, I don't.
4        Q.  And just can help me if I'm
5    reading the chart on 113 to the
6    extent that it relates to these
7    particular years, it looks like the -
8    - it's pretty close to 50/50 split
9    between the Medicaid utilization and
10   the broader low income utilization as
11   to where hospitals fall.
12               ***
13   MS. POWELL:
14       Where are you?
15   MR. TALBERT:
16       I'm on 113, Banner 113.  It's
17   a page up.
18   THE CHAIRMAN:
19       Would you ask that question
20   again?
21   MR. TALBERT:
22       Sure.
23               ***
24   BY MR. TALBERT:
25       Q.  Looking at -- because I

139

1    asked you previously if you know
2    under which formula was used for the
3    specific Providers that are
4    appealing, and you said you didn't
5    know, which is understandable.  I'm
6    just asking you if this chart
7    indicates that although the numbers
8    are slanted a little bit of favor of
9    the low income utilization it's
10   pretty close to a 50/50 split as to
11   which formula would be used across
12   the board?
13       A.  Yes, based on this chart.
14       Q.  Do you know how the --
15   again, if you don't know, does AHCCCS
16   after it calculates its total DSH
17   payments under what formula it's
18   using, does it then take the
19   aggregate of those DSH patients, is
20   that what's submitted for the federal
21   government to get the matching for
22   the Medicaid DSH payment?  Do you
23   know how that process works?
24       A.  Actually, no, I don't.
25       Q.  Now using -- again, I want

140

1    to just follow your factual testimony
2    about Good Samaritan as it related to
3    getting continuous -- as to how it
4    would have received in 1992 and 1993
5    regarding the days that are in
6    controversy.  I think we're clear
7    that as far as audit periods in 1990
8    forward the Intermediary did not
9    include the MN/MI days and the
10   children's day in the DSH
11   calculation?
12       A.  Correct.
13       Q.  And the problem was spotted
14   in early 1992 or late 1991?
15       A.  By the Intermediary.
16       Q.  By the Intermediary.
17       A.  Yes.
18       Q.  Okay.  Now if I understood
19   your testimony that starting in
20   fiscal year 1992 there was -- when a
21   claim is paid for Medicare
22   beneficiary there is an automatic
23   upward percentage adjustment because
24   of the hospital has been in prior
25   years eligible for DSH, is that

143

141

correct?

A. Paid for DSH.

Q. Paid for DSH.

A. Yes.

Q. And some factor is used to gross up or increase each DRG payment for a Medicare beneficiary?

A. Correct.

Q. And I think your testimony was that in -- at least in 1992 and probably in 1991 the actual payments reflected a DSH claim by claim add on based on prior history?

A. Correct.

Q. And that's the basis for your saying that even in 1992 there was payment for the MN/MI days kind of varied in that add on?

A. Based on the factor that's being applied from prior years it would be inclusive in that add on.

Q. So it was actually based on prior -- but when the final settlement was made for '91 and '92 there was no DSH -- I'm sorry. The

142

actual days for MN/MI were taken out of the DSH calculation?

A. Yes, that's correct.

Q. Excuse me for just a moment. Thank you. I have no further questions.

***

THE CHAIRMAN:

Redirect.

MR. KEOUGH:

Just a few. I think it may clarify something if I could use the easel.

THE CHAIRMAN:

Sure.

***

REDIRECT EXAMINATION

BY MR. KEOUGH:

Q. Mr. Angulo, I think -- sometimes my wife has to remind me, sometimes timing is everything, and I want to talk about that. Can you see this? Why don't you get to where you can see it.

A. I can see it. I'm okay.

143

Q. Mr. Talbert asked you a long line of questions about Good Sam '96, what's going on, what days did you include on the report, what was the settlement interrelationship of the two. I want to ask you questions about timing. Good Sam's fiscal year '96 ended on what date?

A. 12/31/96.

Q. Good Sam FYE 12/31/96. What time frame would you be filing the Medicare cost report for Good Sam's fiscal year ending 12/31/96?

A. By the end -- it changed right around this time.

Q. Give me a rough...

A. April, May of 1997.

Q. Okay. Filed cost report April, May generally.

A. Yes.

Q. That's what you'd expect of '97, four or five months after the end of the year?

A. Correct.

Q. At this time when you're

144

filing this cost report for 12/31/96 fiscal year end, you testified you're putting together a number of AHCCCS days. Is that number going to go on the cost report somewhere?

A. Yes, it is.

Q. Where is it going to go in?

A. The S-3 worksheet.

Q. You've testified that the source of the data you used to compile the numbers internal hospital records reflecting who the payers are, the patients?

A. Correct.

Q. So if Aetna paid the stay is it counted?

A. No.

Q. If Medicare paid for Mary Doe's stay, is that stay counted?

A. No.

Q. If AHCCCS paid for John Smith's stay, did you pick that one up?

A. Yes.

Q. Okay. And without

144

145

1  distinction, if I understood your --
2  between whether AHCCCS paid for John
3  Smith's stay because he was in AHCCCS
4  through the MN/MI category or whether
5  he was through one of the other
6  eligibility categories under the
7  AHCCCS program, is that correct?
8      A. Correct.
9      Q. Okay.  Now I don't know if
10 you'd know offhand either.  It's the
11 Intermediary NPRed '96.  It doesn't
12 matter.  Give me a general time frame
13 of when in a typical case you'd be
14 getting a final settlement for a
15 fiscal year.
16     A. Yes.  Generally Good Sam
17 runs about three years after the
18 fiscal year end, so this year would
19 have been settled approximately
20 September, '99.
21     Q. So I'm going to use the
22 abbreviation NPR, Notice of Program
23 Reimbursement, to refer to the final
24 settlement, and that's roughly...
25     A. September, '99.

146

1      Q. September, '99.  You
2  testified earlier all throughout this
3  period not only from Good Sam '96 but
4  all the period under issue when the
5  Intermediary was settling the cost
6  report for a hospital in Arizona and
7  performing the DSH calculation it's
8  required to perform under the DSH
9  regulation it's using data it has
10 received by the time it's settled
11 directly from the AHCCCS program, is
12 that correct?
13     A. That's correct.  They
14 receive it directly from AHCCCS.
15     Q. And is that a report, a
16 data run, that back in '97 when you
17 filed the report, did you have that -
18 - would you have had that AHCCCS
19 report?
20     A. No.
21     Q. Now it's possible, is it
22 not -- I don't know what number of
23 AHCCCS days you had on the three for
24 this year.  I'm going to make up a
25 number, just make one up.  I'm going

147

1  to say on the filed you had a nice
2  round number of 5,000.  And you said
3  when the Intermediary settled these
4  reports at least for after -- well,
5  for all the periods at issue here
6  they would not have counted in the
7  numerator of your Medicaid fraction
8  or your "Medicaid days" or AHCCCS
9  days.  They wouldn't count days
10 attributable to AHCCCS patients
11 qualified for AHCCCS benefits under
12 MN/MI, EAC and ELIC, correct?
13     A. Correct.
14     Q. They would have backed that
15 out?
16     A. Excluded it.
17     Q. And that would have
18 happened because the report that by
19 this time they have since received
20 from AHCCCS isn't including those
21 days, correct?
22     A. Correct.
23     Q. Is it possible -- it's
24 possible, is it not, that even after
25 having taken that up this number

148

1  might even go up?
2      A. It's possible, yes.
3      Q. And it's possible because
4  there are other moving parts, are
5  there not?
6      A. Yes, there are,
7  continuously.
8      Q. For example, when you filed
9  this report for '96, is it possible
10 that for this year or for earlier
11 years as well you would be counting
12 only paid days, days for which AHCCCS
13 made payment?
14     A. That's correct.  Yes.
15     Q. And not as you just
16 testified earlier you wouldn't, for
17 example, be counting on this number
18 other days the patients who are
19 eligible for AHCCCS where AHCCCS
20 didn't make payment?
21     A. That's correct.
22     Q. For example, maybe Aetna
23 had a primary liability or some other
24 payer.  You're looking at payer
25 sources.  So one thing that might

149

1    change depending on the timing and
2    the reports that you're looking at
3    you'd have other moving parts.  For
4    example, if you had five down here
5    the Intermediary making the NPR may
6    have bumped that number down to take
7    out the MN/MI and the other three
8    groups we're talking about but it
9    also may be going back up and could
10   conceivably even be going back up by
11   a larger proportion picking up other
12   eligible AHCCCS days.
13       A. Yes, sir.
14       Q. But we also have different
15   points in your cut off, do you not,
16   when you make this report at the
17   beginning of '97.  You're looking at
18   data, paid claims data, up through
19   obviously whenever you filed it
20   through May of '97?
21       A. Right.
22       Q. And if you're making an
23   NPR, the Intermediary is doing an NPR
24   based on the report it received from
25   AHCCCS two, three, whatever number of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

150

1    years later, there may be additional
2    paid claims having come in for '96
3    after this date?
4        A. Yes.  I'd like to clarify
5    at the fiscal year end we're using
6    census data.  At the time of
7    admission patient status can change
8    after that.
9        Q. So you may have to later
10   cut -- but these are a couple of
11   examples.  Are there others possibly
12   that are moving parts that are
13   impacting the aggregate number in the
14   absolute?  There may be others?
15       A. There possibly could be.  I
16   can't think of any offhand.
17           ***
18   THE CHAIRMAN:
19       Mr. Angulo, even though there
20       may be some changes wouldn't
21       the NPR actually -- or at
22       least the work papers reflect
23       precisely which adjustments
24       were made?  In other words, if
25       the MN/MI were backed out,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

151

1        that would be reflected in
2        something you received?
3    MR. ANGULO:
4        Actually not to any level of
5        detail, no.  It would just be
6        a number.  It would not have a
7        level of detail.
8    MS. POWELL:
9        Do we have an example of one
10       of those reports in the
11       record?
12   MR. KEOUGH:
13       Specifically like a work
14       paper?
15   MR. TALBERT:
16       We probably could put one
17       together.  We don't...
18   MR. KEOUGH:
19       We don't have an AHCCCS report
20       in the record, and in fact the
21       Provider through this period
22       didn't get that report from
23       AHCCCS.  It went to the FI.
24   THE CHAIRMAN:
25       But wouldn't you have a report

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

152

1        from the Intermediary, an NPR
2        that would show exactly what
3        was excluded and -- in other
4        words, each category that
5        changed from what the Provider
6        filed, wouldn't that be
7        reflected?  Do we have an
8        example of that?
9    MR. KEOUGH:
10       I can ask Mr. -- we'll just
11       wing it a little bit.
12           ***
13   BY MR. KEOUGH:
14       Q. Let me give you an example,
15   Mr. Angulo.  In fact, let's use Good
16   Sam '96.  And in Intermediary Exhibit
17   I-4 -- could you turn to that?  The
18   first page behind that tab is just
19   kind of a cover page that says
20   Exhibit I-4A, but the second page is
21   an audit adjustment.
22       A. Okay.
23       Q. If you'd turn to that audit
24   adjustment report.  Take a moment and
25   look at it.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

153

1      A. Okay.
2      Q. I want to direct your
3  attention specifically to adjustment
4  101. That's the left-hand column.
5      A. Yes.
6      Q. What schedule is being
7  adjusted?
8      A. S-3.
9      Q. And you're getting
10  adjustments to aggregate numbers of
11  days, correct?
12      A. Correct.
13      Q. And there are -- and under
14  the hearing explanation adjustment
15  you see there headings adults and
16  peds, ICU -- I'm sorry, intensive
17  care unit, coronary care unit, et
18  cetera?
19      A. Yes.
20      Q. And do those headings
21  correspond to lines on S-3?
22      A. Yes, they do.
23      Q. And they correspond to
24  lines on S-3 under the heading on
25  that portion of S-3 that says Title

154

1  19?
2      A. Yes, correct.
3      Q. And do the lines on S-3 on
4  the HCFA cost report form, is there a
5  line on S-3 under that column for
6  Title 19 for MN/MI?
7      A. No.
8      Q. Or ELIC or EAC? They don't
9  break down that way, do they?
10      A. No.
11      Q. That's an Arizona thing.
12  And the adjustments you get, if I
13  understand this adjustment correctly,
14  and I'm asking you not just for Good
15  Sam but just a little more general
16  the adjustment you get is adjustments
17  to days on S-3, correct?
18      A. Yes.
19      Q. As reported there?
20      A. Yes.
21      Q. And that's basically the
22  report you get as far as that goes
23  from the Intermediary of what changed
24  from what was filed to what was
25  settled?

155

1      A. This is the adjustment
2  report.
3      Q. Right.
4      A. We do get audit work papers
5  also.
6      Q. Now do the work papers show
7  all the pluses and minuses of how
8  they got from A, what was filed, to
9  B, settled?
10      A. There's a reconciliation,
11  yes.
12      Q. Well, but does it break it
13  down and say we whacked out 5,000
14  MN/MI days. I added...
15      A. No.
16      Q. Okay.
17      A. These are reconciliations.
18              ***
19  MR. HOOVER:
20      Let me ask a question right
21      there. If you don't know, if
22      it's not set out, then how do
23      we know that this appeal --
24      your dispute is with these
25      days? If the Intermediary

156

1      didn't set this out that it's
2      MN or MI days and you don't
3      know, what am I looking at?
4  MR. KEOUGH:
5      Well, Mr. Hoover...
6  MR. HOOVER:
7      Let me ask him. He's the one
8      that answered your question.
9  MR. ANGULO:
10      I'm sorry.
11  MR. HOOVER:
12      Your answer to Mr. Keough's
13      question was that you don't
14      know what makes up this
15      adjustment, is that correct?
16  MR. ANGULO:
17      That's correct.
18  MR. KEOUGH:
19      Can I follow up to that?
20  MR. HOOVER:
21      No. I'm asking -- when I quit
22      you will have time to redirect
23      or whatever but let me finish.
24  MR. KEOUGH:
25      Yes, sir.

147

157

MR. HOOVER:

I'm the one that's confused.
My only question is if you
don't know what this
adjustment is for, how do you
know that it's for MN or MI
days? That's what this appeal
is all about. What if it's
for days that this patient
wasn't eligible for AHCCCS?

MR. ANGULO:

And we would not be getting
credit for those days?

MR. HOOVER:

No. No. I'm just asking the
question. You say this is all
the information you get, and
my question is how do you know
that all of these days are for
MN or for MI or EAC or -- how
do you know this adjustment is
for all of that?

MR. ANGULO:

The adjustment to the
Intermediary's records

158

excludes those categories.

MR. HOOVER:

Well, you just got through
saying you didn't know what
made up these days, this
adjustment. You don't know
what days they're excluding.
Do you know what the break
down of this 1,294 days is?

MR. ANGULO:

No.

MR. HOOVER:

Do you know what the break
down of any of these days is?
All I'm saying is that that's
possible -- it is possible
that those days were days
which were not even covered by
AHCCCS, that the patient was
ineligible, do we know that
for sure?

MR. ANGULO:

No, we don't know that for
sure.

MR. HOOVER:

159

While I'm asking this
question, this brings up
another point. The NPR for
1996, you said possibly
September of '99, during all
of this eight or nine, seven
or eight years, did the
Provider continue to put their
total, what they came up with,
on S-3 as Title 19 days?

MR. ANGULO:

We continued to report
internally.

MR. HOOVER:

Even though the Intermediary
made an adjustment each year?

MR. ANGULO:

We continued to, yes.

MR. HOOVER:

Thank you. That's all I have.
Now you may continue.

MR. KEOUGH:

I apologize for the
interruption earlier.

***

160

BY MR. KEOUGH:

Q. Mr. Angulo, you know --
you, Banner, know, do you not, in
fact the parties have stipulated, you
know that the source for the
Intermediary's number, let's say it
was 6,000, you know the source from
which the Intermediary derives that
number, do you not?

A. Yes.

Q. Do you know that it is the
reports that AHCCCS, the AHCCCS
program, transmits to the
Intermediary on a regular basis two
or three years after the end of the
fiscal year?

A. Yes, they are.

Q. And in fact you know, and
the parties stipulated, that those
reports that AHCCCS generates and
transmits to the Intermediary in
respect to each fiscal year since '92
-- the reports that they have
generated since '92 and going back to
as far as '90 have not included the

148

161

1    MN/MI, EAC and ELIC days?
2        A. That's our understanding.
3        Q. Now let me ask another
4    question that's related to this.  The
5    issue in dispute here, look at the
6    Good Samaritan adjustment report.
7    Are you claiming, for example, that
8    the number of ELIC, MN/MI days Good
9    Samaritan had for '96 are the numbers
10   specifically that were taken off S-3?
11       A. They are within those
12   adjustments.
13       Q. That's not what I'm asking.
14   That those numbers aren't -- you're
15   not saying that's the number of MN/MI
16   days we had in this year.  Those
17   numbers are a function of many
18   different moving parts, correct?
19       A. Right.
20       Q. But have you determined,
21   has Good Samaritan determined, from
22   AHCCCS -- now in connection with your
23   work on the appeals how many days you
24   had in each year at issue here for
25   patients who were covered by AHCCCS

162

1    through the various categories we're
2    talking about here?
3        A. Yes, we have.
4        Q. And just to be clear, those
5    are the days that you contend should
6    be added?
7        A. Correct.
8        Q. Now Mr. Talbert asked you
9    about if the Medicaid -- the
10   calculation of the Medicaid
11   utilization rate under AHCCCS, it had
12   looked and that and it said the
13   numerator is Title 19 and the
14   denominator is total days, and he
15   asked you if that was like the
16   Medicare DSH calculation insofar as
17   reference Title 19 and total days, is
18   that correct?  Do you recall that?
19       A. Yes, I do.
20       Q. Now is it your recollection
21   that the Medicare DSH statute as far
22   as you're familiar with it, does it
23   refer to Title 19 days or days
24   eligible for medical assistance under
25   state plan?

163

1        A. Actually days eligible for
2    assistance...
3        Q. I just want to clarify our
4    terms.
5        A. ...for the state plan. Yes.
6        Q. Another question.  This may
7    help clarify some of the -- one of
8    the Board member's questions.  On
9    Provider Exhibit 2, if you could turn
10   to that, turn to the page numbered
11   BAN 15 at the bottom, several pages
12   back in that exhibit.
13       A. Yes.
14       Q. Are you familiar with --
15   can you tell us what this chart is?
16       A. This is a chart that shows
17   the AHCCCS enrollment from 1982
18   through 2002.
19       Q. I'm skipping ahead a little
20   bit.  This is appendix -- it's
21   labeled at the top Appendix 2, is
22   that correct?
23       A. Yes, it is.
24       Q. If you go back to the
25   beginning of this exhibit just to

164

1    identify this, it's Appendix 2 to a
2    report, an overview of AHCCCS, is
3    that correct?
4        A. Yes, it's a 2002 overview
5    of the AHCCCS program.
6        Q. And what I'm asking is we
7    go back to page 15 of the appendix,
8    is this an AHCCCS prepared document?
9        A. Yes, it is.
10       Q. Now I just want you to look
11   across the top of this chart in
12   different columns.  What are those
13   columns?
14       A. Those are the various
15   eligibility categories under the
16   AHCCCS plan.
17       Q. And the three we've been
18   talking about today are listed over
19   toward the right-hand side, are they
20   not?
21       A. Yes, they are.
22       Q. MN/MI, EAC and ELIC?
23       A. Yes.
24       Q. You have a number of other
25   categories listed on that chart, and

165

according to the AHCCCS summary not
all of them were in place, if you
will, at all years, but this chart
shows you which ones were going and
which time, is that right?

    A. Correct.

    Q. It also would show you the
relative numbers of individuals
covered by AHCCCS within each
category, is that correct?

    A. Right.

    Q. Now these other categories,
for example, SOBRA kids, SOBRA moms,
the state did receive FFP for all
expenditures made for medical
assistance for those categories,
correct?

    A. Yes, for those categories.

    Q. The distinction between
they and these three, the MN/MI, EAC
and ELIC, as I understand it, is that
the state did not receive direct FFP
-- the only FFP received was in
connection with the AHCCCS DSH
payment?

166

    A. Yes.

    Q. For those three?

    A. Right.

    Q. Okay.

          ***

THE CHAIRMAN:

    Is this a chart that refers --
    is this unique to the hospital
    or is this a statewide general
    report?

MR. ANGULO:

    It's a statewide general
    report of the entire AHCCCS
    program.

THE CHAIRMAN:

    Thank you.

          ***

BY MR. KEOUGH:

    Q. Mr. Angulo, again if you
would turn to Provider Exhibit 13,
attachment A, the tab there. And go
back several pages to the page
numbered BAN 0135.

          ***

MR. TALBERT:

167

    Let me catch up. You're on
    13?

MR. KEOUGH:

    Yes. I'm sorry. 13, behind
    tab A, page 135.

          ***

BY MR. KEOUGH:

    Q. Down the left-hand column
of this chart, Mr. Angulo, the
hospitals are listed, is that right?

    A. Yes, they are.

    Q. And your four hospitals,
they're alphabetical order, is that
correct?

    A. Yes, it appears that way.

    Q. And you would find going
down, scrolling down that column,
Desert Samaritan, is that right?

    A. Yes.

    Q. And Good Samaritan too
below that?

    A. Yes.

    Q. A couple, three lines below
that you see Maryvale, is that right?

    A. Yes.

168

    Q. And then mostly down the
column Thunderbird?

    A. Right.

    Q. Now then there are four
columns going across from there, and
you mentioned before the four pools
the state has for the AHCCCS DSH
payments?

    A. Correct.

    Q. These four columns, do they
relate to those four pools?

    A. Yes, they do.

    Q. And I'd like you to look on
the fourth column headed 3B. In that
column we have percentages listed,
and I can't make out the percentages
but there are percentages listed for
all of our -- your four hospitals,
Desert, Good Sam, Maryvale, and
Thunderbird, is that correct?

    A. Yes, they are.

    Q. And if you take this
analysis, this AHCCCS analysis on to
to the next page, page 0136, again
you have the hospitals listed in

169

alphabetical order, correct?

A. Yes, correct.

Q. And we have columns again for group one, two, three?

A. Yes.

Q. Now instead of percentages you have dollar amounts?

A. Yes. It appears to be inpatient revenue.

Q. Right. Go to the next page. I have to try to get to the end here. The next page again under group three we have dollar amounts for your four hospitals under group three, is that right?

A. Yes.

Q. Take these charts all the way to the end, the bottom line is you're going to get a DSH payment for each of your four hospitals for the year they're looking at in this analysis under that group three?

A. Right.

Q. Group three, do you recall if group three takes into account the

170

low income utilization rate?

A. Yes, it does.

Q. And the distribution of pool funds among qualifying hospitals?

A. Yes, based on records.

Q. As I recall, and it's reflected in Exhibit 12 on page 113 that group two also is distributed based on the low income utilization rate. Is that your recollection?

A. Which page is that?

Q. If you keep your finger on that page.

A. Okay.

Q. P-12, page 0112. It's a carry over from 0112 to 0113. Page 112.

A. Okay.

Q. At the bottom of that page it describes group two?

A. Yes.

Q. And it indicates distribution is based on low income utilization rate?

171

A. Correct.

Q. As well as group three on the next page?

A. Yes.

Q. Page 113. Can you go back to Exhibit 13, the page we were on earlier, page 0138.

A. Okay.

Q. That's the distribution of numbers among column one, group one, column two, group two, column three, group three. Most of the hospitals are under two or three, are they not?

A. Yes, they are.

Q. Mr. Talbert, at the end of his cross examination asked you about DSH payments made to Good Sam in the '90, '91, '92 time frame as to final settlement NPRs for those years, the MN/MI and these others days at issue would have been taken out?

A. Correct.

Q. That's correct. I'd like you to turn for a moment to Intermediary Exhibit 12. This is

172

really my last question. Are you in I-12?

A. Yes, I am. Yes.

Q. I'm referring to this memorandum of March 13, 2000.

A. Yes.

Q. From director of financial services group to all Medicare Intermediaries.

A. Correct.

Q. Turn back in this exhibit to the page -- it's about the fourth page of the exhibit but it's numbered at the bottom page 3.

A. Okay.

Q. Question six. I'll read you question six. Q6, "What needs to be done if in the past the FI erroneously allowed general assistance days for a number of years but upon realizing the error reopened all cost reports to exclude those days. Does it happen if the reopening happened many years back and the Intermediary's policy since

151

173

1  then has been to exclude these days?"
2  Could you read the answer, the first
3  sentence of that answer following?
4       A.  Sure.  PM 99-62 states in
5  the second sentence second paragraph
6  on page 3 that if prior to the
7  issuance of this PM the Intermediary
8  reopened and settled cost report to
9  disallow the portion of Medicare DSH
10 payment attributable to the inclusion
11 of these type of days the
12 Intermediary is to reopen that cost
13 report again and refund the amount
14 including interest collected.
15      Q.  Okay.  Is the situation
16 described there where the
17 Intermediary issued the NPR including
18 a type of day then later issued a
19 notice of reopening, took that out,
20 and then later you get to 1999 and
21 the program memorandum they're saying
22 look back.  You got to go back,
23 reopen again, and include those days
24 because you paid them originally.  Is
25 that substantially any different than

*York Stenographic Services, Inc.*
*34 North George St., York, PA 17401 - (717) 854-0077*

174

1  the situation at Good Sam where you
2  did receive payment on an interim
3  basis over those years even though it
4  was later taken out at final
5  settlement.  It's essentially the
6  same situation, is it not?
7       A.  Yes, it is.
8            ***
9  MR. KEOUGH:
10      Thank you.
11 MR. HOOVER:
12      Let me ask a question.  Did
13      the Intermediary actually
14      reopen the cost reports or was
15      this an original NPR
16      settlement?
17 MR. ANGULO:
18      To the best of my recollection
19      they were not reopened.
20 MR. HOOVER:
21      Thank you.
22 MR. TALBERT:
23      Can I follow up on his last
24      point or is there is another
25      turn here?

*York Stenographic Services, Inc.*
*34 North George St., York, PA 17401 - (717) 854-0077*

175

1  THE CHAIRMAN:
2       Yeah, but let me just ask you,
3       are we going to have another
4       witness?  Do you have another
5       witness, Mr. Keough?
6  MR. KEOUGH:
7       No, assuming Mr. Talbert is
8       calling Mr. Edmonson, as he
9       said he was earlier, I may
10      have a few questions for him.
11 THE CHAIRMAN:
12      Yeah, go ahead and follow up
13      on the point that you want to
14      right here and then we'll take
15      a break.
16 MR. TALBERT:
17      Just looking at this last
18      point just to make sure what
19      happened using the 1992 cost
20      report the interim payments, I
21      take it, included a DSH add on
22      for lack of a better term
23      based upon prior years DSH
24      payments, which we'll say
25      included the problem base.  Is

*York Stenographic Services, Inc.*
*34 North George St., York, PA 17401 - (717) 854-0077*

176

1       that correct?
2  MR. ANGULO:
3       Correct.
4  MR. TALBERT:
5       But when the Intermediary
6       actually settled a 1992 cost
7       report they made -- the DSH
8       calculation itself was based
9       on what we're calling Medicaid
10      paid days and excluding -- and
11      not including the MN/MI days,
12      is that correct, when the '92
13      cost report -- for any year in
14      which these days may have been
15      included in the interim
16      payments.  When the NPR was
17      issued the NPR was based upon
18      Title 19 days only.
19 MR. ANGULO:
20      It was removing, yes, those
21      days.
22 MR. TALBERT:
23      So I mean the issue of
24      reopening really doesn't apply
25      to any of the years that are

*York Stenographic Services, Inc.*
*34 North George St., York, PA 17401 - (717) 854-0077*

177

```
 1        before the Board here.  There
 2        was no reopening to take back
 3        Title 19 MN/MI days.  They
 4        were actually included in the
 5        cost report's DSH calculation?
 6   MR. ANGULO:
 7        On the original adjustment?
 8   MR. TALBERT:
 9        Yeah.
10   MR. ANGULO:
11        Yes.
12   MR. TALBERT:
13        I'll be real quick here but
14        just the dynamic on Mr.
15        Keough's chart there, is that
16        again representative of all
17        the years under appeal, the
18        same kind of ebb and flow.  A
19        number might go up, a number
20        might go down?
21   MR. ANGULO:
22        There could be various factors
23        where this is applicable and
24        other factors that it may not
25        be.
```

178

```
 1   MR. TALBERT:
 2        I just want to go back and I
 3        just have a couple more
 4        questions here.  Intermediary
 5        exhibit marked 4 just so we're
 6        clear what developed here.
 7        and I'm looking at adjustment
 8        101.  The as reported reflects
 9        again what the hospital
10        reported?
11   MR. ANGULO:
12        Correct.
13   MR. TALBERT:
14        And your testimony was that
15        the source document the
16        Provider used most likely
17        included MN/MI days?
18   MR. ANGULO:
19        Yes.
20   MR. TALBERT:
21        And then the Intermediary, the
22        adjusted figure was based on a
23        later report that the
24        Intermediary got from AHCCCS
25        which specifically listed
```

179

```
 1        Title 19 days?
 2   MR. ANGULO:
 3        Yes.
 4   MR. TALBERT:
 5        So I believe this relates to
 6        Mr. Hoover's question, we
 7        don't know if that difference
 8        is MN/MI or other kind of
 9        problems as we just look at
10        this presentation on this
11        adjustment report, is that
12        correct?
13   MR. ANGULO:
14        I believe it's a component of
15        that.
16   MR. TALBERT:
17        It's a component.
18   MR. ANGULO:
19        Yes.
20   MR. TALBERT:
21        Now can you point me to
22        anything that we -- so all the
23        Provider knew just using
24        hospital peds, adults and
25        peds, is that the Intermediary
```

180

```
 1        thought the correct number of
 2        Medicaid days was 3,637.  Can
 3        you point me to anything for
 4        any year prior to 2000 where
 5        the hospital protested or
 6        complained about this
 7        adjustment in which it
 8        pinpointed out the fact that
 9        the adjustment reflected in
10        part MN/MI days and we -- our
11        hospital thinks that's correct
12        -- that that was wrong.
13   MR. ANGULO:
14        We did not appeal that
15        particular issue.
16   MR. TALBERT:
17        Thank you.
18   THE CHAIRMAN:
19        Before we go to Board
20        questions, let's go off the
21        record.
22              ***
23   [Off the record]
24   [On the record]
25              ***
```

181

THE CHAIRMAN:

Okay. Mr. Hoover, you have a question.

***

BY MR. HOOVER:

Q. Has the amount in dispute -- is it disputed or is there an agreement? That this adjustment report that I looked at if the Board's decision is to reverse that adjustment are we through?

A. I'm not fully understanding the question.

Q. My question -- let me just rephrase it then. What I'm getting at, if the Board makes a decision, and let's just say the Board's decision is for the Provider, is it your understanding that the Intermediary would just reverse their adjustment and everybody is happy?

A. No.

Q. So the next question is then are you going to be able to tell me what the difference is or am I

182

going to have to remand this to the Intermediary to look at all your source data? I'm not sure how -- if you say that won't suffice then what are you asking?

A. We have the information now that has been accumulated by a consultant for us years after.

Q. That's the first I've heard of this but is that in your position paper?

A. I don't believe so.

Q. The other question -- and this is my final question. I promise. If the Provider received the NPR prior to the October 15 date, which eliminated the MN/MI, or whatever it is, days were you in a position at that point to appeal that decision, and if so why didn't you?

A. Yes, I was in a position to appeal that, and I was not aware of that critical date. I was not aware of that critical date.

Q. Well, generally appeals are

183

not contingent upon dates. They're contingent upon dissatisfaction so I'm not -- no one would be aware of that date prior to October 1 so was the October 1 a critical date for you whether or not you appealed this issue? I know it is on the hold harmless but just a regular appeal normally we don't have any dates attached to it. I'm just trying to get what is the Provider's reasoning for not making or not perfecting their appeal at the time when the NPR was issued or was this an afterthought, well, I'll get down and maybe I'll add this issue in 2000 or whatever. Is that really what happened?

A. No. We know as the appeal process goes on that we can continue to add appeals as it goes through the process.

Q. You could add issues?

A. Issues. I'm sorry. Yes. And a bigger issue for us at the time

184

was the whole Title 19 payment that we had a much bigger impact.

***

MR. HOOVER:

That's all the questions I have. Thank you, Mr. Angulo.

MR. ANGULO:

Thank you.

THE CHAIRMAN:

Okay. We're going to continue with Board questions, but let's clarify something if we can before we go any further. Do we have a dispute over the amount just in case -- I'm asking this question of Mr. Talbert and Mr. Keough. Have you even addressed that issue?

MR. TALBERT:

I would say no but it's a little bit of a chicken and egg type of problem that this controversy that should they be added arose, I think the Provider made some effort to

185

1  capture the numbers.  I don't
2  know if they're done or if
3  they think that's the final
4  number because of the posture
5  in the case, you know, we
6  would not have audited the
7  numbers on any expectation of
8  what might or might not happen
9  so I don't know if dispute is
10  the right term but there's
11  certainly no agreement that if
12  the case was over tomorrow.
13  THE CHAIRMAN:
14      All right.  That's all I
15      needed.
16  MR. KEOUGH:
17      I essentially concur with what
18      Mr. Talbert said.  The
19      Intermediary has not audited
20      those, and part of the process
21      the Provider has to go through
22      is to obtain verification from
23      the state on eligibility and
24      they've done all that.  This
25      is a defined universe.  Of

186

1  course, as I said, the
2  Intermediary had not audited
3  those.  And that's reasonable.
4  Their position is none of them
5  count, and so they would be --
6  I would think the Intermediary
7  would reasonably demand even
8  if they lost we need to do our
9  thing and verify those and
10  audit them, and we would have
11  no objection to that.
12  THE CHAIRMAN:
13      No, I just -- I thought
14      perhaps there had been some
15      sort of discussion that this
16      witness might not have been
17      aware of and that that perhaps
18      was off the table but that's
19      all I needed to know.  Ms.
20      Powell, do you have some
21      questions?
22  MS. POWELL:
23      Sure.
                    ***
24
25  BY MS. POWELL:

187

1      Q. Has the consultant's work
2  regarding the accumulation of these
3  days in these three categories been
4  completed at this point?
5      A. Yes, it has.
6      Q. And did you have a CPA firm
7  do that or...
8      A. We originally started with
9  Arthur Anderson, which then the
10  individual has been the same
11  individual.  We then went to KPMG,
12  which is now the spin off, FTI, I
13  believe, of the consulting portion of
14  that.  But it's been the same
15  individual who's very knowledgeable
16  of the AHCCCS program.
17      Q. Several questions ago, Mr.
18  Keough, I believe, on direct was
19  going through an analysis that I
20  didn't find got me anywhere.  And you
21  were looking at the payments for each
22  of the hospital's in the three
23  groups.  What, if anything, were we
24  supposed to gather from that
25  discussion?

188

1      A. The hospitals in question,
2  the qualifying factor is the low
3  income utilization rate, and within
4  the table it follows that utilization
5  which through the various groups and
6  categories which then equates into
7  the payments based on the total
8  dollars available.
9      Q. I understood that but what
10  impact would that have on this issue?
11      A. That the MN/MI, EAC and
12  ELIC are included.  Those patient
13  days are included in the AHCCCS
14  payment for DSH to the hospitals.  So
15  the State of Arizona does recognize
16  that and pays for it.
                    ***
17
18  THE CHAIRMAN:
19      And there is a federal
20      component of that, is that...
21  MR. ANGULO:
22      There is a federal component
23      to the other categories.
                    ***
24
25  BY MS. POWELL:

135

189

1      Q. That was my understanding.
2 That's where I wanted to go with
3 this. There's direct federal
4 participation in those other
5 categories that were spread across
6 the top of that exhibit but when you
7 get to the ones at issue here there
8 was no direct FFP?
9      A. Not directly.
10      Q. Okay.
11      A. Indirectly.
12      Q. What I'm trying to
13 understand is the lump sum additional
14 payment, the Medicaid DSH, I guess is
15 the appropriate term, is based on a
16 calculation of those two -- one or
17 the other of those two factors.
18      A. One or the other, yes.
19      Q. Either Medicaid days or low
20 income?
21      A. Yes.
22      Q. Okay. The state gives you
23 that money?
24      A. Correct.
25      Q. Okay. The state gives you

190

1 that money. Does the federal
2 government match that money or is
3 that...
4      A. For those other categories.
5      Q. Only those categories. Oh,
6 so the lump sum FFP does not address
7 at all those three categories, the
8 lump sum calculation...
9      A. Okay.
10      Q. ...is not applicable to
11 these categories either?
12      A. No, it is. They are
13 inclusive in the utilization factor,
14 the three categories, yes.
15      Q. Okay. Now I'm even more
16 confused than ever, and I beg your
17 indulgence.
18      A. All right.
19      Q. When those three
20 categories, the three categories at
21 issue here, are included in that lump
22 sum payment, that payment comes
23 from...
24      A. The AHCCCS program.
25      Q. Uh-huh. And explain to me

191

1 how the federal participation works
2 then.
3      A. AHCCCS is federally funded
4 for all the other categories directly
5 but those three categories
6 indirectly.
7      Q. To what extent is there a
8 federal match for those three
9 categories?
10      A. Directly, no.
11      Q. Right. Indirectly.
12      A. Because they fall under the
13 state plan of medical assistance to
14 patients under the state plan.
15      Q. I'm still not understanding
16 how the dollars move from the feds to
17 the hospital.
18      A. Through the Title 19
19 matching.
20      Q. And that is some special
21 hybrid calculation?
22              ***
23 MR. KEOUGH:
24      May I interject?
25 MS. POWELL:

192

1      I don't know that I'm -- I'm
2      just trying to...
3 MR. KEOUGH:
4      There's a stipulation on this.
5 MS. POWELL:
6      Okay. I didn't understand it
7      either to tell you the truth.
8      I really did not understand
9      that stipulation.
10 MR. TALBERT:
11      That was by design.
12 MR. KEOUGH:
13      The parties have stipulated,
14      and in fact beyond the
15      stipulation the documents
16      reflect the federal government
17      pays FFP to the state for --
18      at the federal matching rate
19      for the AHCCCS DSH payments.
20 MS. POWELL:
21      All of them?
22 MR. KEOUGH:
23      Yes.
24 MR. KEOUGH:
25      And I apologize. Mr. Angulo,

193

1      he's prepared to talk about
2      the FFP funding piece of this
3      as much because we've
4      stipulated...
5  MS. POWELL:
6      That was directly versus
7      indirectly?
8  MR. KEOUGH:
9      Yes.
10  MS. POWELL:
11      Okay.  So you're -- and I was
12      trying to get to how is this
13      indirect piece calculated and
14      paid.  And the formula is
15      either the Medicaid days ratio
16      or the low income ratio.  But
17      I still don't understand how
18      the money gets to the
19      hospital.
20  MR. HOOVER:
21      I'm confused now.
22  MS. POWELL:
23      I'm sorry, Mr. Hoover.  Those
24      questions, and they're good
25      questions, I just don't

194

1      understand -- I thought I
2      understood it but I don't
3      anymore.
4  MS. POWELL:
5      Okay.  Maybe I don't either.
6      Maybe we do need lunch.
7  THE CHAIRMAN:
8      Okay.  I'll tell you what.
9      Let's do that.  We're going to
10      -- it's obvious that we're
11      going to have some time go up
12      here in trying to figure this
13      out, and maybe even in
14      formulating our questions so
15      let's take a lunch break, and
16      maybe we will be better
17      prepared to ask our questions
18      and then we'll still have Mr.
19      Angulo to respond to those
20      too.  We'll come back at --
21      will 1:30 give everybody
22      enough time, do you think?
23  MR. TALBERT:
24      That will be fine.
25  THE CHAIRMAN:

195

1      Okay.  Thank you.
2      ***
3  [Off the record]
4  [On the record]
5      ***
6  THE CHAIRMAN:
7      All right.  Back on the
8      record.  And, let's see, I'm
9      trying to think where we were.
10      I believe Ms. Powell had not
11      finished her questions.
12  MS. POWELL:
13      That's correct.
14      ***
15  BY MS. POWELL:
16      Q.  I think we're going to just
17  drop where we were before and
18  hopefully that can be clarified for
19  us in post-hearing briefs and those
20  kinds of things.  It may just be that
21  I don't understand so I will not
22  assault you -- now all the hospitals
23  -- I understand from your testimony
24  that Good Samaritan claimed and was
25  reimbursed DSH, a DSH payment.

196

1      A.  From the federal, yes.
2      Q.  Yes.  Did all the other
3  hospitals make a claim on their cost
4  report for federal DSH?
5      A.  No.
6      Q.  And was Good Samaritan the
7  only one that did?
8      A.  Yes, I believe so.  Yes.
9      Q.  And is it the state that --
10  I'm trying to understand how the
11  waiver program works, how these
12  waiver states works, and is a waiver
13  granted because the state has decided
14  that it needs more flexibility in
15  determining who is eligible under a
16  state plan than just the blanket...
17      A.  I'm not that familiar with
18  the waiver program but my
19  understanding is Arizona chose to use
20  a managed care system.
21      Q.  As a cost containment
22  effort?
23      A.  As a cost containment
24  effort, yes, back in the early '80s.
25  Yes.

197

Q. All right. What happens if
say Good Samaritan had a Medicaid
patient -- a Medicaid eligible
patient come in from another state.
    A. Okay.
    Q. Now if they were regular
Medicaid qualified you would get
payment for DSH for that person?
    A. We would get credit for
that day.
    Q. That would stay in your...
    A. And then we would count
those out of state days.
    Q. Okay.  And those would
basically be the same reimbursement
that you'd get if it was an in-state
person or would it be different or
the same amount of reimbursement?  It
doesn't matter.
    A. Okay.
    Q. You testified that Good
Samaritan got federal DSH from '86 to
'89?
    A. Correct.  Yes.
    Q. Did they get it after '89?

198

    A. Yes, they did.
    Q. They continued to get it...
    A. Continually, yes.
    Q. Why is the fiscal year
ending '92 not at issue here?  We
have '91 and then we have '93
forward.
    A. That was the NPR, when that
was issued, that was around the time
frame that we were having a lot of
internal issues that we had to deal
with, financial situations and so
forth.  I believe there was a
business decision to not pursue that
year in particular.  The bigger issue
was the Title 19 population.
    Q. So it was just that you
never appealed the original NPR so
you couldn't add this issue to it
later?
    A. I believe so, yes.
    Q. Okay.  You saw the
affidavit or the statement from Mr.
McNeal?
    A. Yes.

199

    Q. Who does he work for now?
    A. I am not sure.  I'm not
positive.
    Q. But nobody related to this
group of Providers?
    A. No, I do not think so.  No.
                ***
MS. POWELL:
    I believe that's all I have.
    Thank you very much.
THE CHAIRMAN:
    Dr. Blodgett.
                ***
BY DR. BLODGETT:
    Q. I just wanted a
clarification.  I understood Mr.
Keough in his opening remarks to say
that the Providers had not included
the three groups of patients at issue
in this case in their cost reports
after 1992 because of the 1992 HCFA
determination letter, but I
understood you to say that the
Providers did include the disputed
days on all of the cost reports

200

during all the disputed years.  My
question is did the Providers include
them or didn't they include them in
this...
    A. On the filed cost report
data the days were included.  On the
finalized data the days were
excluded.
    Q. They were excluded by the
Intermediary?
    A. By the Intermediary, yes.
    Q. But the Providers didn't --
you did not appeal any of those
exclusions until the year 2000?
    A. That's correct, for this
particular issue.
    Q. Why -- you included them
and then they were adjusted but you
didn't appeal them.  You thought it
would be futile or what?
    A. We were under the
understanding that we could add this
issue since we had an open appeal,
that we could add this particular
down the road if we knew we had to

201

1    add it as a particular issue along
2    with any other issues we knew that we
3    could add issues through the process.
                    * * *
5    DR. BLODGETT:
6         Thank you.  That's all I have,
7    Madam Chair.
8    THE CHAIRMAN:
9         Mr. Hoover.
                    * * *
11   BY MR. HOOVER:
12        Q.  I just have one question.
13   Let's go back to the Intermediary's
14   adjustment report.  If you have the
15   Intermediary's exhibits it's at I-4,
16   and it's about the -- it's page 2 at
17   the bottom.  That may be it right
18   there.
19        A.  I'm at I-4.
20        Q.  Okay.  The adjustment that
21   was made on Good Samaritan, those
22   negative -- that negative adjustment
23   that's in the increase or decrease
24   column.
25        A.  Okay.

202

1         Q.  Does the Provider have
2    support for that as adjusted column
3    or do they have support for the as
4    reported column?
5         A.  You would have support for
6    the as reported number.
7         Q.  Now did the Intermediary
8    give you a work paper which
9    identified the 1,294 days?
10        A.  As a lump sum amount, yes.
11        Q.  As a lump sum amount.
12        A.  Yes.
13        Q.  Hypothetically is it
14   possible that that adjustment had
15   nothing to do with these three
16   categories of patients that we're
17   talking about?
18        A.  I believe it does have to
19   do with that category.
20        Q.  Hypothetically is it
21   possible since you don't know what's
22   in there, is it hypothetically
23   possible?
24        A.  Yes, it is.
25        Q.  And my final question is

203

1    how much of that 1,294 days, and I'm
2    just picking one category, do you
3    know for sure and you have support
4    that all of that adjustment is for
5    the three categories that we're
6    talking about?
7         A.  No, I don't know for sure.
8         Q.  You don't?
9         A.  No.
10        Q.  Then if the Board made a
11   decision in favor of the Provider, we
12   really don't know what kind of a
13   reimbursement impact we're causing by
14   saying Intermediary reverses
15   adjustment?
16        A.  We do have later data that
17   was produced by our consultant that
18   verifies these categories.
19        Q.  Do you know whether the
20   Intermediary accepts your data or do
21   they accept AHCCCS data?
22        A.  For settlement purposes the
23   Intermediary accepts AHCCCS data.
24        Q.  So if they accept AHCCCS
25   data what leads you to believe that

204

1    they will accept the data from your
2    consultant?
3         A.  I believe that they do
4    testing on this area.  They will find
5    that they are allowable days.
6         Q.  But that has not been done?
7         A.  No.
8         Q.  Have you furnished them to
9    them?
10        A.  No, not at this point, but
11   we do have it.
                    * * *
13   MR. HOOVER:
14        That's all the questions I
15   have.
                    * * *
17   BY THE CHAIRMAN:
18        Q.  I'm still confused about
19   what information you actually got
20   from a settlement, and to the extent
21   that you were informed that the
22   adjustments removed the MN/MI, et
23   cetera, days.  Let's forget about '96
24   because that's a little later in the
25   period.  As I understand it, in about

159

205

1  1992 you learned that the
2  Intermediary and the regional office
3  of CMS' position was that they didn't
4  think those should be in there in
5  that figure that you're using in your
6  as-filed cost report.
7      A. Correct.
8      Q. Okay. So there had to be
9  some sort of a recognition that they
10 were in there just to start with?
11     A. Yes.
12     Q. Okay. Now when you filed
13 your subsequent cost reports, as I
14 understood your testimony you
15 continued to include those days?
16     A. Correct.
17     Q. And this is where it gets a
18 little fuzzy as to what extent the
19 Provider understood that those days
20 were included in the figure they were
21 using. Is there any question about
22 that?
23     A. If we're using our internal
24 data, which we consider AHCCCS days,
25 those days would be in there, yes.

206

1      Q. Okay. And is it your
2  testimony that the Provider knew that
3  the days that had been rejected by
4  the Intermediary as appropriate were
5  part of those AHCCCS days that were
6  going into the cost report?
7      A. Yes.
8      Q. Okay. So the Provider
9  continued to claim those days up
10 through this seven, eight, nine year
11 period, is that right?
12     A. Yes.
13     Q. Okay. And every time there
14 was a settlement by the Intermediary
15 they removed those days?
16     A. Correct.
17     Q. Okay. And the Provider
18 knew that they removed those days?
19     A. Yes.
20     Q. Okay. That wasn't entirely
21 clear to me from the testimony
22 before. But none of those
23 adjustments were ever appealed prior
24 to the add on in 2000, the adding of
25 that issue?

207

1      A. Not for that particular
2  issue, no.
3              ***
4  THE CHAIRMAN:
5      Okay. That's all I have but
6      we will allow questions -- Ms.
7      Powell.
8  MS. POWELL:
9      May I just have one follow-up
10     question on Chairman Cochran's
11     question?
12             ***
13 BY MS. POWELL:
14     Q. She asked you whether or
15 not the hospital included the AHCCCS
16 days routinely in their as filed cost
17 reports, and I believe you have
18 direct knowledge of Good Samaritan.
19     A. Yes.
20     Q. Do you have the same level
21 of confidence and direct knowledge as
22 to the other Providers in this case?
23     A. Yes, fairly confident.
24 Yes.
25     Q. And upon what do you get

208

1  that confidence?
2      A. Our census data again,
3  going back to what it captures...
4      Q. So you've actually -- can
5  you verify that in those years that
6  the process was what it was or are
7  you just...
8      A. No. We had looked at some
9  of those years, yes.
10     Q. Okay. Great.
11     A. And checked it, yes.
12             ***
13 MS. POWELL:
14     Okay.
15 THE CHAIRMAN:
16     Okay. Now we'll permit
17     questions based on the Board
18     questions. Mr. Keough.
19             ***
20 BY MR. KEOUGH:
21     Q. Mr. Angulo, Banner has
22 computed an amount in controversy
23 with respect to this issue for each
24 year under appeal, have they not?
25     A. Yes, we have.

160

209

1    Q. Those are listed in one of
2  our exhibits.  That's P-1 on the
3  consolidated exhibits.
4    A. Yes.  Can I clarify?
5    Q. Sure.
6    A. The early years are
7  estimates based on the latter years.
8    Q. In computing those numbers,
9  just walk the Board through the
10 mechanics of how would you come up
11 with a dollar amount for this issue
12 that's in dispute here today?
13    A. How would I compute it?
14    Q. How did you compute it?
15 Just the mechanics of how do you get
16 that number?
17    A. We add in these general
18 assistance categories on top of the
19 final settlement data so that
20 increases our numerator.  Our
21 denominator stays the same,
22 therefore, when it runs through the
23 formula our overall payment rate
24 increases.  So as an example the
25 payment rate would go from 20 percent

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

211

1  determine to test the verification of
2  the state records, correct?
3    A. Not those categories, no.
4        ***
5  MR. KEOUGH:
6    I think that's it.
7  THE CHAIRMAN:
8    Mr. Talbert.
9        ***
10 BY MR. TALBERT:
11    Q. I just need to clear up the
12 history as it relates to questions
13 Mr. Hoover and Ms. Cochran asked you,
14 and I'm going to be using I-4, the
15 first page, as an example.  Beginning
16 in 1992 would it be fair to say that
17 the hospitals in this appeal were put
18 on notice by the Intermediary that
19 the federal DSH calculation should
20 not include the MN/MI and the
21 children's days in the Medicaid
22 proxy?
23    A. Correct.
24    Q. That was made absolutely
25 clear?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

210

1  to 22 percent so that additional 2
2  percent of the DRGs equate to the
3  amounts in question.
4    Q. And for starters there when
5  you went through the process you just
6  described you need to have a number
7  of days you're adding?
8    A. Correct.
9    Q. That number of days I think
10 you indicated earlier consultant has
11 compiled?
12    A. Correct.
13    Q. Has your consultant
14 compiled that from AHCCCS information
15 as to eligibility?
16    A. Yes.
17    Q. Now the Intermediary's
18 position has been none of those days
19 can be included whether or not they
20 were eligible for the MN/MI, EAC or
21 ELIC assistance, correct?
22    A. Yes, that's my
23 understanding.
24    Q. So the Intermediary hasn't
25 gone through to audit them and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

212

1    A. Yes.
2    Q. Now after that point when
3  the Providers continue to file their
4  DSH calculation, if I understood your
5  testimony you went to a report from
6  AHCCCS which just listed the total
7  patient days paid for all AHCCCS
8  covered weeks?
9    A. No, that's not correct.
10    Q. Okay.  What was the source
11 document for the initial claim in the
12 cost report?
13    A. It's our internal records,
14 not AHCCCS records.
15    Q. So your internal records
16 just calculated -- just compiled
17 total AHCCCS days without regard to
18 MN/MI or Title 19?
19    A. Correct.
20    Q. Now had the Provider taken
21 the time, did it have the resources
22 or the tools available to go in and
23 sort out the -- and I'll just use
24 MN/MI from Title 19, could it have
25 done that?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

161

213

A. The data was there.

Q. Okay.

A. Resource wise because of the filing time frame and because we are a large system resource wise we probably would not have had the time and therefore jeopardizing the filing of the cost report.

Q. So would it be fair to say that that number was used as kind of a matter of convenience?

A. It was used on the best available data we had at the time.

Q. And it was done knowing of the Intermediary's position regarding the MN/MI days?

A. Correct.

Q. But I take it the Intermediary could not -- it could not determine from your claim what was MN/MI and what was Title 19?

A. Correct.

Q. Now when the Intermediary got around to doing its audit, which might be a year or a year and a half

214

later, is it your understanding that if the Intermediary received from AHCCCS a much more detailed break down of the days for that fiscal period which did segregate out or at least which identified -- let me try another way, is it your understanding that the document the Intermediary received from AHCCCS that it used in the audit identified only those Title 19 paid days?

A. The document, I believe, identified all AHCCCS.

Q. Including the MN/MI?

A. I believe so.

Q. But it would categorize separately the Title 19 for the MN/MI?

A. Correct. Yes, it would.

Q. And then the Intermediary would then use the Title 19 days to match up against whatever was claimed in the cost report, and it would just substitute the Title 19 days?

A. Yes.

215

Q. So the difference might be MN/MI days. It might be errors in counting. It could be a number of factors?

A. Correct.

Q. Now did the Intermediary send to the Providers a listing of the Title 19 days by patient that it was going to use to calculate the Provider's Medicare DSH?

A. I believe in later years that data was submitted in diskette in later years.

Q. And to your knowledge did the Provider ever respond in the normal audit or settlement process and say, hey, you left out these MN/MI days for these patients, here they are?

A. Did they respond in what manner?

Q. Tell the Intermediary -- because I think you said your total was just an aggregate number that was tabulated off your internal

216

accounting records?

A. Yes.

Q. The Intermediary then at some point comes up and says patient by patient, here are all the Title 19 patients. This is the number we're going to use.

A. Yes.

Q. Was there ever in that process an effort by any of the hospitals to say, Mr. Intermediary, you left out the MN/MI days, here they are, add them in?

A. It would not have mattered because they would not have added it in.

Q. I'm asking you if the Provider ever did.

A. Possibly verbally, yes.

Q. How could you give a verbal list of days?

A. No, a verbal statement that we still believed these should be included. Was that -- was it kind of

217

1    the Provider's hope then that maybe
2    the Intermediary might not do any
3    audit and the MN/MI days would get
4    paid in spite of the Intermediary's
5    policy?
6        A.  No.
7        Q.  So you knew that the
8    Providers knew exactly what source
9    documents the Intermediary would
10   actually use to calculate DSH, what
11   they consisted of?
12       A.  We were aware of the source
13   document.  Now what it consisted of
14   it never came directly to us.  It
15   went directly to the Intermediary.
16   So we don't know what it consisted
17   of.
18       Q.  Was it clear to the
19   Provider in the settlement process
20   that the days used by the
21   Intermediary were the Title 19 days
22   only?
23       A.  No, not at the time of
24   settlement.
25       Q.  For any of these years, so

219

1        Q.  Can you tell me which years
2    are estimates on this schedule?
3        A.  I believe definitely maybe
4    one, maybe three.  I'm not sure about
5    '94.  Let me just take a look here.
6    Possibly '95 but '96 forward are
7    based on work that was redone by our
8    consultant.
9        Q.  And is the data available
10   to expand -- to get the actual
11   numbers for those prior years?
12       A.  Yes, it is.
13       Q.  Okay.  It's just that you
14   wanted to do what you could do and
15   make an estimate in this case and not
16   worry about all the details just yet?
17       A.  We have the data, and we
18   are prepared to present it when it's
19   appropriate, yes.
20       Q.  Okay.  And you have the
21   actual data for all the years?
22       A.  '96 forward.
23       Q.  Okay.  So you don't have
24   any actual data for the earlier
25   years?

218

1    as far as you knew they might have
2    paid the MN/MI days?
3        A.  Based on their audit and
4    based on their findings my
5    understanding is those were excluded.
6                    ***
7    MR. TALBERT:
8        I have no further questions.
9        Thank you.
10   MR. ANGULO:
11       Okay.  Thank you.
12   THE CHAIRMAN:
13       Ms. Powell, do you have
14   another question?
15   MS. POWELL:
16       I have one.
17                    ***
18   BY MS. POWELL:
19       Q.  I believe when you were
20   talking to Mr. Keough you said that
21   you had -- the amount in controversy
22   had been calculated based on actual
23   data for some years and estimates for
24   earlier years?
25       A.  That's correct.

220

1        A.  No, not in the same format
2    that we do have currently for the
3    later years but we attempt to be
4    constructive.
5        Q.  Well, is it part of the
6    Provider's claim then that if we find
7    for the Provider that we should base
8    reimbursement for the earlier years
9    on the averages of the years that you
10   do have the data for once they're
11   verified?
12       A.  Part of the problem was a
13   change in systems.  That can be a
14   major factor.  Depending on when each
15   hospital went to a new patient
16   accounting system, they call
17   staggered over the years so that's
18   why one Provider we may have for a
19   particular year whereas another one
20   we do not, but we do have
21   availability for those earlier years
22   to try to match that data.
23       Q.  Okay.  So you would
24   anticipate then that should you win
25   in this case actually going back to

163

221

1  get the actual data for the earlier
2  years?
3        A.  For the earlier years, yes.
               ***
   MS. POWELL:
6        Okay.  Thank you very much.
7  THE CHAIRMAN:
8        Any follow up on Ms. Powell's
9        question?
10  MR. TALBERT:
11        No.
12  THE CHAIRMAN:
13        Mr. Keough, do you have
14        another witness, anything
15        further from the Provider?
16  MR. KEOUGH:
17        Nothing further from us
18        assuming -- I understand Mr.
19        Talbert is going to call Mr.
20        Edmonson.  I have a few
21        questions for him.
22  MR. TALBERT:
23        That is a correct assumption.
24  THE CHAIRMAN:
25        You may call -- I'm sorry.

222

1        Mr. Angulo, you may return to
2        your seat and thank you very
3        much for your testimony.
4  MR. ANGULO:
5        Thank you.
6  THE CHAIRMAN:
7        Can Mr. Angulo be excused if
8        he so desires from the room?
9  MR. KEOUGH:
10        Sure.
11  THE CHAIRMAN:
12        In other words, you are
13        through with us.
14  MR. ANGULO:
15        Thank you.
                ***
17  [Witness sworn]
                ***
19  THE CHAIRMAN:
20        Oh.  We probably don't need
21        the projector any longer,
22        right?
   MR. KEOUGH:
24        Actually we may have one or
25        two in lieu of writing them up

223

1        on the board.
2  THE CHAIRMAN:
3        Go ahead.
               ***
5        DERRICK EDMONSON,
6  having been first duly sworn, was
7  called as a witness herein and was
8  examined and testified as follows:
               ***
10        DIRECT EXAMINATION
11  BY MR. TALBERT:
12        Q.  Just could you please state
13  your name and spell your last name
14  for the record?
15        A.  Sure.  My name is Derrick
16  Edmonson.  That's E-D-M-O-N-S-O-N.
17        Q.  Where are you employed, Mr.
18  Edmonson?
19        A.  I'm employed at Blue Cross
20  and Blue Shield of Arizona in
21  Phoenix.
22        Q.  And what is your -- how
23  long have you been there?
24        A.  About 4-1/2 years.
25        Q.  And what is your current

224

1  position?
2        A.  I'm a senior auditor.
3        Q.  And just on a day-to-day
4  basis, what does that involve?
5        A.  Right now it involves
6  supporting appeals department.  I do
7  data analysis for paid claims.  I
8  test our payment system, various
9  things like that.
10        Q.  And we'll get to these
11  Providers in a moment but did you do
12  any audit work, Medicare audit work,
13  when you were out in Arizona?
14        A.  Yes, I did.
15        Q.  What was your last position
16  of employment prior to going to
17  Arizona?
18        A.  It was at Blue Cross and
19  Blue Shield Association in Chicago.
20        Q.  And what did you do there?
21        A.  I was a consultant
22  basically working on Medicare
23  appeals.
24        Q.  Kind of the kind of appeals
25  we have today?

164

225

1  A. Exactly.
2  Q. And what about before that?
3  A. Before that I worked at
4  Blue Cross and Blue Shield of
5  Illinois in Chicago as a senior
6  auditor.
7  Q. In their Medicare audit...
8  A. In the Medicare audit
9  function.
10  Q. Tell us about your
11  education after high school.
12  A. I graduated from Southern
13  Illinois University in Carbondale in
14  accounting and finance.
15  Q. And then did you start your
16  career in Medicare reimbursement
17  right after that?
18  A. Yes, right after.
19  Q. Now were you assigned to
20  the audits or otherwise involved in
21  the reimbursement decisions reflected
22  in the initial NPRs for the four
23  hospitals in the various fiscal years
24  involved in this case?
25  A. One specific hospital would

226

1  be Good Sam. From 1997 through 1999
2  I was the in charge.
3  Q. And what was your role or
4  specific assignments in regard to
5  these appeals?
6  A. I did help out initially
7  when these appeals came to write the
8  preliminary position paper. And then
9  when this case started developing and
10  getting more serious my Blue Cross
11  and Blue Shield of Arizona wanted me
12  to help Bernie support the case.
13  Q. Were you -- do you have the
14  stipulation that the parties entered
15  into? Did you bring that up with
16  you?
17  A. I don't think I did.
18  Q. If you'd just look at
19  paragraph six. Just to be clear
20  could you tell us what days make up
21  the controversy including or
22  excluding the Medicaid proxy in the
23  DSH calculation?
24  A. Sure. The three groups are
25  listed under paragraph six. The

237

1  medically needy and medically
2  indigent, which we are referring to
3  as MN/MI, that's the major one. The
4  other two relate to the children
5  programs, eligible assistance
6  children, EAC, and eligible low
7  income children, ELIC.
8  ***
9  MR. TALBERT:
10  And I'll just tell Mr.
11  Edmonson for the record that
12  if I report an MN/MI as a
13  convenience that acronym
14  carries in the two children's
15  programs.
16  ***
17  BY MR. TALBERT:
18  Q. Did you actually do the
19  initial audits of the DSH calculation
20  or the DSH determination that came
21  out in the first final NPR for any of
22  the hospitals -- for the hospital
23  that you did audit as part of this
24  appeal?
25  A. I worked on DSH from 1997

228

1  through 1999.
2  Q. Now are you aware that
3  there was a time when the types of
4  days you just identified were
5  included in the Medicare DSH payment?
6  A. I probably just recently
7  became aware with all this going on,
8  yes.
9  Q. Based on your review of the
10  documentation just to confirm
11  something in the stipulation, when
12  was the last fiscal period in which
13  the MN/MI days were included in the
14  Medicare DSH calculation?
15  A. From all the correspondence
16  we have, which suggests that 1989 was
17  the last year that these days were
18  included.
19  Q. And even if the '89 total
20  DSH payment may have been used in the
21  claims payments in subsequent fiscal
22  periods is it correct that in fact
23  after fiscal year 1989 no MN/MI days
24  were included in the Medicare DSH
25  calculation?

229

A. That is correct.

Q. Can you turn to Intermediary Exhibit 20, and just tell us, number one, if you could identify Ms. Donovan and Ms. Irwin.

A. Okay.

Q. What is this memo, what is it reporting?

A. Okay. Bonnie Irwin at this time was the audit manager, and Debbie Donovan was an audit supervisor. And she wrote this memo to alert Bonnie of a material issue concerning state only days being inadvertently included in the DSH calculation.

Q. And when you drop down closer to the bottom of the page, we see an indentation in five lines. Under Title 19 there's four lines. Are those the categories of days that are in controversy?

A. Yes.

Q. And again what was the problem that Ms. Donovan spotted?

230

A. That we were inadvertently including the state only days in the DSH calculation and we should not be.

Q. Was it intended -- when you said inadvertently included was it an intentional -- was it just an oversight on the part of the Intermediary or was it a flaw in the reporting system between the Intermediary and AHCCCS?

A. I would say it was a flaw in the AHCCCS report we were using that we didn't know existed until 1992.

Q. Could you turn next to Provider Exhibit 28? It's the same Ms. Donovan, isn't it?

A. Yes.

Q. What is this memo about?

A. This looks like a memo to the staff alerting them of the material issue concerning the state only days being incorrectly included in the DSH adjustment. And it touches on the proposed resolution of

231

that issue.

Q. What was the proposed resolution?

A. It looks like she intended to disallow all AHCCCS days because we couldn't tell which ones were Title 19 and which ones were state only, not knowing -- not being able to differentiate the two, we would have to -- that would be a -- what am I trying to say? That would be the extreme approach to take them all out.

Q. And what is -- if you could turn next to Intermediary Exhibit 21. First of all, who is Eugene Chin?

A. I believe that was our regional office person from CMS or HCFA at the time.

Q. And this is the same Ms. Irwin who was writing Mr. Chin?

A. Yes.

Q. Is she basically advising Mr. Chin of the finding that her staff had made concerning the

232

wrongful inclusion of certain days in the DSH calculation?

A. Yes.

Q. And this is within less than a week of when Mr. Irwin found out about the problem?

A. Yes.

Q. Now if you would look to P-20 -- I'm sorry. If you would look at Provider Exhibit 11. Does that represent Mr. Chin's response?

A. Yes, it does.

Q. And what is he communicating?

A. He is communicating that he understands the error that existed and to resolve it by leaving the error alone prior to 1990 so basically from 1990 forward only allow Title 19 days, and before don't worry about the days that you might have included and paid for that were incorrect.

Q. Could you turn to Provider Exhibit 29? Tell us what we're

233

looking at here.

A. This is basically a form letter that went out to all the Providers hospitals, and it's explaining our resolution. This says for cost report periods ending prior to 1990 total AHCCCS days will be used in the DSH calculation. Therefore, there's no need to reopen those previous settled cost reports. And it says for cost reports ending during and after 1990 Title 19 days will be used in the DSH calculation.

Q. And is Pace Samaritan in any way affiliated with the Samaritan hospitals that are actually part of this group appeal?

A. I believe they were, yes.

Q. And is it your understanding that a similar letter was sent to the Samaritan hospitals?

A. Yes. To all the hospitals, yes.

Q. Now I want you to look at the third bullet point and tell us

234

what's being communicated.

A. I'll just read it and then I'll -- per AHCCCS data you have 507 Title 19 days for fiscal year 1990. If you have documentation to support a different number of Title 19 days please submit it to us as soon as possible. And then please note this data will be subject to audit.

Q. So again it looks like -- and who is Ms. Marshall?

A. I'm not sure who she is.

Q. Director of federal programs?

A. That's what it says.

Q. Okay. So in real time in early 1992 -- so we're about 13 or 14 months after the end of the 1990 fiscal year? Am I counting this right?

A. Could you say that again?

Q. Yeah. At the point in time when this letter was written was the Intermediary working on at least this hospital's 1990 cost report at least

235

as it relates to DSH?

A. It's possible. It's possible. February might be a desk review type.

Q. But they were starting a review?

A. Starting to review for maybe a more serious audit later on in that year.

Q. And so the Intermediary is identifying the specific Title 19 days that it had determined should be used by this particular hospital for the 1990 fiscal year?

A. Uh-huh.

Q. And there was an invitation by the hospital to submit any additional days?

A. Yes.

Q. You don't know what happened here, do you? But we'll get into more detail in a moment but does this kind of communication process carry on for the rest of the periods and the specific cases that we're

236

talking about as you understand what happened?

A. As far as submitting a form letter?

Q. No. As far as specifically identifying Title 19 days.

A. Yes, we specifically identified Title 19 days for the subsequent periods.

Q. Now for the hospitals that are in this appeal for the fiscal years in this appeal, were you able to review all the procedural documents which brought these cases before this Board?

A. Could you repeat that?

Q. Yeah. Were you able -- did you have a chance to review the appeal documents when the Provider appealed, what they appealed in regard to NPRs that are before the Board and any revisions to those NPRs?

A. Yes.

Q. Were you able to find any

237

1  document in evidence that any of the
2  hospitals for any of the fiscal years
3  sought to include MN/MI days in their
4  DSH claim?
5      A. No, I did not.
6      Q. Were you able to find any
7  documents that were prepared prior to
8  the year 2000 which evidenced an
9  intent on the part of any of the
10  Providers to appeal or challenge the
11  DSH policy regarding the MN/MI days?
12      A. No, I did not.
13      Q. And is it correct
14  consistent with the stipulation the
15  first challenge was communicated some
16  time early in 2000?
17      A. Correct.
18      Q. And then other hospitals
19  followed suit after that?
20      A. Correct.
21      Q. Now I want to go back to
22  your perception because you're the
23  Intermediary's spokesman on what the
24  audit process was regarding DSH for
25  the period that's before the Board,

238

1  and this kind of -- I'll be asking
2  you very similar questions to what
3  was asked Mr. Angulo. Now do you
4  have an understanding of what the
5  processes were?
6      A. Yes.
7      Q. Were there any major
8  differences say if you were to look
9  at 1991 on the front end of our time
10  cycle and 1999 on the back end of the
11  time cycle?
12      A. The only difference that I
13  would know would be the level of
14  detail the AHCCCS reports were in in
15  1991. They could have been detailed.
16  That's the only thing. I don't know.
17      Q. Okay. Now before today
18  were you aware that the hospitals
19  actually included the MN/MI days in
20  their cost report claim?
21      A. Before today?
22      Q. Yeah.
23      A. I did not know that.
24      Q. Now you heard the
25  testimony. Do you understand what

239

1  the source document that was used to
2  prepare the cost report?
3      A. Do I understand the source
4  document?
5      Q. Yeah.
6      A. Vaguely. I've never seen
7  the source document.
8      Q. Okay. The Provider just
9  reported a number, is that correct?
10      A. That's what it sounded
11  like.
12      Q. We really don't know what
13  was included in that number?
14      A. Yeah, I absolutely do not
15  know what was included in that
16  number.
17      Q. As far as doing the audit
18  was that number audited to the extent
19  you asked the Provider to produce all
20  the source documents and tell us how
21  you got to this number?
22      A. No.
23      Q. Okay. Could you tell us
24  what the audit process was?
25      A. We basically started the

240

1  audit process with AHCCCS. AHCCCS
2  would give us a total paid days
3  report that represented Title 19
4  programs, so we started with that
5  report. This report would go to the
6  Provider so they could review it
7  before we finalize the cost report.
8  We also do that because we're talking
9  about a total paid days report as
10  you're aware of the 97-2 decision
11  where paid days isn't the only thing
12  included. Eligible days approved
13  under Title 19 are also included, so
14  the Provider would have an
15  opportunity to go through their
16  internal listing to find these days
17  that would represent eligible Title
18  19 days that weren't paid by AHCCCS.
19      Q. Let me stop you there. If
20  you know, to the extent that the
21  AHCCCS reports identified the MN/MI
22  days -- let me ask the question.
23  Have you seen AHCCCS reports in this
24  audit process that identify MN/MI
25  days?

468

241

A. They usually -- they should not report. And if they do the MN/MI rate code -- all the rate codes of each individual claim is listed so you could distinguish -- you could actually do a search for MN/MI just to make sure that AHCCCS didn't make a mistake and include these, so the reports from AHCCCS should not have any MN/MI days.

Q. These are highly detailed reports?

A. Yes.

Q. And as you understand the Provider's claim as they described it, it was off some summary internal calculation?

A. Right.

Q. So were the specific claims, Title 19 claims that the Intermediary would be starting with, they were sent to whichever Provider you were auditing?

A. They would be sent to all the hospitals, yes.

242

Q. And then looking at the Samaritan hospitals, they would get a chance to respond after the Intermediary saying you missed these Title 19 days?

A. Exactly.

Q. And did that happen routinely at least as you understand the hospitals that are before the Board that process?

A. Yes. That process happened -- but to explain, usually not until the last year, I would say, the Provider wouldn't provide a -- we call it an additional listing. That meant a listing additional from the AHCCCS paid days report which should include all eligible days that weren't paid by AHCCCS. Now this additional listing was usually supplied after we finalized the cost reports. Therefore, we have to reopen the cost report, review the additional days, and add them into the cost report.

243

Q. But the process, whether it be in the initial settlement or through reopenings was to specifically identify to the Providers including the Samaritan Providers exactly what days on a patient by patient basis the Intermediary thought should be used in the Medicaid proxy?

A. Yes.

Q. And then you would consider whatever the Provider came back with saying you need to add these days in too, audit them, and include them?

A. Exactly.

Q. And in that process from your own knowledge or reviewing what other audit files for years that you were not directly involved in, did you find any time where any representative of any of the hospitals said you need to include these MN/MI and children's days too?

A. I did not.

Q. And are you comfortable

244

that had that happened you would have found that out?

A. Yes. That probably would have been something I would have known.

Q. So are you comfortable in concluding on behalf of the Intermediary that the first time institutionally Blue Cross and Blue Shield of Arizona was aware that a hospital, Samaritan Hospital, wanted MN/MI days was when they added it to the appeal in the year 2000?

A. Yes.

***

MR. TALBERT:

I have no further questions.

THE CHAIRMAN:

Mr. Keough.

MR. KEOUGH:

Yes. Thank you.

***

CROSS EXAMINATION

BY MR. KEOUGH:

Q. First, I just want to --

169

245

1  and I think this is a recap of what
2  you and Mr. Talbert just went
3  through.
4       A. Okay.
5       Q. If I understood you
6  correctly, correct me if I misstate,
7  for purposes of your final DSH
8  calculation, and I'm not talking
9  about the interim payments or
10  anything made through the course of
11  the year but final settlement of the
12  NPR, you're doing your thing. The
13  starting point of the calculation for
14  DSH is when you get that report from
15  AHCCCS, is that right?
16      A. That's correct.
17      Q. And then you look at that
18  and at some point you send it over to
19  the hospital, and they may have other
20  things. But the number that the
21  hospital put on the as filed report,
22  when the hospital filed the cost
23  report for these earlier years they
24  didn't have that AHCCCS report, is
25  that your understanding?

246

1       A. Yes, that's my
2  understanding, correct.
3       Q. And whatever number the
4  hospital put on that cost report is
5  kind of irrelevant in terms of the
6  starting point of your final
7  calculation of the DSH number, is
8  that right?
9       A. Correct. We never used it.
10      Q. You wouldn't use that
11  because you got to get the number
12  from AHCCCS?
13      A. Right.
14      Q. In fact, the Medicare reg
15  would require you to get -- there has
16  to be verification from the state is
17  what I'm driving at.
18      A. Yes. Yes.
19      Q. You mentioned 97-2.
20      A. Yes.
21      Q. And there were some changes
22  as a result of that, and I want to
23  ask you a couple questions relating
24  to this. On your position paper, the
25  Intermediary's position paper, on

247

1  page 2, do you have that?
2       A. Yes.
3       Q. Okay. Mr. Talbert had gone
4  through at the outset clarifying some
5  things, referencing exhibits.
6  There's a few more things in here I'd
7  like to clarify. First, in your page
8  2 do you see under heading A, facts,
9  and then there's a number 2 that's
10  describing the DSH calculation, and
11  it says patient days of patients
12  entitled to Medicaid but not Medicare
13  Part A. Do you see that?
14      A. Yes, I see that.
15      Q. Is that the right standard?
16  Do they have to be entitled to
17  Medicaid or eligible?
18      A. I would say eligible would
19  be proper.
20      Q. In fact, if we looked at
21  the statute, and if you like there's
22  a quote in our position paper on page
23  5 -- Mr. Talbert in fact wrote the
24  same thing up there, in fact the
25  statute is eligible, right?

248

1       A. Yes.
2       Q. And again in the very next
3  paragraph of your position paper
4  under that number 2 it talks about
5  the second fraction, the fraction at
6  issue in this case, and you mention
7  the reg, 42 C.F.R. 412.106(b)(4), and
8  then there's a quote, and the quote
9  says, "The fiscal Intermediary
10  determines for the hospital's cost
11  reporting period the number of
12  patient days for which the patient is
13  entitled to Medicaid." Is that what
14  the reg says, entitled to Medicaid?
15      A. I'd have to look at the
16  reg.
17      Q. Okay. I have a copy here
18  for you. If you want to look at
19  this. In fact, there's a bracket on
20  the relevant part. I think that may
21  just be a typo on your paper. Maybe
22  you want to read that sentence.
23      A. Yes, it does say eligible
24  here.
25      Q. So it says the same thing

that you've written in your paper
except instead of the word entitled
to Medicaid it says eligible for
Medicaid, right?

A. Yes.

Q. And it also says it's the
fiscal Intermediary that determines
that number, the number of days that
are eligible for Medicaid?

A. Yes.

Q. One last question. It's on
the same related point just to
clarify in the position paper. The
second to the last paragraph on the
same page, page 2.

A. Okay.

Q. The paragraph begins, to
support this position, and then the
last sentence of that paragraph says
therefore, Medicaid covered days will
include only those days for which
benefits are payable under Title 19.
Now that, as I recall, is the old
interpretation that CMS originally
had of the Medicare DSH statute, that

the days had to be paid, and it's the
very interpretation at 97-2, which
you mentioned earlier, rescinded, is
that right?

A. That's correct.

Q. That's not really the
standard today or under the regs?

A. Right. It should say
eligible under Title 19.

Q. Okay. Now also 97-2, I'm
sure you may recall, you talked about
that, had rescinded, took back, if
you will, changed CMS' interpretation
of eligible from what they originally
read it to mean, which was entitled
or paid, they just have to be
eligible for Medicaid. What does
eligible mean?

A. I have to think about that
one. To me it means that they were
qualified to be paid at some point
under Medicaid Title 19.

Q. That they're enrolled in?

A. They're enrolled.

Q. They're a recipient?

A. They're a recipient.

Q. Let me read you one other
thing. Maybe this is what you're
thinking about. I'll read you -- I
can give you a copy if you'd like,
but I'm going to read you a quote
from the federal regulation 42 C.F.R.
Section 400.203, and what it says in
part in this. As used in connection
with the Medicaid program unless the
context indicates otherwise, and it
has a bunch of definitions, and
recipient, recipient means an
individual who has been determined
eligible for Medicaid. Is that what
you were thinking in terms of the
meaning of the word eligible, they've
been determined eligible for
Medicaid?

A. Yeah, they've been
determined eligible for Medicaid.

Q. Or as defined in the CMS
regs a recipient, so to speak?

A. I guess, yes.

Q. Okay. Well, I want to just

ask you a couple questions on that.
Assume, I'm not going to ask you to
attest to this, but just assume for
purposes of this question that the
federal Medicaid statute, Title 19,
uses the term recipient a lot in
many, many different sections. And
that's Title 19 of the Social
Security Act, the same statute that
contains the definition of the
Medicare DSH payment. Given that --
and I'm not asking you to agree with
me that it does contain the word.
Just assume it does.

A. Okay.

Q. If that's true, what is it
do you think that Congress meant
recipient?

***

MR. TALBERT:

I'm going to object. We never
put him up to...

MR. KEOUGH:

Why wouldn't it use it here?

MR. TALBERT:

253

```
1         ...speak to what Congress
2    intends.  That's legal
3    argument.
4  THE CHAIRMAN:
5         Do you want to comment on
6    that, Mr. Keough?
7  MR. KEOUGH:
8         The Intermediary has taken a
9    position in its paper and the
10   testimony that these days were
11   not eligible, should not be
12   counted, and I think we're
13   entitled to explore that a
14   little bit.  What do they mean
15   when they say these days
16   aren't eligible, what do they,
17   the Intermediary, mean.
18  THE CHAIRMAN:
19        I think that's a fair inquiry.
20   Obviously, the Board is aware
21   that Mr. Edmonson is not here
22   to speak for Congress but I
23   believe the regulation does
24   say the Intermediary
25   determines so I think it's a
```

254

```
1         fair area to go into.  Go
2    ahead.
3             ***
4  BY MR. KEOUGH:
5         Q.  And I can rephrase this.
6    Put it this way.  If in fact the
7    Medicaid statute uses the term
8    recipient of, and in view of the fact
9    that this section of the statute does
10   not say the number of the hospital's
11   patient days for such a period for
12   which consist of patients who were
13   recipients of medical assistance or
14   even it could just say recipients.
15   Is it possible, possible, that
16   Congress meant something else, that
17   it meant something other than
18   recipient as defined in the CMS regs?
19        A.  I guess anything is
20   possible.
21        Q.  Okay.  Now I've also looked
22   through the Medicare statute --
23   Medicaid statute, and again I'm not
24   going to ask you to confirm that this
25   is true but just hypothetically humor
```

255

```
1    me.  In addition to provisions that
2    use the word recipient there are a
3    lot of provisions in the Medicaid
4    statute that use the phrase
5    determined to be eligible under a
6    state plan.  And I was thinking about
7    this, and I was thinking if eligible
8    alone means determined to be eligible
9    is what I think you suggested at the
10   outset then it seemed to me when you
11   look at these other sections that
12   have the words determined to be
13   eligible then what Congress would
14   really be saying there is determined
15   to be eligible.  And that would be
16   rather redundant, repetitive, and
17   duplicative, do you think?
18            ***
19  THE CHAIRMAN:
20        And I think you may have made
21   the point.  Okay.
22            ***
23  BY MR. KEOUGH:
24        Q.  My question is, is it
25   possible in view of that that
```

256

```
1    Congress maybe meant something else
2    in the Medicare DSH statute other
3    than determined to be eligible?
4         A.  As I said, anything is
5    possible.  I highly doubt it.
6         Q.  Okay.  And I'm not going to
7    press that any further because I got
8    your point earlier but there's one
9    other thing I wanted to ask you
10   about.
11            ***
12  THE CHAIRMAN:
13        Are you going to have other
14        questions along the same lines
15        of is it possible that this is
16        meaning and so forth?
17  MR. KEOUGH:
18        One more.
19  THE CHAIRMAN:
20        Because I understand that
21        you're just trying to make
22        that point but...
23  MR. KEOUGH:
24        No, this is one related.  It's
25        not is it possible, just one
```

257

1                different related question.
2       THE CHAIRMAN:
3            Okay.
4                        ***
5       BY MR. KEOUGH:
6            Q.   Are you familiar with the
7       fact that there were a number of
8       court cases that eligible paid issue
9       that proceeded the issuance of HCFA
10      ruling 97-2?
11           A.   There was four or five
12      cases.
13           Q.   Generally aware?
14           A.   I'm vaguely familiar.
15           Q.   If I tell you one of those
16      cases in the United States Court of
17      Appeals for the Sixth Circuit
18      grappled with the meaning of the word
19      eligible and said, and I'll quote --
20      paraphrase, eligible means capable of
21      receiving Medicaid.  Do you agree
22      with that definition of the word
23      eligible?
24           A.   It seems like I'd have to
25      define capable then as well.

258

1            Q.   But you don't take issue
2       with that definition?
3            A.   Without knowing what he
4       meant by capable, I don't have an
5       issue with it.
6            Q.   Okay.  Would you turn to
7       Intermediary Exhibit 14?  That's one
8       of your exhibits, and just looking at
9       the first page could you tell us then
10      what this document is?
11           A.   This is from AHCCCS Web
12      site.  It's basically a brief
13      overview of AHCCCS history.
14           Q.   Of the AHCCCS program?
15           A.   Of the AHCCCS program.
16           Q.   If you turn back, I think
17      it's the fifth page of that exhibit.
18           A.   Okay.
19           Q.   That's appendix two to the
20      AHCCCS report, is that right?  Are we
21      on the same page?
22           A.   Maybe not.  I went to 5 of
23      5.  Are we in the same...
24                        ***
25      MR. TALBERT:

259

1            Is it marked 1 of 31 up on the
2       right-hand corner?
3       MR. KEOUGH:
4            Yes, on the top right-hand
5            corner it's marked 1 of 31.
6       MR. EDMONSON:
7            Okay.  I'm there.
8                        ***
9       BY MR. KEOUGH:
10           Q.   And this is appendix two to
11      that same report that you put in, is
12      that right?
13           A.   Yes.
14           Q.   And can you tell me...
15                        ***
16      THE CHAIRMAN:
17           Wait.  I'm not on the same
18           page.
19      MR. TALBERT:
20           It's actually the seventh page
21           -- it should be marked -- when
22           we marked them it should be
23           your seventh page.
24      THE CHAIRMAN:
25           All right.  Now I see what

260

1       you're talking about.
2       MR. KEOUGH:
3            Okay.  It's only on the fifth
4            on my copy.
5                        ***
6       BY MR. KEOUGH:
7            Q.   Anyway that's appendix two
8       to this AHCCCS report you mentioned,
9       is that right?
10           A.   Yes.
11           Q.   And go down, you know, what
12      is it, about halfway down the page,
13      it says year one, October 1, '92,
14      September 30, '83.
15           A.   Okay.
16           Q.   What's reflected under
17      there in that first box?
18           A.   Okay.  That looks like
19      someone wrote in the number of
20      patients enrolled in AHCCCS.
21           Q.   In AHCCCS.  So it looks
22      like if I read this right 89,683
23      acute care members?
24           A.   Yes.
25           Q.   Comprised of among other

261

1    things 8,166 MN/MI, is that right?
2        A. Correct.
3        Q. And those are all part of
4    the same AHCCCS program?
5        A. That's all part of the
6    AHCCCS program.
7        Q. Would you turn to your
8    exhibit, Intermediary Exhibit 17?
9        A. Okay.
10       Q. The first page of that
11   exhibit. What is this?
12       A. It's a summary of AHCCCS
13   rate codes defining what program is
14   by rate code.
15       Q. Do any of these codes
16   relate to what you refer to as the
17   Title 19 portion of AHCCCS?
18       A. Yes, I believe so.
19       Q. Do you know which ones?
20       A. It looks like the 1,000,
21   2,000, 2,200, 2,300, 4,300, and I'm
22   not -- I'm just assuming 5,000. I
23   don't know about 6,000.
24       Q. That's okay because those
25   aren't -- these are all part of the

262

1    same program, AHCCCS program?
2        A. They're part of the AHCCCS
3    program, yes.
4        Q. If you'd turn back to your
5    position paper, the text of your
6    paper, page 2, under the heading B,
7    argument, in reference to the
8    Intermediary's position regarding
9    days related to programs, plural,
10   what programs are you talking about?
11       A. Where are we at?
12       Q. Under your position paper,
13   page 2.
14       A. Okay.
15       Q. Under the heading B,
16   argument.
17       A. Okay.
18       Q. The first sentence refers
19   to programs in the plural.
20       A. Yes.
21       Q. I was wondering if there's
22   some other -- what programs you're
23   referring to.
24       A. Okay. The programs I'm
25   referring to are the medically

263

1    indigent, medically needy, eligible
2    low income children, and eligible
3    assistance to children.
4        Q. And just to clarify, you're
5    referring to those eligibility
6    categories of AHCCCS?
7        A. We're referring to those
8    state only programs.
9        Q. Categories.
10       A. Categories.
11       Q. But they're all part of one
12   program, are they not, AHCCCS?
13       A. It's all under the AHCCCS
14   umbrella.
15       Q. Now the same sentence. I
16   have another question for you on your
17   position. It says if the program is
18   not funded by Title 19 it cannot be
19   counted as a Medicaid day. I presume
20   you mean it can't be counted in the
21   Medicare DSH calculation as a
22   Medicaid day?
23       A. Yes.
24       Q. I wanted to ask you then
25   what about the converse, if the state

264

1    does receive federal financed
2    participation or FFP, can the days
3    then be counted?
4        A. What period are we talking
5    about?
6        Q. Any period at issue here.
7        A. Well, I think that needs to
8    be more defined. I'm basing it on
9    the ruling of expansion, waiver that
10   expanded payment, Title 19 payment to
11   the programs that were not Title 19,
12   that would be under the definition
13   that you just stated would not be
14   included as of before January 20,
15   2000, according to the Secretary.
16       Q. If it's part of you said
17   expansion waiver?
18       A. Yes.
19       Q. What if it's not part of an
20   expansion waiver if there is FFP?
21       A. If it's under the Title 19
22   program, yes, you would include that.
23       Q. If there's FFP from the
24   federal government to the state for
25   expenditures made under its state

265

1    plan would you count it?
2        A. Only if the program is
3    approved by Title 19.
4        Q. Was the AHCCCS program
5    approved?
6        A. I believe some of it is.
7        Q. Under Title 19?
8        A. Under Title 19.
9        Q. And AHCCCS makes a Medicaid
10   DSH payment to hospitals?
11       A. Yes, they do.
12       Q. And AHCCCS receives from
13   CMS FFP in respect to those DSH
14   payments?
15       A. They receive federal funds
16   as respect to those DSH payment, yes.
17       Q. FFP, federal financial
18   participation.
19       A. The only thing I read that
20   they received federal funds. I don't
21   know if it's the...
22       Q. The parties have stipulated
23   we received FFP.
24       A. Okay.
25       Q. Do you agree with that?

266

1    Now did you have a chance -- did you
2    see that calculation that Mr. Angulo
3    ran over earlier with respect --
4    hypothetical with respect to the
5    AHCCCS Medicaid DSH?
6        A. Yes.
7        Q. I'll just give you another
8    copy of that, a hard copy. You won't
9    have to mess with that screen. That
10   reflects -- posits a situation where
11   a hospital receives AHCCCS revenue,
12   and in this hypothetical instance all
13   of that AHCCCS revenue is
14   attributable to patients who are
15   MN/MI, EAC and ELIC.
16       A. Okay.
17       Q. In other words, this
18   hospital treats no other AHCCCS
19   patients in this given year?
20       A. Yeah, understood.
21       Q. And they can receive the
22   AHCCCS DSH payment?
23       A. Theoretically, yes. It
24   looks like that.
25       Q. And the federal government

267

1    would provide FFP matching funds with
2    respect to that DSH payment?
3        A. Yes.
4        Q. Thank you. We'll move off
5    of that.
6        A. Okay.
7        Q. Just a couple more items.
8    Again, and clarifying something in
9    the position paper on page 3, I think
10   actually you were just alluding to
11   this a moment ago but in the second
12   paragraph on page 3, the second
13   sentence says, I'll read it out loud
14   for you, if a state chooses to adopt
15   some sort of a waiver program and
16   elects to cover people who would not
17   have otherwise been eligible for care
18   those persons will not be included as
19   Medicaid days in the current formula.
20   That's a statement of your position
21   in the case. Again, I want to ask
22   you what about the converse. What if
23   a state elects not to include some
24   groups that it could include at its
25   option under Title 19 and without any

268

1    kind of waiver, would those days be
2    counted?
3        A. No.
4        Q. Why?
5        A. Well, one main reason when
6    you say could, I don't know how it
7    ever determined whether they could
8    because I don't know the requirements
9    or what kind of items you're looking
10   at.
11       Q. Do you know if Title 19
12   permits a state to include medically
13   needy, medically indigent patients in
14   the state plan?
15       A. Could you repeat that?
16       Q. Do you know whether or not
17   Title 19 permits a state at its
18   option to include medically needy,
19   medically indigent patients in a
20   state plan?
21       A. I believe the expansion
22   waiver allows.
23       Q. Not with a waiver. Without
24   any kind of waiver.
25       A. Okay.

175

269

1    Q. Just a straight out -- do
2  you know whether or not that's an
3  option?
4    A. I don't know.
5    Q. Okay. Fair enough. If you
6  don't know, that's fine.
7    A. Okay.
8    Q. But just assuming, and I'm
9  not conceding that, but assuming a
10  state can at its option include it
11  whether or not a particular state has
12  elected that option can you count
13  those days in the Medicare DSH
14  calculation?
15    A. I could not under the
16  current rules because it would have
17  to be included in Title 19, not --
18  it's not -- what you're suggesting is
19  it's not included in Title 19.
20    Q. Included in Title 19. You
21  mean included in a state plan?
22    A. Which is approved by Title
23  19.
24    Q. So we go back again to Mr.
25  Talbert's summary of the statute.

270

1  You're saying -- well, what are you
2  saying? Are you saying eligible
3  means recipient?
4    A. If they qualify for Title
5  19 under the state rules.
6    Q. That they're entitled?
7    A. Yeah.
8    Q. Yes?
9    A. Yes.
10    Q. Eligible means entitled?
11    A. I think that's where I'm
12  heading, yes.
13    Q. Okay. I'll move off that.
14  It's getting easier from here. I
15  just want to clean up a couple last
16  things on the position paper. Your
17  paper on page 3 has a reference to
18  January 1, 2001, approval of a later
19  expansion of the federally funded
20  portion of Arizona's plan. I think
21  we all agree with that, is that
22  right, that it was expanded as of
23  January 1, '01?
24    A. It was expanded -- I
25  believe they -- it was approved for

271

1  expansion, yeah, January 1, somewhere
2  in January.
3    Q. Okay.
4    A. 2001.
5    Q. That's fair enough.
6  Staying there on page 3 of the paper
7  there's a block quote right in the
8  middle of the page that begins with
9  the words for cost reporting
10  beginning. Do you see where I'm
11  looking?
12    A. Yes.
13    Q. The block quote.
14    A. Uh-huh.
15    Q. I understand that that's a
16  -- it's not cited in here but I
17  understand that's a quotation from
18  program memorandum 99-62, is that
19  right?.
20    A. I believe so, yes.
21    Q. Okay. And the last three
22  lines of that quotation say for open
23  cost reports you are to allow only
24  those types of otherwise ineligible
25  days that the hospital received

272

1  payment for in previous cost
2  reporting periods settled before
3  October 15, 1999, right?
4    A. That's what it says, yes.
5    Q. So if there's payment --
6  when we're talking about a type of
7  day, whatever it is, that otherwise
8  just looking at the statute and the
9  regs can't be counted. If I
10  understand this correctly a hospital
11  can count periods prior -- cost
12  reporting periods beginning before
13  2000 if the hospital has been paid a
14  Medicare DSH payment in respect to
15  that same type of day for prior
16  periods.
17    A. Yeah, reading that alone
18  that's the conclusion, yes.
19    Q. Now we've stipulated to the
20  Intermediary's calculation of the
21  Medicare DSH for the years up through
22  '89 included the AHCCCS MN/MI, EAC
23  and ELIC days, correct?
24    A. Correct.
25    Q. And you were here, and I

176

273

1  believe you heard Mr. Angulo testify
2  earlier that at least with respect to
3  Good Sam they did receive a Medicare
4  DSH payment for '86 to '89 so they
5  would have gotten that payment and
6  then going from there forward through
7  '90, '91, '92 they would have
8  received continuing at least an
9  interim DSH payment, which in turn
10 would be calculated by taking into
11 account prior DSH investments.  Do
12 you agree with that?
13     A.  Yeah, that's possible.
14     Q.  So at a point in time there
15 was some payment being made albeit
16 for '90, '91, '92, it would later
17 have been taken back at a final
18 settlement.  Do you concur with that?
19     A.  Yes.  If the interim rate
20 included the incorrect days we would
21 have taken that back from 1990
22 forward.
23     Q.  On final settlement?
24     A.  Whenever the final
25 settlement, yes.

274

1      Q.  You do have payment in all
2  prior periods for Good Samaritan to
3  all years prior to all the years
4  under appeal here for Good Sam at
5  least on an interim basis, is that
6  right?
7      A.  Say that again.
8      Q.  For Good Samaritan they
9  received Medicare DSH payments
10 finally that were computed based on
11 calculations that took into account
12 these three categories for '86,
13 correct?
14     A.  Correct.
15     Q.  For '87?
16     A.  Correct.
17     Q.  For '88?
18     A.  Correct.
19     Q.  For '89?
20     A.  Correct.
21     Q.  And those are all final
22 said and done?
23     A.  Yes.
24     Q.  On an interim basis they
25 received payments that we take that

275

1  into account for '90.
2      A.  In theory we don't know for
3  sure but, yes, I think more than
4  likely.
5      Q.  You've been with Medicare
6  for a long time.  You know how they
7  accept that.
8      A.  Yeah.
9      Q.  It would be based on  prior
10 year DSH adjustments, right?
11     A.  Yes.  They can use that and
12 they probably did, sure.
13     Q.  And for '92 on an interim
14 basis?  I'm sorry.  '90, '91 and '92
15 on an interim or part of '92 at least
16 on an interim, but for the last three
17 years we all agree that later
18 whenever the Intermediary issued NPRs
19 for those years to the extent any
20 interim payments considered that
21 would have come back out?
22     A.  Correct.
23     Q.  But the years at issue here
24 for Good Samaritan under appeal '91
25 and then '93 to '99, even starting

276

1  with '93 for all prior years there
2  was some payment made of a Medicare
3  DSH payment with respect to these
4  days.  For some of those earlier
5  years it was a final payment and for
6  some of the years it was only an
7  interim payment that was later
8  removed but there was some payment,
9  correct?
10     A.  Now it stopped at 1992.
11     Q.  Correct.
12     A.  Okay.  The way I understood
13 you were saying it continued on past
14 '93.
15     Q.  No, no, but looking at '93
16 as our starting point and looking
17 earlier in time from there, there was
18 some payment whether it be internal
19 or final for every preceding year?
20     A.  I would start with 1992 and
21 go back.
22     Q.  Okay.  But from there too.
23 Now so don't they then qualify under
24 this provision of the hold harmless?
25     A.  Well, it goes on further,

277

1    and I'd have to read it.  The reason
2    why I say they do not is because we
3    corrected it in 1992 and then there
4    was a time period from 1990 through
5    '99, there was no expectation of
6    receiving payment for these days.
7         Q.  Yeah, because on final
8    settlement on the NPRs for '91, '92
9    those interim payments would have
10   been adjusted back out, that's your
11   position?
12        A.  Yeah, if they were included
13   they were adjusted out.
14        Q.  Okay.  Now the paper also
15   talks about the Castle case, the
16   paper on page 67.  And on the top of
17   page 70 kind of a long quote, two
18   paragraphs from the Administrator's
19   decision in that case, is that right?
20        A.  Yes.
21        Q.  And kind of the upshot of
22   the quote is pretty long.  I'm not
23   going to read all that but the last
24   sentence of the second paragraph
25   says, thus, the Administrator finds

278

1    that under the existing policy in
2    effect these days are properly
3    excluded from the calculation of the
4    Provider's DSH payment.  Now was that
5    the Administrator's final resolution
6    of this issue in Castle with respect
7    to QUEST days?
8         A.  I'm going with
9    clarification you said earlier today
10   that it appears that these days are
11   allowed due to the fact that the
12   Provider filed an appeal on October
13   6, 1990, which was before the
14   required deadline of October 15.
15        Q.  I got a copy of that.
16        A.  Okay.
17        Q.  I'm not going to ask you to
18   read it but if you need to look at
19   it, that's fine.  Now so really what
20   the Administrator says and the part
21   you quoted was, look, under the rules
22   in effect during '94 these QUEST days
23   don't count.
24        A.  Yes.
25        Q.  But this hospital comes in

279

1    under the hold harmless on a
2    different prime, they got an appeal
3    in?
4         A.  Correct.
5         Q.  Do you happen to remember
6    when that appeal was filed in the
7    Castle case, when that issue was
8    added?
9         A.  You did mention it today,
10   so I'm only remembering it from a
11   couple hours ago.
12        Q.  You need to look at that
13   paragraph...
14        A.  October 6, 1999 is what you
15   said.
16        Q.  And the fiscal year at
17   issue was '94, does that strike a
18   chord with you?
19        A.  Well, are you referring to
20   the appeal that was in existence and
21   they added this...
22        Q.  Right.  It was an appeal
23   for fiscal year '94.
24        A.  So they must have added
25   this issue on -- yeah, the appeal was

280

1    probably in existence for some years
2    before they filed.
3         Q.  Okay.  Now is it possible
4    that it was just dumb luck on
5    Castle's part that they happened to
6    get that letter in right under the
7    wire five years after the fiscal
8    year?  It could have been just dumb
9    luck, I guess, right?
10        A.  Anything is possible.
11        Q.  Sure.  But maybe it's
12   possible somebody who is kind of in
13   the loop gave them some good advice
14   and said you'd be well advised to add
15   that issue to your appeal before the
16   15th.  That's possible, I suppose.
17        A.  Yeah, it's possible.
18             ***
19   MR. TALBERT:
20        I'm going to object to that.
21        That's speculation even for
22        this kind of a case.  If he's
23        got proof that somebody
24        slipped some information to
25        Castle let's get it out.

( 178

281

MR. KEOUGH:

I'm not suggesting that.

* * *

BY MR. KEOUGH:

Q. What I'm saying is whether it's dumb luck or whatever it is are either of those good reasons in your view -- what's the real distinction in practical terms between the situation Castle is in there and the Banner hospitals are in here. Castle, which has never been paid for those days. Never been paid a DSH payment for the days in question in that case either for '94 or for any other year five years later added an issue to an appeal, and the Banner hospitals in this case it seems to me if Banner had a more reasonable expectation of having the days at issue here included. Do you disagree?

A. Well, I disagree just knowing the history of Banner. That clarification in 1992 of not

282

including it, I don't know if QUEST had any clarification of that back then. And so actually Banner had the benefit of knowing that you do not include it because it happened '89, '88, '87. So I think Banner was more likely not to have expectations on this payment knowing what happened back in '92.

Q. Knowing that the Intermediary had made a decision in '92. They may not particularly disagree entirely.

A. But they never expressed...

Q. Go over -- recap one last thing. You take a time line of the cycle as Mr. Talbert referred to, a time cycle issue in this case. We begin in 1986. In '86, '87, '88, '89 days were counted, right?

A. Yes.

Q. And they can be included. Then you get starting from -- and actually if you're looking at it from the point -- in real time back then

283

up until some point in 1992 everybody is still counting those days until that determination was made by the Intermediary in '92, right?

A. Yeah, that's possible.

Q. So then from that point forward looking back it's only up through '89 they count them, and they no longer count them for that chunk from '89 to '92, correct?

A. From '90 to '92?

Q. Right.

A. Okay.

Q. Is that -- that was the upshot -- that's your position in this case, they don't count?

A. Right.

Q. And you go forward, and your position is they continue not to count in all later years until you get up until '02 and now they can count them?

A. You can count for Title 19 days, yes.

Q. But these days at issue in

284

this case, the individuals who would have been in days of old MN/MI, EAC and ELIC are now folded into that federally funded portion of the AHCCCS program beginning in 2002, correct?

A. Correct.

Q. And now those days could be counted?

A. Yeah, they're no longer called MN/MI.

Q. Understood.

A. Okay.

Q. But the same individual who before would have been in MN/MI will now be eligible under the federally funded portion of the program?

A. Correct.

Q. And even on that time line it's sort of on again, off again, on again. Even within that time line it seems to me there's a little piece here, a little piece, a little sliver of time from December 1, 1999 when CMS issued program memorandum 99-62

179

285

1  until March of 2000 when they issued
2  the Q&A that you rely on in your
3  position paper that all these days
4  could be counted for every year at
5  issue in this case at least for Good
6  Sam under the first prong of that
7  hold harmless provision that you
8  quoted in your position paper.
9       A. I would say you have to
10  limit -- it says open cost reports so
11  I think I know where you're heading
12  but it would have -- I don't now
13  which cost reports were open for Good
14  Sam at the time of that letter.
15      Q. Do we know what's open as
16  of today?
17      A. We're not the FI anymore.
18  I know we closed '99.
19      Q. Well, '99 is at issue in
20  this case and '98.
21      A. So every one of these
22  periods were...
23      Q. We know that at least all
24  the years that are at issue in this
25  case if they were open today they

287

1  Then you have to reopen it if you're
2  going to change something in there
3  whether it's by appeal or a reopening
4  request. You're reopening a closed
5  cost report.
6       Q. Okay. I don't want to
7  belabor that but I want to ask you
8  one question related to -- this is my
9  last question. You're Q&A in Exhibit
10  12 -- it's not your Q&A. It's CMS
11  Q&A, your Exhibit 12. Go back to the
12  page number 3, Q&A page number 3.
13      A. Okay.
14      Q. And the question is
15  question six. I asked Mr. Angulo
16  about this earlier. The question is
17  what needs to be done if in the past
18  the FI erroneously allowed general
19  assistance days for a number of years
20  but upon realizing the error reopened
21  up cost reports to exclude those
22  days. Does it matter if the
23  reopening happened many years back
24  and the Intermediary's policy since
25  then has been to exclude them, and

286

1  would have been open then too.
2       A. No, they're closed today.
3       Q. What do you mean they're
4  closed?
5       A. They're finalized.
6       Q. Are you saying it's not
7  open if you issue an NPR?
8       A. That's what I read that as.
9       Q. Well, then it wouldn't make
10  much sense when it talks about if you
11  had paid it for a prior year and then
12  you took it back on a reopening, then
13  you had to go back and reopen it
14  again?
15      A. I think it clarifies that
16  only if it's reopenable. I mean if
17  it's within three years of the
18  last...
19      Q. Yeah, but I guess my point
20  I was trying to add is if by
21  definition that -- you know, even
22  though you've issued an NPR it's
23  still open.
24      A. I don't read it that way.
25  If you issue an NPR it's closed.

288

1  the answer you can read to yourself
2  if you'd like there and take a
3  moment, but the answer, it seems to
4  me if I read this correctly, under
5  99-62 is the Intermediary because you
6  paid those before even if you then
7  did a reopening and took it back but
8  if you paid them before you got to
9  back today or not immediately but as
10  of December 1 and reopen again and
11  give them the money back.
12      A. That's what it says.
13              * * *
14  MR. KEOUGH:
15          Thank you.
16  THE CHAIRMAN:
17          Redirect.
18  MR. TALBERT:
19          I just have a couple
20          questions.
21              * * *
22      REDIRECT EXAMINATION
23  BY MR. TALBERT:
24      Q. Taking the last point, the
25  only cost reports that would get the

180

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| BANNER HEALTH SYSTEM ) | |
| DSH CALCULATION GROUP APPEALS ) | |
| ) | Fiscal Years |
| v. ) | 1991, 1993-1999 |
| ) | PRRB Case Nos. |
| BLUE CROSS AND BLUE SHIELD ) | 95-0795, 97-1098, 01-2892G, |
| ASSOCIATION/BLUE CROSS ) | 00-3556G, 01-2936G, 01-2937G, |
| BLUE SHIELD OF ARIZONA ) | 02-1810G, 03-1423G |

STIPULATIONS OF THE PARTIES

The parties to the above-referenced appeals before the Board hereby stipulate and agree as to the following facts:

1.    The Providers in these appeals are four non-profit hospitals: Good Samaritan, Desert Samaritan, Thunderbird Samaritan and Maryvale Samaritan. The fiscal years at issue are:

> 1991 & 1993-1999 for Good Samaritan
> 1994-1999 for Thunderbird Samaritan
> 1995 – 1999 for Desert Samaritan
> 1995- 1998 for Maryvale Samaritan

2.    During the periods at issue, each of the Providers was operated by Samaritan Health System, until a 1999 merger, and Banner Health System, after the merger.

3.    Each of the Providers is located in, or near, Phoenix, Arizona, and each of them participates in Medicare & Medicaid

4.    In Arizona, the Medicaid program is the Arizona Health Care Cost Containment System ("AHCCCS"). AHCCCS was created by State law in 1981. The AHCCCS program began participation in the federal Medicaid program in 1982.

5.    From the beginning, a central feature of the AHCCCS program has been the mandatory enrollment of all covered individuals in contracted managed care plans. The mandatory managed care requirement (and other AHCCCS provisions) necessitate a waiver of certain terms of the Medicaid Act, and since 1982, AHCCCS has operated as a Medicaid managed care demonstration project pursuant to a series of federal waivers under section 1115 of the Social Security Act.

1

MAR-17-2004 14:14 FROM:BLUE CROSS BLSHLD    4102986879    TO:202 639 6604    P.3/3

6.    AHCCCS program covers three groups of individuals pertinent to this case.  The three groups are:  the Medically Needy / Medically Indigent ("MN/MI"); Eligible Assistance Children ("EAC"); and Eligible Low Income Children ("ELIC").  All of these groups have income below the federal poverty income level.

7.    During the periods at issue here, the State did not receive federal financial participation ("FFP") for direct expenditures made by AHCCCS for benefits furnished to recipients in the three groups at issue.  Subsequently, the Centers for Medicare and Medicaid Services ("CMS") approved an expansion of federally-funded portion of the AHCCCS program to include the three groups at issue.

9.    However, during the periods at issue, the State did receive FFP for disproportionate share hospital ("DSH") payments made to hospitals by AHCCCS beginning with fiscal year 1992.  The AHCCCS DSH payment considers AHCCCS revenues, which include revenues attributable to services furnished by a hospital to individuals in the MN/MI, EAC and ELIC groups.  The AHCCCS DSH payment to a hospital is a lump sum and is not a percentage add-on to other payments.

10.    For cost reporting periods from 1986 up to 1989, the Intermediary, Blue Cross and Blue Shield of Arizona, included total AHCCCS patient days, including days associated with individuals covered under the MN/MI, EAC and ELIC categories, in the calculation of the numerator of the Medicaid fraction that is used compute the Medicare DSH payment under section 1886(d)(5)(F) of the Social Security Act.  In 1992, a CMS Regional Office confirmed the Intermediary's position that the MN/MI, EAC and ELIC should not be included in the numerator of the Medicaid fraction for cost reporting periods after 1989.

11.    The Providers began raising the issue of whether the MN/MI, EAC and ELIC days should be included in the Medicaid fraction in 2000.

Submitted By:

_____

Christopher L. Keough
Providers' Counsel

_____

Bernard M. Talbert
Intermediary's Counsel

296870_1.DOC

2

193

P - 1

223

PROVIDER EXHIBIT 1

The following table indicates the reimbursement impact relating to the excluded days for each member of the Provider Group in each fiscal year under appeal.

| | Good Samaritan (Provider No. 03-0002) | Desert Samaritan (Provider No. 03-0065) | Thunderbird Samaritan (Provider No. 03-0089) | Maryvale Samaritan (Provider No. 03-0001) |
|---|---|---|---|---|
| FY 91 (PRRB Case No. 95-0795) | $1,327,000 | N/A | N/A | N/A |
| FY 93 (PRRB Case No. 97-1098) | $1,512,000 | N/A | N/A | N/A |
| FY 94 (PRRB Case No. 01-2892G) | $1,587,000 | N/A | $136,380[*] | N/A |
| FY 95 (PRRB Case No. 00-3556G) | $1,351,000 | $214,087[*] | $419,000 | $439,000 |
| FY 96 (PRRB Case No. 01-2936G) | $1,235,000 | $283,000 | $17,535[*] | $503,000 |
| FY 97 (PRRB Case No. 01-2937G) | $1,295,000 | $315,773[*] | $300,000 | $547,000 |
| FY 98 (PRRB Case No. 02-1810G) | $988,000 | $218,000 | $424,000 | $232,000 |
| FY 99 (PRRB Case No. 03-1423G) | $1,062,000 | $293,000 | $353,000 | N/A |

[*]Additional days not yet audited.

P - 2

 **20 healthy years of reaching across Arizona to provide quality health care for those in need**

 **ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM**
Our first care is your health care

AHCCCS

`- Quick Links -` ▾ `Go!`

# 2002 AHCCCS Overview

The *2002 AHCCCS Overview* is available here in a printable, Portable Document Format (PDF) version.

For a PDF version of an individual chapter or appendix, see the Table of Contents below.

## Table of Contents

### Mission Statement

### CHAPTER 1
Overview of AHCCCS

### CHAPTER 2
Acute Care Program

### CHAPTER 3
Arizona Long Term Care System

### CHAPTER 4
KidsCare Program

### CHAPTER 5
Administrative Features and Regulatory Controls in a Managed Care System

### CHAPTER 6
Evaluations of the AHCCCS Program

## Appendices

**APPENDIX I:**    AHCCCS Eligibility Requirements
**APPENDIX II:**   AHCCCS Enrollment (1982 to 2002)
**APPENDIX III:**  AHCCCS Covered Services

BAN-0002

226

**APPENDIX IV:**   Expenditure for Federal Fiscal Year 2002
**APPENDIX V:**    Snapshots of Year One through Year Twenty

---

AHCCCS does not discriminate on the basis of disability in admission to, access to or operations of its programs, activities, services or in its employment practices. Individuals with disabilities, who need accommodations, including auxiliary aids or services for effective communication or additional information can contact the AHCCCS ADA coordinator at (602) 417-4014. This document is available in alternate formats by contacting (602) 417-4534.

Back To Top

---

Send your questions and comments about this web site to the Webmaster.
**Last modified:** October 24, 2003

Copyright Arizona Health Care Cost Containment System. All rights reserved.

BAN-0003

227

# CHAPTER 1
## OVERVIEW OF AHCCCS

The Arizona Health Care Cost Containment System (AHCCCS) is Arizona's Medicaid program. As of October 1, 2002, AHCCCS was providing health care coverage to over 860,000 members, which is almost 16 percent of Arizona's total population (see Chart 1A). In the past 18 months, the number of enrollees in the AHCCCS program has grown by 45 percent for a variety of reasons – primarily the population expansion to 100 percent of the Federal Poverty Level required by Proposition 204 and the downturn in the economy.



AHCCCS has operated under an 1115 Research and Demonstration Waiver since 1982 when the original waiver was granted by the Centers for Medicare and Medicaid Services (CMS). During that period, a number of waiver extensions have been approved by CMS. AHCCCS currently has a five-year extension that will expire on September 30, 2006 and will try to negotiate an extension of the waiver with CMS. The only way that the current AHCCCS waiver can be made permanent is with a change to federal law.

AHCCCS was created to defray the cost of indigent health care. Prior to 1982, Arizona was the only state in the nation that had declined federal Medicaid funds for low-income women, children, aged, blind, and the disabled. Rather than accepting federal funds for health care, the state had a disjointed system of indigent health care provided by individual counties as it saw fit and could afford. In 1980, the counties turned to the Arizona legislature for help.

The legislature responded and passed legislation in 1981 that created the Arizona Health Care Cost Containment System (AHCCCS). Unlike Medicaid programs in other states that relied on a fee-for-service reimbursement system, AHCCCS paid an upfront capitation payment to public and private Health Plans; mainstreaming enrollees into a system that encouraged preventive care and curtailed fraud and abuse practices found in other states. On October 1, 1982, AHCCCS became the first statewide Medicaid managed care system in the nation.

AHCCCS was created as a partnership between the state and private and public managed care Health Plans that mainstreamed Medicaid recipients into private physician offices. This arrangement opened up the private physician network to Medicaid recipients and allowed AHCCCS members to choose a Health Plan and a primary care provider, who acted as gatekeeper for the system and managed all aspects of medical care for a member. AHCCCS Health Plans are paid an upfront, or prospective, monthly capitation amount for each member enrolled with the Health Plan. This capitated concept, although new to Medicaid in 1982, was patterned on the way many consumers paid for private health care insurance. AHCCCS has a competitive bid process and regulatory oversight by the agency that includes operational and financial reviews of the Health Plans and contract monitoring to ensure quality of care.

BAN-0004
228



Chart 1B
EXISTING AHCCCS MODEL

*Behavioral Health services for acute care members are provided through the ADHS contract by Regional Behavioral Health Authorities and by Program Contractors for ALTCS members. ** Almost all Health Plans and Program Contractors provide dental services on a fee-for-service basis.

The start-up of the program on October 1, 1982, only 11 months from the time legislation was approved, was too short. A private administrator was used, McAuto Systems Group Inc., however, they were unable to establish a provider network, provide adequate regulatory oversight, develop a uniform accounting system or maintain a computer system that was capable of supporting managed care. Reimbursement was inadequate and many providers left the system. The turnaround began slowly in 1984 after the state ended the contract with McAuto and Governor Babbitt created a cabinet-level agency reporting directly to him.

From the beginning, AHCCCS has operated under an 1115 Research and Demonstration waiver granted by Health and Human Services. Under that waiver, the state can operate a statewide managed care system and require all enollees to enroll in a contracted Health Plan. After AHCCCS stabilized, the Arizona Legislature added long term care benefits through the Arizona Long Term Care System (ALTCS). The ALTCS program has been touted as a model for the nation mainly for its reliance on community based placements and support services in lieu of institutional care for the elderly, physically disabled or developmentally disabled populations. Unique among the states, ALTCS bundles all long term care services into a package (acute, behavioral health, case management, home and community-based services and institutional care) that is coordinated by various Program Contractors under contract to AHCCCS in all counties in the state. Like the acute care program, AHCCCS reimburses Program Contractors with a capitation payment for each enrolled member.

AHCCCS has undergone many changes since 1990. In 1991, the first managed care computer system in the nation was brought on-line after several years of intense effort. The system requires continual modifications to keep pace with the demands and eventually will need to be replaced.

In addition to the major system changes, AHCCCS has implemented many new programs and initiatives in the past seven years. In 1995, AHCCCS completed a five year phase-in of behavioral health care services for the Medicaid program. In contrast to the acute care and long-term care program, behavioral health services are carved-out and delivered through an Intergovernmental Agreement between AHCCCS and ADHS. ADHS contracts with Regional Behavioral Health Authorities to deliver behavioral health services to members. In 1995, AHCCCS launched a major quality improvement initiative designed to test new ways to measure quality of care in a managed care environment.

2

BAN-0005

229

## Targeted Case Management

In early 1998, a targeted case management program was implemented for individuals who are DD, who meet the financial requirements of Title XIX, who benefit from case management support, but who do not qualify for the ALTCS program. Case managers employed by the Department of Economic Security/Division of Developmental Disabilities provide intervention to ensure that the changing needs of the member and family are recognized on an ongoing basis, and that the widest array of appropriate options are presented for meeting those needs.

## SERVICE DELIVERY



AHCCCS was the first statewide, managed care Medicaid program in the nation to rely on Health Plans to deliver acute care services to both Medicaid and state-funded populations. Financing for the program is based on a prepaid, capitation approach with the AHCCCS Health Plans assuming the financial risk for the delivery of services. AHCCCS Health Plans are defined by state statute and are regulated and monitored by AHCCCS, based on strict financial and operational standards.

Effective October 1, 1997, AHCCCS acute care contracts were awarded for a five-year period, with an annual review and renewal process. In order to secure an AHCCCS contract, prospective contractors responded to a Request for Proposal (RFP) by submitting a bid that included proposed capitation rates for all AHCCCS services. During the contract negotiation process, prospective contractors that responded to the RFP segregated their bids by a specified geographic service area and specified the fixed, per member, per month capitation rate for the various rate codes. A critical element in the bid evaluation performed by AHCCCS was an assessment of how each prospective contractor would meet all financial and operational requirements, ensure quality in the delivery of services and provide a sufficient provider network to meet provider accessibility requirements. AHCCCS also evaluated each capitation proposal based on rate ranges which had been actuarially established to determine whether the bid was too high for the actuarial range or too low for the delivery of quality services. Once a Health Plan was awarded a contract, services had to be available and accessible to the enrolled members based on performance standards specified in the contract. AHCCCS monitors each Health Plan for compliance with the contract as discussed more fully in Chapter 5.

Exhibit 2.1 provides information on the Health Plans contracted with AHCCCS as of October 1, 2002. Exhibit 2.2 includes the Health Plans and the total enrollment by county.

AHCCCS allows members to choose a Health Plan from those available in the GSA in which the member resides. After choosing a Health Plan the member is then requested to choose a primary care provider who is affiliated with that Health Plan. Historically, approximately 60 percent of all Medicaid members select a Health Plan. If the member does not select a Health Plan, AHCCCS automatically assigns the person to an available Health Plan in the member's GSA.

All members have an extensive choice of primary care providers since over 85 percent of the licensed physicians and many practitioners choose to participate in AHCCCS. In the rural areas of the State, the choice is generally more limited due to a general shortage of providers.

The role of the primary care provider is critical to the success of the program since these professionals are the gatekeepers for the system, providing all medical care and arranging referrals for specialty care. There are currently three exceptions to the gatekeeper approach:

- Dental services do not require authorization from the primary care provider,

7

- The network for the behavioral health system uses RHBAs in the gatekeeper role for behavioral health services, and

- Women can elect an OB/GYN provider as their primary care provider.

Once a member chooses a Health Plan, or is assigned to a Health Plan if no choice is made, the member is "locked-in" to the Health Plan until their enrollment anniversary date. However, a member is given a 30-day period in which the member can change Health Plans. AHCCCS allows an exception to the lock-in period primarily to provide for medical or family continuity of care. Historically, the number of members electing to change Health Plans has been low, averaging four to five percent during open enrollment. In 1998, AHCCCS transitioned from the traditional open enrollment to an annual enrollment choice.

Native Americans who are AHCCCS members have the option to select either the Indian Health Service (IHS) or an AHCCCS Health Plan located off-reservation for Medicaid acute services. If the member chooses IHS, all available services are provided by IHS. However, if a Medicaid covered service is not available through IHS or if IHS does not have funding to pay for the service, the member may obtain services on a FFS basis through AHCCCS. A member who has chosen IHS is not "locked-in" and may change to an AHCCCS Health Plan at any time. On October 1, 2002, there were almost 80,000 Native Americans using IHS as their provider of acute care medical services. 

Except for those Native Americans who choose the IHS or Comprehensive Medical and Dental Plan, as their provider, all members are guaranteed eligibility for an initial five-month continuous period plus the month the member was enrolled. This guaranteed enrollment period is important to the member and the Health Plan for two reasons: the member has the security of continuous health care for at least five months; and, the Health Plan has an opportunity to stabilize medical conditions and reduce their financial risk for sick members through the assurance of at least five months of capitation payments.

## HEALTH CARE CAPITATION

Health Plans are prospectively paid a fixed monthly capitation, which is adjusted for the age and gender of each member. AHCCCS uses an independent actuarial firm to develop the rate ranges, not the actual rates, which are the basis for the capitation rates. When a Health Plan submits a bid to participate in the AHCCCS program, the Health Plan agrees to provide a specified set of services to any individual within the geographic area for the capitation rate established by their contract with AHCCCS. Under this arrangement, Health Plans are at-risk for the services provided to a member since they must absorb the loss if the medical costs for a member exceed the monthly capitation payment made to the Health Plan. Reinsurance, which provides some measure of financial protection against significant medical costs to the Health Plans, is discussed in Chapter 5.

The capitation rates for seven acute care rate groups are provided in Chart 2C. The Statewide Average Capitation Rates in Chart 2C do not include (FFS), reinsurance, or Medicare premiums.

BAN-0010
234



Chart 2C
2002/2003 Statewide Average Capitation Rates

## PROGRAM FUNDING

AHCCCS is funded by a combination of federal, state and county funds as reflected in Appendix IV.

For all Medicaid members, CMS pays a federal match to the state based on an annual matching percentage established in federal regulation. For federal fiscal year beginning October 1, 2002, the federal match is 67.25 percent for each Medicaid dollar spent in the State. The state match is 32.75 percent and is paid with a combination of General Fund monies and a fixed contribution from each county. The federal match percentage changes at the beginning of each federal fiscal year.

## HEALTHCARE GROUP

In addition to participating in the AHCCCS program, two AHCCCS Health Plans participate in the privately administered Healthcare Group, which was created by the Legislature to provide an affordable health care option for small employers. As of October 7, 2002, this organization served approximately 13,147 employees and their dependents in Arizona (see Chart 2D). A self-employed individual or employers with 50 or fewer employees is eligible to participate in Healthcare Group by purchasing health care for their employees and the employee's dependents through the participating AHCCCS Health Plans. Employers contract directly with the selected Health Plan and choose the benefit level and cost sharing option suitable for their organization.



Chart 2D
**HealthCare Group Enrollment**
(as of October 7, 2002)

University Physicians—39%

Mercy HCG 61%

9

BAN-0011

2.35



240



**Centers for Medicare & Medicaid Services**

Home | About CMS | FAQs | Feedback ☒ ☁ ▼ T    Search now

Go

Professionals ⊘    Governments ⊘    Consumers ⊘

Public Affairs ⊘

**Programs**
☆ Medicare
☆ Medicaid
☆ SCHIP
☆ HIPAA
☆ CLIA

**Topics**
☆ Advisory Committees
☆ Coverage
☆ Manuals
☆ New Freedom
☆ Open Door Forums
☆ PRIT
☆ Quality Initiatives
☆ Quarterly Provider Update
☆ Regulations
☆ State Waivers
☆ Statistics & Data

**Resources**
☆ Acronyms
☆ Contacts
☆ Forms
☆ Glossary
☆ Mailing Lists
☆ Search

# ARIZONA STATEWIDE HEALTH REFORM DEMONSTRATION

FACT SHEET

**Name of Section 1115 Demonstration:** Arizona Health Care Cost Containment System (AHCCCS)

**Date Proposal Submitted:** May 22, 1982

**Date Proposal Approved:** July 13, 1982

**Date Implemented:** October 1, 1982

## SUMMARY

Until 1982, Arizona was the only State that did not have a Medicaid program under Title XIX. In October 1982, Arizona implemented the Arizona Health Care Cost Containment System (AHCCCS) as a section 1115 demonstration project.

From October 1982 until December 1988, AHCCCS covered only acute care services, except for 90-day post-hospital skilled nursing facility coverage. In November 1988, a 5-year extension of the program was approved (later amended to six years) by the Centers for Medicare & Medicaid Services to allow Arizona to implement a capitated long term care (LTC) program for the elderly and physically disabled (EPD) and the developmentally disabled (DD) populations. The Arizona Long Term Care System (ALTCS) began in December 1988 for DD members and in January 1989 for EPD members. It is administered as a distinct program from the acute care program.

On October 1, 1990, AHCCCS began phasing in comprehensive behavioral health services, beginning with coverage of seriously emotionally disabled children under the age of 18 who require residential care. Over the next five years, behavioral health coverage was extended to all Medicaid eligible persons.

Two major amendments to the AHCCCS program were approved in 2001. In January, Arizona received permission from CMS to expand eligibility for its Medicaid acute care program to 100 percent of the Federal Poverty Level (FPL). In December, Arizona received approval of a section 1115 amendment under the Health Insurance Flexibility and Accountability (HIFA) initiative. The HIFA amendment permits the State to use title XXI funds to provide coverage

BAN-0016

to certain men, women and couples without children with income below 100 percent FPL and parents of Medicaid and State Children's Health Insurance Program (SCHIP) children with income between 100 and 200 percent FPL. Also, a 4-year extension of the demonstration covering October 1, 2002 through September 30, 2006 was approved on December 12, 2001.

As of April 2002, almost 673,000 people were served in the acute care program and close to 34,000 were enrolled in the LTC program. In addition, just under 49,000 children were enrolled in the Arizona SCHIP program, known as KidsCare.

## ELIGIBILITY

AHCCCS provides coverage for all persons eligible for the Federal mandatory groups, including recipients of cash assistance under TANF and SSI, TANF and SSI medical assistance only groups, and SOBRA pregnant women, infants and children. AHCCCS also covers three optional Federal eligibility categories. The SOBRA income standards are currently established at 140 percent FPL for pregnant women and infants; 133 percent FPL for children up to age 6; and 100 percent FPL for children 6 years or older, born on or after October 1, 1983. Eligibility determinations for the acute care program are performed by staff of the local offices of the Arizona Department of Economic Security and the Social Security Administration based on applications submitted in person or by mail.

Eligibility determinations for ALTCS are performed by AHCCCS staff and include both a financial and a medical/functional screen. Categorical Medicaid recipients (i.e., TANF and SSI beneficiaries receiving cash payments) are automatically financially eligible. For the ALTCS program, financial eligibility is extended to those with incomes up to 300 percent of SSI. Once determined financially eligible, a medical/functional screen or preadmission screening (PAS) instrument is administered by the State, and is designed to allow only applicants who are at immediate risk of institutionalization into the ALTCS program. (However, current ALTCS beneficiaries who fail the PAS at the time of redetermination are eligible to continue receiving services through the ALTCS Transitional Program, a pilot program that was made permanent on October 1, 1997.)

## BENEFIT PACKAGE

The AHCCCS program covers inpatient and outpatient hospital services, emergency room care, physician services, outpatient health services, lab, X-ray, pharmacy, behavioral health services, and several other services.

Benefits covered under ALTCS include acute care services as well as Nursing Facility days, Intermediate Care Facility for the Mentally Retarded days, case management, behavioral health services, and HCBS. HCBS covered by ALTCS include home health care, homemaker services, personal care, adult day health, hospice, respite care, transportation, attendant care, environmental modification, life line alert, and home-delivered meals. Habilitation and day-care services are also covered for the DD population.

The behavioral health services provided are primarily outpatient. They include

2 4 2 AN-0017



246

## Center for Medicare & Medicaid Services

Please note that this is a printer-friendly version of http://cms.hhs.gov/hifa/fact1211.asp. Links from this page may not function correctly. If you experience problems, please view the original page. Print this page now

## Health Insurance Flexibility and Accountability (HIFA) Initiative Fact Sheet

**State:** Arizona
**Name of Proposed Program:** Arizona HIFA Amendment
**Date Received:** September 20, 2001
**Projected Implementation:**
November 1, 2001 (Phase One);
October 1, 2002 (Phase Two)

### SUMMARY

The State will use title XXI funds to expand coverage to two populations: (1) adults over age 18 without dependent children and with adjusted net family income at or below 100 percent of the Federal Poverty Level (FPL), and (2) individuals with adjusted net family income above 100 percent FPL and at or below 200 percent FPL who are parents of children enrolled in the Arizona Medicaid or SCHIP programs, but who themselves are not eligible for either program. This expansion will amend the State's existing Medicaid section 1115 demonstration and will be implemented in two phases.

### EXISTING MEDICAID AND SCHIP PROGRAMS

The Arizona Medicaid program, known as the Arizona Health Care Cost Containment System (AHCCCS), operates as a Medicaid section 1115 demonstration. Eligibility for the acute care portion of this program was recently increased to 100 percent FPL, and was implemented in three phases on April 1, July 1, and October 1, 2001. Arizona also has a separate State SCHIP program, known as KidsCare, that covers children up to 200 percent FPL.

### HIFA PROPOSAL DETAILS

#### Number of individuals to be covered:

Phase One: 27,000
Phase Two: 21,250

#### New populations included in amendment:

Phase One: Childless Adults
Phase Two: Parents of SCHIP and Medicaid children

#### Income limit (lower and upper) for new eligibles:

Phase One: Zero to 100 percent FPL, net of income disregards
Phase Two: 100 percent to 200 percent FPL, net of income disregards

BAN-0021

247

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PLAINTIFF'S APPENDIX PURSUANT TO LOCAL RULE 7(n)**</u>

**Volume III of V**
[AR 280 – AR 329]

Respectfully submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

## Plaintiff's Appendix for
## *Banner Health v. Leavitt*
## (1:07-cv-01614-RBW)

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Notice of Administrator's Decision, dated July 16, 2007 | 1 |
| Administrator's Decision, dated July 13, 2007 | 2-21 |
| PRRB Decision No. 2007-D35, dated May 17, 2007 | 31-42 |
| Excerpts from Provider's Post Hearing Brief, dated May 17, 2004 | 61-71, 81-83 |
| Excerpts from Transcripts of Oral Hearing, held March 18, 2004 | 128-180 |
| Stipulations of the Parties | 192-93 |
| Provider's Exhibit P-1 | 223-24 |
| Excerpts from Provider's Exhibit P-2 | 225-29, 233-35 |
| Excerpts from Provider's Exhibit P-3 | 240-42 |
| Excerpts from Provider's Exhibit P-4 | 246-47 |
| Provider's Exhibit P-6 | 280-99 |
| Provider's Exhibit P-7 | 300-12 |
| Provider's Exhibit P-8 | 313-22 |
| Provider's Exhibit P-9 | 323-29 |
| Provider's Exhibit P-12 | 334-52 |
| Excerpts from Provider's Exhibit P-13 | 354-55, 364 |

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Provider's Exhibit P-14 | 379-81 |
| Provider's Exhibit P-15 | 382-84 |
| Provider's Exhibit P-17 | 388-91 |
| Provider's Exhibit P-18 | 392-94 |
| Provider's Exhibit P-19 | 395-96 |
| Provider's Exhibit P-20 | 397-99 |
| Provider's Exhibit P-21 | 400-07 |
| Provider's Exhibit P-28 | 448-54 |
| Provider's Exhibit P-29 | 455-56 |
| Excerpts from Intermediary's Exhibit I-12 | 732-33 |
| Excerpts from Intermediary's Exhibit I-14 | 745, 751-81* |
| Intermediary's Exhibit I-20 | 824-26 |
| Intermediary's Exhibit I-21 | 827-29 |

*The Administrative Record filed by the Secretary in this case did not include page 768.



P - 6

AZ ST § 11-297                                                                      Page 1
A.R.S. § 11-297

ARIZONA REVISED STATUTES ANNOTATED
TITLE 11. COUNTIES
CHAPTER 2. BOARD OF SUPERVISORS
ARTICLE 7. MEDICAL FACILITIES AND CARE OF INDIGENTS

Copyright © 1997 West Group. All rights reserved.

§ 11-297. Hospital treatment; application; affidavit; indigency standards; erroneous determinations; definition

A. Except in emergency cases when immediate hospitalization or medical care is necessary for the preservation of life or limb, no person shall be provided hospitalization, medical care or outpatient relief under this article without first filing with the board of supervisors of the county in which he resides a statement in writing, subscribed and sworn to under oath, that he is an indigent as defined by subsection B of this section.

B. For the purposes of this section, an "indigent" is a resident of the county who:

1. Does not have an annual income in excess of:

(a) Two thousand five hundred dollars, for one individual.

(b) An additional thirty-three and one-third per cent of the base identified in subdivision (a) of this paragraph if living with a dependent member of the family household, or if married and living with a spouse.

(c) An additional seventeen per cent of the base identified in subdivision (a) of this paragraph for each additional dependent member of the family household.

Annual income shall be calculated by multiplying by four the applicant's income for the three months immediately prior to the application for eligibility for the Arizona health care cost containment system pursuant to title 36, chapter 29, article 1. [FN1]

2. Has a household in which the net worth of resources of all persons does not exceed fifty thousand dollars, including but not limited to equity in a house or car, with no more than five thousand dollars cash or other liquid assets. In determining eligibility, medical expenses incurred by the applicant shall not be used to reduce the value of the net worth of resources of all persons in the household. For an individual applicant who is married, any separate property of the applicant's spouse that does not exceed seventy-five thousand dollars shall not be included in determining the net worth of resources of the applicant.

3. Has not, within three years prior to filing an application for eligibility for the Arizona health care cost containment system pursuant to title 36, chapter 29, article 1, transferred or assigned real or personal property with the intent to render himself eligible for such system.

4. Is not an inmate of a public institution that is the responsibility of a governmental unit or over which a governmental unit exercises administrative control.

5. Except as provided in subsection J of this section or emergency care required by § 36-2905.05, meets one of the following requirements for citizenship or alien status:

(a) Is a citizen of the United States.

(b) Is a qualified alien who entered the United States on or before August 21, 1996 as prescribed in § 36-2903.03.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0053

AZ ST § 11-297
A.R.S. § 11-297

(c) Is a qualified alien who entered the United States on or after August 22, 1996 and is a member of an exception group as prescribed in § 36-2903.03.

C. For the purposes of subsection B of this section, each applicant shall provide:

1. Documentation of United States citizenship or qualified alien status as prescribed in § 36-2903.03, and documentation of county residency, as determined by the director of the Arizona health care cost containment system administration pursuant to § 36-2903.01, subsection D.

2. A statement of the amount of personal and real property in which the applicant has an interest, a statement of all income which the applicant received during the three months immediately prior to the application, and a statement of any personal and real property assigned or transferred by the applicant within a three year period immediately prior to filing an application for eligibility for the Arizona health care cost containment system pursuant to title 36, chapter 29, article 1 and any further information determined through rules by the director of the Arizona health care cost containment system administration.

D. A county board of supervisors may by resolution adopt a definition of indigency which includes persons or family households not defined as indigent pursuant to subsection B of this section, except that such persons are not eligible for state funded hospitalization and medical care under the Arizona health care cost containment system established pursuant to title 36, chapter 29, article 1.

E. Each person desiring to be classified as an indigent pursuant to subsection B of this section shall apply for certification by the county of residence of the applicant pursuant to rules adopted by the director of the Arizona health care cost containment system administration. The county shall make the final determination regarding eligibility within thirty days of the date of application or a longer period of time as provided in subsection I of this section or as may be prescribed by rule, and upon such determination by the county that the applicant is eligible for hospitalization and medical care from the Arizona health care cost containment system, the county shall issue a written evidence of certification, copies of which shall be provided to the applicant and the administrator of the Arizona health care cost containment system pursuant to title 36, chapter 29, article 1. If the county fails to complete an eligibility determination within the time period prescribed by the director the county is liable to a provider or nonprovider as defined in § 36- 2901 for expenses incurred or paid or shall reimburse the applicant for claims paid by the applicant, or both, as appropriate. The county is only liable for health and medical services prescribed in § 36-2907 and from the latest date that the person should have been determined eligible as established by the director by rule until the date that the county complies with the notice of eligibility provisions prescribed by the director. This subsection does not limit a county's responsibility for the provision of services for indigent persons otherwise required by this chapter. Any applicant aggrieved by a determination made by a county eligibility worker or a special eligibility officer regarding eligibility for the Arizona health care cost containment system may appeal the determination directly to the director of the Arizona health care cost containment system administration as provided in § 36-2903.01, subsection B, paragraph 4. The director of the Arizona health care cost containment system shall render a decision on each eligibility appeal and each member grievance no later than ninety days from the date the Arizona health care cost containment system administration receives the request for a hearing unless the hearing is postponed or rescheduled at the request of all of the parties or if the parties agree to or the hearing officer orders a further extension. If a decision is not rendered within the time required by this section the initial decision shall be considered the final decision. If a person is dissatisfied with the final decision, the person may file a petition for judicial review pursuant to title 12, chapter 7, article 6. [FN2] The county shall cooperate and coordinate with appropriate state and federal agencies in the determination of eligibility. Each county shall:

1. Deduct from the calculation of income medical expenses incurred by each applicant for which the applicant is responsible for payment and which are not subject to any applicable third party payments for the twelve months immediately prior to determination of eligibility for classification as an indigent under this section. Medical costs incurred do not include the cost of services provided by a county free of charge, or on a subsidized basis.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0054

AZ ST § 11-297                                                                                                                Page 3
A.R.S. § 11-297

2. In accordance with rules adopted by the director of the Arizona health care cost containment system administration, periodically review the eligibility of each person classified as an indigent pursuant to this section and notify the administrator of the Arizona health care cost containment system of the results of such review.

F. If a person who is potentially eligible as indigent pursuant to subsection B of this section is currently receiving hospitalization or medical care or notifies the county that she is pregnant, the county shall complete the eligibility determination of the person on a priority basis and shall notify the administrator of the Arizona health care cost containment system pursuant to title 36, chapter 29, article 1 if the person is determined eligible for the system. Notifications shall conform to rules adopted by the director of the Arizona health care cost containment system administration. The director of the Arizona health care cost containment system administration shall adopt rules specifying procedures for processing the priority applications of pregnant women.

G. All persons who are applying for eligibility pursuant to § 36-2901, paragraph 4, subdivision (a) and who are potentially eligible pursuant to § 36- 2901, paragraph 4, subdivision (b), item (iii), as identified by the county, shall concurrently apply for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii). The county shall assist the person in completing the application for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii) and shall submit the completed application and all required documentation pertinent to the determination to the department of economic security which shall determine the applicant's eligibility. The county may certify or recertify the person as indigent pursuant to § 36-2901, paragraph 4, subdivision (a), pending a final determination by the department of economic security, if the department of economic security does not make an eligibility determination within ten working days from the date of submittal of a complete application by the county. If the person is hospitalized at the time of application, the county may certify the person as indigent pursuant to title 36, chapter 29, article 1, pending an eligibility determination by the department of economic security. A person who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), or who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (i), (ii) or (iv) or § 36-2934, subsection A, paragraph 2, 3 or 4 because that person meets the financial eligibility requirements of the state plan approved under title IV of the social security act [FN3] but who does not receive cash payment under the aid to families with dependent children state plan together with that person's income and resources, shall continue to be counted as part of the household in determining whether the remainder of the household members are eligible as indigent pursuant to § 36-2901, paragraph 4, subdivision (a). Applicants who refuse to cooperate in the eligibility determination process pursuant to this subsection are not eligible pursuant to title 36, chapter 29, article 1. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county department shall maintain in its own applicant files copies of the completed application and all other documents submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The county shall be subject to sanctions in accordance with §§ 36-2905.01 and 36-2905.02. If the administration ascertains that a person certified as indigent by the county was in fact eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), the county shall reimburse the Arizona health care cost containment system for expenses improperly incurred by the system in providing hospitalization and medical care as prescribed in § 36-2905.02. The Arizona health care cost containment system administration and the department of economic security may share all applicant related information pertaining to this eligibility process with the counties. The counties shall receive federal monies that are made available for the administrative costs associated with completing the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii).

H. For the purpose of determining indigency pursuant to subsection B of this section, the county shall not include as income money that an applicant or the applicant's household receives as a result of a settlement agreement or a judgment in a lawsuit brought against a manufacturer or distributor of agent orange.

I. Except for persons applying under subsection G of this section, all persons who are hospitalized and who are applying for eligibility or who are recertified pursuant to § 36-2901, paragraph 4, subdivision (c) and who are potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b) as identified by the counties through the use of a screening tool developed by the department of economic security shall apply for eligibility pursuant to §

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0055

AZ ST § 11-297                                                                 Page 4
A.R.S. § 11-297

36- 2901, paragraph 4, subdivision (b) and shall submit the application and copies of all verification documents contained in the case file at the time of submission to the department of economic security no later than three working days from the date the county completes the application process pursuant to this subsection. The hospitalized person may be certified eligible pursuant to this subsection only until the end of the second month following the month of certification. If the department of economic security does not make an eligibility determination within this period of time, the county may certify or recertify the person as medically needy pursuant to this section, pending a final determination by the department of economic security. If a hospitalized person is determined ineligible pursuant to § 36-2901, paragraph 4, subdivision (b), the county shall extend the person's eligibility as medically needy pursuant to this subsection for the remainder of the six month eligibility period. Following the six month eligibility period, an eligibility redetermination may be made. Applicants who refuse to cooperate in the eligibility determination process pursuant to this subsection are not eligible pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county shall maintain in its own applicant files copies of the application submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The counties shall receive federal monies that are made available for the administrative costs associated with making the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b).

J. Notwithstanding any other provision of law, beginning July 1, 1996, persons who are eligible to receive services pursuant to this section and who are also eligible for medicare coverage in a health maintenance organization shall not be determined or redetermined eligible for services pursuant to this section.

K. Subsection J of this section does not apply to eligible persons or members who have received a transplant.

CREDIT(S)

1997 Electronic PocketPart Update

Amended by Laws 1990, Ch. 118, § 1; Laws 1990, Ch. 333, § 4; Laws 1991, Ch. 298, § 4; Laws 1992, Ch. 287, § 1; Laws 1993, 2nd S.S., Ch. 6, § 5; Laws 1996, Ch. 288, § 2; Laws 1997, Ch. 300, § 3.

[FN1] Section 36-2901 et seq.

[FN2] Section 12-901 et seq.

[FN3] 42 U.S.C.A. § 601 et seq.

HISTORICAL AND STATUTORY NOTES

1997 Electronic Pocket Part Update

Laws 1991, Ch. 298, § 1, par. 2, provides:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0056

AZ ST § 11-297                                                                                                              Page 5
A.R.S. § 11-297

"Section 1. Purpose"


"2. Section 11-297, Arizona Revised Statutes, was amended by Laws 1990, chapter 118, § 1 and Laws 1990, chapter 333, § 4. However, Laws 1990, chapter 118, § 1 failed to set forth in full the existing text of the section as required by the Constitution of Arizona article IV, part 2, § 14. In order to correct a potentially defective enactment, in this act the Laws 1990, chapter 333, § 4 version of § 11-297, Arizona Revised Statutes, is amended to incorporate the amendments made by Laws 1990, chapter 118 and the chapter 118 version is repealed."


The 1991 amendment of this section by Ch. 298 explicitly amended the 1990 amendment of this section by Ch. 333.


The amendment of this section by Laws 1990, Ch. 118, § 1 was repealed by Laws 1991, Ch. 298, § 5.


For study of recommendations of health care cost containment system provision of Laws 1991, Ch. 213, see Historical and Statutory Notes following § 36-2901.


Laws 1996, 5th S.S., Ch. 5, § 6, provides:


"Sec. 6. Medicare coverage; fiscal year 1996-1997 ineligibility for AHCCCS; rules


"A. Notwithstanding any other provision of law, beginning on July 1, 1996, persons who are otherwise deemed eligible to receive services from the Arizona health care cost containment system under § 36-2905, Arizona Revised Statutes, or who are defined as medically indigent under § 11-297, Arizona Revised Statutes, and who are also eligible for medicare coverage in a health maintenance organization shall not be determined or redetermined eligible for services pursuant to § 11-297 or 36-2905, Arizona Revised Statutes, for state fiscal year 1996-1997.


"B. The Arizona health care cost containment system administration may purchase part B medicare coverage for those persons who would otherwise be eligible for medicare coverage in a health maintenance organization and who would have been eligible to receive services from the Arizona health care cost containment system under § 36-2905, Arizona Revised Statutes, or defined as medically indigent under § 11-297, Arizona Revised Statutes.


"C. The Arizona health care cost containment system administration shall adopt rules that are necessary to comply with this section, and these rules are exempt from the rule making requirements of title 41, chapter 6, Arizona Revised Statutes, for the purpose of implementing the requirements of this section."


Reviser's Notes:


1990 Note. The independent amendment of this section by Laws 1990, Ch. 118, § 1 and Ch. 333, § 4 could not be blended because of an electronic data base error in Ch. 118.


1996 Note. Pursuant to authority of § 41-1304.02, in the section heading "definition" was substituted for

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works


BAN-0057

AZ ST § 11-297                                                                                    Page 6
A.R.S. § 11-297

"definitions" and in subsection B the words "subsection J of this section" and "or" were transposed in that order to follow "except for".

**1997 Note.** Pursuant to authority of § 41-1304.02, in subsection G, fifth sentence after "item" "(i)" was substituted for "(l)" to correct a manifest clerical error.

1990 Main Volume

Source:
Civ.Code 1901, § 1033.
Civ.Code 1913, § 2486.
Laws 1917, Ch. 14, § 2.
Rev.Code 1928, § 814.
Laws 1937, 3rd S.S., Ch. 4, § 4.
Code 1939, § 17-349.
Code 1939, § 17-404.

As enacted by the 1956 revision, the section read:

"A. Except in emergency cases when immediate hospitalization or medical care is necessary for the preservation of life or limb no person shall be provided hospitalization, medical care or outpatient relief under the provisions of this article without first filing with a member of the board of supervisors of the county in which he resides a statement in writing, subscribed and sworn to under oath, that he is an indigent, an unemployable totally dependent upon the state or county government for financial support, or an employable of sworn low income without sufficient funds to provide himself necessary hospitalization and medical care, and that he has been a resident of the county for the preceding twelve months.

B. No person shall be admitted to the hospital or receive relief without an order from a member of the board.

C. Any person who files a false or untrue statement with the board for the purpose of obtaining hospitalization, medical care or outpatient relief for himself, shall be guilty of a misdemeanor."

The 1968 amendment inserted "as shall be defined by rules and regulations of the state welfare department" in subsec. A (see 1981 note, post).

The 1972 amendment substituted "state department of economic security" for "state welfare department" in subsec. A.

For effective date of Laws 1972, Ch. 142, see Historical and Statutory Notes following § 41-1951.

The 1978 blended amendments of Chs. 149 and 201, in subsec. C, inserted "knowingly" preceding "files", and classified the misdemeanor as class 2; and added subsec. D which read:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0058

286

AZ ST § 11-297                                                                                      Page 7
A.R.S. § 11-297

"Notwithstanding any provision of this chapter to the contrary, a board of supervisors may adopt standards
defining indigency for those persons requiring care in excess of a ninety-day period which consists of placement in
licensed nursing care or residential care facilities. Such standards shall be no more restrictive with regard to
eligibility for such care than those standards provided in subsection A. Such standards shall provide that financial
assistance to persons requiring care in such facilities shall be in an amount not to exceed the difference between the
reasonable cost of the placement in such facilities and the indigent person's income available for the payment of
such costs. The standards adopted by the board shall provide that a portion of the indigent person's income shall be
retained by the person for his personal use. Such portion shall not be less than fifteen percent of the maximum
benefit available under title XVI of the Federal Social Security Act, as amended.

For effective date provision and application of Laws 1978, Ch. 201, effective October 1, 1978, see Historical and
Statutory Notes following § 1-215.

The 1981 amendment, in subsec. A, substituted "as defined by subsection B of this section" for "as shall be
defined by rules and regulations of the state department of economic security, an unemployable totally dependent
upon the state or county government for financial support, or an employable of sworn low income without
sufficient funds to provide himself necessary hospitalization and medical care, and that he has been a resident of
the county for the preceding twelve months", and made two nonsubstantive changes; deleted former subsec. B
requiring an order from a board member for admittance to the hospital and subsec. C making the filing of an untrue
statement with the board a class 2 misdemeanor; inserted new subsecs. B through E; redesignated former subsec.
D as subsec. F; and in subsec. F, substituted "licensed" for "or" and inserted "or certified adult foster care" in the
first sentence, substituted "B of this section" for "A", and made two nonsubstantive changes.

Laws 1981, 4th S.S., Ch. 1, § 25, subsec. A provides:

"A. Section 5 of this act shall become effective on October 1, 1982."

For provision of Laws 1981, 4th S.S., Ch. 1, relating to the authority of the department of health services to accept
federal funds to implement the health care cost containment system, see Historical and Statutory Notes in the
General Materials (GM) for § 36-2901.

For provision of Laws 1981, 4th S.S., Ch. 1, relating to transfer of health care budget funds for indigents, see
Historical and Statutory Notes in the General Materials (GM) for § 36-2901.

For provision of Laws 1981, 4th S.S., Ch. 1, relating to state and county expenditure limitations on federal grants
received pursuant to Title 36, Chapter 29, see Historical and Statutory Notes in the General Materials (GM) for §
36-2901.

For provision of Laws 1981, 4th S.S., Ch. 1, relating to phase-in of eligible persons into the health care cost
containment system, see Historical and Statutory Notes in the General Materials (GM) for § 36-2901.

For legislative intent regarding termination of provisions added or amended by Laws 1981, 4th S.S., Ch. 1, see
Historical and Statutory Notes in the General Materials (GM) for § 36-2901.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0059

( 287

AZ ST § 11-297                                                             Page 8
A.R.S. § 11-297

Laws 1982 6th S.S., Ch. 4 inserted "for all persons in the household" in subsec. B, par. 2.

Laws 1982, Ch. 314, § 2 was repealed by Laws 1982, 6th S.S., Ch. 4, § 3, effective August 18, 1982, effective retroactively to July 24, 1982. See notes, post.

Laws 1982, 6th S.S., Ch. 4, § 1, par. 1, and § 10 provide:

"Section 1. Purpose

"1. Laws 1981, fourth special session, chapter 1, § 5, which amended § 11- 297, Arizona Revised Statutes, was amended by Laws 1982, chapter 314, § 2. However, the Laws 1982, chapter 314, § 2 amendment did not amend the session law but instead attempted to amend § 11-297, Arizona Revised Statutes, as amended by Laws 1981, fourth special session, chapter 1, § 5. This amendment of the Arizona Revised Statutes was not reflected in the title to this act as required by Constitution of Arizona Article IV, part 2, § 13. In order to correct a defective enactment, in this enactment, § 11-297, Arizona Revised Statutes, as amended by Laws 1981, fourth special session, chapter 1, § 5, is amended to incorporate the amendments made by Laws 1982, chapter 314, § 2, and Laws 1982, chapter 314, § 2 is repealed."

"Sec. 10. Effective date

"A. Section 11-297, Arizona Revised Statutes, as amended by Laws 1981, fourth special session, chapter 1, § 5, and by § 2 of this act, is effective on October 1, 1982.

"B. Sections 3 through 9 of this act are effective retroactively to July 24, 1982."

The 1983 amendment, in subsec. A, inserted "living with a dependent member of the family household or if" in par. 1, subd. (b), added par. 3, and made nonsubstantive changes; made a nonsubstantive change in subsec. D; in subsec. E, inserted "The county shall make the final determination regarding eligibility, and", made a nonsubstantive change, and deleted "net" preceding "income" in par. 1; inserted a new subsec. F; redesignated former subsec. F as subsec. G; and rewrote subsec. C which read:

"C. For the purposes of subsection B of this section:

"1. "Equity" means the full cash value of the owner's interest in real property or the market value of the owner's interest in other property after the deduction of the amount of any outstanding and unpaid mortgage, lien, encumbrance or security interest.

"2. "Net income" means those monies received by the applicant for indigent status for the three months immediately prior to application multiplied by four and includes Arizona gross income, capital gains excluded from Arizona gross income as defined by title 43, spousal maintenance, child support monies, nontaxable strike benefits, cash public assistance and relief, the gross amount of any pension or annuity, including railroad retirement benefits, all payments received under the Federal Social Security Act, as amended, state unemployment insurance

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0060

AZ ST § 11-297                                                                 Page 9
A.R.S. § 11-297

benefits, veterans' disability pensions, nontaxable interest received from Arizona municipal corporations and other
political subdivisions, nontaxable interest received from the federal government or any of its instrumentalities,
workmen's compensation and the gross amount of "loss of time" insurance. Net income does not include relief
granted pursuant to § 43- 1072, surplus foods or relief in kind supplied by a governmental agency."

The 1984 amendment added the second sentence to subsec. B, par. 3 (now subsec. B, par. 1, subd. (c));
substituted "received during the three months immediately prior to the" for "has at the time of filing an" in subsec.
C; substituted "Arizona health care cost containment system administration" for "department of health services" in
subsec. C and in subsec. E, the first paragraph and par. 2; inserted the third sentence in the first paragraph of
subsec. E; added "of the Arizona health care cost containment system administration" to the second sentence of
subsec. F; and made nonsubstantive changes in subsecs. A, C and F.

For legislative purpose and findings provisions of Laws 1984, Ch. 372, see Historical and Statutory Notes
following § 11-291.

The 1985 amendment substituted "§ 36-2903.01, subsection P" for "§ 36-2903, subsection B" in subsec. E.

Laws 1986, Ch. 380, § 1 substituted "Has a household in which the net worth of resources of all persons does not
exceed thirty thousand dollars, including but not limited to equity in a house or car" for "Does not have resources
of all persons in the household, including but not limited to equity in a house or car, with a net worth in excess of
thirty thousand dollars" in subsec. B, par. 2; in subsec. E, inserted "within thirty days of the date of application or
a longer period of time as may be prescribed by rule,", inserted the third, fourth and fifth sentences, and made a
nonsubstantive change; and in subsec. F, inserted "or notifies the county that she is pregnant", and added the third
sentence.

Laws 1986, Ch. 380, § 2, in subsec. B, par. 2, raised the limit on net worth resources from thirty thousand dollars
to fifty thousand dollars, and added the second sentence.

Laws 1986, Ch. 380, § 23, subsec. A provides:

"Sec. 23. Delayed effective dates

"A. Section 11-297, Arizona Revised Statutes, as amended by § 2 of this act, and § 36-2905, Arizona Revised
Statutes, as amended by § 8 of this act, are effective from and after September 30, 1986."

The 1987 amendment added ", article 1" following "title 36, chapter 29" in subsec. B, par. 1, subd. (c), and in
subsecs. C through F; added subsec. B, par. 4; and, in subsec. G, substituted "beginning October 1, 1987 shall"for
"may", added the provision pertaining to those who apply on or after October 1, 1987 to the second sentence, and
added provisions allowing counties to file claims and to impose liens against person's estates to recover paid
assistance.

Laws 1988, Ch. 3 added provision pertaining to those who apply for care on or after March 1, 1988; and added
subsec. H (later redesignated as G, and deleted by Laws 1989, Ch. 293, § 3; see note, post).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0061

AZ ST § 11-297                                                             Page 10
A.R.S. § 11-297

Laws 1988, Ch. 302, § 7, inserted the provision pertaining to an applicant who is married in subsec. B, par. 2; deleted "and regulations" following "rules" in subsec. E par. 2 and F; substituted "adopt" for "promulgate" in subsec. F; and deleted "shall be no more restrictive with regard to eligibility for such care than those standards provided in subsec. B of this section" following "Such standards" in subsec. G (formerly subsec. D; see 1978 note, ante).

The 1988 amendment of this section by Ch. 302, § 7 explicitly amended the 1988 amendment of this section by Ch. 3.

Laws 1988, Ch. 302, § 8 deleted "and regulations" following "through rules" in subsec. C; deleted subsec. G pertaining to standards defining indigency for persons requiring care in excess of a ninety day period; and redesignated former subsec. H as subsec. G (later deleted; see amendment by Laws 1989, Ch. 293, § 3, post).

The 1988 amendment of this section by Ch. 302, § 8 explicitly amended the 1988 amendment of this section by Ch. 302, § 7.

For delayed effective date provisions of Laws 1988, Ch. 302, see Historical and Statutory Notes following § 11-291.

Laws 1989, Ch. 5, deleted "and regulations" following "rules" in subsecs. C and E; inserted "Until July 1, 1989," in subsec. H; and added subsec. I (now subsec. G).

The 1989 amendment of this section by Ch. 5 explicitly amended the 1988 amendment of this section by Ch. 302, § 7.

Laws 1989, Ch. 293, § 2, made a nonsubstantive change in subsec. H; and inserted ", item (iii), or who is determined eligible pursuant to § 36-2901, par. 4, subd. (b), item (i), (ii) or (iv) or § 36-2934, subsec. A, par. 2, 3 or 4 because that person meets the financial eligibility requirements of the state plan approved under Title IV of the Social Security Act but who does not receive cash payment under the Aid to Families with Dependent Children State Plan together with that person's income and resources," following "A person who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b)" in subsec. I (now subsec. G).

Laws 1989, Ch. 293, § 3, deleted subsec. G which read:

"If the Arizona health care cost containment system administration and the federal government agree upon a federal rate of reimbursement for persons who would be determined eligible by the department of economic security pursuant to this subsection, the county shall screen the applicant in accordance with rules adopted by the director of the Arizona health care cost containment system administration to determine if the applicant may be eligible pursuant to § 36-2901, paragraph 4, subdivision (b), before a county certifies an applicant as indigent pursuant to this section. If the county determines through this screening procedure that the applicant may be eligible it shall refer the applicant to the department of economic security for a determination of whether the applicant is eligible pursuant to § 36-2901, paragraph 4, subdivision (b). The county, in carrying out its responsibilities under this subsection, shall provide office space for department of economic security eligibility workers colocated with county eligibility workers and shall assist the department of economic security in collecting

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

8AN-0062

AZ ST § 11-297
A.R.S. § 11-297

information required to process an application for eligibility. The county may certify as indigent a person who meets the requirements of this section and rules adopted by the director of the Arizona health care cost containment system administration pending a determination of the person's eligibility pursuant to § 36-2901, paragraph 4, subdivision (b) by the department of economic security. Eligibility shall be discontinued for persons so long as they fail or refuse to cooperate in the department of economic security's eligibility determination process in accordance with rules adopted by the director of the Arizona health care cost containment system administration. The counties, the Arizona health care cost containment system administration and the department of economic security shall enter into intergovernmental agreements in order to implement the provisions of this subsection. These agreements shall include a provision that the counties shall bear the nonfederal portion of the facility costs required to colocate department of economic security eligibility workers with county eligibility workers."

and added a new subsec. G which contains the same subject matter as the subsec. I added by Laws 1989, Ch. 5 and amended by Laws 1989, Ch. 293, § 2.

The 1989 amendment of this section by Ch. 293, § 2 explicitly amended the 1989 amendment of this section by Ch. 5, § 2, and the 1989 amendment of this section by Ch. 293, § 3 explicitly amended the 1988 amendment of this section by Ch. 302, § 8.

Laws 1989, Ch. 293, §§ 27 and 28 provide:

"Sec. 27. Effective date

"Section 3 of this act is effective from and after September 30, 1989.

"Sec. 28. Retroactivity

"Sections 2, 13 and 14 of this act are effective retroactively to from and after June 30, 1989."

Reviser's Notes:

1978 Note. Prior to the 1981 amendment, this section contained the amendments made by Laws 1978, Ch. 149, § 1 and Ch. 201, § 63 which were blended together pursuant to authority of § 41-1304.03.

1984 Note. Pursuant to authority of § 41-1304.02, the paragraph beginning with "Annual" and ending with "29." following subsection B, paragraph 3 was transposed to follow subsection B, paragraph 1, subdivision (c).

CROSS REFERENCES

Budget determinations, board of supervisors, see § 11-201.

Classification of offenses, see §§ 13-601, 13-602 et seq.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0063

AZ ST § 11-297                                                                                          Page 12
A.R.S. § 11-297

Compensation for patient referrals, violations, penalties, see § 13-3713.

Definition of knowingly, see § 13-105.

Health care cost containment, monthly premium payments, see § 36-2911.

Health care cost containment system, quality control analysis, see § 36-2905.02.

Inmates of public institutions, eligibility as medically needy, health care system, see § 36-2905.

Indigent,
Child passenger restraints, definition, see § 28-907.
Eligibility for health care cost containment system, see § 36-2901.

Powers of board, see § 11-251.

Qualified medicare beneficiary only, eligibility determination and termination, see § 36-2973.

Quality control sample of county eligibility certifications, health care cost containment system, see § 36-2905.01.

Restitution and fines, see § 13-801 et seq.

Sentences of imprisonment, see § 13-701 et seq.

## ADMINISTRATIVE CODE REFERENCES

Definition of indigency for county medical care and hospitalization, see A.A.C. R6-13-1213.

## LAW REVIEW AND JOURNAL COMMENTARIES

Torts, hospitals and emergency cases. Ariz.St.L.J. 3, 1975, p. 606.

## LIBRARY REFERENCES

### 1990 Main Volume

Social Security and Public Welfare ⟨⟩241.90.
WESTLAW Topic No. 356A.
C.J.S. Social Security and Public Welfare § 134.

## UNITED STATES SUPREME COURT

Medical care, residency requirement, see Memorial Hospital v. Maricopa County, U.S.Ariz.1974, 94 S.Ct. 1076,
415 U.S. 250, 39 L.Ed.2d 306.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0064

292

AZ ST § 11-297
A.R.S. § 11-297

Page 13

NOTES OF DECISIONS

Constitutional concerns, residency 6
Contribution by patient 3
Eligibility 1
Emergency care 8, 9
Emergency care - In general 8
Emergency care - State hospital inmate 9
Indigent juveniles 2
Non-indigent patients 4
Notice 11
Records 12
Reimbursement to private service 10
Residency 5-7
Residency - Constitutional concerns 6
Residency - Criteria 5
Residency - Undocumented alien 7
Resources 13
State hospital inmate, emergency care 9
Undocumented alien, residency 7
Validity 1/2

1/2. Validity

Subsection B, par. 2 of this section on eligibility for county health care benefits, which determined patient's indigency by including separate property of patient's spouse, did not constitute a "taking," even though spouse's separate property could not be reached by private hospital for payment of patient's hospital bills, and hospitals must provide emergency treatment regardless of person's ability to pay. St. Joseph's Hosp. and Medical Center v. Maricopa County (App. 1989) 163 Ariz. 132, 786 P.2d 983, review denied, certiorari denied 111 S.Ct. 369, 498 U.S. 950, 112 L.Ed.2d 332.

1. Eligibility

In determining eligibility for indigent medical care under A.R.S. § 11-297, medical expenses may be deducted from resources to calculate net worth in determining eligibility, as allowing "spend down" of resources by mathematical calculation of incurred medical expenses rather than actual expenditures promotes intent of statute. Walter O. Boswell Memorial Hosp., Inc. v. Yavapai County (App. 1986) 148 Ariz. 385, 714 P.2d 878.

Applicable statutory section does not provide for three standards of eligibility for free county medical assistance and person need not be impoverished or devoid of all assets to qualify as an "indigent sick" person, and person who is unable to pay for necessary medical care is eligible. McMullen v. Hargis (App. 1980) 128 Ariz. 142, 624 P.2d 339.

County's method of determining "annual income" for purposes of determining eligibility for free county medical assistance which meant taking gross income from preceding three months and then multiplying it by four was arbitrary and capricious. McMullen v. Hargis (App. 1980) 128 Ariz. 142, 624 P.2d 339.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0065

AZ ST § 11-297                                                                                        Page 14
A.R.S. § 11-297

Where an individual is undergoing court-ordered psychiatric treatment at a private rather than a county facility and is unable to assume the full cost of care, county is responsible for the portion of the cost which exceeds the patient's ability to pay. Op.Atty.Gen. No. 179-75.

Gifts, inheritances, and social security payments constitute income for the purpose of determining either the net income or the gross income from all sources of a person claiming county-provided hospital and medical care under this section. Op.Atty.Gen. No. 178-252.

An unliquidated tort claim cannot be considered as a resource within rule adopted pursuant to this section defining a non-indigent as a person with property or assets having a total fair market value of $800 in determining eligibility for free medical care as an indigent. Op.Atty.Gen. No. 74-3-L.

Question whether a person is an indigent for purposes of reimbursement for services rendered at state hospital is one for court under provision of § 36- 520 relating to patient's "ability to pay". Op.Atty.Gen. No. 72-32-L.

Non-resident of state may be afforded hospitalization or medical care as an indigent where he qualifies as an emergency patient and is so certified by a county physician. Op.Atty.Gen. No. 63-17-L.

Person without dependents would be "indigent" for purposes of admission to a county hospital if, after securing necessities of life, he did not have sufficient means to pay for private hospitalization. Op.Atty.Gen. No. 61-29.

Whether person seeking admission to county hospital is an "indigent" is a fact question for board of supervisors. Op.Atty.Gen. No. 61-29.

### 2. Indigent juveniles

In absence of contrary court order, department of corrections would not be financially liable to county for medical care provided by county to indigent juvenile offender under department's jurisdiction. Op.Atty.Gen. No. 68-27-L.

### 3. Contribution by patient

In imposing obligation on part of county to treat indigent patients, and providing for administrative processing of claims, legislature did not confer upon indigents private right of action to assert claims with respect to medical treatment in court, apart from administrative proceeding. Guibault v. Pima County (App. 1989) 161 Ariz. 446, 778 P.2d 1342.

County board of supervisors could legally spend public funds for care of any indigent person admitted to county hospital without the indigent affidavit, as long as a reasonable method is used to determine the indigent status. Op.Atty.Gen. No. 59-43.

County had to provide an indigent with medical services specified in this section and §§ 11-291 and 11-292

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0066

AZ ST § 11-297                                                          Page 15
A.R.S. § 11-297

without seeking contribution from the patient. Op.Atty.Gen. No. 77-198.

### 4. Non-indigent patients

Section 11-298 expressly conferring upon a paying patient in county hospital the privilege of engaging a private physician, who shall be permitted necessary use of hospital facilities and equipment precludes any implication of a power to exclude physicians from use of county hospital, except for a nonadherence to reasonable rules and regulations. Findlay v. Board of Sup'rs of Mohave County (1951) 72 Ariz. 58, 230 P.2d 526.

Funds budgeted for supplies, salaries, and other expenses for a county hospital are legally expended when not designated for indigents as long as there are other items in budget which indicate source of revenue from paying patients. Op.Atty.Gen. No. 59-43.

County hospital operated for indigent sick of county could accept non-indigent patients, even though other facilities were available, provided such admission was not to inconvenience of any indigent patient. Op.Atty.Gen. No. 59-43.

Non-indigent patients in county hospital would be required to pay actual expense incurred by county in their care. Op.Atty.Gen. No. 59-43.

Non-indigent patients accepted in county hospital can be provided with services by technicians, nurses, and others whose salaries are paid for by county provided that the patients pay the reasonable value of such services to the county. Op.Atty.Gen. No. 59-43.

Overflow paying patients from other hospital facilities in area could be admitted to a county hospital, provided that such admission was not to inconvenience of any indigent patient. Op.Atty.Gen. No. 59-43.

Question whether, as to non-indigent patients accepted in county hospital, separate charges had to be made for each service furnished such patients by hospital and record kept of such charges was an administrative matter, not a legal question. Op.Atty.Gen. No. 59-43.

### 5. Residency—Criteria

Enabling legislation for the Arizona health care cost containment system (see § 39-201 et seq.) provides that the program shall be available to persons who are full-time residents of the state, and the residency criteria of Opinion Attorney General I78-252 are physical presence and intention to remain there indefinitely. Op.Atty.Gen. No. I82-074.

Elements of domicile are physical presence and an intention to remain there indefinitely, and these must concur in point of time in the jurisdiction of intended domicile. Op.Atty.Gen. No. I78-252.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0067

AZ ST § 11-297                                                                           Page 16
A.R.S. § 11-297

6. —— Constitutional concerns, residency

Supreme court was required to determine whether purposes assertedly served by Arizona's durational residency requirement for free medical care satisfied state's heavy burden of justification, and insure that state, in pursuing its asserted objectives, has chosen means that do not necessarily burden constitutionally protected interests. Memorial Hospital v. Maricopa County, U.S.Ariz.1974, 94 S.Ct. 1076, 415 U.S. 250, 39 L.Ed.2d 306.

To extent that purpose of Arizona's durational residency requirement for free medical care is to inhibit immigration of indigents generally, that goal is constitutionally impermissible, and to extent that purpose is to deter only those indigents who take up residence in counties solely to utilize its new and modern public medical facilities, requirement is clearly over-inclusive. Memorial Hospital v. Maricopa County, U.S.Ariz.1974, 94 S.Ct. 1076, 415 U.S. 250, 39 L.Ed.2d 306.

Provision of this section requiring a year's residence in county as a condition to receiving nonemergency hospitalization or medical care at county's expense creates an invidious classification that impinges on right of interstate travel by denying newcomers basic necessities of life and, absent a compelling state interest, is unconstitutional as a violation of equal protection clause. Memorial Hospital v. Maricopa County, U.S.Ariz.1974, 94 S.Ct. 1076, 415 U.S. 250, 39 L.Ed.2d 306.

Provision of this section requiring in nonemergency cases that indigent person be resident of county for the preceding 12 months before such person can receive hospitalization or medical care at county expense, by creating two classes of indigent persons in need of medical care indistinguishable except on basis of length of residence in county, constitutes "invidious classification" and is unconstitutional. Valenciano v. Bateman, D.C.Ariz.1971, 323 F.Supp. 600.

Unconstitutional 12-month residency requirement is severable from general provisions for hospitalization and medical care to indigent sick. Valenciano v. Bateman, D.C.Ariz.1971, 323 F.Supp. 600.

Where plaintiff suing to enjoin enforcement of one-year residency requirement to qualify for nonemergency medical care of indigents had completed his first year of residence in Arizona prior to final order of superior court, cause should have been dismissed as moot. Board of Sup'rs, Pima County v. Robinson (1970) 105 Ariz. 280, 463 P.2d 536, certiorari denied 90 S.Ct. 2211, 399 U.S. 913, 26 L.Ed.2d 568.

Fiscal expediency is an invalid purpose for denying medical care to indigents not meeting residency requirements and will not, in face of challenge of denial of equal protection, support statutory classification distinguishing between resident and nonresident indigents in defining those entitled to medical aid. Board of Sup'rs, Pima County v. Robinson (App. 1969) 10 Ariz.App. 238, 457 P.2d 951, vacated 105 Ariz. 280, 463 P.2d 536, certiorari denied 90 S.Ct. 2211, 399 U.S. 913, 26 L.Ed.2d 568.

Requirement that to be entitled to nonemergency public medical care indigent shall have been a resident of county for preceding twelve months was unconstitutional and was not cured by emergency exception. Board of Sup'rs, Pima County v. Robinson (App. 1969) 10 Ariz.App. 238, 457 P.2d 951, vacated 105 Ariz. 280, 463 P.2d 536, certiorari denied 90 S.Ct. 2211, 399 U.S. 913, 26 L.Ed.2d 568.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0068

AZ ST § 11-297
A.R.S. § 11-297

Unconstitutional 12-month residency requirement of this section as prerequisite to indigent's entitlement to nonemergency medical aid was severable from general statutory provisions for medical care to the indigent sick. Board of Sup'rs, Pima County v. Robinson (App. 1969) 10 Ariz.App. 238, 457 P.2d 951, vacated 105 Ariz. 280, 463 P.2d 536, certiorari denied 90 S.Ct. 2211, 399 U.S. 913, 26 L.Ed.2d 568.

### 7. —— Undocumented alien, residency

County regulation providing that undocumented alien was ineligible for county subsidized health care was invalid because it sought to amend this section enacted by legislature which extended eligibility to "residents" by impermissibly limiting statutory definition of eligibility to legal residents. St. Joseph's Hosp. and Medical Center v. Maricopa County (1984) 142 Ariz. 94, 688 P.2d 986.

### 8. Emergency care—In general

Provision of this section for emergency care in county hospital without necessity of filing statement of indigency was merely intended to expedite admission of emergency cases and was not intended to require treatment in a private hospital, at county expense, of all emergency cases without regard to a subsequent determination of indigency or nonindigency. Good Samaritan Hospital, Inc. v. State ex rel. Maricopa County (App. 1972) 18 Ariz.App. 321, 501 P.2d 949.

Reimbursement of private hospital by county for emergency services rendered an indigent is required only where the county would have been initially responsible for furnishing medical care at county expense; statutory emergency reimbursement provisions, this section and § 11-297.01, do not enlarge right to have medical care at county expense, regardless of indigency or other qualifying factors, but only create a method whereby private hospitals may be reimbursed for services which the county was obligated to furnish, and presumably would have furnished, but for the emergency. Good Samaritan Hospital, Inc. v. State ex rel. Maricopa County (App. 1972) 18 Ariz.App. 321, 501 P.2d 949.

### 9. —— State hospital inmate, emergency care

County was not required to reimburse private hospital for emergency care rendered to state hospital inmate, who escaped from custody, was struck by automobile, and was admitted to private hospital in critical condition; the state, rather than the county, had initial responsibility to furnish medical treatment to inmate. Good Samaritan Hospital, Inc. v. State ex rel. Maricopa County (App. 1972) 18 Ariz.App. 321, 501 P.2d 949.

### 10. Reimbursement to private service

County was not liable to private hospital for patient's emergency care under restitution theory, where county did not have statutory duty to provide such care, as patient did not qualify as indigent under statute due to sufficiency of his wife's separate property. St. Joseph's Hosp. and Medical Center v. Maricopa County (App. 1989) 163 Ariz. 132, 786 P.2d 983, review denied, certiorari denied 111 S.Ct. 369, 498 U.S. 950, 112 L.Ed.2d 332.

Although substantial evidence indicated that shooting was drug related and that victim was participant, city was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0069

AZ ST § 11-297                                                          Page 18
A.R.S. § 11-297

not responsible for treatment rendered by hospital, where no police officer questioned victim or placed him under
arrest at scene of shooting, victim's gunshot wound resulted in extensive brain damage, and county attorney
determined that victim could not be prosecuted because he was unable to aid in his own defense or to appear in
court. St. Joseph's Hosp. and Medical Center v. City of Phoenix (App. 1988) 158 Ariz. 540, 764 P.2d 25.

County did not have statutory obligation to reimburse private hospital for costs of emergency medical care
provided to patient who was member of class of employables of sworn low income without sufficient funds to
provide themselves necessary hospitalization and medical care where such employables were persons who could be
allowed nonemergency medical care at county expense upon application to, and receipt of order from, member of
board of supervisors. St. Joseph's Hospital and Medical Center v. Maricopa County (App. 1981) 130 Ariz. 239,
635 P.2d 527.

Naturopath ordered or authorized by board of supervisors to render his services to the indigent sick would be
entitled to reimbursement by board for such services. Op.Atty.Gen. No. 65-14-L.

### 11. Notice

Even though private hospital did not give notice to county of presence and location of indigent patient until 20
days after patient was admitted, notice was timely when given as soon as patient's attending physician deemed it
medically advisable to transport him. St. Joseph's Hospital and Medical Center v. Maricopa County (App. 1981)
130 Ariz. 239, 635 P.2d 527.

### 12. Records

Until each county or legislature moved to prevent disclosure of information contained in affidavit necessary to
obtain medical care for an indigent, any person may inspect such information in office of board of supervisors
during business hours but may not remove the records from the office for the purpose of photographing or
otherwise. Op.Atty.Gen. No. 73-13-L.

Information contained in affidavit necessary for discharge of duty of board of supervisors to provide medical care
for indigents constitutes a public record and is not required by statute to be kept confidential, but public interest, as
well as statutory consistency arising from fact that, as to all other forms of public assistance, information about
applicants or recipients is to be kept confidential, would best be served if confidentiality was preserved, and each
county board of supervisors has power, and is encouraged to, preserve the confidentiality of the information under
their regulatory power. Op.Atty.Gen. No. 73-13-L.

### 13. Resources

Including spouse's separate property in calculation for determining whether patient is indigent, and thus whether
patient is eligible for county health care benefits, was neither arbitrary, capricious, nor violative of due process,
even though private hospital could not reach spouse's separate property for payment of patient's medical expense.
St. Joseph's Hosp. and Medical Center v. Maricopa County (App. 1989) 163 Ariz. 132, 786 P.2d 983, review
denied, certiorari denied 111 S.Ct. 369, 498 U.S. 950, 112 L.Ed.2d 332.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0070

AZ ST § 11-297                                                    Page 19
A.R.S. § 11-297

"Resources of all persons in the household," within the meaning of subsec. B, par. 2 of this section stating that patient may not have "resources of all persons in the household" in excess of certain amount to be eligible for county health care benefits, includes patient's spouse's separate property, even though state has enacted community property law. St. Joseph's Hosp. and Medical Center v. Maricopa County (App. 1989) 163 Ariz. 132, 786 P.2d 983 , review denied, certiorari denied 111 S.Ct. 369, 498 U.S. 950, 112 L.Ed.2d 332.


A. R. S. § 11-297

AZ ST § 11-297

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0071



300

AZ ST § 36-2901                                                    Page 1
A.R.S. § 36-2901

ARIZONA REVISED STATUTES ANNOTATED
TITLE 36. PUBLIC HEALTH AND SAFETY
CHAPTER 29. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION
ARTICLE 1. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

Copyright © 1997 West Group. All rights reserved.

§ 36-2901. Definitions

In this article, unless the context otherwise requires:

1. "Administration" means the Arizona health care cost containment system administration.

2. "Administrator" means the administrator of the Arizona health care cost containment system.

3. "Director" means the director of the Arizona health care cost containment system administration.

4. "Eligible person" means any person who is:

(a) Classified as an indigent pursuant to § 11-297.

(b) Under federal law any of the following:

(i) Defined as mandatorily eligible either pursuant to title XIX of the social security act (P.L. 89-97; 79 Stat. 344; 42 United States Code § 1396a (1980)) or under the administration's state plan for persons eligible under the temporary assistance for needy families program.

(ii) Under the age of eighteen years and defined as optionally eligible pursuant to title XIX of the social security act (P.L. 89-97; 79 Stat. 344; 42 United States Code §§ 1396a(a)(10)(A)(ii)(I) and 1396d(a)(i)).

(iii) Defined as an eligible pregnant woman, and an infant under the age of one year, pursuant to § 1902(l)(1)(A) and (B) of title XIX of the social security act, [FN1] as amended by § 4603 of the omnibus budget reconciliation act of 1990, and whose family income does not exceed one hundred forty per cent of the federal poverty guidelines as published by the United States department of health and human services and children defined as eligible children who have not attained nineteen years of age pursuant to § 1902(l)(1)(D) of title XIX of the social security act, as amended by § 4601 of the omnibus budget reconciliation act of 1990, and whose family income does not exceed one hundred per cent of the federal poverty guidelines as published by the United States department of health and human services, and children defined as eligible pursuant to § 1902(l)(1)(C) of title XIX of the social security act, as amended by § 6401 of the omnibus budget reconciliation act of 1989, and whose family income does not exceed one hundred thirty-three per cent of the federal poverty guidelines as published by the United States department of health and human services.

(iv) Defined as optionally eligible pursuant to § 1902(a)(10)(A)(ii)(I) of the social security act (42 United States Code § 1396a(a)(10)(A)(ii)(I)).

(c) Classified as a medically needy person pursuant to § 36-2905.

(d) A full-time officer or employee of this state or of a city, town or school district of this state or other person who is eligible for hospitalization and medical care under title 38, chapter 4, article 4. [FN2]

(e) A full-time officer or employee of any county in this state or other persons authorized by the county to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0072

AZ ST § 36-2901                                                        Page 2
A.R.S. § 36-2901

participate in county medical care and hospitalization programs if the county in which such officer or employee is employed has authorized participation in the system by resolution of the county board of supervisors.

(f) An employee of a business within this state.

(g) A dependent of an officer or employee who is participating in the system.

(h) Classified as an eligible child pursuant to § 36-2905.03.

(i) Not enrolled in the Arizona long-term care system pursuant to article 2 of this chapter. [FN3]

(j) Classified as an eligible person pursuant to § 36-2905.05.

5. "Malice" means evil intent and outrageous, oppressive or intolerable conduct that creates a substantial risk of tremendous harm to others.

6. "Member" means an eligible person who enrolls in the system.

7. "Nonprovider" means a person who provides hospital or medical care but does not have a contract or subcontract within the system.

8. "Physician" means a person licensed pursuant to title 32, chapter 13 or 17. [FN4]

9. "Prepaid capitated" means a mode of payment by which a health care provider directly delivers health care services for the duration of a contract to a maximum specified number of members based on a fixed rate per member notwithstanding:

(a) The actual number of members who receive care from the provider.

(b) The amount of health care services provided to any member.

10. "Primary care physician" means a physician who is a family practitioner, general practitioner, pediatrician, general internist, or obstetrician or gynecologist.

11. "Primary care practitioner" means a nurse practitioner certified pursuant to title 32, chapter 15 [FN5] or a physician assistant certified pursuant to title 32, chapter 25. [FN6] Nothing in this paragraph shall expand the scope of practice for nurse practitioners as defined pursuant to title 32, chapter 15, or for physician assistants as defined pursuant to title 32, chapter 25.

12. "Provider" means any person who contracts with the administration for the provision of hospitalization and medical care to members according to the provisions of this chapter or any subcontractor of such provider delivering services pursuant to this article.

13. "System" means the Arizona health care cost containment system established by this article.

CREDIT(S)

1993 Main Volume

Added by Laws 1981, 4th S.S., Ch. 1, § 11. Amended by Laws 1983, Ch. 304, § 4; Laws 1984, Ch. 372, § 8, eff. May 5, 1984; Laws 1986, Ch. 380, § 3; Laws 1987, Ch. 332, § 14; Laws 1988, Ch. 3, § 2, eff. Feb. 16, 1988;

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0073

AZ ST § 36-2901                                                                                  Page 3
A.R.S. § 36-2901

Laws 1989, Ch. 293, § 8; Laws 1990, Ch. 27, § 1, eff. April 6, 1990; Laws 1990, Ch. 333, § 7, eff. Oct. 1, 1990;
Laws 1991, Ch. 213, § 5, eff. June 10, 1991; Laws 1993, 2nd S.S., Ch. 6, § 7; Laws 1993, Ch. 127, § 1.

1997 Electronic Pocket Part Update

Amended by Laws 1994, Ch. 189, § 7; Laws 1994, Ch. 322, § 2; Laws 1997, Ch. 300, § 16.

[FN1] 42 U.S.C.A. § 1396a.

[FN2] Section 38-651 et seq.

[FN3] Section 36-2931 et seq.

[FN4] Section 32-1401 et seq. or 32-1800 et seq.

[FN5] Section 32-1601 et seq.

[FN6] Section 32-2501 et seq.

## HISTORICAL AND STATUTORY NOTES

1997 Electronic Pocket Part Update

Laws 1993, 2nd S.S., Ch. 6, § 39, as amended by Laws 1995, 1st S.S., Ch. 5, § 10, provides:

Sec. 39. Revised hospital reimbursement schedule; MN/MI; applicability

"A. In addition to the adjustments in the rates as prescribed in §§ 27, 28 and 29 of this act, the director of the
Arizona health care cost containment system for fiscal years 1993-1994, 1994-1995 and 1995-1996 shall revise the
per cent of the rate that is paid by the Arizona health care cost containment system administration to non-county
operated hospitals for inpatient hospital and outpatient hospital services for members eligible under § 36-2901,
paragraph 4, subdivisions (a), (c), (h) and (j), Arizona Revised Statutes, that based on past payment history would
result in a reduction in reimbursements totalling approximately $10,000,000 each fiscal year.

"B. For fiscal year 1993-1994, 1994-1995 and 1995-1996, the director of the Arizona health care cost containment
system administration shall report the reductions required by this section monthly to the chairmen of the house and
senate appropriations committees and to the staff of the joint legislative budget committee."

Laws 1993, 2nd S.S., Ch. 6, § 41, which purportedly repealed § 39 of that act effective July 1, 1995, was itself

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0074

AZ ST § 36-2901                                                    Page 4
A.R.S. § 36-2901

repealed by Laws 1995, 1st S.S., Ch. 5, § 12.

The 1994 amendment of this section by Ch. 189 explicitly amended the 1993 amendment of this section by Ch. 127.

This section, as amended by Laws 1993, 2nd S.S., Ch. 6, § 7, was repealed by Laws 1994, Ch. 189, effective July 17, 1994.

Amendment of this section by Laws 1993, 2nd S.S., Ch. 6, § 7, was repealed by Laws 1994, Ch. 322, § 3.

Laws 1994, Ch. 189, § 1, par. 4, provides:

"Section 1. Purpose"

"4. Section 36-2901, Arizona Revised Statutes, was amended by Laws 1993, chapter 127, § 1 and Laws 1993, second special session, chapter 6, § 7. The regular and special session versions could not be blended because they were enacted in different sessions of the legislature. In order to combine these versions, this act amends the Laws 1993, chapter 127 version of § 36-2901, Arizona Revised Statutes, to incorporate the amendments made by Laws 1993, second special session, chapter 6 and the second special session, chapter 6 version is repealed."

The 1994 amendment of this section by Ch. 322 explicitly amended the 1993 amendment of this section by Ch. 127.

Laws 1994, Ch. 322, §§ 19 and 20, subsec. B, provide:

"Sec. 19. Medicare and medicaid demonstration

"The administration may offer services pursuant to title XVIII and title XIX of the social security act to a person who is eligible for services pursuant to § 36-2901, paragraph 4, subdivision (a) or § 36-2931, paragraph 5, Arizona Revised Statutes, if the person elects coverage of these services through an Arizona health care cost containment system provider or program contractor.

"Sec. 20. Conditional enactment"

"B. Sections 10, 18 and 19 of this act will not become effective unless the United States department of health and human services grants the appropriate waivers that are necessary to implement the provisions of this act."

Laws 1995, Ch. 16, §§ 2 and 3, providing for a tobacco tax appropriation and delayed repeal of the provision, were repealed by Laws 1995, Ch. 275, § 15.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0075

AZ ST § 36-2901                                                                    Page 5
A.R.S. § 36-2901

Laws 1995, 3rd S.S., Ch. 1, §§ 5 and 7, effective October 17, 1995, provide:

"Sec. 5. Retaining transplant status; contract contribution; exemption from rules

"A. If, during a redetermination process for eligibility in the Arizona health care cost containment system, an individual who is eligible for a medically necessary and appropriate transplant as determined by the Arizona health care cost containment system as authorized pursuant to § 36-2907, subsection A, paragraph 11, Arizona Revised Statutes, is determined ineligible for coverage due to excess income pursuant to § 36-2901, paragraph 4, subdivisions (a), (b), (c) or (h), Arizona Revised Statutes, and such individual has not yet received the transplant, the individual shall have an opportunity to enter into a contract with a hospital to pay the amount of excess income. For purposes of this section, the excess income shall be calculated by the Arizona health care cost containment system based on the total spend down requirement for the household divided by the number of individuals in the household. The excess income shall be recalculated pursuant to this section at the time the transplant becomes available. If the hospital enters into the contractual agreement with the individual, the hospital shall allow the person to retain the person's transplant candidacy status as long as the individual is medically eligible but the individual will not be eligible for Arizona health care cost containment system covered services unless determined eligible pursuant to subsection B of this section.

"B. Once a transplant is performed the individual shall apply for eligibility pursuant to § 36-2901, subdivisions (a), (b), (c) or (h), Arizona Revised Statutes, and, if a spend down of excess income is necessary in order to be eligible for the Arizona health care cost containment system, it shall be calculated pursuant to the process specified in subsection A of this section. If the transplant is performed within thirty days prior to the date of the eligibility determination by the county pursuant to this section, the Arizona health care cost containment system shall pay the hospital on a retroactive basis at the contracted rate for costs of the transplantation surgery, including up to one hundred days of post-transplantation care. The amount of excess income that the individual has agreed to pay the hospital shall be deducted by the Arizona health care cost containment system before payment is made to the hospital for transplant services pursuant to this section. The Arizona health care cost containment system shall not be responsible for paying any spend down amount if the individual fails to pay the hospital. A copy of the individual's contractual agreement with the hospital shall be submitted by the contracting hospital to the county determining eligibility.

"C. Eligibility pursuant to this section shall be only funded pursuant to § 6 of this act.

"D. Nothing in this section prohibits an individual from applying for eligibility pursuant to any other applicable provision of law.

"E. A person who was eligible for services pursuant to § 36-2901, paragraph 4, subdivision (a), (b), (c) or (h), Arizona Revised Statutes, and who was eligible for a medically necessary and appropriate transplant as determined by the Arizona health care cost containment system as authorized pursuant to § 36-2907, subsection A, paragraph 11, Arizona Revised Statutes, and whose eligibility ended from March 22, 1995 through the effective date of this act because of excess income before receiving a transplant is eligible to retain transplant candidate status pursuant to this section.

"F. Notwithstanding any other law, the Arizona health care cost containment system administration is exempt from title 41, chapter 6, Arizona Revised Statutes, for the purposes of implementing this section. Within one hundred twenty days after the effective date of this section, the director of the Arizona health care cost containment system

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0076

AZ ST § 36-2901                                  Page 6
A.R.S. § 36-2901

shall provide an opportunity for public comment on any filed rules.

"G. The counties are not liable for the provision of or payment for transplant services provided under this section, except that county health plans under contract with the Arizona health care cost containment system remain liable for all service or payment requirements stipulated in their Arizona health care cost containment system contracts. The counties remain responsible for making timely eligibility determinations pursuant to this section."

"Sec. 7. Joint legislative oversight committee on the tobacco and health care fund; additional duties

"In addition to the duties required of the joint legislative oversight committee on the tobacco tax and health care fund, the committee shall:

"1. Evaluate the need for and determine the fiscal impact of covering medically necessary transplants and immunosuppressant medications for persons defined as eligible pursuant to § 36-2901, Arizona Revised Statutes.

"2. Review policies in other states regarding medically necessary transplants and determine how such transplants are funded.

"3. Review transplant coverage services offered in major medical plans by the private sector.

"4. Review and make recommendation concerning proposals for modifications to the eligibility standards for transplant recipients.

"5. Provide proposals on how to educate the public on the need for organ donations.

"6. Develop a written report containing its findings and recommendations and submit the report to the governor, the president of the senate and the speaker of the house of representatives on or before December 31, 1995.

Laws 1995, 3rd S.S., Ch. 1, § 8, as amended by Laws 1997, Ch. 256, § 23, provides:

Sec. 8. Repeal

A. Sections 4, 5 and 6 of this act are repealed from and after September 30, 1999.

B. Section 7 of this act is repealed from and after December 31, 1995.

C. Nothing in the repeal of §§ 4 and 5 of this act affects a person's eligibility rights obtained before October 1, 1999.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0077

AZ ST § 36-2901
A.R.S. § 36-2901

Laws 1997, Ch. 300, §§ 74, 75, provides:

"Sec. 74. Department of economic security; AHCCCS; rule making

"A. For the purposes of developing or revising rules to implement the requirements of this act, the department of economic security and the Arizona health care cost containment system administration are exempt from title 41, chapter 6, Arizona Revised Statutes.

"B. On or before December 31, 1997, the department of economic security and the Arizona health care cost containment system administration shall institute the formal rule making process required by title 41, chapter 6, Arizona Revised Statutes, for developing or revising rules to implement the requirements of this act, including rules developed or revised pursuant to subsection A of this section.

"Sec. 75. Notification of federal agencies; waivers

"The director of the department of economic security and the director of the Arizona health care cost containment system administration shall apply by July 31, 1997 to the United States department of health and human services and the United States department of agriculture for the approval and waivers necessary to implement this act. Each director shall report to the president of the senate and the speaker of the house of representatives every forty-five days after initial contact with the federal agencies to provide updates on communications with the federal agencies."

1994 Reviser's Note:

Prior to the 1997 amendment, this section contained the amendments made by Laws 1994, Ch. 189, sec. 7 and Ch. 322, sec. 2 that were blended together pursuant to authority of § 41-1304.03.

1993 Main Volume

Laws 1984, Ch. 372, §§ 40 and 43, effective May 5, 1984, provide:

"Sec. 40. Applicability of act for eligibility

"Any person who seeks to qualify for the Arizona health care cost containment system pursuant to § 36-2901, paragraph 4, subdivision (a) or (c), Arizona Revised Statutes, as amended by § 8 of this act, and who has not been determined eligible for the system or is not a member on the effective date of this section shall qualify for the system pursuant to § 11-297, Arizona Revised Statutes, as amended by § 5 of this act, or § 36-2905, Arizona Revised Statutes, as amended by § 13 of this act, regardless of whether the person was previously determined eligible for the system or whether he was previously a member of the system.

"Sec. 43. Residency requirements; study

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0078

AZ ST § 36-2901                                                            Page 8
A.R.S. § 36-2901

"The director of the Arizona health care cost containment system administration shall conduct a study, and report to the Governor, the president of the senate and the speaker of the house of representatives no later than December 31, 1984, on the effect of the residency requirements, as amended by this act, on the enrollment levels in the Arizona health care cost containment system program."

For legislative purpose and findings provisions of Laws 1984, Ch. 372, see Historical and Statutory Notes following § 11-291.

Laws 1989, Ch. 302, § 57, providing for establishment of a joint legislative committee on transplants, was repealed effective May 1, 1989, by § 58 of that act.

Laws 1990, Ch. 333, § 46, provides:

"Sec. 46. Delayed effective date

"Section 36-2901, Arizona Revised Statutes, as amended by this act, is effective from and after September 30, 1990."

The 1990 amendment of this section by Ch. 333 explicitly amended the 1990 amendment of this section by Ch. 27.

Laws 1991, Ch. 213, § 20, effective June 10, 1991, providing for a study and report of recommendations on the eligibility process, was repealed by Laws 1992, Ch. 70, § 2, subsec. H., effective October 1, 1993.

For eligibility determination of children receiving children's rehabilitative or behavioral health services provision of Laws 1991, Ch. 213, see Historical and Statutory Notes following § 36-261.

Laws 1992, Ch. 301, § 63, eff. July 10, 1992, provides:

"Sec. 63. Arizona health care cost containment system administration; professional services; audit

"A. The auditor general shall conduct a fiscal audit of the Arizona health care cost containment system administration to determine the cost effectiveness of the system administration's policy to contract for professional services outside of that agency.

"B. The auditor general shall submit the written audit to the governor, the president of the senate and the speaker of the house of representatives on or before March 1, 1993."

Laws 1993, 2nd S.S., Ch. 6, §§ 39 and 41, provide:

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0079

308

AZ ST § 36-2901                                                                 Page 9
A.R.S. § 36-2901

"Sec. 39. Revised hospital reimbursement schedule; MN/MI; applicability

"A. In addition to the adjustments in the rates as prescribed in §§ 27, 28 and 29 of this act, the director of the Arizona health care cost containment system for fiscal years 1993-1994 and 1994-1995 shall revise the per cent of the rate that is paid by the Arizona health care cost containment system administration to non-county operated hospitals for inpatient hospital and outpatient hospital services for members eligible under § 36-2901, paragraph 4, subdivisions (a), (c), (h) and (j), Arizona Revised Statutes, that based on past payment history would result in a reduction in reimbursements totalling approximately $10,000,000 each fiscal year.

"B. For fiscal years 1993-1994 and 1994-1995, the director of the Arizona health care cost containment system administration shall report the reductions required by this section monthly to the chairmen of the house and senate appropriations committees and to the staff of the joint legislative budget committee."

"Sec. 41. Delayed repeal

"Section 39 of this act is repealed from and after June 30, 1995."

Reviser's Notes:

1981 Note. Pursuant to authority of § 41-1304.02, the paragraphs in the section were alphabetized.

1984 Note. Pursuant to authority of § 41-1304.02, the words "or a city, town or school district of this state" following the second "state" in paragraph 4, subdivision (d) were deleted as the correction of a manifest clerical error.

1989 Note. Pursuant to authority of § 41-1304.02, the spelling of "poverty" was corrected in paragraph 4, subdivision (b), item (iii).

CROSS REFERENCES

Arizona works program, eligibility, see § 46-342.

Children's rehabilitative services, eligibility, see § 36-263.

County preadmission screening, see § 11-293.

Disclosure of confidential information, see § 41-1959.

Dual eligible,
Defined, see § 36-2971.
Qualifications for coverage, see § 36-2974.

Health care cost containment system, reduction of payments to meet costs, see § 11-292.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0080

AZ ST § 36-2901                                                                      Page 10
A.R.S. § 36-2901

Hospital treatment, indigents, see § 11-297.

Long-term care system,
Eligibility, transfer of records, see § 36-2947.
Estate recovery program, see § 36-2935.

### ADMINISTRATIVE CODE REFERENCES

Discrimination prohibition, see A.A.C. R9-22-513.

Eligibility and enrollment, see A.A.C. R9-22-301 et seq.

Scope of covered services, see A.A.C. R9-22-201 et seq.

### LIBRARY REFERENCES

1993 Main Volume

Words and Phrases (Perm.Ed.)

### UNITED STATES SUPREME COURT

Abortions. Medicaid assistance, see Beal v. Doe, 1977, 97 S.Ct. 2366, 432 U.S. 438, 53 L.Ed.2d 464; Poelker v.
Doe, 1977, 97 S.Ct. 2391, 432 U.S. 519, 53 L.Ed.2d 528, on remand 558 F.2d 1346, rehearing denied 98 S.Ct.
241, 434 U.S. 880, 54 L.Ed.2d 163.

### NOTES OF DECISIONS

Antitrust exemption 1
Authorized representative 4
Contractor 5
Eligible person 3
Employees of state business 2
1. Antitrust exemption

As to vertical combinations among health providers of different services and horizontal combinations among
health providers of the same service, analysis as to whether a particular combination is covered by the antitrust
exemption established in the Arizona Health Care Cost Containment System Act, § 36- 2901 et seq., does not hinge
on the use of such terms but will be the same regardless of whether the entities constituting a consortium are
providers of the same or of different services. Op.Atty.Gen. No. I82-061.

Arizona Health Care Cost Containment System Act, § 36-2901 et seq., does not totally regulate all aspects of the
health care industry but is directed to specific areas in which bids will be made; consortiums which fall outside the
scope of these areas will be subject to both state and federal antitrust prosecutions. Op.Atty.Gen. No. I82-061.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0081

310

AZ ST § 36-2901
A.R.S. § 36-2901

### 2. Employees of state business

Arizona Health Care Cost Containment System, a state agency empowered to contract with private health care providers for delivery of medical services to AHCCCS "members," is authorized to contract with providers for the delivery of health care services to people working for businesses which employ 25 or less persons, so long as such persons are "employee[s] of a business within this state." Op.Atty.Gen. No. I86-113.

### 3. Eligible person

Although class of persons, who sought classification as medically indigent or medically needy individuals for purposes of state medically indigent/medically needy program should have exhausted administrative remedies before bringing civil rights action against director of program, failed to exhaust administrative remedies, failure did not preclude action; enforcement of exhaustion doctrine might have resulted in irreparable harm to members of class. Zeigler v. Kirschner (App. 1989) 162 Ariz. 77, 781 P.2d 54.

### 4. Authorized representative

Health care plans were agents of Arizona Health Care Cost Containment System (AHCCCS) Administration, for purposes of gathering and transmitting data to determine whether medical center qualified as disproportionate share hospital entitled to payments for serving disproportionate share of low-income patients, and thus, plans' receipt of required data from medical center constituted receipt by Administration; although standard contract between plans and AHCCCS provided that plans were independent contractors, plans served only as transmittal agents of data in this regard. Southeast Arizona Medical Center v. Arizona Health Care Cost Containment System Admin. (App. Div.1 1996) 188 Ariz. 276, 935 P.2d 854, reconsideration denied, review denied.

Statutory fee exemption for Arizona Health Care Cost Containment System (AHCCCS) for recording liens regarding recovery of health care costs extended to independent contractor collection companies hired by AHCCCS director; independent contractors were "authorized representative[s]" under statute, and those representatives were part of "the system" as defined by statute. Arizona Health Care Cost Containment System v. Cochise County (App. Div.1 1996) 186 Ariz. 210, 920 P.2d 776.

### 5. Contractor

Arizona Health Care Cost Containment System Administration (AHCCCS) was not a "contractor" providing medical services to AHCCCS-eligible individuals and thus was not responsible for arranging patient's transfer to Indian Health Service (IHS) facility on reservation and did not have to reimburse private hospital for services during period when transfer was being arranged, notwithstanding its alleged statement to hospital that patient was enrolled in "AHCCCS/IHS" plan; under AHCCCS regulations, Native Americans could enroll with contractor like other eligible individuals or, alternatively, could opt to have health services provided through IHS, which thus performed analogous function even though it did not enter into contract with AHCCCS and thus did not meet technical definition of "contractor." Carondelet Health Services v. Arizona Health Care Cost Containment System Admin. (App. Div.1 1996) 187 Ariz. 467, 930 P.2d 544.

A. R. S. § 36-2901

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0082

AZ ST § 36-2901
A.R.S. § 36-2901

AZ ST § 36-2901

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0083



P - 8

313

ARIZONA REVISED STATUTES ANNOTATED
TITLE 36. PUBLIC HEALTH AND SAFETY
CHAPTER 29. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION
ARTICLE 1. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

Copyright © 1997 West Group. All rights reserved.

§ 36-2905. Medically needy; qualifications for coverage; eligibility exception; definition; eligibility applications; application processing

A. Any person who is a resident of this state may qualify for state assisted care for the medically needy under this article by demonstrating compliance with this section, except that a person who is an inmate of a public institution is not eligible for care under this section or § 11-297. Any person who is a qualified medicare beneficiary pursuant to article 3 of this chapter [FN1] or who refuses to cooperate with the eligibility process prescribed in subsection G of this section, § 11-297, subsection I or § 36- 2905.03, subsection C is not eligible under this chapter. For purposes of this subsection, "public institution" means an institution that is the responsibility of a governmental unit or over which a governmental unit exercises administrative control. The director may adopt rules that further define who is considered to be an inmate of a public institution.

B. "Medically needy resident" means any person who:

1. Has an annual income of more than two thousand five hundred dollars but not more than three thousand two hundred dollars for one individual.

2. Has an annual income of at least three thousand three hundred thirty-three dollars but not more than four thousand two hundred sixty-six dollars, if living with a dependent member of the family household or if married and living with a spouse.

3. Has an annual income of at least the minimum amount as prescribed in paragraph 1 or 2 of this subsection, whichever is applicable, plus at least four hundred twenty-five dollars of additional annual income for each additional dependent member of the family household but not more than the maximum annual income provided in paragraph 1 or 2 of this subsection, whichever is applicable, plus five hundred forty-four dollars of additional annual income for each additional dependent member of the family household other than a spouse.

4. Has a household in which the net worth of resources of all persons does not exceed fifty thousand dollars, including but not limited to equity in a house or car, with no more than five thousand dollars cash or other liquid assets. In determining eligibility, medical expenses incurred by the applicant shall not be used to reduce the value of the net worth of resources of all persons in the household. For an individual applicant who is married, any separate property of the applicant's spouse that does not exceed seventy-five thousand dollars shall not be included in determining the net worth of resources of the applicant.

5. Has not, within three years prior to filing an application for eligibility for the system, transferred or assigned real or personal property with intent to render himself eligible for the system. Annual income shall be calculated by multiplying by four the applicant's income for the three months immediately prior to the application for eligibility for the system.

6. Except as provided in subsection j of this section or emergency care required by § 36-2905.05, Meets one of the following requirements for citizenship or alien status:

(a) Is a citizen of the United States.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0084

AZ ST § 36-2905                                                          Page 2
A.R.S. § 36-2905

(b) Is a qualified alien who entered the United States on or before August 21, 1996 as prescribed in § 36-2903.03.

(c) Is a qualified alien who entered the United States on or after August 22, 1996 and is a member of an exception group as prescribed in § 36-2903.03.

C. For the purposes of subsection B of this section, each applicant shall provide:

1. Documentation of United States citizenship or qualified alien status as prescribed in § 36-2903.03, and documentation of county residency, as determined by the director of the Arizona health care cost containment system administration pursuant to § 36-2903.01, subsection§D.

2. A statement of the amount of personal and real property in which the applicant has an interest, a statement of all income which the applicant received during the three months immediately prior to the application, and a statement of any personal and real property assigned or transferred by the applicant within the three years immediately prior to filing the application for eligibility for the system and any further information determined through rules by the director.

D. A county board of supervisors may by resolution adopt a definition of medically needy which includes persons or family households not defined as medically needy pursuant to subsection B of this section, except that such additional persons are not eligible for state funded hospitalization and medical care provided by the system.

E. Each person desiring to be classified as medically needy pursuant to subsection B of this section shall apply for certification by the county of residence of the applicant pursuant to rules adopted by the director. The county shall make the final determination regarding eligibility within thirty days of the date of application or a longer period of time as provided in subsection J of this section or as may be prescribed by rule, and upon such determination by the county that the applicant is eligible for hospitalization and medical care from the system, the county shall issue a written evidence of certification, copies of which shall be provided to the applicant and to the administration. If the county fails to complete an eligibility determination within the time period prescribed by the director, the county is liable to a provider or nonprovider for expenses incurred or paid or shall reimburse the applicant for claims paid by the applicant, or both, as appropriate. The county is only liable for health and medical services prescribed in § 36-2907 and from the latest date that the person should have been determined eligible as established by the director in rules until the date the county complies with the notice of eligibility provisions prescribed by the director. This subsection does not limit a county's responsibility for the provision of services for indigent persons as otherwise required by title 11, chapter 2, article 7. [FN2] Any applicant aggrieved by a determination made by a county eligibility worker or a special eligibility officer regarding eligibility for the system may appeal the determination directly to the director as provided in § 36-2903.01, subsection B, paragraph 4. If an eligibility determination is appealed, the county shall send the prehearing summary, a copy of the case file and the completed request for hearing form to the administration's division of grievance and appeals within a reasonable time limitation established by the director by rule. If the county fails to comply with the time limitation the county is liable to the administration, a provider or a nonprovider for expenses incurred or paid or shall reimburse the applicant for claims paid by the applicant as appropriate. The county is only liable for health and medical services prescribed in § 36-2907 and from the date the county should have sent the prehearing summary, a copy of the case file and the completed request for hearing form to the administration through the date in which the county sends the documentation. Each county shall:

1. Deduct from the calculation of income medical expenses incurred by each applicant for which the applicant is responsible for payment and which are not subject to any applicable third party payments for the twelve months immediately prior to determination of eligibility for classification as a medically needy person under this section. Medical expenses incurred do not include the cost of services provided by a county free of charge or on a subsidized basis.

2. In accordance with rules adopted by the director, periodically review the eligibility of each person classified pursuant to this section for medically needy status and notify the administrator of the results of such reviews.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0085

AZ ST § 36-2905
A.R.S. § 36-2905

F. If a person who is potentially eligible as medically needy pursuant to subsection B of this section is currently receiving hospitalization or medical care or notifies the county that she is pregnant, the county shall complete the eligibility determination of the person on a priority basis and shall notify the administration if the person is determined eligible for the system. Notifications shall conform to rules adopted by the director. The director shall adopt rules specifying procedures for processing the priority applications of pregnant women.

G. A person who is applying for eligibility pursuant to § 36-2901, paragraph 4, subdivision (c) and who is potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), as identified by the counties, shall concurrently apply for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii). The county shall assist the person in completing the application for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii) and shall submit the completed application and all required documentation pertinent to the determination to the department of economic security which shall determine the applicant's eligibility. The county may certify or recertify the person as medically needy pursuant to this section, pending a final determination by the department of economic security, if the department of economic security does not make an eligibility determination within ten working days from the date of submittal of a complete application by the county. If the person is hospitalized at the time of application, the county may certify the person as medically needy pursuant to this section, pending an eligibility determination by the department of economic security. A person who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), or who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (i), (ii) or (iv) or § 36-2934, subsection A, paragraph 2, 3 or 4 because that person meets the financial eligibility requirements of the state plan approved under title IV of the social security act [FN3] but who does not receive cash payment under the aid to families with dependent children state plan together with that person's income and resources, shall continue to be counted as part of the household in determining whether the remainder of the household members are eligible as medically needy pursuant to this section. Applicants who refuse to cooperate in the eligibility determination process pursuant to this subsection are not eligible pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county shall maintain in its own applicant files copies of the completed application and all other documents submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The county shall be subject to sanctions in accordance with §§ 36-2905.01 and 36-2905.02. If the administration ascertains that a person certified as medically needy by the county was in fact eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), the county shall reimburse the system for expenses improperly incurred by the system in providing hospitalization and medical care as prescribed in § 36- 2905.02. The administration and the department of economic security may share all applicant related information pertaining to this eligibility process with the counties. The counties shall receive federal monies that are made available for the administrative costs associated with completing the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii).

H. For the purposes of determining eligibility pursuant to this section, the county shall not include as income money that an applicant or the applicant's household receives as a result of a settlement agreement or a judgment in a lawsuit brought against a manufacturer or distributor of agent orange.

I. Except for persons applying under subsection G of this section, all persons who are hospitalized and who are applying for eligibility or who are recertified pursuant to § 36-2901, paragraph 4, subdivision (c) and who are potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b) as identified by the counties through the use of a screening tool developed by the department of economic security shall apply for eligibility pursuant to § 36- 2901, paragraph 4, subdivision (b) and shall submit the application and copies of all verification documents contained in the case file at the time of submission to the department of economic security no later than three working days from the date the county completes the application process pursuant to this subsection. The hospitalized person may be certified eligible pursuant to this subsection only until the end of the second month following the month of certification. If the department of economic security does not make an eligibility determination within this period of time, the county may certify or recertify the person as medically needy pursuant to this section, pending a final determination by the department of economic security. If a hospitalized person is

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0086

316

AZ ST § 36-2905                                                                    Page 4
A.R.S. § 36-2905

determined ineligible pursuant to § 36-2901, paragraph 4, subdivision (b), the county shall extend the person's eligibility as medically needy pursuant to this subsection for the remainder of the six month eligibility period. Following the six month eligibility period, an eligibility redetermination may be made. Applicants who refuse to cooperate in the eligibility determination process pursuant to this subsection are not eligible pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county shall maintain in its own applicant files copies of the application submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The counties shall receive federal monies that are made available for the administrative costs associated with making the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision§(b).

J. Notwithstanding any other provision of law, beginning July 1, 1996, persons who are eligible to receive services pursuant to this section and who are also eligible for medicare coverage in a health care services organization shall not be determined or redetermined eligible for services pursuant to this section. The administration by rule shall establish a process for a finding of undue hardship for persons who are otherwise eligible to receive services pursuant to § 11-297 or 36-2905. [FN4] If the administration determines that an undue hardship exists and the person meets the requirements of subsection k of this section, the administration may reimburse the person for the cost of the monthly part b medicare premium and the cost of the monthly premium assessed by a medicare health maintenance organization if there is only one medicare health organization available in the county of residence. This subsection does not apply to eligible persons or members who have received a transplant.

K. The administration shall not pay a medicare part b premium or a monthly premium assessed by a medicare health maintenance organization unless a person is ineligible for qualified medicare beneficiary or quasi-qualified medicare beneficiary eligibility pursuant to § 36-2971.

CREDIT(S)

1993 Main Volume

Added by Laws 1983, Ch. 304, § 8. Amended by Laws 1984, Ch. 372, § 13, eff. May 5, 1984; Laws 1985, Ch. 316, § 12, eff. May 10, 1985; Laws 1986, Ch. 380, § 7, eff. Aug. 13, 1986 and § 8, eff. Oct. 1, 1986; Laws 1987, Ch. 332, § 18; Laws 1988, Ch. 3, § 4, eff. Feb. 16, 1988; Laws 1988, Ch. 302, § 21; Laws 1989, Ch. 5, § 6, eff. April 3, 1989; Laws 1989, Ch. 293, § 13, eff. Sept. 15, 1989, retroactively effective to July 1, 1989; Laws 1990, Ch. 118, § 2; Laws 1992, Ch. 287, § 5; Laws 1993, 2nd S.S., Ch. 6, § 10.

1997 Electronic Pocket Part Update

Amended by Laws 1996, Ch. 288, § 5; Laws 1997, Ch. 256, § 3; Laws 1997, Ch. 300, § 19.

[FN1] Section 36-2971.

[FN2] Section 11-291.

[FN3] 42 U.S.C.A. § 601 et seq.

[FN4] So in original. Section "36-2905" should have read "this section".

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0087

317

AZ ST § 36-2905                                                                                          Page 5
A.R.S. § 36-2905

### HISTORICAL AND STATUTORY NOTES

1997 Electronic Pocket Part Update

Laws 1994, Ch. 233, §§ 1, 2, 4 and 5, provide:

"**Section 1. Joint pilot demonstration program**

"The department of economic security and the Arizona health care cost containment system shall establish, for three years, a joint pilot demonstration program that extends child care and Arizona health care cost containment system benefits from twelve months to a total of twenty-four months for current and former recipients of aid to families with dependent children who are enrolled in an accredited school, equivalency certificate or job skills program or who are employed or enrolled in the jobs opportunities and basic skills training program pursuant to § 41-2026 and meet federal requirements for such transitional benefits as defined in the family support act of 1988 (P.L. 100-485, 42 United States Code section 607).

"**Sec. 2. Report**

"The department of economic security and the Arizona health care cost containment system shall jointly evaluate the demonstration program to determine its effects on participants' utilization of services, employment and economic sufficiency, welfare dependency and recidivism. The directors of the department of economic security and the Arizona health care cost containment system administration shall submit a joint interim report of the evaluation findings and program outcomes within eighteen months after the start of the program, and a final report within nine months after the end of the program to the governor, the president of the senate and the speaker of the house of representatives."

"**Sec. 4. Conditional enactment; application for waiver**

"A. Sections 1, 2 and 3 of this act do not become effective unless the United States department of health and human services grants the appropriate waivers that are necessary to implement the provisions of this act by January 1, 1995.

"B. The director of the department of economic security and the director of the Arizona health care cost containment system administration shall apply to the United States department of health and human services for the appropriate waivers no later than August 1, 1994.

"C. The director of the department of economic security and the director of the Arizona health care cost containment system administration shall implement the provisions of this act within one hundred and eighty days of the receipt of federal approval of the waiver proposals, but no earlier than July 1, 1995.

"**Sec. 5. Delayed repeal**

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0088

AZ ST § 36-2905                                                                     Page 6
A.R.S. § 36-2905

"If the federal government grants the waivers necessary to implement this act, §§ 1 and 2 of this act expire from and after March 31, 1999."

Laws 1996, 5th S.S., Ch. 5, § 6, provides:

"Sec. 6. Medicare coverage; fiscal year 1996-1997 ineligibility for AHCCCS; rules

"A. Notwithstanding any other provision of law, beginning on July 1, 1996, persons who are otherwise deemed eligible to receive services from the Arizona health care cost containment system under § 36-2905, Arizona Revised Statutes, or who are defined as medically indigent under § 11-297, Arizona Revised Statutes, and who are also eligible for medicare coverage in a health maintenance organization shall not be determined or redetermined eligible for services pursuant to § 11-297 or 36-2905, Arizona Revised Statutes, for state fiscal year 1996-1997.

"B. The Arizona health care cost containment system administration may purchase part B medicare coverage for those persons who would otherwise be eligible for medicare coverage in a health maintenance organization and who would have been eligible to receive services from the Arizona health care cost containment system under § 36-2905, Arizona Revised Statutes, or defined as medically indigent under § 11-297, Arizona Revised Statutes.

"C. The Arizona health care cost containment system administration shall adopt rules that are necessary to comply with this section, and these rules are exempt from the rule making requirements of title 41, chapter 6, Arizona Revised Statutes, for the purpose of implementing the requirements of this section."

Reviser's Notes:

1996 Note. Pursuant to authority of § 41-1304.02, in the section heading "definition" was substituted for "definitions" and in subsection A, first sentence the words "subsection J of this section" and "or" were transposed in that order to follow "except for".

1997 Note. This section contains the amendments made by Laws 1997, Ch. 256, sec. 3 and Ch. 300, sec. 19 that were blended together as shown above pursuant to authority of § 41-1304.03.

1993 Main Volume

For legislative purpose and findings provisions of Laws 1984, Ch. 372, see Historical and Statutory Notes following § 11-291.

For applicability of act for eligibility provisions of Laws 1984, Ch. 372, see Historical and Statutory Notes following § 36-2901.

The 1988 amendment of this section by Ch. 302 explicitly amended the 1988 amendment of this section by Ch. 3.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0089

AZ ST § 36-2905                                                          Page 7
A.R.S. § 36-2905

The 1989 amendment of this section by Ch. 293 explicitly amended the 1989 amendment of this section by Ch. 5.

Former § 36-2905, derived from Laws 1981, 4th S.S. Ch. 1, § 11 and Laws 1982, Ch. 314, § 4, defining "medically needy", "equity", and "net income", and otherwise relating to qualifications for coverage, was repealed by Laws 1983, Ch. 304, § 7.

Reviser's Notes:

1983 Note. Pursuant to authority of § 41-1304.02, in the heading of this section "; definition" was added.

1987 Note. Pursuant to authority of § 41-1304.02, in the section heading "; eligibility exception" was added following "coverage".

## CROSS REFERENCES

Qualified medicare beneficiary only, eligibility determination and termination, see § 36-2973.

## ADMINISTRATIVE CODE REFERENCES

Eligibility and enrollment, see A.A.C. R9-22-301 et seq.

## NOTES OF DECISIONS

Audits 3
Breach of contract 2
*Construction and application* 1
Eligible persons 4

1. Construction and application

Hospital's reliance on Arizona Health Care Cost Containment System Administration (AHCCCS) to effectuate transfer of Indian Health Service (IHS) enrollee to reservation facility was not justifiable, for purpose of hospital's claim that AHCCCS was estopped from denying payment while transfer was being arranged, as the only conduct supporting estoppel argument was alleged statement by AHCCCS employee that agency wanted "to work something out with" IHS facility, which did not mean that AHCCCS was assuming responsibility for or was trying to arrange transfer, where hospital employee involved in transfer testified that she had never known AHCCCS to effectuate transfer. Carondelet Health Services v. Arizona Health Care Cost Containment System Admin. (App. Div.1 1996) 187 Ariz. 467, 930 P.2d 544.

Native Americans are afforded equal benefits under Arizona Health Care Cost Containment System Administration (AHCCCS) and, thus, not requiring AHCCCS to provide normal contractor services to Native Americans does not violate equal protection; like other categorically eligible individuals, eligible Native

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0090

AZ ST § 36-2905                                                         Page 8
A.R.S. § 36-2905

Americans may enroll with any contractor in their geographic area and are entitled to same services that such contractors provide to all enrollees and, additionally, Native Americans may opt to enroll in Indian Health Service (IHS), which must provide same services as any other contractor. Carondelet Health Services v. Arizona Health Care Cost Containment System Admin. (App. Div.1 1996) 187 Ariz. 467, 930 P.2d 544.

Enabling legislation for the Arizona health care cost containment system provides that the program shall be available to persons who are full-time residents of the state, and the residency criteria of Opinion Attorney General I78-252 are physical presence in and intention to remain there indefinitely. Op.Atty.Gen. No. I82-074.

Federal law may limit the provision of services with federal funds to residents who are citizens or lawfully admitted aliens. Op.Atty.Gen. No. I82- 074.

## 2. Breach of contract

Hill-Burton Act's remedial provisions did not preempt state law breach of contract claims by persons who were being or would be denied uncompensated care to which they were allegedly entitled pursuant to agreement between federal government and medical center participating in Hill-Burton program. Flagstaff Medical Center, Inc. v. Sullivan, C.A.9 (Ariz.)1992, 962 F.2d 879, as amended.

## 3. Audits

Superior court, rather than Health Care Cost Containment System, was proper forum to resolve county's claim that audit performed by auditor general was void; director of system had no right to determine whether auditor conducted audit according to proper methodology and was merely required to notify county of amount of contribution as determined by audit. Cochise County v. Kirschner (App. Div.2 1992) 171 Ariz. 258, 830 P.2d 470.

## 4. Eligible persons

Patients allegedly eligible for uncompensated indigent care under the Hill- Burton Act from medical center which had entered into agreement with federal government to provide such care were entitled to recover, as "intended third party beneficiaries" under Arizona contract law, for medical center's alleged disregard of Hill-Burton obligations. Flagstaff Medical Center, Inc. v. Sullivan, C.A.9 (Ariz.)1992, 962 F.2d 879, as amended.

Arrestee en route to public institution for booking and incarceration was not disqualified from receiving medical treatment under the Arizona Heath Care Cost Containment System, which is state counterpart to federal medicaid program, as person who was inmate of public institution, which had been defined by rule to refer to persons incarcerated in correctional facilities. Cochise County v. Arizona Health Care Cost Containment System (App. 1991) 170 Ariz. 443, 825 P.2d 968.

A. R. S. § 36-2905

AZ ST § 36-2905

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0091

AZ ST § 36-2905
A.R.S. § 36-2905

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0092



P - 9

AZ ST § 36-2905.03                                                                                    Page 1
A.R.S. § 36-2905.03

ARIZONA REVISED STATUTES ANNOTATED
TITLE 36. PUBLIC HEALTH AND SAFETY
CHAPTER 29. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION
ARTICLE 1. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

Copyright © 1997 West Group. All rights reserved.

§ 36-2905.03. Child eligibility; definition; expanded child coverage

A. Except as otherwise provided in this section, a child who is under the age of fourteen years, and who has not been determined eligible for the system pursuant to § 36-2901, paragraph 4, subdivision (a), (b) or (c), may qualify for state assisted care as an eligible child under this article by demonstrating compliance with either subsection B or subsections C and D of this section.

B. Except as otherwise provided in this section, the director shall provide in rules that a child who is under the age of fourteen years, and who is a resident of this state shall qualify for the system by being a recipient of the federal food stamp program (P.L. 95-113; 91 Stat. 958-979). [FN1] A child who is qualified based solely on age to apply for eligibility as an eligible child pursuant to § 36-2901, paragraph 4, subdivision (b) shall first be determined eligible or ineligible pursuant to § 36-2901, paragraph 4, subdivision (b) before being determined or recertified eligible pursuant to this subsection. There is no retroactive eligibility under this subsection, including cases of successful appeals of denials of food stamp eligibility by the department of economic security. If the child is determined ineligible pursuant to § 36-2901, paragraph 4, subdivision (b), the department of economic security pursuant to § 36-2903.01, subsection B, paragraph 3 shall notify the administration which shall enroll the person pursuant to § 36-2904, subsection F. Health and medical expenses for a child who is determined eligible pursuant to this subsection shall be paid for by the system back to the date of food stamp eligibility notification. Persons who refuse to cooperate in the department of economic security's eligibility process in accordance with rules adopted by the director are not eligible for care pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination.

C. A child who is under the age of fourteen years and who is a resident of this state may qualify for state assisted care as an eligible child under this article by demonstrating compliance with this subsection and subsection E of this section and rules adopted by the director. In this section:

1. "Eligible child" means a person who:

(a) Is under the age of fourteen years.

(b) Has an annual income of all persons in the household in excess of the maximum allowable income for a medically needy household of that size pursuant to § 36-2905 but whose income does not exceed the federal poverty guidelines as published by the United States department of health and human services.

(c) Has a household in which the net worth of resources of all persons does not exceed fifty thousand dollars including but not limited to equity in a house or car, with no more than five thousand dollars cash or other liquid assets. In determining eligibility, medical expenses incurred by the applicant shall not be used to reduce the value of the net worth of resources of all persons in the household.

(d) Has not, within three years before filing an application for eligibility for the system, transferred or assigned real or personal property with intent to render a member of the household eligible for the system. Annual income shall be calculated by multiplying by four the child's household income for the three months immediately before the application for eligibility for the system.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0093

324

AZ ST § 36-2905.03                                                                    Page 2
A.R.S. § 36-2905.03

(e) Except for emergency care required by § 36-2905.05, meets one of the following requirements for citizenship or alien status:

(i) Is a citizen of the United States.

(ii) Is a qualified alien who entered the United States on or before August 21, 1996 as prescribed by § 36-2903.03.

(iii) Is a qualified alien who entered the United States on or after August 22, 1996 and is a member of an exception group as prescribed by § 36-2903.03.

2. Each applicant shall provide:

(a) Proof of age of the potentially eligible child.

(b) Documentation of United States citizenship or qualified alien status as prescribed in § 36-2903.03 and documentation of county residency, as determined by the director of the Arizona health care cost containment system administration pursuant to § 36-2903.01, subsection D.

(c) A statement of the amount of personal and real property in which the child's household members have an interest, a statement of all income which the household members received during the three months immediately before the application, a statement of any personal and real property assigned or transferred by the household members within the three years immediately before filing the application for eligibility for the system and any further information required by rules.

3. A person who is applying for eligibility pursuant to this subsection and who is potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), as identified by counties shall concurrently apply for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii). The county shall assist the person in completing the application for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii) and shall submit the completed application and all required documentation pertinent to the determination to the department of economic security which shall determine the applicant's eligibility. The county may certify or recertify the person as an eligible child pursuant to this subsection, pending a final determination by the department of economic security, if the department of economic security does not make an eligibility determination within ten working days from the date of submittal of a complete application by the county. If the person is hospitalized at the time of application, the county may certify the person as an eligible child pursuant to this subsection, pending an eligibility determination by the department of economic security. A person who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), or who is determined eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (i), (ii) or (iv) or § 36-2934, subsection A, paragraph 2, 3 or 4 because that person meets the financial eligibility requirements of the state plan approved under title IV of the social security act [FN2] but who does not receive cash payment under the aid to families with dependent children state plan together with that person's income and resources, shall continue to be counted as part of the household in determining whether the remainder of the household members are eligible pursuant to § 36-2901, paragraph 4, subdivisions (a) and (c) or pursuant to this subsection. Applicants who refuse to cooperate in the eligibility determination process pursuant to this paragraph are not eligible pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county shall maintain in its own applicant files copies of the completed application and all other documents submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The county shall be subject to sanctions in accordance with §§ 36-2905.01 and 36-2905.02. If the administration ascertains that a person who is certified as eligible pursuant to this subsection by the county was in fact eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii), the county shall reimburse the system for expenses improperly incurred by the system in providing hospitalization and medical care as prescribed in § 36-2905.02. The administration and the department of economic security may share all applicant related information pertaining to this eligibility process with the counties. The counties shall receive

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0094

AZ ST § 36-2905.03                                                                                       Page 3
A.R.S. § 36-2905.03

federal monies that are made available for the administrative costs associated with completing the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b), item (iii).

4. Beginning October 1, 1992, except for persons applying under paragraph 3 of this subsection, all persons who are hospitalized and who are applying for eligibility or who are recertified pursuant to § 36-2901, paragraph 4, subdivision (c) and who are potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b) as identified by the counties through the use of a screening tool developed by the department of economic security, shall apply for eligibility pursuant to § 36-2901, paragraph 4, subdivision (b) and shall submit the application and copies of all verification documents contained in the case file at the time of submission to the department of economic security no later than three working days from the date the county completes the application process pursuant to this subsection. The hospitalized person may be certified eligible pursuant to this subsection only until the end of the second month following the month of certification. If the department of economic security does not make an eligibility determination within this period of time, the county may certify or recertify the person as medically needy pursuant to this section, pending a final determination by the department of economic security. If a hospitalized person is determined ineligible pursuant to § 36-2901, paragraph 4, subdivision (b), the county shall . extend the person's eligibility as medically needy pursuant to this subsection for the remainder of the six month eligibility period. Following the six month eligibility period, an eligibility redetermination may be made. Applicants who refuse to cooperate in the eligibility determination process pursuant to this subsection are not eligible pursuant to this article. A form explaining loss of benefits due to refusal to cooperate shall be signed by the applicant. Refusal to cooperate shall not be construed to mean the applicant's inability to obtain documentation required for eligibility determination. The county shall maintain in its own applicant files copies of the application submitted to the department of economic security in accordance with this subsection. The copies in the county files are subject to quality control review by the administration. The counties shall receive federal monies that are made available for the administrative costs associated with making the applications for persons potentially eligible pursuant to § 36-2901, paragraph 4, subdivision (b).

**D.** Each person desiring to be classified as an eligible child pursuant to subsection C of this section shall apply for certification by the county of residence of the child pursuant to rules adopted by the director. An application for certification of an eligible child shall be filed by a person authorized by rules to apply on behalf of the eligible child. The county shall make the final determination regarding eligibility within thirty days of the date of application or a longer period of time as may be prescribed by rule and, on that determination by the county that the child is eligible for hospitalization and medical care from the system, the county shall issue a written evidence of certification, copies of which shall be provided to the applicant and to the administration. An applicant aggrieved by a determination made by a county eligibility worker or a special eligibility officer regarding eligibility for the system may appeal the determination directly to the director as provided in § 36-2903.01, subsection B, paragraph 4. Each county shall:

1. Deduct from the calculation of income medical expenses incurred by members of the household of the child for which the household members are responsible for payment and which are not subject to any applicable third party payments for the twelve months immediately before the determination of eligibility for classification as an eligible child under this subsection and subsection C of this section. Medical expenses incurred do not include the cost of services provided by a county free of charge or on a subsidized basis.

2. In accordance with rules adopted by the director, periodically review the eligibility of each person classified pursuant to this subsection and subsection C of this section for eligible child status and notify the administration of the results of such reviews.

**E.** If a person who is potentially eligible as an eligible child pursuant to subsection C of this section is currently receiving hospitalization or medical care, the county shall complete the eligibility determination of the person on a priority basis and shall notify the administration if the person is determined eligible for the system. Notifications shall conform to rules adopted by the director.

**F.** No county may require, as a condition of initiating or completing an application or an eligibility review for a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0095

326

AZ ST § 36-2905.03                                                                      Page 4
A.R.S. § 36-2905.03

potentially eligible child, that the child or a person authorized to apply on behalf of such child first apply for the federal food stamp program.

G. For the purposes of determining eligibility pursuant to subsection C of this section, the county shall not include as income money that an applicant or the applicant's household receives as a result of a settlement agreement or a judgment in a lawsuit brought against a manufacturer or distributor of agent orange.

CREDIT(S)

1993 Main Volume

Added by Laws 1986, Ch. 380, § 11, eff. Jan. 1, 1987. Amended by Laws 1987, Ch. 332, § 21; Laws 1988, Ch. 3, § 5, eff. Feb. 16, 1988; Laws 1988, Ch. 302, § 24; Laws 1989, Ch. 5, § 8, eff. April 3, 1989; Laws 1989, Ch. 293, § 14, eff. Sept. 15, 1989, retroactively effective to July 1, 1989; Laws 1990, Ch. 333, § 13; Laws 1991, Ch. 213, § 8, eff. June 10, 1991; Laws 1992, Ch. 287, § 6; Laws 1992, Ch. 302, § 5; Laws 1993, 2nd S.S., Ch. 6, § 13.

1997 Electronic Pocket Part Update

Amended by Laws 1997, Ch. 300, § 20.

[FN1] 7 U.S.C.A. § 2011 et seq.

[FN2] 42 U.S.C.A. § 1396 et seq.

HISTORICAL AND STATUTORY NOTES

1997 Electronic Pocket Part Update

1997 Reviser's Note:

Pursuant to authority of § 41-1304.02, in the section heading "; definition" was added after "eligibility".

1993 Main Volume

Laws 1986, Ch. 380, § 23, subsec. C provides:

"Sec. 23. Delayed effective dates

"C. Section 36-2905.03, Arizona Revised Statutes, as added by § 11 of this act, is effective from and after December 31, 1986."

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0096

AZ ST § 36-2905.03                                                                          Page 5
A.R.S. § 36-2905.03

The 1988 amendment of this section by Ch. 302 explicitly amended the 1988 amendment of this section by Ch. 3.

For eligibility study and report provisions of Laws 1988, Ch. 302, see Historical and Statutory Notes following §
36-2903.

The 1989 amendment of this section by Ch. 293 explicitly amended the 1989 amendment of this section by Ch. 5.

The 1990 amendment of this section by Ch. 333 explicitly amended the 1989 amendment of this section by Ch.
293.

Amendment of this section by Laws 1990, Ch. 118, § 3 was repealed by Laws 1990, Ch. 333, § 14.

Reviser's Notes:

1989 Notes. Pursuant to authority of § 41-1304.02, in subsec. B the spelling of "person's" was corrected.

Laws 1989, Ch. 5, § 8 amended this section by deleting the words "apply for eligibility" in the second sentence of
subsection C. However, this section as amended by Laws 1989, Ch. 293, § 14 retained this phrase. Pursuant to
authority of § 41-1304.02, this phrase was omitted as a correction of a manifest clerical error.

1992 Note. Prior to the 1993 amendment, this section contained the amendments made by Laws 1992, Ch. 287,
sec. 6 and Ch. 302, sec. 5 that were blended together pursuant to authority of § 41-1304.03. In the Laws 1992, Ch.
287 version in subsection D, third sentence after the third "county" "shall" was incorrectly shown as "all".
Pursuant to authority of § 41-1304.02, in order to correct a manifest clerical error "shall" is substituted in the blend
version.


CROSS REFERENCES

Arizona works program, eligibility, see § 46-342.

ADMINISTRATIVE CODE REFERENCES

Denial or discontinuance of eligibility, reasons, see A.A.C. R9-22-318.

Guaranteed enrollment for eligible assistance children, see A.A.C. R9-22-337.

Low income children, eligibility, see A.A.C. R9-22-306, R9-22-313.

UNITED STATES SUPREME COURT


Copr. © West 2002 No Claim to Orig. U.S. Govt. Works


BAN-0097

AZ ST § 36-2905.03　　　　　　　　　　　　　　　　　　　　　　　　Page 6
A.R.S. § 36-2905.03

AFDC eligibility, child's insurance benefits as child support, see Sullivan v. Stroop, 1990, 110 S.Ct. 2499, 496 U.S. 478, 110 L.Ed.2d 438.

A. R. S. § 36-2905.03

AZ ST § 36-2905.03

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

BAN-0098

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S APPENDIX PURSUANT TO LOCAL RULE 7(n)**

**Volume IV of V**
[AR 334 – AR 407]

Respectfully submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
 DC Bar No. 479524
Christopher L. Keough
 DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Notice of Administrator's Decision, dated July 16, 2007 | 1 |
| Administrator's Decision, dated July 13, 2007 | 2-21 |
| PRRB Decision No. 2007-D35, dated May 17, 2007 | 31-42 |
| Excerpts from Provider's Post Hearing Brief, dated May 17, 2004 | 61-71, 81-83 |
| Excerpts from Transcripts of Oral Hearing, held March 18, 2004 | 128-180 |
| Stipulations of the Parties | 192-93 |
| Provider's Exhibit P-1 | 223-24 |
| Excerpts from Provider's Exhibit P-2 | 225-29, 233-35 |
| Excerpts from Provider's Exhibit P-3 | 240-42 |
| Excerpts from Provider's Exhibit P-4 | 246-47 |
| Provider's Exhibit P-6 | 280-99 |
| Provider's Exhibit P-7 | 300-12 |
| Provider's Exhibit P-8 | 313-22 |
| Provider's Exhibit P-9 | 323-29 |
| Provider's Exhibit P-12 | 334-52 |
| Excerpts from Provider's Exhibit P-13 | 354-55, 364 |

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Provider's Exhibit P-14 | 379-81 |
| Provider's Exhibit P-15 | 382-84 |
| Provider's Exhibit P-17 | 388-91 |
| Provider's Exhibit P-18 | 392-94 |
| Provider's Exhibit P-19 | 395-96 |
| Provider's Exhibit P-20 | 397-99 |
| Provider's Exhibit P-21 | 400-07 |
| Provider's Exhibit P-28 | 448-54 |
| Provider's Exhibit P-29 | 455-56 |
| Excerpts from Intermediary's Exhibit I-12 | 732-33 |
| Excerpts from Intermediary's Exhibit I-14 | 745, 751-81* |
| Intermediary's Exhibit I-20 | 824-26 |
| Intermediary's Exhibit I-21 | 827-29 |

*The Administrative Record filed by the Secretary in this case did not include page 768.



P - 12

334

JUL.29.2002  3:21PM                                  NO.999  P.2

 **ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM**

NOV 1 3 1991

LEONARD J. KIRSCHNER, M.D., M.P.H.
Director

FIFE SYMINGTON
Governor

November 12, 1991

Mr. Lawrence McDonough
Associate Regional Administrator
Division of Medicaid
Region IX
75 Hawthorne Street
San Francisco, California 94105

Dear Mr. McDonough:

Enclosed is Arizona's State Plan Amendment Transmittal Number 91 - 25 which amends Attachment 4.19A, the state's payment plan for hospital services. This amendment adds to 4.19A an adjustment for disproportionate share payments to hospitals that qualify under either the mandatory criteria contained in Section 1923 of the Social Security Act or two optional categories established by the state.

As you are aware, at the present time the State of Arizona is waived from provisions mandating that it make a disproportionate share payment. This plan amendment is submitted in order to provide disproportionate share hospitals in Arizona a payment which reflects the services they provide to Title XIX and indigent patients. Once approved, this state plan amendment would be effective retroactively to October 1, 1991.

The estimated federal expenditures for the payment provisions contained in this submittal for Federal FY 1992 (10/01/91) are $89 million. We have developed our submittal based on state plan amendments which HCFA has approved. Please contact Fred Teitelbaum if you have any questions.

Sincerely,

Leonard Kirschner

Leonard J. Kirschner, M.D., M.P.H.
Director

cc:    Charline Franz, Office of the Governor
       Rosada Gonzalez, HCFA

LJK:FT:cmd
11-12-91

801 East Jefferson · Phoenix, Arizona 85034 · (602) 234-3655
P.O. Box 25520 · Phoenix, Arizona 85002

BAN-0101
335

JUL.29.2002 3:21PM    ☆ U.S. GOVERNMENT PRINTING OFFICE 1990-264-604 00029    NO.999    P.3

| DEPARTMENT OF HEALTH AND HUMAN SERVICES HEALTH CARE FINANCING ADMINISTRATION | | Form Approved OMB No. 0938-0193 |
|---|---|---|
| **TRANSMITTAL AND NOTICE OF APPROVAL OF STATE PLAN MATERIAL** FOR: HEALTH CARE FINANCING ADMINISTRATION | TRANSMITTAL NUMBER 91-25 | STATE Arizona |
| | PROGRAM IDENTIFICATION Title XIX of the Social Security Act | |
| TO:  REGIONAL ADMINISTRATOR HEALTH CARE FINANCING ADMINISTRATION DEPARTMENT OF HEALTH AND HUMAN SERVICES | PROPOSED EFFECTIVE DATE October 1, 1991 | |

TYPE OF PLAN MATERIAL (Check One)

☐ NEW STATE PLAN     ☒ AMENDMENT TO BE CONSIDERED AS NEW PLAN     ☐ AMENDMENT

COMPLETE NEXT 4 BLOCKS IF THIS IS AN AMENDMENT (Separate transmittal for each amendment)

FEDERAL REGULATION CITATION
Section 1923 (b) of the Social Security Act

| NUMBER OF THE PLAN SECTION OR ATTACHMENT | NUMBER OF THE SUPERSEDED PLAN SECTION OR ATTACHMENT |
|---|---|
| Supplement 1 to Attachment 4.19A | |

SUBJECT OF AMENDMENT

Disproportionate Share Payments

GOVERNOR'S REVIEW (Check One)

☐ GOVERNOR'S OFFICE REPORTED NO COMMENT     ☒ OTHER, AS SPECIFIED:  NA
☐ COMMENTS OF GOVERNOR'S OFFICE ENCLOSED
☐ NO REPLY RECEIVED WITHIN 45 DAYS OF SUBMITTAL

| SIGNATURE OF STATE AGENCY OFFICIAL *Leonard J Kirschner* | FOR REGIONAL OFFICE USE ONLY | |
|---|---|---|
| | DATE RECEIVED | DATE APPROVED |
| TYPED NAME: Leonard J. Kirschner, M.D., M. P. H. | PLAN APPROVED — ONE COPY ATTACHED | |
| | EFFECTIVE DATE OR APPROVED MATERIAL | |
| TITLE: Director | SIGNATURE OF REGIONAL OFFICIAL | |
| DATE: October 1, 1991 | TYPED NAME: | |
| RETURN TO: AHCCCS Administration 801 East Jefferson Street Phoenix, AZ  85034 Attention: PIR | TITLE: | |
| | REMARKS: | |

STATE PLAN AMENDMENTS

Supplement 1
To attachment 4.19A

Disproportionate Share Hospitals

I.      Criteria

For purposes of complying with Section 1923 of the Act, the Arizona Health Care Cost Containment System, the designated Single State Agency for the Title XIX Medical Assistance Program, will determine which hospitals can be deemed eligible for a disproportionate share payment adjustment using the two mandatory federal criteria set forth in 1.A. and 1.B. and two optional categories set forth in 2.A. and 2.B.

1.  Arizona defines disproportionate share hospitals as those hospitals meeting the following criteria consistent with federal law:

   A.   A medical assistance inpatient utilization rate at least one standard deviation above the mean medical assistance inpatient utilization rate for hospitals receiving medical assistance payments in the State; or

   B.   A low-income inpatient utilization rate exceeding 25 percent;

2.  Arizona also designates the following two optional groups of hospitals as disproportionate share:

   A.   A county or state owned and operated hospital whose low income percentage exceeds the arithmetic mean low income percentage by at least 250%.

   B.   A hospital which owns directly or controls as a related party an AHCCCS Health Plan and whose low income percentage is greater than the arithmetic mean low income percentage across hospitals, or is one of the top five providers of inpatient care for AHCCCS patients in the state.

3.  To qualify under 1 or 2, all hospitals must, as required by law, have at least two obstetricians with staff privileges at the hospital who have agreed to provide obstetric services to individuals entitled to such services under the Arizona Title XIX Program. This requirement does not apply to a hospital a) in which the inpatients are predominantly individuals under 18 years of age, or b) does not offer non-emergency obstetrical services as of 12/22/87.

II.     Definitions of Criteria

1.  Medical Assistance inpatient utilization rate means, for a hospital, a fraction (expressed as a percentage), the numerator of which is the hospital's number of inpatient days attributable to patients who (for such days) were eligible for the Title XIX Medical Assistance Program in a period, and the denominator of which is the total number of the hospital's inpatient days in that period. The period shall be the latest fiscal year for which cost report and state uniform accounting report data are available for all hospitals.

BAN-0103
337

2.  Low income utilization rate means, for a hospital, the sum of:

A.  the fraction (expressed as a percentage) the numerator of which is the sum (for a period) of the total medical assistance revenues paid the hospital for patient services, and the amount of the cash subsidies for patient services received directly from State and local governments, and the denominator of which is the total amount of revenues of the hospital for patient services (including the amount of such cash subsidies) in the period; and

B.  a fraction (expressed as a percentage) the numerator of which is the total amount of the hospital's charges for inpatient hospital services which are attributable to charity care in a period, and the denominator of which is the total amount of the hospital's charges for inpatient hospital services in the hospital in the period.

The numerator under subparagraph (B) shall not include contractual allowances and discounts.

III.  Payment Adjustment

1.  The State of Arizona shall make a disproportionate share payment to each qualifying facility in accordance with the following formula: Payments specified herein are in addition to those payments defined elsewhere in 4.19A. Beginning October 1, 1991, the State shall make payments each year to hospitals due in the first quarter. Once approved, this state plan amendment is effective retroactively to October 1, 1991.

A.  For hospitals that exceed the mean Title XIX inpatient utilization rate by more than one standard deviation unit, each hospital shall receive $25,000 plus $25,000 for each percentage that hospital's Title XIX utilization rate exceeds the mean plus one standard deviation. This method ensures payments are directly proportional to the percentage of Title XIX utilization above the one standard deviation threshold.

B.  For hospitals whose low income utilization rate exceed 25 percent, the payment(s) will equal $300,000 plus $100,000 for each percentage that hospital's low income utilization rate exceeds 25%. This method ensures payments are directly proportional to the percentage of low income utilization above 25%.

C.  For county and state owned and operated hospitals, Arizona shall define an indigent care pool (of $135 million) that will be funded through state general funds based on the combined amount of state subsidized care (other than for Title XIX eligibles), other publicly subsidized care, bad debt and charity care across all state and county owned and operated facilities. A minimum payment of $1 million shall be made to each qualifying hospital. The resulting sum shall be distributed among the qualifying facilities in the direct proportion that the low income utilization rate exceeds 25% except that in no case may a facility receive a disproportionate share payment which exceeds subsidized and uncompensated care provided by the facility. Subsidized care provided in psychiatric hospitals to individuals ages 21 to 64 is included under this provision.

D.  For hospitals which own or control Health Plans and whose low income percentage is greater than the arithmetic mean or are among the top five providers of inpatient care for AHCCCS patients in the state, the payment shall be one dollar plus 3% of the low income percentage of the hospitals net inpatient revenue.

IV.  Hospitals which qualify under more than one category shall be paid in accordance with the methodology which results in the greatest disproportionate share payments.

2

BAN-0104
338

JUL.29.2002  3:23PM                                    NO.999   P.7

# ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM

DEC 1 8 1991

FIFE SYMINGTON
Governor

LEONARD J. KIRSCHNER, M.D., M.P.H.
Director

December 29, 1991

Mr. Lawrence McDonough
Associate Regional Administrator
Division of Medicaid
Region IX
75 Hawthorne Street
San Francisco, California 94105

Dear Mr. McDonough:

Enclosed are replacement pages for Arizona's State Plan Amendment Transmittal Number 91 - 25 which was submitted to you for approval on November 12, 1991 and amended Attachment 4.19A, the state's payment plan for hospital services. That amendment adds to 4.19A an adjustment for disproportionate share payments to hospitals that qualify under either the mandatory criteria contained in Section 1923 of the Social Security Act or two optional categories established by the state.

The replacement pages include changes in disproportionate share groupings and clarifies the manner by which hospitals will be paid. The revised estimate of the federal share of disproportionate share payments is $83.8 million which is $5.2 million less than what had originally been estimated. Please contact Fred Teitelbaum if you have any questions.

Sincerely,

Leonard Kirschner

Leonard J. Kirschner, M.D., M.P.H.
Director


cc:    Rosada Gonzalez, HCFA


LJK:FT:cmd
12-18-91


801 East Jefferson · Phoenix, Arizona 85034 · (602) 294-8855
P.O. Box 25520 · Phoenix, Arizona 85002

BAN-0105

STATE PLAN AMENDMENTS

Supplement 1
To attachment 4.19A

Disproportionate Share Hospitals

I.    Criteria

For purposes of complying with Section 1923 of the Act, the Arizona Health Care Cost Containment System, the designated Single State Agency for the Title XIX Medical Assistance Program, will determine which hospitals can be deemed eligible for a disproportionate share payment adjustment using the two mandatory federal criteria set forth in 1.A. and 1.B. and two optional categories set forth in 2.A. and 2.B.

1.  Arizona defines disproportionate share hospitals as those hospitals meeting the following criteria consistent with federal law:

    A.  A medical assistance inpatient utilization rate at least one standard deviation above the mean medical assistance inpatient utilization rate for hospitals receiving medical assistance payments in the State; or

    B.  A low-income inpatient utilization rate exceeding 25 percent;

2.  Arizona also designates the following two optional groups of hospitals as disproportionate share:

    A.  County or state owned and operated hospitals.

    B.  A hospital in which the low income percentage is greater than the arithmetic mean low income percentage across hospitals, or that provides at least 1% of Medicaid inpatient days in the state.

3.  To qualify under 1 or 2, all hospitals must, as required by law, have at least two obstetricians with staff privileges at the hospital who have agreed to provide obstetric services to individuals entitled to such services under the Arizona Title XIX Program.  This requirement does not apply to a hospital a) in which the inpatients are predominately individuals under 18 years of age, or b) does not offer non-emergency obstetrical services as of 12/22/87.

II.   Definitions of Criteria

1.  Medical Assistance inpatient utilization rate means, for a hospital, a fraction (expressed as a percentage), the numerator of which is the hospital's number of inpatient days attributable to patients who (for such days) were eligible for the Title XIX Medical Assistance Program in a period, and the denominator of which is the total number of the hospital's inpatient days in that period. The period shall be the latest fiscal year for which cost report and state uniform accounting report data are available for all hospitals.

2. <u>Low income utilization rate</u> means, for a hospital, the sum of:

   A. the fraction (expressed as a percentage) the numerator of which is the sum (for a period) of the total medical assistance revenues paid the hospital for patient services, and the amount of the cash subsidies for patient services received directly from State and local governments, and the denominator of which is the total amount of revenues of the hospital for patient services (including the amount of such cash subsidies) in the period; and

   B. a fraction (expressed as a percentage) the numerator of which is the total amount of the hospital's charges for inpatient hospital services which are attributable to charity care in a period, and the denominator of, which is the total amount of the hospital's charges for inpatient hospital services in the hospital in the period.

   The numerator under subparagraph (B) shall not include contractual allowances and discounts.

III. <u>Payment Adjustment</u>

   1. The State of Arizona shall make a disproportionate share payment to each qualifying facility in accordance with the following formula: Payments specified herein are in addition to those payments defined elsewhere in 4.19A. Beginning October 1, 1991, the State shall make payments which may be made either as lump sums or may be spread out as deemed appropriate throughout the fiscal year. Once approved, this state plan amendment is effective retroactively to October 1, 1991.

   A. For hospitals that exceed the mean Title XIX inpatient utilization rate by more than one standard deviation unit, each hospital shall receive $25,000 plus $25,000 for each percentage that hospital's Title XIX utilization rate exceeds the mean plus one standard deviation. This method ensures payments are directly proportional to the percentage of Title XIX utilization above the one standard deviation threshold.

   B. For hospitals whose low income utilization rate exceed 25 percent, the payment(s) will equal $300,000 plus $100,000 for each percentage that hospital's low income utilization rate exceeds 25%. This method ensures payments are directly proportional to the percentage of low income utilization above 25%.

   C. For county and state owned and operated hospitals, Arizona shall define an indigent care pool that will be funded through state general funds based on the combined amount of state subsidized care (other than for Title XIX eligibles), other publicly subsidized care, bad debt and charity care across all state and county owned and operated facilities. From this pool, a minimum payment of $1 million shall be made to each qualifying hospital. The remainder shall be distributed among the qualifying facilities in the direct proportion that the low income utilization rate exceeds 25% except that in no case may a facility receive a disproportionate share payment which exceeds subsidized and uncompensated care provided by the facility. Subsidized care provided in psychiatric hospitals to individuals ages 21 to 64 is included under this provision.

   D. For hospitals in which the low income percentage is greater than the arithmetic mean or that provide at least 1% of the Medicaid inpatient days in the state, the payment shall be $25,000 plus 5% of the low income percentage of the hospitals net inpatient revenue.

IV. Hospitals which qualify under more than one category shall be paid in accordance with the methodology which results in the greatest disproportionate share payments.

2

BAN-0107

341

JUL.29.2002  3:23PM

NO.999  P.6



DEPARTMENT OF HEALTH & HUMAN SERVICES

Health Care Financing Administration

The Administrator
Washington, D.C.  20201

MAY 1 4 1992

Leonard J. Kirschner, M.D., M.P.H.
Director
Arizona Health Care Cost
   Containment System
801 East Jefferson
Phoenix, Arizona  85034

Dear Dr. Kirschner:

I am pleased to inform you that the Health Care Financing Administration is
approving payments to disproportionate share hospitals (DSHs) in Arizona, effective
retroactively to October 1, 1991 under the Arizona Health Care Cost Containment
System waiver.  The approved DSH expenditure level for fiscal year (FY) 1992 is
$72,674,767 in total State and Federal expenditures (i.e., 6 percent of total projected
Medical Assistance expenditures).

We have reviewed your State Plan Amendment (SPA) 91-25 and have determined
that the SPA process is not an appropriate means of permitting these payments because
the Arizona Medicaid program is currently operating as a section 1115 demonstration
project and is waived from the provisions mandating DSH payments.  Any modifications
to the DSH payment levels should be processed through appropriate modifications of
the waiver.  Therefore, we are disapproving SPA 91-25, but we are approving DSH
payments at the level indicated above under the authority of section 1115 of the Social
Security Act.  The current waivers will remain in effect, with the condition that DSH
payments are within the approved limits.

I look forward to the continued success of the Arizona Health Care Cost
Containment System program.

Sincerely,

William Toby, Jr.
Acting Administrator

BAN-0108

342

AUG-02-2002  11:21                                                      P.02



DEPARTMENT OF HEALTH & HUMAN SERVICES          Health Care Financing Administrat

6325 Security Boulevard
Baltimore, MD 21207

FEB 2  1994

Mabel Chen, M.D.
Director
Arizona Health Care
   Cost Containment System                         MAR 02 '..
801 East Jefferson
Phoenix, Arizona  85034

Dear Dr. Chen:

I am pleased to inform you that payments to disproportionate share hospitals (DSHs)
in Arizona have been approved for fiscal year (FY) 1994.  The approved DSH
expenditure level is $105,728,000 in total State and Federal expenditures.  Approval is
under the authority of section 1115 of the Social Security Act.

With this award the Health Care Financing Administration is changing the
methodology used to calculate Arizona's DSH allotment.  For the FY 1994 DSH
payment, you had proposed that DSH allotments in Arizona be subject to the same
rules that apply to other States with base allotments of less than 12 percent of total
Medicaid program expenditures.  Specifically, payments would include a growth amount
equal to the percentage increase in Medicaid program expenditures, plus Arizona's
share of the supplemental amount of the pool that is available to low-DSH States.
The procedure used to calculate the approved FY 1994 DSH amount is consistent with
your proposed approach.  However, since Arizona is exempt from the 1991 legislation
concerning donations and taxes, the supplemental amount has been calculated
separately from all other States.  This allows Arizona to receive its increase without
affecting the supplemental payments to other States.

The above procedure will be used to calculate Arizona's DSH amount in future years.
Arizona will be treated the same as other States with regard to its DSH payment
calculation.

You may contact Ron Lambert of my staff at (410) 966-6624 if you require any further
information.

                                          Sincerely,

                                          George J. Schieber, Ph.D.
                                          Acting Director
                                          Office of Research and Demonstrations

                                                        343 BAN-0109

## DISPROPORTIONATE SHARE PAYMENTS BY HOSPITAL:
### 1992 - 1995

| In Alphabetical Order | FFY 1992 Payment | FFY 1993 Payment | FFY 1994 Payment | FFY 1995 Payment |
|---|---|---|---|---|
| **PRIVATE FACILITIES** | | | | |
| Carondelet Holy Cross Hospital | $336,593 | $203,383 | $220,315 | $329,200 |
| Carondelet St. Joseph's Hospital | $190,376 | $26,219 | $5,000 | $40,044 |
| Carondelet St. Mary's Hospital | $293,463 | $168,973 | $48,122 | $92,005 |
| Casa Grande Regional Medical Center | $95,756 | $466,608 | $402,364 | $654,323 |
| Central Arizona Med Ctr | $181,641 | $0 | $0 | $32,153 |
| Chandler Regional Hospital | $75,778 | $161,861 | $14,647 | $29,397 |
| Cobre Valley Community Hospital | $0 | $5,000 | $0 | $0 |
| Community General – Holbrook | $15,457 | $0 | $0 | $0 |
| Community Hospital Medical Center | $0 | $0 | $0 | $16,590 |
| Desert Samaritan Medical Center | $69,211 | $41,725 | $55,419 | $128,292 |
| Flagstaff Medical Center | $117,512 | $48,479 | $105,795 | $198,837 |
| Good Samaritan Regional Medical Center | $489,012 | $1,098,168 | $1,413,074 | $1,697,729 |
| Kingman Regional Medical Center | $61,688 | $5,000 | $5,000 | $5,000 |
| Marcus J. Lawrence | $64,663 | $0 | $0 | $0 |
| Maryvale Hospital Medical Center | $96,695 | $33,266 | $39,201 | $52,097 |
| Mesa General Hospital Medical Center | $0 | $6,135 | $137,145 | $60,663 |
| Mount Graham Community Hospital | $77,783 | $60,133 | $24,811 | $129,333 |
| Nevapache Hospital | $44,502 | $9,340 | $24,692 | $15,752 |
| Northern Cochise Community Hospital | $17,825 | $0 | $0 | $0 |
| Page Hospital | $54,525 | $19,045 | $37,938 | $53,822 |
| Phoenix Children's Hospital | $1,202,571 | $2,851,116 | $2,400,982 | $4,523,388 |
| Phoenix Memorial Hospital | $1,225,286 | $2,978,893 | $4,434,608 | $3,149,904 |
| Sage Memorial Hospital | $24,690 | $5,000 | $27,333 | $111,734 |
| Sam Beh Pha/Wendy P O'brien | $0 | $0 | $86,130 | $364,028 |
| Southeast Arizona Medical Center | $0 | $121,891 | $48,156 | $112,107 |
| St. Joseph's Hospital – Phoenix | $1,011,291 | $1,188,902 | $1,363,519 | $1,754,800 |
| Thunderbird Samaritan Hospital | $130,637 | $41,739 | $41,323 | $51,578 |
| Tucson General Hospital | $0 | $0 | $93,003 | $0 |
| Tucson Medical Center | $267,371 | $553,693 | $659,371 | $789,168 |
| University Medical Center | $492,436 | $313,613 | $314,772 | $461,930 |
| Westbridge | $0 | $0 | $137,256 | $0 |
| White Mountain | $23,898 | $0 | $0 | $0 |
| Winslow Memorial Hospital | $21,518 | $48,931 | $42,762 | $306,717 |
| Yavapai | $51,600 | $0 | $0 | $0 |
| Yuma Regional Medical Center | $172,180 | $140,847 | $98,061 | $123,810 |
| **. . TOTAL** | $6,826,458 | $10,596,000 | $12,300,900 | $15,282,401 |
| **PUBLIC FACILITIES** | *estimated split* | | | |
| Arizona State Hospital | $7,000,000 | $8,838,300 | $10,258,400 | $28,474,900 |
| Kino Community Hospital | $10,844,080 | $13,825,400 | $16,046,800 | $15,203,100 |
| Maricopa Medical Center | $48,000,000 | $57,849,700 | $67,144,900 | $63,430,600 |
| **TOTAL** | $65,844,080 | $80,513,400 | $93,450,100 | $107,108,600 |
| **. GRAND TOTAL** | $72,670,538 | $91,111,400 | $105,751,000 | $122,391,001 |

kcseh/dis history.xls
08/02/2002
Page 1

344 BAN-0110

# AHCCCS DISPROPORTIONATE SHARE HOSPITAL PAYMENTS FY 1996

## Background

Section 1923 of the Social Security Act sets forth federal requirements designed to aid hospitals that serve a disproportionate share of low-income and Medicaid patients. Federal requirements specify the minimum standards for determining which hospitals qualify for disproportionate share:

- Those hospitals whose mean Medicaid Utilization rate exceeds the state's mean Medicaid Utilization rate plus one standard deviation; or

- Those hospitals whose Low Income Utilization rate is more than 25%.

In addition, beginning in fiscal year 1996, the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) has added the requirement that a hospital must have a Medicaid Utilization rate of at least one percent in order to be eligible for a disproportionate share payment.

A hospital's Medicaid Utilization rate is the number of inpatient days which were paid for by Title XIX Medical Assistance divided by the total number of the hospital's inpatient days. Because Medicaid is not the primary payor, days associated with Medicare crossover claims and encounters are not included.

$$\textit{Medicaid Utilization} = \frac{\textit{Title XIX Days}}{\textit{All Payor Days}}$$

The Low Income Utilization rate is the sum of the ratio of the total AHCCCS revenue (Medicaid, Medicare Crossovers, MN/MI, and EAC/ELIC) and county and state subsidies (e.g., CRS) to net inpatient revenues plus the ratio of gross charity care revenue to gross patient revenues. For county facilities, net inpatient revenues include county subsidy payments. The Low Income Utilization rate is calculated as follows:

$$\textit{Low Income Utilization} = \frac{\textit{Total AHCCCS Revenue} + \textit{County \& State Subsidies}}{\textit{Net Inpatient Revenue}}$$
$$+$$
$$\frac{\textit{Gross Charity Revenue}}{\textit{Gross Patient Revenues}}$$

States are allowed to establish disproportionate share criteria that differ from the federal requirements, but state-specific criteria must be at least as generous as the federal standards. AHCCCS first implemented a disproportionate share program in FY 1992. Arizona uses state-

2                                                        July 18, 1996

Oct-30-02 01:53pm  From-WILLIAM M  RCER          6022240022   · ·      T-355  P.04/10  F-485

specific criteria as allowed under the law to provide for a distinction between public and private hospitals, and also to create a third private hospital group. Each year a pool of funds is established for disproportionate share payments to hospitals. This pool is apportioned to hospitals which qualify either under the federal criteria or under the State's criteria based on a relative weighting.

In addition, for 1996, OBRA '93 has established rules limiting the total disproportionate share payment that a hospital can receive. Disproportionate share payments are limited to no more than the cost of providing hospital services to patients who are either eligible for medical assistance under a state plan or have no health insurance for the services provided, less payments received under Title XIX (other than DSH payment adjustments). These limits went into effect in FY 1995 for public hospitals, but for FY 1996 they apply to both public and private hospitals.

The disproportionate share amount appropriated by the State for FY 1996 is a total of $112,386,400. Of that amount, $98,851,200 has been allocated to the public facilities and $13,535,200 to the private facilities. The State anticipates that its federal grant will be larger, but has not received final notice of this change. If the grant is increased, the legislature will decide how the funds will be distributed.

Qualifying Criteria for FY 1996

The criteria used to determine which hospitals qualify for disproportionate share in FY 1996 were the same as the criteria used in FY 1995 with the addition of the requirement that all hospitals eligible for disproportionate share have a Medicaid Utilization rate greater than 1%. A hospital in Arizona may qualify for disproportionate share payments by meeting one of two federally mandated criteria or one of two optional, state-specific criteria. One group was established for each of the four criteria. If a hospital qualifies for more than one group, the hospital is categorized into the group which maximizes its disproportionate share payment.

The qualifying criteria for each of the four groups is described below:

Group 1: This group is based on the federally mandated criterion of the State's mean Medicaid (Title XIX) Utilization plus one standard deviation. Medicaid Utilization is defined as a hospital's Medicaid inpatient hospital days divided by the hospital's total inpatient hospital days. The State's mean Medicaid Utilization is 14.3%. For FY 1996, the threshold for this group, the mean plus one standard deviation, equals 28.9%.

Group 2: This group is based on the federally mandated criterion targeted at those hospitals whose Low Income Utilization rate is more than 25%. The low income percentage is defined as the sum of the two fractions: 1) a hospital's low income revenue (total AHCCCS, state and county revenues)

3                                July 18, 1996

346                                                    BAN-0112

Oct-30-02 01:53pm From-WILLIAM M 'RCER                    6022240022 · ·    T-355 P.05/10 F-485

as a percentage of net inpatient revenue, and 2) the percentage that gross charity care revenue contributes to gross hospital revenue.

Group 3:    This group is one of the State's optional groups. Acute care general hospitals (Psychiatric and Rehabilitation Facilities excluded) qualify if either

A.    their Low Income Utilization rate is greater than the statewide mean Low Income utilization rate (which is 17.9% for FY 1996), or,

B.    they provide at least 1.0% of the total Medicaid days across hospitals in the State.

Because Group 3 criteria are less restrictive than the criteria for either Group 1 or Group 2, all hospitals that qualify in either Group 1 or Group 2 will also qualify in Group 3. The actual Group placement for a hospital is determined by which placement results in the highest payment.

Group 4:    This group is also one of the State's optional groups and consists only of state and county hospitals (Kino Community Hospital, Maricopa Medical Center and Arizona State Hospital).

The table below provides the thresholds used to categorize facilities for 1992 through 1996 disproportionate share payments for each of the four groups:

| Group | Description of Threshold | 1992 | 1993 | 1994 | 1995 | 1996 |
|-------|--------------------------|------|------|------|------|------|
| 1 | Facility Medicaid Utilization exceeds State's Medicaid Utilization plus one standard deviation | 22.1% | 19.2% | 22.8% | 23.0% | 28.9% |
| 2 | Facility Low Income Utilization greater than 25% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| 3A | Facility Low Income Utilization greater than statewide mean | 11.3% | 13.1% | 15.9% | 16.4% | 17.9% |
| 3B | Facility provides at least 1% of total Medicaid days across hospitals in state | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| 4 | No threshold since qualification is based on status as a public facility | N/A | N/A | N/A | N/A | N/A |

4                                          July 18, 1996

347    BAN-0113

Oct-30-02  01:54pm  From-WILLIAM P  RCER                    6022240022   - -      T-865  P.06/10  F-485

The Medicaid Utilization and Low Income Utilization rates for each hospital for FY 1996 are based on data from each hospital's FY 1994 Uniform Accounting Report (UAR) and from the AHCCCS claims and encounter data for the corresponding period. The UAR is an annual financial report, which is mandated by statute and filed with the Arizona Department of Health Services. The sources for specific data elements used in the calculations for Groups 1 through 3 are described below.

□   Medicaid Utilization *(Group 1)*

| Total Title XIX Days | Calculated from claims and encounter data. |
|---|---|
| All Payor Days | UAR |

□   Low Income Utilization *(Groups 2 and 3A)*

| Charity Care Revenue | UAR |
|---|---|
| Gross Patient Revenue | UAR |
| Net Inpatient Revenue | Calculated from UAR data. |
| Total AHCCCS Revenue | Calculated from claims and encounter data (includes revenues from Title XIX, MN/MI, EAC, and ELIC). |
| County Revenue | Provided separately by the county facilities. |
| Other Government Revenue | CRS plus Other Revenues obtained from DHS. |

Total AHCCCS Revenue is the sum of the payments for Title XIX, MN/MI, EAC, and ELIC claims and encounters. Facilities were given credit for deep discounts.

□   Statewide Percentage of Title XIX Days *(Group 3B)*

| Total Title XIX Days | Calculated from elements from claims and encounters (same calculation as for Medicaid Utilization). |
|---|---|
| Sum of Total Title XIX Days | The sum of all Total Title XIX Days from all hospitals who could potentially qualify. |

5                                                        July 18, 1996

BAN-0114

Group 4 consists of all public hospitals. Additional calculations are not required to determine whether the facility qualifies.

Disproportionate Share Payments for Fiscal Year 1996

As was done in 1995, the funds approved for DSH were divided into four pools, 3 private and 1 public facility pool. Although the total amount of funds was lower, the distribution of the private DSH amount into the 3 pools for private facilities for FY 1996 was in the same relative proportions as in FY 1995. The amount that each hospital received from the pool for which they qualify was determined by a weighting method that considered both the amounts or points over the threshold and volume of services, which, depending upon the group classification of the facility, is either measured by Title XIX days or net inpatient revenue.

Since the FY 1996 appropriated amount was $112,386,400, the funds were divided into the four groups as shown below. Additional funds will be distributed in accordance with legislative action.

| Group | Pool Dollars FY 1995 | Pool Dollars FY 1996 |
|-------|---------------------|---------------------|
| 1 | $360,539 | $319,319 |
| 2 | $9,373,016 | $8,301,422 |
| 3 | $5,548,845 | $4,914,459 |
| 4 | $107,108,600 | $98,851,200 |
| Total | $122,391,000 | $112,386,400 |

The minimum payment amount for private facilities qualifying for disproportionate share was again set at $5,000. Exhibit 1 provides the FY 1996 disproportionate share payments along with the FY 1994 and FY 1995 amounts for individual hospitals. Exhibit 2 presents a summary table of payments by hospital group.

The pool for Public Facilities (Group 4) decreased by $8,257,400, and was allocated in the following manner:

    ▫    Arizona State Hospital was designated to receive $11,993,900.

    ▫    Kino and Maricopa were designated to receive a total of $86,857,300.

6                                                                    July 18, 1996

BAN-0115

349

To determine the allocation for Kino and Maricopa, the relative allocation percentage for each hospital was computed under each of the qualifying criteria for the three private groups using Medicaid Utilization, Low Income Percentage, and Percentage of Statewide Medicaid Days. The average of these three percentages was used to compute the final allocation for each hospital.

## OBRA '93 Payment Limits

As discussed previously, the Omnibus Budget Reconciliation Act of 1993 (OBRA '93) contains provisions which affect the qualification of disproportionate share hospitals and the amount of payment. The qualification change is that for state fiscal years beginning in 1994, a facility may not be qualified as a DSH facility unless it has a Medicaid Utilization rate of at least one percent.

Another provision of OBRA '93 is that a hospital's DSH payment must be limited to the difference between the cost of providing services to the uninsured and the Medicaid payments received. In FY 1995 this applied only to public facilities, but in FY 1996 this limit applies to all DSH facilities.

As the final step in the DSH payment calculation methodology, the payment's proportion of the OBRA '93 limit is calculated as the ratio of the unadjusted DSH payment to the total cost of low income care less Medicaid payments:

$$\frac{\textit{unadjusted DSH payment}}{\textit{cost of low income care} \; - \; \textit{Title XIX payment}}$$

where the facility's cost of low income care is the sum of the cost of services to Medicaid patients and the cost of services to uninsured patients. The proportion must be less than one for facilities to be in compliance with the OBRA '93 provision.

The cost of low income care is calculated using the claims and encounter data submitted by each facility as well as hospital-specific cost-to-charge ratios. The total cost includes the costs of the following components: Title XIX, MN/MI, EAC, ELIC, charity care, and county and other government payments.

For FY 1996 this limit was applied to all facilities. Facilities were determined to be ineligible for DSH payments if their total Title XIX payment exceeded their cost of care (i.e., their costs of providing low income care had been fully reimbursed.) All FY 1996 DSH payments to eligible hospitals were found to be within the OBRA limits.

7                                                            July 18, 1996

BAN-0116

350

Oct-30-02  01:55pm  From-WILLIAM M  RCER                6022240022  ·  ·       T-355  P.09/10  F-485

## EXHIBIT 1

### DISPROPORTIONATE SHARE PAYMENTS BY HOSPITAL
(Based on SFY 96 DSH Appropriation)

| In Alphabetical Order | FY 1994 Payment | FY 1995 Payment | FY 1996 Payment | Dollar Change FY 1995 to FY 1996 | Percent Change FY 1995 to FY 1996 |
|---|---|---|---|---|---|
| **PRIVATE FACILITIES** | | | | | |
| American Transitional Hospital - Phoenix | $0 | $0 | $156,428 | $156,428 | #N/A |
| Benson Hospital | $0 | $0 | $5,000 | $5,000 | #N/A |
| Carondelet Holy Cross Hospital | $320,315 | $328,200 | $120,819 | ($207,381) | -63.2% |
| Carondelet St. Joseph's Hospital | $5,000 | $40,044 | $41,274 | $1,230 | 3.1% |
| Carondelet St. Mary's Hospital | $48,122 | $92,005 | $86,633 | ($5,372) | -5.8% |
| Casa Grande Regional Medical Center | $402,364 | $654,323 | $438,892 | ($215,430) | -32.9% |
| Central Arizona Medical Center | $0 | $32,153 | $6,359 | ($25,794) | -80.2% |
| Chandler Regional Hospital | $14,647 | $28,397 | $29,294 | $897 | 3.2% |
| Community Hospital MC - Phoenix | $0 | $16,590 | $390,592 | $374,002 | 2254.3% |
| Desert Samaritan Medical Center | $55,419 | $128,292 | $110,214 | ($18,079) | -14.1% |
| Flagstaff Medical Center | $105,795 | $198,837 | $173,908 | ($24,929) | -12.5% |
| Good Samaritan Regional Medical Center | $1,413,074 | $1,697,729 | $1,018,842 | ($678,886) | -40.0% |
| Kingman Regional Medical Center | $5,000 | $5,000 | $5,169 | $169 | 3.4% |
| Maryvale Samaritan Hospital | $39,201 | $52,097 | $30,213 | ($21,884) | -42.0% |
| Mesa General Hospital Medical Center | $137,146 | $60,663 | $12,087 | ($48,576) | -80.1% |
| Mount Graham Community Hospital | $24,811 | $129,333 | $29,623 | ($99,709) | -77.1% |
| Navapache Hospital | $24,692 | $15,752 | $18,311 | $2,559 | 16.2% |
| Northern Cochise Community Hospital | $0 | $0 | $11,713 | $11,713 | #N/A |
| Page Hospital | $37,938 | $53,822 | $47,809 | ($6,013) | -11.2% |
| Phoenix Children Hospital | $2,400,982 | $4,523,388 | $5,086,779 | $563,391 | 12.5% |
| Phoenix Memorial Hospital | $4,434,608 | $3,149,904 | $1,921,918 | ($1,227,986) | -39.0% |
| Sage Memorial Hospital | $27,333 | $111,734 | $110,002 | ($1,732) | -1.5% |
| Southeast Arizona Medical Center | $48,156 | $112,107 | $193,835 | $81,728 | 72.9% |
| St. Joseph's Hospital - Phoenix | $1,363,519 | $1,754,800 | $1,756,971 | $2,171 | 0.1% |
| Thunderbird Samaritan Hospital | $41,323 | $51,578 | $30,576 | ($21,002) | -40.7% |
| Tucson General Hospital | $93,003 | $0 | $0 | $0 | #N/A |
| Tucson Medical Center | $659,371 | $789,168 | $855,548 | $66,380 | 8.4% |
| University Medical Center | $314,772 | $461,930 | $586,682 | $124,752 | 27.0% |
| Wendy P. O'Brien | $86,130 | $364,028 | $0 | ($364,028) | -100.0% |
| Westbridge Center - Children | $157,356 | $0 | $0 | $0 | #N/A |
| Winslow Memorial Hospital | $42,762 | $306,717 | $161,784 | ($144,933) | -47.3% |
| Yuma Regional Medical Center | $98,061 | $123,810 | $97,925 | ($25,885) | -20.9% |
| **TOTAL** | $12,300,900 | $15,282,400 | $13,535,200 | ($1,747,200) | -11.4% |
| | | | | | |
| **PUBLIC FACILITIES** | | | | | |
| Arizona State Hospital | $10,258,400 | $28,474,900 | $11,993,900 | ($16,481,000) | -57.9% |
| Kino Community Hospital | $16,046,800 | $15,203,100 | $16,889,200 | $1,686,100 | 11.1% |
| Maricopa Medical Center | $67,144,900 | $63,430,600 | $69,968,100 | $6,537,500 | 10.3% |
| **TOTAL** | $93,450,100 | $107,108,600 | $98,851,200 | ($8,257,400) | -7.7% |
| **GRAND TOTAL** | $105,751,000 | $122,391,000 | $112,386,400 | ($10,004,600) | -8.2% |

FY96 payments are based on FY94 data.  FY95 payments are based on FY93 data.  FY94 payments are based on FY92 data.

7/26/96

351    BAN-0117

EXHIBIT 8

## DISPROPORTIONATE SHARE PAYMENTS BY HOSPITAL

| In Alphabetical Order | FY 1995 Payment | FY 1996 Payment° | FY 1997 Payment° | Dollar Change FY 1996 to FY 1997 | Percent Change FY 1996 to FY 1997 |
|---|---|---|---|---|---|
| **PRIVATE FACILITIES** | | | | | |
| American Transitional Hospital - Phoenix | $0 | $183,804 | $148,990 | ($34,814) | -18.9% |
| Benson Hospital | $0 | $5,000 |  | ($5,000) | -100.0% |
| Carondelet Holy Cross Hospital | $328,200 | $141,902 | $186,474 | $44,672 | 31.5% |
| Carondelet St. Joseph's Hospital | $40,044 | $45,754 | $39,336 | ($6,418) | -14.0% |
| Carondelet St. Mary's Hospital | $92,005 | $87,641 | $111,258 | $23,617 | 26.9% |
| Casa Grande Regional Medical Center | $654,323 | $515,654 | $35,106 | ($480,548) | -93.2% |
| Central Arizona Medical Center | $52,153 | $10,604 |  | ($10,604) | -100.0% |
| Chandler Regional Hospital | $28,397 | $28,044 | $15,559 | ($12,485) | -44.5% |
| Community Hospital MC - Phoenix | $16,590 | $458,947 | $409,374 | ($49,572) | -10.8% |
| Desert Samaritan Medical Center | $128,292 | $120,000 | $162,856 | $42,856 | 35.7% |
| Flagstaff Medical Center | $198,837 | $196,763 | $287,544 | $90,781 | 46.1% |
| Good Samaritan Regional Medical Center | $1,697,729 | $1,042,193 | $1,426,214 | $384,021 | 36.8% |
| Hacienda de los Niños |  |  | $35,612 | $35,612 | 6N/A |
| Kingman Regional Medical Center | $5,000 | $169 |  | ($169) | -100.0% |
| Maryvale Samaritan Hospital | $52,097 | $31,474 | $104,458 | $72,984 | 231.9% |
| Mesa General Hospital Medical Center | $60,663 | $8,314 | $7,638 | ($676) | -8.1% |
| Mount Graham Community Hospital | $129,333 | $33,421 | $56,164 | $22,743 | 68.0% |
| Navapache Hospital | $18,752 | $19,585 | $8,569 | ($11,016) | -56.2% |
| Northern Cochise Community Hospital | $0 | $13,758 |  | ($13,758) | -100.0% |
| Page Hospital | $53,822 | $56,578 | $6,097 | ($50,481) | -89.2% |
| Phoenix Children Hospital | $6,523,388 | $5,976,403 | $8,553,755 | $2,577,352 | 43.1% |
| Phoenix Memorial Hospital | $3,149,904 | $2,257,671 | $1,158,442 | ($1,099,228) | -48.7% |
| Sage Memorial Hospital | $111,734 | $129,264 | $127,445 | ($1,819) | -1.4% |
| Southeast Arizona Medical Center | $112,107 | $227,128 | $336,462 | $109,334 | 48.1% |
| St. Joseph's Hospital - Phoenix | $1,754,800 | $1,921,391 | $2,222,055 | $300,665 | 15.6% |
| Thunderbird Samaritan Hospital | $21,578 | $28,785 | $41,569 | $12,785 | 44.4% |
| Tucson General Hospital | $0 | ($3,300) |  | $3,300 | -100.0% |
| Tucson Medical Center | $789,168 | $930,652 | $974,443 | $43,791 | 4.7% |
| University Medical Center | $461,930 | $1,141,055 | $802,266 | ($338,791) | -29.7% |
| Wendy P. O'Brien | $364,028 |  |  | $0 | 6N/A |
| White Mountains Community Hospital |  |  | $299,782 | $299,782 | 6N/A |
| Winslow Memorial Hospital | $306,712 | $189,915 | $179,010 | ($10,905) | -5.7% |
| Yuma Regional Medical Center | $123,810 | $105,432 | $111,424 | $5,991 | 5.7% |
| **TOTAL** | $15,282,400 | $15,903,900 | $17,847,900 | $1,944,000 | 12.2% |
| | | | | | |
| **PUBLIC FACILITIES** | | | | | |
| Arizona State Hospital | $28,474,900 | $23,089,400 | $28,159,700 | $5,070,300 | 22.0% |
| Kino Community Hospital | $15,203,100 | $13,978,900 | $17,120,100 | $3,141,200 | 22.5% |
| Maricopa Medical Center | $63,430,600 | $75,886,300 | $79,236,300 | $3,349,500 | 4.4% |
| **TOTAL** | $107,108,600 | $112,955,100 | $124,516,100 | $11,561,000 | 10.2% |
| **GRAND TOTAL** | $122,391,000 | $128,859,000 | $142,364,000 | $13,505,000 | 10.5% |

FY97 payments are based on FY95 data. FY96 payments are based on FY94 data. FY95 payments are based on FY93 data.
° FY96 and FY97 payments reflect final federal allotments and are net of all settlements.

10/24/97

352                                                           BAN-0118

## DECLARATION OF BRANCH MCNEAL

I, Branch McNeal, under penalty of perjury, hereby declare and state as follows:

1) I was employed by the Arizona Health Care Cost Containment System ("AHCCCS") from March, 1992 to August, 2002.

2) I initially served as a Financial Consultant for the AHCCCS Office of Managed Care. I later served as the Financial Manager, and finally as the Assistant Director of that office. I served as the Deputy Director of AHCCCS for the last three years of my employment with the State.

3) Throughout my tenure with AHCCCS, I was familiar with eligibility criteria for individuals to qualify for medical assistance under the AHCCCS program. Beginning in 1995, I also became familiar with the criteria and payment formulas for the Medicaid disproportionate share hospital ("DSH") payments made by AHCCCS.

4) Although Arizona received Title XIX federal matching funds for direct expenditures made for health care services provided to most of its eligibility groups, medical assistance furnished by AHCCCS to indigent individuals in three eligibility groups were funded, until 2001, only by the State or counties. These eligibility groups were:

   a) Medically Indigent or Medically Needy Individuals – individuals who were either low income individuals or persons with sufficient medical expenses to reduce their income to the qualifying level.

   b) Eligible Assistance Children – children who were under 14 years of age and were recipients of federal food stamps.

   c) Eligible Low Income Children – children who were under 14 years of age and had an income above the amount to qualify as medically indigent or medically needy, but at or below 100% of the federal poverty level.

5) In January 2001, the Centers for Medicare and Medicaid Services ("CMS") approved a request originally made by AHCCCS in 1996 to expand eligibility under the Title XIX federally-funded portion of the AHCCCS program to the state-funded groups described in paragraph 4 above. The proposed expansion of the federally-funded portion of the AHCCCS plan was acceptable to CMS from the outset; the delay in CMS' final approval of the expansion was due to its initial objections to an unrelated aspect of the State's proposal relating to certain caps that would be imposed by the State. In 2001, CMS finally approved the expansion.

mcneal declarationfinal.DOC

BAN-0119
354

The federally-funded portion of the AHCCCS program now includes all individuals who would have been eligible for one of the above-described state-funded categories prior to the expansion approved by CMS.

6) AHCCCS payments to a Medicaid disproportionate share hospital ("DSH") have always been based on a formula that includes inpatient days attributable to patients eligible for state-funded eligibility categories described in paragraph 4 above. AHCCCS DSH payments to non-public hospitals are calculated on the basis of utilization in prior periods. For example, AHCCCS DSH payments made in 1995 were based on inpatient hospital utilization in 1993. AHCCCS expenditures for these Medicaid DSH payments have always been matched by Title XIX federal funds. The documents attached as Exhibit A accurately describe the State's methodology for calculating the AHCCCS DSH payment.

Branch McNeal

Date: 2/16/2004

2

BAN-0120

355

02/10/2004 14:58 FAX 6029573226         FAX WAS * Pg 18/32          ☒018
                                        COPPERSMITH GORDON

02/09/2004  13:36   6024954939           BANNER HEALTH APCCU            PAGE  17
02/09/2004 MON 12:11 FAX                                              ☒016/030
OCT-04-2001  15:54                                                     P.09

EXHIBIT 1

FY2001 DISPROPORTIONATE SHARE PAYMENTS BY HOSPITAL

| In Alphabetical Order | FY 1999 Payment[a] | FY 2000 Payment[d] | FY 2001 Payment | Dollar Change FY 2000 to FY 2001 | Percent Change FY 2000 to FY 2001 |
|---|---|---|---|---|---|
| **PRIVATE FACILITIES** | | | | | |
| Benson Hospital | $0 | $0 | $9,744 | $9,744 | #NA |
| Carondelet Holy Cross Hospital | $34,310 | $36,008 | $66,150 | $30,184 | 83.4% |
| Carondelet St. Joseph's Hospital | $29,700 | $45,740 | $27,929 | ($17,811) | -38.9% |
| Carondelet St. Mary's Hospital | $129,073 | $171,283 | $143,721 | ($27,986) | -16.3% |
| Casa Grande Regional Medical Center | $174,159 | $172,314 | $110,436 | ($62,278) | -36.1% |
| Glendale Regional Hospital | $13,632 | $13,317 | $15,455 | $3,138 | 25.5% |
| Gobre Valley Community Hospital | $22,958 | $0 | $5,000 | $5,000 | #NA |
| Community Hospital and Medical Center | $294,672 | $0 | $0 | $0 | #NA |
| Desert Samaritan Medical Center | $211,919 | $357,109 | $381,785 | $24,680 | 6.9% |
| Flagstaff Medical Center | $61,925 | $117,583 | $67,518 | ($50,065) | -42.9% |
| Good Samaritan Regional Medical Center | $784,712 | $3883,486 | $3,359,828 | $476,138 | 53.9% |
| Hacienda de los Niños | $199,364 | $67,560 | $339,295 | $321,732 | 476.2% |
| La Paz Regional Hospital | $0 | $0 | $28,251 | $28,251 | #NA |
| Maryvale Hospital Medical Center | $193,902 | $93,157 | $150,197 | $58,043 | 63.0% |
| Mesa Lutheran Hospital | $0 | $5,000 | $5,000 | $0 | 0.0% |
| Mount Grahan Community Hospital | $18,548 | $0 | $0 | $0 | #NA |
| Navopache Hospital | $28,295 | $0 | $0 | $0 | #NA |
| Northern Cochise Community Hospital | $24,408 | $64,862 | $186,113 | $121,252 | 186.9% |
| Page Hospital | $33,967 | $75,478 | $9,787 | ($65,690) | -87.0% |
| Phoenix Baptist Hospital | $5,000 | $0 | $16,741 | $16,741 | #NA |
| Phoenix Children's Hospital | $6,312,327 | $7,419,457 | $6,000,881 | ($1,418,576) | -19.1% |
| Phoenix Memorial Hospital | $1,624,221 | $1,739,616 | $2,385,067 | $645,451 | 37.1% |
| Sage Memorial Hospital | $266,341 | $10,364 | $237,103 | $226,739 | 2187.3% |
| Select Specialty Hospital | $41,816 | $35,496 | $93,038 | $57,542 | 162.1% |
| Southeast Arizona Medical Center | $43,115 | $131,558 | $124,332 | ($7,223) | -5.5% |
| St. Joseph's Hospital - Phoenix | $1,613,831 | $1,761,827 | $1,763,944 | $2,122 | 0.1% |
| Tempe St. Luke's Hospital | $0 | $5,000 | $0 | ($5,000) | -100.0% |
| Thunderbird Samaritan Hospital | $94,925 | $142,797 | $118,066 | ($24,731) | -17.3% |
| Tucson General Hospital | $14,698 | $110,207 | $0 | ($110,207) | -100.0% |
| Tucson Medical Center | $900,035 | $874,483 | $670,662 | ($203,821) | -23.3% |
| University Medical Center | $835,955 | $558,379 | $523,334 | ($35,235) | -6.3% |
| Winslow Memorial Hospital | $107,976 | $150,307 | $167,017 | $16,510 | 11.0% |
| Yuma Regional Medical Center | $120,591 | $108,537 | $94,465 | ($14,073) | -13.0% |
| TOTAL | $13,746,928 | $15,150,000 | $15,150,000 | ($0) | 0.0% |
| **PUBLIC FACILITIES** | | | | | |
| Arizona State Hospital[bb] | $0 | $23,931,900 | $28,474,900 | $4,543,000 | 19.5% |
| Kino Community Hospital | $19,364,000 | $15,258,200 | $13,253,500 | ($2,004,700) | -13.1% |
| Maricopa Medical Center | $90,554,000 | $68,636,100 | $45,895,000 | ($22,740,600) | -33.1% |
| TOTAL | $109,918,000 | $107,726,200 | $87,623,500 | ($20,103,300) | -18.7% |
| GRAND TOTAL | $123,664,928 | $122,876,200 | $102,773,500 | ($20,102,300) | -16.4% |

FY01 payments are based on FY99 data. FY00 payments are based on FY98 data. FY99 payments are based on FY97 data.
[a] FY99 & FY00 payments reflect final federal allotment and are net of all settlements and assessments.
[bb] In FY99 ASH was not Medicare certified. In FY01, ASH received $28,194,900 plus $280,000 in Tobacco Tax monies to reach their requirement.

OCT-04-2001  16:48                                              September 14, 2001
                                            95%                     P.09

BAN-0128

364

245

13TH STORY of Level 1 printed in FULL format.

Copyright 1998 Crain Communications Inc.
Modern Healthcare

August 24, 1998

SECTION: News; Pg. 12

LENGTH: 480 words

HEADLINE: PA. MAY LOSE MILLIONS IN MEDICARE PAYMENTS

BYLINE: Eric Weissenstein

BODY:
    Pennsylvania lawmakers and the Hospital Association of Pennsylvania are pressuring HCFA to reverse a ruling that could cost Pennsylvania hospitals as much as $60 million in Medicare reimbursements this year and millions more in retroactive payments.

    The controversy surrounds what Pennsylvania calls ''general assistance'' payments, which are made to low-income individuals who also qualify for Medicaid. The program is funded and administered by the state. The general assistance payments were factored into the state's Medicare disproportionate-share hospital calculation, which is based on factors such as Medicaid expenditures. So, cutting the general assistance payments would lower a hospital's DSH payments. In some cases, hospitals fell below the minimum threshold for any DSH payments.

    But last year in a memo to its Medicare fiscal intermediaries, HCFA said the general assistance payments would no longer be factored into the Medicare disproportionate-share payment calculation. Most Pennsylvania hospitals weren't made aware of the change until this year.

    According to Scott Malan, vice president of legislative services for HAP, only one Medicare fiscal intermediary appears to have implemented the change. Malan said the state will lose as much as $60 million in annual Medicare DSH payments because of the HCFA decision. The decision also will cause 17 of the 71 hospitals in the state that were eligible for Medicare disproportionate-share payments to fall below the minimum threshold, thereby losing Medicare DSH payments altogether.

    The change is retroactive to any years for which a hospital still has an open cost report. That means some hospitals could owe millions to HCFA. In fiscal 1996, Pennsylvania hospitals received about $200 million in Medicare DSH payments.

    ''The retroactivity is what makes this thing particularly painful,'' said Malan. ''Many hospitals have very thin margins and aren't in a position to make these repayments. I can't understand where (HCFA) gets the authority to do this.''

    The Pennsylvania congressional delegation is asking the same question.

BAN-0143

380

In a letter they sent last week to HCFA Administrator Nancy-Ann Minn DeParle, Pennsylvania's two Republican senators, Rick Santorum and Arlen Specter, said disallowing the general assistance payments in the Medicare DSH formula would ''have serious negative consequences and will make it overly burdensome for Pennsylvania's safety- net hospitals.''

The Pennsylvania hospitals say they are being unfairly singled out for the cuts, as no other states have been similarly affected.

HCFA did not provide a spokesperson to discuss the issue.

''We're finding a lot of inconsistency with the way this is being enforced,'' Malan said.

According to congressional aides and Malan, HCFA has not explained the change, nor has it contacted them about the issue.

LANGUAGE: ENGLISH

LOAD-DATE: August 27, 1998

BAN-0144



Page 1

2 7

76TH ITEM of Level 1 printed in FULL format.

Copyright (c) 1998 The Bureau of National Affairs, Inc.
Medicare Report

August 26, 1998

Vol. 9, No. 35; Pg. 901

LENGTH: 600 words

SECTION: LEGISLATIVE NEWS

TOPIC: Hospitals;

TITLE: SENATORS PRESSURE HCFA TO DELAY IMPLEMENTATION OF DSH PAYMENT DECISION

TEXT:

Pennsylvania's senators have added their voice to the state's House delegation calling on the Health Care Financing Administration to put on hold its decision to disallow inclusion of state-funded general assistance days in calculating Medicare disproportionate share payments for hospitals.

The Hospital and Healthsystem Association of Pennsylvania said HCFA's change in interpretation of a 1997 agency ruling could cost the state's hospitals $ 43 million in Medicare DSH payments annually, with as many as 17 hospitals completely losing the funding.

In an Aug. 18 letter to HCFA Administrator Nancy-Ann DeParle, Republican Sens. Rick Santorum and Arlen Specter said HCFA's recent interpretation of the issue "will have serious negative consequences and will make it overly burdensome for Pennsylvania's safety net hospitals to continue to provide care for a most vulnerable patient population."

"Therefore, we urge you to withdraw this harmful decision and defer this provision of DSH policy to Congressional consideration of comprehensive DSH policy next year," the pair told DeParle.

The letter follows one sent Aug. 6 by the state's House delegation listing similar concerns.

Maintaining Access for Poor.

Medicare's DSH payment is used to help hospitals maintain access to low-income beneficiaries, who are identified in part by the number of Medicaid days they spend in the hospital.

To determine whether a hospital qualifies for DSH payments, Medicare includes days of care provided to supplemental security income recipients who also receive Medicare, and days for patients who were eligible for medical assistance, HAP said in a fact sheet on the issue. In the past, when Medicare counted medical assistance days being reviewed for DSH payments, they included

383 BAN-0145

(c) BNA, Inc., Medicare Report, August 28, 1998

days for patients who were in state-funded programs such as General Assistance, according to the association.

But Pennsylvania hospitals have been told by their Medicare fiscal intermediary that they can no longer count GA days toward their DSH payment, according to HAP. "For any open (ongoing) cost reports hospitals are now being required to identify and exclude GA days from the medical assistance days count to determine eligibility for Medicare DSH," HAP said.

The association wants HCFA not to implement this change until Congress determines how best to reform DSH payments.

HCFA Ruling 97-2.

The issue concerns HCFA Ruling 97-2, effective for cost reporting periods beginning on or after Feb. 27, 1997, in which the agency reversed a previous stance and said it will count all inpatient hospital days of service for patients eligible for Medicaid payment, even if that payment was never made in the calculation used to determine Medicare DSH reimbursement (8 MCR, 313, 4/4/97).

HAP said HCFA appears to be disallowing GA days as "medical assistance days."

"In calculating DSH payments, Pennsylvania has always included patients who receive state-funded General Assistance in their state plan, so the fiscal intermediaries have included them in the calculation of DSH reimbursement," Santorum and Specter said. HCFA's decision "will greatly reduce Pennsylvania's ability to fulfill this duty. Many hospitals will suffer dramatic reductions in their Medicare Disproportionate Share reimbursements and some will lose DSH payments entirely."

The pair estimated the decision could cost the state's hospitals up to $ 60 million a year.

A HCFA official was not immediately available for comment Aug. 26.

BAN-0146

P - 17

388

Citation                Search Result           Rank 46 of 260          Database
  /15/99 NWSDAY A04                                                     ALLNEWS
  /15/99 Newsday A04
1999 WL 8193659
(Publication page references are not available for this document.)

Newsday
Copyright Newsday Inc., 1999

Friday, October 15, 1999

NEWS

$1B Sought From NY Hospitals / Feds target those treating uninsured
Ellen Yan. WASHINGTON BUREAU

By Ellen Yan WASHINGTON BUREAU Washington - The federal Health
Care **Financing Administration** is laying the groundwork to collect as
much as $1 billion from New York hospitals that treat a high
proportion of poor and uninsured patients.

In terse letters sent two weeks ago, the agency notified state
hospitals that their Medicare reimbursements were subject to review,
possibly as far back as 1993. The Healthcare Association of New York
ate, a coalition of about 200 hospitals, estimated that 130
pitals could be forced to pay back as much as $169 million for
h of the past six years. Pennsylvania hospitals lost a similar
dispute last year and have started repaying $250 million.

"It has a very targeted impact on those committed to serving low
income communities," said coalition president Daniel Sisto, who last
week met with President Bill Clinton's health adviser Christopher
Jennings and requested White House help.

"If they persist in doing this, the federal government might as
well get the keys to our institutions," said Kenneth Raske, president
of the Greater New York Hospital Association, which represents Long
Island and New York City.

"This will absolutely destroy some of our institutions." HCFA is
trying to determine if the New York state health department padded
reimbursement claims through a billing practice the state has
followed since 1996. New York is among the top recipients of
compensation for serving the poor. "We want to be sure health care
providers are paid correctly under the law," said HCFA spokesman
Chris Peacock.

In dispute are funds that Medicare, the health care program for
e elderly and disabled, funnels to hospitals to help shoulder
alth costs for the poor. The Medicare **Disproportionate Share**

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

BAN-0149

spital formula partially determines each hospital's reimbursement
rates and takes into account the hospital's workload under Medicaid,
the program for the poor.

   In sending reimbursement data to HCFA, the state health department
has included state Medicaid Home Relief patients - single and married
adults without children, who are not covered by federal Medicaid.
HCFA is trying to determine whether they should be counted in the
federal aid formula.

   The federal agency has ordered its regional directors to determine
if other states with local Medicaid programs follow the same billing
practice.

   Pennsylvania's congressional lawmakers want to resolve the issue
with a bill to stop past recoupments.

   Despite HCFA's ruling in the Pennsylvania case, New York
authorities believe they're on solid, legal ground, primarily because
of a Medicaid waiver that New York state was granted in 1997,
defining Home Relief patients as Medicaid recipients also.

  New York hospital officials estimate that the bulk of any
  oupment, up to $130 million annually, would come out of New York
  -y hospitals.

   Hospital administrators say they're reeling from the 1997 Medicare
and Medicaid cuts imposed on teaching hospitals as part of the 1997
balanced budget agreement. A disproportionate share of the patients
at two-thirds of these hospitals are poor.

   Overall, the cost of the cuts in New York is estimated to be $5
billion over five years, and hospital administrators have been
furiously lobbying for relief.

   Sen. Charles Schumer (D-N.Y.), who has raised the issue with
Clinton, has joined Reps. Charles Rangel (D-Manhattan) and Eliot
Engel (D-Bronx) in pressing the state's case. A White House
spokeswoman said the Department of Health and Human Services is
looking into the dispute.

   Hillary Clinton, a likely U.S. Senate candidate, also raised the
issue yesterday, telling New York hospital officials the dispute
"should be resolved as soon as it can be in a way that does not
penalize hospitals for providing health care for the indigent."
"Everybody all the time is attempting to figure out how to reduce
  penditures," said Mike Dowling, executive vice president of North

                 Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

390  BAN-0150

10/15/99 NWSDAY A06
'Publication page references are not available for this document.)

  pre-Long Island Jewish Health System, whose four hospitals in New
York and Long Island may lose up to $6.2 million per year. "But I
don't think there is an understanding of the impact: These people
don't disappear." As a sign of the byzantine nature of the
reimbursement system, Southside Hospital in Bay Shore received HCFA's
notice that roughly $536,000 it received in 1995 and 1996 would be
reviewed. This week, hospital officials received HCFA's "final"
settlement for reimbursements in 1995 and 1996.

  "What the hell difference does it make?" said Southside president
Theodore Jospe. "They're poor folks, and this program is supposed to
recompense you because you're taking in a disproportionate number of
poor people . . . We're a big user, not because of a kind of plan to
rip off the people of America. We have poor people here. That's the
fact, Jack." Washington Bureau correspondent William Douglas
contributed to this story.

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

  Charts - 1) LI Hospitals Reviewed, 2) Queens Hospitals Reviewed

                    ---- INDEX REFERENCES ----

  MED PERSON:    JENNINGS, CHRISTOPHER R

  KEY WORDS:    HEALTH CARE; HOSPITAL; MEDICARE; NEW YORK CITY; HEALTHCARE
ASSOCIATION OF NEW YORK STATE

  STORY ORIGIN:    WASHINGTON

  REGION:    New York City Metropolitan Area; New York; Eastern U.S.;
United States; North America; Pennsylvania (NYC NY USE US NME PA)

  EDITION:    ALL EDITIONS

  Word Count: 773
  10/15/99 NWSDAY A06
  END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

 BAN-0151



Page 1?

Citation                    Search Result      Rank 42 of 260      Database
  18/99 ASSOCPR (No Page)                                          ALLNEWS
  18/99 Associated Press (Pg. Unavail. Online)
  ...99 WL 28129484                                                25?
(Publication page references are not available for this document.)

                            AP Online
          Copyright 1999 The Associated Press. All Rights Reserved.

                      Monday, October 18, 1999

                  HCFA Absolves Hospitals of Payments
                         By ALICE ANN LOVE
                       Associated Press Write

   WASHINGTON (AP) - The Clinton **administration** has decided to end
attempts to recover millions of dollars from hospitals it had accused of
overstating the amount of money the government owed them for providing
care for the poor.

   "It became obvious that confusion regarding the issue was pervasive,"
Chris Peacock, a spokesman for the Health Care **Financing Administration**,
which administers the payments, said Monday. "This was the fairest thing
to do for these hospitals which treat some of the nation's most
vulnerable patients."

   The **administration** has been conducting a nationwide investigation of
hospitals that receive so-called **disproportionate share** payments through
the Medicare program because they treat large numbers of poor patients.

   The review has focused on whether the hospitals had properly adhered
to federal guidelines when counting patients for purposes of calculating
their claims to the poverty payments.

   Hospitals in some states had already been asked to begin repaying
huge sums for alleged overpayments going back as far as a decade.
Hospitals in New York, for example, were estimated to owe an estimated
$1 billion, Pennsylvania hospitals $250 million and New Jersey hospitals
$288 million.

   In dozens of other states, hospitals were still under investigation.

   The **administration's** reversal came after members of Congress from
affected states protested, saying that the payment rules were not clear
and that hospitals should not be penalized for past errors resulting
from confusion.

   Also, first lady Hillary Rodham Clinton, a potential candidate in the
'00 race for a New York's Senate seat, has said she believes hospitals

              Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

10/18/99 ASSOCPR (No Page)
(Publication page references are not available for this document.)    255

   ing for the poor deserve more federal money.

  **Administration** officials began notifying lawmakers last week that hospitals that have already returned some money will get it back and that no further repayments will be required. The **administration** will also clarify the eligibility rules for the poverty payments, officials said.

  Specifically at issue is whether hospitals can count patients qualifying for state public assistance programs but not the national **Medicaid** health insurance program for the poor.

---- INDEX REFERENCES ----

KEY WORDS:          CABINET, STATE DEPARTMENT, PENTAGON

STORY ORIGIN:      WASHINGTON

NEWS CATEGORY:    WASHINGTON

REGION:           United States; North America (US NME)

Word Count: 326
  10/18/99 ASSOCPR (No Page)
    OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

257

Enclosure

DEPARTMENT OF HEALTH & HUMAN SERVICES
Health Care Financing Administration

October 15, 1999

The Honorable William V. Roth, Chairman
Senate Finance Committee
219 Dirksen Senate Office Building
Washington, D.C. 20510

Dear Senator Roth:

Knowing of your interest in Medicare's policy for determining certain hospital payment adjustments, I am writing you today to inform you of a new development in this area. The Health Care Financing Administration will hold harmless hospitals that have received certain additional Medicare disproportionate share hospital (DSH) payments because guidance on how to claim these funds was not sufficiently clear.

As you know, the DSH formula provides additional funds to hospitals that serve low income Americans. A review of the practices and policies regarding Medicare DSH determinations leads us to conclude that our guidance on the calculation of Medicare DSH, particularly with regard to the inclusion of general assistance days, was neither sufficiently clear nor well understood. The most recent guidance to hospitals on this matter was provided prior to 1998. Many hospitals, fiscal intermediaries and state Medicaid agencies have differing understandings about the particulars of the DSH calculation. We have been actively gathering facts about practices of entities involved in Medicare DSH determinations, and we now have available the information we need to resolve the confused situation we observe.

We will quickly clarify our Medicare DSH policy in guidance both to our fiscal intermediaries and to hospitals. We will also provide clarification of our policy to state Medicaid agencies to ensure that data they submit for use in making DSH determinations comport with our DSH formula. Medicaid data are critical to the DSH calculation, and the state Medicaid agencies are the primary source of the data in question. The forthcoming guidance will be effective for hospital Medicare cost reporting periods beginning on or after January 1, 2000.

The Honorable William V. Roth Page 2

For hospital Medicare cost reporting periods beginning on or before December 31, 1999, our intermediaries will not disallow the portion of DSH payments claimed that reflect this misunderstanding of the DSH formula where a hospital had previously claimed and received Medicare DSH payments under the incorrect formula. This will apply to both open and closed cost reports. Where fiscal intermediaries have disallowed the portion of DSH reimbursement claimed under our insufficiently clear policy, and the hospitals timely pursued their administrative remedies, the disallowances will be reversed and, where necessary, repaying the hospitals the amounts that had been recouped.

We believe the hospitals should be held harmless in light of the existing confusion. I look forward to continuing to work with you in the future on matters of mutual importance.

Sincerely,

signed.

Michael Hash
Deputy Administrator

Return to Medicaid Professional Technical Information Page

HCFA-RUL, MED-GUIDE 1997 ... ED-GUIDE-TB ¶45,105, Interpretation of ... icaid Days in Medicare DSH Adjustment Calculation., HCFA Ruling No. 97-2 , (Feb. 27, 1997)
COPYRIGHT 2002, CCH Incorporated

Interpretation of Medicaid Days in Medicare DSH Adjustment Calculation.

HCFA Ruling No. 97-2 February 27, 1997

#### Medicare and Medicaid: Determination of Disproportionate Patient Percentage

Prospective payment systems–Disproportionate share hospitals–Determination of disproportionate patient percentage–Treatment of Medicaid days.--
Acquiescing to the holdings of federal courts of appeals in four circuits, HCFA has issued the following *Ruling* changing its interpretation of statutory and regulatory provisions concerning the treatment of Medicaid days in calculating the Medicare disproportionate share adjustment under the prospective payment system. Effective February 27, 1997, the ruling states that the DSH adjustment should be determined by including as part of the calculation all inpatient hospital days of service for which a patient was eligible for assistance under a state Medicaid plan, whether or not the hospital actually received payment for those days.

See ¶4269.18, ¶14,725.13.
[Text of Ruling]

HCFA Rulings are decisions of the Administrator that serve as precedent final opinions and orders and statements of policy and interpretation. They provide clarification and interpretation of complex or ambiguous statutory or regulatory provisions relating to Medicare, Medicaid, Utilization and Quality Control Peer Review, and related matters.

HCFA Rulings are binding on all HCFA components, Medicare contractors, the Provider Reimbursement Review Board, the Medicare Geographic Classification Review Board, the Departmental Appeals Board, and Administrative Law Judges who hear Medicare appeals. These decisions promote consistency in interpretation of policy and adjudication of disputes.

This Ruling states the policy of the Health Care Financing Administration concerning the determination to change its interpretation of section 1886(d)(5)(F)(vi)(II) of the Social Security Act (the Act) and 42 CFR 412.106(B)(4) to follow the holdings of the United States Courts of Appeals for the Fourth, Sixth, Eighth, and Ninth Circuits. Under the new interpretation, the Medicare disproportionate share adjustment under the hospital inpatient prospective payment system will be calculated to include all inpatient hospital days of service for patients who were eligible on that day for medical assistance under a State Medicaid plan in the Medicaid fraction, whether or not the hospital received payment for those inpatient hospital services.

MEDICARE PROGRAM

Hospital Insurance (Part A).

INTERPRETATION OF MEDICAID DAYS INCLUDED IN THE MEDICARE DISPROPORTIONATE SHARE ADJUSTMENT CALCULATION

PURPOSE: This Ruling announces the Health Care Financing Administration's (HCFA) determination to change its interpretation of section 1886(d)(5)(F)(vi)(II) of the Social Security Act (the Act) and 42 CFR 412.106(b)(4) to follow the holdings of the United States Courts of Appeals for the Fourth, Sixth, Eighth, and Ninth Circuits. Under the new interpretation, the Medicare disproportionate share adjustment under the hospital inpatient prospective payment system will be calculated to include all inpatient hospital days of service for patients who were eligible on that day for medical assistance under a State Medicaid plan in the Medicaid fraction, whether or not the hospital received payment for those inpatient hospital services.

CITATIONS: Section 1886(d)(5)(F) of the Social Security Act and 42 CFR 412.106(b)(4) .

PERTINENT HISTORY: The Medicare disproportionate share hospital (DSH) adjustment calculation, which is set forth in section 1886(d)(5)(F) of the Act , has been the subject of a substantial amount of litigation. The adjustment is calculated by determining a hospital's disproportionate patient percentage, which is the sum of two fractions, the Medicare fraction and the Medicaid fraction. In the Medicare fraction, the number of patient days for patients who (for those days) were entitled to both Medicare Part A and Supplemental Security Income (SSI) under Title XVI of the Act is divided by the total number of patient days for patients entitled to Medicare Part A for that same period. The Medicaid fraction consists of the number of

398    BAN-0155

HCFA-RUL, MED-GUIDE 1997    ED-GUIDE-TB ¶45,105, Interpretation of    icaid Days in Medicare DSH
Adjustment Calculation., HCFA Ruling No. 97-2 , (Feb. 27, 1997)
COPYRIGHT 2002, CCH Incorporated

patient days for patients who for those days "were eligible for medical assistance under a State plan approved under title XIX [Medicaid] but who were not entitled to benefits under Medicare Part A" (section 1886(d)(5)(F)(vi)(II) of the Act), divided by the total number of patient days for that same period. The Medicaid fraction is the subject of this ruling.

In implementing the calculation of the Medicaid fraction, HCFA interpreted the statutory language to include as Medicaid patient days only those days for which the hospital received Medicaid payment for inpatient hospital services. This interpretation has been considered by the courts of appeals in four judicial circuits. The initial issue in the litigation was whether HCFA should have counted days for patients who had been found to be Medicaid eligible, but who had exceeded Medicaid coverage limitations on inpatient hospital days of service (and, consequently, no Medicaid payment was made for those days). In later cases, plaintiffs challenged HCFA's exclusion of any days of inpatient hospital services for patients who met Medicaid eligibility requirements, regardless of the reason for which no Medicaid payment was made. In each of the cases, the court declined to uphold HCFA's interpretation, reasoning that the statutory language "eligible for medical assistance" would include days on which the patient meets Medicaid eligibility criteria regardless of whether payment is made.

Although HCFA believes that its longstanding interpretation of the statutory language was a permissible reading of the statutory language, HCFA recognizes that, as a result of the adverse court rulings, this interpretation is contrary to the applicable law in four judicial circuits.

In order to ensure national uniformity in calculation of DSH adjustments, HCFA has determined that, on a prospective basis, HCFA will count in the Medicaid fraction the number of days of inpatient hospital services for patients eligible for Medicaid on that day, whether or not the hospital received payment for those inpatient hospital services. This would not include days for which no Medicaid payment was made because of the patient's spenddown liability, because an individual was not eligible for Medicaid at that point.

Pursuant to this Ruling, Medicare fiscal intermediaries will determine the amounts due and make appropriate payments through normal procedures. Claims must, of course, meet all other applicable requirements. This includes the requirement for data that are adequate to document the claimed days. The hospitals bear the burden of proof and must verify with the State that a patient was eligible for Medicaid (for some covered services) during each day of the patient's inpatient hospital stay. As the intermediaries may require, hospitals are responsible for and must furnish appropriate documentation to substantiate the number of patient days claimed. Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid cannot be counted.

We will not reopen settled cost reports based on this issue. For hospital cost reports that are settled by fiscal intermediaries on or after the effective date of this ruling, these days may be included. For hospital cost reports which have been settled prior to the effective date of this ruling, but for which the hospital has a jurisdictionally proper appeal pending on this issue pursuant to either 42 CFR 405.1811  or 42 CFR 405.1835 , these days may be included for purposes of resolving the appeal.

RULING: For all cost reporting periods beginning on or after February 27, 1997, the Medicare disproportionate share adjustment will be determined by including in the calculation of the Medicaid fraction set forth in section 1886(d)(5)(F)(vi)(II) of the Act the additional days as set forth above.

IV. EFFECTIVE DATE

This Ruling is effective February 27, 1997.

/s/Bruce C. Vladeck

Administrator,

Health Care Financing Administration

BAN-0156



P - 21

400

# PMI A-99-62 CLARIFICATION OF ALLOWABLE MEDICAID DAYS IN THE MEDICARE DISPROPORTIONATE SHARE HOSPITAL (DSH) ...

A-99-62 CLARIFICATION OF ALLOWABLE MEDICAID DAYS IN THE MEDICARE DISPROPORTIONATE SHARE HOSPITAL (DSH) ADJUSTMENT CALCULATION--ACTION

---

| Program Memorandum | Department of Health and Human Services |
| Intermediaries | Health Care Financing Administration |

---

Transmittal No. A-99-62                          Date DECEMBER 1999

---

Change Request #1052

PMI A-99-62 CLARIFICATION OF ALLOWABLE MEDICAID DAYS IN THE MEDICARE DISPROPORTIONATE SHARE HOSPITAL (DSH) ADJUSTMENT CALCULATION--ACTION

A review of practices and policies regarding Medicare disproportionate share payment determinations led HCFA to conclude that it is necessary to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy and communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations. This clarification applies to cost reporting periods beginning on or after January 1, 2000. The purpose of this memorandum is to address those details that may need clarification and also to communicate the hold harmless position for cost reporting periods beginning before January 1, 2000. A similar memorandum will be sent to the Medicaid State agencies.

CLARIFICATION FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 2000

BAN-0157

Background

Under section 1886(d)(5)(F) of the Social Security Act, the Medicare disproportionate share patient percentage is made up of two computations. The first computation includes patient days that were furnished to patients who, during a given month, were entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding State supplementation). This number is divided by the number of covered patient days utilized by patients under Medicare Part A for that same period. The second computation includes patient days associated with beneficiaries who were eligible for medical assistance (Medicaid) under a State plan approved under Title XIX but who were not entitled to Medicare Part A. (See 42 CFR 412.106(b)(4).) This number is divided by the total number

of patient days for that same period.

## Included Days

In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for "Medicaid days" reflects several key concepts. First, the focus is on the patient's eligibility for Medicaid benefits as determined by the State, not the hospital's "eligibility" for some form of Medicaid payment. Second, the focus is on the patient's eligibility for medical assistance under an approved Title XIX State plan, not the patient's eligibility for general assistance under a State-only program. Third, the focus is on eligibility for medical assistance under an approved Title XIX State plan, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid (under an approved Title XIX State plan). In other words, for purposes of the Medicare disproportionate share adjustment calculation, the term "Medicaid days" refers to days on which the patient is eligible for medical assistance benefits under an approved Title XIX State plan. The term "Medicaid days" does not refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is not eligible for medical assistance benefits under an approved Title XIX State plan, the patient day cannot become a "Medicaid day" simply by virtue of some other association with the Medicaid program.

Medicaid days, for purposes of the Medicare disproportionate share adjustment calculation, include all days during which a patient is eligible, under a State plan approved under Title XIX, for Medicaid benefits, even if Medicaid did not make payment for any services. Thus, Medicaid days include, but are not limited to, days that are determined to be medically necessary but for which payment is denied by Medicaid because the provider did not bill timely, days that are beyond the number of days for which a State will pay, days that are utilized by a Medicaid beneficiary prior to an admission approval but for which a valid enrollment is determined within the prescribed period, and days for which payment is made by a third party. In addition, we recognize in the calculation days that are utilized by a Medicaid beneficiary who is eligible for Medicaid under a State plan approved under Title XIX through a managed care organization (MCO) or health maintenance organization (HMO). However, in accordance with 42 CFR 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day. Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, you must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract them from the other days in the calculation.

## Excluded Days

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program. For example, some States provide medical assistance to beneficiaries of State-funded income support programs. These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and, therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must

BAN-0158

contact the State for assistance in ing so.

In addition, if a given patient day effects the level of <u>Medicaid</u> DSH payments <u>to the hospital</u> but the patient is not eligible for Medicaid under a State plan approved under Title XIX on that day, the day is not included in the <u>Medicare</u> DSH calculation.

It should be noted that the types of days discussed above are not necessarily the only types of excluded days. Please see the attached chart, which summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation.

To provide consistency in both components of the calculation, any days that are added to the Medicaid day count must also be added to the total day count, to the extent that they have not been previously so added.

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed. Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.

HOLD HARMLESS FOR COST REPORTING PERIODS BEGINNING BEFORE
JANUARY 1, 2000

In accordance with the hold harmless position communicated by HCFA on October 15, 1999, for cost reporting periods beginning before January 1, 2000, you are not to disallow, within the parameters discussed below, the portion of Medicare DSH adjustment payments previously made to hospitals attributable to the erroneous inclusion of general assistance or other State- only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days in the Medicaid days factor used in the Medicare DSH formula. This is consistent with HCFA's determination that hospitals and intermediaries relied, for the most part, on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and that some of those agencies commingled the types of otherwise ineligible days listed above with Medicaid Title XIX days in the data transmitted to hospitals and/or intermediaries. Although HCFA has decided to allow the hospitals to be held harmless for receiving additional payments resulting from the erroneous inclusion of these types of otherwise ineligible days, this decision is not intended to hold hospitals harmless for any other aspect of the calculation of Medicare DSH payments or any other Medicare payments.

<u>Hospitals That Received Payments Reflecting the Erroneous Inclusion of Days at Issue</u>

In practical terms this means that you are not to reopen any cost reports for cost reporting periods beginning before January 1, 2000 to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days if the hospital received payments for those days based on those cost reports. If, prior to the issuance of this Program Memorandum, you reopened a settled cost report to disallow the portion of Medicare DSH payment

BAN-0159

attributable to the inclusion of these types of days, reopen that cost report again and refund the amounts (including interest) collected. Do not, however, pay the hospital interest on the amounts previously recouped as result of the disallowance. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

For cost reporting periods beginning before January 1, 2000, you are to continue to allow these types of days in the Medicare DSH calculation for all open cost reports only in accordance with the practice followed for the hospital at issue before October 15, 1999 (i.e., for open cost reports, you are to allow only those types of otherwise ineligible days that the hospital received payment for in previous cost reporting periods settled before October 15, 1999). For example, if, for a given hospital, a portion of Medicare DSH payment was attributable to the erroneous inclusion of general assistance days for only the out- of-State or HMO population in cost reports settled before October 15, 1999, you are to include the ineligible waiver days for only that population when settling open cost reports for cost reporting periods beginning before January 1, 2000. However, the actual number of general assistance and other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration days, as well as Medicaid Title XIX days, that you allow for the open cost reports must be supported by auditable documentation provided by the hospital.

### Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue

If a hospital did not receive any payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the Provider Reimbursement Review Board (PRRB) on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost reports for cost reporting periods beginning before January 1, 2000. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. If there are any questions or concerns regarding the qualifications for a "jurisdictionally proper appeal", please submit them in writing before rendering a decision in a specific case to Charles Booth, Director, Financial Services Group, Office of Financial Management, 7500 Security Boulevard, Location C3-14- 16, Baltimore, Maryland 21244-1850. Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula on or after October 15, 1999, reopen the settled cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. The actual number of these types of days that you use in this revision must be properly supported by adequate documentation provided by the

BAN-0160

hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on other Medicare DSH issues or other unrelated issues.

You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on previously settled cost reports.

Finally, you are reminded that, if a hospital has filed a jurisdictionally proper appeal with respect to the HCFA 97-2 ruling and the hospital has otherwise received payment for the portion of Medicare DSH adjustment attributable to the inclusion of general assistance or other State-only health programs, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days based on its paid Medicaid days, include these types of unpaid days in the Medicare DSH formula when revising the cost reports affected by the HCFA 97-2 appeal.

The *effective date* for this Program Memorandum (PM) is for cost reporting periods beginning on or after January 1, 2000.

The *implementation date* for this PM is January 1, 2000.

Funding is available through a Supplemental Budget Request for costs required for implementation.

PM may be discarded after January 31, 2001.

SPECIAL INSTRUCTIONS TO THE INTERMEDIARIES FOR PUBLISHING THE PM:
The intermediaries are required to distribute the content of this PM to all the hospitals immediately upon receipt of the PM.

HCFA-Pub. 60A

Attachment

| TYPE OF DAY | DESCRIPTION | ELIGIBLE TITLE XIX DAY |
|---|---|---|
| General Assistance Patient Days | Days for patients covered under a State-only (or county-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a State-only health program. These patients are not Medicaid-eligible | No. |

BAN-0161

405

| | ...under the State plan. | |
|---|---|---|
| Charity Care Patient Days | Days for patients not eligible for Medicaid or any other third-party payer, and claimed as uncompensated care by a hospital. These patients are not Medicaid-eligible under the State plan. | No. |
| Actual 1902(r)(2) and 1931(b) Days | Days for patients eligible under a State plan based on a 1902(r)(2) or 1931(b) election. These patients are Medicaid-eligible under the Title XIX State plan under the authority of these provisions, which is exercised by the State in the context of the approved State plan. | Yes. |
| Medicaid Optional Targeted Low Income Children (CHIP-related) Days | Days for patients who are Title XIX-eligible and who meet the definition of "optional targeted low income children" under section 1905(u)(2). The difference between these children and other Title XIX children is the enhanced FMAP rate available to the State. These children are fully Medicaid-eligible under the State plan. | Yes. |
| Separate CHIP Days | Days for patients who are eligible for benefits under a non-Medicaid State program furnishing child health assistance to targeted low-income children. These children are, by definition, not Medicaid-eligible under a State plan. | No. |
| 1915(c) Eligible Patient (the "217" group) Days | Days for patients in the eligibility group under the State plan for individuals under a Home and Community Based Services waiver. This group includes individuals who would be Medicaid-eligible if they were in a medical institution. Under this special eligibility group, they are Medicaid-eligible under the State plan. | Yes. |
| Retroactive Eligible Days | Days for patients not enrolled in the Medicaid program at the time of service, but found retroactively eligible for Medicaid benefits for the days at issue. These patients are Medicaid-eligible under the State plan. | Yes. |
| Medicaid Managed Care Organization Days | Days for patients who are eligible for Medicaid under a State plan when the payment to the hospital is made by an MCO for the service. An MCO is the financing mechanism for Medicaid benefits, and payment for the service through the MCO does not affect eligibility. | Yes. |

BAN-0162

| Medicaid DSH Days | Days for patients who are not eligible for Medicaid benefits, but considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid-eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula. | No. |

BAN-0163

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S APPENDIX PURSUANT TO LOCAL RULE 7(n)**

**Volume V of V**
[AR 448 – AR 829]

Respectfully submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

April 30, 2008

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Notice of Administrator's Decision, dated July 16, 2007 | 1 |
| Administrator's Decision, dated July 13, 2007 | 2-21 |
| PRRB Decision No. 2007-D35, dated May 17, 2007 | 31-42 |
| Excerpts from Provider's Post Hearing Brief, dated May 17, 2004 | 61-71, 81-83 |
| Excerpts from Transcripts of Oral Hearing, held March 18, 2004 | 128-180 |
| Stipulations of the Parties | 192-93 |
| Provider's Exhibit P-1 | 223-24 |
| Excerpts from Provider's Exhibit P-2 | 225-29, 233-35 |
| Excerpts from Provider's Exhibit P-3 | 240-42 |
| Excerpts from Provider's Exhibit P-4 | 246-47 |
| Provider's Exhibit P-6 | 280-99 |
| Provider's Exhibit P-7 | 300-12 |
| Provider's Exhibit P-8 | 313-22 |
| Provider's Exhibit P-9 | 323-29 |
| Provider's Exhibit P-12 | 334-52 |
| Excerpts from Provider's Exhibit P-13 | 354-55, 364 |

**Plaintiff's Appendix for**
***Banner Health v. Leavitt***
**(1:07-cv-01614-RBW)**

| Document | Pages for Plaintiff's Appendix (original numbering from Administrative Record) |
|---|---|
| Provider's Exhibit P-14 | 379-81 |
| Provider's Exhibit P-15 | 382-84 |
| Provider's Exhibit P-17 | 388-91 |
| Provider's Exhibit P-18 | 392-94 |
| Provider's Exhibit P-19 | 395-96 |
| Provider's Exhibit P-20 | 397-99 |
| Provider's Exhibit P-21 | 400-07 |
| Provider's Exhibit P-28 | 448-54 |
| Provider's Exhibit P-29 | 455-56 |
| Excerpts from Intermediary's Exhibit I-12 | 732-33 |
| Excerpts from Intermediary's Exhibit I-14 | 745, 751-81* |
| Intermediary's Exhibit I-20 | 824-26 |
| Intermediary's Exhibit I-21 | 827-29 |

*The Administrative Record filed by the Secretary in this case did not include page 768.

JAN 14 '92  02:05PM ST JOSEPH'S HOSPITAL                    P.2

TO:    Audit & Reimbursement Staff

FROM:   Debbie Donovan

DATE:   January 10, 1992

SUBJECT:  AHCCCS Days Count for DSH Calculation


Per the May 6, 1986 Federal Register, page 15777, for
purposes of determining a hospital's disproportionate
patient percentage, AHCCCS covered days will include only
those days for which benefits are payable under Title XIX.

The State AHCCCS program is a combination of 5 different
eligibility selections.

        Title XIX - Federally funded under Title XIX
        Medically Indigent - State of Arizona program
        Medically Needy - State of Arizona program
        Eligible Low Income Children - County program
        Eligible Assistance to Children - Federal

Only the Title XIX eligible receive federal Title XIX funds.
Per the regulations, these are the only allowable days to
count for DSH purposes.  On audit we have always counted
total AHCCCS days as allowable for DSH.  This is incorrect
and has caused great overstatements in DSH reimbursement.

The problem in resolving this issue is that the provider's
do not have the capability to determine which AHCCCS
patients on their listings are Title XIX eligible.  This can
only be done by AHCCCS Administration and they do not
maintain this data. They are currently working on reports to
extract days and charges by eligibility class.  We
therefore have no means to distinguish Title XIX days on
audit for the DSH calculation.

Due to this problem and the overpayments it is creating, you
are to DISALLOW the % AHCCCS Days to Total Days in the DSH
calculation for all DSH providers.  As the provider must
have a percentage of 15% or greater to qualify for the
adjustment, you will have to make the determination based
solely on the SSI Ratio published by HCFA.  This treatment
is effective for all current open cost reports.

We are currently sending out reopening notices to all DSH
providers for all reopenable cost reports.  We will be
explaining this new treatment and will place the
responsibility of obtaining distinct Title XIX days on them.
We realize providers will be very angry with this change and
expect to receive phone calls.  I am attaching the Admin-
istrative Bulletin with the appropriate Federal Register for

your information.  This may be copied for the provider.
Refer the provider to the appropriate supervisor should they
persist in questioning this adjustment.

If you have any questions on this issue, please see me or
Marty.

JAN 02 '93  11:56AM B.C.B.S.FEDERAL PROGRM

**Blue Cross**
and
**Blue Shield**
Association



676 North St. Clair
Chicago, Illinois 30
312/440-6000

Post-it™ brand fax transmittal memo 7671 | # of pages ► 4
To: Brian Douglas       From: Marty Enriquez
Co.: Regulatory Perms   Co.: Bc BS AZ
Samaritans            Phone #: 864-4792
Fax #: 495-4713         Fax #: 864-4062

Administrative Bulletin 1666, 86.05

DATE:     May 13, 1986

TO:       Directors of Federal Programs
          Reimbursement Managers

FROM:     Harry P. Cain, II, Administrator
          Federal Programs Division

SUBJECT:  MEDICARE PROGRAM; FISCAL YEAR 1986 CHANGES TO THE INPATIENT
          HOSPITAL PROSPECTIVE PAYMENT SYSTEM; ~~INTERIM FINAL RULE~~ WITH
          COMMENT PERIOD

ACTION:   Respond to BCBSA by May 30, 1986.


Attached to this Administrative Bulletin is the above referenced ~~interim a
final rule which was published in the May 31 1986 Federal Register.~~ These
changes are made in order to implement certain positions of the Consolidated
Omnibus Budget Reconciliation Act of 1985 (COBRA). The following are
affected by this legislation:

   o  FY 86 PPS payments
      - revised DRG classifications and weights
      - revised wage index
      - revised adjusted standardized amounts

   o  the rate-of-increase limits (target amounts) for hospitals excluded
      from PPS

   o  the length of the transition period and the method of payment

   o  application of the hospital wage index

   o  payment for the indirect costs of medical education

   o  payments for hospitals that serve a ~~disproportionate share of~~ low
      income patients

   o  revised DRG classifications and weights

-1-

451
BAN-0200

16776    Federal Register / Vol. 31, No. 87 / Tuesday, May 6, 1986 / Rules and Regulations

$$3 \times \left[\left(1 + \frac{\text{interns and residents}}{\text{beds}}\right)^{.405} - 1\right]$$

*For Example:* A hospital has an intern and resident to bed ratio of .2. Its adjustment factor is computed in the following way:

$3 \times [(1 + .2)^{.405} - 1] = 3 \times [1.07683] = .18327$

This hospital's indirect medical education adjustment factor is .1833. To determine the hospital's additional payment, this factor is multiplied by the hospital's total DRG revenue based on the DRG-adjusted prospective payment.

On February 28, 1986, we published a notice of proposed rulemaking in the Federal Register (51 FR 3735) to revise the application of the formula used to calculate payment for the indirect costs of medical education for prospective payment hospitals. We proposed to apply the education adjustment factor of '1.99 on a curvilinear basis.

Since the provisions of section 9104 of Pub. L. 99-272 supersede that proposal, we are withdrawing it from consideration.

Section 9104(a) of Pub. L. 99-272 also amended section 1886(d)(5)(B) of the Act to provide that, for discharges occurring on or after May 1, 1986, interns and residents assigned to outpatient departments of a hospital are included in the count of interns and residents for the purpose of determining the indirect medical education adjustment factor. Thus, we are deleting from the regulations the changes we made to § 412.118(f) in the September 3, 1985 final rule concerning the exclusion from the count of interns and residents of those individuals who are assigned to outpatient departments or are furnishing outpatient services in ancillary departments. Because of the provisions of Pub. L. 99-107, the changes we made to § 412.118(f) never became effective.

**2. Direct Costs of Medical Education**

We note here that Pub. L. 99-272 changes the way Medicare pays for the direct costs of medical education. Under section 1886(h)(4) of the Act, direct costs of medical education are excluded from the definition of inpatient operating costs that are covered by the prospective payment system. Thus, the direct costs of approved medical

education programs (for example, salaries for interns and residents and overhead costs) are not included in hospital-specific, regional, or national payment rates to hospitals subject to the prospective payment system, but are reimbursed on a reasonable cost basis. The provisions governing reimbursement for the services of interns and residents appear at section 1322(a)(1)(B)(i) and 1861(b)(6) of the Act.

On July 1, 1985, we published a final rule in the Federal Register (50 FR 27722) that placed a one-year limit on the amount of reimbursement for providers for their direct costs of approved medical education activities for cost reporting periods beginning on or after July 1, 1985 and before July 1, 1986. Section 9202 of Pub. L. 99-272 specifies a different approach to reimbursement of direct medical education costs starting with cost reporting periods beginning on or after July 1, 1985. The provisions of this section of the law supersede the provisions set forth in the July 1, 1985 final rule, thus making this rule no longer effective. We plan to publish revised regulations to implement section 9202 of Pub. L. 99-272 in the near future.

**3. Payments for Hospitals That Serve a Disproportionate Share of Low-Income Patients**

Section 1886(d)(5)(C)(i) of the Act authorizes the Secretary to make adjustments to the prospective payment rates to take into account the special needs of certain classes of hospitals, including public or other hospitals that serve a significantly disproportionate number of low-income patients or Medicare Part A beneficiaries. We had not made special provisions for these

hospitals in the Medicare regulations because, based on our past analyses (which are described in several Federal Register publications at 47 FR 43282, 48 FR 39418, 48 FR 26789, 49 FR 379-377, 50 FR 24394-24395 and 50 FR 35999-35998), we believed that there had not been sufficient evidence to demonstrate that an adjustment is warranted.

Section 9105 of Pub. L. 99-272 adds a new section 1886(d)(5)(F) to the Act to require that we make an additional payment for hospitals that serve a disproportionate share of low-income patients. Section 1886(d)(5)(F)(i) of the Act provides that for discharges occurring on or after May 1, 1986 and before October 1, 1988, an additional payment must be made for each prospective payment hospital that meets one of the following criteria:

• During the hospital's cost reporting period, the hospital has a disproportionate patient percentage that is at least equal to—

—15 percent if the hospital is located in an urban area and has 100 or more beds;

—30 percent if the hospital is located in an urban area and has fewer than 100 beds; or

—45 percent if the hospital is located in a rural area; (Sections 1886(d)(5)(F)(i)(I)(I), and (v) of the Act).

• The hospital is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its total inpatient care revenue is derived from State and local government payments for indigent care furnished to patients not covered by Medicare or Medicaid. (Section 1886(d)(5)(F)(i)(II) of the Act).

For purposes of meeting the latter criterion, it is incumbent upon a hospital to demonstrate that more than 30 percent of its total inpatient care revenues are from State and local government sources and that those revenues are specifically earmarked for the care of indigents (that is, none of that money may be used for any purpose other than indigent care). The following are among the types of care that are not to be included by the hospital as indigent care:

• Free care furnished to satisfy the hospital's Hill-Burton obligation.

• Free or other care furnished at reduced rates made available by the hospital to its employees or by a government hospital to any category of public employees.

• Funds furnished to the hospital to cover general operating deficits.

BAN-0201

For purposes of determining a hospital's bed size, we are using the same definition that is currently used for determining number of beds for purposes of calculating the indirect medical education adjustment (§ 412.118(b)). That is, the number of beds in a hospital is determined by counting the number of available bed days during the hospital's cost reporting period, not including beds assigned to newborns, custodial care, and excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

Section 1886(d)(5)(F)(vi) states that the term "disproportionate patient percentage," which is used in the criterion implementing section 1886(d)(5)(F)(i)(I) and (v) of the Act which is described above, means the sum of the following two fractions, which is expressed as a percentage:

1. Patient days of those patients entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding those patients receiving State supplementation only)

Patient days of those patients entitled to Medicare Part A

2. Patient days of those patients entitled to Medicaid but not to Medicare Part A

Total number of patient days

The number of patient days of those patients entitled to both Medicare Part A and SSI will be determined by matching data from the Medicare Part A Tape Bill (PATBILL) file with the Social Security Administration's (SSA's) SSI file. This match will be done at least annually and will involve a match of the individuals who are SSI recipients for each month during the Federal fiscal year in which the hospital's cost reporting period begins with the Medicare Part A beneficiaries who received inpatient hospital services during the same month. Thus, if a Medicare beneficiary is eligible for SSI benefits (excluding State supplementation only) during a month in which the beneficiary is a patient in the hospital, the covered Medicare Part A inpatient days of hospitalization in that month will be counted for the purpose of determining the hospital's disproportionate patient percentage. The match of SSI eligibility records to Medicare inpatient hospital days for a hospital will consist of counting the days in which Medicare inpatient hospital services are furnished during each month to patients entitled to both

Medicare Part A and SSI, summing those days, and dividing by the total number of days for which Medicare inpatient hospital services are furnished to all Medicare Part A beneficiaries in the hospital.

Although section 1886(d)(5)(F)(vi)(I) of the Act specifies that the match is done on a cost reporting period basis, we believe that matching Social Security numbers on a Federal fiscal year basis is the most feasible approach. A monthly match of SSI eligibility files to Medicare hospital records would be administratively more cumbersome and costly and could not be accomplished in a timely manner. Relying on Medicare billing records for the Federal fiscal year rather than the hospital cost reporting period avoids the problem of billing lag at the end of the cost reporting period. We do not believe that there are likely to be significant fluctuations from one year to the next in the percentage of patients served by the hospital who are dually entitled to Medicare Part A and SSI. Consequently, the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period.

However, we are affording all hospitals the option to determine their number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods. A hospital that avails itself of this option must furnish to its fiscal intermediary, in a manner and format to be prescribed by HCFA, data on its Medicare patients for its cost reporting period. These data will then be matched by SSA to determine those patients dually entitled to Medicare and SSI for the hospital's cost reporting period. The full cost of this process, including the cost of verification by SSA, will be borne by the hospital.

The number of patient days of those patients entitled to Medicaid but not to Medicare Part A will be determined by the hospital's Medicaid fiscal intermediary based on Medicaid statistical data reported on the hospital's Medicare cost report. Total Medicaid inpatient days will include all covered days attributable to Medicaid patients including any inpatient days for Medicaid patients who are members of a health maintenance organization.

Section 1886(d)(5)(F)(vi)(II) of the Act describes Medicaid patient days of those". . . which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX . . ." Therefore, Medicaid covered days will include only those days for which

benefits are payable under title XIX. Any day of a Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days. For example, if a patient is hospitalized for 19 days and is eligible for Medicaid benefits for 10 of those days, only the 10 covered days will be considered Medicaid patient days for purposes of determining a hospital's disproportionate patient percentage.

The preamble will not be making payments to hospitals that serve a disproportionate share of low-income patients will be similar to the process we use to make the additional payment for the indirect medical education costs that is, we will make interim payments based on the latest available data subject to a year-end settlement on a cost reporting period basis. For purposes of making those interim payments, the initial determination of a hospital's eligibility for this payment will be made by the hospital's Medicare fiscal intermediary based on Medicaid statistical data as reported on the hospital's most recent cost report and the SSI and Medicare data to be supplied by HCFA central office. If a hospital disagrees with the intermediary's determination of its Medicaid patient days, it will be the hospital's responsibility to demonstrate to the intermediary that the Medicaid statistics reported on its cost report are incorrect or were improperly applied. Medicaid data submitted by the hospital, whether on the cost report or furnished subsequently, are subject to intermediary audit to ensure their accuracy.

Sections 1886(d)(5)(F) (II) and (iv) of the Act specify that the additional payment adjustment for hospitals that meet the disproportionate patient percentage criterion (section 1886(d)(5)(F)(i)(I) of the Act) is determined as follows:

• For urban hospitals with 100 or more beds, the hospital's total DRG revenue (as defined below) is increased by 2.5 percent plus one-half the difference between the hospital's percentage of low-income patients and 15 percent, up to a maximum of 15 percent, that is, the disproportionate share adjustment factor is the lesser of 15 percent or (P − .15)(.5) + .025, where P equals the hospital's disproportionate patient percentage expressed as a decimal.

• For urban hospitals with fewer than 100 beds, the hospital's total DRG revenue is increased by five percent.

BAN-0202

16778    *Federal Register* / Vol. 51, No. 87 / Tuesday, May 6, 1986 / Rules and Regulations

For those hospitals the hospital's total DRG revenue to increase by these amount.

As specified in sections 1886(d)(5)(F)(ii) and (iii) of the Act, for those hospitals that meet the indigent care revenue criterion (section 1886(d)(5)(F)(i)(II) of the Act), the payment adjustment is determined by increasing the hospital's total DRG revenue by 15 percent. A hospital's total DRG revenue is the revenue based on DRG-adjusted prospective payment rates (for transition period payments, the Federal portion of the hospital's payment rates) including outlier payments but excluding any other additional payments such as the indirect medical education payment.

The provisions for adjusting the prospective payment rates for hospitals serving a disproportionate share of low-income patients are set forth in regulations at a new §412.105.

*2. Hospitals that Qualify for Waiver of Requirements Concerning Part A Billing*

Section 202(k) of Pub. L. 98-21 authorizes a temporary waiver, in certain circumstances, of the requirement set forth in sections 1862(a)(14) and 1886(a)(4)(H) of the Act that hospitals bill for all nonphysician patient hospital services under Medicare Part A. This waiver authority is implemented through our regulations governing provider agreements (42 CFR Part 489). Essentially, a hospital qualifies for a waiver if it—

° Had traditionally followed the practice of allowing suppliers of items and services furnished to its inpatients to bill directly under Medicare Part B for those items and services and

° This practice was so extensive that the hospital's immediate compliance with the new requirement would threaten the stability of patient care.

These provisions are set forth in §489.23.

Section 202(k) of Pub. L. 98-21 requires that we reduce the Medicare Part A payment to a hospital that has a waiver for the amount of Part B billings for nonphysician services furnished to the hospital's inpatients. Therefore, our regulations (§412.120(c)) state that payments for inpatient services are reduced to take into account 100 percent of the reasonable charges (before application of the Medicare Part B deductible and coinsurance amounts) for nonphysician services furnished by an outside supplier.

As mentioned earlier in section III.D.1 of this preamble, §412.118 provides that a hospital's indirect medical education payment is determined on the basis of the total DRG revenue based on the Federal rates received by the hospital.

The DRG revenue received by hospitals that qualify for a waiver under §489.23 does not include the Part B reasonable charges for nonphysician services furnished by an outside supplier. Therefore, our policy for determining the amount of the indirect medical education payment for a hospital that has a waiver has been to base the payment on the DRG revenue based on Federal rates after it has been reduced for Part B billings.

Section 9112(a) of Pub. L. 99-272 amends section 202(k) of Pub. L. 98-21 by adding a provision that specifies that the indirect medical education payment for hospitals that have a waiver is to be computed as if the hospital were receiving under Part A all the payments that were made under Part B because of the waiver. That is, a hospital with a waiver under section 202(k) of Pub. L. 98-21 is treated as if the waiver is not in effect for purposes of computing the additional payment for the indirect costs of medical education. Section 9112(b) of Pub. L. 99-272 specifies that this amendment is effective for cost reporting periods beginning on or after January 1, 1986. Therefore, we are revising §412.118(a)(2) to include in the computation of the indirect medical education payment for the costs of indirect medical education the payments made under Part B to hospitals that have a waiver.

In addition, section 9112(a) of Pub. L. 99-272 amended section 202(k) of Pub. L. 98-21 to specify that Part A services billed under Part B under a waiver will be paid at 100 percent of the reasonable charge (or other applicable basis of payment) and that in order to retain its waiver, the hospital must ensure that the supplier that bills for the services accepts this payment as payment in full (that is, the beneficiary is not responsible for payment of the coinsurance). In section 9112 of Pub. L. 99-272, Congress specifically stated that payment for Part A services billed under Part B is equal to 100 percent of the reasonable charge and that the entity furnishing the services must accept *this amount* as the full charge. Because there is no mention of a reduction of this amount by the Part B deductible, for administrative simplicity, we will not apply the deductible to these payments. We are revising §489.23 to include this requirement, which is effective 10 days after the day of enactment of Pub. L. 99-272, that is, April 17, 1986.

*V. Tables*

This section contains the tables referred to in this preamble. For Tables 2, 3a, and 3b, refer to the September 1, 1985 interim final rule (50 FR 38848). For Table 9, refer to the September 3, 1985 final rule (50 FR 36348).

### TABLE 1.—ADJUSTED STANDARDIZED AMOUNTS, LABOR/NONLABOR

| Region | Urban | | Rural | |
|---|---|---|---|---|
| | Labor related | Nonlabor related | Labor related | Nonlabor related |
| 1. New England (CT, ME, MA, NH, RI, VT) | 2179.04 | 871.80 | 2142.91 | 809.79 |
| 2. Middle Atlantic (PA, NJ, NY) | 2230.39 | 694.01 | 2177.03 | 616.37 |
| 3. South Atlantic (DE, DC, FL, GA, MD, NC, SC, VA, WV) | 2036.63 | 315.20 | 1997.46 | 459.17 |
| 4. East North Central (IL, IN, MI, OH, WI) | 2447.01 | 718.04 | 1981.39 | 453.10 |
| 5. East South Central (AL, KY, MS, TN) | 2248.33 | 546.33 | 1997.01 | 561.08 |
| 6. West North Central (IA, KS, MN, MO, NE, ND, SD) | 2271.37 | 528.26 | 1549.32 | 418.33 |
| 7. West South Central (AR, LA, OK, TX) | 2319.10 | 502.07 | 1652.71 | 200.88 |
| 8. Mountain (AZ, CO, ID, MT, NV, NM, UT, WY) | 2314.72 | 537.66 | 1528.88 | 447.98 |
| 9. Pacific (AK, CA, HI, OR, WA) | 2319.31 | 740.07 | 1647.30 | 524.10 |
| 10. National | 2319.83 | 267.48 | 1350.03 | 440.16 |

### TABLE 4A.—WAGE INDEX FOR URBAN AREAS

| Urban area (constituent counties or county equivalents) | Wage index |
|---|---|
| Abilene, TX: Taylor, TX | .9826 |

### TABLE 4A.—WAGE INDEX FOR URBAN AREAS—Continued

| Urban area (constituent counties or county equivalents) | Wage index |
|---|---|
| Akron, OH: Portage, OH | 1.0608 |

BAN-0203

454



Medicare

2444 West Las Palmaritas Drive
P.O. Box 37700
Phoenix, Arizona 85069-7700
Claims Service 602/864-4299

Regulatory Programs Department
1441 North 12th Street
P.O. Box 25409
Phoenix, Arizona 85002-5489

FEB 2 4 1992

February 12, 1992

Lynda Miller
Director, Regulatory Programs
Samaritan Health Services
1441 North 12th Street
Phoenix, Arizona 85006

RE:   Page Samaritan Hospital - 03-0047

Dear Lynda:

As you are aware, we had been waiting for direction from the Health
Care Financing Administration (HCFA) on how to properly calculate the
disproportionate share (DSH) adjustment.

The purpose of this letter is to let you know we have heard from HCFA
on how to proceed.  Here is how HCFA has instructed us to handle the
matter:

   o    For cost reports ending prior to 1990, total AHCCCS days
        will be used in the DSH calculation.  Therefore, there is
        no need to reopen those previously settled cost reports.

   o    For cost reports ending during and after 1990, Title XIX
        days will be used in the DSH calculation.

   o    Per AHCCCS data, you had ____507____ Title XIX days for
        fiscal year 1990.  If you have documentation to support a
        different number of Title XIX days, please submit it to us
        as soon as possible.  (Please note, this data will be
        subject to audit.)

   o    Title XIX information will continue to be supplied by
        AHCCCS.  However, you may submit your own documentation,
        subject to audit, to us at the time of future cost report
        filings.

   o    Current interim payments for DSH will be revised to
        reflect the inclusion of Title XIX days only.

If you have any questions or need additional information, please
don't hesitate to call your audit supervisor at 864-4225.

Sincerely,

Denise Marshall

Denise Marshall
Director, Federal Programs

Exhibit I-12

GAZLETT. WFD



DEPARTMENT OF HEALTH & HUMAN SERVICES          Health Care Financing
Administration

7500 Security Boulevard
Baltimore, MD 21244

Memorandum

RECEIVED

MAR 13 2000

March 13, 2000

MEDICARE, CLAIMS
CUSTOMER SERVICE

FROM    :    Director
             Financial Services Group, OFM

             Deputy Director
             Medicare Contractor Management, CBS

SUBJECT:    Questions and Answers Related to Program Memorandum A-99-62

TO      :    All Medicare Fiscal Intermediaries

Attached are the questions and answers related to the Program Memorandum to Intermediaries
A-99-62 which were either presented at the January 13, 2000 teleconference or subsequently sent
to Mr. Chuck Booth.

If there are additional questions based on actual situations, please E-Mail them to
CBooth@HCFA.gov.

        /s/                              /s/
    Charles R. Booth                 Marjorie Kanof, M.D.
    Director                         Deputy Director
    Financial Services Group         Medicare Contractor Management
    Office of Financial Management   Center for Beneficiary Services

    Attachment

    cc:

733

 **20 healthy years of reaching across Arizona to provide quality health care for those in need**

 **ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM**
Our first care is your health care

- Quick Links - 

*2001 AHCCCS Overview:*

# Chapter 1 Beginnings and Future of AHCCCS

### Overview:

The Arizona Health Care Cost Containment System (AHCCCS) is Arizona's Medicaid program, and the State's health care program for persons who do not qualify for Medicaid. As of October 1, 2001, AHCCCS was providing health care coverage to 657,490 members, which is approximately 13% of Arizona's population. This represents an approximate 24% increase over the previous year (see *Chart 1A*). These figures do not include approximately 26,300 individuals in the Premium Sharing Program, Healthcare Group, and the Medicare cost-sharing programs.

The 657,490 members include 575,620 Title XIX individuals, 53,685 Title XXI individuals, and 28,185 individuals in State-only funded programs. Approximately 547,318 members are enrolled with health plans, 32,720 members are enrolled in the long term care program, 76,548 individuals receive services through fee-for-service (FFS) arrangements (for example, the emergency services program and Indian Health Services), and 953 are Qualified Medicare Beneficiaries (QMB's) Only members (see *Chart 1B*).



Chart 1A
AHCCCS Population



Chart 1B
AHCCCS Population by Type
(as of October 1, 2001)

AHCCCS health care coverage is comprised of:

- Acute care services including outpatient health services, hospital, pharmacy and durable medical equipment, laboratory and x-ray, specialty care, home health and family planning.
- Long term care services including home and community based services (HCBS),



20 healthy years of reaching across Arizona
to provide quality health care for those in need



**ARIZONA HEALTH CARE**
**COST CONTAINMENT SYSTEM**
Our first care is your health care

| - Quick Links - |  |

**AHCCCS Overview:**

# Appendix II

Year One          Year Six          Year Eleven        Year Sixteen
Year Two          Year Seven        Year Twelve        Year Seventeen
Year Three        Year Eight        Year Thirteen      Year Eighteen
Year Four         Year Nine         Year Fourteen      Year Nineteen
Year Five         Year Ten          Year Fifteen

This table provides information on Year One of AHCCCS (October 1, 1982 - September 30, 1983).

| **Year One (October 1, 1982 - September 30, 1983)** |
| --- |
| **Enrollment:**<br><br>89,683 **acute** care members (53,195 AFDC & AFDC\MAO, 28,322 SSI & SSI\MAO, 8,166 MN/MI) as of December 6, 1982. By December 12, 1993, enrollment had increased to 147,124 members (66,520 AFDC & AFDC/MAO, 29,506 SSI & SSI/MAO, and 51,098 MN/MI). |
| **Program:**<br><br><ul><li>AHCCCS began provision of Title XIX covered services but was waived from providing some mandatory services normally covered under traditional Medicaid. (SB 1001, Chapter 1, Laws of 1981).</li><li>Legislation also contained language which enabled AHCCCS to create Healthcare Group (see Year 6).</li><li>Coverage of human organ transplants included bone marrow, heart and kidney transplants for all Title XIX members under age 18.</li><li>Services were also provided to State-only funded groups.</li><li>AHCCCS paid fee-for-service for inpatient hospital costs based on 100% of covered billed charges.</li><li>18 Health Plans served AHCCCS members.</li></ul> |
| **Waivers:**<br><br>AHCCCS was waived from 14 provisions of the Social Security Act enabling the State to: |

- exclude SNF services;
- exclude home health care;
- exclude nurse-midwife services;
- exclude family planning services;
- restrict freedom of choice of provider;
- exempt well baby care and services from co-payments;
- exclude eyeglasses, dental care and hearing as part of EPSDT services;
- obtain greater flexibility in arranging provider reimbursement agreements;
- exclude from Medicaid all incurred costs for eligible recipients prior to 10/1/82;
- impose cost sharing on mandatory services and individuals enrolled in an HMO;
- limit the scope of adult inpatient and outpatient mental health services to acute conditions;
- substitute an advisory panel of experts in place of the Medical Care Advisory Committee;
- be exempted from federal regulations requiring that State funding comprise at least 40 percent of the non-federal share of Medicaid expenses; and
- allow expenditures for certain items, which are not otherwise included as expenditures under Section 1903 of the Social Security Act, for example, 1) to guarantee six months eligibility in an AHCCCS health plan; and 2) to permit a one year lock and waive 75/25 member composition mix requirements.

| Financial: | Source | SFY Expenditures | |
|---|---|---|---|
| | TOTAL | $98,525,000 | |

Total is estimated and includes funding from federal, state and other sources and was included in the DHS budget.

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- There were 46 ADHS FTEs staffing the AHCCCS program.
- In the spring of 1983, after Dr. Foley's departure as Director of AHCCCS, Donald Mathis served as Acting Director until J. Gregory Fahey was named the Director of AHCCCS on August 15, 1983.

Back To Top

This table provides information on Year Two of AHCCCS (October 1, 1983 - September 30, 1984).

| Year Two (October 1, 1983 - September 30, 1984) |
|---|
| **Enrollment:** |



185,409 **acute** care members (74,898 AFDC & AFDC/MAO, 30,582 SSI & SSI/MAO, and 79,929 MN/MI).

**Program:**

- The second Annual Medical Audit was conducted during July - September, 1984. Findings issued in November, 1984 concluded that AHCCCS providers render care similar to that received by private non-AHCCCS patients and that "...AHCCCS patients received the highest quality of medical care available..."
- AHCCCS began using a charge-based inpatient hospital cost reimbursement system, the Adjusted Billed Charges (ABC) system. This system was designed to hold reimbursement rates for hospital claims constant at 1984 levels, on a hospital-specific basis.
- On May 5, 1984 (HB 2551, Chapter 272, Laws of 1984) created an independent state agency, AHCCCS, and made the following other substantive changes:

  - Strengthened eligibility documentation requirements for MN/MI;
  - Based MN/MI eligibility determinations on an annualization of the previous 3 months' income rather than annualization of the prior month's income;
  - Allowed MN/MI to appeal directly to the State if their eligibility was denied, instead of to the county;
  - Permitted AHCCCS to defer the enrollment of hospitalized persons and pay for their care on a fee-for-service or adjusted billed charge basis;
  - Gave AHCCCS the authority to require the posting of performance bonds for AHCCCS contractors;
  - Directed AHCCCS to pay hospitals on an adjusted billed charge basis;
  - Authorized AHCCCS to pay hospitals directly for hospital care that was not paid in a timely manner by contracting Health Plans;
  - Permitted, in certain circumstances, written subcontract requirements to be waived;
  - Allowed AHCCCS to contract directly with hospital for discounted rates;
  - Required AHCCCS to establish a third party liability unit; and
  - Required AHCCCS to develop specific quality of care standards.

- 18 Health Plans served AHCCCS members.

**Waivers:**

- AHCCCS dropped two waivers. The agency began covering eyeglasses, dental care and hearing as part of EPSDT services and dropped the waiver that excluded from Title XIX all incurred costs for eligible recipients prior to 10/1/82 because it was no longer necessary.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 26.1 |
| | State | $57,063,300 | 37.2 |
| | Other | 81,270,100 | 36.7 |
| | TOTAL! | 80,415,500 | 100.0 |
| | | $218,748,900 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- On March 16, 1984, after 18 months of administrative and budgetary problems, the contract with McAuto was terminated and the State took over the administration of AHCCCS.
- Donald F. Schaller, M.D. was appointed Director on April 12, 1984 by Governor Bruce Babbitt to replace J. Gregory Fahey, who remained as Deputy Director.
- On May 5, 1984, Governor Babbitt signed legislation making AHCCCS a separate state agency.
- Number of FTEs = 221

Back To Top

This table provides information on Year Three of AHCCCS (October 1, 1984 - September 30, 1985).

| Year Three (October 1, 1984 - September 30, 1985) |
|---|
| **Enrollment:** |
| 144,450 **acute** care members (71,948 AFDC & AFDC/MAO, 32,340 SSI & SSI/MAO, and 40,162 MN/MI). |
| **Program:** |

- On May 10, 1985, the State Legislature passed a two-year extension of the AHCCCS program (SB 1226, Chapter 316, Laws of 1985). The bill also:

  - Added orthognathic surgery for children & podiatry as covered services effective October 1, 1985;
  - Modified reinsurance coverage to include certain outpatient services;
  - Clarified county residual responsibility for indigent care and county contributions for FY 86;
  - Required providers to submit claims within 9 months of date of service or face payment denial;

- o Required provider contract provisions to include maintaining deposits, bonds, financial reserves;
- o Provided immunity from civil liability or legal action for any person participating in review committee proceedings;
- o Clarified that third party payments which are collected and retained by the provider must be reflected in lower capitation rates paid to plans; and
- o Prohibited providers from billing members or referring unpaid accounts to collection or credit reporting agencies.

- o 19 Health Plans served AHCCCS members.

**Waivers:**

- o In July 1985, HCFA approved a two-year extension of the program to September 30, 1987.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 26.0 |
| | State | $66,772,402 | 48.6 |
| | Other | 124,620,647 | 25.4 |
| | **TOTAL!** | 65,271,255 | 100.0 |
| | | 256,664,304 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- o To strengthen administrative monitoring and control, the Fraud and Abuse and TPL Units were created.

- o Number of FTEs = 307

Back To Top

This table provides information on Year Four of AHCCCS (October 1, 1985 - September 30, 1986).

| Year Four (October 1, 1985 - September 30, 1986) |
|---|
| **Enrollment:** |
| 151,146 **acute** care members (74,043 AFDC & AFDC/MAO, 34,869 SSI & SSI/MAO, and 42,234 MN/MI). |

**Program:**

- Oral surgery for children under age 18, podiatry services, and total parenteral nutrition added as covered services effective October 1, 1985. (SB 1226, Chapter 316, Laws of 1985).

- Studies by the Arizona JLBC and SRI International in April, 1986 showed AHCCCS to be more cost effective than comparable Medicaid systems.

- A Lou Harris study, commissioned by the Flinn Foundation and released in late 1985, reported that "from the patient's perspective, the AHCCCS program seems to be working. It has improved access to health care for the people it serves and, by and large, they are pleased with the care they receive.

- 15 Health Plans served AHCCCS members

**Waivers:**

- No change in waivers.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | $70,120,100 | 26.7 |
| | State | 141,553,500 | 53.9 |
| | Other | 50,981,400 | 19.4 |
| | **TOTAL** | $262,655,000 | 100.0 |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- Rule modifications initiated by AHCCCS resulted in the refinement of eligibility requirements and strengthened third party recovery activity.

- Number of FTEs = 325

Back To Top

This table provides information on Year Five of AHCCCS (October 1, 1986 - September 30, 1987).

| Year Five (October 1, 1986 - September 30, 1987) |
|---|
| Enrollment: 192,305 acute care members (88,059 AFDC & AFDC/MAO, 36,949 SSI |

& SSI/MAO, 47,003 MN/MI, 19,161 EAC and 1,133 ELIC) .

**Program:**

- Effective January 1987, State legislation (HB 2086, Chapter 380, Laws of 1986) created the Children's Care Program which created two new eligibility groups:

    Eligible Assistance Children (EAC) - A State-funded group of children whose household receives food stamps: and

    Eligible Low Income Children (ELIC) - A category of children in families not receiving food stamps with income exceeding the state MN/MI level but not the federal poverty level.

- The February 1987 SRI Report covering the April 1984 - September 1985 period found that "...overall, AHCCCS made substantial progress in stabilizing the administration of the program during the second 18 months" of AHCCCS operation.

- On May 21, 1987 Governor Evan Mecham signed Senate Bill 1418 placing the AHCCCS program permanently in statute. The Bill also authorized the development of a Title XIX long-term care program.

- Effective August 17, 1987, medically necessary kidney, cornea, and bone transplants, and immunosuppressant medications for these transplants became covered services for all members. (SB 1418, Chapter 332, Laws of 1987)

14 Health Plans serve AHCCCS members.

**Waivers:**

- The June 18, 1987 Waiver Request incorporated a long-term care program request.

- On September 29, 1987, HCFA granted a one-year extension to September 30, 1988.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | $87,147,800 | 30.4 |
| | State | 127,822,300 | 44.5 |
| | Other | | |

| | Total | $287,171,700 | 100.0 |
|---|---|---|---|

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- Leonard J. Kirschner, M.D., M.P.H. appointed Director on February 2, 1987 by Governor Mecham.

- Number of FTEs = 350

Back To Top

This table provides information on Year Six of AHCCCS (October 1, 1987 - September 30, 1988).

**Year Six (October 1, 1987 - September 30, 1988)**

**Enrollment:** 216,425 **acute** care members (100,014 AFDC & AFDC/MAO, 38,760 SSI & SSI/MAO, 47,680 MN/MI, 22,613 EAC, 1,525 ELIC, 4,139 SOBRA Children and 1,694 SOBRA Women). 384 persons enrolled in **Healthcare Group.**

**Program:**

## Acute Care

- Nurse-midwife services added effective October 1, 1987.
- Effective January 1, 1988 implemented the SOBRA program for pregnant women and children under 5 years of age with income up to 100% FPL. (SB 1418, Chapter 332, Laws 1987)
- Heart transplants and immunosuppressant medications added for categorically eligible AHCCCS members effective April 12, 1988.
- Adopted a guaranteed enrollment period for pregnant women. (SB 1418, Chapter 332, Laws 1987)
- In cooperation with IHS, AHCCCS developed a pilot project to ensure that all AHCCCS-eligible American Indian children residing on-reservations were provided with EPSDT services.
- The SRI International survey of member's access to medical care and satisfaction found that fewer than 1 in 22 AHCCCS members reported difficulties in receiving care, only half of the rate of the New Mexico control group. In addition, 78 percent of AHCCCS members stated they were satisfied with the care they received.
- 13 Health Plans served AHCCCS members.

## Healthcare Group

- Effective January 1, 1988, small companies with up to 15

employees were able to purchase health insurance in Pima, Gila, Maricopa, and Pinal counties through Healthcare Group and receive care through AHCCCS Health Plans. (SB 1001, Chapter 1, Laws of 1981)

**Waivers:**

- Added a waiver that enabled the State to provide complete acute care Medicaid coverage to pregnant women during the 60-day period after the end of pregnancy and for the new optional categorically needy group of SOBRA pregnant women with incomes up to the FPL.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | $111,982,900 | 29.7 |
| | State | 187,193,300 | 49.6 |
| | Other | 78,049,500 | 20.7 |
| | **Total** | $377,225,700 | 100.0 |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

Number of FTEs = 464

Back To Top

This table provides information on Year Seven of AHCCCS (October 1, 1988 - September 30, 1989).

| **Year Seven (October 1, 1988 - September 30, 1989)** |
|---|
| **Enrollment:** 270,642 **acute** care members (125,708 AFDC & AFDC/MAO, 36,803 SSI & SSI/MAO, 39,690 MN/MI, 30,537 EAC, 3,236, ELIC, 23,031, 28,130 SOBRA Children, and 6,538 SOBRA Women), 10,616 **ALTCS** members. 852 persons enrolled in **Healthcare Group.** |

**Program:**

**Acute Care**

- Effective October 1, 1988, eligibility age limits for children whose families were receiving food stamps became automatically eligible for AHCCCS were raised from 6 to under 14. (SB 1418, Chap 332, 1987)
- Effective October 1, 1988, eligibility age limits for SOBRA children

with incomes to 100% FPL raised from under 5 years of age to under 6 years of age. (SB 1182, Chapter 3, Laws of 1988)
- Liver transplants for categorical children under age 18 added effective October 1, 1988. (SB 1486, Chapter 302, Laws of 1988)
- Family planning services, but not abortion or abortion counseling, added October 1, 1988. (SB 1486, Chapter 302, Laws of 1988)
- Home health care added January 1, 1989. (SB 1418, Chapter 332, Laws of 1987)
- Qualified Medicare Beneficiaries (QMB) added effective July 1, 1989. (SB 1151, Chapter 5, Laws of 1989)
- In late June, 1989, the legislature approved emergency legislation requiring counties, effective July 1, 1989, to process AHCCCS applicants first under federally funded categories before processing them under State-only funded categories.
- The five year January, 1989 SRI International study found that AHCCCS was less expensive, provided higher quality of care for children and had better access than traditional Medicaid.
- 13 Health Plans served AHCCCS members.

## ALTCS

- ALTCS program (SB 1418, Chapter 332, Laws of 1987) began in two phases: 1) DD population added December 19, 1988; and 2) EPD population added January 1, 1989.
- 5 Program Contractors served ALTCS members.

## Healthcare Group

- Services are limited to Pima county effective February 1, 1989.

**Waivers:**

- Dropped three waivers that: excluded SNF services, nurse-midwife services, and family planning services.
- Added four waivers that enabled the State to:

  - provide HCBS to individuals with incomes not exceeding 300% SSI;
  - be exempt from federal requirements for timely financial eligibility determination for long term care recipients during the start up of ALTCS;
  - exclude hospitalized and others not requiring long term care services from the optional institutionalized eligibility categories; and
  - perform inspection of care on a sample basis.

- The 1115 waiver was extended on November 23, 1988 for 5 years until September 30, 1993.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 36.1 |
| | State | $192,720,200 | 45.9 |
| | Other | 244,260,300 | 18.0 |
| | **Total** | 95,724,800 | 100.0 |
| | | $532,705,300 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

Number of FTEs = 834

Back To Top

This table provides information on Year Eight of AHCCCS (October 1, 1989 - September 30, 1990).

| Year Eight (October 1, 1989 - September 30, 1990) |
|---|

**Enrollment:** 319,324 **acute** care members (150,693 AFDC & AFDC/MAO, 39,538 SSI & SSI/MAO, 40,172 MN/MI, 25,934 EAC, 3,187 ELIC, 50,782 SOBRA Children, and 9,018 SOBRA Women), 13,102 **ALTCS** members. 2,072 persons enrolled in **Healthcare Group.**

**Program:**

**Acute Care**

- Autologous bone marrow transplants added October 1, 1989 for Title XIX members. (SB 1348, Chapter 293, Laws of 1989)
- Legislation directed AHCCCS to continue re-evaluating its existing hospital reimbursement system. (SB 1348, Chapter 293, Laws of 1989)
- SOBRA pregnant women, children and infants income limits increased from 100% FPL to 133% FPL effective April 1, 1990. SOBRA was initially raised (SB 1348, Chapter 293, Laws of 1989) to 130% FPL to become effective July 1, 1990, however, federal law raised SOBRA to 133% FPL in the interim, making it necessary to pass State legislation to comply with federal law effective April 1, 1990. (HB 2249, Chapter 27, Laws of 1989)
- Legislation created an Advisory Council on Indian Health Care. (SB 1348, Chapter 293, Laws of 1989)
- 13 Health Plans served AHCCCS members.

## ALTCS

- Congress repealed most elements of the Medicare Catastrophic Coverage Act of 1988. Some elements which affected Medicaid remained in place.
- HCFA set HCBS cap at 15% of the EPD population.
- 5 Program Contractors served ALTCS members.

## Healthcare Group

- Services expanded to Cochise County in January 1990 and Maricopa County in April 1990.

### Waivers:

- On February 6, 1990, added a waiver enabling the State to phase in OBRA 89 requirements related to treatment of mental health service needs in the EPSDT program.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 47.7 |
| | State | $357,087,200 | 35.7 |
| | Other | 267,219,900 | 16.6 |
| | **Total** | 123,826,500 | 100.0 |
| | | $748,133,600 | |

Does not include DSH payments and appropriations made to other State agencies.

### Administration:

- AHCCCS terminates the contract with Deloitte and Touche, a private firm that had been hired to develop the Prepaid Medical Management Information System (PMMIS).
- The federal government started paying "real time" FFP for acute care Health Plan capitation payments.
- Number of FTEs = 888

Back To Top

This table provides information on Year Nine of AHCCCS (October 1, 1990 - September 30, 1991).

| Year Nine (October 1, 1990 - September 30, 1991) |
|---|

**Enrollment:** 383,824 **acute** care members (191,951 AFDC & AFDC/MAO, 44,933 SSI & SSI/MAO, 43,249 MN/MI, 23,129 EAC, 4,023 ELIG, 66,511 SOBRA Children,

and 10,029 SOBRA Women),14,501 **ALTCS** members. 3,817 persons enrolled in **Healthcare Group**.

**Program:**

**Acute Care**

- Expansion of SOBRA eligibility from 133% FPL to 140% FPL for pregnant women and infants effective October 1, 1990. (HB 2351, Chapter 333, Laws of 1990)
- QMB eligibility increased to individuals with incomes up to 100% FPL effective January 1, 1991. (SB 1140, Chapter 213, Laws of 1991)
- OBRA 90 mandates adopted: infants retain eligibility for 12 months if mother would be eligible if still pregnant; and, children born on or after September 30, 1983 with incomes up to 100% FPL eligible up to age 18 effective July 1, 1991. (SB 1140, Chapter 213, Laws of 1991)
- 15 Health Plans served AHCCCS members.

**ALTCS**

- HCFA set HCBS cap at 18 percent of the total budget for the EPD population.
- A 1991 Laguna Research study showed that long term care costs under AHCCCS were lower than in states with case management services, and that the preadmission screening was better than in many other states.
- 7 Program Contractors served ALTCS members.

**Behavioral Health**

- AHCCCS functions in a regulatory role for ADHS which is responsible, by statute, for the provision of behavioral health services to Title XIX eligible persons.
- Phased in behavioral health services (HB 2554, Chapter 334, Laws of 1990) in the acute care program for Title XIX members: 1) under the age of 18 who are SED, effective October 1, 1990; and 2) under age 18 who are not SED, effective on April 1, 1991.

**Indian Health Care**

Under terms of a settlement between AHCCCS and IHS: 1) AHCCCS agreed to pay before IHS for services provided to AHCCCS eligible Native Americans who are referred off-reservation for health care services; 2) the Federal government agreed to pay $2 million for

health care services already rendered; and 3) both parties agreed to work towards an improved eligibility process on Arizona's reservations.

### Healthcare Group

- Effective August 1991, the limitation on the number of employees in a company is expanded from 25 to 40 employees. (HB 2077, Chapter 299, Laws of 1991)

**Waivers:**

- Dropped the waiver that exempted the State from federal requirements for timely financial eligibility determination for long term care recipients during the start up of ALTCS.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 48.6 |
| | State | $467,687,600 | 34.6 |
| | Other | 333,186,800 | 16.8 |
| | **Total** | 161,248,200 | **100.0** |
| | | **$962,122,600** | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- Number of FTEs = 923
- In early March 1991, after an extensive test period, PMMIS becomes operational.

Back To Top

This table provides information on Year Ten of AHCCCS (October 1, 1991 - September 30, 1992).

| Year Ten (October 1, 1991 - September 30, 1992) |
|---|
| **Enrollment:** 431,633 acute care members (213,592 AFDC & AFDC/MAO, 51,343 SSI & SSI/MAO, 48,553 MN/MI, 21,840 EAC, 4,942 ELIC, 80,663 SOBRA Children, and 10,700 SOBRA Women), 16,688 **ALTCS** members. 6,190 persons enrolled in **Healthcare Group**. |
| **Program:** <br><br> **Acute Care** |

- Optional income Medicaid children (section 1902(r)(2) of the Social Security Act) up to age 14 added July 1, 1992. (No bill)
- 14 Health Plans served AHCCCS members.

## ALTCS

- A Second Implementation and Operation Report, completed by Laguna Research Associates and released in April 1992, concluded that the ALTCS program demonstrated its ability to set up a network of prepaid, capitated program contractors and offered the potential for cost savings.
- HCBS cap set at 25% of the EPD population.
- 7 Program Contractors served ALTCS members

## Behavioral Health

- Behavioral health services are expanded to Title XIX SMI and non-SMI members age 18 through 20, effective October 1, 1991. The BH services delivered to this group are provided through the Health Plans. (SB 1502, Chapter 301, Laws of 1992).

## Healthcare Group

- Services expanded to Coconino county in April 1992.

**Waivers:**

- Dropped six waivers that enabled the State to:
  - phase in OBRA 89 requirements related to treatment of EPSDT mental health service needs;
  - exclude home health;
  - provide complete acute care Medicaid coverage to pregnant women during the 60-day period after the end of pregnancy and for the new optional categorically needy group of pregnant women;
  - exempt well baby care and services from co-payments (moved to co-payment waiver);
  - substitute an advisory panel of experts for the Medical Care Advisory Committee; and
  - be exempted from federal regulations requiring that State funding comprise at least 40 percent of the non-federal share of Medicaid expenses.
- 1115 waiver extended until October 1, 1994.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 55.1 |

| | | | |
|---|---|---|---|
| | State | $646,687,000 | 34.6 |
| | Other | 420,450,500 | 12.3 |
| | **Total** | 149,020,200 | 100.0 |
| | | $1,216,157,700 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- AHCCCS finished as first runner-up from a field of 132 entrants nationwide for the American Healthcare Systems Award given to the most innovative program serving the medically indigent.
- The federal government certifies the PMMIS.
- The Office of the General Counsel is created as a result of Governor Symington's Project SLIM.
- Mabel Chen is named AZ Administrator of the Year by the AZ Administrators Association.
- Number of FTEs = 932

Back To Top

This table provides information on Year Eleven of AHCCCS (October 1, 1992-September 30, 1993).

**Year Eleven** (October 1, 1992 - September 30, 1993) (October 1, 1992 - September 30, 1993)

**Enrollment:** 451,914 **acute** care members (223,622 AFDC & AFDC/MAO, 57,362 SSI & SSI/MAO, 41,912 MN/MI, 3,406 EAC, 3,430 ELIC, 15,590 CMP, 93,572 SOBRA Children, 11,417 SOBRA Women, 171 State Emergency Services, and 1,432 Federal Emergency Services),17,886 **ALTCS** members. 9,150 persons enrolled in **Healthcare Group.**

**Program:**

**Acute Care**

- On March 1, 1993, AHCCCS began a prospective inpatient hospital reimbursement system based on levels of care (tiers) and a hospital-specific cost to charge ratio for covered outpatient care.
- Definition of primary care practitioner expanded to include nurse practitioners and physician assistants.
- Effective April 1, 1993, (and retro to 10/16/90) allogeneic bone marrow transplants covered for Title XIX members. (HB 2508, Chapter 302, Laws of 1992)
- Effective July 1, 1993, persons eligible for state funded only group have to prove citizenship or legal alien status. Undocumented

aliens only eligible for emergency services. (HB 2007, Chapter 6, Laws of 1993)
- Effective July 1, 1993, doctor/home visit co-payments increased from $1 to $5 for state-only program.
- 15 Health Plans serve AHCCCS members.

## ALTCS

- In April 1993, Laguna Research Associates released an Outcome Report that evaluated acute care and long term care costs, utilization and nursing home quality of care. The report found that acute care costs continued to show savings and that ALTCS costs were less than traditional Medicaid.
- HCBS cap set at 30% of the EPD population.
- 8 Program Contractors served ALTCS members.

## Behavioral Health

- Phased in behavioral health services to: 1) Title XIX seriously mentally ill members age 21 and older enrolled in acute care effective November 1, 1992; and, 2) Title XIX members age 65 and older enrolled in ALTCS effective July 1, 1993.

## Healthcare Group

- Services expanded to the remaining 11 Arizona counties effective March 1, 1993.

**Waivers:**

- Dropped the waiver that enabled the State to perform inspection of care on a sample basis.
- Added two waivers that enabled the State to: 1) provide attendant care services on a non-statewide basis for the DD population; and, 2) receive payment for outpatient drugs without complying with the requirements of OBRA 90 pertaining to drug rebate and drug use review.
- On January 6, 1993, the 1115 waiver was extended for a year until September 30, 1994.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | $815,014,000 | 56.4 |
| | State | 470,352,600 | 32.5 |
| | Other | 160,689,600 | 11.1 |
| | **Total** | $1,446,056,200 | 100.0 |

**Page 768 was not included in the Administrative Record**

**filed by the Secretary**

monitoring requirements and other information, are renewed for all eight ALTCS program contractors.
- In addition to Maricopa and Pima, two new counties were awarded ALTCS contracts, Yavapai and Cochise.
- HCBS cap set at 35% of the EPD population.
- 8 Program Contractors served ALTCS members.

**Waivers:**

- On August 17, 1994, the 1115 waiver was extended for an additional three years until September 30, 1997.
- No change in current waivers.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 59.4 |
| | State | $934,712,500 | 29.4 |
| | Other | 463,805,800 | 11.2 |
| | **Total** | 176,404,200 | 100.0 |
| | | $1,574,922,500 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- Mabel Chen, M.D. appointed Director on October 19, 1993 by Governor Fife Symington.
- The AHCCCS Quality Initiative, a total quality management program, is implemented.
- Number of FTEs = 1,015

Back To Top

This table provides information on Year Thirteen of AHCCCS (October 1, 1994 - September 30, 1995).

| Year Thirteen (October 1, 1994 - September 30, 1995) |
|---|
| **Enrollment:** 439,162 **acute** care members (208,698 AFDC & AFDC/MAO, 66,714 SSI & SSI/MAO, 29,215 MN/MI, 1,988 EAC/ELIC, 8,376 CMP, 99,224 SOBRA Children, 12,161, SOBRA Women, 3,479 Family Planning Services, 307 State Emergency Service, 4,180 Federal Emergency Service, 4,820 QMB only), 20,919 **ALTCS** members. 18,781 persons enrolled in **Healthcare Group.** |
| Program: |
| Acute Care |

- Baby Arizona, a prenatal care program began in Pima (Nov. 1994) and Maricopa (May 1995) counties.
- Members allowed to self-refer for dental services.
- Effective March 22, 1995, added heart, liver and bone marrow transplants for non-Title XIX members and liver transplants for adult Title XIX members. (SB 1253, Chapter 16, Laws of 1995)
- Effective June 1, 1995, Advantage Health and Health Choice merge into Health Choice of Arizona.
- On August 1, 1995, the Family Planning Services Extension Program was implemented. This program allows women to continue receiving only family planning services for up to 24 months after losing SOBRA eligibility. Services are covered by AHCCCS on a FFS basis.
- 14 Health Plans served AHCCCS members.

### ALTCS

- Developed a new age-specific PAS for the DD population.
- On September 1, 1995, adopted a functional level PAS for ALTCS members who fail the at-risk of institutionalization test at redetermination. Persons who pass the new PAS could continue in the program and receive HCBS. (SB 1325, Chapter 322, Laws of 1994)
- HCBS cap set at 40% of the EPD population.
- 8 Program Contractors served ALTCS members.

### Behavioral Health

- A risk-based RFP for the provision of Title XIX covered mental health services for eligible children and seriously mentally ill adults was developed during October and awarded to ADHS in December 1994.

Waivers:

- Added waivers to:
  - streamline and simplify acute and ALTCS eligibility requirements.
  - adopt a functional PAS for persons enrolled in ALTCS and who subsequently fail the at-risk of institutionalization test at time of redetermination.
  - permits SOBRA newborns to remain Medicaid eligible for the first 12 months after birth without consideration of the mother's continued Medicaid eligibility
  - extend family planning services for women who lose Title XIX SOBRA eligibility.



- provide supported employment services to DD clients eligible for ALTCS transitional.
- AHCCCS is seeking approval of waivers which would:
  - permit Medicare/Medicaid dual eligibles four options to for receiving Medicare/Medicaid services.
  - permit AHCCCS, with IHS, to operate a managed care pilot program on-reservation.

| Financial: | Source | SFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 60.3 |
| | State | $1,088,906,000 | 29.3 |
| | Other | $529,650,000 | 10.4 |
| | **Total** | $187,959,000 | 100.0 |
| | | $1,806,515,000 | |

Does not include DSH payments and appropriations made to other State agencies.

**Administration:**

- In October 1994, two AHCCCS' Quality Initiative teams won the Governor's Award of Excellence.
- On December 6, 1994, the Council of State Governments awarded AHCCCS an Innovation Award.
- Richard Potter, OMC Assistant Director, named Administrator of the Year in June.
- Number of FTEs = 1,061

Back To Top

This table provides information on Year Fourteen of AHCCCS (October 1, 1995 - September 30, 1996).

| Year Fourteen (October 1, 1995 - September 30, 1996) |
|---|

**Enrollment:** 455,573 **acute** care members (206,478 AFDC & AFDC/MAO, 69,590 SSI & SSI/MAO, 28,529 MN/MI, 2,369 EAC/ELIC, 4,206 CMP, 106,129 SOBRA Children, 11,914 SOBRA Women, 15,358 Family Planning Services, 317 State Emergency Service, 5,335 Federal Emergency Service, and 5,348 QMB Only), 22,350 **ALTCS** members. 20,377 persons enrolled in Healthcare Group .

**Program:**

**Acute Care**

- In October 1995, a GAO study showed: AHCCCS produced noteworthy cost savings; competitive bidding is an effective tool; and; access to care for AHCCCS members remains high.

- A February 1996 Laguna Research report stated that cumulative cost savings for the AHCCCS program are almost $500 million through FY93 compared to a traditional Medicaid program.
- Effective July 1, 1996, MN/MI eligibility is denied for Medicare eligible applicants and members who reside in a county where a Medicare HMO operates. An estimated 500 individuals will be affected.
- On September 23, 1996, HCFA presented the Baby Arizona Project with the HCFA Beneficiary Services Certificate of Merit for implementing a successful public/private partnership to encourage low-income pregnant women to receive early and continuous prenatal care.
- 14 Health Plans serve AHCCCS members.

## ALTCS

- 8 Program Contractors serve ALTCS members.
- On October 1, 1995, the Adult Care Home Pilot program began permitting a limited number of EPD individuals to receive HCBS in an adult home setting.
- Supportive Residential Living Centers added as a permanent setting effective July 20, 1996.

## Behavioral Health

- Effective October 1, 1995, behavioral health services added for Title XIX non-SMI adults age 21 and older enrolled in the acute care program and adults age 21-64 enrolled in ALTCS, resulting in services to all Title XIX members. (SB 1215, Chapter 204, Laws of 1995)

## Healthcare Group

- In June, Healthcare Group recognized as a semifinalist in the 1996 Innovations in American Government Awards sponsored by the Ford Foundation and the JFK School of Government at Harvard University.

## Waivers:

- Dropped the waiver that allowed AHCCCS to limit adult mental health services to acute conditions only.
- Withdrew Medicare/Medicaid dual eligibles waiver request on March 22, 1996.

| Financial | Source | FFY Expenditures | Percentage |
|---|---|---|---|

| **Expenditures:**<br><br>**This is the first<br>year using FFY<br>expenditures** | Federal<br>State<br>Other<br>**Total** | $1,239,500,800<br>489,042,800<br>197,398,800<br>**$1,925,942,400** | 65<br>25<br>10<br>**100** |
|---|---|---|---|

Includes DSH payments and appropriations made to other State agencies.

**Administration:**

- John H. Kelly appointed as Acting Director on March 25, 1996.
- Richard Potter named Deputy Director in September 1996.
- Gloria Collins, DMS Manager, named AZ Administrator of the Year by the AZ Administrator's Association.
- Major redesign of FFS claims system operational on April 15, 1996.
- Number of FTEs = 1,091

Back To Top

This table provides information on Year Fifteen of AHCCCS (October 1, 1996 - September 30, 1997).

**Year Fifteen (October 1, 1996 - September 30, 1997)**

**Enrollment:** 410,854 **acute** care members (176,579 TANF & TANF/MAO, 61,715 SSI & SSI/MAO, 21,126 MN/MI, 1,954 EAC/ELIC, 41 CMP, 106,763 SOBRA Children, 31,093 SOBRA Women, 1,576 Family Planning Services, 216 State Emergency Service, 4,170 Federal Emergency Service, and 5,621 QMB Only), 24,109 **ALTCS** members. 21,147 persons enrolled in **Healthcare Group.**

**Program:**

**Acute Care**

- 13 Health Plans served AHCCCS members. During the year, three Health Plans were terminated:
    - Arizona Health Concept effective November 30 in Maricopa county. .
    - Regional AHCCCS Health Plan effective April 30 in Pinal County.
    - Intergroup Select Health Plan effective May 31 in Maricopa County.
- The *AHCCCS Member Survey Report* was published. This report summarizes the results of a telephone survey of over 14, 000 acute care members conducted in 1996.
- Effective September 1, applicants at DES may pre-select their

health plan. Once categorical eligibility is determined, if no plan is selected, the member is auto-assigned to a health plan (eliminates 3 day FFS window). Auto-assigned members are notified that they have 10 days to request a plan change.
- Pursuant to federal Welfare Reform legislation, Arizona enacted eligibility legislation for qualified persons and undocumented persons.

## ALTCS

- 8 Program Contractors Health Plans served ALTCS members.
- Effective July 21, instead of an annual PASARR, ALTCS members residing in a NF who have mental illness or mental retardation will be reviewed when the NF reports a significant change in physical/mental condition.

## Behavior Health

- In July, ADHS took over temporary operation of ComCare, the Maricopa County RBHA because a behavioral health emergency was declared by the Governor.

## Waivers:

- In September, received informal HCFA approval on waiver request to extend AHCCCS through 9/30/98.
- Acting on a 1996 initiative passed by voters, submitted a request to HCFA in May to extend acute care Title XIX eligibility to low income adults & children with income up to 100% of the federal poverty level (FPL) and to implement a Medical Expense Deduction program for persons with unpaid medical bills. Responded to detailed HCFA questions on proposal in August.

| Financial Expenditures: | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 60 |
| | State | $1,220,058,700 | 29 |
| | Other | 576,193,700 | 11 |
| | **TOTAL** | 225,980,100 | 100 |
| | | **$2,022,232,500** | |

Includes DSH payments and appropriations made to other State agencies.

## Administration:

- In March, John Kelly is appointed AHCCCS Director.
- Number of FTEs = 1,111



Back To Top

This table provides information on Year Sixteen of AHCCCS (October 1, 1997 - September 30, 1998).

### Year Sixteen (October 1, 1997 - September 30, 1998)

**Enrollment:** 406,376 **acute** care members (142,316 TANF Related MAO, 72,901 SSI & SSI/MAO, 21,365 MN/MI, 1,406 EAC/ELIC, CMP, 120,228 SOBRA Children, 12,591 SOBRA Women, 24,528 Family Planning Services, 229 State Emergency Service, 4,668 Federal Emergency Service, and 6,144 QMB Only), 25,511 **ALTCS** members. 14,874 members enrolled in **Healthcare Group.**

**Program:**

## Acute Care

- Five year contracts awarded to twelve health plans in nine geographic services areas (GSAs). Two health plans, Family Health Plan of NEAZ and Pima Health Plan, received capped contracts. On August 1, the Family Health Plan cap was lifted.
- Effective October 1, Health Plans have responsibility for :
    - members in the 24-month extended Family Planning Services Extension Program;
    - claims incurred during Prior Period (time between eligibility effective date and enrollment date);
    - compliance with a revised EPSDT Periodicity Schedule (28 visits recommended from 0-20 years)
- Effective January 1998, provide 48 hour stay for normal maternity delivery, 96 hours for cesarean delivery.
- During its fourth year, Baby Arizona becomes available in every county. The percentage of AHCCCS eligible women starting care in the first trimester of their pregnancies increased about 2.5 percent per year in 1996 and 1997, compared to .5% per year from 1992 to 1995.
- Scannable Member ID cards are issued to all AHCCCS members beginning in October 1998.
- KidsCare, Arizona's Title XXI Children's Health Insurance Program, is implemented on November 1.
- Annual enrollment, previously provided for all members during a period in August, changed to an annual enrollment based on the member's enrollment anniversary date.

## ALTCS

- HCBS cap is set at 45% of EPD population.
- Adult Care Homes become a permanent alternative setting for ALTCS members under a new category of licensure known as "assisting living facilities".

## Behavioral Health

- In September, following a year of ADHS operation of ComCare which resulted from a behavioral health emergency, Value Options is awarded the contract for the Maricopa county RBHA.

## Healthcare Group

- In February, Healthcare Group implemented the Premium Sharing Pilot program in four counties for three years. The program provides health care for low income persons for a sliding scale monthly premium.

**Waivers:**

- Current waiver expires 9/30/98. A one-year waiver extension was submitted on August 13, 1998. The 100% FPL Waiver, which was submitted in May 1997and is pending approval, includes a 5 year extension of the 1115 Demonstration and Research Waiver.

| Financial Expenditures: | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 60% |
| | State | $1,271,307,200 | 28% |
| | Other | 618,016,800 | 12% |
| | **TOTAL** | 239,775,600 | **100%** |
| | | **$2,129,099,600** | |

Includes DSH payments and appropriations made to other State agencies.

**Administration:** Number of FTEs =1,159 Number of FTEs =1,159

Back To Top

This table provides information on Year Seventeen of AHCCCS (October 1, 1998 - September 30, 1999).

| Year Seventeen (October 1, 1998 - September 30, 1999) |
|---|
| **Enrollment:** |
| 446,242 **acute** care members (133,837 TANF Related MAO, 73,690 SSI & SSI/MAO, 20,248 MN/MI, 372 EAC/ELIC, 21,256 KidsCare, 148,757 SOBRA Children, 13,021 SOBRA Women, 21,903 Family Planning Services, 237 State Emergency Service, 5,956 Federal Emergency Service, and 6,965 QMB Only), 25,511 **ALTCS** members. 11,474 members enrolled in **Healthcare Group.** |
| **Program:** |

## Acute Care

- AHCCCS begins preparations for a targeted pilot program on October 1, 1999 using a universal application.
- The Baby Arizona Project completed its 5th year of operation on June 30, 1999. The program, which promotes early access to prenatal care and streamlines eligibility for Medicaid coverage for pregnant women, helped more than 6,200 expectant mothers enroll in AHCCCS Health Plans during Year Seventeen.

## ALTCS

- In November 1998, an ALTCS -related workshop is attended by over 300 persons. Over 95% of the attendees were satisfied with the conference and with the information they received.

## Behavioral Health

- Several independent studies of the five Regional Behavioral Health Authorities are conducted to access children's behavioral health services in Arizona.

## KidsCare

- On November 1, 1998, AHCCCS implemented KidsCare, Arizona's Children's Health Insurance Program (CHIP) which received approval from HCFA on September 18, 1998.

**Waivers:**

Waiver extension expired 9/30/99. New AHCCCS 3-year waiver began October 1, 1999.

| Financial Expenditures (Title XIX) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 61% |
| | State | $1,385,405,391 | 28% |
| | Other | 637,112,823 | 11% |
| | **TOTAL** | 244,392,735 | **100%** |
| | | **$2,266,910,949** | |

Includes DSH payments and appropriations made to other State agencies.

| Financial Expenditures (Title XXI) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 58% |
| | State | $9,235,784 | 42% |
| | **TOTAL** | 6,731,511 | **100%** |
| | | **$15,967,295** | |

**Administration:**

> o Phyllis Biedess becomes AHCCCS Director in April 1999.
> o Branch McNeal becomes AHCCCS Deputy Director in August 1999.
> o Number of FTEs = 1262

This table provides information on Year Seventeen of AHCCCS (October 1, 1998 - September 30, 1999).

### Year Eighteen (October 1, 1999 - September 30, 2000)

**Enrollment:**

509,054 **acute** care members (180,951 TANF & TANF/MAO, 75,220 SSI & SSI/MAO, 17,194 MN/MI, 489 EAC/ELIC, 28.073 KidsCare, 148,320 SOBRA Children, 11,604 SOBRA Women, 21,138 Family Planning Services, 225 State Emergency Service, 8,067 Federal Emergency Service, and 7,773 QMB Only), 30,003 **ALTCS** members. 11,667 persons enrolled in **Healthcare Group**

**Program:**

**Acute Care**

> o An April 2000 survey conducted by the Behavior Research Center of 734 households shows that 70 percent of households have some degree of familiarity with AHCCCS, a much higher rate than anticipated.
> o A fall 1999 survey of 291 dentists who serve AHCCCS members showed that 70% of the providers said they had seen major improvements in the previous 12-24 months in the way services were delivered. During that period, most Health Plans switched from capitated agreements to fee-for-service payments. Providers felt this resulted in "more reasonable" compensation.

**ALTCS**

> o For the first time since the inception of the ALTCS/EPD program in January 1989, members in Maricopa county will be provided with a choice of program Contractors effective October 1, 2000. On June 1, 2000, AHCCCS awarded contracts totaling $290 million annually to 3 Arizona health care companies: Maricopa Long Term Care Plan, Lifemark Health Plans, and Mercy Care Plan.
> o In April 2000, HCFA removed the ALTC S program's HCBS cap retroactively to October 1, 1999. The cap had been in place since the beginning of the ALTCS program and had been steadily increased. Removal of the cap permits the agency to respond to growth in services such as Alternative Residential Living Facilities, an increasingly popular option for individuals.
> o The 17th Annual Home and Community Based Services (HCBS) conference was hosted from October 31 through November 2, 1999 and 100% of attendees classified the conference "a valuable experience".

## Behavioral Health

- The Psychotropic Medication Initiative began on October 1, 1999 to provide funding to Health Plans to allow Primary Care Providers (PCPs) to prescribe psychotropic medication to members with diagnoses of mild depression, anxiety and Attention-Deficit Hyperactivity disorders.

## Waivers:

- HCFA approved a 3-year waiver extension for the period from October 1, 1999 through September 30, 2002 on July 5, 2000.

| Financial Expenditures (Title XIX) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 62% |
| | State | $1,507,442,406 | 28% |
| | Other | 690,260,622 | 10% |
| | **TOTAL** | 253,048,290 | **100%** |
| | | **$2,450,751,318** | |

Includes DSH payments and appropriations made to other State agencies.

| Financial Expenditures (Title XXI) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | | 72% |
| | State | $34,696,421 | 28% |
| | **TOTAL** | 13,517,417 | **100%** |
| | | **$48,213,838** | |

## Administration:

- The agency experienced no significant Y2K related problems as a result of extensive planning, preparation, and testing.
- Number of FTEs = 1269

---

### Year Nineteen (October 1, 2000 - September 30, 2001)

**Enrollment:**  624,770 **acute** care members (338,977 TANF & TANF/MAO, 88,925 SSI & SSI/MAO, 28,184 MN/MI, 1 EAC, 53,685 KidsCare, 79,515 SOBRA Children, 8,560 SOBRA Women, 16,607 Family Planning Services, 217 State Emergency Service, 9,146 Federal Emergency Service, and 953 QMB Only), 32,720 **ALTCS** members. 10,706 persons enrolled in Healthcare Group.

**Program:**

### Acute Care

In November, Arizona voters approved Proposition 204, the Healthy Arizona

Initiative, which expanded eligibility under AHCCCS to 100% of the federal poverty level (FPL). In January 2001, the Centers for Medicare and Medicaid Services (CMS) approved AHCCCS' waiver request to expand eligibility to 100% of the FPL and eliminate prior quarter coverage to new enrollees in both the acute care and ALTCS program.

· In the spring of 2001, AHCCCS initiated Medicaid in the Public Schools (MIPS) to reimburse school districts for services provided to Medicaid-eligible students in special education classes. AHCCCS contracted with Arizona Physicians IPA to handle the school districts claims. Public schools, charter schools not associated with a school district and the Arizona School for the Deaf and Blind are eligible.

## ALTCS

· The National Health Care Purchasing Institute honored AHCCCS with the National Health Care Purchasers Award for Public Sector Purchasers for awarding three contracts for long term care in Maricopa County. Prior to these contracts, only Maricopa Long Term Care Plan had a contract to deliver services to the more than 10,000 elderly or physically disabled ALTCS members in the county.

## Behavioral Health

· In June 2001, Judge Roll of the United States District Court, District of Arizona granted final approval to the proposed JK settlement agreement (No. CIV 91-261 TUCJMR). The term of the agreement is until 2007. The obligations of AHCCCS under this settlement agreement center on the delivery of services to children and families according to a set of principles aimed at providing timely, accessible, culturally appropriate services which are designed to aid children to achieve success in school, live with their families, avoid delinquency, and become stable and productive adults.

## Waivers:

· On January 18, 2001, CMS approved AHCCCS' request to expand eligibility to 100% of the FPL for the acute care program and waive the requirement to provide prior quarter coverage to new enrollees in both the acute care and ALTCS program.

| Financial Expenditures (Title XIX) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | 1,804,030,465 | 64% |
| | State | 742,042,550 | 26% |
| | Other | 282,830,544 | 10% |
| | | - | - |
| | TOTAL | $ 2,828,903,559 | 100% |

Includes DSH payments and appropriations made to other State agencies.

| Financial Expenditures (Title XXI) | Source | FFY Expenditures | Percentage |
|---|---|---|---|
| | Federal | 56,505,943 | 75% |
| | State | 18,449,444 | 25% |
| | | – | – |
| | TOTAL | $ 74,955,387 | 100% |

**Administration:**

· Number of FTEs = 1,330

In May 2001, The National Health Care Purchasing Institute honored AHCCCS with the National Health Care Purchasers Award for Public Sector Purchasers for awarding three contracts for long term care in Maricopa County.

Back To Top

Overview Table of Contents

Send your questions and comments about this web site to the Webmaster.
**Last modified:** April 04, 2003

Copyright Arizona Health Care Cost Containment System. All rights reserved.

EXHIBIT I.20

TO: Bonnie Irwin

FROM: Debbie Donovan

DATE: January 9, 1992

SUBJECT: AHCCCS Days Count for DSH Calculation

COPIES: Marty Enriquez

Review of AHCCCS days on audit for the purpose of the
disproportionate share adjustment has always required review
of patient billing files to determine AHCCCS eligibility and
coverage of patient stay. The allowable count of total
AHCCCS days was then used as part of the DSH calculation. I
have determined that there is an error in our counting of
days.

Per discussion with Ann Taylol and per the Federal Register,
"Medicaid (AHCCCS) covered days will include only those days
for which benefits are payable under Title XIX. Any day of
a Medicaid (AHCCCS) patient's hospital stay that is not
payable by the Medicaid (AHCCCS) program will not be counted
as a Medicaid (AHCCCS) patient day ... for purposes of
determining a hospital's disproportionate patient
percentage."

Per my discussions with Joan Agostinelli, the AHCCCS program
has many different health plans which contract with the
program to provide coverage to AHCCCS eligible bene's.
These plans offer coverage to both indigent and regular
bene's with the exception of a few which are 100% indigent
bene coverage.

The AHCCCS program is actually a combination of 5 different
eligibility selections.

    Title XIX - Federally funded under Title XIX
    Medically Indigent - State of Arizona program
    Medically Needy - State of Arizona program
    Eligible Low Income Children - County program
    Eligible Assistance to Children - Federal

Only the Title XIX eligible receive federal Title XIX funds.
Per the regulations these are the only allowable days to
count for DSH purposes. It has always been our
understanding that all AHCCCS days were allowable for DSH
purposes. As you can see this is not the case and therefore
it follows that our DSH calculations on audit have been
greatly overstated.

825

The problem here is that the providers have no means to
distinguish which eligibility selection a patient is covered
under.  Each patient would have to be compared to the AHCCCS
base file and the providers do not have this capability.
Only AHCCCS administration can do this.  Joan Agostinelli
just developed reports during 1991 which will break out
AHCCCS days and charges by eligibility class at each
provider, by fiscal year-end.  These first reports were for
fiscal year ends in 1990 and are not yet fully accurate.
Many providers are contesting the numbers that have been
calculated.  Due to these problems, Joan is unable to
release these reports to us for cost report purposes.  She
was able to give me the State and County averages from her
calculations.  Statewide, 68% of all hospital AHCCCS days
are Title XIX.  For Maricopa County, 67% of all hospital
AHCCCS days are Title XIX.  I have no supporting
documentation for these numbers.

As we can not distinguish the Title XIX days on audit and do
not have access to these data reports at this time, we are
continuing to greatly overstate DSH reimbursement if you
consider that we are allowing, on the average, 32% of days
which should not be counted.  While all past settlements are
overstated, there is no documentation at AHCCCS on days
prior to the development of these reports.  As this news
will have a great impact on DSH providers, we must decide
our course of action to be followed.

ADDITIONAL COMMENTS:
    Joan Agostinelli - AHCCCS is really the only Title XIX
program in the state.  It is possible that Children's Rehab
Services and the DES programs for foster care and develop-
mentally disabled persons may receive some Title XIX funds.

    Ena Ramon and Ann Taylol - Indian Health Services is not
included as DSH as it is not Title XIX.  Indian bene's must
apply at the State AHCCCS office for coverage.

    Ann Taylol - Even though AHCCCS is the Medicaid program
in the state of Arizona, only that portion that receives
Title XIX funds is allowable for DSH purposes.  The state
and county programs do not qualify.

SOURCES:

Ann Taylol - HCFA Central Office, BPD  (410) 966-4537
Joan Agostinelli - AHCCCS Administration, Policy  254-5522
Ena Ramon - IHS, Contract Health Dept.  640-2087
Federal Register May 6, 1986, pg. 16777  (AB# 1666,86.05)

826



EXHIBIT I-21

MAR-10-2004 WED 03:08 PM BCBSAZ-MEDICARE PRA       FAX NO. 602 864 4062       P. 02

# Medicare

P.O. Box 37700
2444 West Las Palmaritas Drive
Phoenix, Arizona 85069-7700
Claims Service 602/864-4299

January 15, 1992

Eugene Chinn
Chief, Financial Operations
Division of Medicare
Health Care Financing Adminstration
Region IX
75 Hawthorne Street
San Francisco, California  94105

RE: DSH CALCULATION

Dear Gene:

Per the May 6, 1986 Federal Register, page 16777, (attached) for purposes of
determining a hospital's disproportionate patient percentage, AHCCCS covered
days will include only those days for which benefits are payable under Title
XIX

The State AHCCCS program is a combination of 5 different eligibility
selections.

> Title XIX- Federally funded under Title XIX
> Medically Indigent- State of Arizona Program
> Medically Needy- State of Arizona Program
> Eligible Low Income Children- County Program
> Eligible Assistance to Children- Federal

Only the Title XIX eligible receive federal Title XIX funds.  Per the
regulations, these are the only allowable days to count for DSH purposes.  On
audit we have always counted total AHCCCS days as allowable for DSH.  This is
incorrect and has caused great overstatements in DSH reimbursement.

The problem in resolving this issue is that the providers do not have the
ability to determine which AHCCCS patients are Title XIX eligible.  This can
only be done by AHCCCS Administration and they do not maintain this data.
They are currently working on reports to extract days and charges by
eligibility class.  These reports were for fiscal year ends in 1990 and are
not yet fully accurate.  Many providers are contesting the numbers that have
been calculated.  Late today, AHCCCS agreed to release the Title XIX days but
will not give us access to the data used to determine these days.  State and
County averages from AHCCCS calculations show that statewide 68% of all
hospital AHCCCS days are Title XIX.  For Maricopa County, 67% of all hospital
AHCCCS days are Title XIX.  We have no supporting documentation for these
numbers.  All past settlements are overstated and there is no documentation at
AHCCCS on days prior to the development of these reports.

MAR-10-2004 WED 03:09 PM BCBSAZ-MEDICARE PRA        FAX NO. 602 864 4062        P. 03

Page Two
January 15, 1992

We have issued reopening letters on eleven of our providers that qualify for the DSH adjustment. We had planned to disallow the % of AHCCCS days to total days in the DSH calculation because we are not able to distinguish Title XIX days. We are planning to make the determination based solely on the SSI Ratio published by HCFA. This has caused a great deal of concern amongst the provider community. They are particularly concerned about the retroactive application of this misinterpretation of the regulation. The providers also are questioning the intent of the law in this situation, and have sought legal counsel.

Please advise us whether the approach we have taken is in accordance with HCFA policy or if another approach is acceptable.

If you have any questions please call me at (602) 864-4185.

Sincerely,

Bonnie Irwin
Audit Manager
Provider Reimbursement Department

10128/131/kb