**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEALTH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-1614 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary, United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff hereby responds to Defendant's Notice of Supplemental Authority [Doc. No. 33]

regarding *Adena Regional Medical Center v. Leavitt*, No. 07-5273, 2008 WL 2221811 (D.C. Cir.

May 30, 2008).

1.      Defendant's Notice ignores the one salient respect in which *Adena* bears on the

decision in this case.  Namely, the Court of Appeals accepted the Secretary's argument in *Adena*

that the term "medical assistance" in the Medicare DSH statute at issue in this case must be

given the same meaning that is given to the same term in the Medicaid statute.  *Adena*, slip op.

at 6, 2008 WL 2221811, at *3.  This holding is key because, as shown by Plaintiff hospitals in

their briefs, the Secretary has previously interpreted this term in the Medicaid statute in a 2002

letter to all State Medicaid Directors to mean that individuals whose service costs factor into

*Medicaid* DSH payment calculations are thereby receiving "medical assistance" as defined in

section 1905(a) of the Social Security Act, 42 U.S.C. § 1396d(a).  Moreover, the Secretary has

yet to provide any explanation whatsoever, let alone a rational one, for this inconsistent

interpretation of the same term in this case.[1]  Because there is no dispute that the Plaintiff hospitals received Medicaid DSH payments based on the costs of services to the low-income patients at issue, there can be no dispute that these patients received "medical assistance" for purposes of Title XIX and that their days, therefore, must be counted in the Medicare DSH calculation as days attributable to patients who were "eligible for medical assistance under a State plan."

2.      In all other respects, *Adena* is factually distinguishable and not controlling.  First, the Plaintiff hospitals have shown, and Defendant has conceded, that the patients at issue here were eligible for and enrolled in AHCCCS, which is the Arizona Medicaid program.  The *Adena* hospitals, on the other hand, conceded that the Ohio charity care patients at issue in that case were *not* eligible for "medical assistance" under the Medicaid statute.  *See* Appellees' Opening Brief at 53, *Adena*, No. 07-5273 (D.C. Cir. filed Feb. 19, 2008) (attached hereto).  Second, whereas Ohio did not make payment to the *Adena* hospitals for services furnished to their charity care patients (*Adena*, slip op. at 2, 4, 2008 WL 2221811, at *1-*2), Arizona did make payments to the Plaintiff hospitals for services furnished to the AHCCCS patients at issue on the same terms and at the same payment rates applicable for all other AHCCCS enrollees.  Third, the *Adena* hospitals did not show (as the Plaintiff hospitals have shown here) that the patients at issue were capable of receiving medical assistance under a traditional State Medicaid plan.  Fourth, the *Adena* hospitals did not assert, as the Plaintiff hospitals have demonstrated here, that they had received DSH payments for prior periods and should therefore receive additional DSH

---

[1] The Secretary apparently did not inform the Court of Appeals of the agency's prior inconsistent interpretation of the term "medical assistance" as set forth in the agency's 2002 letter to all State Medicaid Directors.

payments under the Secretary's hold harmless rule.  For these reasons, except with respect to the

consistent construction of the term "medical assistance," *Adena* does not dictate the result in this

case.

Respectfully submitted,

/s/ Stephanie A. Webster
Stephanie A. Webster
  DC Bar No. 479524
Christopher L. Keough
  DC Bar No. 436567
KING & SPALDING, L.L.P.
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006-4706
(202) 737-0500 (phone)
(202) 626-3737 (fax)

Counsel for Plaintiff

Dated:  June 11, 2008

[ORAL ARGUMENT ON MARCH 18, 2008]
NO. 07-5273

_____

_____


IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ADENA REGIONAL MEDICAL CENTER, et al.,
Plaintiffs-Appellees

v.

MICHAEL O. LEAVITT, Secretary,
Department of Health & Human Services,
Defendant, Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

APPELLEES' OPENING BRIEF

_____

MURRAY J. KLEIN
(609) 520-6022
*Attorney for Plaintiffs-Appellees*
*REED SMITH LLP*
*Princeton Forrestal Village*
*136 Main Street, Suite 250*
*Princeton, NJ 08540*
Email: *mklein@reedsmith.com*

_____

_____

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO
## FED. R. APP. P. RULE 26.1 AND D.C. CIRCUIT RULE 26.1

I, Murray J. Klein, counsel of record for the above-captioned plaintiffs, certify that to the best of my knowledge and belief, there is no parent company, subsidiary, or affiliate of any of the Hospital-Appellees, which has outstanding securities in the hands of the public.

These representations are made in order that Judges of the Court of Appeals may determine the need for recusal.

Dated:    February 19, 2008

Respectfully submitted,

Murray J. Klein
Reed Smith LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
(609)987-0050

## CERTIFICATE OF COUNSEL PURSUANT TO CIR. R. 28(a)(1)

**Parties and Amici:**  Plaintiffs-Appellees are: Adena Regional Medical Center, Alliance Community Hospital, Community Health Partners West Campus, Cuyahoga Falls General Hospital, East Liverpool City Hospital, Ft. Hamilton-Hughes Hospital, Good Samaritan Hospital & Health Center, Licking Memorial Hospital, Marietta Memorial Hospital, MedCentral Health System, Med-Health System-Greene Memorial Hospital, Medical College Hospital, MetroHealth Medical Center, Miami Valley Hospital, Middletown Regional Hospital, Robinson Memorial Hospital, Southern Ohio Medical Center, St. Elizabeth Health Center, St. Joseph Health Center, Summa Health System, Trinity Health System, University of Cincinnati Hospital, Western Reserve Care System, Community Health Partners East Campus, and Trumball Memorial Hospital.  Defendant-Appellant is the Secretary of the United States Department of Health and Human Services.  There are no Amici.

**Rulings Under Review:**  The ruling under review is the Honorable Louis F. Oberdorfer's July 11, 2007 Memorandum decision granting Plaintiff's Motion for Summary Judgment, denying Defendant's Cross-

Motion for Summary Judgment, and remanding the case to the fiscal

intermediary for relief as specified.

**Related Cases:**  None

MURRAY J. KLEIN
Counsel for Appellees

# TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF JURISDICTION ................................................... 1

STATEMENT OF THE ISSUE ........................................................ 1

PROVISIONS AT ISSUE ................................................................ 2

STATEMENT OF FACTS ................................................................ 3

    I.    Statutory And Regulatory Background ......................... 3

        A.    The Medicare DSH Adjustment ............................ 5

        B.    Ohio's State Plan Of Medical Assistance ............. 7

        C.    The Intermediary Excluded HCAP Days
            From The Hospitals' Medicare DSH
            Calculations ........................................................ 11

SUMMARY OF ARGUMENT ......................................................... 16

STANDARD OF REVIEW .............................................................. 20

LEGAL ARGUMENT ..................................................................... 21

    I.    The Secretary's Contention That The Phrase
        "Eligible For Medical Assistance Under a State
        Plan" Has The Same Meaning In Both the
        Medicaid Statute And The Medicare DSH Statute
        Is False. ......................................................................... 21

    II.    HCAP Days Must Be Included In The Medicare
        DSH Calculation Because HCAP Is Medical

Assistance Under Ohio's State Plan Approved
Under Title XIX..............................................26

A.    Congress Clearly Intended For Patient Days
      Such As HCAP Days To Be Included In The
      Medicare DSH Calculation. ............................26

B.    The Secretary Has Skipped The First Step
      Of The *Chevron* Analysis. ............................30

III.  The Various Arguments Raised By The Secretary
      In His Opening Brief Must Fail. ........................34

A.    The Secretary Does Not Adhere To The
      Medicaid Statute's Definition Of "Medical
      Assistance" In Determining Which Patient
      Days To Include In the Medicare DSH
      Adjustment. .................................................34

      1.    *Expansion Waiver Days Are Not*
            *Eligible For "Medical Assistance"*
            *Under the Medicaid Statute's*
            *Definition Of The Term, But The*
            *Secretary Nevertheless Includes Them*
            *In The Medicare DSH Calculation* ............36

      2.    *"Unpaid" Medicaid Days Are Not*
            *Eligible For "Medical Assistance"*
            *Under The Medicaid Statute's*
            *Definition Of The Term, But The*
            *Secretary Nevertheless Includes Them*
            *In The Medicare DSH Calculation* ............44

B.    The Secretary's Reliance Upon The *Cabell*
      Line Of Cases Is Misplaced. ............................47

C.    The Statutory Sections Referenced By The
      Secretary Do Not Support His Argument ..........52

D.    The Secretary Has Mischaracterized The
      Hospitals' Arguments ..........................................61

E.    The Ohio Statutory Provisions Referenced
      By The Secretary Do Not Support His
      Argument And Are Irrelevant Under
      *Chevron* ...........................................................62

F.    The Secretary's Arguments Relative To The
      *Medicaid* DSH Adjustment Are Irrelevant
      To The Resolution Of The Issues On Appeal .....66

      1.    *The Secretary's Analogy Between The*
            *Medicare And Medicaid DSH*
            *Provisions Does Not Withstand*
            *Scrutiny* ....................................................66

      2.    *HCAP's Role In Ohio's Medicaid DSH*
            *Calculation Does Not Impact The*
            *Analysis Of Whether HCAP Days Get*
            *Included In The Medicare DSH*
            *Calculation* ..............................................69

G.    The Inclusion Of HCAP Patients Will Not
      Affect The Accuracy Of The Medicare DSH
      Adjustment. ........................................................72

Conclusion .................................................................76

# TABLE OF AUTHORITIES

**Page**

## Cases

*Air Traffic Controllers Organization*, 18 B.R. at 902 ....................33

*Alhambra v. Thompson*, 259 F.3d 1071 (9ᵗʰ Cir. 2001)............14, 15

*Ashtabula County Medical Center v. BlueCross
    BlueShield Association*, decision 2005-D49 (August
    10, 2005) (reversed by the CMS Administrator on
    October 12, 2005).........................................................................12

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002)...............32

*Bruggerman v. Blagojevich*, 324 F.3d 906 (7ᵗʰ Cir. 2003) .......22, 23

*Cabell Huntington Hosp., Inc. v. Shalala*,

101 F.3d 984 (4ᵗʰ Cir. 1996)........................ 14, 15, 24, 45, 47, 48, 49

CBS Inc. v. Primeime 24 Joint Venture, 245 F.3d 1217
    (11th Cir. 2001) ........................................................................26

*\*Chevron U.S.A., Inc., v. Natural Resources Def.
    Council*, 467 U.S. 837 (1984)...................... 17, 26, 30, 31

*Clark Regional Medical Center v. Shalala*, 136 F. Supp. 2d 667
(E.D. Kentucky
2001)..............................................................................................14

*Cookeville Regional Medical Center v. Thompson*, 2005
    WL 327 WL 327629 (D.D.C. 2005)...............................................42

*Cookeville Regional Medical Center v. Thompson*, 2006
    WL 2787831 (D.D.C. 2006) ........................................................42

*Deaconess Health Serv. Corp. v. Shalala*, 83 F.3d 1041
    (8ᵗʰ Cir.1996)............................................ 15, 16, 47, 49

*Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 156 L. Ed.
2d 84 (2003) ......................................................................32

*Finney v. Roddy*, 617 F. Supp. 997 (E.D. Va. 1985) ................31, 33

*Greer v. Paulson*, 505 F.3d 1306, 1312 (D.C. Cir. 2007)................20

*Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d
412 (D.C. Cir. 1994).........................................................3

*In Re Medicare Reimbursement Litigation*, 414 F.3d 7
(D.C. Cir. 2005)............................................................44, 45

*In re Professional Air Traffic Controllers Organization*,
18 B.R. 894 (Bankr. D.D.C. 1982)..................................31

*Jersey Shore Medical Center v. Blue Cross and Blue
Shield Assoc.*, No. 95-0907, 1998 WL 773617, at 8
(PRRB Oct. 30, 1998) ..................................................13

*Jewish Hospital, Inc. v. Secretary of Health and
Human Servs.*, 19 F.3d 270 (6th Cir. 1994).... 6, 14, 15, 25, 47, 49

*Legacy Emanuel Hosp. & Health Cntr. v. Shalala*, 97
F.3d 1261 (9th Cir. 1996) ...........................................15, 24, 47, 49

*Monmouth Medical Center v. Thompson*, 257 F.3d 807 (D.C. Cir.
2001).............................................................................15

*Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d
536 (W.D. Pa. 2003).....................................................32

*Odessa Regional Hospital v. Leavitt*, 386 F.Supp. 2d 885 (W.D.
Texas 2005)..................................................................14

*Oklahoma Chapter of the American Academy of
Pediatrics v. Fogarty*, 472 F.3d 1208 (10th Cir. 2007).....21, 22, 23

*Pacific Nat. Cellular v. U.S.*, 41 Fed. Cl. 20 (1998) ......................32

*Portland Adventist Medical Center v. Thompson*, 399
F.3d 1091 (9th Cir. 2005) .......................................... 15, 38, 40, 42

*Pottgieser v. Kizer*, 906 F.2d 1319 (9th Cir. 1990) ........................... 7

*Schlumberger Tech. Corp. & Subsidiaries v. U.S.*, 55
Fed. Cl. 203 (2003) ............................................................... 32

*United States v. Blue Cross and Blue Shield of
Michigan*, 726 F. Supp. 1517 (E.D. Mich. 1999) .......................... 3

*Washington State Medicare DSH Group II v. BCBSA*,
PRRB No. 2007-D5, at 3 (Nov. 22. 2006) (reversed by
the CMS Administrator on January 19, 2007) ...................... 13

*Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th
Cir. 1990) ..................................................................... 31, 33

*Westside Mothers v. Olszewski*, 454 F.3d 532 (6th
2006) ................................................................................ 23

Cases primarily relied upon are marked by an asterisk.


## **Statutes**

8 U.S.C. § 1182(o)(6)(B)(iii) ................................................. 60

8 U.S.C. § 1611(b)(1)(A) ...................................................... 60

8 U.S.C. § 1612(b)(2)(A) ...................................................... 60

8 U.S.C. § 1612(b)(2)(F) ...................................................... 60

38 U.S.C. § 1722(a)(1) ......................................................... 60

38 U.S.C. § 1722(g) ............................................................. 60

Consolidated Omnibus Budget Reconciliation Act of
1985, Pub. L. No. 99-272, § 9105, 100 Stat. 82 (1986) .................. 5

# GLOSSARY

Appellant's Appendix.................................................................APP

Centers for Medicare and Medicaid Services.......................CMS

Consolidated Omnibus Budget Reconciliation Act

     of 1985...........................................................................COBRA

Deficit Reduction Act of 2005............................................DRA

Disproportionate Share Hospital.......................................DSH

Federal Financial Participation..........................................FFP

Hospital Care Assurance Program.....................................HCAP

Notice of Program Reimbursement....................................NPR

Prospective Payment System..............................................PPS

Provider Reimbursement Review Board.............................PRRB

U.S. Department of Health and Human Services................HHS

## STATEMENT OF JURISDICTION

In the present matter, the plaintiff hospitals ("the Hospitals") invoked the district court's jurisdiction under 42 U.S.C. § 1395oo(f)(1). Appellant's Appendix ("APP") 18, 116. On June 11, 2007, the district court issued a final order granting the Hospitals' motion for summary judgment and directing the defendant, the Secretary of Health and Human Services ("the Secretary") to recalculate the Hospitals' Medicare disproportionate share hospital ("DSH") adjustments. The Secretary filed a notice of appeal on August 8, 2007. APP 14. This Court has appellate jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

This case arises from a dispute over how to calculate the Medicare DSH adjustment, which is paid to hospitals that serve a disproportionate share of low-income patients. *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). The formula for calculating the Medicare DSH adjustment is set forth in the Medicare statute and requires the Secretary to include in the Medicare DSH calculation a tally of

1

the inpatient days of service ("patient days") that a hospital
provides to patients who are "eligible for medical assistance under
a State plan approved under [Title] XIX."  42 U.S.C.
§ 1395ww(d)(5)(F)(vi)(II).

The question presented is whether the Secretary must
include in the Medicare DSH calculation those patient days for
which patients were eligible for free inpatient care under Ohio's
Hospital Care Assurance Program ("HCAP").  HCAP is
comprehensively set forth in Ohio's State plan of medical
assistance approved by the Secretary under Title XIX.  APP 43.

## PROVISIONS AT ISSUE

The second fraction of the Medicare DSH calculation, at issue
in the present appeal, consists of the following statutory formula:

> [T]he fraction (expressed as a percentage),
> the numerator of which is the number of the
> hospital's patient days for such period
> which consist of patients who (for such
> days) were eligible for medical assistance
> under a State plan approved under [Title]
> XIX . . ., but who were not entitled to
> benefits under Part A of [the Medicare
> statute], and the denominator of which is

2

the total number of the hospital's patient
days for such period. . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).


## STATEMENT OF FACTS

### I.    Statutory And Regulatory Background

Congress enacted the Medicare program, Title XVIII of the
Social Security Act, 42 U.S.C. §§ 1395www(d), in 1965.  As
originally enacted, Medicare was a public health insurance
program that furnished health benefits to participating
individuals once they reached the age of 65.  *United States v. Blue
Cross and Blue Shield of Michigan,* 726 F. Supp. 1517, 1519 (E.D.
Mich. 1999).  Over the years, it has been expanded to provide
health benefits to qualifying disabled persons and to individuals
suffering from end-stage renal disease.  *Health Ins. Ass'n. of
America, Inc. v. Shalala*, 23 F.3d 412, 414 (D.C. Cir. 1994).  The
present litigation arises under Part A of the Medicare program,
which authorizes payments for, among other things, certain
inpatient hospital services.  *See* 42 U.S.C. §§ 1395c, 1395d.

3

Up until October 1, 1983, the Medicare program reimbursed hospital services on a "reasonable cost" basis. *Id.* § 1395f(b). Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the prospective payment system ("PPS") to reimburse hospitals for inpatient operating costs. *Id.* § 1395ww(d). Under PPS, hospitals are paid a fixed amount for each of approximately 490 diagnosis-related groups, subject to certain payment adjustments. *Id.* § 1395ww(d)(1)-(d)(4); 42 C.F.R. Part 412.

The Secretary has delegated much of the responsibility for administering PPS to the Centers for Medicare and Medicaid Services, formerly known as the Health Care Financing Administration. *See* 42 U.S.C. § 1395h, 1395u (both entities will hereinafter be collectively referred to as simply "CMS"). CMS, in turn, delegated many of Medicare's audit and payment functions to organizations known as Medicare fiscal intermediaries. *Id.* § 1395h.

At the close of a fiscal year, a Medicare provider must submit to its fiscal intermediary a "cost report" showing both the

4

costs incurred by it during the fiscal year and the appropriate share of those costs to be apportioned to Medicare.  42 C.F.R. § 413.24(f).  The intermediary is required to analyze and audit the cost report and then issue a final determination of the amount of Medicare reimbursement owed to the hospital (or owed by the hospital to Medicare) in a document known as a "notice of program reimbursement" or "NPR."  *Id.* § 405.1803.  A hospital dissatisfied with its reimbursement may file an appeal with the Provider Reimbursement Review Board ("PRRB") within 180 days of the date it received its NPR.  42 U.S.C. § 1395oo(a).  Final decisions by the PRRB can be challenged in the United States district courts.  *Id.*

## A.    The Medicare DSH Adjustment

In 1986, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 9105, 100 Stat. 82 (1986).  COBRA included a provision that both created and defined the Medicare DSH adjustment.  42 U.S.C. § 1395ww(d)(5)(F).  The Medicare DSH adjustment

5

requires the Secretary to provide increased PPS reimbursement to hospitals that serve a "significantly disproportionate number of low-income patients." *Id.* § 1395ww(d)(5)(F)(i)(I). Whether a hospital qualifies for the Medicare DSH adjustment, and how large an adjustment it receives, depends upon the hospital's "DSH percentage." *See Id.* § 1395ww(d)(5)(F)(v).

The Medicare DSH percentage is "defined as the sum of two fractions expressed as percentages and serves as a 'proxy' for all low income patients." *Jewish Hospital, Inc. v. Secretary of Health and Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994). The first fraction, known as the "Medicare fraction," is based on a hospital's patient days for those patients who are eligible for both Medicare Part A and Supplemental Security Income. 42 U.S.C. § 1395ww(d)(5)(F) (vi)(I). The Medicare fraction is not at issue in this case.

The second fraction comprising the Medicare DSH percentage, which is at issue in the present matter, is known as the "Medicaid fraction." The numerator of the Medicaid fraction is based on the number of patient days for which patients were

6

"eligible for medical assistance under a State plan approved under [Title] XIX . . . ." *Id.* § 1395ww(d)(5) (F)(vi)(II). Title XIX of the Social Security Act is commonly referred to as the "Medicaid" statute. *See Pottgieser v. Kizer*, 906 F.2d 1319, 1321 (9th Cir. 1990).

The more patient days which are included in the numerator of the Medicaid fraction, the higher the Medicare DSH percentage. *See* 42 U.S.C. § 1395ww (d)(5)(F)(vi)(II). Hospitals that meet or exceed a statutorily fixed threshold are entitled to receive a Medicare DSH adjustment. *Id.* A hospital's Medicare DSH percentage determines the size of the adjustment. *Id.*

## B.    Ohio's State Plan Of Medical Assistance

Title XIX of the Social Security Act sets forth a cooperative federal-state program known as "Medicaid" which furnishes health care to the indigent. *See Id.* § 1396; *Pottgieser, supra.,* 906 F.2d at 1321. In order for a state to participate in the program and receive Title XIX funding (also referred to as "federal financial participation" or "FFP") a state must develop and submit a "State plan for medical assistance" to the Department of Health and

7

Human Services and have it approved by the Secretary. *See* 42

U.S.C. § 1396. The states participating in Medicaid have a

substantial amount of discretion in selecting the benefits provided

under their Medicaid programs. 42 U.S.C. § 1396d. The Medicaid

statute sets forth the minimum standards that must be met in

order for a State plan to be approved under Title XIX. *See* 42

U.S.C. § 1396a.

The Ohio State plan of medical assistance approved under

Title XIX (hereinafter, "the Ohio State plan"), in addition to

describing the mandatory health care services referenced in 42

U.S.C. § 1396a, also includes HCAP. APP 43. The Ohio State

plan identifies which individuals are eligible for medical services

free of charge under HCAP:

> (B)  Determination of eligibility.
>
> A person is eligible for basic, medically
> necessary hospital-level services under the
> provisions of this rule if the person is a current
> recipient of the disability assistance (DA)
> program or the person's individual or family
> income is at or below the current poverty
> guideline issued by the secretary pursuant to
> 42 U.S.C. 9902 that applies to the individual
> or family when calculated by either of the
> methods described in paragraphs (B)(2)(a) and

8

(B)(2)(b) of this rule on the date these services were provided.

(1)     For purposes of this rule, a "family" shall include the patient, the patient's spouse, and all of the patient's children, . . . natural or adoptive, under the age of eighteen who live in the home.  If the patient is under the age of eighteen, the "family" shall include the patient, the patient's natural or adoptive parent(s), and the parent(s)' children, natural or adoptive under the age of eighteen who live in the home.  If the patient is the child of a minor parent who still resides in the home of the patient's grandparents, the "family" shall include only the parent(s) and any of the parent(s)' children, natural or adoptive who reside in the home.

(2)     "Income" shall be defined as total salaries, wages, and cash receipts before taxes; receipts that reflect reasonable deductions for business expenses shall be counted for both farm and non-farm self-employment. Income will be calculated by:

(a)     Multiplying by four the person's or family's income, as applicable, for the three months preceding the date hospital services were provided;

(b)     Using the person's or family's income, as applicable, for the twelve months preceding the date hospital services were provided.

(3)     For outpatient hospital services, a hospital may consider an eligibility determination to be

9

effective for ninety days from the initial service
date, during which a new eligibility determination
need not be completed.  Eligibility for inpatient
hospital services must be determined separately
for each admission, unless the patient is
readmitted within forty-five days of discharge for
the same underlying condition.  Eligibility for the
disability assistance program must be verified on
a monthly basis. APP 44-45.

The Ohio State plan also contains the following provision

describing the scope of the free medical services that are available

under HCAP:

> Provision of basic, medically necessary hospital-level
> services
>
> [E]ach hospital . . . shall provide, without
> charge to the individual, basic, medically
> necessary hospital-level services to the
> individual who is a resident of this state, is not
> a recipient of the Medicaid program and whose
> income is at or below the federal poverty line.
> Residence is established by a person who is
> living in Ohio voluntarily and who is not
> receiving public assistance in another state. . .
>
> (A)    Definitions.
>
> (1)    "Basic, medically necessary hospital level
> services" are defined as all inpatient and
> outpatient services covered under the Medicaid
> program in Chapter 5101:3-2 of the
> Administrative Code with the exception of
> transplantation services and services
> associated with transplantation.  These

10

> covered services must be ordered by an Ohio
> licensed physician and delivered at a hospital
> where the physician has clinical privileges and
> where such services are permissible to be
> provided by the hospital under its certificate of
> authority . . . APP 44.

### C.     The Intermediary Excluded HCAP Days From The Hospitals' Medicare DSH Calculations

The Hospitals consist of twenty-five not-for-profit, acute care facilities that participate in the Medicare and Medicaid programs. APP 18-21.  In computing the Hospitals' Medicare DSH percentages for the cost report years at issue in this litigation, the Secretary, through one of his fiscal intermediaries, uniformly excluded from the Medicare DSH calculation all patient days for which patients were eligible for HCAP ("HCAP days").  APP 18.

The Hospitals appealed the HCAP issue to the PRRB.  APP 30-38.  While before the PRRB, the Hospitals requested that the PRRB grant the Hospitals "Expedited Judicial Review."  APP 30. The PRRB issued a decision granting EJR on December 7, 2005. APP 39-40.   Because the PRRB granted EJR to the Hospitals, the

11

dispute in the present matter did not go to a hearing before the PRRB.

The HCAP issue, however, in a separate case, was the subject of a hearing before the PRRB. In 2005, the PRRB reviewed the very issue which is the subject of this appeal, i.e. whether HCAP days must be included in the second fraction of the Medicare DSH calculation. *Ashtabula County Medical Center v. BlueCross BlueShield Association*, decision 2005-D49 (August 10, 2005) (reversed by the CMS Administrator on October 12, 2005).[1]

In the *Ashtabula* case, the PRRB unanimously held: "It is undisputed that HCAP is included in the State of Ohio's approved plan under Title XIX . . . ." *Id.* "[T]he Board considers the federal statute the controlling authority in this case [and] finds the [statutory] language clear and unambiguous and finds that the federal DSH statute does not limit the patients covered to Medicaid patients only, but that it includes patients who qualify for 'medical assistance' under Ohio's State plan that is approved

_____

[1] The Ashtabula case is currently pending in the United States District Court for the District of Columbia.

12

under Title XIX." *Id.* The PRRB concluded that "HCAP patient days should, therefore, be included in the calculation of the Medicaid proxy to determine the Providers' DSH adjustments." *Id.*

The PRRB reached the same conclusion with respect to similar programs set forth in other State plans that were approved under Title XIX in the states of New Jersey and Washington. *See Jersey Shore Medical Center v. Blue Cross and Blue Shield Assoc.*, No. 95-0907, 1998 WL 773617, at 8 (PRRB Oct. 30, 1998) (holding that the New Jersey State plan "was approved under Title XIX of the Social Security Act as required by the statute, and contained the subject Charity Care program which provided medical assistance to eligible persons.") (reversed and remanded by the CMS Administrator for further findings by the PRRB); *Washington State Medicare DSH Group II v. BCBSA*, PRRB No. 2007-D5, at 3 (Nov. 22. 2006) (reversed by the CMS Administrator on January 19, 2007) (the providers' filed a civil action seeking judicial review of the Administrator's decision; that

13

action is pending before the United States District Court for the

Western District of Washington).[2]

The CMS Administrator's track record with respect to these

issues comes as little surprise, because CMS has a history of

reversing the PRRB on DSH matters, only to be ultimately

corrected by the federal courts.  *See, e.g. Alhambra v. Thompson*,

259 F.3d 1071 (9th Cir. 2001); *Odessa Regional Hospital v. Leavitt*,

386 F.Supp. 2d 885 (W.D. Texas 2005); *Clark Regional Medical

Center v. Shalala*, 136 F. Supp. 2d 667 (E.D. Kentucky 2001).  The

Administrator's decisions arise from what the courts have

observed to be CMS's institutional hostility toward the DSH

adjustment.  *Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d

984, 990 (4th Cir.1996) ("We cannot . . . allow an agency, hostile

from the start to the very idea of making the payments at issue, to

rewrite the will of Congress."); *Jewish Hospital., Inc. v. Sec'y of

Health & Human Servs.*, 19 F.3d 270, 276 (6th Cir.1994) ("[W]e

find Jewish Hospital's contention that the Secretary was hostile to

---

2 None of these other PRRB cases have been the subject of a
judicial decision.

the concept of a disproportionate share adjustment credible and compelling"); *Alhambra v. Thompson*, 259 F.3d 1071 at n.4. (noting agreement with the Court in *Jewish Hospital* which found "credible and compelling evidence of Secretarial hostility to the concept of the disproportionate share adjustment."). The Circuit Court for the District of Columbia observed that the Secretary's interpretation of the DSH statute has "fared poorly, being struck down in four sister Circuits." *Monmouth Medical Center v. Thompson*, 257 F.3d 807, 810 (D.C. Cir. 2001). *See also Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir.1996); *Deaconess Health Servs. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir.1996) (per curiam).

More recently, the Court of Appeals for the Ninth Circuit, in *Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091, 1099, found that the Secretary's refusal to include all appropriate patients days in the DSH calculation "appears to be the latest in a series of cases in which the Secretary has refused to implement the DSH provision in conformity with the intent behind the statute [citing *Alhambra, Cabell Huntington, Legacy Emanuel,*

15

*Jewish Hosital*, and *Deaconess Health Servs.*,]." The Court noted that "[i]n each of these cases, the court rejected the Secretary's position. The same result must follow here. The text of the statute, the intent of Congress, and the decisions of this and other courts make it plain that the entire low-income population actually served by the hospitals . . . must be accounted for in the DSH Medicaid fraction." Id. at 1099.

In the present matter, following the grant of EJR, the Hospitals proceeded to file an action in the United States District Court for the District of Columbia. APP 7. The Hospitals then filed a motion for summary judgment in the district court, which the court granted. APP 14. The Secretary's appeal followed.

## SUMMARY OF ARGUMENT

The Medicare DSH statute requires that the DSH calculation include all patient days for which patients are "eligible for medical assistance under a State plan approved under [Title] XIX . . . ." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Accordingly, in order for a particular patient day to be included in the Medicare DSH calculation, two straightforward requirements must be met.

16

First, the patient must be eligible for "medical assistance." *Id.*
Second, the medical assistance for which the patient is eligible
must be provided "under a State plan approved under [Title] XIX."
*Id.*

HCAP meets both of these statutory requirements. HCAP is
"medical assistance" because it consists of inpatient care to
indigent populations. APP 44-45. HCAP is medical assistance
"under a State plan approved under Title XIX" because HCAP's
eligibility criteria and scope of coverage are comprehensively set
forth in the physical document which comprises the Ohio State
plan of medical assistance approved under Title XIX. APP 43-48.
As the district court below correctly held, the plain language of the
Medicare DSH statute therefore requires that HCAP days be
included in the Medicare DSH calculation.

The only way the Secretary would be able defeat the
Hospitals' arguments is to show that the language of the Medicare
DSH statute is ambiguous and that the Secretary's interpretation
of the statutory provision is therefore entitled to deference under
*Chevron U.S.A., Inc., v. Natural Resources Def. Council,* 467 U.S.

17

837, 842 (1984).  The Secretary has failed to make this showing. Indeed, the Secretary never endeavors to demonstrate (let alone *actually* demonstrate) that the terms "medical assistance" or "State plan approved under Title XIX" are ambiguous.  Instead, the Secretary skips this threshold step in *Chevron* and proceeds directly to various extrinsic materials in an attempt to create a jargonized definition of "medical assistance" more to his liking.

The Secretary's jargonized definition of "medical assistance," however, is not the actual definition used by the Secretary in practice, in determining which patient days to include in the Medicare DSH calculation.  Nor is it the definition used by the various circuit courts of appeals.  The Secretary's definition of "medical assistance," fashioned solely for purposes of this litigation, requires that all patient populations be excluded from the Medicare DSH calculation except those which are eligible for "medical assistance" as defined by the Medicaid statute at 42 U.S.C. 1396d(a) (the Medicaid statute defines "medial assistance" as being the "payment of part or all of the cost" of various categories of medical services to individuals who meet certain

18

eligibility criteria with respect to their age, medical condition, and/or income level).

We know that the Medicaid statute's definition of "medical assistance" is not the definition that the Secretary actually uses to determine which days get included in the Medicare DSH calculation. For example, the Secretary includes "expansion waiver populations" in the Medicare DSH calculation, which consist of individuals who are ineligible for medical assistance under the criteria specified by the Medicaid statute in 42 U.S.C. 1396d(a), but who nevertheless receive medical assistance under Title XIX pursuant to a waiver under Section 1115 of the Social Security Act. Furthermore, the Secretary also includes in the Medicare DSH calculation a large number of patients who are Medicaid beneficiaries but for whom Medicaid makes no payment. Neither group of patients is eligible for "medical assistance" within the Medicaid statute's definition of the term at 42 U.S.C. 1396d(a). Indeed, the Secretary himself, in the Federal Register, has even conceded that expansion waiver populations are not "eligible" for medical assistance under the Medicaid statute's

19

definition at 42 U.S.C. 1396d(a).  65 Fed. Reg. 3136 (Jan. 20, 2000).

The Secretary's other arguments are based on the federal *Medicaid* statute and the Ohio statutes.  The Secretary's arguments in this regard are based on extrinsic materials and are irrelevant under the *Chevron* analysis because the unambiguous, plain meaning of the Medicare DSH statute requires that HCAP days be included in the Medicare DSH calculation.  Moreover, as further set forth in this brief, the Secretary's arguments on these points alternate between being logically inconsistent and just plain wrong.  The Secretary's main purpose in introducing extrinsic materials into the argument is to misdirect the court from the core issue of construing the *Medicare* DSH statute.  For all of these reasons, the Court of Appeals must affirm the ruling of the district court.

## STANDARD OF REVIEW

The standard of review in this case is de novo.  Greer v. Paulson, 505 F.3d 1306, 1312 (D.C. Cir. 2007).

## LEGAL ARGUMENT

I.  **The Secretary's Contention That The Phrase "Eligible For Medical Assistance Under a State Plan" Has The Same Meaning In Both the Medicaid Statute And The Medicare DSH Statute Is False.**

The cornerstone of the Secretary's argument is that the phrase "eligible for medical assistance under a State plan approved under Title XIX" has the same meaning under the Medicare DSH statute as it does under the Medicaid statute. *See* Secretary's Brief (hereinafter "Sec. Br.") at 11, 17. The Secretary, however, is totally incorrect. Indeed, the courts of appeals, contrary to the Secretary's express representation to this Court, recognize that the phrase has a *different* meaning in the Medicare DSH statute than it does under the Medicaid statute.

In the context of the Medicaid statute, the courts have held that "eligible for medical assistance" means eligible for Medicaid *payments* and not eligibility for "medical assistance" as that term is commonly understood. "Medicaid is a payment scheme, not a scheme for state-provided medical assistance. . . ." *Oklahoma*

21

*Chapter of the American Academy of Pediatrics v. Fogarty*, 472
F.3d 1208, 1214 (10th Cir. 2007). The term "medical assistance,"
as employed in the Medicaid statute, "refers to financial
assistance rather than to actual medical services." *Id.* at 1214.
*See also Bruggerman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir.
2003). For a patient to have coverage under Medicaid means that
the State is "required . . . *to pay* promptly. . . for medical services
when the state is presented with the bill." *See, Oklahoma Chapter
of the American Academy of Pediatrics, supra*, at 1214 (emphasis
added). The Medicaid statute has "uniquely defined" the term
"medical assistance" to consist of a requirement "*to pay* for
[certain] medical services. . . ." *Id.* at 1215 (emphasis added).
"The term 'medical assistance,' as used throughout the Medicaid
Act, refers to the *payment* of all or part of the cost of the care and
services specifically described in the act. That is . . . the Medicaid
Act requires participating states to provide beneficiaries financial
assistance rather than actual medical services." *Id.* at 1215
(emphasis added). Individuals who are "eligible" for Medicaid are
eligible for "financial assistance" pure and simple, nothing more,

22

nothing less.  *Westside Mothers v. Olszewski*, 454 F.3d 532, 540

(6th Cir. 2006).[3]

The Secretary, early on, used the Medicaid statute's

definition of "medical assistance under a State plan" to interpret

the same phrase in the Medicare DSH statute and to determine

which patient days to include and exclude from the Medicare DSH

calculation.  The Secretary, when promulgating the Medicare DSH

regulations in 1986, announced that only patient days that were

actually paid by Medicaid would be included in the Medicare DSH

calculation.  *See* 51 Fed. Reg. 31454, 31460 (September 3, 1986).

The Secretary referred to these days as "Medicaid covered days"

and days "that were paid for by the State's Medicaid program."

*Id.*

---

3 The three cases discussed in this paragraph all involved the
failure by the respective state Medicaid programs to provide
payments for necessary health care services to Medicaid-eligible
children, including early and periodic screening, diagnosis and
treatment services.  *See Oklahoma Chapter of the American
Academy of Pediatrics*, 472 F.3d at 1208, 1214; *Bruggerman*, 324
F.3d at 910; *Westside Mothers*, 454 F.3d at 540.  The courts held
that the states' failure to provide these payments violated the
Medicaid statute.  *Id.*

When hospitals sued the Secretary to include in the Medicare DSH calculation those patient days for which Medicaid made no payment—i.e. days for which patients did not fall within the Medicaid statute's definition of the phrase "eligible for medical assistance"—the Secretary argued that the Court should embrace the Medicaid statute's definition and exclude the unpaid Medicaid days from the calculation.  The Secretary argued that "[a]ny day of the Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days." *See Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996).

The courts, however, when interpreting the Medicare DSH statute, have rejected the Secretary's approach and have not used the Medicaid statute's definition of "eligible for medical assistance under a State plan."  Instead, the courts have determined that this phrase, as set forth in the Medicare statute, has a meaning that is broader than the Medicaid statute's definition and includes a Medicaid beneficiary's unpaid days. *Legacy Emanuel Hosp. &*

24

*Health Cntr. v. Shalala*, 97 F.3d 1261, 1264 (9th Cir. 1996)

(emphasis added) (*quoting Jewish Hospital, Inc. v. Secretary of*

*Health & Human Services*, 19 F.3d 270, 275 (6th Cir. 1994).

The Secretary, in the present appeal, attempts to rely on his

old argument, that the language "eligible for medical assistance"

is identical in both the Medicaid statute and the Medicare DSH

statute and therefore should carry the same meaning in each

instance.  Sec. Br. at 17.  Citing the Medicaid statute's definition

of "medical assistance," the Secretary argues that "'medical

assistance' is a term of art" and that the Court should embrace the

Medicaid statute's definition of the term.  Sec. Br. at 11.

As discussed above, the courts of appeals have soundly

rejected the Secretary's argument.  The phrase "eligible for

medical assistance under a State plan" simply does not have the

same meaning in both the Medicaid statute and the Medicare

statute.  Therefore, the Secretary's reference to the Medicaid

statute is of no use in delineating the scope of the phrase "eligible

for medical assistance," as used in the Medicare DSH statute, and

whether that phrase excludes HCAP.

25

II.    **HCAP Days Must Be Included In The Medicare DSH
Calculation Because HCAP Is Medical Assistance
Under Ohio's State Plan Approved Under Title XIX.**

A.    **Congress Clearly Intended For Patient Days
Such As HCAP Days To Be Included In The
Medicare DSH Calculation.**

The goal of statutory interpretation is to implement the

intent of Congress.  Thus, the first step of the *Chevron* analysis is

determining whether Congress "has directly spoken to the precise

question at issue." *Chevron, supra,* at 842.  If Congress has

spoken clearly, the analysis is at an end and the statute must be

enforced according to its terms. *Id.*  Courts "must give effect to

the unambiguously expressed intent of Congress." *Id.* at 842-843.

"[W]hen the words of a statute are unambiguous, then this first

canon [of statutory construction] is also the last:  judicial inquiry

is complete." *CBS Inc. v. Primeime 24 Joint Venture,* 245 F.3d

1217, 1222 (11th Cir. 2001) (internal citations omitted).  The

Court "must presume that Congress said what it meant and

meant what it said." *Id.*

The language of the Medicare DSH statute is explicit.

Under the statute, the Medicare DSH calculation includes all

26

"patient days for such period which consist of patients who (for

such days) were eligible for medical assistance under a State plan

approved under [Title] XIX, but who were not entitled to

[Medicare Part A benefits]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The plain meaning of the term "medical assistance," in the

Medicare DSH statute, is clear.  The word "medical" is common

enough and means "of, relating to, or concerned with physicians or

the practice of medicine."[4]  "Assistance" means the "act of

assisting or the help supplied."[5] The words are so ordinary and

plain that it is almost redundant to quote a definition.  Using the

plain meaning of these words, one can readily see that HCAP is

"medical assistance" because the State plan defines HCAP medical

benefits as "necessary hospital-level services . . . ordered by an

Ohio physician and delivered at a hospital where the physician

has clinical privileges. . . ." APP 44.  The Secretary, in his brief,

virtually concedes that HCAP constitutes "medical assistance,"

---

4 *See Merriam-Webster Online Dictionary*, http://www.m-
w.com/dictionary/medical.
5 *See Merriam-Webster Online Dictionary*, http://www.m-
w.com/dictionary/assistance.

under the plain meaning and ordinary usage of the term, describing HCAP as "medical services, free of charge, to qualifying Ohioans. . . ." Sec. Br. at 8.

Because the "State plan approved under Title XIX" is a physical document that can be readily inspected to see which kinds of medical assistance are contained within its pages, and, which are not, the Medicare DSH statute is relatively easy to apply. One need only read the State plan. In the present matter, the HCAP provisions are set forth in the Ohio State plan in black and white. APP 44-48. The Secretary has provided written authorization and approval to include the HCAP program in Ohio's State plan under Title XIX since 1992. APP 43. HCAP has been part of the Ohio State plan approved under Title XIX since that date and covers all of the time periods at issue in the Hospitals' complaint. *Id.*

As far as eligibility criteria are concerned, the Ohio State plan's HCAP provisions require Ohio hospitals to provide HCAP services to those state residents whose income is at or below the federal poverty line and who are not otherwise concurrently

28

receiving medical coverage under any other part of the Ohio State plan. APP 44-45. The Secretary readily concedes that HCAP requires hospitals to provide free of charge medical services to the indigent. Sec. Br. at 8.

The Ohio State plan, for purposes of determining eligibility for HCAP, defines "income" as "total salaries, wages, and cash receipts before taxes . . . ." APP 45. A person is also eligible for HCAP if he is a current recipient of Ohio's disability assistance program. *Id.*

With respect to which specific services are encompassed by HCAP, the Ohio State plan includes most services provided by traditional Medicaid, but does not include transplantation and services associated with transplantation. APP 44.

Based on the foregoing, there can be no serious dispute that HCAP days must be included in the Medicare DSH calculation. The Medicare statute requires that the calculation include "the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Title] XIX of this chapter, but

29

who were not entitled to benefits under Part A of this subchapter [i.e. Medicare]. . ." *See* 42 U.S.C. §1395ww(d)(5)(F) (vi)(II).  HCAP days easily satisfy the statutory criteria and must therefore be included in the Medicare DSH calculation.

**B.     The Secretary Has Skipped The First Step Of The *Chevron* Analysis.**

Under the first step of the *Chevron* analysis, one must first determine if the plain meaning of the text found in the Medicare statute—*"eligible for medical assistance under a State plan approved under [Title XIX]"*—answers the question of whether HCAP days must be included in the Medicare DSH calculation. *See Chevron*, 467 U.S. at 843.  If the plain meaning of the statute answers the question, then the analysis is at an end, and the statute is applied in a accordance with its plain meaning, without resorting to extrinsic materials.  *Id.*  It is only if the Medicare DSH statute is ambiguous that one then consults extrinsic materials, such as other statutes, to aid in interpreting the provision.  *Id.*

The Secretary pays only the most abbreviated lip service to the first step of *Chevron* and never even confronts the issue of whether "medical assistance" has a plain meaning or not.  Sec. Br. at 14-15.  The Secretary, instead, relies immediately upon the *Medicaid* statute and borrows its definition of the term "medical assistance" to support his flawed position "that the Medicaid fraction [of the Medicare DSH calculation] simply does not include people who are not eligible for Medicaid . . . ."  *Id.*

The Secretary's argument in this regard also violates the well-settled doctrine of statutory construction which states that statutes are not construed *in pari materia* "if the statute  [to be interpreted] is clear and unambiguous without reference to [other statutes] . . . ."  *In re Professional Air Traffic Controllers Organization,* 18 B.R. 894, 902 (Bankr. D.D.C. 1982) (*quoting* 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 51.01 at 287 (4th ed. 1973)); *see also Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 240 (6th Cir. 1990) ("Other statutes may not be resorted to if the statute [to be interpreted] is clear and unambiguous."); *Finney v. Roddy,* 617 F.

31

Supp. 997, 1001 (E.D. Va. 1985) (same).

The Medicaid statute, including its definition of "medical assistance" and other related provisions that the Secretary cites, are extrinsic materials that are neither relevant nor legally available as interpretational tools unless and until the statute at issue before this Court—the Medicare DSH statute—is found by the Court to be ambiguous. "The court considers the language of an enactment in its natural and ordinary signification, and if there is no ambiguity or obscurity in the language, there is usually no need to look elsewhere to ascertain intent." 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 46:1 (6th ed. 2005) (*citing Pacific Nat. Cellular v. U.S.*, 41 Fed. Cl. 20 (1998); *Schlumberger Tech. Corp. & Subsidiaries v. U.S.*, 55 Fed. Cl. 203 (2003); *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002); *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003); *Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536 (W.D. Pa. 2003)). "There is no safer nor better settled canon of interpretation that when language is clear and unambiguous it must be held to mean what it plainly expresses." Singer,

32

*Sutherland Statutes, supra*, at § 46:1 (6th ed. 2005).

The reason for the Secretary's reluctance to confront the plain meaning of the Medicare statute and to instead rely upon the provisions of the Medicaid statute is obvious. The text of the Medicare DSH statute, on its own, demonstrates the unambiguous intent of Congress to include, in the Medicare DSH calculation, patient days for which patients were eligible for medical assistance under a State plan, this would include patient days such as HCAP days.

Based on the *Chevron* analysis, the judicial inquiry is at an end because there is no ambiguity in the Medicare DSH provision. As explained in the first subsection, above, HCAP services constitute "medical assistance" and HCAP is also part of the Ohio State plan approved under Title XIX. Contrary to the Secretary's approach in this appeal, it is impermissible to resort to extrinsic interpretive aids to construe a statute that has already been found to be clear. *See Air Traffic Controllers Organization*, 18 B.R. at 902; *Watson*, 915 F.2d at 240; *Finney*, 617 F. Supp. at 1001; Singer, *Sutherland Statutes, supra*, at § 51.01 at 287 (6th ed.

33

2005).  The only thing left to do, under *Chevron* and the decisional law set forth above, is to apply the statute.  The district court's decision must therefore be affirmed.

### III.  The Various Arguments Raised By The Secretary In His Opening Brief Must Fail.

#### A.    The Secretary Does Not Adhere To The Medicaid Statute's Definition Of "Medical Assistance" In Determining Which Patient Days To Include In the Medicare DSH Adjustment.

The Secretary is correct that the term "medical assistance," as it appears in the *Medicaid* statute, is a "term of art" defined by 42 U.S.C. § 1396d(a).  Sec. Br. at 11.  The Secretary argues, that the term carries the same meaning in the Medicare DSH statute.  Sec. Br. at 11.  In an attempt to make his case, the Secretary engages in a number of drawn out, exegetical forays regarding various parts of the Medicaid statute.  *See* Sec. Br. at 21-25, 33-37, 40-44.  At the end of each of his expeditions, the Secretary concludes that a patient day can be included in the Medicare DSH calculation if, and only if, the patient is eligible for "medical

assistance" as that term is defined by the Medicaid statute at 42 U.S.C. § 1396d(a).

The Secretary's argument is incorrect, however, and he must know it to be so, because the argument is utterly belied by the Secretary's actual practice, the Secretary's official pronouncements in the Federal Register, as well as by the decisional law generated by the federal courts on this issue. The courts, as well as the Secretary himself, have long recognized that the Medicare DSH statute requires the Secretary to include categories of patient days in the Medicare DSH calculation which consist of patients who are *not* eligible for medical assistance as defined by the Medicaid statute at 42 U.S.C. § 1396d(a).

Because neither the Secretary nor the courts adhere to the Medicaid statute's definition of "medical assistance" in determining which patient days to include in the Medicare DSH calculation, it would make no sense for the court, in the present matter, to use the Medicaid statute's definition of "medical assistance" to exclude HCAP days from the Medicare DSH calculation.

### 1.   *Expansion Waiver Days Are Not Eligible For "Medical Assistance" Under the Medicaid Statute's Definition Of The Term, But The Secretary Nevertheless Includes Them In The Medicare DSH Calculation*

Title XI of the Social Security Act (entitled "General Provisions, Peer Review, and Administrative Simplification") contains a provision, Section 1115 ("Demonstration Projects"), which authorizes the Secretary to waive certain State plan requirements in order to encourage states to create innovative programs that are "likely to assist in promoting the objectives of . . . [Title] XIX." 42 U.S.C. § 1315(a). The stated objective of Title XIX is to provide medical assistance to individuals "whose income and resources are insufficient to meet [certain health care costs including inpatient hospital services]." *Id.* § 1396d(a). In order to foster the development of demonstration projects, also known as "waiver programs," Section 1115 allows the Secretary to waive compliance with the eligibility criteria outlined in the Medicaid statute at 42 U.S.C. § 1396a, 1396d(a).

36

In some cases, a waiver program covers patients who could have been made eligible for "medical assistance" under all of the Medicaid statute's eligibility requirements. 42 U.S.C. § 1396a. *See* 65 Fed. Reg. 3136 (January 20, 2000). In other cases, a waiver program covers patients who do *not* meet the Medicaid statute's eligibility requirements for receiving "medical assistance." *Id.* The latter patients are referred to as "expansion waiver populations." *Id.* at 3136-3137. The patient days associated with the inpatient care of expansion waiver populations are referred to, in this brief, as "expansion waiver days."

The Secretary has conceded, in the Federal Register, that expansion waiver populations are, by definition, not eligible for "medical assistance" as that term is defined in the Medicaid statute. 65 Fed. Reg. at 3136. Notwithstanding the fact that expansion waiver populations are undeniably ineligible for "medical assistance" under the Medicaid statute's definition of the term, the Secretary nevertheless currently requires that expansion waiver days be *included* in the Medicare DSH calculation. *See* 42 C.F.R. 106(b)(4)(ii). The Secretary imposed

37

this requirement beginning on January 20, 2000. *See* 42 C.F.R. 106(b)(4)(ii).

Separately, the Court of Appeals for the Ninth Circuit has held that, aside from the Secretary's regulations, the Medicare statute itself required expansion waiver populations to be included in the Medicare DSH calculation, even though these patient populations consist of individuals who are not eligible for "medical assistance" under the Medicaid statute's definition of the term. *See Portland Adventist Medical Center v. Thompson*, 399 F.3d 1091, 1093, 1097, 1099 (9th Cir. 2005).

On February 8, 2006, the President of the United States signed into law the Deficit Reduction Act of 2005 ("the DRA"). Section 5002(a) of the DRA added a provision to the Medicare DSH statute that changed the legal status of expansion waiver populations, for purposes of the Medicare DSH calculation, from being eligible for medical assistance under Title XIX to being "not so eligible" and to being included in the Medicare DSH calculation only at the Secretary's discretion, as opposed to being mandatorily

38

included in the calculation prior to the passage of § 5002.  *See*

DRA § 5002(a).

Section 5002(b) of the DRA ratified the Secretary's existing

regulations regarding waiver days.  *Id.*  These regulations

required expansion waiver days to be included in the DSH

calculation beginning on January 20, 2000.  *See* DRA § 5002 (b).

These regulations continue to be in force, requiring expansion

waiver days to be included in the Medicare DSH calculation.  *See*

42 C.F.R. 106(b)(4)(ii).

The Secretary contends that Congress, by enacting § 5002 of

the DRA, has "reversed the conclusion of the Ninth Circuit [in

*Portland Adventist*] that the DSH provision unambiguously

included individuals who were not eligible for Medicaid. . . ."  Sec.

Br. at 20.  The Secretary also contends that Congress, by enacting

§5002, meant to "key the [Medicare] DSH provision to Medicaid

eligibility."  *Id.*  Along these lines, the Secretary states that

because Congress no longer considers expansion waiver

populations to be "eligible for Medicaid; it could not conceivably

have thought that [HCAP patients]—who likewise are not eligible

39

for Medicaid—must be counted" in the Medicare DSH calculation. *Id.* (internal quotations omitted).

The Secretary's take on the DRA is incorrect at each juncture. First, § 5002 of the DRA has not "reversed" the Ninth Circuit's decision in *Portland Adventist* in any respect. Neither the text of § 5002 nor its statutory history provides any evidence that Congress was even aware of the *Portland Adventist* decision, much less that it had any intent on "reversing" it. *Id.*; H.R. Rep. No. 109–362, at 209 (2005) (Conf. Rep.). Nor was the decision reversed as a practical matter, since the Secretary never filed a petition for certiorari in *Portland Adventist*, and the court's judgment was final and beyond the reach of appeals long before § 5002 was signed into law.

Second, Congress, in § 5002, has not taken any action to adopt the Secretary's position in the present appeal, that the phrase "medical assistance under a State plan" means the same thing in the Medicare DSH statute as it does in the Medicaid statute. *See* § 5002. The only action taken by Congress in § 5002 was to prospectively denote expansion waiver populations as being

40

ineligible for "medical assistance under a State plan" *as that phrase is used in the Medicare DSH statute.* It is for this reason that § 5002 (a) begins with the preamble: "In determining under subclause (II) [of the Medicare DSH statute] the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan. . . ." *Id.* That is a far cry from Congress endorsing the *Medicaid* statute's definition of the term "medical assistance." Indeed, if anything, the opposite is true. Expansion waiver days continue to be included in the Medicare DSH calculation, in violation of the pristine rule proffered by the Secretary in the present appeal, that only days for which patients are eligible for "medical assistance" as defined by the Medicaid statute can be included in the Medicare DSH calculation.

Third, the Secretary's point, based on § 5002, that Congress could "not conceivably have thought that [HCAP patients] . . . must be counted" in the Medicare DSH calculation is incorrect for one more, critical reason. Prior to the DRA, the mechanism by which an expansion waiver program became part of a State plan

41

of medical assistance was *by operation of law.*  A waiver program

was *deemed* to operate under the State plan by virtue of Section

1115 of the Social Security Act.  *See Portland Adventist, supra,* at

1096.  It follows that this mechanism could be undone by

operation of law, which is precisely what Congress did, indirectly,

by passing § 5002. [6]

The mechanism by which HCAP became part of the Ohio

State plan, however, is more mundane and not so easily undone.

HCAP was inserted into the Ohio State plan by means of black ink

and a formal submission to the Secretary, which the Secretary

approved.  APP 43.  This fact is fatal to the Secretary's argument

---

[6]  The Secretary has continued, up through present, to include
expansion waiver days in the Medicare DSH calculation for those
states that have Section 1115 waiver programs.  The D.C. district
court, in *Cookeville Regional Medical Center v. Thompson,* 2005
WL 327 WL 327629 (D.D.C. 2005) also ruled that the Medicare
statute required expansion waiver days to be included in the
Medicare DSH calculation.  The D.C. district court, based on the
DRA, later vacated its earlier ruling, finding that the change in
the law was intended to be retroactive and barred the inclusion of
the days for the particular time periods at issue in that case that
pre-dated January 20, 2000.  *Cookeville Regional Medical Center
v. Thompson,* 2006 WL 2787831 (D.D.C. 2006).  The case is
currently under appeal to this Court, under case number 07-5252.

42

because there is no aspect of § 5002 which purports to diminish HCAP's status as being an approved amendment to the Ohio State plan or undo the fact that HCAP physically constitutes part of the Ohio State plan.

Finally, the Secretary's central argument before this court—that the Medicare DSH adjustment includes only those patient days for which patients are eligible for "medical assistance," as defined by the Medicaid statute—cannot be reconciled with the fact that expansion waiver days, according to the Secretary's own regulations, must still be included in the Medicare DSH calculation. *See* 42 C.F.R. 106(b)(4)(ii). When one reads the Secretary's arguments in the present appeal, and then reads his official pronouncements regarding expansion waiver populations (that they are not eligible for "medical assistance" under the Medicaid statute's definition of the term but must nevertheless be included in the Medicare DSH calculation), one comes to realize that the Secretary has staked out an artificial, doctrinaire position that is grossly at odds with both the facts and the law.

43

2.   *"Unpaid" Medicaid Days Are Not Eligible For "Medical Assistance" Under The Medicaid Statute's Definition Of The Term, But The Secretary Nevertheless Includes Them In The Medicare DSH Calculation*

"Medical assistance," as defined by the Medicaid statute, does not consist of *services* provided to patients, but rather of "*payment* of part or all of the cost of [certain] care and services. . . ." 42 U.S.C. 1396d(a).  The distinction is important because there is a huge category of patient days which are considered to be "eligible for medical assistance under a State plan" for purposes of the *Medicare* statute (and which are included in the Medicare DSH calculation) but which do not meet the *Medicaid* definition of the term "medical assistance" because Medicaid makes no payment for the services rendered on those days.  *See, e.g., In Re Medicare Reimbursement Litigation*, 414 F.3d 7 (D.C. Cir. 2005) (affirming directive to Secretary to reopen cost reports and adjust them to include patient days for which Medicaid beneficiaries received inpatient care, regardless of whether Medicaid made payment for the days).

44

The courts have uniformly held that "unpaid" patient days for which Medicaid beneficiaries receive no Medicaid coverage must be included in the Medicare DSH calculation under the unambiguous meaning of the term "medical assistance" as it appears in the Medicare DSH statute. *Id.*; *Cabell Huntington Hosp. Inc. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996) (patient days for those Medicaid beneficiaries who were ineligible for inpatient payment from Medicaid must be included in the Medicare DSH calculation).

As with expansion waiver days, the example of "unpaid" Medicaid days serves as another glaring instance in which the courts do not embrace the Medicaid statute's definition of "medical assistance" that the Secretary is propounding in this appeal. As noted above, neither the Secretary nor the courts adhere to the Medicaid statute's definition of the term "medical assistance" when determining how to calculate the Medicare DSH adjustment.

This is fatal to the Secretary's entire line of argument. The Secretary has offered up the Medicaid statute's definition of

45

"medical assistance" as a reliable yardstick for determining which patient days are required to be included in the Medicare DSH calculation and which patient days are required to be excluded. Implicit in the Secretary's argument, however, is the notion that it is the Medicaid statute's definition of "medical assistance" that currently governs which patient days get included in the Medicare DSH calculation.  *See* Sec. Br. at 21-25, 33-37, 40-44.

This is the foundational pillar upon which the Secretary's entire argument rests.  Upon this pillar, the Secretary builds the argument, throughout his brief, that for purposes of construing the Medicare DSH statute, the Medicaid definition of "medical assistance" is a transcendent rule that can be generalized to the case of HCAP days, requiring that those days be excluded from the Medicare DSH calculation.  As seen by the inclusion of expansion waiver days and unpaid Medicaid days in the Medicare DSH calculation, however, this pillar is simply an illusion of the Secretary's own making.  The Secretary's entire argument regarding the exclusion of HCAP days from the Medicare DSH calculation fails as a necessary consequence.

46

**B.    The Secretary's Reliance Upon The *Cabell* Line
Of Cases Is Misplaced.**

In a related and equally misguided argument, the Secretary,

ironically, actually attempts to use the decisional law regarding

"unpaid" Medicaid days to make his case.  As noted earlier, he

argues that the courts of appeals have uniformly concluded that

eligibility for Medicaid, as defined by the Medicaid statute, is the

"touchstone" for determining which patient days are required to

be included in the Medicare DSH provision.  Sec. Br. at 17.  The

Secretary points to *Cabell Huntington Hosp., Inc. v. Shalala*, 101

F.3d 984 (4th Cir. 1996), *Jewish Hospital v. Sec'y of Health &*

*Human Servs.*, 19 F.3d 270 (6th Cir. 1994), *Legacy Emanuel Hosp.*

*& Health Ctr. V. Shalala*, 97 F.3d 1261 (9th Cir, 1996) and

*Deaconess Health Serv. Corp. v. Shalala*, 83 F.3d 1041 (8th

Cir.1996), as examples of the supposed uniform reliance on the

Medicaid statute's definition of "medical assistance" for

determining whether particular patient days are included in the

Medicare DSH calculation.

47

An examination of this line of cases, however, in the context of the issues that were actually before the courts, reveals that the courts' informal use of the term "Medicaid," in lieu of the term "medical assistance under a State plan," was in no way intended to resolve, much less address, the issue regarding HCAP days— which involve recipients of medical assistance under a State plan who are not traditional Medicaid beneficiaries—that confronts this court in the present appeal.

For example, in *Cabell*, the only issue that was brought before the court was whether days of service provided to traditional Medicaid beneficiaries, which were unpaid by Medicaid, must be included in the Medicare DSH calculation:

> whether [the language] in the Medicaid proxy means DSH payments should take account of only those inpatient hospital days which are *actually paid* by West Virginia's Medicaid program (as the Secretary maintains) or whether the calculation should include all the days of patients who otherwise qualify for Medicaid but who may have exceeded the number of days covered under the state Medicaid plan (as the hospitals argue).

48

*Cabell*, 101 F.3d at 986-87 (bold emphasis added).

The distinction between payment and non-payment of services provided to traditional Medicaid beneficiaries is the only issue raised in the cases that the Secretary cites. In *Jewish Hospital, Inc.*, the court closely examined the distinction between being a Medicaid beneficiary and having a right to coverage (i.e. payment) for the particular patient day in question. *Jewish Hospital, Inc.*, 19 F.3d at 272; 274-275. The Court in *Jewish Hospital*, like the court in *Cabell*, did not inquire as to whether patient days, other than traditional Medicaid days, fell within the scope of the text of the Medicare DSH statute ("eligible for medical assistance under a State plan"). *Id.* Rather, the issue before the courts in *Legacy Emanuel Hospital* and *Deaconess Health Service Corp.* was whether days for which Medicaid beneficiaries had no Medicaid inpatient hospital coverage (i.e. received no Medicaid payment) must be included in the Medicare DSH calculation. *See Legacy Emanuel Hospital*, 97 F.3d at 1264; *Deaconess Health Servs. Corp. v. Shalala*, 912 F. Supp. at 444 ("the underlying issue

is whether the numerator should be calculated . . . by counting only those days that are actually *paid*. . . .").

Thus, the Secretary's argument regarding these cases— namely that they address whether the Medicare DSH calculation may include patient days other than traditional Medicaid days (such as HCAP days)—is wildly off the mark. None of the decisions in the *Cabell* line of cases needed to address, nor did address, whether days of service that a hospital provides under a program that is part of a State plan approved under Title XIX, but which is not traditional Medicaid, must be included in the Medicare DSH calculation.

The fact that none of the court decisions in the *Cabell* line of cases addressed this issue is unsurprising. There were no patient days at issue in those cases that would be analogous to the HCAP days at issue in the present appeal. Although the states at issue in the *Cabell* line of cases (Kentucky, Oregon, and West Virginia) all have some type of "charity care" program, none of those programs are set forth in the states' State plans approved under

50

Title XIX, let alone comprehensively set forth therein as in the case of HCAP in Ohio.

The district court below quite correctly rejected the Secretary's argument based on the *Cabell* line of cases, noting that "the part of the phrase at issue here was not before those courts." No. 05-2422, 2007 WL 4438985, at 4 (D.D.C. June 11, 2007).  In the cases cited by the Secretary, the courts never analyzed the issue, much less rendered any rulings, as to whether patient days, other than those for which patients were covered by traditional Medicaid, should be counted as being eligible for "medical assistance under a State plan."  Certainly the *Cabell* line of cases only found that, in order to be included in the Medicare DSH calculation, it was *sufficient* that a patient be a traditional Medicaid beneficiary.  The question in the present matter, however—which the cases do not address at all—is whether it is *necessary* for a patient to be a traditional Medicaid beneficiary in order to be included in the calculation.  For all of these reasons, the district court below properly described the present matter as "a case of first impression."  APP 118.

### C.    The Statutory Sections Referenced By The Secretary Do Not Support His Argument

The Secretary's identification of other statutory provisions that contain the phrase "eligible for medical assistance under a State plan," or a variation thereof, adds nothing to the analysis of whether the Medicare DSH statute requires the inclusion of HCAP patients days in the Medicare DSH calculation.

Of the numerous statutes cited by the Secretary in footnotes "1" and "2" of his opening brief, twenty-seven of the references regarding "medical assistance" are to the Medicaid statute itself.[7] The gist of the Secretary's argument is that the provisions, taken together, help to sketch out the meaning of the term.  The

_____

7  The Secretary's references to the Medicaid statute include: 42 U.S.C. § 1396a(a); 42 U.S.C. § 1396a(a)(10)(A)(ii)(VIII)(cc); 42 U.S.C. § 1396a(a)(10)(G); 42 U.S.C. § 1396a(a)(10)(E); 42 U.S.C. § 1396a(70); 42 U.S.C. § 1396a(e)(3); 42 U.S.C. § 1396a(q)(1)(B); 42 U.S.C. § 1396a(r)(1)(B)(i)(I); 42 U.S.C. § 1396a(v); 42 U.S.C. § 1396b(m)(1)(A)(i); 42 U.S.C. § 1396b(v)(2)(B); 42 U.S.C. § 1396d(q)(1)(B); 42 U.S.C. § 1396j(c); 42 U.S.C. § 1396k(a)(1); 42 U.S.C. § 1396n(a)(1)(A); 42 U.S.C. § 1396n(g)(3); 42 U.S.C. § 1396n(i)(1); 42 U.S.C. § 1396p(c)(1)(D)(ii), (c)(4); 42 U.S.C. § 1396r(c)(5)(B)(iii); 42 U.S.C. § 1396r-1(c)(2), (3); 42 U.S.C. § 1396r-1a(c)(2), (3); 42 U.S.C. § 1396r-1b(c)(2), (3); 42 U.S.C. § 1396r-4; 42 U.S.C. § 1396r-6(b)(3)(B); 42 U.S.C. § 1396r-8(a)(5)(B); 42 U.S.C. § 1396u-2; 42 U.S.C. § 1396u-4(a)(1).

Secretary's argument in this regard, however, is totally incorrect.

The term "medical assistance" has exactly the same meaning in

each and every instance in which it is used in the Medicaid statute

*because it is a defined term in that statut*e.  *See* 42 U.S.C.

1396d(a).  Congress's repeated use of the term in the Medicaid

statute, taken as a totality, therefore neither adds nor subtracts

from the meaning of that term in the Medicaid statute, much less

the Medicare statute.  As an exercise in statutory construction,

the Secretary's 27 references to the Medicaid statute are therefore

pointless.

Even more fundamentally, the Secretary fails to appreciate

that the Hospitals do not dispute that the term "medical

assistance" is defined by the Medicaid statute at 42 U.S.C. 1396(a)

and that the definition does not include HCAP.  The whole point of

the Hospitals' argument, which is left largely unaddressed by the

Secretary's opening brief, is that under *Chevron*, the plain

meaning of the Medicare DSH statute requires HCAP days to be

included in the Medicare DSH calculation.  As explained under

the first point heading of this brief, because the case is resolved

53

under the plain meaning of the Medicare DSH statute, extrinsic materials, such as the Medicaid statute, cannot be used to change that plain meaning and the Secretary is not afforded deference in his interpretation of the statute.

It should be noted that the Secretary cites one provision in the Medicaid statute, 42 U.S.C. §1396b(v), arguing that the provision "prohibits payment to any state for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." Sec. Br. at 43 (internal quotations omitted). The Secretary's statement of the law is incorrect. There are actually numerous instances in which Medicaid pays for services provided to illegal aliens so long as the "care and services are necessary for the treatment of an emergency medical condition of the alien." 42 U.S.C. §1396b(v)(2)(A). Thus, the Secretary's statement that there is a blanket prohibition against Medicaid payments for treatment to illegal aliens is false.

Furthermore, the section cited by the Secretary is from the Medicaid statute and only addresses "medical assistance" under

54

the Medicaid statute's definition of the term (i.e. financial assistance for traditional Medicaid patients). Nothing in the provision prohibits a program such as HCAP from being included in a State plan of medical assistance approved under Title XIX. Finally, if the Secretary had any concerns about the HCAP program relating to incidental assistance provided to illegal aliens, he could have elected not to approve the State plan.

In addition to citing to the Medicaid statute itself, the Secretary also asserts that the term "medical assistance under a State plan," when used in seven other sections of the Social Security Act, must be imputed to share the definition of the term found in the Medicaid statute.[8] These sections also do not support the Secretary's argument. Four of the sections cited by the Secretary address requirements that States must meet in applying for certain types of other federal programs, such as primary health centers, demonstration projects, and block grants

---

[8] 42 U.S.C. § 254b(k)(3); 42 U.S.C. § 300z-5(a)(13); 42 U.S.C. § 602(a)(3); 42 U.S.C. § 608(a)(11)(A), (B); 42 U.S.C. § 1320a-7b(a)(6); 42 U.S.C. § 1382h(b)(3); 42 U.S.C. § 1397ee(d)(1).

for Temporary Assistance to Needy Families. *See* 42 U.S.C. §§ 254b(k)(3); 300z-5(a)(13); 602(a)(3); and 608(a)(11)(A) and (B). Each time the phrase is used in these sections, the statute is simply addressing either the State's responsibility to have a State plan in place or advising that patients may, in addition to receiving benefits provided under the project or block grant, receive some benefits under a State plan. The Secretary has not cited, nor have the Hospitals been able to find, any cases in which courts interpreting these sections addressed the definition of the phrase, in order to determine whether HCAP, or any analogous program, constitutes "medical assistance." Thus, these sections shed no light on the issue of statutory construction which lies at the heart of the present appeal. Moreover, as with the Secretary's arguments regarding the Medicaid statute, these additional provisions are not, in any event, reached under the *Chevron* analysis.

With respect to the Medicare statute, the Secretary makes two references to "Pickle DSH," which is a seldom-used alternative to the standard, proxy-method of calculating the Medicare DSH

adjustment under 42 U.S.C. § 1395ww(d)(5)(F) (vi)(II).  Sec. Br. at

24, 34 n.4.  The Secretary argues that Pickle DSH provides for a

calculation "without regard to Medicaid eligibility" and that the

Hospitals' argument in the present case, that HCAP days must be

included in the proxy method of calculating Medicare DSH, would

cause Pickle DSH to "be rendered largely superfluous." *Id.* at 24.

The Secretary's argument is untrue.  The calculation

outlined by the Pickle DSH statute most definitely includes

neither HCAP days nor HCAP-related revenue and would

therefore *not* be rendered superfluous by the inclusion of HCAP

days in the proxy-method of calculating the Medicare DSH

adjustment.  Pickle DSH is based on a hospital's inpatient care

revenues for services to the indigent, "*excluding* any such

revenues attributable to [Medicare] or State plans approved under

[Title] XIX."  42 U.S.C. § 1395ww(d)(5)(F)(i)(II).  Based on the

language of the Pickle DSH statute, neither HCAP days nor

HCAP-related revenue can be included in the Pickle DSH

calculation because the revenue that Ohio Hospitals receive

related to HCAP comes in the form of Title XIX Medicaid DSH

57

funds, which Pickle DSH specifically excludes. *Id.* Indeed, the

Secretary has even admitted in his brief that the only Ohio

hospital revenue that is triggered by services to HCAP patients

comes in the form of Title XIX matching funds (the same FFP

which underwrites traditional Medicaid) as part of the Medicaid

DSH adjustment. *See, e.g.* Sec. Br. at 8.

Furthermore, because Pickle DSH is a revenue-based

calculation, there is no mechanism for HCAP *days* to be included

in the Pickle DSH calculation because Pickle DSH does not count

patient days. 42 U.S.C. § 1395ww(d)(5)(F)(i)(II). For all these

reasons, the Secretary's argument that Pickle DSH is

"superfluous" if HCAP days are included in the proxy method of

calculating the Medicare DSH adjustment (under 42 U.S.C. §

1395ww(d)(5)(F)(vi)(II), is simply wrong.

The remaining three sections of the Social Security Act cited

by the Secretary address (1) the criminal penalties for knowingly

or willfully disposing of assets in order to become eligible for

medical assistance under a State plan (42 U.S.C. § 1320a-

7b(a)(6)); (2) the benefits available to individuals who perform

58

substantial gainful activity despite severe medical impairment (42
U.S.C. § 1382h(b)(3)); and (3) the eligibility standards applicable
to the State's Children's Health Insurance Program (42 U.S.C. §
1397ee(d)(1)).  As is the case with the other four sections cited in
the preceding paragraph, not one of these provisions gives any
indication as to whether it embraces the definition of "medical
assistance" that is set forth in the Medicaid statute or the
Medicare statute.  These provisions, therefore, add nothing.  As
was the case with the other sections of the Social Security Act, the
Secretary does not cite to one case, nor have the Hospitals located
any, in which a court addresses the term "medical assistance" in
the context of these provisions.

Finally, the Secretary cites several statutes that fall outside
of the Social Security Act which include the phrase "medical
assistance under a State plan approved under title XIX of the
Social Security Act."  The use of the phrase in these provisions
also provides no additional insight into the meaning and

59

interpretation of the term.9  For example, the federal statute addressing the restrictions of welfare and public benefits available to aliens, cited three times by the Secretary, and the federal statute addressing hospital and nursing home benefits provided to veterans, state nothing more than that certain aliens and veterans may or may not be eligible for federal benefits depending upon whether they are "eligible for medical assistance under a State plan," or, if the alien "otherwise meets the eligibility requirements for medical assistance under the State plan."  *See* 8 U.S.C. § 1612(b)(2)(F); § 1612(b)(2)(A); 38 U.S.C. §§ 1722(a)(1),(g).

Neither of these provisions address the issue of what "medical assistance under the State plan" actually means, much less in a way that would shed light on the issue in the present appeal.  As with the other provisions, the Secretary does not cite to a single case, nor are the Appellees able to locate one, in which a court interprets the phrase in the context of either of these statutes.  Rather than provide support for the Secretary's

---

9 8 U.S.C. § 1182(o)(6)(B)(iii); 8 U.S.C. § 1611(b)(1)(A); 8 U.S.C. § 1612(b)(2)(F); 38 U.S.C. 1722(a)(1), (g).

argument, these provisions underscore the fact that interpretation of the phrase remains open as to each, shedding no light on the issue presented.

### D.    The Secretary Has Mischaracterized The Hospitals' Arguments

Ten pages of the Secretary's brief are devoted to the argument that HCAP "is not a State plan Approved under Subchapter XIX." Sec. Br. at 27-37.  Despite the Secretary's arguments to the contrary, this was never the Hospitals' position before the district court.  Instead, the Hospitals maintained, and continue to maintain, that HCAP is *part of* Ohio's State plan approved under Title XIX.

While the district court, in one section of the decision, states that "[i]t is undisputed that HCAP is a 'state plan approved under Title XIX,'" it is clear from other sections of the decision that the court's omission of the words "part of" in this particular statement was a typographical error.  For example, the district court, on page two of its decision, observes that "Plaintiffs are 25 hospitals that participate in Ohio's Hospital Care Assurance Program

61

('HCAP'), a *part of* Ohio's state health plan ('State Plan')." *Id.*

Later, on page three of its decision, the district court notes once

again that, "[i]t is undisputed that HCAP is *part of* Ohio's State

Plan and that the State Plan has been approved by the Secretary

under Title XIX." The Secretary's argument on this point must be

rejected, and the district court's ruling must be affirmed.

> **E.    The Ohio Statutory Provisions Referenced By The Secretary Do Not Support His Argument And Are Irrelevant Under *Chevron***

The Secretary points out that the Ohio statutes refrain from

referring to HCAP as "medical assistance" in order to distinguish

HCAP from "the medical assistance program, i.e., Medicaid." Sec.

Br. at 25-26 (internal quotations omitted). The Secretary's

quotation of the Ohio statutes, however, is misleading. In

actuality, the Ohio statutes have several different medical

assistance programs and use the term differently in various

contexts.

For example, in one provision, the Ohio statutes state that

"'medical assistance provided under a public assistance program'

62

means medical assistance provided under the *programs* established under sections 5101.49, 5101.50 to 5101.503, 5101.51 to 5101.5110, and 5101.52 to 5101.529, Chapters 5111. and 5115., *or any other provision of the Revised Code.*" *See* Ohio Rev. Code § 5101.26 (emphasis added).  The second time that the term "medical assistance" appears in the foregoing quote, it is obviously being used in its common usage.  Furthermore, because the Ohio legislature, in this provision, conceives of "medical assistance" as being provided under multiple "programs" instead of under a single "program," and sweeps in programs established under "any . . . provision of the Revised Code," the language clearly would include HCAP.  HCAP is established by Ohio Rev. Code § 5112.01 *et seq.*

In yet another instance, the Ohio statutes state that a person "seeking to participate in a program of medical assistance under this section shall apply to the county department of job and family services in the county in which the applicant resides."  Ohio Rev. Code § 5111.0115.  Although the legislative section in which the text appears relates to Medicaid, it is nevertheless evident

63

that the Ohio legislature is using the term "medical assistance" at least partly in its common, ordinary usage. Certainly the use of the words "a program of medical assistance" in Ohio Rev. Code 5111.0115 is different from, and more generic than, the words "the program of medical assistance" as used in Ohio Rev. Code 5112.01(b)(3)(G) which is cited by the Secretary.

The point of examining these various Ohio statutory provisions is not to question the veracity of the Secretary's claim that, in the context of HCAP, the Ohio legislature finds it useful to employ the terminology of the federal Medicaid statute in order to differentiate between medical assistance which is provided under HCAP and medical assistance which is provided in the form of traditional Medicaid services. Rather, the point to be gleaned from this exercise is that the Ohio legislature, like the United States Congress, uses the term "medical assistance" in different ways, including, when the term is not specifically defined, in a manner that engages the term's plain and customary meaning.

Using the Ohio statutes as an analogy, it is unsurprising that the United States Congress uses the term "medical

64

assistance" as a defined marker in the Medicaid statute, but in the term's common and ordinary usage in the Medicare DSH provision.   Indeed, when Congress uses a term as common as "medical assistance," without a definition attached to it, that would seem to be reason enough to embrace its plain, common meaning.   Certainly Congress is aware of the straightforward meaning of the term and that should it wish to compel a different interpretation, a definition would be needed.

Lastly, the Secretary's contention that the Court of Appeals should use specific Ohio statutory provisions to gauge the meaning of the Medicare DSH statute must be rejected out of hand.   First, the Ohio provision to which the Secretary refers in his brief (Ohio Rev. Code § 5112.01(b)(3)(G)) uses "medical assistance" as a defined term of art.   The provision does not attempt to answer the threshold question of whether HCAP is "medical assistance" in accordance with the plain, common usage of the term.   Second, part of what the Secretary is doing is construing the Medicare DSH statute in light of the intent of the Ohio legislature, and that makes less than no sense.   Third, the

65

Ohio statutory provisions are, in any event, extrinsic to the Medicare statute and therefore impermissible interpretive tools under the first step of the *Chevron* analysis.

**F.    The Secretary's Arguments Relative To The *Medicaid* DSH Adjustment Are Irrelevant To The Resolution Of The Issues On Appeal**

*1.    The Secretary's Analogy Between The Medicare And Medicaid DSH Provisions Does Not Withstand Scrutiny*

The Secretary, in his brief, offers up an analogy between the Medicare statute's DSH provision and the Medicaid statute's DSH provision, noting that the Medicaid statute "expressly distinguishes between patients who are eligible for medical assistance under a State plan" and patients who receive "inpatient hospital services which are attributable to charity care." Sec. Br. at 16 (citing 42 U.S.C. §§1396r-4(b)(2) and (b)(3)(B)). The Secretary's statement is totally untrue.

In the Medicaid DSH provision cited by the Secretary, Congress was not "distinguishing" the concept of "medical assistance under a State plan" from the concept of "charity care." As alluded to earlier, the term "medical assistance" is *already* a

66

defined term in the Medicaid statute by virtue of §1396d(a).  It is impossible for subsequent provisions in the Medicaid statute, such as §§1396r-4(b)(2) and (b)(3)(B), which are quoted by the Secretary, to further delineate the term's meaning.  In other words, in §§1396r-4(b)(2) and (b)(3)(B), "medical assistance" means "traditional Medicaid," not because of any attempt by Congress to distinguish between the common meaning of the terms "medical assistance" and "charity care," but rather because the statutory definition found at §1396d(a) *requires* the term "medical assistance" to carry the specific meaning assigned to it throughout the entire Medicaid statute, irrespective of where or how the term is used.  Nor is the Medicaid statute's definition of the term "medical assistance" even disputed in this matter.

The Secretary also mentions the fact that the Medicaid DSH adjustment, as a conceptual matter, constitutes an increase in the Medicaid rates of Medicaid patients.  Sec. Br. at 35.  The Secretary, however, misses the point, which is that an Ohio hospital receives a Medicaid DSH adjustment based in part on the HCAP services it provides, but only if it provides services to HCAP

patients as required by the eligibility provisions contained in the Ohio State plan approved under Title XIX.  Moreover, as seen in the *Cabell* line of cases discussed earlier, the fact that a particular patient day is ineligible for Medicaid payments is not, in itself, grounds for excluding that patient day from the Medicare DSH calculation.

The Secretary, in a similar vein, cites the legislative history of the Medicaid DSH statute in support of the proposition that "payment for [charity care] days . . . does not mean that the patient is eligible for Medicaid or can be counted in the Medicare DSH formula."  Sec. Br. at 34 (internal quotations and brackets omitted).  The legislative history he cites, however, H.R. Conf. Rpt. 103-111, at 211 (1993), *reprinted* in 1993 U.S.C.C.A.N. 378, 538, does not even remotely advance any proposition related to the issue of what patient days must be included or excluded from the Medicare DSH calculation.  *Id.*  The actual language quoted by the Secretary in this regard comes from his own policy memorandum, Program Memorandum 99-62.  Sec. Br. at 34, APP 82.

The whole point of the Hospitals' argument in the present matter is that the Medicare DSH statute is unambiguous and must be applied in light of the plain meaning of its terms.  The Secretary's excursion into the backwaters of the Medicaid statute's DSH provisions is simply another attempt to circumvent the core question under *Chevron* as to whether the Medicaid statute is reached at all in the analysis.

2.  *HCAP's Role In Ohio's Medicaid DSH Calculation Does Not Impact The Analysis Of Whether HCAP Days Get Included In The Medicare DSH Calculation*

The Secretary points out that HCAP serves as one of the components of Ohio's Medicaid DSH calculation, which Ohio pays to certain hospitals that serve a disproportionate share of indigent patients, and that HCAP also serves as a "redistributive fund paid into by wealthier hospitals that, along with the Medicaid DSH adjustment, is distributed to hospitals serving a disproportionate share of low-income Ohioans." Sec. Br. at 8.  It is an interesting side bar, but why should the court care?  The fact that HCAP has these features does not answer the question, one way or the other,

69

as to whether or not HCAP constitutes "medical assistance," under the ordinary usage of the term, under Ohio's State plan approved under Title XIX. The only way to answer that question is to examine Ohio's State plan, which the Secretary fails to do at every turn.

Further along these lines, the Secretary contends that "HCAP was submitted to the Secretary for purposes of setting the methodology by which Ohio will calculate the Medicaid DSH adjustment, a rate adjustment that is a required part of every state Medicaid plan." Sec. Br. at 11. The provisions at issue in the present matter, however, have absolutely nothing to do with "setting the methodology" for calculating Ohio's Medicaid DSH adjustment. Instead, the State plan provisions at issue in this appeal focus on which patients are eligible for medical assistance under HCAP and the nature of the covered services. APP 118.

Contrary to the suggestion of the Secretary, the HCAP eligibility provisions and the listing of the services available under the HCAP program are not required by any federal or state law to be included in the State plan. *See* 42 U.S.C. 1396a. Indeed, for

70

purposes of instituting and maintaining a Medicaid DSH program,

the Medicaid statute does not require that indigent patients who

are ineligible for traditional Medicaid be made eligible for medical

services at all. *See* 42 U.S.C. 1396r-4 et seq. A state can comply

with the Medicaid DSH provisions without having any HCAP-like

program. *Id.* All that is required by the Medicaid statute is that

it specifically define which hospitals are considered to be "DSH"

hospitals for purposes of Medicaid, and establish a mechanism for

allocating and paying the Medicaid DSH adjustment. *Id.* Indeed,

even those states that do elect to maintain a medical assistance

program similar to HCAP, and to use data relating to that

program to help calculate the Medicaid DSH adjustment, are

under no requirement to include the program's patient eligibility

provisions in their State plans approved under Title XIX. *Id.*

Indeed, Kentucky and Florida have similar programs, but the

State plans for these states do not contain patient eligibility

provisions.[10]

The Secretary's suggestion that it was necessary to include patient eligibility criteria for HCAP, and related provisions, in the Ohio State plan, in order to expedite and enable the payment of Medicaid DSH, is simply, and completely, false.

### G.    The Inclusion Of HCAP Patients Will Not Affect The Accuracy Of The Medicare DSH Adjustment.

The Secretary is entirely incorrect when he argues that the inclusion of HCAP days in the Medicare DSH calculation would result in a "proxy that does not consistently estimate the number of poor patients served from state to state."[11]  The Secretary maintains that "because different states have different programs for serving poor populations that do not qualify for Medicaid – some will be swept into the Medicare DSH calculation resulting in higher payments, while some will not in spite of imposing similar

---

10*See, e.g.* http://web.archive.org/web/20061006022548/
www.cms.hhs.gov/medicaid/stateplans/results.asp?State=WV&Sec
tion=4.19&Type=Supplements&Subfolder=A&File=S1&Link=Sup
plement+1+to+Attachment+A&Terr=S;
11 Secretary's Opening Brief at 42.

costs."[12]  In reaching this position, however, the Secretary again ignores the facts on the ground.

For example, as explained above, since January 20, 2000, the Secretary has *required* that "expansion waiver days" associated with the inpatient care of "expansion waiver populations" be included in the Medicare DSH calculation.  HCAP, and an expansion waiver program, such as the "TennCare" program in Tennessee, cover essentially the same patient populations.[13] Thus, patient populations similar to HCAP patients are already being included in the Medicare DSH adjustment in states such as Tennessee.  The fact that HCAP patients would be included in the Medicare DSH calculation will not introduce patient populations into the calculation that are not already being included in other states.

Second, the Medicaid statute sets forth certain broad parameters with respect to Medicaid coverage, and states are free

---

[12] Secretary's Opening Brief at 42.

[13] In order to be eligible for HCAP, a patient must be at or below 100% of the federal poverty line.  App. 23.  The eligibility provisions in Tennessee's waiver program are identical.

to decide, within these parameters, which patient populations are eligible for Medicaid benefits under their respective Medicaid programs.  *See* 42 U.S.C. 1396a, *et seq.*  CMS describes the Medicaid statute as establishing "general guidelines for the program," and that "[w]hether or not a person is eligible for Medicaid will depend on the State where he or she lives."[14]

For example, a state has the option of whether to cover under its Medicaid program a category of  patients defined by the Medicaid statute as "medically needy" (which consists of individuals with too much income or savings to be part of a patient population for which Medicaid coverage is mandatory)  *Id.*; *see also* 42 U.S.C. 1396a et seq.  The Secretary has even conceded this fact in his brief, observing that a state "may, at its *option*" make traditional Medicaid "available to medically needy persons." Sec. Br. at 6 (emphasis added).  Thirty-five states cover the "medically needy" under their traditional Medicaid programs.  The

---

14 *Medicaid At-a-Glance* (CMS 2005), at 1-2, http://www.cms.hhs.gov/MedicaidGenInfo/Downloads/MedicaidAtAGlance2005.pdf

remaining states do not.[15]  Hospitals in states that cover the "medically needy" under their traditional Medicaid program have that whole category of patient days swept into their Medicare DSH calculation.  These days are not included in the Medicare calculation of hospitals that are located in states that do not cover the "medically needy."

Based on the foregoing, the Secretary's argument on this issue is simply wrong. Medicaid programs and the patient populations they cover already vary widely from state to state.  *Id.* Therefore, the patient populations which are included in the Medicare DSH calculation also varies widely from state to state. The Medicare DSH adjustment nationally consists of many different types of patient populations, and will remain unaffected by the inclusion of HCAP days.  The Secretary's claim that there exists a narrow consistency in the kinds of patient days that are included in the Medicare DSH calculation is completely false.

---

15 *See Medicaid At-a-Glance, Supra.*

## Conclusion

Based on all of the foregoing, the district court's decision must be affirmed.

Respectfully Submitted,

MURRAY J. KLEIN
Attorney for Plaintiff-Appellees
Reed Smith LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
(609) 987-0050

February 18, 2008

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
# OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify, pursuant to Fed. R. App. P. Rules 32(a)(7)(C) and

D.C. Circuit Rule 32(a), that the foregoing brief is proportionally

spaced, has a typeface of 14 point, and contains 13,090 words.

Murray J. Klein

## CERTIFICATE OF SERVICE

I certify that on this 19th day of February, 2008, I caused to

be served via hand delivery one true and correct copy of the foregoing

brief to both of the following:

Anthony John Steinmeyer, Esq.,
U.S. Department of Justice
Appellate Staff, Civil Division
950 Pennsylvania Avenue, NW, Room 7529
Washington, DC 20530-0001

August Edward Flentje, Esq.
U.S. Department of Justice
Appellate Staff, Civil Division
950 Pennsylvania Avenue, NW, Room 7242
Washington, DC 20530-0001

_____
Steven B. Roosa