# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
BANNER HEALTH,                                    )
                                                  )
            Plaintiff,              )
                                                  )
            v.                      )      Civil Action No. 07-1614 (RBW)
                                                  )
KATHLEEN SEBELIUS,                                )
Secretary of the Department of                    )
Health and Human Services,[1]                     )
                                                  )
            Defendant.              )
_____)

## MEMORANDUM OPINION

The plaintiff, Banner Health, appeals a final decision of the Secretary of Health and

Human Services (the "Secretary") denying certain Medicare Part A payment adjustments to four

Arizona hospitals in return for expenses the hospitals incurred providing services to low-income

individuals in fiscal years 1991 and 1993-1999.  Complaint For Sums Due and For Declaratory

and Injunctive Relief Concerning Medicare Payments to Disproportionate Share Hospitals

("Compl.") ¶¶ 1, 8.  Currently before the Court are the parties' cross-motions for summary

judgment.[2]  For the reasons set forth below, both parties' motions must be granted in part and

denied in part, and the case remanded to the Secretary for further action consistent with this

opinion.

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Kathleen Sebelius, the current Secretary of Health and Human Services, has been substituted for the original named defendant.

[2]  The Court also considered the following papers in resolving the parties' motions: (1) Plaintiff's Memorandum of Points and Authorities in Support of its Second Motion for Summary Judgment ("Pl.'s Mem."); (2) Plaintiff's Consolidated Memorandum in Opposition to Defendant's Second Motion for Summary Judgment and Reply Memorandum in Support of Plaintiff's Second Motion for Summary Judgment ("Pl.'s Opp'n & Reply"); (3) Defendant's Memorandum in Support of His Combined Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Mem."); and (4) Defendant's Reply in Support of His Motion for Summary Judgment.

# I. BACKGROUND

## A. Statutory and Regulatory Framework

### 1. Medicare and the DSH Payment Adjustment

Through a "complex statutory and regulatory regime," the Medicare program reimburses qualifying hospitals for the services that they provide to eligible patients.  County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999).  The Medicare regime is administered by the Centers for Medicare and Medicaid Services (the "CMS"),[3] under the supervision of the Secretary, and through a network of fiscal intermediaries, usually private companies serving as the Secretary's agents for the purpose of reimbursing health care providers.  See Dialysis Clinic, Inc. v. Leavitt, 518 F. Supp. 2d 197, 199 (D.D.C. 2007).  Under the Medicare Act, the "operating costs of inpatient hospital services" are reimbursed under a system of prospectively determined standardized rates, but those rates are subject to hospital specific adjustments.  See 42 U.S.C. § 1395ww(d) (2006); In re Medicare Reimbursement Litig. Baystate Health Sys. ("Baystate"), 414 F.3d 7, 9 (D.C. Cir. 2005), cert. denied, 547 U.S. 1054 (2006).

In order to receive the reimbursements, eligible hospitals file cost reports with their fiscal intermediaries at the end of each fiscal year.  See 42 C.F.R. § 413.20(b) (1999).[4]  See generally Baystate, 414 F.3d at 8 (describing reimbursement process).  After auditing the reports, the fiscal intermediaries issue Notice of Program Reimbursements in which they determine the amount owed by the Secretary to the hospitals for the fiscal year at issue.  42 C.F.R. § 405.1803(a).  Hospitals dissatisfied with the fiscal intermediary's award have 180 days to appeal to the

---

[3]  The CMS was formerly known as the Health Care Financing Administration.  Monmouth Med. Ctr. v. Thompson, 257 F.3d 807, 809 n.1 (D.C. Cir. 2001).  Both names appear in the administrative record in this case.  For simplicity, the Court will refer to the agency by its current name, the CMS.

[4]  Unless otherwise noted, stand alone citations to the Code of Federal Regulations are to the 1999 edition, the most recent cost year being appealed by the plaintiff.  Compl. ¶ 8.

Provider Reimbursement Review Board (the "Reimbursement Board"), which issues a decision that the Secretary may reverse, affirm, or modify within sixty days. 42 U.S.C. § 1395oo(f)(1). Hospitals remaining dissatisfied after either the Reimbursement Board or the Secretary issues a final decision may seek judicial review by filing suit in the appropriate federal district court. Id.

This case involves one of the hospital specific adjustments known as the Medicare disproportionate share hospital ("DSH") adjustment. Id. § 1395ww(d)(5)(F)(i)(I); see Compl. ¶¶ 9-10, 24-32. This adjustment is made to hospitals that serve "a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Congress enacted legislation establishing detailed criteria for determining eligibility and the extent of a hospital's payment adjustment. Baystate, 414 F.3d at 9.

Whether a hospital qualifies for the Medicare DSH adjustment, and the amount of the adjustment it receives, depends on its "disproportionate patient percentage," 42 U.S.C. § 1395ww(d)(5)(F)(v), which is determined by the Secretary pursuant to a statutory formula. 42 U.S.C. § 1395ww(d)(5)(F)(v)-(vii); 42 C.F.R. § 412.106(b). According to the formula, the disproportionate patient percentage is the sum of two fractions, 42 U.S.C. § 1395ww(d)(5)(F)(vi), commonly referred to as the Medicaid fraction and the Medicare fraction, see Jewish Hosp., Inc. v. Sec'y of Health & Human Servs., 19 F.3d 270, 272 (6th Cir. 1994). Together, the Medicare and Medicaid fractions serve as a proxy for the number of low-income patients served by the hospital. Id.

More specifically, the dispute in this case centers on the computation of the numerator of the Medicaid fraction. Compl. ¶ 32.[5] According to the statute, the Medicaid fraction is:

> The fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which

_____
[5] The Medicare fraction is not at issue in this case. Compl. ¶ 27.

consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Title] XIX of this chapter [i.e., Medicaid], but who were not entitled to benefits under [Medicare Part A], and the denominator of which is the total number of the hospital's patient days for such period.

Id. § 1395ww(d)(5)(F)(vi)(II); see Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176, 178 (D.C. Cir. 2008), cert. denied., 129 S. Ct. 1933 (2009) (discussing Medicaid fraction). "Put simply, the more a hospital treats patients who are 'eligible for medical assistance under a State plan approved under [Medicaid],' the more money it receives for each patient covered by Medicare." Adena, 527 F.3d at 178 (emphasis and alteration in original).

*2. Medicaid*

The Medicare DSH provision expressly refers to the Medicaid statute. Id. at 180. See generally 42 U.S.C. §§ 1396-1396v. And although this case involves a Medicare reimbursement dispute, several aspects of Medicaid are relevant.

Medicaid is a cooperative venture between the federal and state governments to assist states in providing medical care to eligible individuals. Harris v. McRae, 448 U.S. 297, 301 (1980). The federal government shares the costs of Medicaid with States that elect to participate in the program and, in return, participating States are to comply with the requirements imposed by the Medicaid Act and by the Secretary. Atkins v. Rivera, 477 U.S. 154, 156-57 (1986).

Each state administers its own Medicaid program pursuant to a state Medicaid plan which must be reviewed and approved by the Secretary. See 42 U.S.C. § 1396-1 ("The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance"); id. §§ 1396a(a)(1)-(65) (setting forth state plan requirements). A state plan "is a comprehensive written statement submitted by the [state] agency describing the nature and scope of its Medicaid program and

giving assurance that it will be administered in conformity with the specific requirements of" federal law. 42 C.F.R. § 430.10.

To obtain approval, a state Medicaid plan must meet a number of requirements. For example, the plan must provide coverage for the "categorically needy" population. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 651 (2003). This population consists of individuals who qualify based on their eligibility for assistance under the federal programs know as the Aid to Families with Dependent Children Program or the Supplemental Security Income Program. See id. at 651 n.4 (citing 42 U.S.C. § 1396a(a)(10)(A)(i)). In addition, and "at the option of the State," 42 U.S.C. § 1396a(a)(10)(A)(ii), the state plan may provide coverage to the "medically needy" population. Walsh, 538 U.S. at 651. As compared to the "categorically needy," the medically needy are "individuals who meet the nonfinancial eligibility requirements for inclusion in one of the groups covered under Medicaid, but whose income or resources exceed the financial eligibility requirements for categorically needy eligibility." Id. at 651 n.5 (citing 42 U.S.C. § 1396a(a)(10)(C)). State Medicaid agencies must "reimburse health care providers for the cost of covered services delivered to Medicaid beneficiaries." Ariz. Health Care Cost Containment Sys. v. McClellan, 508 F.3d 1243, 1246 (9th Cir. 2007).

If the state's Medicaid plan is approved by the Secretary, the state generally becomes eligible to receive federal matching funds for a statutorily set percentage of the amount "expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1); see id. § 1396d(b); see also Va. Dep't of Med. Assistance Servs. v. Johnson, 609 F. Supp. 2d 1, 2 (D.D.C. 2009). These federal matching funds are referred to as "federal financial participation." E.g., Va. Dept's of Med. Assistance Servs., 609 F. Supp. 2d at 2-3.

In distributing these funds, states must consider "the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv). Specifically, states must provide for an "appropriate increase in the rate or amount of payment for [inpatient hospital] services provided by such hospitals." Id. § 1396r-4(a)(1)(B). In determining the amount of this adjustment, states may choose from three different methods, including one based on "costs, volume, or proportion of services provided to patients eligible for medical assistance under a State plan approved under this subchapter or to low-income patients." 42 U.S.C. § 1396r-4(c)(3)(B). These adjustments are known as "Medicaid DSH" payments, Northeast Hosp. Corp. v. Sebelius, ___ F. Supp. 2d. ___, ___, No. 09-180, 2010 WL 1199311, at *4 (D.D.C. Mar. 29, 2010), and states generally have flexibility in administering the Medicaid DSH adjustments as opposed to the Medicare DSH adjustments. Id. (citing 42 U.S.C. §§ 1396r-4(b)(4), (c)(1)-(3)).

*3. Medicaid Title XI Waivers*

In addition to the Secretary's authority to approve state Medicaid plans under Title XIX, the Secretary is given authority under § 1115 of Title XI the Social Security Act, 42 U.S.C. § 1315, to "waive compliance with any of the requirements" of 42 U.S.C. § 1396a to enable States to carry out "experimental, pilot, or demonstration project[s.]" 42 U.S.C. § 1315(a); see also Portland Adventist Med. Ctr. v. Thompson, 399 F.3d 1091, 1093 (9th Cir. 2005). The requirements are waived to "enable the states to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of recipients." Cookeville Reg'l Med. Ctr. v. Leavitt, 531 F.3d 844, 845 (D.C. Cir. 2008) (quoting 42 C.F.R. § 430.25). Patients who receive federally reimbursable care under a § 1115 waiver who would not otherwise meet the normal Medicaid requirements are

referred to as the "expansion waiver population." Id. However, "[d]espite not meeting the requirements of [Title] XIX, the costs of providing care under a demonstration project waiver are treated as federally reimbursable expenditures made under [Title] XIX 'to the extent and for the period prescribed by the Secretary.'" Id. (quoting 42 U.S.C. § 1315(a)(2)(A)).

*4. The Secretary's Medicare DSH Payment Policy*

From approximately 1986 until 1997, the Secretary construed the phrase "eligible for medical assistance under a State Medicaid plan approved under [Title] XIX," 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), to include only those days where benefits were actually paid by Medicaid. See Jewish Hosp., 19 F.3d at 272. However, between 1994 and 1996 four federal circuit courts invalidated this approach, see Baystate, 414 F.3d at 9 (citing cases), and in 1997 the Secretary revised the interpretation and included in the numerator of the Medicaid fraction "the number of days of inpatient hospital services for patients eligible for Medicaid on that day, whether or not the hospital received payment for those inpatient hospital services." Administrative Record ("A.R.") at 399;[6] see also 42 C.F.R. § 412.106(b)(4) (1998). The Secretary reasoned that "[u]nder the new interpretation," the Medicaid fraction "will be calculated to include all inpatient hospital days of service for patients who were eligible on that day for medical assistance under a State Medicaid plan." A.R. at 398.

With respect to Medicare DSH calculations when a § 1115 waiver program was invoked, the Secretary's policy during the relevant time period was to separate the beneficiaries into two categories: (1) the inclusion of individuals who could have qualified for Medicaid through a traditional State plan and (2) the exclusion of individuals who were covered under the State plan

_____

[6] The defendant filed the entire 3,912 page administrative record with the Court on December 19, 2007. Docket Entry Number 17. The plaintiff submitted portions of the administrative record with the Court on April 30, 2008. Docket Entry Number 30. Unless indicated otherwise, all administrative record documents cited in this Memorandum Opinion can be found as attachments to the plaintiff's filing.

by virtue of the § 1115 waiver.  <u>See</u> Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation: Change in the Treatment of Certain Medicaid Patient Days in States with 1115 Expansion Waivers, 65 Fed. Reg. 3,136, 3,136 (Jan. 20, 2000); <u>see also</u> <u>Cookeville</u>, 531 F.3d at 846 ("Before January 2000, the Secretary's policy was not to include expansion waiver patients in the Medicaid fraction.").

In 2005, Congress passed the Deficit Reduction Act, Pub. L. No. 109-171, 120 Stat. 4, which explained that, in determining the number of days in the Medicaid fraction, "the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not [eligible for Medicaid] but who are regarded as such because they receive benefits under a demonstration project approved under Title XI."  <u>Id.</u> § 5002(a).  The Deficit Reduction Act "purported to ratify the Secretary's prior policies regarding the inclusion or exclusion of the expansion waiver population[s]."  <u>Cookeville</u>, 531 F.3d at 847.

*5. Program Memorandum 99-62 and the Hold Harmless Policy*

In December 1999, the Secretary determined it was "necessary to clarify the definition of eligible Medicaid days," A.R. at 401, for the purpose of calculating the Medicaid fraction.  <u>See</u> <u>id.</u> at 401-07 (Program Memorandum A-99-62 Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation) (the "Program Memorandum").  The clarification would apply to "cost reporting periods beginning on or after January 1, 2000."  <u>Id.</u> at 401.  According to the Program Memorandum, "[t]he term 'Medicaid days' does <u>not</u> refer to all days that have some relation to the Medicaid Program[.]"  <u>Id.</u> at 402 (emphasis in original).  Instead, the Secretary declared that "the term 'Medicaid days' refers to

days on which the patient is eligible for medical assistance benefits under an approved Title XIX

State plan." Id.[7]

Of particular relevance here, the Program Memorandum adopted a "hold harmless"

policy "for cost reporting periods beginning before January 1, 2000," that affected two groups of

hospitals. Id. at 403-05. First, with respect to hospitals that had received Medicare DSH

payments based on the erroneous inclusion of ineligible patient days, the hold harmless policy

instructed fiscal intermediaries to allow the hospitals to retain the payments, but "only in

accordance with the practice followed for the hospital at issue before October 15, 1999." Id. at

404. Second, with respect to hospitals that did not receive Medicare DSH payments based on the

erroneous inclusion of patient days, if such hospitals "filed a jurisdictionally proper appeal to the

[Reimbursement Board] on the issue of the exclusion of these types of days from the Medicare

DSH formula before October 15, 1999," the intermediary was instructed to "reopen the cost

report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of

days as Medicaid days." Id. (emphasis in original).

B. Factual and Procedural History[8]

The plaintiff operates four hospitals in Arizona:  Banner Good Samaritan Medical

Center; Banner Desert Medical Center; Banner Thunderbird Medical Center; and Maryvale

Hospital Medical Center (collectively, the "hospitals").  Compl. ¶ 8.  Before 1982, Arizona did

---

[7]  The Program Memorandum also observed that although "[m]any States operate programs that include both State-only and federal-state eligibility groups in an integrated program[,] . . . . [t]hese beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and, therefore . . . do not count" in the Medicare DSH calculations.  A.R. at 402.

[8]  The facts are taken from the portions of the Complaint that the defendant does not subsequently challenge, and as necessary directly from the administrative record.  The Court recognizes that the parties disagree on a number of the facts, most notably the nature of the Arizona System.  See generally Docket Entry Number 18, Plaintiff's Statement of Material Facts Not in Genuine Dispute; Docket Entry Number 21, Defendant's Statement of Material Facts in Support of His Motion for Summary Judgment; Docket Entry Number 23, Plaintiff's Response to Defendant's Statement of Material Facts; Docket Entry Number 21, Defendant's Response to Plaintiff's Statement of Material Facts.

not have a Medicaid program under Title XIX, A.R. at 241, and in 1982, Arizona implemented the Arizona Health Care Cost Containment System (the "Arizona System") as a § 1115 demonstration project. Id. Instead of using a Medicaid "fee-for-service reimbursement system, [the Arizona System] paid an upfront capitation payment to public and private Health plans." Id. at 228. Under this approach, the Arizona System members selected "a Health Plan and a primary care provider, who acted as gatekeeper for the system and managed all aspects of medical care for a member." Id.

During the cost years at issue, 1991 and 1993-1999, Compl. ¶ 8, the Arizona System covered three groups of patients relevant to the dispute in this case: the Medically Needy/Medically Indigent; the Eligible Assistance to Children; and the Eligible Low Income Children (collectively, the "MN/MI patient groups"). See id. ¶¶ 56-60. During this time period, the hospitals received Medicaid DSH payments from the Arizona System, id. ¶ 63, but Arizona "did not seek or receive federal funding" for recipients in the MN/MI patient groups. Id. ¶ 65.

From 1986 until 1989, the fiscal intermediary in Arizona included the MN/MI patient groups in the Medicare DSH calculations. A.R. at 36. However, it excluded the MN/MI patient groups from the calculation for the fiscal cost years at issue. Id. The plaintiff appealed the exclusion to the Reimbursement Board, which, after holding a hearing, id. at 31, concluded that the fiscal intermediary erred and that the MN/MI patient groups should have been included in the Medicare DSH calculations. Id. at 41. According to the Reimbursement Board, the Medicare "DSH [calculation] must include all patients eligible for medical assistance under Title XIX without regard to how they became eligible." Id. at 39.[9] Because the Reimbursement Board

---

[9] In rendering its decision, the Reimbursement Board admitted it was influenced by "a similar case" from the Ninth Circuit, Portland Adventist Med. Ctr., 399 F.3d 1091. See A.R. at 39-40. In addition, the Reimbursement Board was persuaded that the MN/MI patient groups could have been included as optional groups under a traditional

(continued . . .)

rested its decision on the "plain language of the 1115 waiver and [the] DSH statutes" it did not consider the impact of the hold harmless policy. Id. at 41.

The Secretary, acting through the Administrator of the CMS, subsequently reversed the Reimbursement Board. See id. at 2-21. After discussing the Medicare DSH statute and the design of the Arizona System, the Secretary explained that "[i]f a patient is not eligible for Medicaid, then the patient is not 'eligible for medical assistance under a State plan approved under Title XIX.'" Id. at 16. Applying that standard, the Secretary determined that "the days involved in this case are related to individuals not eligible for 'medical assistance' as that term is used under Title XIX and, thus, are not properly included in the Medicaid patient percentage of Medicare DSH calculation." Id. The basis for this conclusion was that the patient days involved in this case were related to "general assistance days,"[10] for which Arizona does not receive federal financial participation, and therefore were "not related to patients eligible for Medicaid and hence, cannot be counted in the numerator of the Medicare DSH fraction." Id.[11]

In addition, the Secretary determined that the hospitals did not qualify for the hold-harmless policy. See id. at 18-20. First, the Secretary found that because "from 1990 forward, the State of Arizona (i.e., [the Arizona System]) excluded the MN/MI [patient group] days from

---

( . . . continued)
Medicaid state plan, even in the absence of a § 1115 waiver, and they therefore should have been included in the calculation. Id. at 40-41.

[10] As the Secretary had explained earlier, general assistance days are "days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program." A.R. at 12 (quoting Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47,054, 47,087 (Aug. 1, 2000)).

[11] The Secretary added that although the Reimbursement Board found that the MN/MI patient groups would be eligible for Medicaid if they were to apply, "there is no demonstration in the record that the criteria for these general assistance populations are identical to the Medicaid optional eligibility criteria." A.R. at 17. The Secretary therefore found that the "[Reimbursement] Board finding that the MN/MI [patient groups] at issue would have been included under the Medicaid optional category of . . . a traditional State plan is not supported by the record." Id.

the data reported to the Intermediary[,]" <u>id.</u> at 18, the hospitals therefore "had no expectation of being paid for the MN/MI [patient groups] [for the] days at issue." <u>Id.</u> at 19. This finding was "supported by" a Question and Answer document related to the Program Memorandum. <u>Id.</u>[12] Second, the Secretary found that while some of the hospitals had appeals pending with the Reimbursement Board, "the appeals did not raise the specific issue of inclusion of State-only days[,]" <u>id.</u> at 20, and therefore the hospitals could not qualify for that provision of the hold harmless policy.

Thereafter, the plaintiff filed a claim in this Court, contending the Secretary's decision denying Medicare DSH payment adjustments "should be set aside because it is contrary to law, arbitrary and capricious, and not based upon substantial evidence in the record," Compl. ¶ 78, and further alleging that the Secretary's determination "that the Hospitals do not qualify for the hold-harmless protection under [the Program Memorandum] is arbitrary and capricious because it is inconsistent with the clear dictates of that policy, and is not based upon substantial evidence." <u>Id.</u> ¶ 80. The plaintiff requests that the Court declare the Secretary's decision

---

[12] This document reads as follows:

> Q16. How are the open cost reports for fiscal years beginning prior to 1-1-00 to be handled in a situation where the intermediary disallowed the ineligible days during the audit of the latest settled cost report (e.g., FYE 12-31-97) but allowed them in the preceding cost reports(s) (e.g., FYE 12-31-96 or FYE 12-31-96 and several prior fiscal years)?
>
> A. If before October 15, 1999 the hospital filed a jurisdictionally proper appeal on the issue of exclusion of these types of days for FYE 12-31-97 cost report the intermediary should reopen that cost report and revise the Medicare DSH payment to reflect inclusion of these types of days. . . . <u>If the hospital abandoned its expectation of receiving payment in those open cost reports (FYE 12-31-98 and FYE 12-31-99) and did not even include this issue on the 'protected amount line, the intermediary should not continue paying the Medicare DSH adjustment reflecting the inclusion of these types of days for those cost years.</u>

A.R. at 19 (emphasis in original).

invalid, require the Secretary to pay all sums due as a result of the reversal, and require the

Secretary to pay all related legal fees the hospitals incurred resulting from this litigation.  Id. ¶

81.  For its part, the defendant denies the plaintiff's allegations and contends that the plaintiff is

not entitled to any relief.  Answer of the Secretary of Health and Human Services ("Answer") ¶¶

78-81.  The dispute is properly before this Court, 42 U.S.C. § 1395oo(f), and both parties seek

summary judgment.[13]

## II. STANDARD OF REVIEW

### A. Summary Judgment

Courts will grant a motion for summary judgment under Federal Rule of Procedure 56(c)

only if the moving party has shown "that there is no genuine issue as to any material fact and that

[it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a Rule

56(c) motion, courts must view the evidence in the light most favorable to the non-moving party.

Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing

Prods., 530 U.S. 133, 150 (2000).  Courts must therefore draw "all justifiable inferences" in the

non-moving party's favor and accept the non-moving party's evidence as true.  Anderson v.

Liberty Lobby, 477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on

"mere allegations or denials," but "must set forth specific facts showing that there is a genuine

issue for trial."  Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477

U.S. at 248).  Moreover, "in ruling on cross-motions for summary judgment, the court shall grant

summary judgment only if one of the moving parties is entitled to judgment as a matter of law

---

[13]  As indicated by the titles of the parties' filings, supra note 2, this is actually the second round of summary judgment briefings in this case.  During the initial cycle, the situation turned into a "tit-for-tat dispute" with the parties accusing each other of improperly raising new arguments and relying on evidence outside the administrative record.  See Docket Entry Number 37, Order at 3.  Rather than expend its resources on these issues, the Court denied the parties' motions without prejudice and ordered the filing of renewed motions.  Id.

upon material facts that are not genuinely disputed." Muwekama Ohlone Tribe v. Kempthorne, 452 F. Supp. 2d 105, 113 (D.D.C. 2006) (Walton, J.).

Because this case "involves a challenge to a final administrative action, the Court's review is limited to the administrative record." Fund for Animals v. Babbit, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, 435 U.S. 519, 549 (1978) (stating that "when there is a contemporaneous explanation of the [challenged] agency decision, the validity of that action must stand and fall on the propriety of that finding"). Summary judgment "is an appropriate procedure for the Court to review an agency's administrative record in the face of a challenge to a final agency action." Shays v. FEC, 424 F. Supp. 2d 100, 109-10 (D.D.C. 2006).

B. Review of the Secretary's Decision Under the Administrative Procedure Act

Pursuant to the Medicare statute, this Court reviews the Secretary's decision in accordance with the standard of review set forth in the Administrative Procedure Act (the "APA"). 42 U.S.C. § 1395oo(f)(1); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Mem'l Hosp./Adair County Health Ctr., Inc., v. Bowen, 829 F.2d 111, 116 (D.C. Cir. 1987). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," AT&T Corp. v. FCC, 86 F.3d 242, 247 (D.C. Cir. 1996) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939), taking into account "whatever in the record detracts from its weight," id. (quoting Universal Camera Corp v. NLRB, 340 U.S. 474, 488 (1951)). In this Circuit, the arbitrary and capricious standard and the substantial evidence standard "require equivalent levels

of scrutiny." St. Luke's Hosp. v. Thompson, 224 F. Supp. 2d 1, 5 (D.D.C. 2002) (citing Adair County, 829 F.2d at 117).

"Under both standards, the scope of review is narrow and [the Court] must not substitute its judgment for that of the agency." Heartland Reg'l Med. Ctr. v. Leavitt, 511 F. Supp. 2d 46, 51 (D.D.C. 2007) (citing Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Court will therefore not disturb the decision of an agency that has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Md. Pharm., Inc. v. DEA, 133 F.3d 8, 16 (D.C. Cir. 1998) (alterations in original) (quoting State Farm, 463 U.S. at 43); see Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (instructing the reviewing court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). This deferential standard presumes the agency action to be valid, Kisser v. Cisneros, 14 F.3d 615, 618-19 (D.C. Cir. 1994), and the burden of showing that agency action violates the APA falls on the plaintiff, Diplomat Lakewood Inc., v. Harris, 613 F.2d 1009, 1018 (D.C. Cir. 1979). In conducting its review, the Court takes special note of the tremendous complexity of the Medicare and Medicaid statutes, which adds to the deference due to the Secretary's decision. Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1229 (D.C. Cir. 1994).

"The requirement that [an] agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995). However, the agency's explanation "need not be a model of analytic precision to survive a challenge" under the APA, Frizelle v. Slater, 111 F.3d 172, 176 (D.C. Cir. 1997), and courts "will uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned."  <u>Bloch</u>, 348 F.3d at 1068 (citing <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)).  However, courts may not supply an explanation for agency action that the agency itself did not provide.  <u>See</u> <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 88 (1943).  And "[d]eference to what appears to be nothing more than an agency's convenient litigating position [is] entirely inappropriate."  <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 213 (1988).

When the action under review involves an agency's interpretation of a statute that the agency is charged with administering, the court applies the familiar two-step analysis outlined in <u>Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).  Under the <u>Chevron</u> framework, the first step is determining whether Congress has spoken directly to the "precise question at issue," for if it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  <u>Id.</u> at 842-43.  When determining whether Congress has spoken to the "precise question at issue," courts must first "employ[] traditional tools of statutory construction."  <u>Id.</u> at 843 n.9.  If, however, the statute is silent or ambiguous with respect to the specific issue, "the question for the Court is whether the agency's answer is based on a permissible construction of the statute."  <u>Id.</u> at 843.

Finally, in reviewing an agency's interpretation of its regulations, courts must afford the agency substantial deference, giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation."  <u>Thomas Jefferson</u>, 512 U.S. at 512; <u>Presbyterian Med. Ctr. of Univ. of Pa Health Sys. v. Shalala</u>, 170 F.3d 1146, 1150 (D.C. Cir. 1999).  Thus, so long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect.  <u>Wyo. Outdoor Council v. United States Forest Serv.</u>, 165 F.3d 43, 52 (D.C. Cir. 1999).  Where the regulations involve a complex, highly technical

regulatory program, such as in the Medicare context, broad deference is all the more warranted.

Thomas Jefferson, 512 U.S. at 512.

### III. THE PARTIES' ARGUMENTS

The plaintiff advances three main theories for why the Secretary's decision is incorrect. See Pl.'s Mem. at 2-6. First, the plaintiff claims that the MN/MI patient groups "received medical assistance under the approved [Arizona System] program, which is Arizona's Medicaid program." Id. at 2-3. The plaintiff asserts that "the undisputed record evidence and the factual findings in the proceedings below show that the State made Medicaid DSH payments to the . . . [h]ospitals for services furnished to the patients in the [MN/MI patient groups] at issue, and the State received federal Medicaid matching funds for those payments." Id. at 3 (emphasis in original). Because of the Medicaid DSH payments, the plaintiff contends that the MN/MI patient groups "were receiving 'medical assistance,'" both as that term is defined in the statute, and as it has been previously interpreted by the Secretary. Id.

Second, the plaintiff asserts that "the term 'eligible' has been construed to refer to an individual's 'capability of receiving' medical assistance under a state Medicaid plan" in the context of the Medicare DSH calculation. Id. at 4-5 (citing Jewish Hosp., 19 F.3d at 274-75). As such, the plaintiff argues that even if the MN/MI patient groups did not actually receive medical assistance under Medicaid, they still should be included in the Medicare DSH calculations because they were capable of receiving such assistance under either mandatory or optional Medicaid eligibility categories. Id. In other words, the plaintiff posits that the MN/MI patient groups "could have received medical assistance under a state plan." Id. at 33 (first emphasis added).

Third, the plaintiff challenges the Administrator's determination that the MN/MI patient groups could not qualify for the hold harmless policy. Id. at 5. Specifically, the plaintiff claims that all of the hospitals "qualified for the Medicare DSH payment," and that one of the hospitals "received Medicare DSH payments for prior years based on the inclusion of" an otherwise ineligible day "in prior cost reporting periods." Id. Referencing the Question and Answer document, the plaintiff states that in rendering the decision about the hold harmless policy, the Secretary "relied solely on unpublished instructions that were issued to the Medicare fiscal intermediary contractors." Id. The plaintiff believes this constitutes a violation of the Medicare statute because these instructions were "not published or listed in the Federal Register." Id.

In opposition, the defendant contends that the Arizona System operates both Arizona's federal Medicaid program and its exclusively State-funded program. Def.'s Mem. at 1 (emphasis in original). According to the defendant, the MN/MI patient groups are members of the State-funded portion of the Arizona System, and are therefore not part of the "[Arizona] 'State plan approved under [Medicaid].'" Id. (alterations in original) (citing Adena, 527 F.3d at 178). In other words, the defendant contends the MN/MI patient groups "simply were not 'Medicaid patients' at all." Id. at 24.

With respect to the Secretary's determinations concerning the hold harmless policy, the defendant maintains that the plaintiff cannot qualify for its protections because "none of [the hospitals] received Medicare DSH adjustments that included days of State-only patients for any of the cost years at issue here," and "none [of them] can demonstrate a reasonable reliance interest in receiving these erroneous DSH payments." Id. at 2.

## IV. ANALYSIS

A.  The Exclusion of the MN/MI Patient Groups From the Medicare DSH Calculation

The first question for the Court to resolve is whether the MN/MI patient groups should have been included in the numerator of the Medicaid fraction.  If so, the Secretary miscalculated the reimbursement and the case must be remanded.  For the following reasons, the Court concludes the Secretary was correct, and the MN/MI patient groups were properly excluded.

Because the Court is reviewing the Secretary's interpretation of the Medicare DSH provision, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), the Court applies the two-step framework outlined in Chevron.  The first question for the Court then is whether Congress has spoken directly to the "precise question at issue," for if it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 842-43.  This inquiry starts with an assessment of the statutory language.  Carcieri v. Salazar, ___ U.S. ___, ___, 129 S. Ct. 1058, 1063-64 (2009).

Although the Medicare statute does not define the phrase "medical assistance," the District of Columbia Circuit has held that these words "ha[ve] the same meaning" in the Medicare statute "as [they have] in the federal Medicaid statute," where the phrase is defined.  Adena, 527 F.3d at 179.  According to the Medicaid statute, "medical assistance" is "'payment of part or all of the cost' of medical 'care and services' for a defined set of individuals."  Id. at 180 (quoting 42 U.S.C. § 1396d(a)).  And this defined group of individuals consists of patients who fall within one of thirteen categories of individuals to whom states may (or must) extend Medicaid benefits.  See 42 U.S.C. § 1396d(a).  Therefore, for an individual to be "eligible for medical assistance" for the purposes of the numerator of the Medicaid fraction, the individual must be eligible for Medicaid under the federal Medicaid statute.  See Northeast Hosp. Corp.,

2010 WL 1199311, at *7 (agreeing with this interpretation of the phrase "eligible for medical assistance").

Turning to the remainder of the statutory language, it follows that for a patient to be "eligible for medical assistance under a State plan approved under [Medicaid]," 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), the patient must be eligible for Medicaid payment under the approved State Medicaid plan. See Cabell Huntington Hosp. Inc., v. Shalala, 101 F.3d 984, 989 (4th Cir. 1996) ("It is apparent that 'eligible for medical assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a particular state's Medicaid plan, whether or not they are actually receiving payment for a particular type of service[.]") (emphasis added); Phoenix Mem'l Hosp. v. Leavitt, No. 07-1720, slip op. at 15 (D. Ariz. Jan. 12, 2009) ("[The Medicare DSH statute] states that any patient who is eligible for medical assistance under an approved state plan can be included in the numerator."); Deaconess Health Servs. Corp. v. Shalala, 912 F. Supp. 438, 447 (E.D. Mo. 1995) ("The plain words of the [Medicare DSH] statute indicate that the numerator is to consist of the patient days . . . which are attributable to patients 'eligible' for medical assistance under a state Medicaid plan."), aff'd, 83 F.3d 1041 (8th Cir. 1996); see also 42 C.F.R. § 412.106(b)(4)(i) ("A patient is deemed eligible for Medicaid on a given day if the patient is eligible for medical assistance under an approved State Medicaid plan on such day . . . .").

As a basis for her decision, the Secretary concluded that the "days involved in this case are related to individuals that are not eligible for 'medical assistance' as that term is used under Title XIX[,]" A.R. at 16, and there is evidence in the record to support this conclusion. For example, the Secretary cited to a 2002 Arizona System Overview document, see A.R. at 15 n.36, which describes how the Arizona System "was the first statewide, managed care Medicaid

program in the nation to rely on Health Plans to deliver acute care services to both Medicaid <u>and state-funded populations</u>."  <u>Id.</u> at 233 (emphasis added); <u>see also</u> <u>id.</u> at 228 ("On October 1, 1982, [the Arizona System] became the first statewide Medicaid managed care system in the nation.").  The distinction between Medicaid and state-funded populations sheds light on Medicaid eligibility within the Arizona System when seen in context with the other evidence in the record.

Significantly, in another Arizona System Overview document from 2001, <u>see</u> <u>id.</u> at 745, 751-81, the Arizona System describes itself as "Arizona's Medicaid program, <u>and the State's health care program for persons who do not qualify for Medicaid</u>."  <u>Id.</u> at 745 (emphasis added); <u>see also</u> Docket Entry Number 17, Defendant's Notice of Filing, A.R. at 747 ("[The Arizona System] was charged with the new responsibility of operating a 100% state-funded program for indigent persons who did not qualify for Medicaid.").  That document also indicates that the membership of the Arizona System was composed of "575,620 Title XIX [i.e., Medicaid] individuals," and "28,185 individuals in State-only funded programs."  A.R. at 745.  The 2001 Arizona System Overview document also explains how the Arizona System "was waived from providing some mandatory services normally covered under traditional Medicaid," and that "[s]ervices were also provided to State-only funded groups."  <u>Id.</u> at 751; <u>see</u> <u>id.</u> at 751-52 (listing fourteen provisions of Medicaid that the Arizona System was not required to comply with).

The delineation between the Medicaid and State-funded populations also shows that the MN/MI patient groups were not eligible for federal Medicaid benefits <u>under the Arizona System</u>. As the Secretary explained, "[u]nder Arizona's § 1115 demonstration project waiver as approved by [the] CMS, only the categorically needy receive direct [f]ederal [f]inancial [p]articipation . . . . The State has also decided to provide services to three other groups, for which no [federal

financial participation] is paid, each with different State eligibility requirements." A.R. at 15. The Secretary indicated that the MN/MI patient group "is not referenced as an expanded eligibility group under the waiver," id. at 17, and "the [State-only groups] were not approved by the Secretary and included for payment under the waiver." Id.

In other words, the Arizona System covered the "categorically needy" as required by a Medicaid state plan, see Walsh, 538 U.S. at 651, but at the "option of the State," 42 U.S.C. § 1396a(a)(10)(A)(ii), Arizona elected not to cover the MN/MI patient groups under its Medicaid State plan and instead covered them under the State-only portion of the Arizona System. See A.R. at 745. Compare A.R. at 301-02 (Ariz. Rev. Stat. Ann. § 36-2901(4)(a), (c), & (h) (1997)) (providing eligibility criteria under Arizona law for the medically indigent, medically needy, and eligible children groups), with id. (Ariz. Rev. Stat. Ann. § 36-2901(4)(b)) (providing separate eligibility criteria for Medicaid eligible group). Indeed, under Arizona law in effect in 1999, the administrator of the Arizona System was authorized to apply for federal funds to "be used only for the support of persons defined as eligible pursuant to [T]itle XIX of the [S]ocial [S]ecurity [A]ct[,]" Ariz. Rev. Stat. Ann. § 36-2903.01(B)(5) (1999) (emphasis added), meaning these funds could not be used to support the State funded groups.[14] Consequently, while the MN/MI patient groups were part of the Arizona System, the manner in which the Arizona System was structured during the relevant time periods rendered the MN/MI patient groups ineligible for Medicaid under Arizona's State plan.[15] See Cabell Huntington, 101 F.3d at 989; Univ. of Wash.

_____

[14] Although the plaintiff points out that this statute is not part of the administrative record, Pl.'s Opp'n & Reply at 7-8, the Court can take judicial notice of the legislative acts of both federal and state legislative bodies. Fed. R. Evid. 201(a) advisory committee's note; Lamar v. Micou, 114 U.S. 218, 223 (1885); see also Demos v. City of Indianapolis, 302 F.3d 698, 706 (7th Cir. 2002) ("[A] district court can always rely on public statutes.").

[15] The Court notes that this conclusion comports with those of two other district courts that have considered the nature of the Arizona System. See Phoenix Mem'l Hosp., slip op. at 24 ("[The] MN/MI patient[ groups] . . . were not eligible for medical assistance under Arizona's Medicaid plan, even though they were eligible for medical

(continued . . . )

Med. Ctr. v. Sebelius, 674 F. Supp. 2d 1206, 1212-13 (W.D. Wash. 2009) ("Because Washington's state plan does not confer Medicaid eligibility on [the disputed patient groups], the administrator's finding that [these] patients are not Medicaid patients is supported by substantial evidence.").

In addition, the Secretary's analysis of how the Arizona System was funded, see A.R. at 15-17, provides more compelling evidence that the MN/MI patient groups were properly excluded from the Medicare DSH calculation. Namely, there is substantial evidence in the record that during the cost years at issue the MN/MI patient groups did not receive federal financial participation from the Secretary, and therefore were not receiving care "under a State plan approved under [Medicaid]." Id. § 1395ww(d)(5)(F)(vi)(II). As the District of Columbia Circuit recently explained in interpreting the Medicaid fraction under Chevron step one, "an approved State Medicaid Plan . . . must pay providers for the care of eligible patients." Adena, 527 F.3d at 178 (emphasis added) (citing 42 U.S.C. §§ 1396a-1396b, 1396d(a), (b)).[16] And as the statutes cited in that portion of the opinion make clear, the payment must come from the Secretary. E.g., 42 U.S.C. § 1396b(a) ("From the sums appropriated therefor, the Secretary . . . shall pay to each State which has a plan approved under this subchapter . . . ."); see also Northeast Hosp. Corp., 2010 WL 1199311, at *7-8 (relying on Adena in finding that

---

( . . . continued)
assistance under [the Arizona System]."); Newton-Nations v. Rodgers, No. 03-2506, 2010 WL 1266827, at *10 (D. Ariz. Mar. 29, 2010) ("Arizona has a Medicaid State Plan approved by [the Secretary]. Members of the [p]laintiff class, while of low income and in need of medical care, are not eligible for Medicaid under Arizona's State Plan, that is, they are not 'categorically needy' individuals. Arizona has opted not to include coverage for the 'medically needy' population in its State Plan.").

[16] The plaintiff attempts to distinguish the situation in Adena by arguing, among other things, that there the plaintiffs conceded that the Ohio Charity Care patients were not eligible for medical assistance under the Medicaid statute. See Pl.'s Mem. at 32 n.11. But by admitting here that that Arizona did not receive federal matching funds for the MN/MI patient groups, see A.R. at 193 (Stipulations before the Reimbursement Board ¶ 7); Compl. ¶ 65, the plaintiff has made a similar concession. And the fact that the plaintiffs in Adena conceded they were not eligible for Medicaid does not mean the Secretary's decision in this case is not supported by substantial evidence.

Massachusetts charity care patients did not receive care "under a State Medicaid plan"); Univ. of Wash. Med. Ctr., 674 F. Supp. 2d at 1212 ("[T]he relevant issue is whether the [disputed patient groups] directly receive[d] federal matching funds under Medicaid."); Phoenix Mem'l Hosp., slip op. at 23-24 ("If the MN/MI populations had been part of Arizona's approved Medicaid plan, Arizona should have been receiving [federal financial participation] for them.").

Here, the Secretary identified a number of items in the record concerning federal funding. See A.R. at 15 n.37. For example, the Secretary cited the stipulations the plaintiff submitted to the Reimbursement Board, wherein the plaintiff admitted that during "the periods at issue here, the State did not receive federal financial participation . . . for direct expenditures made by [the Arizona System] for benefits furnished to recipients in the [MN/MI patient groups]." Id. at 193 (Stipulations before the Reimbursement Board ¶ 7); see also Compl. ¶ 65. The Secretary also pointed to excerpts from the Reimbursement Board hearing, where witnesses testified that the federally funded portion of the Arizona System was expanded after 2001 to include federal funding for the MN/MI patient groups. See A.R. at 176 (Reimbursement Board Hearing Transcript ("Hr'g Tr.") 270:13-271:4, Mar. 18, 2004), 179 (Hr'g Tr. 283:18-284:18). In addition, the Secretary referenced the declaration of a former Deputy Director of the Arizona System, who stated that "[a]lthough Arizona received Title XIX federal matching funds for direct expenditures made for health care services provided to most of its eligibility groups, medical assistance furnished by [Arizona System] to indigent individuals in [the MN/MI patient] groups were funded, until 2001, only by the State or counties." A.R. at 354 (Declaration of Branch McNeal ¶ 4). Indeed, if the MN/MI patient groups were already part of the Arizona "State plan approved under Medicaid," Arizona did not have to expand the federally funded portion of the Arizona System in 2001 to include the MN/MI patient groups. See id. at 354-55

(Declaration of Branch McNeal ¶ 5); cf. A.R. at 241, 247 (describing the two major amendments to the Arizona System approved by the CMS in 2001). Accordingly, the record shows that during the fiscal years in dispute the MN/MI patient groups were not receiving federal financial participation from the Secretary, and therefore were not receiving care provided "under [Arizona's] State plan approved under [Medicaid]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The plaintiff's various arguments that the MN/MI patient group received "medical assistance from the Arizona Medicaid Program," see Pl.'s Mem. at 22-33, are unavailing. As the record shows, the Arizona System "is Arizona's Medicaid program, and the State's health care program for persons who do not qualify for Medicaid." A.R. at 745 (emphasis added). The fact that the plaintiff and the fiscal intermediary stipulated before the Reimbursement Board that Arizona's Medicaid program is the Arizona System, id. at 192 (Stipulations before the Reimbursement Board ¶ 4), is not binding on the Secretary because she was not a party to those proceedings. E.g., Appalachian Reg'l Healthcare, Inc., v. Shalala, 131 F.3d 1050, 1053 n.4 (D.C. Cir. 1997) ("Of course, the intermediary's position is not the Secretary's."). And the fact that the defendant admitted that the Arizona System is the Arizona Medicaid Program, see Compl. ¶ 50; Answer ¶ 50, is not enough to overcome the deferential review the Court must accord to the Secretary's factual findings that the Arizona System during the time period relevant to this litigation was a "Statewide managed care system," A.R. at 15, in which "[t]he State . . . also decided to provide services to three other groups, for which no [federal financial participation] is paid, each with different State eligibility requirements," id.; see also A.R. at 745; Docket Entry Number 17, Defendant's Notice of Filing, A.R. at 746 (explaining that the "Medicaid portion of the [Arizona System] has operated under an 1115 Research and Demonstration Waiver since 1982") (emphasis added).

As to the plaintiff's argument concerning Arizona's receipt of federal funding via the Medicaid DSH provision, Pl.'s Mem. at 29-33, the hospitals receipt of these funds does not establish that the MN/MI patient groups were eligible for medical assistance under the Arizona State Medicaid plan.  See Adena, 527 F.3d at 179 ("the Secretary's approval of [Ohio's Medicaid DSH program] does not suggest in any way that the [Ohio Hospital Care Assurance Program] patients receive care pursuant to the Ohio Medicaid plan."); Northeast Hosp. Corp., 2010 WL 1199311, at *7 ("[E]ven assuming that the federal [Medicaid DSH funds] specifically pay for the treatment of the Hospital's charity care patients . . . those charity care patients are not rendered 'eligible for medical assistance.'"); Univ of Wash. Med. Ctr., 674 F. Supp. 2d at 1212 ("Just because a patient is counted for purposes of the Medicaid DSH payment does not mean that the patient is eligible for Medicaid benefits . . . .").[17]

This conclusion is called for because "the Medicaid DSH provision permits states to adjust DSH payments 'under a methodology that' considers either patients eligible for medical assistance under a State plan approved under [Medicaid] or . . . low income patients." Adena, 527 F.3d at 180 (quoting 42 U.S.C. § 1396r-4(c)(3)(B)).  Compare 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (Medicare DSH calculation strictly limiting DSH calculations to include only patients who were "eligible for medical assistance under a State plan approved under

---

[17]  Relying on a two-page letter from the CMS to State Medicaid directors sent in 2002, Attachment to Answer, Letter from Dennis G. Smith, Director, Center for Medicaid and State Operations, CMS, to State Medicaid Directors (Aug. 16, 2002), the plaintiff contends that the Secretary has previously taken the position that a State "provides medical assistance to individuals under a [State] plan by virtue of including the cost of services in the calculation of the State's Medicaid DSH payments to hospitals, even if those individuals would not otherwise be considered eligible for Medicaid."  Pl.'s Opp'n & Reply at 10-12; see also Pl.'s Mem. at 30-31.  But as a reading of that document reflects, the purpose of that letter was to clarify the treatment of costs of hospital care for prisoners with respect to the Medicaid DSH calculation, not determine the overall status of prisoners under the Medicaid statute. And in any event, the District of Columbia Circuit rejected the plaintiff's proposed reading of the statute, see Adena, 527 F.3d at 178, 180 (resolving the issue of what qualifies as "medical assistance" under Chevron step one), and it is Congress's unambiguous definition of this term that controls.  Northeast Hosp. Corp., 2010 WL 1199311, at * 7 (citing Am. Fed'n of Gov't Employees, AFL-CIO v. Gates, 486 F.3d 1316, 1321-22 (D.C. Cir. 2007).

subchapter XIX"), with 42 U.S.C. § 1396r-4(a)(1) (Medicaid DSH provision allowing states to include not only patients eligible for assistance under the Medicare DSH provision, but also other low-income individuals). Moreover, state Medicaid plans are required to contain a methodology for making Medicaid DSH payments, 42 U.S.C. § 1396r-4(a), and the Secretary "must approve that plan." Adena, 527 F.3d at 179. In fact, the Medicare statute actually provides for another type of adjustment, known as the "Pickle method," for hospitals "serving a significantly disproportionate number of low income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I) (emphasis added); see Cooper Univ. Hosp. v. Sebelius, 686 F. Supp. 2d 483, 494 (D.N.J. 2009) (discussing the Pickle method).

In short, the Medicaid DSH provision specifically accounts for "low income patients" while the Medicare DSH provision at issue here does not. And when Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate . . . exclusion." Rodriguez v. United States, 480 U.S. 522, 525 (1987); see also Cooper Univ. Hosp., 686 F. Supp. 2d at 494 (discussing the differences in the Medicare and Medicaid DSH provisions and commenting that the plaintiff "may continue to include [charity care patients] when calculating Medicaid DSH rate adjustments, but those same patients cannot be included in the far narrower DSH provisions in the Medicare [DSH] statute."). Therefore, the fact that the MN/MI patient groups were included when calculating the Medicaid DSH payment does not render the MN/MI patient groups beneficiaries of the Medicaid program, any more than Medicaid patients are beneficiaries of the Medicare program simply because they were included in the Medicare DSH calculation. See Adena, 527 F.3d at 179 n.**; Cooper Univ. Hosp., 686 F. Supp. 2d at 495.

The plaintiff's other core argument, that the MN/MI patient groups "could" have been made eligible under "a" state plan–Pl.'s Mem. at 33-38–is also not persuasive.  As the defendant observes, Def.'s Mem. at 33, the logical conclusion of such an interpretation would require the Secretary to include in the Medicaid fraction days of anyone who could receive benefits under a hypothetical state plan, an anomalous result under the statute.  See Cooper Univ. Hosp., 686 F. Supp. 2d at 494 ("Congress recently amended the Medicare DSH provision, suggesting Congress' intent to narrowly apply the Medicaid proxy fraction.") (citing Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31).  Indeed, one possible reading of the plaintiff's argument would ignore the fact that Medicaid eligibility is tied to state residency.  See 42 C.F.R. § 435.403(a).  Moreover, the plaintiff's focus on "a State plan," Pl.'s Mem. at 35 (emphasis in original), is misleading because it omits the full definition of the Medicaid fraction, which refers to "a State plan approved under [Title] XIX."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

Furthermore, in the cases concerning the meaning of "eligibility," the courts have not held patients to be eligible for Medicaid because they could have received medical assistance under some hypothetical plan, but rather that patients were eligible for Medicaid when they otherwise met the enrollment criteria set forth in the State plan approved by the Secretary.  See, e.g., Cabell Huntington, 101 F.3d at 987 (observing that patients otherwise meeting income and status requirements under the Medicaid state plan were still "eligible" for Medicaid even though they exhausted available services in one category of benefits); id. at 989 ("It is apparent that 'eligible for medical assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a particular state's Medicaid plan, whether or not they are actually receiving payment for a particular type or service or for a particular duration of coverage.") (emphasis added); Deaconess Health Servs. Corp., 912 F. Supp. at 447 ("The plain

words of the [Medicare DSH] statute indicate that the numerator is to consist of the patient days . . . which are attributable to patients 'eligible' for medical assistance <u>under a state Medicaid plan</u>.") (emphasis added).[18]

In addition, the plaintiff's argument would put the burden on the Secretary to determine who might be eligible under some hypothetical state Medicaid plan, when it is the hospitals who have the burden to establish whether patients should be included in the Medicaid fraction. <u>See</u> 42 C.F.R. § 412.106(b)(4)(ii) ("The hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under [the Medicaid fraction], and of verifying with the State that a patient was eligible for Medicaid during each claimed hospital day."); A.R. at 403 ("[T]he hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay."); <u>see also</u> <u>Visiting Nurse Ass'n Gregoria Auffant, Inc., v. Thompson</u>, 447 F.3d 68, 77 (1st Cir. 2006) ("The burden of proof is on the provider seeking reimbursement to demonstrate whether a cost is eligible for reimbursement."); <u>Friedman v. Sec'y of Dep't of Health & Human Servs.</u>, 819 F.2d 42, 45 (2d. Cir. 1987) ("A claimant nevertheless has the burden of proving entitlement to Medicare benefits.").[19]

---

[18] <u>Jewish Hospital</u>, 19 F.3d 270, cited frequently by the plaintiff, <u>e.g.</u>, Pl.'s Mem. at 4, 25, 26, 36, 37, does not change the outcome here. In that case, the Sixth Circuit concluded only that the Secretary's interpretation of the phrase "eligible for medical assistance" to mean "entitled to medical assistance" was contrary to the plain meaning of the Medicare DSH statute, or at least was an impermissible interpretation of an ambiguous provision. <u>See</u> 19 F.3d at 274-76. The court explained that although "[t]here is no indication from the text of the statute that Congress intended to impute any special meaning to the term, eligible," <u>id.</u> at 274, "Congress intended [the term 'eligible'] to refer to the qualification for Medicaid benefits," <u>id.</u> at 275. That case, however, did not address the impact of the phrase eligible for medical assistance in the context of demonstration projects approved under § 1115, or whether individuals other than those in the mandatory categorically needy Medicaid eligibility groups were eligible for medical assistance. <u>See also</u> <u>id.</u> at 276-86 (Batchelder, J., dissenting) (criticizing the majority opinion).

[19] And here, during testimony before the Reimbursement Board, the fiscal intermediary's representative explained that in the process of auditing the hospital's cost reports, Arizona provided the hospitals' data concerning all Arizona System patient days, not just patients already enrolled in Medicaid, but all Medicaid eligible days. <u>See</u> A.R. at 168 (Hr'g Tr. 239:23-240:13). As a result, the hospitals had the opportunity to "go through their internal listing to

(continued . . .)

In sum, the Medicaid fraction requires that a patient be eligible for medical assistance (i.e., eligible for federal Medicaid funds) under the approved state Medicaid plan.  During the cost years under review, the MN/MI patient groups were part of the State-funded portion of the Arizona System, which consisted of patients who were not eligible for Medicaid as admitted by the Arizona System, and not "eligible for medical assistance under the [Arizona] State plan approved under [Medicaid]" because of the manner in which the Arizona System was designed. Furthermore, the fact that Arizona neither applied for nor received federal financial participation for the MN/MI patient groups establishes that the care these patients received was not provided under the Arizona "State plan approved under Medicaid."  Accordingly, the Secretary's decision to exclude the MN/MI patient groups from the Medicaid fraction of the Medicare DSH calculation was not arbitrary and capricious and is supported by substantial evidence.

B. The Secretary's Decision Concerning the Hold Harmless Policy

The second issue for the Court to resolve is whether the Secretary correctly found that the hospitals did not qualify for the hold harmless policy outlined in the Program Memorandum. The policy provision relevant to this case instructs the fiscal intermediaries that "[f]or cost reporting periods beginning before January 1, 2000, you are to continue to allow these types of days in the Medicare DSH calculation for all open cost reports only in accordance with the practice followed for the hospital at issue before October 15, 1999."  A.R. at 404 (emphasis added).  For the following reasons, the Court concludes that the Secretary was correct with respect to three of the hospitals, Desert Medical Center, Thunderbird Medical Center, and Maryvale Hospital Medical Center, but incorrect as to Good Samaritan Medical Center.

---

( . . . continued)
find these days that would represent eligible Title [XIX] days that weren't paid by [the Arizona System]."  Id. (Hr'g Tr. 240:14-18).  In other words, the hospitals had the opportunity to include patients eligible for Medicaid in their Medicare reimbursement cost reports, and they did not do so.

In rendering her decision, the Secretary did not consider the express language from the hold harmless policy, but instead focused on its intent, which she explained was "to prevent hardship on hospitals that were relying on the payment based on prior treatment and receipt of these [Medicare DSH] funds." A.R. at 19. Importantly, though, the Secretary found that "from 1990 forward, the State of Arizona (i.e., [the Arizona System]) excluded MN/MI population days from the data reported to the [fiscal] [i]ntermediary." Id. at 18. And based on that finding, the Secretary reasoned that the hospitals could not qualify for the hold harmless policy because they "had no expectation of being paid for the MN/MI population days at issue." Id. at 19. The Secretary then added that this conclusion was "supported by" the Question and Answer document. Id.[20]

As summarized above, the plaintiff contends that the hospitals are entitled to payment under the prior practice component of the hold harmless policy, and further claims that the Secretary impermissibly relied on the Question and Answer document. See Pl.'s Mem. 38-42.[21] However, the applicable standard of the hold harmless policy states that hospitals will be paid "in accordance with the practice followed for the hospital at issue before October 15, 1999." A.R. at 404. And "practice," in the everyday sense of the word, means "to do or perform often,

---

[20] As noted earlier, the Secretary found that the plaintiff could not qualify under the second part of the hold harmless policy, because none of the hospitals filed a jurisdictionally proper appeal to the Reimbursement Board by the October 15, 1999, deadline set out in the Program Memorandum. A.R. at 20; see also id. at 193 (Stipulations before the Reimbursement Board ¶ 11) ("The [hospitals] began raising the issue of whether the [MN/MI patient groups] should be included in the Medicaid fraction in 2000.").

[21] Chippewa Dialysis Servs. v. Leavitt, 511 F.3d 172 (D.C. Cir. 2007), relied on by the plaintiff, Pl.'s Mem. at 40-41, is distinguishable from this case. There, in determining whether to grant an "[a]typical service intensity" payment adjustment to the reimbursement rate for end stage renal disease treatment, 511 F.3d at 173, the Secretary relied on a 3.0 hours per treatment standard that had not been published in the Federal Register, id. at 176. The District of Columbia Circuit found that the standard employed by the Secretary "qualifie[d] . . . as a guideline of general applicability," which the Medicare Act "require[d] the Secretary to publish . . . in the Federal Register." Id. at 177. In this case, by contrast, the Program Memorandum (and thus the standard concerning the "practice followed" by the particular hospital) was in fact published in the Federal Register. See Medicare and Medicaid Programs; Quarterly Listing of Program Issuances–Fourth Quarter 1999 through First Quarter, 2002, 67 Fed. Reg. 43,762, 43,765 (June 28, 2002).

customarily, or habitually," or "the usual mode or method of doing something." Webster's Third New International Dictionary 1780 (3d. ed. 1981). In this case, the record demonstrates that the "practice followed" by Desert Medical Center, Thunderbird Medical Center, and Maryvale Medical Center during the cost years they are appealing was to not include the MN/MI patient groups in their cost reports.

To begin with, the record reflects that the Arizona System was instructed by the CMS to "use the Title [XIX] [Arizona System] data from 1990 onward to settle the affected Medicare cost reports." See Docket Entry Number 17, Defendant's Notice of Filing, A.R. at 333, Letter from Eugene L. Chinn, Chief of Financial Operations, Division of Medicare, to Bonnie Irwin, Provider Audit Department, Blue Cross/Blue Shield Arizona (Jan. 30, 1992); see also A.R. at 449, Memorandum from Debbie Donovan to the Audit and Reimbursement Staff (Jan. 10, 1992) ("Per the May 6, 1986 Federal Register, page 15777, for purposes of determining a hospital's disproportionate patient percentage, [Arizona System] covered days will include only those days for which benefits are payable under Title XIX.") (emphasis in original); A.R. at 456, Letter from Denise Marshall, Director, Federal Programs Medicare, to Lynda Miller, Director, Regulatory Programs, Samaritan Health Services (Feb. 12, 1992) ("For cost reports ending during and after 1990, Title XIX days will be used in the DSH calculation . . . . Current interim payments for DSH will be revised to reflect the inclusion of Title XIX days only.") (emphasis added). In fact, before 1990, it appears that it was impossible for the fiscal intermediaries to "accurately segregate Title [XIX] days from total [Arizona System] days." Docket Entry Number 17, Defendant's Notice of Filing, A.R. at 333, Letter from Eugene L. Chinn, Chief of

Financial Operations, Division of Medicare, to Bonnie Irwin, Provider Audit Department, Blue Cross/Blue Shield Arizona (Jan. 30, 1992).[22]

Consequently, there is nothing in the record showing that either Desert Medical Center, Thunderbird Medical Center, or Maryvale Hospital Medical Center ever received an erroneous Medicare DSH payment containing otherwise ineligible days during the fiscal years under review. Indeed, these three hospitals did not even qualify for Medicare DSH eligibility until after 1990, A.R. at 82, and the earliest cost year they are appealing is 1994, Compl. ¶ 8, which is well after the CMS issued its instructions about the patient days to use in the Medicaid fraction. Thus, the "practice followed" by Desert Medical Center, Thunderbird Medical Center, and Maryvale Hospital Medical Center during the relevant time periods was not to include the MN/MI patient groups in their cost reports. Accordingly, the Secretary's determination that the hold harmless policy did not apply to these hospitals is supported by substantial evidence and represented a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43.

As to the remaining hospital, Good Samaritan Medical Center, the picture is somewhat less clear. In particular, the record shows that it received erroneous final Medicare DSH payments from 1986 to 1989, see A.R. at 134-35 (Hr'g Tr. 104:19-105:14), and from 1990 to 1992 received erroneous interim Medicare DSH payments that never became final payments. See generally id. at 176-78 (Hr'g Tr. 272:19-277:13). Thus, whatever their practice was after 1992, it is unclear what their earlier practice had been. And while the Arizona System was

---

[22]  As to the Secretary's reference to the Question and Answer document, the Court observes that the Secretary used it only to "support" the earlier factual finding that the MN/MI patent groups were being excluded from the Medicaid fraction beginning in 1990. A.R. at 19. And given the evidence in the record on this point, the Secretary's failure to publish this document in the Federal Register did not amount to prejudicial error under the APA. See AFL-CIO v. Chao, 496 F. Supp. 2d 76, 87 (D.D.C. 2007) ("The prejudicial-error rule . . . treat[s] an agency's failure to follow notice-and-comment procedures as harmless where the approach adopted by the agency is 'the only reasonable one.'" (quoting Sheppard v. Sullivan, 906 F.2d 756, 762 (D.C. Cir. 1990))).

excluding the MN/MI patient groups from the Medicaid fraction beginning in 1990, the actual instructions to implement this practice derive from documents all dated in 1992. E.g., A.R. at 456. Thus, because the cost years Good Samaritan Medical Center is appealing include time periods prior to 1992, Compl. ¶ 8, the Court finds the Secretary erred in her application of the hold harmless policy to those cost years prior to 1992. Accordingly, the Court will remand this case back to the Secretary for a closer examination of what Good Samaritan Medical Center's practice was during the cost years it is appealing.

## V. CONCLUSION

For the reasons set forth above, the Court finds that the Secretary properly excluded the MN/MI patient groups from the Medicare DSH calculation and correctly determined that three of the four hospitals did not qualify for relief under the hold harmless policy. However, the Court concludes that the Secretary failed to properly apply the hold harmless policy to Good Samaritan Medical Center. Accordingly, both the plaintiff's and the defendant's motions for summary judgment are granted in part, and denied in part, and this case is remanded to the Secretary for further proceedings consistent with this opinion. An Order accompanies this Memorandum Opinion.

**SO ORDERED** this 7th day of June, 2010.

_____/s/_____
Reggie B. Walton
United States District Court Judge